## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **KAMRAN KHODAKHAH,** | |
| *Plaintiff,* | |
| **v.** | Civil Action No._____ |
| **MONTEFIORE HEALTH SYSTEM, INC., MONTEFIORE MEDICAL CENTER, MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF MEDICINE, GORDAN TOMASELLI, PABLO CASTILLO, BRYEN JORDAN, JOHN—JANE DOES 1-10,** | <u>**VERIFIED COMPLAINT**</u>  **JURY TRIAL DEMANDED** |
| *Defendants.* | |

Plaintiff Kamran Khodakhah, by and through his attorneys, Nesenoff & Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York N.Y. 10001, alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

## <u>THE NATURE OF THIS ACTION</u>

1.      Plaintiff Kamran Khodakhah ("Plaintiff" or "Dr. Khodakhah") is a scientist and academic researcher who is employed by Albert Einstein College of Medicine ("Einstein"), as a tenured professor of neuroscience, psychiatry, and behavioral sciences.

2.      In or about March 2022, Einstein commenced a series of adverse actions against Dr. Khodakhah's employment based on erroneous, bad faith allegations, instigated by Dr. Bryen Jordan ("Dr. Jordan") and Dr. Pablo Castillo ("Dr. Castillo"), professors in Einstein's departments of Neuroscience and Psychiatry, who were motivated by personal animus toward Dr. Khodakhah

1.

and their shared desire to oust him from his appointment as Chair of the Department of Neuroscience.

3.    Exploiting gender stereotypes and campus concerns with sexual harassment, Einstein's then dean, Gordan Tomaselli ("Dean Tomaselli"), "suspended" then permanently dismissed Dr. Khodakhah from his appointment as Chair, on July 11, 2022, based on allegations which Einstein's Title IX office knew were baseless.

4.    Not satisfied with Dr. Khodakhah's unlawful ouster as Chair, on July 11, 2022, Einstein's Title IX office issued Dr. Khodakhah two erroneous Title IX complaints, which were used as the basis to take further unwarranted sanctions against his employment.

5.    On July 13, 2022, Dean Tomaselli erroneously charged Dr. Khodakhah with a "flagrant disregard" of a purported "no retaliation" policy and ordered Dr. Khodakhah suspended from duty and "immediately removed" from campus.  The dean's suspension and removal order remains in effect today and continues to unlawfully deny Dr. Khodakhah access to his research laboratory, making it impossible for him to perform academic research and all of his other required academic obligations as a tenured faculty member.

6.    Following a procedurally irregular Title IX process in which Einstein chose to apply its obsolete Title IX Policy, on December 18, 2023, Einstein issued Dr. Khodakhah a decision in which it purported to find him "responsible" for one of the two erroneous Title IX complaints and imposed additional unduly harsh sanctions upon Dr. Khodakhah.

7.    The multiple adverse actions Einstein has taken against Dr. Khodakhah's employment have been in total disregard for his contractual rights under the terms of his appointment, which incorporate Einstein's various employment, discipline, and Title IX policies.

8.      Einstein's actions have also violated Dr. Khodakhah's rights under Title IX, the New York State Human Rights Law (the "SHRL") and the New York City Human Rights Law (the "CHRL"), as they constitute prohibited sex discrimination and retaliation.

9.      As a result of Defendants' unlawful actions, Dr. Khodakhah has suffered tremendous harm.  He has been unlawfully prohibited from performing his academic obligations as a tenured faculty member in Einstein's Neuroscience department.  His reputation and stature as a leading scientist in his field have been sullied, if not destroyed, making it impossible for him to continue in his profession, in or outside of Einstein.

10.     Accordingly, through this civil action, Dr. Khodakhah seeks damages and injunctive relief.

## THE PARTIES

11.     Plaintiff Dr. Khodakhah is a natural person who is domiciled in Harrison, New York and holds an appointment as a tenured professor at Albert Einstein College of Medicine.

12.     Defendant Montefiore Medical Center ("MMC") is a teaching hospital located in the Bronx, New York and is a New York not-for-profit corporation.

13.     Defendant Montefiore Health System, Inc. ("MHS") is a New York not-for-profit corporation and the University Hospital for Albert Einstein College of Medicine.

14.     Defendant Albert Einstein College of Medicine ("Einstein") is a private medical school located in the Bronx, NY, chartered by the Board of Regents of the New York State Department of Education, and is a subsidiary of MHS.

15.     Defendant Montefiore Medicine Academic Health System, Inc. ("MMAH" or "Montefiore") is a New York not-for-profit organization and is the corporate parent and umbrella

organization of Defendants Einstein and MHS.  MMAH does business under the marketing name "Montefiore Medicine."

16.     Defendants MMC, MHS, Einstein, and MMAH each receive federal funding.

17.     Defendants Einstein, MMC, MHS, and MMAH do business collectively under the marketing name "Montefiore Einstein."

18.     The operations of Defendants of Einstein, MMC, MHS, and MMAH are substantively interrelated, and are under common management and ownership.

19.     Defendant Gordan Tomaselli ("Dean Tomaselli") is a natural person and a resident of New York. Dean Tomaselli is a professor emeritus and dean emeritus at Einstein and was formerly the Dean of the School of Medicine at Einstein.

20.     Defendant Pablo Castillo is a natural person and resident of New York.  Dr. Castillo holds an appointment as a professor at Einstein.

21.     Defendant Bryen Jordan is a natural person and resident of New York.  Dr. Jordan holds an appointment as a professor at Einstein.

## JURISDICTION AND VENUE

22.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367 because the federal law claim arises under the Constitution and statutes of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

23.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

24.     This Court has personal jurisdiction over Defendants MMC, MHS, Montefiore-Einstein, and MMAH (collectively "Montefiore-Einstein") because they are established under the laws of New York State and operate in the State of New York.

25.     This Court has personal jurisdiction over Defendants Dean Tomaselli, Castillo, and Jordan because they are all residents of New York.

**I.      Dr. Khodakhah's Professional Background and Employment at Einstein**

      **A.      Dr. Khodakhah's 2001 Appointment to Einstein's Faculty, 2012 Tenured Appointment, 2014 Retention Agreement, and 2016 Promotional Appointment as Chair of Neuroscience**

26.     Dr. Khodakhah has dedicated the past 30 years to the pursuit of educational and research activities that have enabled him to reach the top of his profession in the study of the role of the cerebellum in various disease states.

27.     Dr. Khodakhah's career path began with 10-plus years of academic education and training.

28.     For the past 20 years, Dr. Khodakhah has been employed at Einstein as a professor of neuroscience, psychiatry and behavioral Sciences, and neurology.

29.     Dr. Khodakhah was appointed as a member of Einstein's faculty in 2001, at the rank of "Assistant Professor and In Residence status."

30.     In his 2001 appointment letter ("**2001 Appointment Letter**"), Dr. Khodakhah was guaranteed that his faculty appointment would be "subject to the terms outlined in [his] letter and to the provisions of [Einstein's] System of Appointments" and "other policies of [Einstein] applicable to faculty."

31.     Dr. Khodakhah received his first independent research grant from the National Institutes of Health ("NIH") in 2001, and his laboratory was continuously funded for the next 20 years.

32.     Since that time, Dr. Khodakhah established a first-class lab at Einstein that conducts innovative and highly funded research into normal and abnormal brain function.

33.     An integral part of Dr. Khodakhah's work as a faculty member has been teaching and mentoring the postdoctoral fellows and students who work in his lab, including PhD graduate students at Einstein and BSc, MA, and PhD students from other institutions.

34.     Dr. Khodakhah has taught, mentored, and directly supervised more than 50 such trainees and students, whose assistance is critical to Dr. Khodakhah's ability to conduct his research.

35.     For more than 20 years, Dr. Khodakhah's exemplary reputation as a scientist enabled him to give dozens of national and international lectures and seminars per year, which further elevated his stature and prominence in the scientific community and attracted PhD students and postdoctoral fellows to work in his laboratory as trainees.

36.     Over the years, Dr. Khodakhah has chaired or been on the roster of multiple NIH study sections. He has served on grant review boards for international grant agencies and charitable foundations dedicated to health research. He has also served on a range of advisory boards of numerous organizations.

37.     On September 11, 2012, Einstein granted Dr. Khodakhah tenure, in recognition of his highly productive and innovative research program and his capacity to obtain substantial external funding for his academic research.

38.     In 2012, following a large bequest to Einstein by Muriel Block, Einstein's then-dean, Allen Spiegel ("Dean Spiegel") decided to rejuvenate the Department of Neuroscience.  To do so, Einstein embarked on an international search to find a new Chair.

39.     To ensure that the department functioned smoothly during the search, Dean Spiegel appointed Dr. Khodakhah as Interim Chair of the Department of Neuroscience in 2013.

40.     It is widely known that Dr. Castillo wanted to be appointed as Interim Chair, and that he told others he thought he was more deserving than Dr. Khodakhah for the position.

41.     In 2014, Dr. Khodakhah was recruited to work at Northwestern University Feinberg School of Medicine, which offered him a faculty position with a large  endowment to support his research.

42.     Aware of Dr. Khodakhah's offer from Northwestern University, Einstein made Dr. Khodakhah a counter-offer with tangible incentives if he would remain at Einstein.

43.     Dr. Khodakhah declined Northwestern University's offer, with its large endowment, and accepted the terms of Einstein's counter-offer.

44.     Dr. Khodakhah and Einstein jointly signed a second appointment letter dated June 9, 2014, (**"2014 Retention Agreement"**), memorializing the terms of Einstein's counter-offer.

45.     The 2014 Retention Agreement specified, *inter alia,* that "should one or more of [Dr. Khodakhah's] R01 grants not be renewed, [Einstein] [was] committed to providing generous interim support (equivalent to the direct costs of the R01."

46.     In the next couple years, Dr. Khodakhah helped guide Einstein through a difficult separation from its long-standing affiliation with Yeshiva.

47.     After MHS and Yeshiva University finalized an agreement that transferred operational and financial responsibility for Einstein to MHS in 2015, Dr. Khodakhah worked as a member of a joint Einstein-Montefiore committee to help create a strategic plan for the newly formed Montefiore-Einstein enterprise.

48.     When the Einstein-Montefiore committee selected brain sciences as an area of focus, Dean Spiegel was tasked with restarting the search for a new Chair of Neuroscience to spearhead the "Brain Science Initiative," to reinvest in and reinvigorate brain research at Einstein-Montefiore.

49.     With the unanimous support of the Neuroscience faculty, notably absent one, Dr. Castillo, Dr. Khodakhah was appointed as Chair of the Department of Neuroscience in May 2016.

50.     Dr. Castillo made it widely known that he considered himself more qualified and better suited to serve as Chair than Dr. Khodakhah.

51.     Dr. Castillo is known to have harbored a long-standing personal grudge against Dr. Khodakhah since he was first passed over for the role of Interim Chair, and later Chair.

52.     In his May 3, 2016 appointment letter to the Chairmanship of the Neuroscience Department **("2016 Promotional Letter")**, Dr. Khodakhah was promised that his Chairmanship was "for an indefinite term," with "continuation . . . subject to performance as determined by the Dean."

53.     The 2016 Promotional Letter reaffirmed that "the Commitment to Interim Support" that was outlined in the **2014 Retention Agreement** would continue.

54.     As Interim Chair and later Chair, Dr. Khodakhah worked tirelessly to reinvigorate Einstein's Neuroscience department, and helped turn Neuroscience around from a department with a declining faculty, limited financial support and critical infrastructure, to a vibrant and growing community with a bright future.

55.     In 2020, Dr. Khodakhah was voted President Elect of the American Association of Medical School Neuroscience Department Chairs ("AMSNDC").

56.     By 2021, the Neuroscience Department was ranked tenth in the nation by the Blue Ridge Institute for Medical Research, based on total grant funding from the National Institutes of Health.

57.     Despite these accomplishments, the following year, Dr. Khodakhah would be dismissed from his appointment as Chair of Neuroscience by Dean Spiegel's successor,  Dean Gordon Tomaselli.

**B.     In 2020-2021, Dr. Khodakhah's Tenacious Advocacy for His Department Incurs Resentment of Einstein's New Dean, Gordon Tomaselli, M.D.**

58.     Following Dean Spiegel's retirement, Steven M. Sayer, M.D., then President and CEO of Montefiore, selected Gordon Tomaselli, M.D. ("Dean Tomaselli") as Dean Spiegel's successor.

59.     After being appointed dean in July 2018, Dean Tomaselli proved to be a poor leader, failing to perform the budgetary, fiduciary, and infrastructure responsibilities of a dean.

60.     Dean Tomaselli failed to secure basic services and resources for Einstein from Montefiore and ceded most of the powers of the office of dean to an oversight committee at Montefiore.  Consequently, the office of dean no longer has a meaningful role at Einstein.[1]

61.     As a result of Dean Tomaselli's failure to even attempt to secure funding for the repair of the Animal Facility for the Neuroscience Department, Neuroscience faculty could not perform their NIH-funded research.

---

[1] The Liaison Committee on Medical Education ("LCME"), the accrediting body for all medical education programs resulting in an M.D. program in the U.S., made a determination on July 31, 2023 to grant Einstein's "full accreditation, on probation" status.  The unsatisfactory accreditation elements warranting probation include the "absence of an Einstein strategic plan," "insufficient curricular management," lack of budget, and financial instability.  *See* https://www.einsteinmed.edu/about/consumer-information-student-outcomes/lcme-accreditation-status/

9.

62.     Because of Dean Tomaselli's failure to secure funding for Einstein, Dr. Khodakhah was forced to use the Brain Fund—which was intended for Department of Neuroscience scientific initiatives—to take care of financial burdens that were the responsibility of the Dean's office.

63.     Dr. Khodakhah, consistent with his duties as a departmental Chair, tenaciously advocated for the needs of his department, lobbying senior leadership to undertake facilities repairs and infrastructure issues that were impairing the ability of the Neuroscience faculty to perform their educational responsibilities and causing them to threaten to leave Einstein.[2]

64.     Dr. Khodakhah repeatedly warned Dean Tomaselli that lack of a budget and a strategic plan for Einstein, and recurrent flooding and deplorable conditions in the Animal Facility (which were threatening the health and safety of research animals) had made it impossible for Neuroscience faculty to perform their grant-funded research.

65.     As but one example of many such communications, on October 28, 2020, Dr. Khodakhah emailed Dean Tomaselli, copying Einstein's Executive Dean, Dr. Edward Burns ("Dean Burns"), and Associate Dean for Administration and Finance, Gregg Tarquinio, the following message:

> [Neuroscience faculty] feel they are doing their research despite [Einstein's] support, and not because of it. We, like the rest of [Einstein], have had major issues with the internet (we had to cancel a number of outside speaker seminars because the internet was down), almost monthly flooding in the building, elevators not working, the windows literally falling off, and for the past few months most of our precious mice dying at the animal facility.
> . . .
> I truly appreciate our financial difficulties, but it is imperative that we take into account that we truly have a world class faculty, but are providing them inferior infrastructure. It is important that we consider all these issues as we put forth a budget, or we will lose our faculty.

---

[2] Pursuant to Einstein's longstanding practice and policy, (the "Faculty and Academic Institutional Responsibilities for Education Students" ("FAIREST") policy), "[i]t is the obligation of the academic chairs to provide the appropriate environment for their faculty and to sufficiently protect them from clinical and financial pressures, so as to enable them to have the time and freedom necessary to fulfill their educational responsibilities."

66.     Despite Dr. Khodakhah's lobbying, Dean Tomaselli failed to communicate the needs of the Neuroscience department to senior leadership or to otherwise effectuate the needed improvements.

67.     On or about January 21, 2021, having finally lost confidence in Dean Tomaselli's capacity or will to assume a leadership role at Einstein, Dr. Khodakhah tendered his resignation as Chair of Neuroscience, effective February 1, 2021.

68.     Einstein's most senior leadership were unwilling to accept Dr. Khodakhah's offer to resign.

69.     Dean Burns emailed Dr. Khodakhah and begged him not to leave "when we need you," and described the "intense pressure" on Dean Tomaselli "to save money."  Dean Burns advised Dr. Khodakhah that he would consider his resignation letter "not as a literal resignation letter but as a wakeup call" to Einstein.

70.     Dr. Khodakhah remained steadfast, emailing Dean Burns on January 22, 2021 that Einstein was "spiraling down" fast, and that he lacked confidence that the needs of the departmental chairs were being communicated to leadership.  Dr. Khodakhah noted that the "assault on the Brain Fund ha[d] been in place for years, with [his] first objection to its use in this manner during the first year that Gordon [Tomaselli] started as the Dean."

71.     Only after Montefiore's President and CEO, Dr. Philip Ozuah, intervened and assured Dr. Khodakhah of his unequivocal support for Einstein, in general, and that the needs of his department would be met, did Dr. Khodakhah agree to withdraw his resignation as Chair.

72.     However, even after Dr. Ozuah's intervention, Dean Tomaselli persisted in his course of inaction.

73.     For a third year in a row, Einstein did not have a budget in place, and Einstein's departmental chairs remained without resources for their departments.

74.     In early 2022, when Einstein's departmental chairs, led by Dr. Khodakhah, urged Dean Tomaselli for a budget and pay raises for faculty, Dean Tomaselli informed Dr. Khodakhah that their requests were "stupid" and "irrational" and refused to present them to Montefiore.

75.     Dr. Khodakhah openly criticized Dean Tomaselli's leadership to Einstein's other departmental chairs, and questioned whether they should, as a group, support the dean's quest for a second term, which would be up for renewal at the end of 2023.

76.     It is known that Dean Tomaselli resented and felt threatened by Dr. Khodakhah's persistent and outspoken criticism of his performance as dean.

## II.    **Relevant Employer Policies**

### A.    **Einstein's Title IX Policies Before and After August 14, 2020**

#### 1.    **The 2018 Title IX Policy**

77.     Prior to August 14, 2020, Einstein analyzed complaints of alleged sexual harassment and discrimination pursuant to a policy titled "Title IX: Non-Discrimination and Anti-Harassment Policy and Complaint Procedure," dated October 26, 2018 **(the "2018 Title IX Policy")**.

78.     Reflecting a gendered Title IX process that favored predominantly female complainants against predominantly male respondents, the 2018 Title IX Policy uses the term "victim" to refer to the "complainant." *See, e.g., id.* at 7-8 ("[c]omplaints may be reported by the victim or by anyone else with knowledge of a violation of this policy" and, "the College strongly encourages victims to file complaints promptly").

