## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KAMRAN KHODAKHAH,

          *Plaintiff*,

    v.

MONTEFIORE MEDICINE ACADEMIC HEALTH
SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF
MEDICINE, GORDAN TOMASELLI, PABLO
CASTILLO, BRYEN JORDAN, and JOHN-JANE
DOES 1-10,

          *Defendants*.

No. 1:24-cv-00839-LAK-RFT

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF MEDICINE, PABLO CASTILLO, AND BRYEN JORDAN'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Roberta A. Kaplan
Michele C. Materni
KAPLAN MARTIN LLP
156 West 56th Street, Suite 207
New York, NY 10019
Tel: (212) 316-9500
rkaplan@kaplanmartin.com
mmaterni@kaplanmartin.com

Gabrielle E. Tenzer
Anna Collins Peterson
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
gtenzer@heckerfink.com
apeterson@heckerfink.com

November 15, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT BACKGROUND ............................................................................................. 2

    A.    Einstein, Its Title IX Policies, and Recent Changes in Title IX Regulations .............. 2

    B.    Plaintiff Becomes an Einstein Faculty Member and Chair of the Neuroscience Department ........................................................................................................ 4

    C.    Following an External Investigation, Plaintiff Is Removed as Chair of the Neuroscience Department ................................................................................. 4

    D.    Plaintiff Is Found Responsible for Violating the College's Title IX Policy ............... 7

    E.    The Retaliation Investigations ...................................................................... 8

    F.    This Action ................................................................................................ 9

LEGAL STANDARD .......................................................................................................... 10

ARGUMENT ...................................................................................................................... 10

I.    Plaintiff Fails to Allege Any Wrongful Act by Montefiore ................................. 10

II.    Plaintiff Fails to Allege a Title IX Erroneous Outcome Claim ........................... 12

    A.    Plaintiff Fails to Allege Facts Establishing a Minimal Plausible Inference of Gender Bias ............................................................................................. 13

    B.    Plaintiff Does Not Allege Any Clear Procedural Irregularity ................................... 16

III.    Plaintiff Does Not Allege Retaliation in Violation of Title IX ........................... 20

IV.    The Court Should Dismiss Plaintiff's State Law Claims .................................... 23

    A.    Plaintiff's NYSHRL and NYCHRL Claims Fail ..................................................... 23

    B.    Plaintiff Fails to Allege Breach of Contract .......................................................... 24

    C.    Plaintiff's Claims for Breach of the Implied Covenant and Promissory Estoppel Are Duplicative and Should Be Dismissed ................................................ 29

    D.    Plaintiff Has Not Pled Tortious Interference with Contractual Relations Against Drs. Castillo and Jordan .................................................................. 30

CONCLUSION ................................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
No. 12 Civ. 4828, 2018 WL 1273343 (S.D.N.Y. Mar. 5, 2018) ........................................... 2

*Allaire Corp. v. Okumus*,
433 F.3d 248 (2d Cir. 2006)............................................................................................... 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................... 10

*B.B. v. New Sch.*,
No. 17 Civ. 83497, 2018 WL 2316342 (S.D.N.Y. Apr. 30, 2018)...................................... 20

*Bailey v. New York L. Sch.*,
No. 19-3473, 2021 WL 5500078 (2d Cir. Nov. 24, 2021) .................................................. 22

*Barcellos v. Robbins*,
858 N.Y.S.2d 658 (2d Dep't 2008)..................................................................................... 31

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................... 10

*Burgess v. Harris Beach PLLC*,
346 F. App'x 658 (2d Cir. 2009) ....................................................................................... 22

*Carton v. Reno*,
310 F.3d 108 (2d Cir. 2002)............................................................................................... 23

*Chambers v. Time Warner, Inc.*,
282 F. 3d 147 (2d Cir. 2002).............................................................................................. 10

*Chen v. Major League Baseball Props., Inc.*,
798 F.3d 72 (2d Cir. 2015)................................................................................................... 3

*Chung v. Williams Schwitzer & Assocs., P.C.*,
157 N.Y.S.3d 465 (1st Dep't 2021) ................................................................................... 30

*Cooper v. Franklin Templeton Invs.*,
No. 22-2763, 2023 WL 3882977 (2d Cir. June 8, 2023)................................................... 23

*Dalton v. Educ. Testing Serv.*,
663 N.E.2d 289 (N.Y. 1995).............................................................................................. 26

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ................................................................................... 20

*Doe v. Bd. of Trs. of N. Ill. Univ.*,
    No. 17 Civ. 07991, 2024 WL 4346627 (N.D. Ill. Sept. 30, 2024) ..................................... 21

*Doe v. Colgate Univ.*,
    No. 15 Civ. 1069, 2017 WL 4990629 (N.D.N.Y. Oct. 31, 2017) ......................................... 15

*Doe v. Colgate Univ.*,
    760 F. App'x 22 (2d Cir. 2019) ............................................................... 14, 15

*Doe v. Columbia Univ.*,
    831 F.3d 46 (2d Cir. 2016) ........................................................ 2, 12, 13, 16, 19

*Doe v. N.Y. Univ.*,
    438 F. Supp. 3d 172 (S.D.N.Y. 2020) ............................................................. 14

*Doe v. Quinnipiac Univ.*,
    404 F. Supp. 3d 643 (D. Conn. 2019) ............................................................. 15

*Doe v. Trs. of Columbia Univ. in City of N.Y.*,
    No. 21 Civ. 5839, 2022 WL 3666997 (S.D.N.Y. Aug. 25, 2022) ....................................... 17

*Doe v. Vassar Coll.*,
    No. 19 Civ. 9601, 2019 WL 6222918 (S.D.N.Y. Nov. 21, 2019) ....................................... 20

*Doe v. Yeshiva Univ.*,
    703 F. Supp. 3d 473 (S.D.N.Y. 2023) ............................................................. 22

*Drummond v. Akselrad*,
    No. 23 Civ. 179, 2023 WL 3173780 (S.D.N.Y. May 1, 2023) .......................................... 29

*Du Bois v. Bd. of Regents of Univ. of Minn.*,
    987 F.3d 1199 (8th Cir. 2021) .................................................................. 21

*Feibleman v. Columbia Univ.*,
    No. 19 Civ. 4327, 2020 WL 882429, (S.D.N.Y. Feb. 24, 2020) ................................... 12, 16

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
    No. 11 Civ. 5881, 2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012) ...................................... 3

*Holm v. Ithaca Coll.*,
    669 N.Y.S. 2d 483 (N.Y. Sup. Ct. 1998) .......................................................... 18

*Int'l Cargo Loss Prevention, Inc. v. Mediterranean Shipping Co. (USA), Inc.*,
No. 23 Civ. 1312, 2024 WL 37072 (S.D.N.Y. Jan. 3, 2024).................................................. 2

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
157 F. Supp. 3d 352 (S.D.N.Y. 2016)................................................................. 29

*J.M. Builders & Assocs., Inc. v. Lindner*,
889 N.Y.S.2d 60 (2d Dep't 2009)....................................................................... 31

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005)........................................................................... 21, 21, 22

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
29 F.4th 118 (2d Cir. 2022) ................................................................ 29, 30

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
507 F. Supp. 3d 490 (S.D.N.Y. 2020).................................................................. 28

*Jordan v. Verizon Corp.*,
No. 08 Civ. 6414, 2008 WL 5209989 (S.D.N.Y. Dec. 10, 2008)....................................... 29

*Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*,
694 F. Supp. 3d 374 (S.D.N.Y. 2023)................................................................. 11

*Kolari v. N.Y. Presbyterian Hosp.*,
455 F.3d 118 (2d Cir. 2006)........................................................................... 23

*Lai v. St. John's Univ.*,
64 N.Y.S. 3d 227 (2d Dep't 2017)..................................................................... 18

*Langenkamp v. Olson*,
628 F. App'x 50 (2d Cir. 2015) ....................................................................... 25

*Latour v. Columbia Univ.*,
12 F. Supp. 3d 658 (S.D.N.Y. 2014)................................................................... 23

*Livingston v. City of New York*,
563 F. Supp. 3d 201 (S.D.N.Y. 2021).................................................................. 23

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020)............................................................................. 2

*Maas v. Cornell Univ.*,
721 N.E.2d 966 (N.Y. 1999)............................................................................ 25

*Mastrovincenzo v. City of New York*,
    435 F.3d 78 (2d Cir. 2006)......................................................................... 28

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ................................................................................... 23

*McHenry v. Lawrence*,
    886 N.Y.S.2d 492 (2d Dep't 2009) ............................................................ 31

*Medtech Prod. Inc. v. Ranir, LLC*,
    596 F. Supp. 2d 778 (S.D.N.Y. 2008)........................................................ 31

*Menaker v. Hofstra Univ.*,
    935 F.3d 20 (2d Cir. 2019)............................................................... 2, 12, 16

*Mitchell v. Planned Parenthood of Greater N.Y., Inc.*,
    No. 23 Civ. 01932, 2024 WL 3849192 (S.D.N.Y. Aug. 16, 2024) .................... 23

*Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*,
    203 F. Supp. 3d 312 (S.D.N.Y. 2016)................................................... 24, 25

*NBT Bancorp Inc. v. Fleet/Norstar Finan. Grp., Inc.*,
    664 N.E.2d 492 (N.Y. 1996) ...................................................................... 30