79.     The 2018 Title IX Policy sets forth a vague definition of "sexual harassment," that covers a veritably limitless range of "unwelcome" or "unwanted" conduct that a "victim"

subjectively perceives to constitute "conduct" of a "sexual nature." Under the 2018 Title IX Policy, "[s]exual harassment refers to any *unwelcome* or *unwanted* sexual advances, requests for sexual favors, physical, demonstrative, or electronic conduct or communication of a sexual nature." *See* 2018 Title IX Policy, § IV at Page 18 (emphasis in original).

80.     The 2018 Title IX Policy sets forth procedures for a formal "adjudication" that do *not* afford the accused a right to a hearing, and that permit Einstein's Title IX Coordinator to serve three functions:  investigator, decision-maker, and Title IX Coordinator.  *See id.,* Appx. E, 34-35.

81.     Under the 2018 Title IX Policy, an accused has:

   a.   no right to a presumption of innocence;
   b.   no right to confront the complainant or question witnesses;
   c.   no right to an impartial decision-maker;
   d.   no right to exculpatory evidence, including the final investigation "report," and
   e.   no right to appeal from a finding of responsibility.

*See* Appx. E, 34-35.

82.     Under the 2018 Title IX Policy, the burden of proof to hold an accused responsible for alleged misconduct was a mere *preponderance of the evidence standard*.  *See* 2018 Title IX Policy, Appx. E at 34-35.

### 2.     The 2020 Title IX Policy (Aug. 14, 2020)

83.     In accordance with Regulations promulgated by the Department of Education on August 14, 2020 (the "2020 Title IX Regulations"), on August 14, 2020, Einstein replaced its 2018 Title IX Policy in in its entirety, by the "Title IX Gender-Based Misconduct, Discrimination and Harassment Policy and Complaint Procedures for Employees and Non-Students" (dated Aug. 14, 2020)**(the "2020 Title IX Policy"**).

84.     The 2020 Title IX Policy narrowed the definition of the term "sexual harassment" under Einstein's 2018 Title IX Policy, and incorporated a reasonable person standard, providing that:

13.

> Title IX Sexual harassment, which is expressly prohibited under this policy, refers to sexual harassment that is so ***severe, pervasive, and objectively offensive*** that it effectively denies a person equal access to Einstein's education program or activity.

*See* 2020 Title IX Policy at § III.C.2 at 6 (emphasis in original).

85. Consistent with the 2020 Title IX Regulations, the 2020 Title IX Policy also provides substantially greater due process protections for respondents accused of sexual harassment than was provided under the 2018 Title IX Policy.

86. Under the 2020 Title IX Policy, when a "complaint" is filed alleging Title IX violations, Einstein *must* provide written notice to the accused, which includes, at a minimum: (i) *notice of Einstein's complaint, investigation, resolution, and grievance procedures;* (ii) *notice of the allegations, including sufficient details* and time to allow for preparation of a response before any initial interview, including:

   a. the identities of the parties involved,
   b. the alleged conduct constituting Prohibited Conduct with reference to applicable provisions in this policy,
   c. the date, time, location and factual allegations concerning the incident,
   d. a reference to the specific prohibited conduct the Respondent is alleged to have engaged in,
   e. possible sanctions;
   f. a statement that the Respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process;
   g. a statement that the parties may have an advisor of their choice who may be, but is not required to be, an attorney;
   h. an explanation that the parties may inspect and review evidence;
   i. a reference to the prohibition on knowingly making false statements or knowingly submitting false information during the grievance process.

*See* **2020 Title IX Policy**, § III.F.5 at 13-14; *see also* 34 C.F.R. § 106.45(b)(2).

87. The 2020 Title IX Policy, unlike the 2018 Title IX Policy, affords an accused substantial procedural protections that specifically meet or exceed the procedural protections provided under the 2020 Title IX Regulations. These procedural rights include, *inter alia:*

14.

a.  a right to an investigation conducted by officials who are impartial, with no conflict of interest or bias (*see* 2020 Title IX Policy, § III.H.1 at 16; *see also* 2022 Title IX Policy, § III.H.1 at 17-18);

b.  a right to exculpatory evidence, including the investigative report (*see* 2020 Title IX Policy, §§ III.H.1 at 18, III.I at 19; *see also* 2022 Title IX Policy, §§ III.H.1 at 19, III.I at 20);

c.  a presumption of innocence (*see* 2020 Title IX Policy, § III.I at 19; *see also* 2022 Title IX Policy. § III.I at 21);

d.  a hearing and a right to confront the complainant and question witnesses (*see* 2020 Title IX Policy, § III.I at 19-22; *see also* 2022 Title IX Policy, § III.I at 20-23);

e.  a right to an independent, impartial decision-maker, and an explicit prohibition against a Title IX coordinator from serving as investigator and/or decision-maker (*see* 2020 Title IX Policy, § III.I at 19; *see also* 2022 Title IX Policy, § III.I at 20);

f.  a presumption that he or she is not responsible absent proof meeting the ***"clear and convincing evidence"*** standard (*see* 2020 Title IX Policy, § III.I at 19; *see also* 2022 Title IX Policy. § III.I at 21); and

g.  a right to appeal a finding of "responsibility" and sanctions imposed (*see* 2020 Title IX Policy, § III.I at 22; *see also* 2022 Title IX Policy, § III.I at 23).

*See also* 34 C.F.R. § 106.45.

### 3.  The 2022 Title IX Policy (March 18, 2022)

88.  The 2020 Title IX Policy was renewed by Einstein without modification on March 18, 2022. *See "*Title IX Gender-Based Misconduct, Discrimination and Harassment Policy and Complaint Procedures for Employees and Non-Students" (March 18, 2022)**(the "2022 Title IX Policy**").

### B.  Discrimination and Harassment Policy (Non-Title IX) (Aug. 14, 2020)

89.  At all relevant times, allegations of discrimination and harassment were covered under an Einstein employment policy titled "Discrimination and Harassment Policy (Non-Title IX)," (dated Aug. 14, 2020) (the **"Discrimination/Harassment Policy"**).

15.

90.     The Discrimination/ Harassment Policy provides procedures for complaints of alleged discrimination and harassment based on an individual's protected characteristics, including sexual misconduct that does not arise to a Title IX violation.  *See* 2020 Title IX Policy § III.C.2 at 7.

91.     To the extent that a faculty member's conduct might be covered by *both* Einstein's 2020 Title IX Policy and the Discrimination/ Harassment Policy (or any other employment policy), if the "principles and procedures" in the two policies differ, the procedures in the 2020 Title IX Policy (or the 2022 Title IX Policy) control.  *See* 2020 Title IX Policy at § II at 1; 2022 Title IX Policy at §§ II at 3.

92.     The Discrimination/Harassment Policy provides procedures for resolution of complaints pursuant to both an "informal resolution process" or "general grievance procedures." *See* Discrimination/ Harassment Policy, § IX.A-B at 10-11.

93.     An informal resolution could involve (i) an informal, direct discussion between the complainant and respondent in the presence of the Title IX Coordinator/Vice President of Human Resources, (ii) education for the area or department where the complaint originated, or (iii) mediation.  *See* Discrimination/ Harassment Policy, § IX.A at 10-11.

94.     The policy's "general investigation and grievance procedure" provides for a grievance process that includes, *inter alia:* (i) an investigation, overseen by the Vice President for HR/Title IX Coordinator, by an investigator trained in conducting investigations in a fair and impartial manner, and (ii) opportunity for the accused to be heard and present information.   *See* Discrimination/ Harassment Policy, § IX.B at 11.

95.     Under the Discrimination/ Harassment Policy, *prior to the imposition of any discipline*, Einstein is required, *inter alia*:

(i)     to provide the accused with a fair and impartial investigator report, with any findings and outcome; and

(ii)    to prove by *"clear and convincing evidence"* that the accused committed the alleged violation.

*See* § X.B at 12 (emphasis added).

### C.    The Appointments Policy and the Tenure and Compensation Policy

96.    In July 2018, Einstein adopted a policy titled, "Rules and Regulations Governing Appointments, Titles, and Compensation" ("Appointments Policy"). Section III.H of the Appointments Policy covers the procedures for termination of employment of faculty "for cause," who have been served a written statement of charges by the Dean.

97.    On December 19, 2018, Einstein adopted the **Tenure and Compensation Policy**, which Einstein declared was retroactively applicable to faculty members who had already obtained the rank of professor with tenure.[3]

98.    Pursuant to the Appointments Policy, a professor with tenure has a term of appointment of an indefinite duration, terminable only for *"neglect of duties,"* pursuant to procedures outlined in Einstein's "Tenure and Compensation Policy," or *"for cause,"* pursuant to procedures set forth in the Appointments Policy. *See* Tenure and Compensation Policy, §§ III.A.3 and III.A.8; Appointments Policy at III.H at 8.

99.    The Tenure and Compensation Policy provides that, to maintain continuous employment and compensation as a tenured professor, the individual must be "engaged full time

---

[3] The Tenure and Compensation Policy describes tenure as "a fundamental aspect of academic freedom that protects faculty from arbitrary dismissal and provides an element of employment security typically not offered in non-academic settings" and "an indispensable component of this career choice." The stated purpose of the policy was to "expand the scope and preserve the principles of tenure," thereby aiding in the "recruitment and retention of outstanding faculty." Id. at 2.

in academic activities" that contribute to Einstein's mission and "fulfill the usual requirements" of

a full-time professor in the department:

> In order to maintain compensated employment, tenured faculty members must be engaged full time in activities that contribute to the mission of the College of Medicine [Einstein] and fulfill the usual requirements of the Department for full time membership in the Department (the "academic obligation"). Activities that contribute to the mission of the College of Medicine[Einstein] include grant supported research, submission of research or training applications for extramural grants, directorship of a training grant, reviewing grants and manuscripts, service on study sections and other panels, service on editorial boards and for professional societies, center or facility directorships, classroom teaching, individual and small group student and faculty mentoring, academic committee membership, public health policy advocacy, and scholarly work such as publishing books and articles and presenting at meetings. ***Inadequate contributions can result in a recommendation for transfer to emeritus/emerita status or dismissal***.

Tenure and Compensation Policy, § III.A.4 at 3.  (Emphasis added).

## III.    <u>Chronology of Events</u>

### A.    **Early 2022:  "Letter of Concern" and Falsified "Student Survey"**

100.    In early 2022, Dr. Castillo and Dr. Jordan led two other Einstein faculty members

(together, the "Gang of Four") in a concerted effort to obtain Dr. Khodakhah's ouster as Chair.

101.    Dr. Jordan and Dr. Castillo, leading and in concert with the other members of the

Gang of Four, convinced nine other faculty members (a small subset of the total number of

Neuroscience faculty) to sign a purported letter of concern ("Letter of Concern") addressed to Dr.

Khodakhah.

102.    The purported "Letter of Concern" falsely implied that Dr. Khodakhah had

mistreated administrative staff.

103.    Lacking any particular facts (i.e., the "*who," "what," "when," and "where"*), the

Letter of Concern vaguely alleged that there had been "accounts" by unidentified staff, students,

and faculty of purportedly "demeaning and unprofessional comments" and "autocratic behaviors"

by Dr. Khodakhah.

104.    Dr. Khodakhah has never mistreated office staff.

105.    The Gang of Four obtained signatures to the Letter of Concern from faculty who could not possibly have had any first-hand knowledge of Dr. Khodakhah's interactions with staff, such as retired faculty, professors emeritus or emerita (who were not on active duty), and faculty who had not been seen on campus for years.

106.    Faculty who signed the Letter of Concern did so based on false allegations circulated by the Gang of Four, in particular, Dr. Jordan and Dr. Castillo, that Dr. Khodakhah had engaged in sexual indiscretions with two female junior faculty members.

107.    Allegations of sexual misconduct, instigated by Dr. Castillo and Dr. Jordan, and joined in by the other members of the Gang of Four, subsequently formed the basis of two Title IX complaints against Dr. Khodakhah.

108.    Dr. Khodakhah has never engaged in "sexual indiscretions" with faculty members.

109.    The Gang of Four also convinced faculty to sign the Letter of Concern by circulating a purported anonymous "student survey" about Dr. Khodakhah.

110.    Dr. Jordan had contemporaneously exploited his position as Chair of the Graduate Education Committee to fabricate a purported "student survey" that contained purported anonymous "student comments," which Dr. Jordan either penned himself or took out of context to create the false impression that students had alleged mistreatment, including discriminatory and sexist comments, by  Dr. Khodakhah.

111.    Dr. Khodakhah has never mistreated students or subjected them to discriminatory treatment on the basis of sex or any other protected characteristic.

112.     On February 24, 2022, Dr. Jordan, in his capacity as head of the Neuroscience Graduate Student Organization ("GSO"), sent the falsified student survey to the Associate Dean for Graduate Programs in Biomedical Sciences, Victoria Freedman ("Dean Freedman").

113.     In a cover letter, Dr. Jordan falsely advised Dean Freedman that the GSO had "received numerous accounts of students detailing inappropriate and harmful comments and actions by the Chair [Dr. Khodakhah]."

114.     On February 24, 2022, as part of the orchestrated campaign against him, Dr. Khodakhah was sent the purported "Letter of Concern," signed by the 13 faculty members.

**B.     Dr. Khodakhah Denies the Allegations and Seeks HR's Support**

115.     Surmising that he had been the target of false information, on February 24, 2022, Dr. Khodakhah promptly sought assistance from Dean Burns and Yvonne Ramirez ("Ms. Ramirez"), in her capacity as both Einstein's VP of Human Resources and Title IX Coordinator.

116.     Dr. Khodakhah suggested to Ms. Ramirez and Dean Burns that they look into the Letter of Concern.

117.     Ms. Ramirez informed Dr. Khodakhah—for the first time—of the purported anonymous "student survey." which he had not previously seen, but did not provide him a copy.

118.     Ms. Ramirez and Dean Burns advised Dr. Khodakhah that they believed the allegations against Dr. Khodakhah were nonsense.

119.     However, Ms. Ramirez and Dean Burns also told Dr. Khodakhah that, given the "climate" in the wake of the #Me Too movement, Einstein needed to appear "responsive" to the anonymous allegations.

120.     Although Ms. Ramirez and Dean Burns acknowledged that the allegations against Dr. Khodakhah were baseless, they offered him the "option" to "step down" as Chair.

121.    Dr. Khodakhah declined the "option" to "step down" as Chair, and on March 8, 2022, he emailed Dean Burns, Ms. Ramirez, and Dana Lee, Senior Counsel in Einstein's Title IX Office, providing them with a full explanation.

122.    Dr. Khodakhah's March 8 email reiterated that both the Title IX Office and Dean Burns had acknowledged that the allegations against him were baseless.

123.    Dr. Khodakhah also noted the obvious credibility issues with the Letter of Concern, including that it had been signed by faculty members who were retired or otherwise had no firsthand knowledge of how he had interacted with staff.

124.    Dr. Khodakhah also emphasized that faculty in the Neuroscience department had reported feeling coerced into signing the Letter of Concern.

125.    Regarding the "anonymous student survey," Dr. Khodakhah noted that the purported "student" comments were obviously edited and/or taken out of context.

126.    However, two days later, although no formal complaint or charge of any sort had been filed against Dr. Khodakhah with Human Resources or the Title IX Office, Dr. Khodakhah received a letter from Dean Tomaselli, advising him that he was being *"suspended"* as Chair, and the subject of an "investigation."

C.    **March 10, 2022:  Dean Tomaselli "Suspends Dr. Khodakhah's Appointment as Chair and Announces that He is Under Investigation**

127.    On March 10, 2022, at 2:01 p.m., Dr. Khodakhah received a letter from Dean Tomaselli, stating that, "we have received information on concerns from the Neuroscience faculty and students related to your leadership as chair, and most distressing anonymous feedback from students . . . concerning behavior that borders on student mistreatment and violations of Einstein's code of conduct of students."

128.    Dean Tomaselli's letter advised Dr. Khodakhah that Einstein would engage a third party to conduct an investigation into the allegations, and that he was immediately "***suspending***" Dr. Khodakhah's appointment as Chair, pending the outcome of the investigation, and with it, "all administrative and financial authority as chair."

129.    Dean Tomaselli's letter indicated he had decided to "suspend" Dr. Khodakhah "to protect all parties from fear of retaliation," citing a "power differential" and "complaints of retaliation, actual or perceived."

130.    Dean Tomaselli provided Dr. Khodakhah a copy of Einstein's obsolete 2018 Title IX Policy, which had been replaced two years ago by the 2020 Title IX Policy.

131.    Dean's Tomaselli's March 10 letter instructed Dr. Khodakhah that he was "not to communicate with the faculty and students about the investigation."

132.    However, 22 minutes later, at 2:23 p.m., Dean Tomaselli emailed the entire Neuroscience Department to inform them that, based on the "information received" in a "letter of concern from faculty and results of student surveys," Dr. Khodakhah was under "investigation," and inviting individuals to contact investigators with "any information."

133.    Dean Tomaselli also asserted that, "Dr. Khodakhah will step down from his role as chair," and that the dean would be choosing an Interim Chair to replace him.

134.    In fact, Dr. Khodakhah had refused the "option" to step down as Chair, when Ms. Ramiriz and Dean Burns made clear to him that there was no reason for him to do so other than to make Einstein appear "responsive" to anonymous allegations.

135.    Since February 2022, Dr. Jordan and Dr. Castillo had been spreading false allegations and innuendo that Dr. Khodakhah was involved in sexual misconduct with female members of the junior faculty.

136.     Following Dean Tomaselli's March 10, 2022 announcement, female students were heard asking if they would be *"safe"* alone with Dr. Khodakhah and expressing concern that Einstein had not taken greater action to protect them.

**1.      Dean Tomaselli's Decision to Suspend Dr. Khodakhah from His Chairmanship on March 10, 2022 Was Impermissible Under Einstein's Policies**

137.     Dean Tomaselli's letter did not specify what purported "violations" or "code of conduct of students" were referenced by his letter.

138.     Dean Tomaselli's March 10, 2022 suspension of Dr. Khodakhah's Chairmanship was not permitted under any of Einstein policies.