*Okeke v. Interfaith Med. Ctr.*,
    205 N.Y.S.3d 189 (2d Dep't 2024) ............................................................ 23

*In re Optionable Sec. Lit.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008)........................................................... 2

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
    633 F.3d 81 (2d Cir. 2011).......................................................................... 22

*Rocchigiani v. World Boxing Council, Inc.*,
    131 F. Supp. 2d 527 (S.D.N.Y. 2001)........................................................ 28

*Roe v. St. John's Univ.*,
    91 F.4th 643 (2d Cir. 2024) .................................................................. 12, 16

*S.G. v. Bank of China, Ltd.*,
    No. 23 Civ. 2866, 2024 WL 1861158 (S.D.N.Y. Apr. 29, 2024)................. 10, 11

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016)............................................................................ 3

*Schiebel v. Schoharie Cent. Sch. Dist.*,
No. 23-1080, 2024 WL 4644958 (2d Cir. Nov. 1, 2024) ............................. 12, 16

*Shub v. Hankin*,
869 F. Supp. 213 (S.D.N.Y. 1994) .................................................... 18

*State St. Glob. Advisors Tr. Co. v. Visbal*,
431 F. Supp. 3d 322 (S.D.N.Y. 2020) ................................................. 30

*Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc.*,
No. 20 Civ. 78, 2021 WL 1199430 (S.D.N.Y. Mar. 30, 2021) .......................... 30

*Townsend v. Benjamin Enters., Inc.*,
679 F.3d 41 (2d Cir. 2012) .............................................................. 22

*Trakansook v. Nahal Realty Corp.*,
579 N.Y.S.2d 391 (1st Dep't 1992) ..................................................... 28

*United States ex rel. Takemoto v. Nationwide Mut. Ins. Co.*,
674 F. App'x 92 (2d Cir. 2017) ......................................................... 10

*Water Sols., LLC v. Ravyn & Robyn Constr., LLC*,
789 F. App'x 920 (2d Cir. 2020) ....................................................... 12

*Yu v. Vassar Coll.*,
97 F. Supp. 3d 448 (S.D.N.Y. 2015) .............................................. 15, 20, 29

*Yusuf v. Vassar Coll.*,
35 F.3d 709 (2d Cir. 1994) .......................................................... 12, 20

## FEDERAL STATUTES

20 U.S.C. § 1681 ................................................................................. 1

28 U.S.C. § 1367 ................................................................................ 23

42 U.S.C. § 2000e-3 ............................................................................ 22

## FEDERAL REGULATIONS

34 C.F.R. § 106.45 ....................................................................... 3, 13, 18

## OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024) .......................................................... 28

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
    Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) ........................................... 3, 17

OCR, *Q&A on Campus Sexual Misconduct* (2017),
    https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/qa-title-ix-201709.pdf...... 3, 15

OCR, *Questions and Answers on the Title IX Regulations on Sexual Harassment* (2021),
    https://www2.ed.gov/about/offices/list/ocr/docs/ 202107-qa-titleix.pdf ........................ 3, 17

OCR, *Revised Sexual Harassment Guidance* (2001),
    https://www.ed.gov/sites/ed/files/about/offices/list/ocr/ docs/shguide.pdf ........................ 15

Defendants Montefiore Medicine Academic Health System, Inc.[1] ("Montefiore"), Albert Einstein College of Medicine ("Einstein" or the "College"), Dr. Pablo Castillo, and Dr. Bryen Jordan respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint ("FAC").

## PRELIMINARY STATEMENT

In early 2022, Plaintiff's colleagues wrote him a letter, expressing concerns about his leadership as Chair of the Neuroscience Department at Einstein. Around the same time, student responses to an anonymous survey echoed those concerns. Now, over two years later, Plaintiff airs a litany of grievances about the investigations that followed. At every turn, rather than take feedback from his colleagues, students, or College leadership, Plaintiff has flouted professional norms and College policies, escalating intra-department concerns into a federal lawsuit.

Significantly, Plaintiff's only federal hook—Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX")—is inapplicable here because Plaintiff does not, and cannot, allege that Einstein or Montefiore took any actions against him because of his gender or because Plaintiff complained of sex discrimination. That alone is reason to dismiss this case.

Plaintiff's state law claims fail as well. Plaintiff's conclusory and internally inconsistent allegations fail to show that Montefiore took any action, let alone any wrongful action, against him. The College appropriately applied and adhered to its policies in the various investigations involving Plaintiff and did not breach any contract with or enforceable promise to him. Nor did his colleagues procure the College's breach of any contract, since there wasn't any breach in the first place. At bottom, Plaintiff's grievances do not amount to any actionable legal claim, and the FAC should be dismissed in its entirety, with prejudice, for failure to state a claim under Rule

---

[1] Earlier this year, Montefiore Medicine Academic Health System, Inc., changed its name to Montefiore Einstein, Inc.

12(b)(6).

## RELEVANT BACKGROUND[2]

### A.    Einstein, Its Title IX Policies, and Recent Changes in Title IX Regulations

Einstein is a private medical school in the Bronx, ¶ 13,[3] with close to a thousand students

and more than two thousand full-time faculty, *About Albert Einstein College of Medicine*,

Montefiore Einstein, https://einsteinmed.edu/about (last visited Nov. 14, 2024). Founded over 70

years ago, the College maintains its commitment to "medical and graduate education, cutting-edge

research, and patient-centered clinical care," as well as health equity and community engagement.

*Id.* Einstein was previously affiliated with Yeshiva University, but in 2015, became established as

its own legal entity and began an affiliation with Montefiore, ¶ 54, which is the umbrella

organization for Einstein and Montefiore-affiliated clinics and hospitals, ¶ 12.

Einstein, like other colleges that receive federal funding, has a policy to address complaints

of sex discrimination in accordance with federal Title IX regulations. In 2018, that policy was the

College's Title IX: Non-Discrimination and Anti-Harassment Policy and Complaint Procedures,

dated October 26, 2018 ("2018 Title IX Policy"). ¶ 84. Einstein's 2018 Title IX Policy prohibits

---

[2] The factual allegations in the FAC are accepted as true only for purposes of this motion, but not to the extent that they are contradicted by other, more specific allegations, by documents integral to the FAC or incorporated therein by reference, or by documents of which this Court may take judicial notice. *See, e.g.*, *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, No. 12 Civ. 4828, 2018 WL 1273343, at *8 n.4 (S.D.N.Y. Mar. 5, 2018); *In re Optionable Sec. Lit.*, 577 F. Supp. 2d 681, 688 (S.D.N.Y. 2008) (Kaplan, J.). Because Plaintiff quotes from and relies on his various appointment letters, *see* FAC ¶¶ 37, 473-474, his 2014 Retention Letter, *id.* ¶¶ 501-503, his 2016 Chair Appointment Letter, *id.* ¶¶ 497-500, the July 11, 2022 Chair Dismissal Letter, *id.* ¶ 163-166, and the July 13, 2022 Interim Suspension Letter, *id.* ¶¶ 190-191, they are properly considered by the Court on this motion. *See, e.g.*, *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020); *Int'l Cargo Loss Prevention, Inc. v. Mediterranean Shipping Co. (USA), Inc.*, No. 23 Civ. 1312, 2024 WL 37072, at *2 (S.D.N.Y. Jan. 3, 2024) (collecting cases). Additionally, throughout the FAC, Plaintiff quotes from and relies on Einstein's Title IX policies, *see, e.g.*, FAC ¶¶ 84-89, 90-95, 185-186, 189, 193, 200-201, 218, 220, 222, 231, 296, 301-305, 314-315, which courts routinely consider on motions to dismiss Title IX claims. *See, e.g.*, *Menaker v. Hofstra Univ.*, 935 F.3d 20, 28-29, 34-35 (2d Cir. 2019); *Doe v. Columbia Univ.*, 831 F.3d 46, 51-54 (2d Cir. 2016).

[3] Citations to "¶ _" refer to paragraphs of the FAC, ECF 48. Citations to "Ex. _" refer to exhibits to the Declaration of Gabrielle E. Tenzer: the 2000 Offer Letter (Ex. A); the 2001 Appointment Letter (Ex. B); the 2014 Retention Letter (Ex. C); the 2016 Chair Appointment Letter (Ex. D); the July 11, 2022 Chair Dismissal Letter (Ex. E); the July 13, 2022 Interim Suspension Letter (Ex. F); and Einstein's 2018, 2020, and 2022 Title IX Policies (Exs. G-I).

sex discrimination, harassment, and sexual misconduct, and establishes procedures for reporting, investigating, and responding to such prohibited conduct. *See generally* Ex. G. For complaints not involving students, the 2018 Title IX Policy establishes a process involving an investigation (but no live hearing), a preponderance of the evidence standard, and no appeal. *See id*. at 34-36. These provisions are all consistent with guidance issued in September 2017 by the Department of Education's Office for Civil Rights ("OCR"), the office with oversight responsibility for Title IX. *See* OCR, *Q&A on Campus Sexual Misconduct* 5 (2017), https://www.ed.gov/sites/ed/files/about/ offices/list/ocr/docs/qa-title-ix-201709.pdf ("2017 Q&A").[4]

In 2020, the Department of Education issued new Title IX regulations, which defined sexual harassment more narrowly and added new procedural requirements. Among other changes, these new regulations required colleges and universities to conduct live hearings and permit appeals (if available in comparable proceedings) when adjudicating reports of sexual harassment. *See* 34 C.F.R. § 106.45(b)(6)(i), (b)(8) (2020). They also permitted the application of a clear and convincing standard to the evidence. *See* 34 C.F.R. § 106.45(b)(1)(vii) (2020). Although these new regulations became effective August 14, 2020, they were not retroactive. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,061 (May 19, 2020); *see also* OCR, *Questions and Answers on the Title IX Regulations on Sexual Harassment* 10 (2021), https://www2.ed.gov/about/offices/list/ocr/docs/ 202107-qa-titleix.pdf ("2021 Q&A") ("[T]he 2020 amendments do not apply to alleged sexual harassment occurring before August 14, 2020.").