139.     Neither the 2020 Title IX Policy nor the Discrimination/Harassment Policy permitted Dean Tomaselli to suspend Dr. Khodakhah from his appointed position as Chair, as a purported "interim protective measure." *See* 2020 Title IX Policy, § III.G. at 15-16; Discrimination/Anti-Harassment Policy, § VIII at 9-10.

140.     The 2020 Title IX Policy and the Discrimination/ Harassment Policy provide for non-disciplinary "Interim Protective Measures," pending the outcome of an investigation, which are "reasonable and prudent to protect and ensure safety, prevent retaliation, and/or avoid an ongoing hostile environment, and or restore or preserve equal access/opportunities."  2020 Title IX Policy, § III.G. at 15; Discrimination/ Harassment Policy, § VIII at 9-10.

141.     "Suspending" Dr. Khodakhah as Chair constituted a *de facto* demotion, an adverse employment action that was inherently punitive and disciplinary.

142.     However, neither the 2020 Title IX Policy nor the Discrimination/Harassment Policy permitted Einstein to impose *discipline* upon Dr. Khodakhah without any complaint against him, and prior to an adjudication and proof of responsibility by *clear and convincing evidence*.

### 2. Dr. Khodakhah's "Suspension" as Chair Is Not Permitted Under Title IX

143. Title IX forbade Einstein from "suspending" Dr. Khodakhah from his Chairmanship as a purported "interim protective measure," as it amounted to a *de facto* demotion which was inherently disciplinary and punitive in nature, and not "designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment." *See* 34 CFR § 106.30.

144. Under Title IX, "[a] recipient's response must treat complainants and respondents equitably . . . by following a grievance process that complies with § 106.45 **before** the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." 34 C.F.R. § 106.44 (emphasis added).

### 3. Dr. Khodakhah's "Suspension" as Chair is Not Permitted Under the Terms of the 2016 Promotional Letter

145. The May 3, 2016 appointment letter provides that Dr. Khodakhah's service as chair was ***"subject to performance*.***"

146. The terms of the May 3 appointment letter did not grant Dean Tomaselli discretion to "suspend" Dr. Khodakhah's Chairmanship as a purported interim protective measure that was impermissible under Einstein's own employment policies and applicable law.

### D. March-April 2022:  Einstein Ignores Complaints of False, Bad Faith Allegations

147. Following Dean Tomaselli's March 10, 2022 announcement to the Department of Neuroscience that Dr. Khodakhah would be "stepping down" as Chair, multiple members of the faculty and at least one student complained to Ms. Ramirez and Dean Burns that Dr. Castillo and Dr. Jordan had pressured members of the faculty to sign a letter of complaint against Dr. Khodakhah and that the purported "student survey" was falsified by Dr. Jordan.

24.

148.    On information and belief, Einstein ignored these complaints.

149.    When faculty raised their concerns to Dean Tomaselli, he told them there had been "additional allegations" against Dr. Khodakhah.

150.    Dr. Khodakhah was provided no notice of any "additional allegations."

**E.    Einstein's External Investigator Focuses Inquiry on Dr. Castillo and Dean Tomaselli's Personal Animus Against Dr. Khodakhah**

151.    Over the next several months, an investigation conducted by an external investigator commissioned by Einstein ensued.

152.    Faculty members informed the investigator that a handful of senior male faculty members had instigated false, politically motivated allegations against Dr. Khodakhah.

153.    The investigator shared with at least one member of Einstein's faculty that there appeared to be no substance to the allegations against Dr. Khodakhah, and that he was personally puzzled by the sanctions imposed upon him.

154.    During Dr. Khodakhah's approximately four and a half-hour interview with the external investigator, the investigator's questions focused on why Dr. Castillo and Dean Tomaselli had a grudge against him.

155.    The investigator asked Dr. Khodakhah about how Dr. Castillo reacted, years ago, when Dr. Khodakhah was appointed Interim Chair and later Chair, as well as about the circumstances in which he had tendered his resignation as Chair and President Ozuah's subsequent intervention.

**F.      July 11, 2022:  Dean Tomaselli Permanently Dismisses Dr. Khodakhah as Chair for Alleged Misconduct and Refuses to Release the Investigation Report**

156.     On July 11, 2022, Dean Tomaselli sent Dr. Khodakhah a letter informing him that "the investigation" was concluded, and that he was being immediately dismissed from his appointment as Chair for misconduct.

157.     Dean Tomaselli wrote to Dr. Khodakhah that, although he was "an excellent scientist" and had "accomplished great things for the Department," his "behavior and the atmosphere it has created" ***"violates Einstein policies"*** and was cause for his dismissal as Chair.

158.     As with his March 10, 2022 letter, Dean Tomaselli's July 11, 2022 letter did not identify what "policies" Dr. Khodakhah's had supposedly violated.

159.     Dr. Khodakhah denied all of the allegations.

160.     Dean Tomaselli's letter contained no particulars, including the identities of the alleged mistreated students, or the date, time, location, substance or context of Dr. Khodakhah's purported conduct.

161.     To this day, Dr. Khodakhah has not been provided a copy of the purported "Report," despite that he has repeatedly requested a copy, and Dean Tomaselli has repeatedly misrepresented to faculty that Dr. Khodakhah has been provided a copy of the "Report."

**1.      Dr. Khodakhah's July 11 Dismissal from His Chairmanship Is Impermissible Under Einstein's Employment Policies and the terms of his 2016 Promotional Letter**

162.     Dr. Khodakhah's dismissal from his appointment as Chair constitutes a demotion that has resulted in a diminishment of his responsibilities and a reduction in his base salary.

163.     Neither of Einstein's potentially applicable policies, specifically, the 2020 Title IX Policy and the Discrimination/Harassment Policy, permitted Einstein to impose discipline against Dr. Khodakhah by permanently dismissing him from his position as Chair ***prior*** to an adjudication

of any claims of discrimination and/or sexual misbehavior.  *See* 2020 Title IX Policy, §§ H-J at 17-25; Discrimination/Harassment Policy, § X.B at 12).

164.    In breach of the terms of his appointment and promotional letters, Dean Tomaselli dismissed him as Chair *not* because of his *performance* in that role, but for purported *misconduct*, without a formal charge or complaint, without an adjudication in which it was proved, by *"clear and convincing evidence,"* that he was responsible, and without an opportunity to review the investigator's final report on which the disciplinary decision was purportedly based.

### G.    July 11, 2022:  Einstein Issues Two Procedurally Irregular Notices of Investigation for Two Erroneous Title IX Complaints

165.    On July 11, 2022, Dr. Khodakhah received two separate Notices of Investigation (separately, "NOIA 1" and "NOIA 2," and, together, "NOIAs") for two Title IX complaints brought by two female junior professors ("Complainant 1" and "Complainant 2"), both with ties to Dr. Castillo and Dr. Jordan.

166.    NOIA 1 informed Dr. Khodakhah that Complainant 1 alleged that, in 2017, during a job interview, Dr. Khodakhah had (i) asked her "impermissible questions" about her husband's occupation and placed his hand on her bare knee when he greeted her and (ii) greeted her with a kiss at a professional social gathering.  Complainant 1 further alleged that, during her visit to campus before she was hired by Einstein, Dr. Khodahah had pointed out his house to her after picking her up from the train station and offered her wine during dinner with colleagues.

167.    NOIA 2 informed Dr. Khodakhah that Complainant 2 alleged that, during a 2018 professional reception, Dr. Khodakhah had (i) placed his hand on her back as they waited in line to be served and that, (ii) at a 2018 annual meeting of the Society for Neuroscience, while engaged in conversation with others, (a) placed his hands on her breastbone and (b) "also called her a 'moron' as [he] rushed her and slapped her upper thigh."

168.     Dr. Khodakhah has never engaged in sexual misconduct with any faculty member.

169.     The allegations by Complainant 1 and Complainant 2 were false and rehashed the allegations against Dr. Khodakhah instigated by Dr. Jordan and Dr. Castillo in the preceding months.

170.     Complainant 2 was a postdoctoral research fellow/junior faculty member who had been collaborating with Dr. Castillo for the preceding four to five years and was applying for grants and jobs.

171.     Complainant 2 relied on Dr. Castillo as one of her three reference letter writers.

172.     On information and belief, Complainant 2 was coerced by Dr. Castillo to file a Title IX complaint against Dr. Khodakhah.

173.     Procedurally irregular, both NOIAs informed Dr. Khodakhah that his alleged behavior met the definition for "sexual harassment" described in Einstein's then obsolete 2018 Title IX Policy.

174.     Both NOIAs contained a footnote indicating that Einstein intended to apply the 2018 Title IX Policy to Dr. Khodakhah's case.

175.     As noted above, on August 14, 2020, the United States Department of Education promulgated the 2020 Title IX Regulations governing Title IX proceedings.

176.     On August 14, 2020, Einstein had replaced its 2018 Title IX policy in its entirety with its 2020 Title IX Policy, which Einstein renewed without modification, on March 18, 2022, as the "2022 Title IX Policy."

177.     On July 11, 2022, the stated "scope" of the 2022 Title IX policy unambiguously applied to govern the conduct of all Einstein faculty, *without regard to the date of the alleged occurrence*.  *See* 2022 Title IX Policy § II at 3-4.  This section provides that:

> This Policy governs the conduct of all College of Medicine faculty, . . . and covers their treatment of each other and of students, as well as others with whom they come into contact at or near the College of Medicine and/or at College of Medicine-sponsored and affiliated activities and events.

*Id.* at 3.

178.    Even if the allegations by Complainant 1 and Complainant 2 were true, which they were *not,* they would not have constituted "sexual harassment" under the definition provided in Einstein's 2022 Title IX Policy, which incorporated a reasonable person standard.

### H.    July 13, 2022: Dean Tomaselli Suspends Dr. Khodakhah from His Faculty Position and Removes Him from Campus

179.    On July 12, 2022, Dr. Khodakhah exercised his right to participate in the Title IX process by reaching out to colleagues who might serve as witnesses.

180.    Title IX regulations and Einstein's 2022 Title IX Policy both entitle a respondent to secure potential witnesses and speak with them about the allegations. *See* 2022 Title IX Policy § III.H.1 at 19; 34 CFR § 106.45.[4]

181.    In a letter dated July 13, 2022, Dean Tomaselli informed Dr. Khodakhah that, he was being "immediately removed from campus until final determinations are complete regarding your flagrant disregard of Einstein's no retaliation policy."

182.    Dean Tomaselli's letter advised Dr. Khodakhah that his suspension included "immediate removal" from all Einstein buildings, including his office and laboratory in the Kennedy building, his active digital directory, email accounts, and associated linked accounts were de-activated.

---

[4] Even the obsolete 2018 Title IX Policy that Einstein purported to apply to Dr. Khodakhah's two pending Title IX cases entitled the accused to gather evidence and discuss the allegations with potential witnesses. *See* 2018 Title IX Policy, Appendix B (1)(3), page 24.

183.     On July 13, 2022, Einstein also imposed a gag order on Dr. Khodakhah. Through its counsel, Einstein instructed Dr. Khodakhah*:  "Dr. Khodakhah can talk to other faculty about his research, the weather, etc., but he cannot speak to them about either the investigation that just concluded removing him as Department Chair or the now pending Title IX investigation."*

>    **1.     Dr. Khodakhah's "suspension and removal" is impermissible under Einstein's policies and Title IX.**

184.     Dr. Khodakhah had never been charged and adjudicated "responsible" for any violation of the prohibition against retaliation under Einstein's 2022 Title IX Policy.

185.     As of today, Dr. Khodakhah remains suspended from duties as a member of the faculty, barred from his laboratory, and completely cut off from Einstein's campus, facilities, and online and digital services.

186.     As noted above, under the 2022 Title IX Policy, it was impermissible for Einstein to impose *discipline* against Dr. Khodakhah *prior* to affording him a grievance process meeting *all* of the robust procedural protections provided for under the 2022 Title IX Policy.

187.     In Dean Tomaselli's July 13, 2022 letter notifying Dr. Khodakhah of his suspension and removal decision, he erroneously cited Section III.H of the Appointments Policy as authority for his action.

188.     However, Section III.H of the Appointments Policy did not permit Dean Tomaselli to summarily suspend and remove Dr. Khodakhah from his faculty appointment or to order him removed from campus.

189.     Section III.H of the Appointments Policy provides for the summary paid suspension of an employee against whom written charges of *for cause* dismissal have been made, "pending final action upon such charges, in such instances where continuance of the Faculty member in his duties threatens immediate harm to himself or other or may cause irreparable damage to Einstein."

190.    Section III.H of the Appointments Policy was inapplicable to Dr. Khodakhah as he had (i) never been issued written charges as part of a dismissal for cause proceeding involving "violence, or psychical or psychologic harassment," and (ii) posed no threat of *"immediate harm"* to himself or others, or any possibility of causing "irreparable damage to Einstein." *See* Section III.H of the Appointments Policy.

191.    Dr. Khodakhah had not retaliated against Complainant 1 or Complainant 2, and never violated a purported "no retaliation policy" or any Einstein policy.

192.    Dean Tomaselli's decision to suspend and ban Dr. Khodakhah from campus was in retaliation for Dr. Khodakhah's exercise of his rights to participate in the Title IX proceeding.

193.    The 2022 Title IX Policy specifically prohibits retaliation against a respondent for participating in a Title IX proceeding. *See* 2022 Title IX Policy at § III.N at 26-27.

194.    The 2022 Title IX Policy comports with the 2020 Title IX Regulations, which likewise protect *any respondent who has participated* in an investigation or proceeding from retaliation. *See* 34 CFR § 106.71.

195.    Under the 2020 Title IX Regulations, charging an individual with a code of conduct violation for the purpose of interfering with any right or privilege secured by Title IX constitutes retaliation. *Id.*

196.    The Title IX 2020 Regulations provide, in pertinent part, that:

(a) Retaliation prohibited. No recipient or other person may intimidate, threaten, coerce, or discriminate against ***any individual*** for the purpose of interfering with any right or privilege secured by title IX . . . , or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or

31.

formal complaint of sexual harassment, for the purpose of interfering with any
right or privilege secured by title IX or this part, constitutes retaliation.

*Id.* (emphasis added).

197.    Dean Tomaselli's actions in charging Dr. Khodakhah with violation of a purported
"no retaliation policy" constitutes prohibited retaliation under both Einstein's 2022 Title IX Policy
and Title IX.

198.    Dean Tomaselli's actions were motivated by retaliatory animus and significantly
interfered with Dr. Khodakhah's rights to secure witnesses and gather information in his defense.

**I.      Late July/Early August 2022:  Einstein Ignores Faculty and Students'
Complaints that Dr. Khodakhah Was Targeted by False, Bad Faith
Allegations**

199.    In late July and early August, 2022, multiple faculty members of the Neuroscience
department independently reported to Einstein and Montefiore's leadership—including Dr. Ozuah,
Dean Tomaselli, Ms. Ramirez, and Dean Burns—that they had reason to believe that the
allegations against Dr. Khodakhah were false and motivated by personal grudges of a handful of
white, male faculty, and specifically identified Dr. Castillo and Dr. Jordan.

200.    On or about August 2, 2022, thirty-three (33) past and current members of Dr.
Khodakhah's laboratory signed a letter in support of Dr. Khodakhah which they emailed to Dr.
Ozuah, protesting the "presumptions being made about [Dr. Khodakhah], with very limited
information, and before any verdict ha[d] been made."

201.    These past and current students complained that the allegations against Dr.
Khodakhah were contrary to their own experiences.  They wrote:

The main pre-requisite to join the Khodakhah lab is a passion for helping others
through science; asking and answering incisive questions from unique perspectives.
No one embodies that as much as Kamran, who leads by example.

202.    Rebutting allegations of discrimination in the purported anonymous "student survey," Dr. Khodakhah's past and current lab members wrote that:

> [O]ur lab is extensively diverse, made [up] mostly of foreigners and minorities from different cultures with diverse perspectives, customs and traditions.  Everyone's viewpoints, including Kamran's are debated regardless of position, creating a truly collegial environment.

203.    On information and belief, Einstein's Title IX Office did not interview any of Dr. Khodakhah's past and future students who signed this letter.

**J.     August 12, 2022:  Dean Tomaselli Discloses to the Neuroscience Department the Fact of Dr. Khodakhah's Pending Title IX Investigations**

204.    On August 12, 2022, Dean Tomaselli emailed the entire Department of Neuroscience and disclosed the fact of Dr. Khodakhah's pending Title IX investigations.

205.    Dean Tomaselli's email stated, in part:

> Following the conclusion of the investigation of Dr. Khodakhah's fitness to serve as chair and his removal from that leadership position, in July 2022, [Einstein] notified Dr. Khodakhah that it was commencing separate investigations of other additional allegations that Dr. Khodakhah had engaged in conduct that may violate additional Einstein policies.

206.    Dean Tomaselli's statement concerning an "investigation of Dr. Khodakhah's *fitness* to serve as chair" falsely implied that Dr. Khodakhah had been charged and adjudicated as *"unfit,"* and was evidently intended to embarrass Dr. Khodakhah.

207.    Dr. Khodakhah had never been charged with any violation for which he was adjudicated and found "unfit" or "responsible" under any of Einstein's disciplinary policies.

208.    Dean Tomaselli did not reveal the pending investigations to the Neuroscience Department in an attempt to obtain more information about alleged harassment.

209.    Dean Tomaselli's conduct in disclosing the fact of the pending two Title IX investigations to the entire Neuroscience Department was not reasonable, done merely to

reprimand Dr. Khodakhah for participating in a Title IX investigation, and seriously interfered with his rights to confidentiality and to gather information and secure witnesses.

### K.   August 17, 2022:  Dr. Khodakhah Files a Complaint with Einstein's Title IX Office for Retaliation Under its Title IX Policy

210.   The 2022 Title IX Policy did not permit Dean Tomaselli to disclose the fact of Dr. Khodakhah's pending Title IX investigations.

211.   The 2022 Title IX Policy also provides that, "Einstein will maintain as confidential the identity of  . . . a Respondent," and limit disclosure to that which is required by law or on a "need to know" basis "to commence or continue" an investigation.  *See* § III.F.3 at 13.

212.   On August 17, 2022, Dr. Khodakhah filed a formal written complaint with Ms. Ramirez against Dean Tomaselli for breaching his rights of confidentiality and his right not to be retaliated against based on (i) Dean Tomaselli's August 12, 2022 email to the Neuroscience Department; and (ii) Dean Tomaselli's July 13, 2022 decision to suspend him from his faculty position and ban him from campus.