Like many other colleges and universities, Einstein revised its policies to comply with the

---

[4] Courts routinely consider agency guidance at the motion to dismiss stage. *See, e.g.*, *Salazar v. King*, 822 F.3d 61, 67–68, 76–77, 80-81 (2d Cir. 2016); *Chen v. Major League Baseball Props., Inc.*, 798 F.3d 72, 79–80 (2d Cir. 2015). Moreover, the Court may take judicial notice of the 2017 Q&A because it is a publicly available document. *See, e.g.*, *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11 Civ. 5881, 2012 WL 4477552, at *5 (S.D.N.Y. Sept. 27, 2012).

new 2020 Title IX regulations. Specifically, Einstein adopted the Title IX Gender-Based Misconduct, Discrimination and Harassment Policy and Complaint Procedures for Employees and Non-Students, dated August 14, 2020 ("2020 Title IX Policy"), ¶ 90, which Einstein re-adopted in 2022, without modification. *See* Ex. I ("2022 Title IX Policy"); ¶ 95.

**B.      Plaintiff Becomes an Einstein Faculty Member and Chair of the Neuroscience Department**

Plaintiff joined Einstein's faculty in 2001 as an Assistant Professor, with a limited term appointment in the Neuroscience Department. ¶ 36; Ex. A at 1; Ex. B. Plaintiff's appointment was in accordance with the College's System of Appointments Policy, as set forth in both his 2000 Offer Letter and his 2001 Appointment Letter. ¶ 37; Ex. A at 1; Ex. B. In those same letters, he was also told that other College policies could be found in a faculty handbook. ¶ 37; Ex. A at 1; Ex. B.

Einstein granted Plaintiff tenure in 2012. ¶ 44. Two years later, in 2014, Plaintiff received a job offer from another institution. ¶ 48. To keep him at the College, Einstein provided Plaintiff with a retention package, offering, among other commitments, that "should one or more of [Plaintiff's] 3 current R01 grants not be renewed," Einstein would provide "generous interim support (equivalent to the direct costs of the R01) to better enable [Plaintiff] to recapture that grant." ¶¶ 48-53; Ex. C at 2. Plaintiff accepted the offer and remained at Einstein. ¶ 51.

In 2016, Plaintiff was appointed Chair of the Neuroscience Department. ¶ 59; Ex. D. According to his appointment letter, Plaintiff's Chair appointment was for an "indefinite term" and, "[a]s with all Department Chair appointments, continuation [was] subject to performance as determined by the Dean." Ex. D; *see also* ¶ 59.

**C.      Following an External Investigation, Plaintiff Is Removed as Chair of the Neuroscience Department**

In February 2022, Plaintiff received a "Letter of Concern" signed by thirteen of his

colleagues in the Neuroscience Department. ¶¶ 108, 121. The Letter expressed concerns about "'demeaning and unprofessional comments' and 'autocratic behaviors' by" Plaintiff. ¶ 110. Plaintiff claims that four of his colleagues, including Defendants Dr. Pablo Castillo and Dr. Bryen Jordan, led the effort in drafting the Letter. ¶¶ 18-19, 108. Plaintiff further alleges that around the same time, Dr. Jordan, who held a leadership position in the Neuroscience Department related to graduate student education, shared with Einstein's Associate Dean for Graduate Programs a student survey, which included "numerous accounts of students detailing inappropriate and harmful comments and actions by" Plaintiff. ¶¶ 119-120.[5]

In light of these allegations about Plaintiff's leadership of the Department, Plaintiff was offered the option of stepping down as Chair, which he declined. ¶¶ 127-128. Instead, he suggested to Einstein's Vice President of Human Resources and Title IX Coordinator, Ms. Yvonne Ramirez, and Einstein's Executive Dean, Dr. Edward Burns, that they "look into the Letter of Concern." ¶¶ 72, 122-123. Executive Dean Burns and Ms. Ramirez allegedly told Plaintiff at the time that Einstein would need to appear "responsive" to the Letter of Concern, "given the 'climate' in the wake of the #Me Too movement." ¶ 126. Of course, that movement had occurred several years earlier, in 2017-2018.

A few days later, Einstein's then-Dean, Dr. Gordon Tomaselli, notified Plaintiff by letter that Einstein was engaging a third-party investigator to review the allegations in the Letter of Concern (the "Chair Investigation"). ¶¶ 3, 134-135. In the Letter, Plaintiff was informed that he would be suspended as Chair while the investigation was ongoing, in order "to protect all parties

---

[5] Plaintiff alleges that Dr. Jordan was Chair of the Graduate Education Committee and head of the Neuroscience Graduate Student Organization. ¶¶ 19, 117. Dr. Jordan is Chair of the *Neuroscience* Graduate Education Committee. *Student Advisory Committee & Neuroscience Graduate Education Committee*, Dominick P. Purpura Dep't of Neuroscience, https://einsteinmed.edu/departments/neuroscience/graduate-program/committee/#NGEC (last visited Nov. 14, 2024). And Dr. Jordan is not "head" of the Neuroscience Graduate Student Organization, which is an organization of students, fellows, and trainees within the Neuroscience Department. *About Us*, NGSO, https://ngso.einsteinmedneuroscience.org/index.php/about-us/ (last visited Nov. 14, 2024).

from fear of retaliation," given the obvious power differential between the Chair and the rest of the Neuroscience Department and the concerns of retaliation that had already arisen. ¶¶ 135-136. The investigation took place over the next several months. ¶¶ 158.

On July 11, 2022, Plaintiff was notified by letter that the investigation, which had "involved interviews with 59 current or former members of the Department, including [Plaintiff], other faculty, research fellows, current and former staff, and current and former students," had confirmed a range of misconduct by Plaintiff, including:

1) Persistent general mistreatment of students;

2) Persistent and inappropriate use of discriminatory nicknames;

3) Repeated instances of racist, disability, and gender-based comments and insensitive and politically incorrect comments;

4) Repeated references to students and others as "morons" in front of both students and faculty;

5) Repeated inappropriate and unwanted physical touching, including pulling female students' ponytails, stomach touching, shoulder touching, and pushing;

6) Repeated instances of serving alcohol to and drinking alcohol with students in classes and in the lab, which is in direct violation of Einstein's Drug and Alcohol Policy;

7) Inappropriate behavior at on- and off-campus Einstein events, believed to be due to intoxication; and

8) Persistent mistreatment, intimidation, and abuse of staff, including by threatening the loss of their jobs and privileges such as vacation and personal time.

Ex. E; ¶ 164.[6] Accordingly, Dean Tomaselli exercised the discretion afforded to him by the 2016

---

[6] Plaintiff alleges that in a different action, Einstein denied having knowledge or information sufficient to form a belief as to allegations that Plaintiff used inappropriate nicknames for students, among other allegations. ¶¶ 318-320. Generally, this other action involves allegations specific to the plaintiff in that action that do not bear on Plaintiff's claims in the instant action. *See, e.g.*, Compl. ¶ 29, NYSCEF Doc. No. 1, *Roudabush v. Albert Einstein Coll. of Med.*, No. 807857/2023E (N.Y. Sup. Ct., Bronx Cnty., May 19, 2023) ("Defendant KHODAKHAH requested that he refer to all of his students by assigned 'nicknames.' Plaintiff was taken aback but complied. . . .").

Chair Appointment Letter and removed Plaintiff as Chair of the Department. Exs. D, E; ¶¶ 163, 166.

### D.    Plaintiff Is Found Responsible for Violating the College's Title IX Policy

Following the Chair Investigation, on July 11, 2022, Plaintiff received two separate notices that Einstein would investigate allegations by two junior faculty members ("Complainant 1" and "Complainant 2") that Plaintiff had sexually harassed each of them (the "Title IX Notices"). ¶¶ 174-176. The Title IX Notices referred to Complainants 1 and 2 by name and detailed each of their allegations. Ex. F. Specifically, Complainant 1 alleged that when she interviewed for her job at Einstein, among other things, Plaintiff greeted her with a kiss, "placed his hand on her bare knee," and asked her "impermissible questions" about her husband. ¶ 175. Complainant 2 alleged that Plaintiff had twice placed his hand on her back as they waited in line at a reception hosted by the Neuroscience Department, ¶¶ 176, 265-266, and placed his hands on her breastbone and slapped her upper thigh and called her a "moron" later that same year at a different Department reception, ¶¶ 176, 265.[7]

The following day, July 12, 2022, Plaintiff forwarded both Title IX Notices, complete with each of the Complainant's names and detailed allegations, to multiple other Einstein faculty—an act he describes in the FAC as "reaching out to colleagues who might serve as witnesses." ¶ 188; Ex. F. In response to Plaintiff sharing this sensitive information with other members of the Einstein faculty, Dean Tomaselli suspended Plaintiff from campus, revoked his access to his Einstein email and other College IT systems, and instructed Plaintiff to refrain from discussing the pending investigations with other faculty. ¶¶ 190-192; Ex. F.