213.   As noted above, the 2022 Title IX Policy prohibits retaliation against a respondent for participating in an investigation or proceeding.

214.   On September 1, 2022, Ms. Ramirez erroneously advised Dr. Khodakhah that Dean Tomaselli had not committed any breach of confidentiality, but informed Dr. Khodakhah that the Title IX Office would address his retaliation complaint.

215.   Einstein was required to adjudicate Dr. Khodakhah's claim for retaliation pursuant to the 2022 Title IX Policy's grievance procedures, *see* 2022 Title IX Policy, § III.N at 27, and to resolve his complaint within 60 days after he filed it.  *See id.*, § III.I at 24.

216.   As of today, Einstein has not resolved Dr. Khodakhah's retaliation complaint, which he filed more than a year ago, and he remains suspended and banned from campus.

**L.      Mid-Late August 2022:  Einstein's Title IX Office Continues to Ignore Complaints of Falsified, Bad Faith Reports Against Dr. Khodakhah**

217.    In April 2022, Jane Roe,[5] a former student trainee in Dr. Khodakhah's lab had contacted Ms. Ramirez with concerns that Dr. Khodakhah had been the subject of false allegations.

218.    In mid-August 2022, following Dr. Khodakhah's public dismissal from his Chairmanship on July 11, 2022, and his suspension and removal from campus on July 13, 2022, Dr. Roe met with Ms. Ramirez in-person to provide a detailed complaint concerning the allegations against Dr. Khodakhah.

219.    On August 25, 2022, Dr. Roe followed up by emailing a three-page, single-spaced complaint to Ms. Ramirez, copying Dean Burns and Ms. Lee, legal counsel to the Title IX Office.

220.    Dr. Roe reported that, in February 2022, Dr. Jordan exploited his position as Chair of the Graduate Education Committee ("GEC") when he asked her to discuss the results of a student survey about the Neuroscience Department's leadership.

221.    Dr. Roe reported that Dr. Jordan had taken her statements out of context and—without her knowledge—misrepresented them to HR and faculty members as official "student" comments which he then incorporated in a manufactured "student survey."

222.    Dr. Roe reported that, in March 2022, when she asked Dr. Jordan to set the record straight and remove her purported "comments" from the purported "student survey," Dr. Jordan assured her not to worry, since *two female junior faculty members would be presenting even more serious allegations of sexual misconduct against Dr. Khodakhah.*

223.    Dr. Roe complained that Dr. Jordan had gossiped with her and other students about Dr. Khodakhah's marriage, which he (erroneously) claimed was not doing well, and shared with

---

[5] A pseudonym is used to protect Ms. Roe's identity.

her and other students unsubstantiated allegations about Dr. Khodakhah's purported sexual behaviors involving two female junior faculty members.

224.    Dr. Roe alleged that, based on Dr. Jordan's statements, she believed that his actions were motivated by his and Dr. Castillo's personal animus toward Dr. Khodakhah and their shared desire to remove him as Chair.

225.    Both the Discrimination/Harassment Policy and the 2022 Title IX Policy prohibit knowingly false claims and information.  *See* 2022 Title IX Policy, §§ III.O at 27; III.A at 5; III.F.5 at 13-14; Discrimination/Harassment Policy, § XIII at 13.

226.    However, Einstein did not reopen the allegations against Dr. Khodakhah for which it had purportedly dismissed him from his appointed Chairmanship on July 11, 2022.

227.    Upon information and belief, the Title IX Office also never investigated the allegations of falsified information concerning Dr. Khodakhah.

**M.    November 2022:  Society for Neuroscience Revokes Dr. Khodakhah's Invitation to Give a Special Lecture**

228.    Founded more than 50 years ago, the Society for Neuroscience ("SfN") is an organization with a stated mission of advancing scientific exchange, support of the neuroscience community, educating the public, and advocating for the field of neuroscience.

229.    For many years, SfN has hosted an annual meeting that is attended by thousands of researchers, scientists, and physicians from around the world.

230.    SfN's annual meeting offers attendees a variety of scientific programming, including lectures and symposia, and opportunities to network with the leaders in brain science.

231.    Every year, SfN selects a handful of persons to give a "Special Lecture" at its annual meeting.

232.   SfN's "Special Lectures feature some of the world's leading scientists and draw huge crowds at SfN's annual meetings.

233.   Months in advance of Neuroscience 2022, SfN invited Dr. Khodakhah an opportunity to present a Special Lecture at Neuroscience 2022, on November 15, 2022, at the San Diego Convention Center, which he accepted.

234.   News, press releases, and publicity concerning Neuroscience 2022 contained information about Dr. Khodakhah's planned Special Lecture, titled: "Cerebellar Interactions with the Basal Ganglia: Does This Thing Come with an Instruction Manual?" *See, e.g., Neuroscience Conference Returns to San Diego as Live Event,* https://www.photonics.com/Articles/Neuroscience_Conference_Returns_to_San_Diego_as/a684 73

235.   Based on past annual events, Dr. Khodakhah's Special Lecture was expected to be a highlight of **Neuroscience 2022**.

236.   Dr. Khodakhah's professional and academic colleagues were aware that he was to present a "Special Lecture" at Neuroscience 2022.

237.   On November 10, 2022, Dr. Khodakhah received a telephone call from SfN, informing him that SfN had just received an "anonymous" email from someone who had highlighted allegations against Dr. Khodakhah by Einstein and warning that he should not be allowed to give his keynote lecture because, otherwise, the SfN could expect negative publicity and a social media war.

238.   Dr. Khodakhah subsequently received a letter from the president of SfN, Gina Turrigiano, PhD, dated November 11, 2022, informing him that his invitation to participate as a

special lecturer at Neuroscience 2022 was "withdrawn" because of concerns that his participation could "draw unwanted attention for both you and [SfN]."

**N.      October 2023:  National Institutes of Health Removes Dr. Khodakhah from Peer Review Committees**

239.      National Institutes of Health ("NIH") had designated Dr. Khodakhah to serve as chair of a peer review committee with a reference number PANEL-ZNS1 SRB K44.

240.      At the same time, NIH had also designated Dr. Khodakhah to serve as chair of a second peer review committee, with a reference number ZRG1 ICN-W-55 Brain Initiative Meeting.

241.      Relative to PANEL-ZNS1 SRB K44, after Dr. Khodakhah had spent countless hours reviewing the proposal and preparing for the committee's upcoming meeting, in or about October 2023, NIH removed Dr. Khodakhah, without cause, from the committee.

242.      Relative to ZRG1 ICN-W-55 Brain Initiative Meeting, after months into its review, in or about October 2023, NIH removed Dr. Khodakhah as chair, without cause, notifying him just a week prior to the committee's next meeting.

**O.      December 18, 2023:  In a Procedurally Irregular and Biased Process, Einstein Issues Decision on Title IX Complaint and Imposes Unduly Harsh Sanctions**

243.      Purporting to follow the 2018 Title IX Policy, Ms. Ramirez issued two decisions on the two pending Title IX cases against Dr. Khodakhah on December 18, 2023.

244.      In Complainant 1's case, Ms. Ramirez adopted a male investigator's finding that Dr. Khodakhah was not responsible for "sexual harassment."

245.      In Complainant 2's case, Ms. Ramirez adopted a female investigator's finding that Dr. Khodakhah was responsible for "sexual harassment."

246.      Dr. Khodakhah had cooperated in an investigation by submitting to interviews.

38.

247.    However, Dr. Khodakhah was not fully allowed to participate in the investigative process because Einstein and the investigator both had instructed Dr. Khodakhah that he was not permitted to discuss the allegations with potential witnesses.

248.    This "gag order" violated not only Einstein's then-current 2022 Title IX Policy, and even the obsolete 2018 Title IX Policy.  *See* 2018 Title IX Policy, Appendix B (1)(3), page 24.

### 1.    Hostile and Biased Investigator

249.    Einstein utilized a third-party, Grand River Solutions to conduct the investigation, Notably, Grand River Solutions' employees consist primarily of former Title IX Coordinators, nearly all of whom are women, who have connections to each other stemming from their past positions at various institutions.

250.    Grand River Solutions' co-founder and Managing Director Jody Shipper has herself overseen a one-sided and superficial sexual assault investigation while serving as Title IX Coordinator at the University of Southern California, a decision that was set aside by a California appeals court in 2018 (*Doe v. Univ. of S. California*, 29 Cal. App. 5th 1212, 241 Cal. Rptr. 3d 146 (2018), *reh'g denied* (Dec. 27, 2018)).

251.    The investigation into Complainant 2's case was conducted by a Grand River Solutions investigator, Jennifer Meehan, who was confrontational and hostile toward Dr. Khodakhah during investigatory interviews.

252.    When Dr. Khodakhah was able to review the Preliminary Investigation Report, it confirmed that Ms. Meehan had treated him differently from Complainant 2 and that she was not an impartial investigator.

253.    For example, although Dr. Khodakhah's wife was in attendance at a reception where one of the alleged occurrences took place, Ms. Meehan declined to fully interview her.

254.    In her investigation report, the investigator misleadingly implied that Dr. Khodakhah's wife could not recall whether she had attended the reception at issue.  However, Dr. Khodakhah's wife had told the investigator in no uncertain terms that she attended the reception, and that it was her practice to accompany Dr. Khodakhah at such events.

255.    Although Complainant 2's husband did *not* attend the reception at issue, Ms. Meehan fully interviewed him, despite that all he could offer was a retelling of his wife's account.

256.    Ms. Meehan also repeatedly instructed Dr. Khodakhah that he was "not allowed" to contact his potential witnesses, and that he should provide her with the contact information of any of his potential witnesses.  However, Ms. Meehan declined to interview witnesses Dr. Khodakhah identified.

257.    Ms. Meehan did not impose similar restrictions on Complainant 2 and was agreeable when Complainant 2 offered to reach out and speak with her witnesses to coordinate the investigator's interviews.

258.    Ms. Meehan also fed information to Complainant 2's witnesses.  In at least one instance, when one of Complainant 2's witnesses provided key testimony that contradicted Complainant 2's account, Ms. Meehan prompted the witness to change her testimony.

### 2.    Complainant 2's Claims Do Not Meet the Definition of "Sexual Harassment" Under the 2022 Title IX Policy that Einstein Withheld

259.    Complainant 2's complaint involved two purported incidents, the first allegedly occurring at a Graduate Student reception hosted by the Department of Neuroscience ("Allegation #1), and the second allegedly occurring at a Department of Neuroscience meeting at the annual meeting of the Society for Neuroscience ("Allegation #2).

### a.      Allegation #1

260.    The gist of Complainant 2's allegations was that Dr. Khodakhah had tapped her twice briefly on the shoulder while they were both waiting in line to be served.

261.    Dr. Khodakhah did not recall any of this alleged incident.

262.    Complainant 2 stated that Dr. Khodakhah had said something to her, but she could not recall what he said.

263.    Dr. Khodakhah surmised that he may have said something about moving forward in line.

264.    On its face, this allegation of so-called "inappropriate touching" does not rise to the level of "sexual harassment" under the 2022 Title IX Policy that Einstein withheld from Dr. Khodakhah.

### b.      Allegation #2

265.    The second allegation alleged two separate violations.

266.    As to the first alleged occurrence, Complainant 2 claimed that Dr. Khodakhah forcefully touched her "breastbone" with both hands.

267.    Dr. Khodakhah recalled that he was walking toward Complainant 2, with his right-hand index finger pointing in the direction of her necklace, and that he tripped, and his finger landed on Complainant 2's necklace.

268.    It was undisputed that Dr. Khodakhah tripped while he was walking toward Complainant 2, and was saying, "what's this?"

269.    It was also undisputed that Dr. Khodakhah never touched Complainant 2's bare skin.

270.     The only fact in dispute was whether Complainant 2 was wearing a necklace. Complainant 2 asserted that she was not wearing a necklace, and that Dr. Khodakhah's finger landed near her neckline (collar) area, over her clothing.

271.     No witness corroborated Complainant 2's account, but one of her witnesses, S.K., (a graduate student in Dr. Castillo's lab), corroborated Dr. Khodakhah's account.

272.     S.K., who was a first-year graduate student at the time and who identified Complainant 2 as her "direct mentor," testified that Complainant 2 spoke with her right before Complainant 2 left the meeting, and that she recalled Complainant 2 saying that she had been *"taken off guard" by Dr. Khodakhah touching her necklace, and that Complainant 2 made this statement in the presence of many other students.*

273.     Immediately after S.K. made this statement indicating that Complainant 2 was, in fact, wearing a necklace,  the investigator prompted S.K. *by informing her that Complainant 2 denied that she was wearing a necklace that evening.*

274.     The investigator did not appear to have interviewed any of the many other students who were present at the annual meeting, even though Dr. Khodakhah informed her that it was his understanding that several first-year graduate students were in attendance at the event and had overheard the statement made by Complainant 2 to S.K. concerning her necklace.

275.     Under either a *"preponderance of evidence"* standard, (as provided under the 2018 Title IX Policy), or a *"clear and convincing"* standard of evidence, (as provided under the 2022 Title IX Policy), Complainant 2 failed to establish that Dr. Khodakhah touched *her* instead of her *necklace*.

276.     Under even the obsolete 2018 Title IX Policy, Complainant 2 alleged no conduct that could be considered "harassment" *directed at Complainant 2's sex.*

277.     In the second alleged instance of "inappropriate touching" in allegation #2, Complainant 2 falsely claimed that, after the necklace incident, Dr. Khodakhah slapped her on her thigh outside on the patio.  Complainant told the investigator that Dr. S.C. came to her "rescue" by pulling Dr. Khodakhah away from her.

278.     Dr. Khodakhah denied the allegations completely, stating that the alleged incident never happened.

279.     Complainant 2's own witness, Dr. S.C., testified that he was nowhere near Dr. Khodakhah during the purported incident and did not recall the incident Complainant 2 alleged.

280.     Under a fair application of even the old 2018 Title IX Policy's "preponderance of the evidence standard," it should have been clear to an impartial decision-maker that Complainant 2 had failed to prove her second allegation.

### 3.     Complainant Was Not Credible

281.     Not a single eyewitness called by Complainant 2 corroborated her allegations.

282.     The majority of Complainant 2's witnesses actually *refuted* her contentions.

283.     There were also major factual discrepancies between the information contained in NOIA 2 that Dr. Khodakhah received on July 11, 2022 and the verbal statements made by Complainant 2 to the investigator.

284.     For example, NOIA 2 advised Dr. Khodakhah that the alleged incident in Allegation #1 occurred at a summer Graduate Student reception party hosted by the Department of Neuroscience, an event that is always held at Einstein.

285.     However, Complainant 2 later told the investigator that the location of the alleged occurrence was Einstein's Collegewide Graduation reception, an event that is organized by the Graduate School, and which is not hosted by the Department of Neuroscience, as it is for *all* students, not just Neuroscience students.

43.

286.    At the very least, such a major discrepancy should have raised doubts as to Complainant 2's memory.

### 4.    Ms. Ramirez Was A Biased and Conflicted Decision-Maker

287.    Ms. Ramirez adopted the biased investigator's finding that, "the four instances of touching, *taken in their totality*, were sexual in nature as defined by the Policy [2018 Title IX Policy]."

288.    Ms. Ramirez ignored that Complainant 2's witnesses did not corroborate her account, and that no single eye-witness at the crowded receptions (the purported site of the occurrences) supported her claims.

289.    Although Ms. Ramirez's decision cited the obsolete 2018 Title IX Policy's preponderance of the evidence standard, her decision was clearly against the weight of the evidence.

290.    Under the current and applicable 2022 Title IX Policy, which Einstein chose not to apply to Dr. Khodakhah's case, Ms. Ramirez, who served as the Title IX Coordinator, would have been prohibited from serving as the decision-maker. *See* § III.I at 20 ("The Title IX Coordinator will coordinate details of the Hearing and parties' submissions, but will not serve as a Decisionmaker."); *see also* 34 C.F.R. § 106.45 (7)(i) ("The decision-maker(s), who cannot be the same person(s) as the Title IX Coordinator or the investigator(s), must issue a written determination regarding responsibility.").

291.    Ms. Ramirez had a professional conflict of interest in that she was the Title IX Coordinator and directly reported to Dean Tomaselli, whose actions against Dr. Khodakhah were motivated by his own personal and retaliatory animus.

292.    Ms. Ramirez's bias in favor of the Complainant is further demonstrated by the fact that, in February 2022, she gave Dr. Khodakhah the "option" to step-down as Chair so that Einstein could appear "responsive" to allegations which she knew were baseless.

293.    Ms. Ramirez's bias is also demonstrated by the fact that she ignored multiple reports submitted by students and faculty that the allegations against Dr. Khodakhah were false.

## 5.    Einstein Impermissibly Considers  Allegations Outside the Grievance Process When Imposing Sanctions Against Dr. Khodakhah

294.    Ms. Ramirez indicated in her decision that, in arriving at the sanctions, she considered Complainant 2's case to be a 'second offense." Ms. Ramirez wrote:

> You were removed from the position of chair on July 11, 2022, for behaviors that were unprofessional, violated our code of conduct, and contribute to a toxic learning and work environment.  The sanctions outlined below are for your violation of Einstein's Title IX policy which is considered a **second offense**, even though the underlying conduct in this Title IX investigation occurred prior to the investigation that led to your removal as chair.  It is worth noting that some of the behaviors reported during the interviews in this Title IX investigation are similar to the behaviors that led to your removal as chair. In other words, there have been multiple instances of your conduct not conforming to Einstein's policies and causing disruptions to Einstein's learning and research environment.

295.    Under the 2022 Title IX Policy, Ms. Ramirez was not permitted to consider allegations of alleged misconduct for which Dean Tomaselli dismissed Dr. Khodakhah as Chair on July 11, 2022, and for which Dr. Khodakhah had never been found responsible in a Title IX proceeding (or any proceeding) by clear and convincing evidence.

296.    The 2022 Title IX Policy and Title IX did not permit Einstein to impose upon Dr. Khodakhah more severe sanctions in Complainant 2's Title IX case based on purported conduct that was outside the grievance process prescribed in the 2022 Title IX Policy and applicable federal regulations.  *See*  34 C.F.R. § 106.45(b)(1)(i) (schools must "[t]reat complainants and respondents

equitably . . . by following a grievance process that complies with this section before the imposition of any disciplinary sanctions").