---

[7] Although Plaintiff acknowledges that Complainant 2's allegation was that he "placed his hand on her back as they waited in line to be served," ¶ 176, he later mischaracterizes the allegation as "tap[ping] her twice briefly on the shoulder," ¶ 266.

Einstein retained a third party to conduct the investigations into Complainants 1 and 2's allegations. ¶ 255. Because the alleged harassment had occurred several years prior, the investigations were conducted pursuant to Einstein's 2018 Title IX Policy. ¶¶ 175-176, 183. Consistent with this Policy, Plaintiff was given the opportunity to submit "names of possible witnesses" to the Title IX Coordinator or the investigator. *See* Ex. G at 34; ¶ 253. The investigator in Complainant 2's proceeding interviewed witnesses and gathered evidence, and Plaintiff was permitted to review the Preliminary Investigative Report. ¶ 258.[8]

Einstein's Title IX Coordinator adopted the investigator's recommendation that Plaintiff be found responsible for sexual harassment as to Complainant 2 on the ground that the four instances of touching—twice on Complainant 2's back, once on her breastbone, and once on her upper thigh—taken in their totality, were sexual in nature. ¶¶ 251, 293; *see* Ex. G at 18. The sanctions imposed included a prohibition on working with students or serving in a faculty governance role for three years, as well as a requirement that Plaintiff's lab be relocated to a different building. ¶ 306.[9] In imposing these sanctions, it was noted that Plaintiff had previously been found to have engaged in inappropriate behavior in the Chair Investigation, and so the sexual harassment finding was a "second offense." ¶ 300.

### E.    The Retaliation Investigations

Following Plaintiff's dissemination of the Title IX Notices, including the Complainants' names and allegations, to his Einstein colleagues in July 2022, the College conducted an investigation into whether Plaintiff's actions violated the anti-retaliation provisions of the 2022 Title IX Policy. Ex. F; ¶¶ 328-332. After conducting a hearing, a third-party hearing officer

---

[8] Plaintiff does not describe the investigation of Complainant 1's allegations, except to allege that the male investigator recommended he be found not responsible for sexual harassment. ¶ 250.

[9] Einstein has since conveyed to Plaintiff that it does not intend to relocate Plaintiff's lab at this time.

determined that Plaintiff's conduct did not violate the Policy. ¶¶ 331-332.

Plaintiff also filed his own retaliation complaint against Dean Tomaselli. In late July and early August 2022, faculty in the Neuroscience Department and members of Plaintiff's lab communicated with Einstein's and Montefiore's leadership about the allegations and investigations involving Plaintiff. ¶¶ 206-207. In response, Dean Tomaselli sent an email to the Neuroscience Department, stating that, although the Chair Investigation had concluded, the College "was commencing separate investigations of other additional allegations that [Plaintiff] had engaged in conduct that may violate additional Einstein policies." ¶¶ 211-212. Although Plaintiff alleges the email, by the very language quoted above, "disclosed the fact of [Plaintiff's] pending Title IX investigations," ¶ 211, the email did not mention Title IX or sexual misconduct. Nonetheless, Plaintiff filed a complaint against Dean Tomaselli based on the email, alleging retaliation in violation of the College's Title IX policies. ¶ 219. As with the retaliation complaint against Plaintiff, the College investigated whether the Dean's actions violated the anti-retaliation provisions of the 2022 Title IX Policy. ¶¶ 333-344. And as with the retaliation complaint against Plaintiff, following a hearing, a different third-party hearing officer determined that Dean Tomaselli's conduct did not violate the Policy either. ¶ 334.

### F.    This Action

Plaintiff filed this action on February 5, 2024, and, following a conference pursuant to Rule III.A of this Court's Individual Practices, filed the FAC on September 23, 2024. In the FAC, Plaintiff brings Title IX claims against Einstein and Montefiore; New York State and New York City Human Rights Law claims against Einstein, Montefiore, and Dean Tomaselli; contract and quasi-contract claims under New York law against Einstein and Montefiore; and claims of tortious interference with contract against Dean Tomaselli and Drs. Castillo and Jordan.

9

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). While the Court must accept as true all well-pleaded factual allegations in the complaint and "draw[] all inferences in the plaintiff's favor," *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006), it may also consider documents incorporated by reference or integral to the complaint. *Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 153 (2d Cir. 2002); *see supra* n.2.

## ARGUMENT

### I.    Plaintiff Fails to Allege Any Wrongful Act by Montefiore

Despite his 563 paragraphs of allegations, Plaintiff has not stated any plausible claim against Montefiore. Plaintiff relies on improper group pleading to bootstrap claims against Montefiore onto his claims against Einstein, failing to allege any specific actions that Montefiore supposedly took against him or to establish any basis to hold Montefiore responsible for Einstein's alleged actions. Accordingly, Montefiore should be dismissed as a defendant in this action.

When "a complaint lumps all the defendants together in each claim and provides no factual basis to distinguish their conduct, it fails to satisfy [Rule 8's] minimum standard." *S.G. v. Bank of China, Ltd.*, No. 23 Civ. 2866, 2024 WL 1861158, at *2 (S.D.N.Y. Apr. 29, 2024) (Kaplan, J.). (internal quotation marks omitted); *see also United States ex rel. Takemoto v. Nationwide Mut. Ins. Co.*, 674 F. App'x 92, 94-95 (2d Cir. 2017). Plaintiff alleges that "Defendants Einstein[] and [Montefiore] discriminated against Plaintiff [] because of his sex," ¶ 439, and that "Defendants breached [Plaintiff's] employment contract," ¶ 473. But Plaintiff nowhere alleges, beyond

conclusory statements, that *Montefiore* took any discriminatory action toward him or breached any contract with him. Although Plaintiff alleges that "[o]n information and belief, . . . the investigation of disciplinary issues and decisions on disciplinary decisions as regards Einstein employees were made by [Montefiore]," ¶ 24, this conclusory allegation is directly contradicted by Plaintiff's own, more specific allegations about who conducted various investigations and made disciplinary decisions concerning Plaintiff. *See, e.g.*, ¶¶ 158, 173, 249-251, 255, 334, 340 (identifying investigators and decisionmakers in Plaintiff's disciplinary proceedings, none of which were Montefiore). Because the FAC fails to give Montefiore "notice of what [it] is alleged to have done," *Bank of China*, 2024 WL 1861158, at *2, and a "corporate affiliation" between Einstein and Montefiore, standing alone, is not an excuse to improperly group plead, *id.*, Plaintiff's allegations are insufficient to state a claim against Montefiore.

Indeed, Plaintiff's allegations relating to Montefiore, such as they are, do not amount to any actionable wrongdoing. Plaintiff alleges that the then-President and CEO of Montefiore selected Dr. Tomaselli as Dean, ¶ 65; that Montefiore's current president had previously convinced Plaintiff not to resign as Chair, ¶ 78; and that faculty members reported to Montefiore's current president, among others, that they believed allegations against Plaintiff were false, ¶ 206. Of course, none of this constitutes sex discrimination, retaliation, or a breach of any enforceable promise on Montefiore's part.

Finally, Plaintiff has not met, and cannot meet, the "very demanding" standard to pierce the corporate veil and hold Montefiore liable for any alleged wrongful acts of Einstein. *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 386 (S.D.N.Y. 2023). Plaintiff generally alleges that Montefiore is the "corporate parent and umbrella organization of . . . Einstein," ¶ 12, and occasionally offers a conclusory allegation that Einstein and Montefiore

"operated as agents of one another," ¶ 443. But where, as here, the "complaint sets out only generalized and conclusory allegations regarding common ownership, employees, management, control, and decision making," the Second Circuit has found such allegations insufficient to plead veil piercing. *E.g.*, *Water Sols., LLC v. Ravyn & Robyn Constr., LLC*, 789 F. App'x 920, 921 (2d Cir. 2020).

## II.    Plaintiff Fails to Allege a Title IX Erroneous Outcome Claim

Although Plaintiff offers a litany of grievances about Einstein's treatment of him, he fails to allege gender discrimination—the *sine qua non* of a Title IX claim. To challenge the outcome of his Title IX proceeding under an "erroneous outcome" theory, *see* ¶¶ 434-449, Plaintiff must allege, among other things, "specific facts that support a minimal plausible inference" of gender discrimination. *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016); *see also Schiebel v. Schoharie Cent. Sch. Dist.*, No. 23-1080, 2024 WL 4644958, at *4 (2d Cir. Nov. 1, 2024); *Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30-31 (2d Cir. 2019). A plaintiff can establish a minimal plausible inference of gender bias through "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that [] tend to show the influence of gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). In the absence of such direct evidence of gender bias, "procedural irregularities or preferential treatment during the disciplinary proceeding, *combined with* a concrete motive to discriminate on the basis of gender, is sufficient to create at least a 'minimal inference' that a [plaintiff] was subjected to gender bias." *Feibleman v. Columbia Univ.*, No. 19 Civ. 4327, 2020 WL 882429, at *9 (S.D.N.Y. Feb. 24, 2020) (citing *Doe v. Columbia*, 831 F.3d at 57) (emphasis added). Here, Plaintiff fails to satisfy this crucial element of a Title IX claim through any means.