297.    Pursuant to § III.H of the 2022 Title IX Policy:

If, in the course of an investigation of a Complaint, Einstein decides to investigate allegations of Title IX Violations that were not included in the notice regarding the original Complaint allegations (as discussed in Section III.F.5.), **_Einstein will provide notice of the additional allegations to all parties whose identities are known, pursuant to the process set forth_** In Section III.F.5.

*Id.* (Emphasis added).

298.    The 2022 Title IX Policy and the 2020 Title IX Regulations required that Einstein afford Dr. Khodakhah (i) notice of the allegations against him, and (ii) a presumption that he was not responsible for the alleged conduct absent proof at the conclusion of the grievance process based on "clear and convincing evidence."  *See* 2022 Title IX Policy at § III.I at 21; 34 C.F.R. § 106.45(b)(iv).

299.    Ms. Ramirez's consideration of alleged conduct outside the grievance process deprived Dr. Khodakhah of his rights under the 2022 Title IX Policy—which Einstein should have afforded him—to both *fair notice* and a presumption of innocence.

### 6.    Einstein Issues Overly Harsh Sanctions to Prevent Dr. Khodakhah from Performing His Academic Obligations.

300.    Ms. Ramirez's listed sanctions include, *inter alia,* that Dr. Khodakhah:

    a.    "Be barred from teaching, mentoring, or advising students and from serving on doctoral committees for a period of three (3) years following the end of your suspension."

    b.    "Be barred from serving in any faculty governance role, at both the department and College level for a period of three (3) years following the end of your suspension."

    c.    "Relocate your lab to a location other than the Kennedy Building, at the request of Dr. Adam Kohn, Interim Chair of the Neuroscience Department.  Your lab will maintain the equipment

> necessary for your research but will be relocated to another building on campus."

301.    The imposition of these sanctions serves only to further undermine Dr. Khodakhah's capacity to perform his academic obligations and serves no legitimate disciplinary or remedial purpose.

302.    The sanctions imposed on Dr. Khodakhah constitute bad faith interference with Dr. Khodakhah's capacity to engage "full time in activities that contribute to the mission of [Einstein] and fulfill the usual requirements of the Department for full time membership in the Department." *See* **Tenure Policy**.

303.    Complainant 2 was a member of the faculty, not a student.  Barring Dr. Khodakhah from working with students for three years serves no possible remedial purpose.

304.    Barring Dr. Khodakhah from working with students for three (3) years serves only to continue Dean Tomaselli's retaliatory decision to suspend and remove Dr. Khodakhah from campus on July 13, 2022 by making it impossible for him to perform research in his laboratory, where trainees provide assistance.  As such, the sanction is untethered to any legitimate remedial or disciplinary purpose.

305.    Forcing Dr. Khodakhah to vacate the Kennedy building also serves no legitimate disciplinary or remedial purpose, as Complainant 2 (the purported victim) does not work in that building and has long ago left Einstein for a position elsewhere.

306.    The sole purpose of forcing Dr. Khodakhah to relocate his lab from the Kennedy building is to prohibit him from interacting with colleagues in the Neuroscience Department.

307.    The sanction seeks only to further extend the effects of Dean Tomaselli's retaliatory suspension and removal decision on July 13, 2022, which impermissibly isolated Dr. Khodakhah from his colleagues.

7. **Einstein's Decision to Apply its 2018 Policy Deprives Dr. Khodakhah His Right to Appeal**

308.     Under the current and applicable 2022 Title IX Policy, Dr. Khodakhah was entitled to appeal a finding of responsibility, including the right to appeal a sanction that *"is excessive, inconsistent or insufficient with the nature of the offense."*

309.     In choosing to apply its obsolete 2018 Title IX Policy and rendering a decision which explicitly states*: **"neither party may appeal this decision,"*** Einstein has further failed to abide by the applicable employment policies and Title IX, which both entitle a respondent to a right of appeal in a Title IX proceeding.  *See* 2022 Title IX Policy, § III.I at 23; 34 C.F.R. 106.45(b)(5).]

P. **Einstein Refuses to Provide Interim Support Required by the 2014 Retention Agreement**

310.     Under the terms of the 2014 Retention Agreement, Dr. Khodakhah and Einstein mutually understood and agreed that, if one or several of his three R01 grants terminated without renewal, Einstein was  obligated to provide funding for Dr. Khodakhah's laboratory in an amount equivalent to the original amount of the terminated R01 grant, until such time that Dr. Khodakhah secured renewal of the original R01 grant.  The purpose of the 2014 Retention Agreement was to ensure that Dr. Khodakhah's  research remained funded at the level of the three R01 grants without lapse.

311.     Einstein specifically reiterated its commitment to provide the agreed-upon interim funding in Dr. Khodakhah's 2016 Promotional Letter.

312.     In breach of the terms of the 2014 Retention Letter, Einstein is not providing interim support in an amount equal to the direct costs of the three R01 grants.

313.    In a letter dated December 11, 2023, Dean Burns wrote Dr. Khodakhah that Einstein's current practice was "to limit interim support to one year," and referenced "Einstein's Interim Support Policy and Procedure," dated July 27, 2018 ("2018 Interim Support Policy").

314.    Citing the so-called 2018 Interim Support Policy, (which he did not attach to his letter), Dr. Burns's wrote:

> The policy states 'At the end of the first year of interim support, if the investigator has still not received renewal of his/her federal funding, and if other funding is not available to the PI, the Chairman will advise him/her in writing that the College of Medicine may not continue its support.'

315.    Dr. Khodakhah <u>never agreed to or signed the 2018 Interim Support Policy</u>.

316.    Correspondence between the parties dating from 2015 demonstrates their mutual understanding as to the meaning of the term "interim support."

317.    On March 26, 2015 at 4:35 a.m., Dr. Khodahah emailed Dean Burns, requesting confirmation of his understanding of the term "interim support" as used in the 2014 Retention Agreement, which was signed by former Dean Allen Spiegel.  Dr. Khodakhah wrote:

> Dear Ed:
> Allen offered this kind of support (keeping 3 R01's worth of research at all times going in the lab) in lieu of the massive endowment that Northwestern was offering me (which provided unconditional cash every year).  It may be playing with words (although with significant consequences for some faculty in my experience), but is the term interim support really what should be used to describe this support here?

318.    On March 26, 2015 at 8:32 p.m., Dean Burns emailed Dr. Khodakhah, confirming that his understanding was correct, that "interim support" guaranteed indefinite support by Einstein at all times.  Dean Burns wrote:

> **You're right, it's a semantic point.  In your case it's interim support promised in your retention package.  *It's all the same money*.** (Emphasis added).

319.    During the past five years, Dr. Khodakhah has had three active R01 grants, with total direct costs of more than $1.1 million per year.

320.    As of today, Dr. Khodakhah has no active R01 grants, and his last R01 grant expired in July of 2023.

321.    Dean Burns has informed Dr. Khodakhah that Einstein's position is that, when his two years interim support runs completely out of money in six months, Einstein will fire all the personnel who work in Dr. Khodakhah's laboratory because their positions will be unfunded.

322.    Funding of Dr. Khodakhah's laboratory is essential to his research because it pays for personnel, animals used in research, equipment, and supplies.  Without such funding, Dr. Khodakhah's research  and his career as an eminent scholar are impossible.

323.    Interim support in the event that a grant does not renew is critical to retaining laboratory personnel, whose employment is contingent upon grant funding.

324.    In the field of academic research, laboratory personnel typically start looking for a new position a year before the end of their grant-funded contract, to ensure that there is no lapse in their employment.

325.    Einstein's promise of guaranteed funding of Dr. Khodakhah's laboratory guaranteed that he could offer his laboratory personnel multiple-year contracts so that they would not leave to find another grant-funded position and guaranteed Dr. Khodakhah security in maintaining a long-term career at Einstein.

326.    Einstein has informed Dr. Khodakhah that trainee positions in his  laboratory will be unfunded in one year or less.

327.    Personnel appointed in positions as trainees in Dr. Khodakhah's laboratory, either as PhD students or postdoctoral fellows, who reasonably understood based on terms of their appointments that their positions would remain funded for multiple years have recently been informed by Einstein that their positions will be unfunded in less than one year.

328.     As but one example, on January 9, 2022, Einstein contacted J.V., a postdoctoral fellow who works in Dr. Khodakhah's laboratory, to inform him that, because of Dr. Khodakhah's "limited funding," Einstein would only secure his HB1 visa for one year.

329.     Since October of 2023, Einstein had communicated to Dr. Khodakhah that it was working on securing J.V. an HB1 visa with a three (3) year duration to coincide with the expected duration of his appointed position in Dr. Khodakhah's laboratory.

330.     In breach of Dr. Khodakhah's reasonable expectations under the terms of the 2014 Retention Agreement, as reiterated in the 2016 Promotional Letter, Einstein is informing workers in Dr. Khodakhah's laboratory that their positions will not be funded in six (6) months, knowing and intending for Dr. Khodakhah's laboratory personnel to leave their positions to secure new jobs elsewhere.

331.     Since July 13, 2022, Einstein has wrongfully precluded Dr. Khodakhah from working and conducting research in his laboratory.

332.      Einstein is  now refusing to provide the agreed upon interim support, pursuant to the 2014 Retention Agreement and informing his laboratory personnel that their grant-funded appointments will terminate.

333.     Einstein's evident intent is to effectively shut down Dr. Khodakhah's laboratory completely, destroying any capacity for him to perform academic research, and to use his inability to perform his academic obligations as a basis to terminate his tenured appointment.

## IV.     Indicia of Gender Bias

### A.     The Office for Civil Rights Pressures Universities to Aggressively Pursue Sexual Misconduct Complaints

334.     On April 4, 2011, the United States Department of Education in the Office for Civil Rights ("OCR") issued a guidance document to colleges and universities in receipt of federal

funding, which became widely known as the "April 2011 Dear Colleague Letter" ("2011 DCL"). *See* [RESCINDED] *Dear Colleague:  From Assistant Secretary for Civil Rights*, Russlynn Ali, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

335.    The 2011 DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations and directed schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." 2011 DCL at 4.

336.    Despite its purported purpose as a mere guidance letter, the Department of Education treated the 2011 DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

337.    The 2011 DCL, while not completely ignoring due process concerns, suggested that schools should focus on victim advocacy and "minimize the burden on the complainant," *id.* at 15–16.

338.    On April 29, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A"), which was aimed at addressing campus sexual misconduct policies and advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *See* Q&A at 31, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

339.    The 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  *Id.* at 25-31.

340.    Contemporaneous with the 2014 Q&A, the White House issued a report titled *Not Alone*, warning schools that, if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could initiate investigations, compliance review, and/or litigation against schools suspected of violating Title IX.  *See id.*

341.    In June of 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the 2011 DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the DOJ.  *See Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Dep't of Educ.,* (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

342.    Following the 2011 DCL, OCR put considerable pressure on universities to treat those accused of sexual misconduct—especially men—with a presumption of guilt. *See* Robin Wilson, *Presumed Guilty: College men accused of rape say the scales are tipped against them,* CHRONICLE OF HIGHER EDUCATION, (Sept. 1, 2014), https://www.chronicle.com/article/presumed-guilty/.

**B.    The OCR Rescinds the 2011 DCL and Adopts Enhanced Due Process Protections**

343.    On September 22, 2017, the OCR formally rescinded the 2011 DCL and 2014 Q&A and put in place interim guidance (the "2017 Dear Colleague Letter" or "2017 DCL), while the OCR reviewed and revised its practices regarding the adjudication of complaints of sexual

misconduct on college campuses.  *See Dep't of Educ., Dear Colleague Letter* (Sept. 22, 2017), *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf*.

344.    In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and which "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *See id.* (citations omitted).

345.    As former Secretary of Education Betsy DeVos noted, the rescission of the 2011 DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims."  Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

346.    The OCR put in place an interim guidance, U.S. Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf [hereinafter 2017 Q&A], while conducting a rulemaking process that would eventually lead to new binding Title IX regulations.  The 2017 Q&A directed schools to "adopt and publish grievance procedures that provide for a *prompt and equitable* resolution of complaints of sex discrimination, including sexual misconduct."  *See* 2017 Q&A at 3 (citing 34 C.F.R. 106.8(b) and OCR guidance from 2001) (emphasis added).

### C.    OCR Releases Final Regulations, Taking Effect August 14, 2020

347.    On May 6, 2020, the United States Department of Education released final Title IX regulations, (the **"2020 Title IX Regulations"**), which took effect on August 14, 2020.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistanc*e, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106).

348.     In a significant departure from the rescinded 2011 DCL and the 2014 Q&A, the 2020 Title IX Regulations make clear, *inter alia*, that schools can be found to discriminate on the basis of sex by treating either the complainant or the respondent unfairly; that parties must be provided a live hearing with cross-examination and access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; that investigators and decisionmakers must receive non-biased training, may not rely on sex stereotypes, and must be impartial; and must explain delays for good cause in the timeframe of the process in writing. *See* 34 C.F.R. § 106.45.

349.     In addition, the 2020 Title IX Regulations contain a three-pronged definition of "sexual harassment" that includes conduct on the basis of sex that satisfies one of the following criteria: (i) quid pro quo harassment; (ii) "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity"; (iii) "sexual assault" as defined under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f), and "dating violence" and "domestic violence" as defined under the Violence Against Women Reauthorization Act of 2013, 34 U.S.C. § 12291 *et seq*. *See* 34 C.F.R. § 106.30(a) (emphasis added).

350.     Prior to the 2020 Title IX Regulations, there had been only vague, non-binding guidance as to what conduct constituted "sexual harassment," which was inconsistent with judicial precedents. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistanc*e, 85 Fed. Reg/ 30,037 (May 19, 2020).

351.    "By utilizing precise definitions of conduct that constitutes sexual harassment," and incorporating a "reasonable person" standard into the definition's third prong, the Department of Education sought "to reduce uncertainty and confusion for recipients, students, and employees, while ensuring conduct that jeopardizes equal educational access remains conduct to which a recipient must respond under Title IX."  *See id.*

**D.     Internal Pressure on Einstein to Appear Responsive to Allegations of Sexual Harassment by Females Against Males**

352.    In late 2021, a female graduate student gave a presentation at a Neuroscience Department "Works in Progress" concerning the widespread perception among Einstein's female graduate students that Einstein was failing to resolve allegations of student mistreatment, including alleged sexual harassment.

353.    Following the Works in Progress presentation, Associate Dean for Graduate Programs in Biomedical Sciences, Victoria Freedman ("Dean Freedman"), told Dr. Khodakhah that she believed it was a major problem that female students perceived that Einstein was not adequately addressing their allegations of sexual harassment, and that it was critical for Einstein to appear more responsive to students' sexual harassment allegations.

354.    The Liaison Committee on Medical Education ("LCME") is the accrediting body for medical schools in the United States and certifies when a medical school meets all the standards set by the LCME.

355.    When a medical school fails to meet all of LCME's standards, LCME places the medical school on probation.  A school's placement on probationary status by LCME raises a red flag that can dissuade students from applying to that school.

356.    LCME standards include whether the school has sufficient mechanisms to promptly respond to allegations of student mistreatment, which include allegations of sexual harassment.

### E.      Einstein's Gender-Biased Enforcement of its Title IX Process

357.    In the wake of the 2011 DCL and the 2014 Q&A, Einstein sought to demonstrate that it was responsive to allegations of sexual misconduct.

358.    The #Me Too movement further affected Einstein's talk on campus, and graduate students complained of Einstein's failure to resolve students' allegations of sexual harassment.

359.    Einstein's Title IX Office is involved in every allegation of sexual misbehavior, no matter how slight.

360.    Sexual harassment and Title IX training is incorporated in Einstein's onboarding and orientation of new employees, graduate students and post-docs, and is aimed to enhance Einstein's efforts to provide a "safe and respectful" learning environment for women.

361.    On August 14, 2020, Einstein revised its old Title IX policy (dated Oct. 26, 2018) to conform with the federally mandated changes to the Title IX definitions and procedures pursuant to the 2020 Title IX Regulations.  *See* 2020 Title IX Policy, § III.I at 19 ("These Procedures are intended to implement 34 C.F.R. § 106.45, and as such, should be interpreted consistently with its requirements."); 2022 Title IX Policy, § III.I at 20 (same).

362.    Einstein was aware of its obligation to create a grievance process that affords both complainants (who are predominantly female) and respondents (who are predominantly male) a fair proceeding and due process rights, and to implement the regulatory changes for conduct that constitutes prohibited conduct under Title IX.

363.    Despite Einstein's knowledge of its obligations under Title IX, in Dr. Khodakhah's case, Einstein's Title IX Office chose not to afford Dr. Khodakhah notice of these changes to its policies and procedures.

364.    Instead, Einstein "suspended" Dr. Khodakhah on March 10, 2022 from his appointment as Chair and, on July 11, 2022, permanently dismissed him as Chair of the

Neuroscience Department, imposing discipline without affording Dr. Khodakhah an adjudication with all of the procedural protections required under Einstein's own employment policies and Title IX.

365.    Einstein further discriminated against Dr. Khodakhah when, on July 11, 2022, it made a conscious decision to adjudicate two Title IX complaints against Dr. Khodakhah pursuant to Einstein's obsolete Title IX policy, (effective October 26, 2018), despite that Einstein had replaced its obsolete Title IX policy in its entirety on August 14, 2020.

366.    Einstein applied its obsolete Title IX policy solely to ensure that it could hold Dr. Khodakhah "responsible," without the due process protections and a right of appeal, as provided for under Einstein's current Title IX policy and under Title IX.

367.    Einstein's decisions not to apply its current Title IX policy to investigate and adjudicate allegations of sexual harassment against Dr. Khodakhah were discriminatory, based on Einstein's motivation to ensure that Dr. Khodakhah would be found "responsible," with no real due process protections and rights of appeal.

## V.    Dr. Khodakhah has Suffered Immense Injury

368.    Dr. Khodakhah demonstrates sex discrimination in employment through facts that show he was subjected to a biased, procedurally flawed Title IX process, instigated by baseless allegations that exploited gender stereotypes and the pressure on his employer to appear more "responsive" to females' allegations of sexual misconduct by males.