### A.    Plaintiff Fails to Allege Facts Establishing a Minimal Plausible Inference of Gender Bias

Plaintiff fails to allege either direct evidence of gender bias or facts showing a concrete motive to discriminate on the basis of gender. Indeed, his allegations barely relate to gender at all. The only allegation even indirectly related to gender in connection with his disciplinary proceedings concerns the alleged statement made by Executive Dean Burns and Ms. Ramirez when Plaintiff spoke to them about the Letter of Concern. *See* ¶¶ 122-133, 448(d). Plaintiff alleges that Executive Dean Burns and Ms. Ramirez "told [him] that, given the 'climate' in the wake of the #Me Too movement, Einstein needed to appear 'responsive' to the anonymous allegations," thereby prompting the Chair Investigation. ¶ 126.

That the College would need to be "responsive" to allegations of misconduct is not evidence of bias, let alone gender bias, in Plaintiff's Title IX proceeding. In fact, Einstein is required to respond to allegations of misconduct under, for example, the Title IX regulations, *see* 34 C.F.R. § 106.45, and its own policies, *see* Exs. G-I. Indeed, Plaintiff himself alleges that promptly responding to allegations of student mistreatment is required by Einstein's accrediting body. ¶¶ 394-396. What is more, Plaintiff alleges that he himself "suggested to Ms. Ramirez and [Executive] Dean Burns that they look into the Letter of Concern." ¶ 123.[10]

Nor is it plausible that the #MeToo movement somehow created the kind of pressure on Einstein that, if coupled with clear procedural irregularities, would give rise to an inference of gender bias. Here, Plaintiff has not alleged that Einstein was a particular focus of the #MeToo movement. *Cf. Doe v. Columbia*, 831 F.3d at 57 (finding "plausible support" for "bias with respect to sex" where, for example, "during the period preceding the disciplinary hearing, there was

---

[10] Plaintiff also alleges that Ms. Ramirez should not have served as the decisionmaker in his Title IX proceedings because she was biased against him, but he does not allege that she was biased against him because of his gender. *See* ¶¶ 296-299.

substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students"). Nor has Plaintiff alleged that the 2017 movement put a national spotlight on the College that continued during its response to the allegations against him—allegations that arose more than four years later, in 2022. *See Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020) (concluding #MeToo movement was insufficient to show inference of gender bias because it "occurred on college campuses across the country" and "took place several months before [the complainant] even filed her complaint").

Plaintiff's other attempts to allege gender-based pressure on Einstein likewise fail. Plaintiff relies on purported national pressure from a 2011 Dear Colleague Letter by the Department of Education. *See* ¶¶ 448(e), 374-382. But not only is the 2011 Dear Colleague Letter more than a decade old, it was withdrawn years prior to Plaintiff's disciplinary proceedings. ¶¶ 383-385. For these same reasons, courts have rejected similar reliance on the 2011 Dear Colleague Letter to establish a motive to discriminate on the basis of sex. *See, e.g.*, *Doe v. N.Y. Univ.*, 438 F. Supp. 3d at 186 (holding plaintiff could not rely on 2011 Dear Colleague Letter to allege discriminatory motive "because at the time of the complaint, investigations and hearings, the letter had already been withdrawn"); *Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019) (rejecting that 2011 Dear Colleague Letter evinced "gender bias on the part of the University").

Plaintiff's allegations concerning "pressure" to take "appropriate" action in response to complaints of harassment—whether to comply with accreditation standards, ¶ 448(e), or in response to a single student presentation, ¶¶ 448(e), 392-393—fare no better, since they do not demonstrate gender bias. Complaints of harassment can be brought by and against individuals of any gender, and the College's commitment to appropriately responding in no way demonstrates

bias against any gender. *See*, *e.g.*, *Doe v. Colgate Univ.*, 760 F. App'x at 30-31 (finding no gender bias when University president gave general speech on responding to sexual harassment). Similarly, any alleged "pressure" resulting from Plaintiff's suspension as Chair, *see* ¶ 448(f), has nothing to do with gender.

Plaintiff's allegations regarding the outside investigators in his Title IX proceedings, a firm by the name of Grand River Solutions, and the 2018 Title IX Policy are similarly unavailing. Although Plaintiff alleges that Grand River Solutions employees are primarily women, *see* ¶ 255, the gender of an investigator does not establish a plausible inference of bias against another gender. *See Doe v. Colgate Univ.*, 760 F. App'x at 31-32 (rejecting argument that female former police detective was biased investigator).[11] Likewise, the 2018 Title IX Policy's use of the gender-neutral word "victim" does not reflect gender bias. ¶ 85; *see, e.g.*, *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 661 n.6 (D. Conn. 2019) (use of the word "victim" rather than "complainant . . . is gender-neutral on its face . . . and thus does not support any inference of gender bias"); *Doe v. Colgate Univ.*, No. 15 Civ. 1069, 2017 WL 4990629, at *15 (N.D.N.Y. Oct. 31, 2017) ("Facially gender-neutral sexual misconduct policies . . . do not create an inference of gender bias."), *aff'd*, 760 F. App'x 22 (2d Cir. 2019); *see also Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 478 (S.D.N.Y. 2015) (concluding "entirely gender neutral" policy did not demonstrate gender bias). Nor can the 2018 Title IX Policy's procedures, standard of evidence, or definition of "sexual harassment" possibly demonstrate gender bias. *See* ¶ 86. Rather, the 2018 Title IX Policy applied equally to all genders and was consistent with relevant OCR guidance at the time. *See* 2017 Q&A at 5; OCR, *Revised Sexual Harassment Guidance* 2 (2001), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/

---

[11] That the Managing Director of Grand River Solutions was previously the Title IX coordinator at an institution whose investigation was "set aside" by a California court, ¶ 256, similarly does not show that gender bias influenced Plaintiff's case.

docs/shguide.pdf.[12]

**B.    Plaintiff Does Not Allege Any Clear Procedural Irregularity**

Without pleading a minimal plausible inference of gender bias or any motive to discriminate, Plaintiff's erroneous outcome claim fails. *Feibleman*, 2020 WL 882429, at *9; *Doe v. Columbia*, 831 F.3d at 57. But even setting that fatal defect aside, Plaintiff has failed to allege the type of clear procedural irregularity that, when combined with a concrete motive to discriminate based on gender, could support a plausible inference of gender bias.

The Second Circuit has been explicit: "we emphasize that our standard requires *clear* irregularities to raise an inference of bias . . . . [M]inimal irregularities (absent other indicia of bias) do not suffice to suggest discrimination." *Menaker*, 935 F.3d at 34 n.50; *see also Roe v. St. John's Univ.*, 91 F.4th at 654 ("Even allegations of potentially serious flaws in a Title IX plaintiff's disciplinary proceedings may fail to allege sufficient facts to support a plausible inference that the irregularities are attributable to sex bias." (internal quotation marks omitted)). For example, in *Menaker*, the defendant allegedly "completely disregarded the process provided for in its written 'Harassment Policy,'" including allegedly failing to "interview potential witnesses, provide [the plaintiff] the opportunity to submit a written response, and produce a written determination of reasonable cause," and it terminated the plaintiff even though a top-level university administrator "knew that at least one of the accusations against [the Plaintiff] was false." *Menaker*, 935 F.3d at 3-35; *see also Schiebel*, 2024 WL 4644958, at *9-10 (concluding plaintiff alleged clear procedural irregularities where school "did not provide [the plaintiff] with even the rudiments of due process"). Plaintiff's allegations here are not even close to comparable.

Plaintiff appears to claim that his disciplinary processes were irregular in four ways:

---

[12] Following the rescission of the 2011 Dear Colleague Letter, the Department of Education announced that it would look to its prior 2001 Guidance in assessing compliance with Title IX. *See* 2017 Q&A at 1.

(1) the policy applied; (2) the sanction imposed; (3) the interactions with witnesses; and (4) the weighing of evidence and credibility determinations. *See* ¶ 447. However, none of Plaintiff's allegations amount to "clear irregularities."

### 1. Einstein Properly Applied the 2018 Title IX Policy to Plaintiff's 2018 Conduct

It was not procedurally irregular for Einstein to apply the 2018 Title IX Policy in force at the time of the underlying conduct, rather than later iterations of the Title IX policy, to Plaintiff's Title IX proceedings. *See*, *e.g.*, ¶ 447(a). The procedural changes in the College's 2022 Title IX Policies flow from changes in the Title IX regulations in 2020, which the Department of Education has repeatedly made clear are not retroactive: "[T]he 2020 amendments do not apply to alleged sexual harassment occurring before August 14, 2020. This is true even if the school's response was on or after this date." 2021 Q&A at 10; Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,061 (May 19, 2020) ("[T]he Department will not enforce these final regulations retroactively."); *see also Doe v. Trs. of Columbia Univ. in City of N.Y.*, No. 21 Civ. 5839, 2022 WL 3666997, at *11 (S.D.N.Y. Aug. 25, 2022) (holding 2020 Title IX regulations did not apply retroactively, stating that "it is clear Columbia acted in compliance with Department of Education regulations when it applied its 2019 [Title IX] Policy to Doe's complaint, which arose from a sexual assault she alleges took place on January 8, 2019").