369.    For more than 20 years at Einstein, Dr. Khodakhah excelled in performing *all* of his required academic obligations, including, *inter alia*: (i) obtaining and maintaining funding for his research; (ii) communicating research results to colleagues and collaborators in top tier, highly competitive science journals and as an invited lecturer and speaker at national and international forums; (iii) maintaining his professional stature and reputation as an international leader in the

58.

field of neuroscience; (iv) attracting the best students, postdoctoral fellows, and trainees to work in highly sought-after positions in his laboratory; and (v) conducting outstanding research in his laboratory, thereby significantly increasing the stature of Einstein.

370.     As a result of Dean Tomaselli's retaliatory decision to suspend and remove Dr. Khodakhah from Einstein's campus on July 13, 2022, Dr. Khodakhah has been unable to conduct his grant-funded research, to teach and mentor the students who work in his laboratory, to administer his grants, and to perform all of his other academic obligations for more than a year.

371.     For more than 20 years while at Einstein, Dr. Khodakhah successfully obtained grant funding for the innovative and productive research in his laboratory, something he has been unable to do as a result of the multiple adverse employment actions and the rumors and innuendo radiating out from Einstein.

372.     The damage to Dr. Khodakhah's professional reputation and stature in the scientific community has been so great that he is no longer invited to give professional seminars and lectures and is no longer able to attract PhD students and postdoctoral fellows to work in his lab.

373.     As noted above, the SfN withdrew its invitation for Dr. Khodakhah to give a keynote speech at Neuroscience 2022 as a result of Defendants' unlawful conduct, and NIH withdrew Dr. Khodakhah's participation in two peer review committees.

374.     Defendants' wrongful actions have destroyed not only Dr. Khodakhah's ability to perform his job functions as a faculty member at Einstein, but his ability to continue in his profession. The stigma attached to the adverse employment actions have made it impossible for Dr. Khodakhah to find work elsewhere and engage professionally with his peers in various forums.

375.     Dr. Khodakhah now suffers from health issues, emotional distress, and anxiety.

376.    Due to his lost Chairmanship, Dr. Khodakhah has suffered a loss in income associated with the Chair appointment.

377.    Due to Defendants' wrongful actions, Dr. Khodakhah has suffered the loss of job and promotional opportunities to advance to higher positions, such as deanship, presidency of a university, or directorship of a medical research institute or foundation.

## VI.    Imposition of Einstein's Sanctions Upon Dr. Khodakhah Threaten Irreparable Harm

378.    To successfully conduct medical research and compete at the top tier, as Dr. Khodakhah has done, requires successful coordination of a number of factors, including access to customized and purpose-built laboratory space, enlistment of outstanding laboratory personnel, and access to funding.

379.    In its  December 18, 2023 Title IX decision, Einstein announced its intention to sanction Dr. Khodakhah by, *inter alia,* requiring that he relocate his laboratory from the Kennedy building and that he be suspended from working with students for three years.

380.    Dr. Khodakhah's laboratory at Einstein is customized for him with the specialized space and equipment necessary to perform the extremely complicated experiments that his research requires.

381.    The time spent on designing and making a new laboratory space will take four to six months. Moving the laboratory (the equipment, supplies, and animals) will take at least as long, and would require the termination of months long experiments in one location and restarting them at the new location once the move has completed. Hence, requiring Dr. Khodakhah to move his laboratory from the Kennedy building will effectively preclude him from meaningfully conducting research for at least  a year.

382.   Dr. Khodakhah's medical research also requires smart, hardworking personnel:  the postdocs, graduate students and visiting international and national students who collectively are the trainees who actually do the experiments.

383.   To have a functioning laboratory, Dr. Khodakhah must maintain productivity and continuously bring in new personnel, so that the new personnel are trained over the course of a year or two to use the extremely complicated instruments and to conduct the incredibly difficult experiments by the more senior experts in the laboratory before they leave.

384.   Suspending Dr. Khodakhah from working with students for three years, on top of the needless move from the Kennedy building, will virtually shut down Dr. Khodakhah's laboratory.

385.   Postdocs will be highly unlikely to select to work in Dr. Khodakhah's laboratory if there are no graduate, visiting or summer students to train or contribute research toward their papers as a result of Einstein's Title IX sanctions.

386.   Consequently, without postdocs or students, Dr. Khodakhah's laboratory will be without personnel, and no research will be done.

387.   Imposition of Einstein's sanctions to relocate his laboratory and to suspend for three years his capacity to work with students will cause irreparable harm by resulting in a lapse in research *for at least four years*, continuing the precipitous attrition of all aspects of Dr. Khodakhah's ability to continue research when Dean Tomaselli ordered him suspended from duty and "removed" from campus 19 months ago, in July 2022.  .

388.   It took Dr. Khodakhah more than 30 years to reach the top of his profession in the study of the role of the cerebellum in various disease states. His research is fundamental to the understanding of deficits in the brain that may underlie human disease states.

389.   There are only a handful of neuroscientists in the world who do the caliber and quality of work that Dr. Khodakhah does in his field, and his work is demonstrably important and influential:

- Dr. Khodakhah's 2019 paper, "Cerebellar modulation of the reward circuitry and social behavior," published in Science, was ranked by NIH with a Relative Citation Ratio ("RCR") of 19.84.   According to the NIH, a paper's RCR "represents a citation-based measure of scientific influence" of a research article," meaning that Dr. Khodakhah's article has been cited **nearly 20 times as many cites per year** as the median NIH-funded paper in its field.  *See* https://icite.od.nih.gov/analysis.

- The same article received an Almetric attention score of 389.  This measures the "quality and quantity of online attention" the article receives worldwide, and means that the article has scored *"in the top 5% of all research outputs ever tracked by Altmetric."*  https://science.altmetric.com/details/54062616#score; *see also* Susan A. Elmore,  Editor-in-Chief, "The Altmetric Attention Score: What Does It Mean and Why Should I Care?" Toxicol Pathol, (2018 Apr).

- Dr. Khodakhah's 2019 article is still on the cutting edge of scientific innovation in the field of neuroscience and continues to be cited by scientists in his field, in January 2024 and upcoming February academic scientific journals.  *See* https://science.altmetric.com/details/54062616/citations.

  Despite its short tenure, Dr Khodakhah's recent 2024 Nature Neuroscience paper, "The cerebellum directly modulates the substantia nigra dopaminergic activity" has been highlighted by 16 news agencies, has an extremely high Attention Score of 99 percentile compared to publications of the same age, and is "in the top 5% of all research outputs ever tracked by Altmetric."  This work represents a culmination of eight years of research in Dr Khodakhah's laboratory.

390.   As a result of Einstein's actions, including, *inter alia*, its July 13, 2022 suspension and removal order, which precluded him from being physically present to provide necessary guidance and mentoring to trainees in his laboratory, Dr. Khodakhah's laboratory has already been reduced to half its size and his laboratory is currently at least several years behind in its progress.

391.   Dr. Khodakhah cannot maintain his momentum by doing research alone, without students and trainees, and without a laboratory. The loss of momentum would significantly lower

Dr. Khodakhah's scientific productivity, which in turn would ruin his ability to obtain NIH funding and attract outstanding students and postdocs to his laboratory.

392.   Dr Khodakhah's medical research has made major contributions to our understanding of how the brain works, with significant translational implications for disorders such as Parkinson's disease, ataxia, dystonia, Autism spectrum disorder, and addiction.

393.   The future of Dr. Khodakhah's capacity to do science that is of value to the public good will be lost because of the devasting effects of Einstein's ongoing sanctions. As a consequence of Einstein's actions, it is extremely unlikely that Dr Khodakhah will be able to resume his top tier research for at least a decade, if ever.

## COUNT I

### Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 et seq.
**(As to Defendants Einstein, MMC, MHS, and MMAH)**
**Erroneous Outcome - Intentional Sex Discrimination**

394.   Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

395.   Title IX of the Education Amendments of Title IX of the Education Amendments of 1972 20 U.S.C. § 1681 *et. seq.,* provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

396.   Title IX applies to all public and private educational institutions that receive funding.

397.   Title IX prohibits any covered entity from discriminating in "in employment or recruitment, consideration, or selection therefor, whether fulltime or part-time" "on the basis of sex." 34 C.F.R. § 106.51(a)(1).

398.    Title IX requires a school "to adopt and publish grievance procedures requiring the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b).

399.    Defendants Einstein, MMC, MHS, and Montefiore discriminated against Plaintiff Dr. Khodakhah because of his sex by applying an unfair, unreliable, and partial process, against him in resolving a Title IX complaint.

400.    The outcome in this case was erroneous because Dr. Khodakhah was innocent and did not violate Einstein's polices.

401.    Defendant Einstein is an "educational" program under Title IX.

402.    Defendants Einstein, MMC, MHS, and Montefiore receive federal funding.

403.    At all points relevant herein, Defendants Einstein, MMC, MHS, and Montefiore operated as agents of one another.  As described herein, the operations of Einstein, MMC, MHS, and Montefiore are substantively consolidated.

404.    "Title IX allows a private right of action for a university's intentional gender-based discrimination against a faculty member."  *Vengalattore v. Cornell Univ*., 36 F.4th 87, 106 (2d Cir. 2022); *see Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979).

405.    As recently held by the Second Circuit, gender discrimination may be inferred where:

        a.      the university failed to act in accordance with university procedures designed to protect accused students;

        b.      the university failed to seek out potential witnesses whom the accused had identified as sources of information favorable to the accused;

        c.      that the defendant university had been criticized for not seriously addressing complaints by female students of sexual misconduct by males; and

        d.      that the university made findings against the accused male that were incorrect and contrary to the weight of the evidence.

*See Vengalattore*, 36 F.4th at 106–07 (citation and punctuation omitted); *see also Menaker v. Hofstra Univ,* 935 F.3d at 31-32 (2d Cir. 2019).

406.    "Procedural irregularity alone may suggest some form of bias, when there are clear procedural irregularities in a university's response to allegations of sexual misconduct" *See id.* (internal citations and punctuation omitted); (citing *Menaker*, 935 F.3d at 33 & n.48.

407.    As alleged in the foregoing paragraphs, procedural irregularities in the investigation and treatment of Dr. Khodakhah's sexual misconduct process, supporting an inference of gender discrimination include, *inter alia,* the following:

a.    Einstein improperly chose to evaluate Dr. Khodakhah's two Title IX complaints under its obsolete 2018 Title IX Policy, which did not afford him the procedural protections of its current 2022 Title IX Policy despite that (i) Einstein had entirely replaced its 2018 Title IX Policy on August 14, 2020 with its 2020 Title IX Policy, which it republished and renewed, without substantive modification, on March 18, 2022; and (ii) the stated scope of the 2022 Title IX Policy unambiguously applies to all faculty accused of Title IX misconduct, regardless of the date of the alleged occurrence.  *See supra* ¶¶ 77-88, 174-179, 309-310, 366-368.

b.    Einstein arrived at its sanctions by improperly considering unsubstantiated allegations of alleged "behaviors" that purportedly violated a "code of conduct" and for which Dr. Khodakhah had purportedly been dismissed as Chair on July 11, 2022, without an adjudication, as required by Title IX, and which were unconnected to/unconsolidated with Dr. Khodakhah's Title IX case, and which permitted the decision-maker to draw an unwarranted and prejudicial inference that Dr. Khodakhah's Title IX case was a so-called *"second offense*." *See supra* ¶¶ 295-300.

c.    Einstein arbitrarily imposed overly harsh and punitive sanctions, including a sanction to bar Dr. Khodakhah *for three years* from working with students for alleged conduct that does not constitute "Title IX sexual harassment" under Einstein's current and applicable 2022 Title IX Policy.  *See supra* ¶¶ 179, 260-277, 301-308.

d.      The decision-maker wrongly applied the preponderance of the evidence standard by erroneously finding that Dr. Khodakhah lacked credibility based on nothing more than her acceptance of Complainant 2's *word* over Dr. Khodakhah's. *See supra* ¶¶ 272-276, 278-291.

e.      The investigator did not speak with all of Dr. Khodakhah's witnesses and declined to seek out witnesses identified by Dr. Khodakhah who could have provided exculpatory evidence favorable to him. *See supra* ¶¶ 254, 257.

f.      The investigator instructed Dr. Khodakhah not to speak with his witnesses to coordinate their  statements but imposed no such restriction on the complainant. *See supra* ¶¶ 257-258.

g.      The decision-maker adopted the investigator's recommended findings which wrongfully ignored relevant, exculpatory evidence, resulting in findings of fact and credibility determinations that were incorrect and contrary to the weight of the evidence, as both the investigator and the decision-maker were motivated to favor the accusing female over the accused male. *See supra* ¶¶ 250-259, 288-290.

h.      Einstein and the investigator wrongfully interfered with Dr. Khodakhah's rights to communicate with and secure witnesses in his Title IX process and he was not permitted to discuss the allegations with potential witnesses, as was his right under Einstein's Title IX Policy. *See supra* ¶¶ 180-184, 193-199, 205-210, 248-249, 257.

i.      Two days after Dr. Khodakhah was notified of the Title IX complaints, Dean Tomaselli suspended and removed him from campus in retaliation for reaching out to potential witnesses, an action that was prohibited under Einstein's Title IX policy and procedures. *See supra* ¶¶ 180, 182.

j.      Multiple members of the faculty, as well as a former member of Dr. Khodakhah's laboratory, reported to the Title IX Office that there was reason to believe that the Title IX complaints against Dr. Khodakhah contained false allegations, made in bad faith, but the Title IX Office did not look into these allegations, despite provisions in its procedures prohibiting the submission of false information. *See supra* ¶¶ 200-204, 218-228.

408.   As alleged in the foregoing paragraphs, gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff, Dr. Khodakhah.   Factual circumstances demonstrating gender bias include, without limitation, *inter alia*:

a.   Einstein was aware of its obligation under the 2020 Title IX Obligations to create a grievance process that affords both complainants (who are predominantly female) and respondents (who are predominantly male) a fair proceeding and due process rights but failed to implement a fair and equitable grievance process in Dr. Khodakhah's case.  *See supra* ¶¶ 349, 362-366.

b.   Einstein rejected application of the 2020 Title IX Regulations, as incorporated in its then-current 2022 Title IX policy, which offered enhanced due process protections for all accused, in all cases of alleged sexual misconduct, and, in Dr. Khodakhah's case, failed to afford procedural protections required under Title IX. *See supra* ¶¶ 367-368.

c.   Einstein rejected application of the 2020 Title IX Regulations with respect to their clearer and more precise definition of sexual harassment, and its decision to apply an overbroad and vague definition of "sexual harassment" from an obsolete policy in Dr. Khodakhah's case to ensure that Einstein could hold him "responsible" and that he would have no right to appeal a finding of responsibility.  *See supra* ¶¶ 179-179, 350-352, 367-368.

d.   When Dr. Khodakhah informed Ms. Ramirez, the Title IX Coordinator who was the decision-maker in his Title IX cases, and Dean Burns that he had been the subject of false anonymous allegations of misconduct, including sexual misconduct, they both agreed that the allegations were nonsense but offered Dr. Khodakhah the "option" "to step-down" as Chair, saying that Einstein needed to appear "responsive" to anonymous allegations during the wake of the #Me Too movement.  *See supra* ¶¶ 115-126.

e.   For years, Einstein faced external pressure to aggressively pursue sexual misconduct complaints.  *See supra* ¶¶335-346.  Einstein also faced internal pressures to appear "responsive" to allegations of sexual harassment, highlighted by a "Works in Progress" meeting at which a female graduate student raised concerns about Einstein's perceived failure to appropriately resolve female

graduate students' complaints of sexual harassment. *See supra* ¶¶ 353-354, 358-361. Einstein was also under pressure by the LCME accreditation body to appropriately resolve allegations of sexual harassment. *See supra* ¶¶ 355-357.

f.   Following Dr. Khodakhah's unwarranted suspension from his Chairmanship on March 10, 2022, Einstein was under pressure to take even greater action against him on the basis of rumor and unsubstantiated allegations of sexual misconduct. *See supra* ¶¶ 132, 135-136.

409.   As a direct and proximate result of Defendants' conduct, Dr. Khodakhah suffered significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

<u>**COUNT II**</u>

<u>**Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681**</u>
<u>**Retaliation**</u>
**(As to Defendants Einstein, MMC, MHS, and MMAH)**

410.   Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

411.   Defendants Einstein, MMC, MHS, and MMAH operated as agents of one another; the operations of Defendants Einstein, MMC, MHS, and MMAH are substantively consolidated.

412.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

413.   Defendant Einstein is an "educational program" under Title IX.

414.   Defendants Einstein, MMC, MHS, and MMAH receive federal funding.

415.   Retaliation by an educational program receiving federal funds against a person for engaging in protected activity under Title IX is actionable. To state a claim for retaliation, a

plaintiff must allege:  "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action."  *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).

416.    As alleged in the foregoing paragraphs, on July 12, 2022, Dr. Khodakhah engaged in Title IX protected activity when he responded to allegations that he engaged in sexual misconduct as the named respondent in two Title IX complaints by reaching out to secure witnesses.

417.    Title IX regulations and Einstein's then-current 2022 Title IX Policy entitle a respondent to secure potential witnesses and speak with them about the allegations in preparing a response to a complaint of an alleged Title IX violation.  *See* 34 CFR § 106.45.  *See supra* ¶181.

418.    Participation by "any individual" in any manner in a Title IX investigation or proceeding constitutes protected activity under Title IX. *See* 34 C.F.R. § 106.71.  Prohibited retaliation against any such individual includes charging him with a code of conduct violation for the purpose of interfering with any right or privilege secured by Title IX.  *See id.*

419.    On July 13, 2023, one day after Dr. Khodakhah sought to secure potential witnesses in his Title IX proceedings, Einstein erroneously charged him with a violation of Einstein's so-called "no retaliation policy" and ordered Dr. Khodakhah to be suspended from his faculty position and immediately removed from campus, including the Kennedy building, and deactivated Dr. Khodakhah's active directory, email accounts, actions that have continued until today.

420.    As alleged in the foregoing paragraphs, Dr. Khodakhah suffered adverse action by Einstein's suspension and removal order, which remains in effect today.  As a result of Einstein's retaliatory actions, Dr. Khodakhah has been unable to conduct research in his lab, supervise the

students who work in his lab, and administer his grant-funded research. *See supra* ¶¶ 182-283, 370-371, 386-387.