Plaintiff's claim that the 2022 Title IX Policy should have been applied also lacks support in the Policy itself. Plaintiff alleges that "the 2022 Title IX policy unambiguously applied to govern the conduct of all Einstein faculty, *without regard to the date of the alleged occurrence.*" ¶ 186. But that is not what the 2022 Title IX Policy says. Rather, the 2022 Title IX Policy merely provides: "This Policy governs the conduct of all College of Medicine faculty . . . and covers their

treatment of each other and of students, as well as others with whom they come into contact at or near the College of Medicine and/or at College of Medicine-sponsored and affiliated activities and events." Ex. I at 3. Not only does the 2022 Title IX Policy not state that it applies regardless of the date of the alleged Policy violation, but such an interpretation would be contrary to OCR guidance.

### 2. The Sanctions Imposed Were Not Unduly Harsh or Procedurally Irregular

Plaintiff next contends that the sanctions imposed after he was found responsible for sexual harassment—a three-year bar from working with students or serving in a faculty governance role, and the relocation of his lab, ¶ 306—are unduly harsh and therefore demonstrate clear procedural irregularity. But the 2018 Title IX Policy clearly states that the College may impose, among other sanctions, "a warning, disciplinary probation, restriction from employment by the College, . . . loss of privileges, no contact, [and] exclusion from areas of the campus and facilities . . . ." Ex. G at 35. Accordingly, Plaintiff's disciplinary sanctions are not outside the bounds of the 2018 Title IX Policy, and certainly are not clearly irregular.[13]

Moreover, nothing that Plaintiff cites in the 2022 Title IX Policy or 2020 Title IX regulations (if either were even to apply here, which it does not) prohibits the College from considering past findings of misconduct in determining an appropriate sanction; nor does anything in the 2018 Title IX Policy prohibit such consideration either. *See* ¶¶ 301-304. In fact, Appendix G to the 2018 Title IX Policy explicitly provides: "An individual found responsible for violating

---

[13] Even if the 2022 Title IX Policy applied—and it does not—the sanctions imposed would still fall within its bounds. *See* Ex. I at 25 (listing same possible sanctions as the 2018 Title IX Policy). Further, similar (and even more severe) sanctions have been upheld for faculty found responsible of engaging in sexual harassment. *See, e.g., Lai v. St. John's Univ.*, 64 N.Y.S. 3d 227, 227 (2d Dep't 2017) (tenured professor terminated for sexual harassment); *Holm v. Ithaca Coll.*, 669 N.Y.S. 2d 483, 484-88 (N.Y. Sup. Ct.) (same), *aff'd*, 682 N.Y.S. 2d 295 (3d Dep't 1998), *leave denied* 711 N.E.2d 643 (N.Y. 1999); *Shub v. Hankin*, 869 F. Supp. 213, 215, 220 (S.D.N.Y. 1994) (granting motion to dismiss when tenured professor was suspended pending the outcome of a sexual harassment investigation), *aff'd* 66 F.3d 808 (2d Cir. 1995).

College policy may be given a range of sanctions (depending on the severity of the conduct and other factors, *such as prior judicial history*) . . . ." Ex. G at 45 (emphasis added); *see also* Ex. I at 39 (same).[14]

### 3.    Plaintiff's Allegations Regarding Witnesses Are Not Clearly Irregular

A plaintiff pleads procedural irregularity with respect to witnesses when he alleges a defendant "accept[s] an unsupported accusatory version over Plaintiff's" and "decline[s] even to explore the testimony of Plaintiff's witnesses." *Doe v. Columbia*, 831 F.3d at 57. Here, Plaintiff merely alleges in a conclusory manner that "[t]he investigator did not speak with all of [Plaintiff's] witnesses." ¶ 447(e). But the only witness who Plaintiff specifically identifies is his wife, who Plaintiff alleges the investigator "declined to *fully* interview." ¶ 259 (emphasis added). Plaintiff does not allege with any specificity in what way his wife's interview was purportedly incomplete, what other witnesses the investigator supposedly "declined to interview," ¶ 262, or what information those witnesses would have provided.

That Plaintiff was instructed to provide the names of witnesses to the Title IX Coordinator or investigator, rather than to contact the witnesses himself, ¶¶ 262, 447(e), does not constitute a clear procedural irregularity either. Rather, it fully comports with Einstein's 2018 Title IX Policy, which affords the complainant and the respondent the opportunity to do just that—provide the Title IX Coordinator with the "names of possible witnesses." Ex. G at 34. Plaintiff further alleges that the investigator "was agreeable when Complainant 2 offered to reach out and speak with her

---

[14] 34 C.F.R. § 106.45(b)(1)(i) (2020), on which Plaintiff erroneously relies, *see* ¶ 302, simply requires recipients of federal funds to "[t]reat complainants and respondents equitably . . . by following a grievance process that complies with this section before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." That does not mean, as Plaintiff mistakenly suggests, that to be considered in imposing sanctions, prior misconduct must also have been adjudicated consistent with the 2020 Title IX regulations. Such a misinterpretation would inexplicably prevent schools from considering either pre-2020 misconduct or misconduct falling outside the scope of Title IX when sanctioning repeat offenders.

witnesses," ¶ 263—information he apparently gleaned from his review of the Preliminary Investigation Report, ¶ 258. But even if his interpretation of the Preliminary Investigation Report were correct, there is no reason to think that any difference in whether Plaintiff and Complainant 2 were encouraged to contact witnesses was due to bias, gender or otherwise, rather than the much more obvious explanation that Plaintiff's prior purported witness outreach—by forwarding the Title IX Notices to his colleagues—had caused concerns within the Department. *See, e.g.*, Ex. F.

### 4. The Weighing of the Evidence and Credibility Determinations Were Not Clearly Irregular

Finally, Plaintiff complains that the investigator's "findings of fact and credibility determinations . . . were incorrect and contrary to the weight of the evidence." ¶ 447(g). A district court, however, generally will not "second-guess a university's credibility determinations and overall evaluation of the evidence" in a Title IX proceeding. *Doe v. Vassar Coll.*, No. 19 Civ. 9601, 2019 WL 6222918, at *8 (S.D.N.Y. Nov. 21, 2019); *see also, e.g., Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."); *Yu v. Vassar Coll.*, 97 F. Supp. 3d at 462 ("To the extent that [plaintiff] simply disagrees with the [university's] decision, the Court cannot now— absent flawed process *and* gender discrimination—second-guess the panelists' credibility determinations and factual conclusions."). There is no reason to depart from that practice here.[15]

## III. Plaintiff Does Not Allege Retaliation in Violation of Title IX

Plaintiff's Title IX retaliation claim fails because he does not allege that Einstein took any action against him because he complained of sex discrimination. The Supreme Court has held that

---

[15] For all of these same reasons, Plaintiff's Title IX claim should also be dismissed on the ground that his allegations do not "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" sufficient to plead an erroneous outcome claim. *Yusuf*, 35 F.3d at 715; *see also B.B. v. New Sch.*, No. 17 Civ. 83497, 2018 WL 2316342, at *5-7 (S.D.N.Y. Apr. 30, 2018).

"the private right of action implied by Title IX encompasses claims of retaliation" where a college or university "retaliates against an individual *because he has complained about sex discrimination*." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005) (emphasis added). As the Supreme Court explained in *Jackson*:

> [R]etaliation is discrimination "on the basis of sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX.

*Id.* at 174. Consistent with this holding, courts in multiple circuits have held that participation in a sexual harassment investigation as a respondent, in and of itself, is *not* protected activity that would support a *prima facie* case of retaliation. *See, e.g.*, *Du Bois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1205 (8th Cir. 2021) ("No part of Title IX designates participation in a sexual harassment investigation on the side of the accused as protected activity."); *Doe v. Bd. of Trs. of N. Ill. Univ.*, No. 17 Civ. 07991, 2024 WL 4346627, at *9 (N.D. Ill. Sept. 30, 2024) ("Plaintiff's retaliation claim fails because he did not engage in a protected activity by merely defending himself against Roe's sexual assault allegation.").

Here, Plaintiff alleges that Einstein retaliated against him "when he responded to allegations that he engaged in sexual misconduct . . . by reaching out to secure witnesses." ¶ 456; *see also* ¶ 188. But nowhere in the FAC does Plaintiff allege that in that outreach, he complained of sex discrimination. Rather, Plaintiff contends that "[p]articipation by 'any individual' in any manner in a Title IX investigation or proceeding constitutes protected activity under Title IX." ¶ 458. But that contention is at odds with *Jackson*, controlling Supreme Court precedent.