421.    Einstein's suspension and removal of Dr. Khodakhah from campus were actions taken for the purpose of interfering with Dr. Khodakhah's right to gather information and secure witnesses in his Title IX proceeding. *See supra* ¶¶180-183, 185, 187-188-199.

422.    The close temporal proximity (one day) between Dr. Khodakhah participation in the Title IX proceeding and the adverse actions taken against him by Einstein demonstrates a causal connection between the protected activity and the adverse action. *See supra* ¶¶180, 182.

423.    That a retaliatory motive played a part in the adverse actions taken against Dr. Khodakhah is obvious. Einstein erroneously charged Dr. Khodakhah with a purported violation of a so-called "no retaliation policy" specifically because of his protected activity—activity which was expressly permitted under Einstein's own Title IX policy. *See supra* ¶¶ 181-182, 185, 192-193.

424.    As alleged in the foregoing paragraphs, Defendants' retaliatory motivation against Dr. Khodakhah is also demonstrated by the overly harsh and punitive sanctions that Einstein has imposed on Dr. Khodakhah in its December 18, 2023 decision. *See supra* ¶¶ 301- 308.

425.    For no legitimate remedial or disciplinary purpose, Einstein's December 18, 2023 decision on the erroneous Title IX complaint –which involved a *faculty member*— imposed a three-year ban on Dr. Khodakhah's ability to teach, mentor or work with *students*. *See supra* ¶¶301, 304-305.

426.    By effectively making it impossible for Dr. Khodakhah to conduct research in his lab—where graduate students perform research as trainees—the obvious purpose of the sanction

is to continue the retaliatory suspension and removal order Einstein on July 13, 2022. *See supra* ¶¶ 33-34, 301, 304-305.

427.    As a result of Defendants' retaliation, Dr. Khodakhah has suffered reputational harm, mental pain and anguish, including without limitations, symptoms of anxiety and depression.

428.    As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, plus attorneys' fees, and an order lifting the suspension and removal order of July 13, 2022, and an order enjoining Defendants from imposing upon Dr. Khodakhah any bar to working on campus, including the Kennedy building, and any bar against teaching, mentoring, or advising students.

## COUNT III

## Breach of Contract
### (As to Defendants Einstein, MMC, MHS, and MMAH )

429.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

430.    Under New York law, to establish a breach of contract, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the [claimant], (3) breach of contract by the [accused], and (4) damages." *Stadt v. Fox News Network LLC,* 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010).

431.    Under New York law, policies in a personnel manual specifying the employer's practices with respect to the employment relationship become a part of the employment contract. *See  Langenkamp v. Olson,* 628 F.App'x 50, 52 (2d Cir. 2015) *Kaloyeros v. Rsch. Found. of State Univ. of New York*, 71 Misc. 3d 1219(A), 144 N.Y.S.3d 557 (N.Y. Sup. Ct. 2021) (same).

432.    Under New York law, employment policies incorporated by reference in an appointment letter constitute a contract which is binding on the employer.  *See Monaco v. New York Univ.,* 204 A.D.3d 51, 65, 164 N.Y.S.3d 87, 98 (2022); *Klinge v. Ithaca Coll.*, 167 Misc. 2d 458, 461, 634 N.Y.S.2d 1000, 1002 (Sup. Ct. 1995).

433.    Defendants breached Dr. Khodakhah's employment contract by subjecting his employment to discipline in violation of the terms of his appointment letters and the specific procedures set forth in Einstein's various employment policies.

434.    Dr. Khodakhah's appointment letter in 2001 and later appointment and promotional letters incorporate by reference the employer's policies "applicable to faculty."  *See supra* ¶ 30.

435.    Dr. Khodakhah fully complied with all provisions set forth under the terms of his employment and under Einstein's policies and procedures.  *See supra* ¶¶ 31-36, 371.   Dr. Khodakhah has understood that his rights and responsibilities were defined in Einstein's employment policies, and that they are binding on Defendants.  *See supra* ¶¶ 28-30.

436.    Without any justification, Defendants breached their contract with Dr. Khodakhah.

437.    At all times relevant, Einstein's employment policies specified the employer's practices with respect to Dr. Khodakhah's employment relationship, including its specific procedures and policies for discipline, the adjudication of complaints brought pursuant to Title IX, and discipline for alleged discriminatory conduct (non-Title IX).  *See supra* ¶¶ 77-99.

438.    As alleged in the foregoing paragraphs, at all times relevant, Einstein had in place a Title IX Policy, i.e., the 2020 Title IX Policy, which was renewed without modification on March 18, 2022, i.e., the 2022 Title IX Policy), and the Discrimination/Harassment Policy. *See supra* ¶¶ 77-95.

A.      "Suspension" from Chairmanship on March 10, 2022

439.    On March 10, 2022, Einstein removed Dr. Khodakhah from his Chairmanship as a purported interim protective measure "to protect all parties from fear of retaliation," and announced that it would replace him with an "interim chair."  *See supra* ¶¶ 127-129.

440.    The then-current 2020 Title IX Policy and the Discrimination/Harassment Policy provide specific procedures for interim protective measures.  *See supra* ¶ 140.

441.    Neither the 2020 Title IX Policy nor the Discrimination/Harassment Policy permit "interim protective measures" that are punitive or disciplinary in nature, or that constitute an adverse employment action (e.g., demotion, dismissal or suspension from an appointed position). *See* ¶¶138-142.

442.    A demotion is an inherently punitive and disciplinary measure.

443.    Dr. Khodakhah's dismissal from his Chairmanship, and his replacement with an "interim chair" constituted a demotion.  As such, it was an inherently punitive and disciplinary measure and impermissible under the procedures provided for in Einstein's employment policies governing interim protective measures and discipline.  *See supra* ¶ 142.

444.    Dean Tomaselli had no discretion under the above-mentioned employment policies to impose *discipline* against Dr. Khodakhah's employment by "suspending" him from his Chairmanship on March 10, 2022, and replacing him with an Interim Chair, as a purported "interim protective measure."  *See supra* ¶ 140-142.

445.    Einstein breached the specific provisions providing for discipline and interim protective measures when it purported to "suspend" Dr. Khodakhah from his Chairmanship, which was a *de facto* demotion.  *See supra* ¶¶138-142.

**B.** **Disciplinary Dismissal of Dr. Khodakhah from His Appointment as Chair on July 11, 2022**

446.     On July 11, 2022, Dr. Khodakhah had in place both the 2022 Title IX and the Discrimination/Harassment Policy (for non-Title IX violations).  *See supra* ¶¶88-89.  These two policies were the only employment policies potentially applicable to the erroneous allegations against Dr. Khodakhah, as contained in the falsified anonymous "student survey" for which Dr. Khodakhah was allegedly dismissed from his Chairmanship.  *See supra* ¶ 110.

447.     To the extent that the alleged misconduct for which Einstein purportedly dismissed Dr. Khodakhah from his Chairmanship on July 11, 2022 could have fallen under both the Discrimination/Harassment Policy and the 2022 Title IX Policy, ***or any other employment policy,*** the procedures set forth in the 2022 Title IX Policy controlled. *See supra* ¶ 91 (citing 2022 Title IX Policy, § II at 3).

448.     Both the 2022 Title IX Policy and the Discrimination/Harassment Policy specifically required—at a minimum—that Einstein (i) provide Dr. Khodakhah a fair and impartial investigative report, with any findings and outcome; ***and*** (ii) prove by a "clear and convincing" standard of evidence that Dr. Khodakhah had committed the alleged violation ***prior to the imposition of discipline***.  *See supra*  ¶¶ 87 (citing 2022 Title IX Policy at § III.I. at 21), 95 (citing Discrimination Harassment Policy, § X.B at 12).

449.     In breach of the contract, Einstein failed to afford Dr. Khodakhah the minimal procedural protections required under its employment policies, specifically, § III.I of the 2022 Title IX Policy and § X.B of the Discrimination/Harassment Policy, when it permanently dismissed Dr. Khodakhah from his appointed Chairmanship on July 11, 2022, for a disciplinary reason (alleged misconduct), without, providing him the procedural protections specifically required under Einstein's employment policies.  *See supra* ¶¶87-88, 95, 163-164.

**C.     Adjudication of 2 Title IX Complaints – Application of Obsolete 2018 Title IX Policy**

450.    As alleged in the foregoing paragraphs, Einstein's 2022 Title IX Policy, which was in place on July 11, 2022, required that Einstein provide Dr. Khodakhah a Title IX grievance process that was compliant with all of the procedural requirements of that policy *prior* to the imposition of any discipline. *See supra* ¶¶ 87-88, 176-177, 362 (citing § III.I of the 2022 Title IX Policy, providing that, "[t]hese Procedures are intended to implement 34 C.F.R. § 106.45, and as such, should be interpreted consistently with its requirements.").

451.    The scope of the 2022 Title IX Policy unambiguously applied to Dr. Khodakhah's two pending Title IX Complaints. *See supra* ¶ 178.

452.    In accordance with the 2020 Title IX Regulations, the 2022 Title IX Policy, provides detailed procedural requirements which required Einstein to afford ***specific and robust*** procedural protections to a respondent, which included, *inter alia*, that:

> i.      "Following the Investigation and issuance of the Investigative Report, the Complaint will proceed to a live Hearing," at which "each party's Advisor will be given an opportunity to ask the other party and any witnesses all relevant questions and follow-up questions in real time, including questions challenging credibility."

*See supra* ¶ 87 (citing 2022 Title IX Policy at § III.I at 20-23).

> ii.      "The Title IX Coordinator will coordinate details of the Hearing and parties' submissions, but will not serve as a Decisionmaker."

*See supra* ¶ 291 (citing 2022 Title IX Policy at § III.I at 20).

> iii.      "The Respondent will be presumed to be not responsible for the alleged conduct unless and until proven otherwise under a clear and convincing evidence standard of evidence."

*See supra* ¶ 87 (2022 Title IX Policy at § III.I at 21).

iv.     "Both parties have the right to appeal from a determination regarding responsibility."

*See supra* ¶ 87 (citing 2022 Title IX Policy at § III.I at 23).

453.    The 2022 Title IX Policy did not permit Einstein to deprive Dr. Khodakhah of the aforementioned procedural protections or to decline to evaluate the Title IX complaint against him pursuant to that policy's definition of "Title IX sexual harassment."  *See* ¶¶ 83-88, 178, 362.

454.    The 2022 Title IX Policy was expressly intended to implement the 2020 Title IX Regulations,  *see* 34 C.F.R. § 106.45.  The 2022 Title IX Policy afforded Einstein  no discretion to apply its obsolete 2018 Title IX Policy to Dr. Khodakhah's Title IX case.  *See* ¶ 362.

455.    As alleged in the foregoing paragraphs, Einstein breached multiple specific provisions of the 2022 Title IX Policy when it purported to provide Dr. Khodakhah Title IX grievance procedures pursuant to its obsolete 2018 Title IX Policy in ways that included, *inter alia:* (i) failing to provide Dr. Khodakhah a hearing; (ii) failing to provide Dr. Khodakhah a right to confront the complainant and question witnesses; (iii) failing to afford Dr. Khodakhah a presumption of innocence; (iv) purporting to apply a  "preponderance of the evidence" standard rather than the "clear and convincing" standard of evidence; (v) purporting to apply the vague and confusing 2018 Title IX policy definition of "sexual harassment" rather than the  narrower and clearer definition of "Title IX Sexual Harassment" as provided under the 2022 Title IX Policy. *See supra* ¶¶ 86-88, 176-179, 299, 309-310, 366-368.

456.    Einstein further breached the 2022 Title IX Policy when it purported to arrive at the sanctions to impose upon Dr. Khodakhah by considering false and anonymous allegations for which Dr. Khodakhah had never been issued a "formal complaint," as required under the 2022 Title IX Policy, and for which Dr. Khodakhah had *no notice* and which were outside the procedures mandated by the 2022 Title IX Policy.  *See supra* ¶¶ 295-300.

### D. Disciplinary Dismissal from Appointment as Chair -Breach of the Terms of May 3, 2016 Appointment Letter

457.     The express terms of Dr. Khodakah's May 3, 2016 appointment letter promoting him to Chair of the Department of Neuroscience provided that his "continuation is subject to performance as determined by the Dean."  *See supra* ¶¶ 52, 145.

458.     In breach of Dr. Khodakah's reasonable expectations under all of Einstein's employment policies and the terms of Dr. Khodakah's appointment and promotional letters, Dean Tomaselli dismissed Dr. Khodakah as Chair ***not*** because of his "performance," but for an alleged ***disciplinary*** reason.  *See supra* ¶ 146.

459.     In breach of Dr. Khodakah's employment contract, Dean Tomaselli purported to impose discipline against Dr. Khodakah's employment by dismissing him from his Chairmanship, with no adjudication or findings, or any of the other procedural protections afforded under Einstein's employment and discipline policies.  *See supra* ¶¶ 87-88, 95, 145-146.

460.     Accordingly, the dean's actions exceeded his discretion under the May 3, 2016 appointment letter, when such letter is read in conjunction with all of the appointment letters and policies constituting Dr. Khodakah's employment relationship with Einstein.  *See, e.g., Monaco*, 204 A.D.3d 51, 65, 164 N.Y.S.3d 87, 98 (2022).  *See supra* ¶¶ 52, 145-146.

### E. Failure to Provide Interim Funding -Breach of the Terms of the June 9, 2014 Retention Agreement

461.     As alleged in the foregoing paragraphs, on June 14, 2014, Einstein committed to providing Dr. Khodakah ongoing interim support for his laboratory, and reiterated this commitment in 2016, in appointment letters that both parties signed that predated Einstein's 2018 Interim Support Policy.  *See* ¶¶ 44-45, 53.

462.     Einstein and Dr. Khodakah mutually understood and agreed that, under the terms of Dr. Khodakah's 2014 Retention Agreenent and the 2016 Promotional Letter, Einstein

77.

committed to provide interim support equivalent to the direct costs of Dr. Khodakhah's R01s indefinitely, subject to Dr. Khodakhah's retirement or the termination of his tenured employment. *See supra* ¶¶ 311-312, 318-319.

463.    The interim support commitment that Einstein promised Dr. Khodakhah was made in its June 9, 2014 Retention Letter as a counter-offer to the large endowment which Dr. Khodakhah had been offered by Northwestern University when it tried to recruit him. *See supra* ¶¶ 41-45, 318-319.

464.    At all times relevant, Dr. Khodakhah performed his obligations as an academic researcher under the terms of his various appointment and promotional letters. *See supra* ¶¶ 31-37, 54-56, 370.

465.    In breach of the agreement, Einstein has failed to provide interim support. *See supra* ¶¶ 313-316, 321-322, 333.

466.    As a result, Dr. Khodakhah's research is not being funded and he is losing lab personnel. *See supra* ¶¶ 325-331.

467.    Einstein's failure to provide the agreed-upon interim support for Dr. Khodakhah's laboratory threatens to make it impossible for him to continue to conduct research in his laboratory, furthering the damage Defendants have already caused to Dr. Khodakhah's reputation and stature in the scientific community, and further making it impossible for him to perform his academic obligations as a tenured professor. *See supra* ¶¶ 323, 332, 334.

**F.  July 13, 2022 Suspension and Removal Order**

468.    As alleged in the foregoing paragraphs, on July 13, 2022, Dean Tomaselli ordered Dr. Khodakhah suspended and removed from campus for a purported violation of a "no retaliation policy." *See supra* ¶¶ 182-183.

469.    Dean Tomaselli's actions were not permitted under the applicable 2022 Title IX Policy, as the suspension and removal of Dr. Khodakhah from campus constituted discipline without an adjudication and finding of misconduct by clear and convincing evidence.  *See* ¶¶ 185, 187, 193-195.

470.    Dean Tomaselli's suspension and removal action was also not authorized under Section III.H of the Appointments Policy.  *See supra* ¶¶ 188-191.

**G.  Breach of Obligation to Resolve Plaintiff's Claim for Retaliation**

471.    As alleged in the foregoing paragraphs, on August 17, 2022, Plaintiff filed a claim with Einstein's Title IX office for retaliation by Dean Tomaselli based on  the latter's decision to suspend him from duty and order him removed from campus.  *See supra* ¶ 213.

472.    Einstein was required to adjudicate Dr. Khodakhah's claim for retaliation pursuant to the 2022 Title IX Policy's grievance procedures, and to resolve his complaint within 60 days after he filed it.  *See supra* ¶ 216 (citing 2022 Title IX Policy, §§ III.N at 27, III.I at 24).

473.    In breach of the 2022 Title IX policy and Plaintiff's reasonable expectations, Einstein has still not adjudicated and resolved Plaintiff's retaliation claim and Plaintiff has remained suspended and banned from campus for more than one year.  *See supra* ¶ 217.

474.    As a result of the foregoing, Plaintiff has suffered damages in an amount to be determined at trial, as a direct and proximate cause of Defendants' breach of Plaintiff's employment agreement, including Einstein's employment policies and Faculty Handbook and the terms of Plaintiff's appointment and promotional letters, which include but not limited to:

    a.    long-term injury to Plaintiff's professional reputation and career;
    b.    Loss of Plaintiff's annual compensation for service as Chair;
    c.    Loss of physical well-being, emotional and psychological pain and suffering.

## COUNT IV

### Breach of Implied Covenant of Good Faith and Fair Dealing
**(As to Defendants Einstein, MMC, MHS, and MMAH )**

475.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

476.    "In every contract there exists an implied covenant of good faith and fair dealing, that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 79, 188 N.E. 163 (1933); *see Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 90–91, 118 N.E. 214 (1917) ("A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed.")

477.    The implied covenant of good faith includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Serv*., 87 N.Y.2d 384, 389, 663 N.E.2d 289 (1995) (citation and quotation marks omitted).

478.    "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv*., 87 N.Y.2d 384, 389, 663 N.E.2d 289 (1995); *see also Tedeschi v. Wagner Coll*., 49 N.Y.2d 652, 659 (N.Y. 1980). *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P*., 309 A.D.2d 288, 302, 765 N.Y.S.2d 575 (2003) ("even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement").

479.    When a party to a contract engages in deceit to destroy the right of the other party to receive the fruits of the contract, that party breaches the covenant of good faith and fair dealing. *25 Bay Terrace Assocs., L.P. v. Pub. Serv. Mut. Ins. Co*., 144 A.D.3d 665, 667, 40 N.Y.S.3d 469

(2016) (finding breach where "factually inaccurate" report was prepared for the sole purpose of denying policy holder's claim).