Further, although Plaintiff cites the Title IX regulations in support of his claim, *see* ¶¶ 203, 458, the Supreme Court has declined to expand claims of Title IX retaliation beyond the statutory text on the basis of the regulations, *Jackson*, 544 U.S. at 178 & n.2 ("[P]laintiffs may not assert

claims under Title IX for conduct not prohibited by that statute."); *see also Burgess v. Harris Beach PLLC*, 346 F. App'x 658, 661 (2d Cir. 2009) ("[T]here is no private right of action to enforce [a] regulation to the extent that it extends Title IX protections beyond the plain meaning of the statute."). As the Supreme Court explained in *Jackson*, in holding that the implied private right of action under Title IX encompasses retaliation, the Court did "not rely on regulations extending Title IX's protection beyond its statutory limits; indeed, [the Court did] not rely on the Department of Education's regulation at all, because the statute *itself* contains the necessary prohibition." 544 U.S. at 178. Accordingly, claims of Title IX retaliation are circumscribed by controlling interpretations of the scope of the private right of action under Title IX. Plaintiff's claims, however, fall outside those limits.[16]

Because Plaintiff has not alleged that he participated in protected activity that would support a claim of retaliation under Title IX, he cannot establish a *prima facie* case of retaliation or a plausible inference of retaliatory motive. *See Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 495 (S.D.N.Y. 2023) (setting forth the standard for a *prima facie* case of retaliation (citing *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011))); *see also Bailey v. New York L. Sch.*, No. 19-3473, 2021 WL 5500078, at *2 (2d Cir. Nov. 24, 2021). But even if Plaintiff could make out a *prima facie* case of retaliation, his claim still fails. Einstein had a legitimate and non-discriminatory reason for wanting Plaintiff to refrain from discussing his Title IX investigations with other faculty, including the junior faculty Complainants and other faculty who may have been witnesses in those investigations—namely, to protect the integrity of the investigations. *See ¶¶* 174, 192; *Papelino*, 633 F.3d at 92 (holding that once a plaintiff establishes

---

[16] Even Title VII, with its explicit textual protection for retaliation on the basis of participation in a proceeding, 42 U.S.C. § 2000e-3(a), does not extend as far as Plaintiff would stretch Title IX. The Second Circuit has concluded that Title VII's participation clause "does not include participation in an internal employer investigation unrelated to a formal EEOC charge." *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012).

a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973))); *Carton v. Reno*, 310 F.3d 108, 113 (2d Cir. 2002) ("imped[ing] the investigation by intimidating the complaining witnesses" is a legitimate concern "both as a matter of investigative technique" and to promote "a fair and complete investigation").

## IV.     The Court Should Dismiss Plaintiff's State Law Claims

If the Court dismisses Plaintiff's Title IX claims, it should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also, e.g.*, *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006); *Latour v. Columbia Univ.*, 12 F. Supp. 3d 658, 664 (S.D.N.Y. 2014) (Kaplan, J.). Nevertheless, in the interest of completeness, as set forth below, Plaintiff's state law claims against Einstein, Montefiore, and Drs. Castillo and Jordan also fail as a matter of law.

### A.     Plaintiff's NYSHRL and NYCHRL Claims Fail

Claims under the NYCHRL are subject to a more lenient standard and a more liberal construction than Title IX claims. But to make out such a claim, a plaintiff still must allege facts giving rise to an inference of discrimination on the basis of a protected characteristic. *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, No. 23 Civ. 01932, 2024 WL 3849192, at *19 (S.D.N.Y. Aug. 16, 2024) (citing *Okeke v. Interfaith Med. Ctr.*, 205 N.Y.S.3d 189, 191 (2d Dep't 2024)). And while the standard for pleading an NYSHRL claim is now "closer to the standard of the NYCHRL," *id.* at *21 (quoting *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021)), it too requires an allegation of a discriminatory motive, *id.* at *22 (citing *Cooper v. Franklin Templeton Invs.*, No. 22-2763, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023)). Here, for the reasons discussed above, Plaintiff fails to plead discriminatory intent on the basis of gender,

*see supra* Section II.A, so his NYCHRL and NYSHRL claims fail.

**B.    Plaintiff Fails to Allege Breach of Contract**

**1.    Einstein's Title IX Policies Are Not Contracts, Nor Has Einstein Breached Them**

Plaintiff claims that Einstein breached its employment contract with him by purportedly violating the terms of the College's Title IX policies in connection with his various disciplinary proceedings, including in the Chair Investigation, the Title IX proceedings, and adjudicating Plaintiff's complaint of retaliation. ¶ 473. Although Plaintiff contends that "employment policies incorporated by reference in an appointment letter constitute a contract which is binding on the employer," ¶ 472, Plaintiff's appointment letters did not incorporate by reference any Title IX policy. Under New York law, a document is incorporated by reference into a contract if "(1) it is clearly identified in the agreement, and (2) the contract contains language that clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract, rather than merely to acknowledge that the referenced material is relevant to the contract." *Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*, 203 F. Supp. 3d 312, 322 (S.D.N.Y. 2016) (internal citations and quotation marks omitted).

None of the employment documents that Plaintiff cites clearly indicate that any Title IX policies are incorporated therein by reference. The 2000 Offer Letter explicitly incorporated the College's System of Appointments. It states that Plaintiff's "faculty appointment *is subject to* the terms outlined in this letter and to the provisions of the College's System of Appointments." Ex. A at 1 (emphasis added). By contrast, the same 2000 Offer Letter referred to, but treated differently, other policies, by simply stating where they could be found: "other policies of the College of Medicine applicable to faculty can be found in the AECOM Faculty Handbook." *Id*. Similarly, the 2001 Appointment Letter states: "Your faculty appointment is in the In Residence

Status *in accordance with* the System of Appointments, Titles and Compensation Arrangements at the Albert Einstein College of Medicine." Ex. B at 1 (emphasis added). And again, instead of explicitly incorporating any other policies, the 2001 Appointment Letter simply states: "the Faculty Handbook . . . as well as other College policies, is being sent to you." *Id*.[17] This type of vague reference to "other College policies" is insufficient under New York law to transform the policies into a binding contract. *See Nat'l Union Fire Ins. Co. of Pittsburg*, 203 F. Supp. 3d at 322; *cf. Langenkamp v. Olson*, 628 F. App'x 50, 52 (2d Cir. 2015) (finding plaintiff alleged a contractual relationship governed by a faculty handbook where her offer letter stated, "in accepting this offer, you agree to abide by all NYU policies . . . including . . . the Faculty Handbook"). Even if Plaintiff were correct that one of these two letters incorporated the Title IX policies, the letters, by their own terms, expired nearly two decades ago. *See* Ex. A at 1 (describing an appointment "for a three-year period"); Ex. B (describing Plaintiff's appointment as "terminating on June 30, 2002").

Furthermore, when a college has discretion to unilaterally alter a policy, courts have concluded that the policy does not rise to the level of being a binding agreement. *Maas v. Cornell Univ.*, 721 N.E.2d 966, 970 (N.Y. 1999) (finding no contract when the "handbook clearly states that it can be altered at any time (impliedly unilaterally)"). Here, each iteration of Einstein's Title IX policy provides the College with significant discretion to alter it unilaterally. *See, e.g.*, Ex. G at 15 ("The College reserves the right to modify and/or amend any or all of the terms and/or procedures outlined herein at any time, in its sole discretion."); Ex. I at 17, 27 (Einstein "in its sole discretion, reserves the right to depart from the prescribed steps" laid out in the Policy and to "modify and/or amend [them] at any time."). As the New York Court of Appeals has observed, these types of "feature[s] [are] hardly the harbinger of a legally binding set of arrangements."

---

[17] Plaintiff refers to the 2001 Appointment Letter but quotes from the 2000 Offer Letter. ¶ 37.

*Maas*, 721 N.E.2d at 970.

What is more, Einstein did not depart from its Title IX policies in any meaningful way in adjudicating the Title IX complaints against Plaintiff, *see supra* Section II.B, or Plaintiff's complaint of retaliation against Dean Tomaselli. Despite Plaintiff's allegations that Einstein was required to adjudicate his claim of retaliation pursuant to the 2022 Title IX Policy's grievance procedures and to resolve it within 60 days of filing, ¶ 222, Einstein adhered to the 2022 Title IX Policy. In accordance with the 2022 Title IX Policy, Plaintiff's complaint was adjudicated by a third-party hearing officer following a live hearing.  Ex. I at 20, 23; ¶ 334. And the Policy makes no promise about the length of time in which a complaint will be resolved. Ex. I at 24 (noting estimated timeline "may be extended depending on the nature of the allegations, the time of year, and any other unforeseen or extenuating circumstance"). Nor did Einstein breach any enforceable promise, in the Title IX policies or otherwise, in conducting the investigation into Plaintiff's leadership as Chair. *See infra* Section IV.B.2.

## 2.  Plaintiff Cannot Allege a Breach of Contract Related to His Status as Chair

None of Einstein's actions in connection with Plaintiff's status as Chair constitute a breach of any enforceable promise. The 2016 Chair Appointment Letter was clear that for Plaintiff's appointment, "[a]s with all Department Chair appointments, continuation is subject to performance *as determined by the Dean*." Ex. D at 1 (emphasis added); ¶ 497. Under New York law, where, as here, a "contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995).

It was not arbitrary or irrational for Dean Tomaselli to suspend Plaintiff as Chair when a letter, signed by thirteen members of the Neuroscience Department, alleged that Plaintiff made

"demeaning and unprofessional comments" and engaged in "autocratic behaviors," leading the Neuroscience Department members to raise "concerns . . . related to [Plaintiff's] leadership as chair." ¶¶ 108, 110, 134. Rather than simply dismiss Plaintiff as Chair on the basis of this report from his colleagues, Einstein instead engaged a third-party investigator to review the allegations and interview dozens of faculty, staff, and students about Plaintiff's leadership. Ex. E. When that external investigation confirmed that Plaintiff had engaged in "[p]ersistent general mistreatment of students"; "[p]ersistent and inappropriate use of discriminatory nicknames"; "instances of racist, disability, and gender-based comments"; "inappropriate and unwanted physical touching"; "serving alcohol to and drinking alcohol with students in classes and in the lab"; and "mistreatment, intimidation, and abuse of staff," Dean Tomaselli acted neither arbitrarily nor irrationally in dismissing Plaintiff as Chair. ¶ 164.