480.   Here, Defendant Einstein breached the implied covenant of good faith and fair dealing in ways that included, *inter alia*, the following:

a.   Ordering Dr. Khodakhah suspended and barred from campus on July 13, 2022, and continuing to suspend and bar him for more than a year, an action designed to prevent Dr. Khodakhah' from fulfilling his academic obligations as a tenured professor, pursuant to § III.A.4 of the Tenure and Compensation Policy, which require that he be "*engaged full time in activities that contribute to the mission of the College of Medicine [Einstein] and fulfill the usual requirements of the Department for full time membership in the Department,*" such as "grant supported research" and student mentoring, or else be subject to dismissal for "neglect of duties." *See supra* ¶¶ 98-99.

b.   In its December 18, 2023 decision on the Title IX complaint, imposing overly harsh and punitive sanctions, lacking any remedial or disciplinary purpose, that are designed to prevent Plaintiff from performing his academic obligations, as required under the terms of his tenured employment, and which serve to continue Dean Tomaselli's retaliatory suspension and removal order of July 13, 2022. *See supra* ¶¶ 301-308.

c.   Failing to look into numerous complaints that allegations against Dr. Khodakhah were false and made in bad faith. *See supra* ¶¶ 147-150, 200-204, 218-228.

d.   Failing to provide Plaintiff a copy of the investigative Report, even when Einstein used the Report to justify its dismissal of Plaintiff from his Chairmanship on July 11, 2022. *See supra* ¶¶ 146-162.

e.   "Suspending" Plaintiff from his Chairmanship as a purported protective measure that was unnecessary to protect the health and safety of anyone on campus and was inherently punitive and disciplinary in nature. *See supra* ¶¶ 110-118, 126-144.

f.   Knowingly relying on false, bad faith allegations contained in the "Letter of Concern" and falsified "Student Survey" to dismiss Plaintiff from his Chairmanship. *See supra* ¶¶ 110-118, 135, 151-156, 162, 162.

g.  Dismissing Plaintiff from his Chairmanship for purported disciplinary reasons rather than performance, without an adjudication, thereby frustrating Plaintiff's reasonable expectations on the terms of his appointment as Chair, described in the May 3, 2016 appointment letter. *See supra* ¶¶ 145-146, 165.

h.  Failing to abide by ***any*** of the procedural and substantive requirements of its own disciplinary and Title IX policies by imposing discipline without a prior adjudication. *See supra* ¶¶ 128, 137-139, 140-142, 158-159, 163-164, 182, 185, 187-191.

i.  Choosing to apply its obsolete 2018 Title IX Policy for the purpose of ensuring it could hold Plaintiff responsible for alleged sexual harassment and deprive him of a right to an appeal. *See supra* ¶¶ 363-368.

j.  Notifying Plaintiff of the purported reasons for the various adverse actions taken against his employment, (i.e., the suspension of his Chairmanship on March 10, 2022, the dismissal of his Chairmanship on July 11, 2022, and his suspension and removal from campus on July 13, 2022), in purposefully vague language that did not clearly identify any actual and applicable Einstein employment policy, such that Plaintiff could not be certain what policy or procedure applied, if any. *See supra* ¶¶ 127-129, 137, 158-159.

k.  Failing to timely adjudicate Dr. Khodakah's claim for retaliation, which he filed more than a year ago, based on Dean Tomaselli's retaliatory decision to suspend and remove him from campus on July 13, 2022. *See supra* §§ 216-217.

l.  Seeking to effectively shut down Dr. Khodakhah's laboratory by (a) failing to provide Dr. Khodakhah interim support for his research, as required under the terms of the 2014 Retention Letter, (b) suspending and removing him from campus for no legitimate disciplinary or remedial reason, (c) imposing an unwarranted sanction upon Plaintiff, suspending him for three years from working with students;  (c) ordering him to relocate his custom-designed laboratory to another building. *See supra* § 301-308, 333, 380, 383.

481.   Plaintiff has suffered damages in an amount to be determined at trial as a direct and proximate cause of Defendants' breach of the implied duty of good faith and fair dealing, which include but not limited to:

     a.    long-term injury to Plaintiff's professional reputation and career.
     b.    Loss of Plaintiff's annual compensation for service as Chair;
     c.    Loss of physical well-being, emotional and psychological pain and suffering.

## COUNT V

### Promissory Estoppel
### (As to Defendants Einstein, MMC, MHS, and MMAH)

482.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

483.    "To establish a promissory estoppel claim, the plaintiff must establish:  (1) the defendant' clear and unambiguous promise," (2) upon which the plaintiff reasonably relied, (3) to her detriment."  *Goldberg v. Pace University*, 535 F.Supp.3d 180, 299 (S.D.N.Y. 2021).

484.    In 2014, Einstein expected or should have expected that its promise and representation to Plaintiff in the 2014 Retention Agreement, that it would provide generous interim support for his laboratory indefinitely, equivalent to the direct costs of Plaintiff's three R01 grants, would induce Plaintiff to stay at Einstein and to decline an offer of employment from Northwestern University for a faculty appointment with a large endowment.  *See supra* §§41-45.

485.    Dr. Khodakhah reasonably relied upon this promise Einstein made of guaranteed support for his research when he chose to remain at Einstein and declined Northwestern's job offer with a large endowment.

486.    Einstein expected or should have expected that, in May 2016, when it renewed its commitment of interim support in the 2016 Promotional Letter, appointing Plaintiff to Chair of Neuroscience, that its promise to continue the commitment it made in the 2014 Retention Agreement would induce Plaintiff to continue to remain at Einstein, instead of furthering his career at another school.  *See supra* ¶¶ 52-53, 312.

487.    Dr. Khodakhah reasonably relied upon Einstein's representations and promises contained in the 2016 Promotional Letter, which promised Einstein's continued commitment to provide indefinite interim support for his laboratory, as originally outlined in the 2014 Retention Agreement.

488.    Plaintiff relied to his detriment on the express and implied promises and representations made by Einstein and was induced by Einstein's promises in making his decision to further his career at Einstein instead of at another school of equal caliber.

489.    Based on the foregoing, Einstein is liable to Plaintiff based on promissory estoppel.

490.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT VI

### Tortious Interference with Contractual Relations
### (As to Defendants Pablo Castillo, Bryen Jordan, and Gordon Tomaselli)

491.    Plaintiff repeats and realleges each and every allegation as set forth hereinabove above as if fully set forth herein.

492.    Under New York law, "to state a claim for tortious interference with contractual relations, a plaintiff must allege (1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73, 77 (S.D.N.Y. 1995).

493.    "[A] plaintiff may maintain an action for tortious interference against a co-employee by showing that the co-employee acted outside the scope of his or her authority." *Albert*

84.

*v. Loksen*, 239 F.3d 256 (2001) (citations and quotation marks omitted); *see Riddell*, 872 F. Supp. at 78 ("If it is the case that one or more officers or directors, motivated by malice and acting outside of the scope of their corporate representative capacities, induced a breach, then a claim for tortious interference with contractual relations properly lies.").

494.    Defendant Einstein has breached its employment contract with Plaintiff as a result of Defendant Tomaselli, Defendant Castillo, and Defendant Jordan's actions.

495.    As alleged in the foregoing paragraphs, Dr. Castillo and Dr. Jordan, induced the breach of Plaintiff's employment contract with Einstein using improper means—making false and defamatory statements concerning Plaintiff—and motivated by malice toward Plaintiff.  *See supra* ¶¶ 2, 40, 49-51, 100-114, 135, 147, 151-155, 166, 169-173, 200, 220-225.

496.    As alleged in the foregoing paragraphs, Dean Tomaselli induced the breach of Plaintiff's employment contract by taking adverse actions against Dr. Khodakhah's employment, specifically: (i) ordering the suspension and subsequent dismissal of Plaintiff from his Chairmanship, in violation of all of Einstein's applicable employment policies, based on allegations that Dean Tomaselli had reason to know were false and in bad faith *see supra* ¶¶ 115-126, 134-135, 137-162; and (ii) suspending Plaintiff from duty and removing him from Einstein's campus for more than a year, in violation of all of Einstein's applicable employment policies, *see supra* ¶¶ 180-182, 185-199.

497.    Plaintiff has suffered damages in an amount to be determined at trial as a direct and proximate cause of Defendants' tortious interference with Plaintiff's employment agreement, which include but are not limited to:

  a.    long-term injury to Plaintiff's professional reputation and career.
  b.    Loss of Plaintiff's annual compensation for service as Chair;
  c.    Loss of physical well-being, emotional and psychological pain and suffering.

85.

<u>COUNT VII</u>

**<u>Sex Discrimination in violation of the New York State Human Rights Law</u>**
**(As to Defendants Gordon Tomaselli, Einstein, MMC, MHS, and MMAH)**

498.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

499.    Plaintiff is a male and is therefore a member of a protected class.

500.    At all relevant times, Plaintiff was qualified to work as an employee for Einstein and satisfactorily performed the duties required by the position he held at Defendant Einstein, including his position as a tenured professor and in his appointed position as department Chair.

501.    As set forth in detail above and herein, Defendants subjected Plaintiff to discrimination by virtue of disparate treatment and disparate discipline on the basis of Plaintiff's sex and/or gender, which discrimination resulted in his dismissal from his appointment as Chair of the Department of Neuroscience, his unlawful suspension from duty and removal from campus, and severe and overly harsh sanctions in his Title IX process, including the relocation of his laboratory and his three-year suspension from working with students.

502.    The Defendants' conduct as alleged in the foregoing paragraphs constitutes discrimination based on gender in violation of the SHRL.  Defendants knew that accusations against Plaintiff were false, *see supra* ¶¶118-126, 152, 200, 218-228, and that Plaintiff had not been afforded the procedural protections provided for in his employer's written sexual harassment policy.  *See supra* ¶¶ 297-300, 364-368.

503.    Defendants distorted and deviated from the stated purpose of Defendant Einstein's sexual harassment policy, *see supra* ¶¶ 361-362, by deferring to invidious gender and/or sexual stereotypes and crediting malicious accusations against Plaintiff which they knew were false.  *See supra* ¶¶ 100-129, 134-135, 147-155, 166, 170-173, 200-204, 218-228.

504.     Defendants subjected Plaintiff to a clearly irregular investigative and adjudicative Title IX process. *See supra* ¶¶ 137-144, 156, 162, 164, 174-180, 182-183, 185-191, 193-194, 198, 295-300, 362-368.

505.     The discrimination that Plaintiff suffered while employed by Defendant Einstein severely affected the terms and conditions of his employment and culminated in Plaintiff's unlawful removal from his position as department Chair and in his unlawful suspension from duties and removal from campus.

506.     By reason of Defendants' violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with his employment.

507.     As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered extreme emotional distress, severe anxiety about his future, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his personal and professional reputation, disruption of his personal and professional life, and the loss of enjoyment of the ordinary pleasures of everyday life.

508.     Accordingly, Defendants discriminated against Plaintiff on the basis of sex and/or gender by virtue of treating him less well than his similarly situated colleagues outside his protected class and in violation of his statutory rights as guaranteed by the SHRL.

509.     As a result of the foregoing, Defendants are liable to Plaintiff for damages in an amount to be determined at trial.

## COUNT VIII

### Sex Discrimination in violation of the New York City Human Rights Law
**(As to Defendants Gordon Tomaselli, Einstein, MMC, MHS, and MMAH)**

510.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

511.    Plaintiff is a male and is therefore a member of a protected class.

512.    At all relevant times, Plaintiff was qualified to work as an employee for Einstein and satisfactorily performed the duties required by the position he held at Defendant Einstein, including his position as a tenured professor and in his appointed position as department Chair.

513.    As set forth in detail above and herein, Defendants subjected Plaintiff to discrimination by virtue of disparate treatment and disparate discipline on the basis of Plaintiff's sex and/or gender, which discrimination resulted in his dismissal from his appointment as Chair of the Department of Neuroscience, his unlawful suspension from duty and removal from campus, and his severe and overly harsh sanctions in his Title IX process, including the relocation of his laboratory and his three-year suspension from working with students.

514.    The Defendants' conduct as alleged in the foregoing paragraphs constitutes discrimination based on gender in violation of the CHRL.  Defendants knew that accusations against Plaintiff were false, *see supra* ¶¶118-126, 152, 200, 218-228, and that Plaintiff had not been afforded the procedural protections provided for in his employer's written sexual harassment policy. *See supra* ¶¶ 297-300, 364-368.

515.    Defendants distorted and deviated from the stated purpose of Defendant Einstein's sexual harassment policy, *see supra* ¶¶ 361-362, by deferring to invidious gender and/or sexual stereotypes and crediting malicious accusations against Plaintiff which they knew were false.  *See supra* ¶¶ 100-129, 134-135, 147-155, 166, 170-173, 200-204, 218-228.

516.    Defendants subjected Plaintiff to a clearly irregular Title IX investigative and adjudication process.  *See supra* ¶¶ 137-144, 156, 162, 164, 174-180, 182-183, 185-191, 193-194, 198, 295-300, 362-368.

517.    The discrimination that Plaintiff suffered while employed by Defendant Einstein severely affected the terms and conditions of his employment and culminated in Plaintiff's unlawful removal from his position as department Chair and in his unlawful suspension from duties and removal from campus.

518.    By reason of Defendants' violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with his employment.

519.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered extreme emotional distress, severe anxiety about his future, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his personal and professional reputation, disruption of his personal and professional life, and the loss of enjoyment of the ordinary pleasures of everyday life.

520.    Accordingly, Defendants discriminated against Plaintiff on the basis of sex and/or gender by virtue of treating him less well than his similarly situated colleagues outside his protected class and in violation of his statutory rights as guaranteed by the CHRL.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff Kamran Khodakhah prays for the following relief:

(i)    On the first count of violation of Title IX of the Education Amendments of 1972, (sex discrimination-erroneous outcome), a judgment against Defendants Albert Einstein College of Medicine, Montefiore Health System, Inc. Montefiore Medical Center, Montefiore Medicine Academic Health System, Inc.:

      a.    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

    b.   injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Khodakhah, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning Complaint 1 and Complaint 2's complaints and the corresponding investigations from Dr. Khodakhah's employment file; and reinstatement of Dr. Khodakhah's Chairmanship at Einstein and a declaration that Plaintiff did not commit sexual harassment and did not violate Einstein's Title IX policy;

(ii)   On the second count of violation of Title IX of the Education Amendments of 1972, (retaliation), a judgment against Defendants Albert Einstein College of Medicine, Montefiore Health System, Inc. Montefiore Medical Center, Montefiore Medicine Academic Health System, Inc.:

    a.   damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

    b.   injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Khodakhah, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning Complaint 1 and Complaint 2's complaints and the corresponding investigations from Dr. Khodakhah's employment file; and reinstatement of Dr. Khodakhah's Chairmanship at Einstein and a declaration that Plaintiff did not commit sexual harassment and did not violate Einstein's Title IX policy;

(iii)   On the third count of breach of contract against Defendants Albert Einstein College of Medicine, Montefiore Health System, Inc. Montefiore Medical Center, Montefiore Medicine Academic Health System, Inc., damages in an amount to be determined at trial plus pre-judgment interest; including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)   On the fourth count of breach of the implied covenant of good faith and fair dealing against Defendants Albert Einstein College of Medicine, Montefiore Health System, Inc. Montefiore Medical Center, Montefiore Medicine Academic Health System, Inc., damages in an amount to be determined at trial plus pre-judgment interest; including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)   On the fifth count of promissory estoppel against Defendants Albert Einstein College of Medicine, Montefiore Health System, Inc. Montefiore Medical Center, Montefiore Medicine Academic Health System, Inc., damages in an amount to be determined at trial plus pre-judgment interest; including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)   On the sixth count of tortious interference with contractual relations against Defendants Gordon Tomaselli, Pablo Castillo, and Bryen Jordan, damages in an amount to be determined at trial plus pre-judgment interest; including damages for physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)   on the seventh count of violation of the New York State Human Rights Law against Defendants Gordon Tomaselli, Albert Einstein College of Medicine, Montefiore Health System, Inc. Montefiore Medical Center, and Montefiore Medicine Academic Health System, Inc., a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, backpay damages, damages to Plaintiff's physical well-being, emotional and psychological damages, past and future economic losses, loss of career opportunities, front pay, and punitive damages, together with prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(viii)   on the eighth count of violation of the New York City Human Rights Law against Defendants Gordon Tomaselli, Albert Einstein College of Medicine, Montefiore Health System, Inc. Montefiore Medical Center, and Montefiore Medicine Academic Health System, Inc., a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, backpay damages, damages to Plaintiff's physical well-being, emotional and psychological damages, past and future economic losses, loss of career opportunities, front pay, and punitive damages, together with prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### JURY DEMAND

Kamran Khodakhah herein demands a trial by jury of all triable issues in the present matter.

**Dated:  February 5, 2023**

**Respectfully submitted,**

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiff Kamran Khodakhah***

By: /s/ *Andrew T. Miltenberg_____*
**Andrew T. Miltenberg, Esq.**
**Stuart Bernstein, Esq.**
**Julie Sacks, Esq. (pro hoc vice forthcoming)**
**Gabrielle Vinci, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**sberbstein@nmllplaw.com**
**jsacks@nmllplaw.com**
**gvinci@nmllplaw.com**

## <u>VERIFICATION</u>

STATE OF   <u>NEW YORK</u>   )
                           ) **ss.:**
COUNTY OF  <u>WESTCHESTER</u> )

      **KAMRAN KHODAKHAH,** being duly sworn, deposes and says:

      I am the named Plaintiff in this matter. I have read the annexed Complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

      Signed under the pains and penalties of perjury, on the <u>5th</u> day of February 2024.

                                                Kamran Khodakhah

State of Florida
County of Manatee

**Sworn to and subscribed before me**

**this** <u>5th</u> **day of** <u>February</u> **, 2024.**

                                     DIXIE L HACKWORTH
                             Notary Public - State of Florida
                             Commission # HH 219481
                             My Comm. Expires Jan 23, 2026

*Dixie L Hackworth*
**NOTARY PUBLIC**
Dixie L Hackworth, Online Notary

                                     Signer Kamran Khodakhah produced New York DL, as
                                     identification along with multi-factor authentication and
                                     audio/video recording to be notarized online.