Plaintiff's contention that a "*disciplinary* reason"—*i.e.*, student mistreatment, violations of the College's alcohol use policies, abuse of staff—is somehow distinct and unrelated to his "performance" as Chair, ¶ 498, strains credulity. Indeed, it is difficult to imagine any considerations that would be *more* related to an individual's performance as department chair. Dean Tomaselli acted in good faith and entirely within the discretion explicitly afforded to him when he decided that Plaintiff's performance, as confirmed by an external investigation, did not warrant him continuing in the role of Department Chair.

Although Plaintiff alleges that his suspension and ultimate removal as Chair were impermissible under the College's 2020 Title IX Policy, *see* ¶¶ 146-151, 172, Einstein was not required to follow that Policy in investigating the allegations in the Letter of Concern. The 2020 Title IX Policy, by its own terms, applies to sexual harassment and other forms of serious sexual misconduct. Ex. H. at 6. But Plaintiff alleges that the Letter of Concern included allegations of

"demeaning and unprofessional comments" and "autocratic behaviors," ¶ 110, not sexual harassment or misconduct. Accordingly, the 2020 Title IX Policy did not apply. Nor has Plaintiff identified any other applicable College policy that would have entitled him to any additional process, including reviewing the investigative report, before being removed from the position of Chair at the Dean's discretion.

### 3.    Plaintiff Cannot Allege a Breach of Contract Related to Interim Funding for His Lab

As with Plaintiff's other breach of contract allegations, none of Einstein's alleged actions in connection with the 2014 Retention Letter constitute a breach of any enforceable promise. In that Letter, Einstein agreed to provide Plaintiff with "interim," not indefinite, funding. Specifically, the 2014 Retention Letter stated: "should one or more of your 3 current R01 grants not be renewed, we are committed to providing generous *interim support* (equivalent to the direct costs of the R01) to better enable you to *recapture that grant*." Ex. C (emphases added).

Under New York law, "in interpreting contracts, 'words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.'" *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 500 (S.D.N.Y. 2020) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006)), *aff'd*, 29 F.4th 118 (2d Cir. 2022); *see also Trakansook v. Nahal Realty Corp.*, 579 N.Y.S.2d 391, 391 (1st Dep't 1992). The plain meaning of "interim" is that it is temporary. *See Interim*, Black's Law Dictionary (12th ed. 2024) (defining "interim" as "[d]one, made, or occurring for an intervening time; temporary or provisional <an interim director>"); *cf. Rocchigiani v. World Boxing Council, Inc.*, 131 F. Supp. 2d 527, 530-31 (S.D.N.Y. 2001) (applying New York law and rejecting that plaintiff-boxer was only temporarily or provisionally a fight champion because the contract did not indicate that the champion title was "interim"). Plaintiff's contention that by promising *interim* support, Einstein instead promised

support "indefinitely, subject to [Plaintiff's] retirement or the termination of his tenured employment," ¶ 502, is plainly at odds with the plain language of the parties' written agreement. Ex. C.

Because the parties' written agreement is unambiguous, none of Plaintiff's allegations regarding communications about the 2014 Retention Letter should be considered. *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 361 (S.D.N.Y. 2016), *aff'd*, 850 F. App'x 38 (2d Cir. 2021). In any event, none of those allegations show that Einstein promised Plaintiff anything other than interim support to enable him to recapture a grant. ¶¶ 356, 359. Moreover, a close read of the FAC reveals that Einstein has not failed to fund Plaintiff's lab at all, but rather that the lab continues to receive interim funding, even though Plaintiff's last R01 grant expired over a year ago. ¶¶ 361-362.

### C.    Plaintiff's Claims for Breach of the Implied Covenant and Promissory Estoppel Are Duplicative and Should Be Dismissed

Under New York law, "[a] claim for violation of the [implied] covenant [of good faith and fair dealing] survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract." *JN Contemp. Art LLC*, 29 F.4th at 128. Therefore "raising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing." *Jordan v. Verizon Corp.*, No. 08 Civ. 6414, 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008); *accord Yu*, 97 F. Supp. 3d at 482 ("[A] breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed."). Similarly, "where claims for promissory estoppel are duplicative of a plaintiff's stated claim for breach of contract, such claims will be dismissed." *Drummond v. Akselrad*, No. 23 Civ. 179, 2023 WL

3173780, at \*10 (S.D.N.Y. May 1, 2023) (citing *Chung v. Williams Schwitzer & Assocs.*, P.C., 157 N.Y.S.3d 465, 468 (1st Dep't 2021)).

Because Plaintiff's breach of the implied covenant claim is based on the same factual allegations as his breach of contract claim and "the damages sought for both claims would be the same," the claim for breach of the implied covenant should be dismissed. *JN Contemp. Art LLC*, 29 F. 4th at 128*; compare* ¶ 523(a)-(m), *with* ¶¶ 473-516; *see also* FAC at 99. And because Plaintiff's promissory estoppel claims are duplicative of the alleged breaches of the 2014 Retention Letter and the 2016 Chair Appointment Letter, *see supra* Section IV.B.2-.3, those claims should also be dismissed, *see* ¶¶ 526-532.

### D.    Plaintiff Has Not Pled Tortious Interference with Contractual Relations Against Drs. Castillo and Jordan

To state a claim for tortious interference with contract under New York law, a plaintiff must allege that a contract was actually breached. *NBT Bancorp Inc. v. Fleet/Norstar Finan. Grp., Inc.*, 664 N.E.2d 492, 495 (N.Y. 1996). Because Plaintiff has not alleged that Einstein breached any contract, *see supra* Section IV.B, Plaintiff's tortious interference claim against his fellow Einstein faculty members, Drs. Castillo and Jordan, fails.

Even beyond this fatal defect, Plaintiff's tortious interference claim fails for several additional reasons. First, to plead a claim for tortious interference, a plaintiff is required to allege *actual* knowledge of the contract on the part of the defendants, including "knowledge of the terms and conditions of the allegedly-interfered-with contract." *Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc.*, No. 20 Civ. 78, 2021 WL 1199430, at \*8 (S.D.N.Y. Mar. 30, 2021) (quoting *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020)). But beyond a general reference to his "employment contract," Plaintiff does not allege what contract or contractual provisions Drs. Castillo and Jordan purportedly induced Einstein to breach, *see* ¶¶ 537-

538, let alone that they had any actual knowledge of Plaintiff's "employment contract" (whatever contract that might be).

Second, although New York courts require a plaintiff to allege a co-employee acted outside the scope of their employment to state a claim for tortious interference with an employment contract, Plaintiff has failed to do so here. *See, e.g.*, *McHenry v. Lawrence*, 886 N.Y.S.2d 492, 494 (2d Dep't 2009). Drs. Castillo and Jordan were acting within the scope of their employment when they raised concerns about Plaintiff's leadership of the Neuroscience Department, treatment of staff, and misconduct involving students. ¶¶ 109-110, 119. Indeed, as Plaintiff alleges, Dr. Jordan held positions specifically related to graduate student education. ¶¶ 117, 119. Thus, reporting student concerns to Einstein's Associate Dean for Graduate Programs, as Plaintiff alleges Dr. Jordan did, was certainly within the scope of Dr. Jordan's employment, even if the students' reports turned out to be false or Dr. Jordan was motivated, in some part, by his own personal ambition. ¶ 119; *see, e.g.*, *McHenry*, 886 N.Y.S.2d at 494; *Barcellos v. Robbins*, 858 N.Y.S.2d 658, 660 (2d Dep't 2008). Relatedly, Plaintiff's allegations do not show the sort of unjustified acts required to state a claim for tortious interference. ¶¶ 537-538; *see, e.g.*, *Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008); *J.M. Builders & Assocs., Inc. v. Lindner*, 889 N.Y.S.2d 60, 63 (2d Dep't 2009) (dismissing claim, finding defendant "badmouthing" plaintiff was not equivalent to intentionally procuring a breach of plaintiff's contract).

Where, as here, Plaintiff has failed to specify any contractual basis for his claim, let alone a breach of that contract, or unjustified behavior on the part of Drs. Castillo and Jordan outside the scope of their employment, the claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants Einstein, Montefiore, and Drs. Castillo and Jordan respectfully request that the Court grant their motion to dismiss the FAC in its entirety and with

prejudice.

Dated:    November 15, 2024                    Respectfully submitted,

                                        By: _____
                                            Gabrielle E. Tenzer
                                            Anna Collins Peterson
                                            HECKER FINK LLP
                                            350 Fifth Avenue, 63rd Floor
                                            New York, NY 10118
                                            Tel: (212) 763-0883
                                            Fax: (212) 564-0883
                                            gtenzer@heckerfink.com
                                            apeterson@heckerfink.com

                                            Roberta A. Kaplan
                                            Michele C. Materni
                                            KAPLAN MARTIN LLP
                                            156 West 56th Street, Suite 207
                                            New York, NY 10019
                                            Tel: (212) 316-9500
                                            rkaplan@kaplanmartin.com
                                            mmaterni@kaplanmartin.com

                                            *Counsel for Defendants Montefiore
                                            Medicine Academic Health System, Inc.,
                                            Albert Einstein College of Medicine, Pablo
                                            Castillo, and Bryen Jordan*