```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                          :
                                      Docket #24cv839
 KHODAKHAH,                     :

              Plaintiff,        :

  - against -                   :

 MONTEFIORE, et al.,            : New York, New York
                                  April 22, 2024
              Defendants.       :

------------------------------------ :


                     PROCEEDINGS BEFORE
              THE HONORABLE ROBYN F. TARNOFSKY,
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:              NESENOFF & MILTENBERG, LLP
                            BY:  STUART BERNSTEIN, ESQ.
                                 GABRIELLE VINCI, ESQ.
                            363 Seventh Avenue, 5th Floor
                            New York, New York 10001


For Einstein College and    KAPLAN MARTIN LLP
Montefiore defendants:      BY:  ROBERTA KAPLAN, ESQ.
                            1133 Avenue of the Americas
                            Suite 1500
                            New York, New York 10119


For Defendant Tomaselli:    EMERY CELLI BRINCKERHOFF ABADY
                               WARD & MAAZEL LLP
                            BY:  SARA ESTELA, ESQ.
                            One Rockefeller Plaza, 8th Floor
                            New York, New York 10020



Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                          PROCEEDINGS                    3
 2              THE COURT:  Everyone, please be seated
 3              THE CLERK:  Judge Robyn Tarnofsky is now
 4    presiding over 24cv839, Khodakhah v. Montefiore Health
 5    System.  Counsel, please stat your appearance for the
 6    record starting with the plaintiff.
 7              MR. STUART BERNSTEIN:  Stuart Bernstein for the
 8    plaintiff.
 9              MS. GABRIELLE VINCI:  Gabrielle Vinci for the
10    plaintiff.
11              THE COURT:  Good morning.
12              (interposing)
13              MS. ROBERTA KAPLAN:  Roberta Kaplan, Your
14    Honor, for defendants Montefiore and related
15    (indiscernible).
16              MS. SARA ESTELA:  Good morning, Judge, Sara
17    Estela for defendant Gordon Tomaselli.
18              THE COURT:  Good morning.  Thanks for being
19    here --
20              MS. KAPLAN:  I said Montefiore which is a huge
21    (indiscernible), I meant Einstein.
22              THE COURT:  Thank you.  (inaudible)
23              (inaudible comments)
24              THE COURT:  Please.
25              MS. KAPLAN:  So one thing about housekeeping,
```

```
 1                      PROCEEDINGS              4
 2   Your Honor, I know my friends at the table have some
 3   arguments on behalf of Gene Tomaselli.  Do you want us
 4   to split our time?  How would you like us to do that?
 5          THE COURT:  I have as much time as you need.  I
 6   would appreciate you splitting the time as you think is
 7   going to be most helpful.
 8          MS. KAPLAN:  Thank you, Your Honor, and I'm
 9   going to apologize in advance for the court reporter.  I
10   have a tendency, maybe more than a tendency to speak
11   very fast.  I constantly try to slow myself down, and I
12   will do that today, but if I'm going too fast, please
13   let me know.
14          Your Honor, when I was getting ready for this
15   oral argument this morning, I was trying, kept thinking
16   about a basic question which is why are we here.  Should
17   be a pretty easy question to answer, but it actually
18   isn't.  And the real reason it's a difficult question is
19   there really isn't any reason to be here.  We understand
20   that our clients have disputes with the plaintiff Dr.
21   Khodakhah, but none of those disputes rise to a
22   violation of Title IX which is the focus of the motion
23   to dismiss.
24          In this situation the plaintiff, when he dean
25   of the neuroscience department at Einstein, engaged in
```

1                              PROCEEDINGS                     5

2  behavior that included abusive mistreatment of his

3  students and another faculty and staff, repeated

4  instance of racist, disabled, and gender-based comments

5  or jokes, and repeated inappropriate and unwanted

6  physical touching including female students, grabbing

7  female students' ponytails, stomach touching, etc.

8          When allegations of this was brought to

9  Einstein's attention, they did exactly what they were

10 supposed to do.  They hired a third-party consultant to

11 look into the allegations, and this is important, Your

12 Honor, for I think conceptual purposes there are really

13 three investigations that happened.  I'm going to try to

14 walk you through those.

15         The first investigation was about allegations

16 of the kind I just mentioned, and the question there was

17 whether plaintiff could remain as dean of the

18 department, chair of the department, excuse me.  That

19 issue was completely discretionary, it's not a Title IX

20 issue at all.  The dean has a right to decide who the

21 chair is and to change the chair if he sees fit.  And

22 we'll go into that a little bit later.

23         The second investigation, Your Honor, was a

24 Title IX investigation.  It arose out of two separate

25 complainants that had come through kind of the dean

```
 1                          PROCEEDINGS                  6
 2   investigation process, two junior female faculty
 3   members, and they have specific claims of Title, of
 4   sexual harassment.  There, again, Einstein did exactly
 5   what it was supposed to do and hired a third-party
 6   investigator, actually another third-party investigator,
 7   and they investigated those claims, and, importantly,
 8   extremely importantly, Your Honor, for the status of
 9   this proceeding and the posture that we're in, he won
10   some and he lost some on that.  On one of the
11   complainants, the outside investigator found no
12   responsibility, and on the other they found not all
13   responsibility but some responsibility.
14           It's hard to imagine how – I've never seen,
15   Your Honor, to be honest, now that I think about it, a
16   Title IX case where someone's bringing erroneous outcome
17   claim but they won some and they lost some.  It's not
18   clear, so it was erroneous for the ones he lost but not
19   erroneous for the ones he won.  As a matter of simple
20   common sense, that doesn't make sense.
21           And the final set of investigations, the third,
22   the final set of investigations, Your Honor, were cross-
23   investigations, one filed by Dr. Khodakhah, one filed by
24   Einstein for alleged retaliatory action.  Both of the
25   parties in those ones lost.  The finding for both was
```

```
 1                         PROCEEDINGS                    7
 2  that there was no acts of retaliation.
 3          I understand sitting here today why Dr.
 4  Khodakhah is dissatisfied with these decisions.  He
 5  didn't win everything, he won some, he lost some.  I
 6  understand that.  But that doesn't create, Your Honor, a
 7  cause of action under Title IX, it doesn't create a
 8  federal court of action, cause of action in this court.
 9          With respect to erroneous – let me back up.  So
10  I've been litigating issues under Title IX since, for
11  about 15 years, since the mattress (indiscernible) at
12  Columbia.  And Second Circuit, as Your Honor is well
13  aware, has a very well-developed law in Title IX.  There
14  are three kinds of claims that in this Circuit a
15  plaintiff can make under Title IX.  One is the erroneous
16  outcome claim, i.e., the investigations were wrong, the
17  results were wrong.  You got the wrong guy or I didn't
18  do it or I did do it.  That's what erroneous outcome is.
19          Two, you could have a deliberate indifference
20  claim, and that's when, and we'll talk about it a bit
21  later, is with the exception of a (indiscernible)
22  opinion, Your Honor, it's been limited to students, for
23  the most part limited to students with a couple of
24  exceptions to that, and that's when a student, comes
25  from the Supreme Court's decision in Davis, is
```

PROCEEDINGS                    8

experiencing harassment from his peers or from a

teacher, and it's so pervasive, it's so terrible and

pervasive that that student is deprived of the benefits

of an education.  Okay?  It's kind of like a hostile

work environment in the Title VII context shifted to the

Title IX context.  But it's about educational, the right

to educational opportunities and an education, and that

education part is crucial here because I'm not sure what

educational opportunities Dr. Khodakhah is being

deprived of in any way.

        And the third kind of claim, as Your Honor

knows, is selective enforcement claim, that's not an

issue here at all.  That's that you're picking, imposing

harsher penalties or harsher sentences on one group of

people as opposed to the other.

        With respect to the erroneous outcome thing,

which really is I think the heart of plaintiff's

allegations, as Your Honor I'm sure is aware, in that

kind of a claim, in that kind of a case, the alleged

discrimination has to be, quote, this comes all the way

from Justice Ginsberg, on the basis of sex.  Right.  So

there has to be some gender discriminatory component in

the case for it to be a Title IX claim at all.

        So what does plaintiff come forward with to

```
 1                        PROCEEDINGS                    9
 2  allege this (indiscernible) sex, this gender bias?
 3  First, he says that the Title IX coordinator at Einstein
 4  told him they needed to be responsive to allegations of
 5  sexual misconduct because of Me Too.  First of all, the
 6  Me Too movement peaked in 2017 to 2018, so it was way
 7  before this happened.  Plaintiff does not ever allege as
 8  is the case in certain cases, the older Columbia cases,
 9  that Einstein was ever a focus of that movement and that
10  it was ever focused on Columbia the way Doe v. Columbia,
11  the Second Circuit talked about, it was focused on
12  Columbia.  And three --
13           THE COURT:  Ms. Kaplan, is it a requirement
14  though of the case law that the educational institution
15  be a focus or is it sufficient that there be this issue
16  --
17           MS. KAPLAN:  Well, so, Your Honor, if Me Too,
18  if the existence of Me Too years before were sufficient
19  to say that something was on the basis of sex in every
20  single complainant at every single university in the
21  country would be on the basis of sex because Me Too is a
22  fact in our society, it happened, it didn't happen, it's
23  controversial for sure.  But everyone in the world knows
24  about it, and so here you could say that the fact that
25  Me Too happened is enough to create that, enough of a
```

```
 1                         PROCEEDINGS                10
 2   plausible inference of discriminatory bias that would
 3   apply to everyone.  That's clearly not what was
 4   intended.
 5           THE COURT:  Is that really what plaintiff is
 6   saying or is what he's saying is that they raised the
 7   issues of Me Too?
 8           MS. KAPLAN:  He's saying that someone said Me
 9   Too, we have to respond to our students.  I mean for the
10   fact that she said Me Too, obviously that's (inaudible).
11   There's Me Too and we have to respond to students.  To
12   respond to our students obviously is true.  That's
13   required by Title IX, and the fact that she said there's
14   this (indiscernible) Me Too and we're trying to be
15   responsive to students under Me Too, that does not
16   create gender bias.  By the way, you could have the same
17   thing, there are plenty of men who claim that they were
18   victimized under Me Too, and a male person who said he
19   was harassed could have the exact same argument.  So it
20   just doesn't make sense.
21           The second argument he makes which is far
22   weaker is that the outside investigators at Einstein
23   engaged, and as Your Honor I'm sure knows, the reason
24   they engaged them is to kind of remove any sense of
25   bias.  If you hire an outside third-party investigator,
```

PROCEEDINGS                  11

the whole point is to make it as objective and

independent as possible.  That those investigators had

too many women working for them.  Well, Your Honor, that

obviously does not create a plausible inference of, on

the basis of sex or gender discrimination.  No one

thinks that because someone's a woman, they're

necessarily biased one way or the other.  And, again, if

that were enough, the same argument I made the last time

with respect to Me Too, Your Honor, then there'd be no

way to have any investigation unless you could show that

there were 50/50 employment at the company, men/women,

would be on the basis of sex.

Let me go through the facts, turn now to the

facts, and we'll come back to the law, if it's okay with

Your Honor.

Plaintiff joined Einstein's faculty in 2001 as

an assistant professor.  He was granted tenure in 2012.

In 2016 he was appointed chair of the neuroscience

department for an indefinite term subject to performance

as determined by the dean.  That's what I was talking

about earlier, Your Honor.  In February 2022, so, again,

in terms of Me Too, we're talking Me Too was '17/18.

This is 2022.  It's already four, five years later.

Plaintiff received a letter of concern signed by 13 of

```
 1                           PROCEEDINGS              12
```

 2  his colleagues in the neuroscience department expressing

 3  concerns about, quote, "demeaning and unprofessional

 4  comments and autocratic behaviors" by plaintiff.  At the

 5  same time Einstein was made aware of a student survey

 6  among students in that department that made similar

 7  complaints.

 8           So what did Einstein do?  As I said before,

 9  they did the absolute right thing, they engaged an

10  outside investigator to review the allegations.  Dr.

11  Khodakhah was told that he would be suspended as chair

12  while the investigation was ongoing.  And as a result of

13  that investigation, the investigator concluded after

14  interviewing 59 (indiscernible) former members of the

15  department, including plaintiff himself, other faculty,

16  fellows, students, staff, etc., that investigator

17  concluded as follows, that there was a persistent

18  general mistreatment of students, that there was

19  persistent and inappropriate use of discriminatory

20  nicknames of students, that there were repeated

21  incidents of racist, disabled, and gender-based

22  comments, that there were repeated references to

23  students and others as morons in front of students and

24  faculty, that there was repeated inappropriate physical

25  touching including pulling ponytails, etc.  There were

```
 1                        PROCEEDINGS                 13
 2   repeated instances of serving alcohol and drinking
 3   alcohol with students even though that was prohibited by
 4   Einstein's policies.  And there was persistent
 5   mistreatment of staff.
 6            As a result of those findings, Your Honor, the
 7   dean did what he had the discretion to do, and he
 8   removed plaintiff as chair of the neuroscience
 9   department.  Again, I'm not sure, other than there's a
10   factual basis for some of the investigations
11   (indiscernible) and obviously on similar topics, I don't
12   think he could have any Title IX claim whatsoever about
13   his removal as chair.  Certainly within the discretion
14   of the dean, the dean did what he should do, the
15   investigation found what it found, and he was removed as
16   chair.
17            Now, as a result of the let's call it the chair
18   investigation, as I said before, two women who were
19   junior faculty each alleged that Dr. Khodakhah had
20   harassed them.  One alleged, let's call it complainant
21   1, that she, that when she interviewed for her job at
22   Einstein, plaintiff greeted her with a kiss, placed his
23   hand on her bare knee, and asked her impermissible or
24   inappropriate questions about her husband.  The second
25   woman alleged that plaintiff placed his hand on her back
```

```
 1                              PROCEEDINGS                    14

 2   as the waited in line in reception, placed his hands on

 3   her breast bone, and then slapped her upper thigh, and

 4   called her a moron later at a different reception,

 5   excuse me, later that year.

 6              These were, in fact, of course, Your Honor,

 7   focused on Title IX and these were Title IX allegations.

 8   So, again, what did Einstein do?  It did exactly what it

 9   should do.  It hired an outside investigator to get to

10   the bottom of what had happened.

11              During this period, a day after he was notified

12   that Einstein was doing these investigations, Dr.

13   Khodakhah forwarded both Title IX notices, complete each

14   with complainants' names and allegations, to multiple

15   other Einstein faculty members and (indiscernible)

16   reaching out to colleagues who could serve as witnesses

17   and act at Einstein and certainly the complainant saw

18   that is intended to intimidate them, intimidate others

19   from testifying and interfere with the investigation.

20              As a result of that, because people were pretty

21   angry about it, Einstein then suspended plaintiff from

22   campus, revoked his access to his Einstein email, etc.,

23   and instructed plaintiff from discussing the pending

24   investigations with other faculty.

25              So the investigation happens, and what happens?
```

1
2   Well, with respect to complainant 1, the outside third-
3   party investigator concluded that there had been no
4   responsible, no acts of misconduct, and that plaintiff
5   Khodakhah was not responsible for what that person said
6   happened.  However, with respect to the complainant 2,
7   the investigator recommended that plaintiff be
8   responsible for sexual harassment on the ground of the
9   (indiscernible) which that investigator concluded in
10  their totality were sexual in nature.
11          In light of that finding and in light of the
12  earlier investigation about the chair, Einstein imposed
13  sanctions and those sanctions included a prohibition on
14  working with students or serving in faculty governance
15  for three years as well as a requirement that
16  plaintiff's lab be relocated to a different building,
17  although Your Honor knows that's subsequently been
18  withdrawn, and he's in his old lab.
19          Now I'm turning to stage 3.  In addition to the
20  investigations of the complainants 1 and 2, an
21  investigation was conducted into whether plaintiff's
22  dissemination of that Title IX notice to a large number
23  of Einstein faculty violated the anti-retaliation
24  provisions of the Title IX policy.  To use a legal
25  expression, Your Honor, Dr. Khodakhah then kind of

```
 1                      PROCEEDINGS                    16
 2   countersued, and he brought his own retaliation claim
 3   that people were retaliating against him as well.  Both
 4   of those investigations went forward, and there neither
 5   party was found responsible for retaliation, and that
 6   was it for the investigation phase.
 7            We'll now turn to his complaints and how it
 8   relates to various defendants.  Let me begin with
 9   Montefiore, Your Honor.  That was the terrible slip of
10   the tongue I made earlier this morning.  Despite the 553
11   paragraphs and allegations in this complaint, plaintiff
12   has not stated any plausible claim against Montefiore as
13   opposed to Einstein.  What plaintiff does is make
14   classic, generic (indiscernible) allegations that
15   Einstein and Montefiore did this.  Einstein and
16   Montefiore did that.  Einstein and Montefiore did that.
17   But when it comes to specifics, Your Honor, he doesn't
18   make any particularized allegations of anything that
19   Montefiore did, said, or had any role in with respect to
20   this case.
21            For example, all he really alleges with respect
22   to specificity is things like Montefiore is the parent
23   of Einstein, we agree with that, or that they, quote,
24   "operated as agents of one another."  I don't know what
25   that means here.  And the law, Your Honor, as I'm sure
```

```
 1                        PROCEEDINGS                    17
 2   you know, is clear that even in this context, in all
 3   contexts, is generalized and (indiscernible) allegations
 4   regarding common ownership, etc., are not sufficient to
 5   establish liability.
 6            Realizing that, in his opposition to our
 7   motion, plaintiff argues theories of single or joint
 8   employer, that Einstein or Montefiore were either
 9   together his employer or jointly his employer.  First of
10   all, you can't really amend the complaint by arguing
11   something in a brief, as Your Honor knows, but he has
12   the same problem there.  You cannot just simply allege
13   that two entities are joint employers of you without any
14   specifics, and here the specific allegations contradict
15   the generic allegations of Montefiore.
16            Plaintiff alleges it was Einstein, not
17   Montefiore, who offered him his job.  They granted him
18   tenure.  They appointed him chair.  They investigated
19   the allegations, etc.  Honestly, Your Honor, I don't
20   even think this is a close question.  Montefiore does
21   not belong in this case.
22            And on top of all that, it wasn't just the
23   general grouping problem, you have the Supreme Court's
24   decision in the *Gebson* case rejecting theories of
25   respondeat superior in the (indiscernible) context.  The
```

```
 1                        PROCEEDINGS              18
 2   cases cited in our brief, Your Honor, do the same with
 3   respect to the contract and breach of contract claims.
 4        Let me turn now to the heart of the matter
 5   because I think the claim that this case really is
 6   about, it is a federal claim that brings us to this
 7   court.
 8        As I mentioned before, Your Honor, in order to
 9   challenge the outcome of a Title IX proceeding under
10   what's called an erroneous outcome claim, plaintiffs
11   must allege, quote, "specific facts that support a
12   minimal plausible inference of gender discrimination."
13   Such minimal plausible inference to be established
14   through statements by members of a disciplinary
15   tribunal, statements by university officials, or
16   patterns of decision-making that tend to show the
17   influence of gender.  Alternatively, you can show it by
18   really great serious procedure irregularity,
19   (indiscernible) treatment, combined with a concrete
20   motive to discriminate.
21        Let's turn back, Your Honor, to the two
22   instances that plaintiffs say shows has a gender bias.
23   The first, Your Honor, is this reference, alleged
24   reference that the thing that was told by Einstein, that
25   Einstein needed to appear responsive to these student
```

allegations in the wake of Me Too.  The problem with

that is (indiscernible) every university in the world

(indiscernible) wants to be responsive to their

students.  And these were the kinds of allegations that

had been popularized in Me Too.  That does not create

gender bias; it's just a fact.

         With respect - moreover, the Me Too movement,

as I said before, had already occurred.  It's kind of

(indiscernible) at that point in time.  So that's not

enough.  Plaintiff relies on the 2011 Dear Colleague

letter that came out of OCR Department of the Department

of Education.  We cite numerous cases, Your Honor,

including some that we litigated, I myself litigated,

*Doe v. NYU*, *Doe v. Colgate*.  The courts have said you

can't, the 2011 Dear Colleague letter does not state

minimal plausible inference of gender bias.

         He then makes those allegations about the

gender of the employees of the outside investigators

that we used.  Again, that obviously can't be enough.

But he then says that the fact that Einstein applied the

2018 Title IX policy to acts that actually occurred in

that time or was applicable at that time shows gender

bias.  We obviously think that's right.  Whether it's

right or wrong, it doesn't show gender bias.  There's a

1

2  number of decisions that cite to that, and I'll explain

3  why later the policies were not retroactive, so that was

4  the right policy to apply.

5          THE COURT:  Let me just pause it there for a

6  minute because that's something that I wanted to

7  understand more about.  The policies were different.  I

8  think one arguably provides more protections to the

9  person being accused.  How does applying later adopted

10 policy that's in effect at the time that provides more

11 protections to the accused, how is that not at least

12 potentially suggestive of a minimum plausible inference?

13         MS. KAPLAN:  Because the Title IX regulations

14 in and of themselves say quite explicitly that it's not

15 to be applied retroactively, and every school has

16 followed, as we have to do, followed Title IX and

17 followed the regulations that are put out by DOE.  In

18 number cases, (indiscernible), *Doe v. Colgate*, etc.,

19 have basically held that upon one policy as opposed to

20 the other is not itself a plausible inference of gender

21 bias, Your Honor.  Also the *Yu v. Vassar* college case as

22 well.

23         And putting aside the retroactivity of the

24 policy, Your Honor, his only other argument really here

25 is this clear procedural irregularities argument, and,

```
 1                        PROCEEDINGS                    21
 2   again, it's hard to understand what he means.  The kinds
 3   of cases in this circuit that have found that kind of
 4   procedural irregularity include cases where the person
 5   is told one day that they're going to be investigated,
 6   and two days later they're fired or there's no process
 7   whatsoever, there's no witnesses, there's no testimony,
 8   there's nothing.  (indiscernible) even allowed to speak.
 9   I'm thinking about the Meniker (phonetic) case which is
10   a (indiscernible) I think New Jersey if I call
11   correctly, Your Honor.  The Schiebel case which I'm
12   going to come back to, the St. Johns case.
13           These are all cases with really I think what
14   everyone, well, we're living in the world today so we
15   can all understand procedures that I think all probably
16   violate due process.  Due process isn't applied to
17   private universities, but since we're living in a world,
18   Your Honor, where people are talking about due process
19   all the time, I think it's fair to say in those cases
20   that's the kind of thing that leads to this clear
21   procedural irregularity.
22           Here, Einstein had its processes, it followed
23   its processes, it interviewed witnesses, it had outside
24   investigators.  It's hard to imagine that he can even
25   come close to meeting that standard.
```

```
 1                        PROCEEDINGS              22
```

2                And with respect – and also, Your Honor, again,

3    I think this point that he won some, he lost some is

4    incredibly important.  Again, I'm not aware of any case

5    that has succeeded in this context where the plaintiff

6    won some and lost some.  Typically they lose everything.

7    I think it's relevant both to the procedural

8    irregularities and to the gender bias.  It's very hard

9    for him to argue, I think for anyone to argue, that the

10   procedure was okay when they found in my favor but it

11   was not okay when they found against me.  By the same

12   token, Your Honor, I don't think you could, I don't

13   think it's plausible under Ikbal to argue that the

14   procedure was motivated by gender bias when I lost and

15   not motivated by gender bias when I won.  I think those

16   facts, Your Honor, on their own make it implausible

17   under the standard for these allegations of clear gender

18   bias or significant procedural irregularity to be

19   believed or to be plausible.

20                And I'll give you one example.  There's many I

21   could give you, but one of the complaints is, complaints

22   with respect to the process is that the investigator did

23   not speak to all the witnesses.  Well – that he

24   identified.  The witness he identified was his wife,

25   they spoke to his wife.  He doesn't say what it is they

```
 1                         PROCEEDINGS                    23
 2   should've said or not said to his wife that should've
 3   happened.  But to claim that that's the procedural
 4   irregularity, again, doesn't make a whole lot of sense.
 5           And, of course, as they have to, the courts in
 6   this circuit have said in this context, again,
 7   particularly with an outside investigator,
 8   (indiscernible) terminations, the investigators' belief
 9   of who's telling the truth and who's not, that's the
10   kind of thing that's classically a thing that the courts
11   like Your Honor are supposed to defer from.  And the
12   Supreme Court said that directly in the *Davis v. Monroe*
13   case which created Title IX enforcement in the first
14   place.
15           (indiscernible) I really think that's the heart
16   of this case.  I don't think, given the facts and given
17   this kind of he won some and he lost some, anyone could
18   plausibly find either gender bias or irregularity.
19           THE COURT:  I mean I'm not saying its this
20   case, but isn't there a situation where some of the
21   allegations are so clear that even biased procedure
22   (indiscernible) whereas others might be closer, and with
23   biased procedures, that would tip, could tip them from
24   winning into losing.
25           MS. KAPLAN:  It's hard to imagine that, Your
```

PROCEEDINGS                    24

1

2  Honor.  First of all, a procedure is – if someone's

3  biased, they're biased.  And I think maybe if something

4  is so outrageous is they can't get away with being

5  biased, they'll try to paper it over.  But that's not –

6  my second answer – that's not the context here.  The

7  allegations of the two complainant women are pretty

8  similar.  They find that one happened; that the other

9  didn't happen.  It's had to say that would show gender

10 bias, and if there was bias on retaliation, they

11 would've found that he retaliated (indiscernible), and

12 they found that neither of them did.  So I really think

13 on these facts they've got kind of a structural

14 philosophical problem here with alleging these

15 violations of Title IX in this context.

16         And, again, I am not aware, we'd be happy to

17 see the letter, Your Honor, if you'd like to update us

18 because I don't think this is addressed in the briefs,

19 but I'm not aware of a single case in this circuit in

20 which a complaint gets past a motion to dismiss when

21 there's kind of a you won some you lost some stated

22 facts.

23         Let me now – I think to some extent plaintiff

24 and his counsel understand these issues.  So in their

25 briefs they brought in a new thing which is this

PROCEEDINGS                    25

deliberate indifference theory.  First of all, Your

Honor, you're not really allowed to bring in a new

theory in your brief, and this Your Honor knows.  Second

of all, Your Honor, the facts – *Schiebel*, which is the

main case they cite, which is a Menashi opinion, the

facts are the kinds I was talking about before where the

procedural irregularity is so bad, it's just patently

obvious there's a problem.

So in *Schiebel* this is what happened.  The

school did not inform the plaintiff that it was

investigating him.  It did not allow him to present

witnesses.  They conducted only one interview with the

student.  The Title XI coordinator was hostile, and she

served as both the investigator and the ultimate

decisionmaker.  Not one of those facts, not one of them

is even remotely applicable here.

Here, he was told of the investigation, he

submitted names of witnesses who were interviewed.  He

responded to the preliminary investigative report.  They

hired an expert investigator rather than have the same

internal person do both, etc.  Again, we're universes

apart, Your Honor.

And in *Schiebel*, with respect to the findings,

this is actually making my point, the court found that

```
 1                        PROCEEDINGS              26
 2  the findings here, the conclusions were inexplicable.
 3  Here, again, given this won some lost some on very
 4  similar sets of facts, I don't think you could possibly,
 5  no one could allege that was inexplicable, that's what
 6  the outside investigator found.
 7            In reality, Your Honor, think about what the
 8  consequences would be for Einstein if they had done
 9  nothing.  If these two women had made these complaints
10  about Dr. Khodakhah and Einstein had said, you know
11  what, we don't care.  We're not going to investigate it
12  --
13            THE COURT:  I don't think anyone's suggesting
14  that that --
15            MS. KAPLAN:  But that would've been deliberate
16  indifference.  That's my point, Your Honor.  If Einstein
17  had not done what it did here, they would've been
18  deliberate indifferent.  Here the (indiscernible) to
19  those women.  Here that they're deliberately indifferent
20  to Dr. Khodakhah doesn't make sense.
21            And let me say one more thing, Your Honor, and
22  that has to do with the Schiebel opinion itself.  In
23  Schiebel Judge Menashi seems to suggest that the three
24  category of Title IX violations rubric that I talked
25  about that has been the law in the Second Circuit for 15
```

1                          PROCEEDINGS                    27

2  years, as far as I'm aware, Your Honor, somehow citing

3  other court, other circuit decisions somehow is no

4  longer the law.  When (indiscernible) *Schiebel*, I've

5  never seen a case, and I'm happy to hand you a copy,

6  that has so many literal red flags from Westlaw in

7  almost every other line of the opinion, Your Honor.  I'm

8  going to be candid with the Court, I do not think that

9  that is an accurate statement of the law, and I also

10 think that when he cites *Davis* in that opinion to say

11 that *Davis* allows there to be a deliberate indifference

12 claim for a faculty member, or (indiscernible) it wasn't

13 even a faculty member, it was an outside (indiscernible)

14 maple syrup guy, I don't know how else to describe it,

15 the guy was teaching about maple syrup, how that person

16 could have a deliberate indifference claim literally

17 doesn't make sense

18          In *Davis* Justice O'Connor was very clear that

19 in order for there to be a deliberate indifference

20 claim, she used the words educational opportunities, and

21 that the person who could be deliberately indifferent to

22 what was a student.  Here, I just don't understand.  Dr.

23 Khodakhah might have a Title VII hostile environment

24 claim.  That would – I'm not going to say he does

25 because he obviously doesn't – but that rubric would fit

PROCEEDINGS                    28

1
2  these facts.  But the idea of a deliberate indifference
3  claim under Title IX doesn't fit the facts and is
4  directly contrary to what both O'Connor said in her
5  majority opinion in *Davis* and what Kennedy said
6  dissenting, and it just doesn't make sense at all.
7  *Schiebel* doesn't make sense for people who are
8  employers.  And he talks about the difference between
9  Title VII and Title IX, people are employees.
10         So I understand this is the decision of the
11  Circuit, I get it, I don't think there's a full
12  explanation in there of these three rubrics.  I don't
13  think he flatly says they no longer apply.  There are
14  circuits out there that have kind of ignored them, but
15  the Second Circuit to this day has not, and in order for
16  there to be a deliberate indifference claim in the
17  Second Circuit, there has to be a substantial and
18  pervasive deprivation of educational opportunities.
19  And, again, I think that means students, not faculty.
20         Let me turn briefly to a couple of other
21  things, Your Honor.  With respect to retaliation, for
22  retaliation to matter in the context of Title IX, it
23  must be that the plaintiff alleges that they were
24  retaliated because they brought a complaint of sex
25  discrimination.  Here, that's not really what plaintiff

```
 1                        PROCEEDINGS                    29
```

2  alleges.  He alleges that he complained about sex

3  discrimination, but he didn't bring a complaint

4  originally that he was being discriminated against on

5  the basis of sex.  Complaints of other people that he

6  was discriminating against them on the basis of sex were

7  what was at issue.

8          And with respect to the retaliation

9  investigations that went on while both sides lost their

10 arguments, Einstein certainly had a reasonable basis to

11 be concerned that sending around the names of the two

12 women who were complainants the day after we have the

13 notice and sending it like by mass email to a bunch of

14 different people within the department was something

15 that could have a serious impact not only those women

16 being afraid but in terms of intimidating people and

17 interfering with the investigation.  That kind of stuff

18 happens all the time, and that's what they were

19 concerned about here.

20         THE COURT:  Is that something that can be

21 determined on (problem with audio)?

22         (pause in proceeding or no audio)

23         MS. KAPLAN:  I think it can, Your Honor,

24 because I don't think – I think both, in both

25 investigations, the finding by the outside investigator

2    was there was no retaliation, and it's kind of the same

3    point, he can't say retaliation against me was

4    actionable but Einstein, but I didn't (indiscernible)

5    against Einstein.  You have the same problem which is

6    the investigator found both sides did not engage in

7    retaliation.  That's hard to find a gender bias here or

8    to be candid improper motive, and I didn't think, Your

9    Honor, here, Your Honor, this court should be kind of a

10   super appellate court for deciding on the merits whether

11   those findings were correct.  The question is whether

12   they show some kind of a protective activity that would

13   arise to the level of retaliation.

14          And I think, I guess I'd have to say that if

15   Your Honor were to judge that, if all plaintiff had to

16   say I was retaliated against because they investigated

17   me, then, again, you're basically saying that every

18   Title IX investigation, which everyone does say, every

19   Title IX investigation would be in the courthouse and

20   this point would be relitigated all over again, and I

21   don't think that's (indiscernible), that's what the

22   Supreme Court intended.

23          I can turn to the state law claims quickly,

24   Your Honor.  First of all, I don't think if you dismiss

25   the Title IX claims, you should exercise pendent

PROCEEDINGS                    31

1  jurisdiction, although obviously it's within your

2  discretion.  For the New York City and New York State

3  discrimination claims, there are indeed more liberal,

4  more liberally applied than Title IX, but the state

5  (indiscernible) is a requirement, and I think all the

6  same arguments apply.

7  With respect to the breach of contract claims,

8  Your Honor, (indiscernible) courts in this district and

9  in this circuit are very careful about holding that

10  certain materials and students, schools and universities

11  issue count as contracts.  I think that's partly the

12  case because it's the public policy of New York, not to

13  micromanage schools.  I think it's also the case because

14  Your Honor knows universities and schools put out a lot

15  of statements a lot of times.  If every one of those

16  formed an enforceable contract, we'd all be in a lot of

17  trouble.

18  Here, Dr. Khodakhah seriously argues the

19  statements in his employment contract that says we're

20  doing things in accordance with the policies

21  (indiscernible) separate contracts under the policies.

22  It does not, and numerous courts have held that.  Even

23  if it did, as we've explained before, there's no

24  question that Einstein followed these policies.  And

```
 1                        PROCEEDINGS              32
 2   courts have held that when a university like Einstein
 3   has the ability to unilaterally change its policies,
 4   which is one of the issues in this case, the change of
 5   the police after the Trump administration changed the
 6   Title IX regs or the interpretation of the Title IX
 7   regs, the fact that the college has the right to do that
 8   means that it doesn't rise to the level of a binding
 9   agreement.
10           With respect to the status of chair, the
11   language of the policy regs here that the dean had
12   discretion to remove someone as chair, there's no
13   contract there.  It's hard to see (indiscernible) there
14   was.  And with respect to the (indiscernible) funding,
15   again, the language of the letter is clear on its fact.
16   It says interim funding.  It's not a perpetual agreement
17   to always provide funding for Dr. Khodakhah, although
18   I'll note for the record it's my understanding that
19   Einstein is still providing interim funding anyway.
20           (indiscernible) much more of his questions,
21   that's about it, I want to mention Drs. Castillo and
22   Jordan.  They've pled a tortious interference with
23   contract claim.  I don't think that claim would lie here
24   for at least a couple of reasons.  One, you would have
25   to allege that those two people knew about there were
```

1                           PROCEEDINGS                    33

2    contracts that were allegedly breached, and there's no

3    allegation of that whatsoever in the complaint.  You

4    can't have tortious interference with a contract unless

5    you know exactly what the contract is obviously.

6           And, two, in the employment context, which is

7    where we are right now, (indiscernible) courts require

8    plaintiff to allege that the employee was the subject of

9    a tortious interference claim acting outside the scope

10   of their employment.  Here, that's not true.  There's

11   these issues, these concerns had been raised about Dr.

12   Khodakhah and his behavior.  They did the right thing,

13   they looked into them, they're not outside the context

14   of employment.  They're doing exactly the right thing,

15   what we would want them to do and what Einstein's

16   policies required them to do.

17          Your Honor, if there's any other questions.  I

18   don't know if that was the (indiscernible), but I'm

19   happy to answer any question.  Otherwise, just a couple

20   of minutes on reply if I need it.

21          THE COURT:  Okay, thank you very much.

22          MS. ESTELA:  Good morning.  The Court just

23   heard a lot about why the claims against Einstein and

24   the other defendants should be dismissed.  I'm going to

25   talk about why the claims against Dr. Gordan Tomaselli

```
 1                          PROCEEDINGS                    34
 2   should be dismissed.
 3          The case against Dean Tomaselli arises from
 4   very few discretionary grounded personnel decisions.
 5   They were communicated (indiscernible) in 2022, and by
 6   plaintiff's own telling, the neuroscience department
 7   that he chaired was in a state of chaos at that time
 8   (indiscernible) medical college.  Dean Tomaselli was
 9   doing his job when he responded to concerns of students
10   and faculty within the department and tried to restore
11   order and function.  And (indiscernible) three letters
12   that form the basis of all the claims against him.
13          So I'll just talk a little bit about the facts
14   specifically as they relate to Gordan Tomaselli, and
15   I'll talk about why these facts don't make out any
16   claims.
17          So (indiscernible) the letter of concern that
18   was sent in 2022.  It was signed by 13 faculty members,
19   and it raised accounts by unidentified staff and
20   students of demeaning and unprofessional comments and
21   autocratic behaviors by Dr. Khodakhah.  In response to
22   that letter of concern, (indiscernible) that plaintiff's
23   claims was unfounded and given the impression that
24   students had alleged mistreatment on the part of Dr.
25   Khodakhah.
```

```
 1                        PROCEEDINGS                    35
 2            So in a responsive letter of concern
 3   (indiscernible) student survey, Dean Tomaselli sent a
 4   letter on March 10 temporarily suspending Dr. Khodakhah
 5   pending the outcome of an investigation into the letter
 6   of concern.  So that was the first of March 10.
 7            Then at the conclusion of the investigation, it
 8   concluded that there was misconduct (indiscernible)
 9   because Your Honor has quoted already and that's listed
10   in paragraph 164 in the complaint, but it did find that
11   there was misconduct, to put it mildly, and in response
12   to that Dean Tomaselli exercised his discretion and
13   removed Dr. Khodakhah from his position as chair.  Then
14   (indiscernible) July 11, so it's the second of the three
15   letters.
16            Also, on July 11, Your Honor has heard that two
17   Title IX complaints were sent to Dr. Khodakhah, and he
18   forwarded those complaints to other faculty members, and
19   in so doing he disclosed the identity of the
20   complainants, details about the complaints, and in
21   response to that Dean Tomaselli (indiscernible) telling
22   Dr. Khodakhah there would be an investigation into that
23   conduct, his sending those complaints, and while that
24   was happening, he was to be removed from campus.  So
25   that's it, Your Honor, those are the letters.
```

1                              PROCEEDINGS                    36

2  (indiscernible) complaint claims against Dean Tomaselli.

3  They don't make out any of the claims as a matter of

4  law.

5          So there are three claims against Dean

6  Tomaselli:  tortious interference of contract claim and

7  then there's gender discrimination under the New York

8  State and New York City Human Rights Act.  So I'll start

9  with the tortious interference claim.  There's no

10 tortious interference claim for a couple of reasons.  I

11 won't go through everything that we have included in our

12 brief, but I'll just highlight a few.

13         First, because there's no breach of contract,

14 there can't be a tortious interference with contract

15 claim.  So as the Court finds as it should that there

16 wasn't a breach of contract (indiscernible) claim.  And

17 also (indiscernible) to this claim is the well-

18 established principle of New York law that an individual

19 cannot be (indiscernible) for inducing his principal to

20 breach.  (indiscernible)  But that makes good sense

21 because you can't tortiously interference with a

22 contract that you're a part of it because if you're a

23 part of it, that's a breach of contract claim.  But if

24 Dean Tomaselli is found (indiscernible) tortious

25 interference with contract (indiscernible) external to

1
2  the contracts that plaintiff (indiscernible) breached.

3            (indiscernible) not one that plaintiff

4  discounts.  There is a very narrow exception to that

5  principle that has (indiscernible) standard.  In

6  situations where a defendant was acting outside the

7  scope of their employment in bad faith and for purely

8  personal gain.  The allegations in the complaint don't

9  satisfy that standard.  Even by the complaint's

10  (indiscernible), Dean Tomaselli was acting within the

11  scope of his employment when he sent the two letters at

12  issue.  He was responding to concerns that were arising

13  within the department and ensuring that there was some

14  (indiscernible) and that an investigation

15  (indiscernible) not interrupted by these concerns and

16  the investigations that were happening.  So that was

17  within the scope of his employment.

18            Courts consider a supervisor's conduct to be

19  outside the scope of their employment when the conduct

20  is independently tortious.  So why isn't this more than

21  a claim that the supervisor or the tort feasor doesn't

22  like (indiscernible) to the contract, that's things like

23  what happened in the (indiscernible) case that plaintiff

24  cites, and in that case there was allegations that the

25  defendant had defrauded and stolen plaintiff's ID and

2  then ousted him from the company in an effort to profit

3  from this plaintiff's ID without having to compensate

4  him for it.  We don't have allegations of fraud or theft

5  here.

6          This case is a lot more like the

7  (indiscernible) case which we cite in our papers in a

8  reply.  (indiscernible) case the Fox news anchor had

9  been accused of sexual assault within the workplace, and

10  an independent investigation was had.  The CEO and Fox

11  News decided to terminate his employment, and he brought

12  among other claims, a tortious interference with

13  contract claim against the CEO for terminating him.  And

14  the court held that there was no claim for tortious

15  interference because the CEO's decision to terminate his

16  employment in light of a third-party investigation's

17  findings was not malicious, even though in that case the

18  plaintiff did claim that he wasn't responsible, that the

19  sexual relationship was completely consensual.  So this

20  case aligns a lot more with those facts, Judge, and

21  there's no malice or bad faith alleged.

22          And the other (indiscernible) exception is

23  there's a requirement that the conduct be for purely

24  personal gain on the part of a defendant.  So even if

25  the complaint alleged that Dean Tomaselli had some

1                           PROCEEDINGS                    39

2  personal motive in sending the letters that he did, the

3  plaintiff (indiscernible) other reasons for his conduct

4  and that alone defeats the claim.

5          The last thing I want to say about the tortious

6  interference with contract, Judge, is that it's not

7  intentional, and Ms. Kaplan referenced this as well, a

8  defendant needs to be knowledgeable about the

9  contractual obligation that they're alleging defendant

10 has caused a party to breach, and there's no claim of

11 knowledge here as to Dean Tomaselli, and that's because

12 the knowledge, it's not knowledge (indiscernible)

13 personal knowledge because of one's job, but it's

14 specific knowledge about the obligation.

15         And the complaint – so I guess I'll say two

16 things.  One is with respect to (indiscernible) process

17 is that Dr. Khodakhah claims he was entitled to and

18 didn't get it or the ones that he got but were wrong,

19 those (indiscernible) policies which he claims became a

20 contract by virtue of (indiscernible) 2000 and 2001.

21 These are many, many years before (indiscernible) Dean

22 Tomaselli became associated with Einstein.  So there's

23 no allegation that he knew anything about the 2000 and

24 2001 documents that purportedly (indiscernible) policies

25 contracts.

```
 1                          PROCEEDINGS                40
 2              The other thing --
 3              THE COURT:  Does dean of the medical school
 4    mean that (problem with audio), and would that be
 5    enough?
 6              MS. ESTELA:  I don't think it would be enough,
 7    Judge.  One, there is no allegation that says that
 8    specifically.  The other thing is it wouldn't be enough
 9    because for (indiscernible) a defendant has to know not
10    just about the contract, about the specific obligation
11    that was breached, and the complaint alleges
12    (indiscernible) were breached, but none of them
13    (indiscernible) knowledge as to any of them.  And so as
14    an example, (indiscernible) 60 days under which his
15    Title IX complaint was supposed to have been
16    adjudicated, and it wasn't.  There's no allegation that
17    Dean Tomaselli knew about the requirement, and that
18    applies to all of the other alleged breaches of the
19    Title IX procedures.  So he wasn't the Title IX
20    coordinator, and I guess one other thing about this,
21    Judge, is the complaint alleges that with respect to the
22    July 13 letter Dean Tomaselli cited the wrong HR policy.
23    And I think that allegation is inconsistent with his
24    sort of (indiscernible) detailed inter-workings of any
25    of these policies.  He would have been aware of them,
```

```
 1                          PROCEEDINGS                    41
 2   and maybe the complaint at a minimum alleges that, but
 3   it certainly doesn't allege that he knew about the
 4   obligations that he (indiscernible) induced Einstein to
 5   breach.  That's what's required for this claim.
 6              So I'll just briefly turn to the
 7   (indiscernible) claims.  It's fundamental to a gender
 8   discrimination claim that the conduct alleged because
 9   (indiscernible), and in this case plaintiff's human
10   rights law claims against Dean Tomaselli fails because
11   he's not alleged, even a suggestion (indiscernible) on
12   the part of Dean Tomaselli.  (indiscernible)  On the
13   side of gender bias, the complaint alleges that Dean
14   Tomaselli's conduct is motivated by personal animus, but
15   (indiscernible) alleged in the complaint, it was
16   motivated by complaints and concerns about Dr.
17   Khodakhah's conduct.  That's not discrimination.
18              To the extent that plaintiff's claims against
19   Dean Tomaselli arise under these erroneous, under an
20   erroneous outcome and (indiscernible), excuse me, those
21   claims don't make sense for all of the reasons that Ms.
22   Kaplan laid out, and they make even less sense against
23   Dean Tomaselli who plaintiff does not allege had any
24   role in overseeing the Title IX process and adjudicating
25   any of the complaints or investigations that were had.
```

1                            PROCEEDINGS                    42

2              In the face of that failure, plaintiff alleges

3    or raises for the first time in his opposition brief an

4    aiding and abetting (indiscernible) which putting aside

5    the procedural impropriety, trying to do that in an

6    opposition brief also fails just on the principle that

7    plaintiff himself cites which is that an aider and

8    abettor must participate in a discrimination, and that

9    means conduct that's, you know, a component of the

10   discriminating conduct and also a showing

11   (indiscernible) intent.  And neither of those is

12   alleged.

13              (pause in proceeding)

14              MS. ESTELA:  I'll just (indiscernible) unless

15   Your Honor has any questions, just to say that to the

16   extent the claim about bias arises from these external

17   pressures with respect to only two (indiscernible)

18   pressures that the university and my client felt,

19   there's no specific allegation that Dean Tomaselli had

20   any of those pressures, that he felt (indiscernible),

21   that he showed any of those.  And if you look

22   specifically at the complaint, this is 319 through 396,

23   paragraph 126, the claims (indiscernible) Dean Tomaselli

24   and his feelings about those pressures.

25              So I'll just end by saying, Judge, that Dean

```
 1                        PROCEEDINGS                    43

 2   Tomaselli is a real person.  He's been brought into this

 3   lawsuit simply for doing his job.  He was faced with

 4   (indiscernible) 13 faculty members, students

 5   (indiscernible), an investigation (indiscernible)

 6   interview of 59 members of the community, and in

 7   response to that he suspended Dr. Khodakhah from his

 8   chair position and ultimately removed him, which is a

 9   decision falling within his discretion (indiscernible),

10   and he temporarily removed Dr. Khodakhah from campus,

11   and then the investigation into the (indiscernible)

12   email that disclosed the identities and the details of

13   the complaints.  And in sending those three letters,

14   Judge, Dean Tomaselli was doing his job, he was

15   responding to concerns (indiscernible), and that's not

16   the kind of context that gives rise to a gender

17   discrimination claim or tortious interference of

18   contract claim.  So for all those reasons the complaint

19   should be dismissed.

20             THE COURT:  Thank you.

21             MS. ESTELA:  Thanks.

22             MR. BERNSTEIN:  Thank you, Your Honor.  Do you

23   want me to go - I have a --

24             THE COURT:  Wherever you would like to be, it's

25   fine with me.
```

```
 1                          PROCEEDINGS                    44

 2            MR. BERNSTEIN:  You sure?

 3            THE COURT:  Absolutely.

 4            MR. BERNSTEIN:  Okay.  Okay, Your Honor,

 5   there's a lot of things said here, and Your Honor asked

 6   some questions that I wanted to address in a minute.

 7   With regards to my colleague, I agree with her on one

 8   thing, I asked myself the same thing, why are we here?

 9   The evidence in this case is so overwhelming in light of

10   the standard, the minimum standard of a motion to

11   dismiss, and, Your Honor, I needed to put it in the

12   record, but we all know what the standard is here and a

13   motion to dismiss, that the facts to be accepted as true

14   and every reasonable inference construct4ed in the

15   plaintiff's favor.  The pleading standard is a light one

16   and does not impose a probability requirement.

17   Plaintiff need only plead enough facts to reach a

18   reasonable expectation that discovery would reveal

19   evidence of conduct, and, you know, it's the *Ikbal* case

20   and also *Lynch v. City of New York*, Second Circuit 2020.

21            So the standard is set for Your Honor is pretty

22   (indiscernible) for our (indiscernible) those motions,

23   and the facts in this case are just so overwhelming.

24   Let me just hit a few things quickly, and then I can go

25   into some of the things that stick out.  Counsel for Dr.
```

```
 1                         PROCEEDINGS                    45
 2   Tomaselli said he had no knowledge of the 60 days, had
 3   no knowledge of procedures.  In Einstein's motion they
 4   attach to Your Honor exhibits, exhibits H and I, and
 5   exhibit I, I believe it's page 26 and exhibit I, page
 6   27, Dean Tomaselli signs the Title IX policy as the dean
 7   and the executive officer.  So, respectfully, the
 8   concept, the notion that Dean Tomaselli didn't know the
 9   policies and procedures is really just not accurate,
10   Your Honor.
11          And with regards to Castillo and Jordan and
12   Tomaselli, the other thing is they're tenured
13   professors.  They have the same contracts, they have the
14   same policies.  They are aware.  We don't have to prove
15   actual knowledge of every detail of the contract to the
16   third parties.  They are aware of the contracts, and
17   they tortiously interfered, and we can discuss that.
18   We'll discuss that.
19          So, again, Ms. Kaplan's asking this court, at
20   least that's how I heard it, and I apologize, I'm not
21   trying to put words, she's asking this Court to
22   completely ignore the precedent set five months ago in a
23   unanimous decision.  The *Schiebel* court very clearly,
24   succinctly, again, it was a unanimous decision.  It
25   wasn't just two, it wasn't 2 to 1.  I don't know of it
```

 1
 2  going, you know, being appealed at this juncture.  They
 3  wrote, "A recipient's inadequate response to allegations
 4  of sexual misconduct within its program may give rise to
 5  Title IX claim by the accusing party (the complainant)
 6  or by the accused party (the respondent).  Both
 7  complainant and respondent may assert claims under an
 8  official action theory or a deliberate indifference
 9  theory."
10          That is new law, and I admit that is new law
11  starting in November of 2024 in this circuit which
12  respectfully, Your Honor, that's the decision that's
13  holding here.  And if you look at the *Schiebel*
14  complaint, the Schiebel, who, by the way, is not a
15  student, and as Ms. Kaplan gave us like a maple syrup
16  consultant going around the state teaching students
17  about maple syrup, he was a contractor, not a student,
18  and the Second Circuit provided him with a deliberate
19  indifference cause of action.
20          But what I was to say is counsel's arguing that
21  we didn't allege deliberate indifference, we can't amend
22  the pleadings.  The *Schiebel* court found based on the
23  facts a deliberate indifference cause of action.
24  *Schiebel* didn't, if you pull the complaint, *Schiebel*
25  didn't plead a deliberate indifference cause of action

1                              PROCEEDINGS                    47

2   for Title IX.  They plead erroneous outcome because at

3   the time that's what the law was.  And the *Schiebel*

4   court founds, based on the facts that they allege, that

5   they pled a deliberate indifference cause of action.  So

6   respectfully, Your Honor, I believe you can find that we

7   had pled a deliberate indifference cause of action, but

8   if Your Honor wants it to be a little more clean and

9   decision wants us to amend to title something as a

10  deliberate indifference, I would ask that Your Honor,

11  you know, give us that ability to do that if Your Honor

12  is not inclined to follow exactly the *Schiebel* because

13  the inferred and found a deliberate indifference cause

14  of action.

15            I listened for about an hour, and, again, my

16  counsel, my learned counsel's interpretation of facts,

17  that's not appropriate here.  It is the facts that are

18  alleged by the plaintiff that have to be taken as true.

19  So the interpretation of Dean Tomaselli did something

20  appropriately.  He did this, he did that because he had

21  to, respectfully, that's not appropriate in this

22  standard of this motion.  The facts are, and I'm going

23  to go through some of them right now, and something I

24  didn't hear, Your Honor, and it's in our complaint, it's

25  in our papers is the name Stacey Roundabush (phonetic).

```
 1                        PROCEEDINGS              48
 2   That is ironic, in, respectfully, my opinion a gift to
 3   my client.  And why do I say that?  Because this young
 4   lady filed a lawsuit in the Bronx in 2023 or 2024
 5   against Einstein and my client, and she alleged a mirror
 6   image of what allegedly was in that (indiscernible)
 7   report that to this date, this day, as I sit here right
 8   now, our client, my office has never seen a copy of this
 9   report.
10          Ms. Roundabush talked about nicknames, talked
11   about sexual harassment.  She alleged all those things
12   against Einstein and my client.  What did Einstein do?
13   In their answer they specifically denied that Dr.
14   Khodakhah did such actions against, conducted himself in
15   a such a way and also denied information and belief to
16   know.
17          So that by itself, respectfully, Your Honor,
18   just shows to you how biased, deliberately indifferent,
19   egregious Einstein and defendant Tomaselli's actions
20   were against my client.  How can they in a legal
21   document say he didn't do those things and we deny
22   knowledge about those things; however, two years ago we
23   ruined his life?  Counsel said that Dean Tomaselli is a
24   man, he's a person.  You're right, he is.  He's a very
25   nice man outside.  But he has destroyed this man's
```

```
 1                            PROCEEDINGS                    49
 2   career.  He is a renowned scientist who has been
 3   destroyed.  He's been disinvited as a keynote speaker.
 4   His life has been destroyed based on the defendants'
 5   actions.  And they weren't acting in good faith in doing
 6   what they did.  I'm going to go through that right now,
 7   a few of those things.
 8           So the Roundabush decision is deafening.  How
 9   they can say he didn't do it, he didn't do those things
10   to Ms. Roundabush, oh, an important, Einstein has
11   admitted that defendant Castillo and Ms. Roundabush met
12   in March of 2021.  And we have pled defendant Castillo
13   was one of the ones who drummed up his fake letter,
14   these fake surveys.  So it all comes together.
15   Counsel's right, there's layers.  And we have
16   established those layers, and the Roundabush lawsuit and
17   Einstein's subsequent answer is extremely important.
18           Let me - counsel, and I apologize for jumping
19   around.  There are just some quick things I want to talk
20   about.  The retaliation claim.  Let's be very clear.
21   The statute clearly allows retaliation claim for any and
22   all participation, participation by any individual in
23   any manner in a Title IX investigation or proceeding
24   constitutes protective activity.  And that's 34 C.F.R.
25   106.71.  That's the regulation.  Einstein says, no, that
```

```
 1                          PROCEEDINGS                    50
 2   doesn't apply.  We'll give you some Eighth Circuit case,
 3   completely (indiscernible).
 4         What's also interesting is their policy.  Their
 5   policy also specifically says, and I'm reading from page
 6   27 of exhibit H which is also 50-9, by page 26.  This
 7   policy prohibits retaliation against any individual for
 8   the purpose of interfering with any Title IX right or
 9   privilege all because the individual has made a report,
10   a complaint, testified, assisted, or participated.
11   Exactly what this gentleman did.  He was a defendant, a
12   respondent, and he exercised his right to get witnesses.
13   He's protected by the statute as a participant and it
14   was a protected activity, and by Einstein's own policy.
15         THE COURT:  Are there no limits on what he can
16   do to get witnesses?
17         MR. BERNSTEIN:  Your Honor, there's not, and
18   the testimony, there was a hearing.  As we understood,
19   Dean Tomaselli, let's be very clear on this, Dean
20   Tomaselli immediately threw plaintiff off campus and cut
21   off his access to emails for almost two years because of
22   him sending the Title IX letter to seven people asking
23   for, you know, for assistance.  And it's in the letter,
24   if anyone could be a witness, it's in that letter, it's
25   in his email.  So he was clearly exercising his
```

1                              PROCEEDINGS                    51

2   protected right to get witnesses.  And both Ms. Ramirez

3   and Dean Tomaselli at subsequent proceeding under oath,

4   at that subsequent proceeding testified that they know

5   of no provision in Einstein's Title IX policy

6   prohibiting the plaintiff from sending the complaint out

7   to others.

8           And that's why, as Ms. Kaplan's indicated, Dr.

9   Khodakhah was found not responsible for that allegation

10  of retaliation.  Why was he found not responsible?

11  Because he didn't violate a policy.  Einstein had no

12  policy, and why did Einstein have no policy?

13  Respectfully, because the Title IX regulations allow it.

14  You can – most people wouldn't, Your Honor, but a Title

15  IX respondent, a Title IX complainant has every right to

16  take out a billboard and post that letter that I'm a

17  Title IX respondent, that there's Title IX allegations

18  against me.  They have every --

19          THE COURT:  Well, it's the names of --

20          (interposing)

21          MR. BERNSTEIN:  Yeah, there's nothing

22  prohibiting, there's nothing prohibited.  And, again,

23  there's no – in the policy there's none.  But, Your

24  Honor, even if, hypothetically, and I'm say there's not.

25  If there was, that's still a question of fact.  It's not

1                          PROCEEDINGS                    52

2  appropriate at this stage.  So, respectfully, I'm

3  telling what my understanding of the evidence in this

4  case, both Ms. Ramirez and Dr. Tomaselli testified they

5  know of no prohibition of sending out that letter, and

6  he was found not responsible.

7          THE COURT:  Well, but wasn't there a parallel

8  finding of not responsible --

9          MR. BERNSTEIN:  Your Honor, respectfully,

10 that's not – we don't allege that in our complaint, and

11 what the parallel was was Dr. Khodakhah, again, it's not

12 part of this complaint.  Ms. Kaplan has brought it in

13 and said there was other things, which I understand, but

14 let's just be very clear, we are not suing or bringing a

15 cause of action in that Einstein found Dr. Tomaselli as

16 well as the two Title IX complainants not responsible

17 for retaliation.  That's what Ms. Kaplan was speaking

18 about.  That Dr. Khodakhah brought his own retaliation

19 complaints, one against Dr. Tomaselli because at a

20 meeting Dr. Tomaselli told everyone which is a

21 violation, told everyone that Dr. Khodakhah was under

22 Title IX, and in an abundance of caution, Dr. Khodakhah,

23 as I said, was the keynote speaker at a national

24 neuroscience in Las Vegas in 2023.  In an abundance of

25 caution he advised Ms. Ramirez, the Title IX coordinator

PROCEEDINGS                          53

at Einstein, that he's the guest speaker, that he's the
keynote speaker, because he didn't want it to be awkward
if the two Title IX complainants were there.  So he took
it upon himself to tell Ms. Ramirez.  Guess what
happened, Your Honor?  Within 48 hours neuroscience
chair or the people in charge of the neuroscience
conference were told about the allegations against him,
and he was disinvited.

        Miraculously, in 48 hours, after he did the
right thing, after he didn't have to, that he told
Einstein that he's the guest speaker, within 48 hours,
and to be more specific, Your Honor, we know it came
from an Einstein, they said it came from Einstein.  When
I say they, we mean the neuroscience.  We have those
emails, and that's going to be part of discovery in this
case potentially.

        So those peripheral retaliations are not part
of this case.  The only retaliation complaint is that
Dr. Tomaselli literally threw the plaintiff off campus
for almost two years.  And what's even more, and we're
going to get to that in a few minutes, even more
interesting, when you say not responsible in May of
2024, they kept him off campus for months.  We'll talk
about — so he clearly was retaliated against.

```
 1                        PROCEEDINGS              54
 2            Now, let me now just address, we heard argument
 3   from counsel about the Me Too movement.  That's not
 4   enough.  2011 (indiscernible), that's the only thing
 5   that we've talked about.  That's not what in our
 6   complaint.  And first, with regards to the Me Too
 7   movement, it's the first part of that sentence which I
 8   haven't heard all day today.  What transpired was when
 9   Dr. Khodakhah found out about these, about Jordan and
10   Castillo's letter, he himself went to Ms. Ramirez who
11   was the Title IX, the dual Title IX coordinator and I
12   believe the director or assistant director of human
13   resources and Associate Dean Burns.  He said, guys, this
14   is what I'm hearing, this is what's being told to me.
15   And Dean Burns and Ms. Ramirez said we believe these to
16   be nonsense, these allegations to be nonsense.  However,
17   because of the Me Too movement we have to be, you know,
18   heightened, have to be, you know, concerned.  We have to
19   act on it.
20            So it's not – and, Your Honor, you asked a very
21   good question of Ms. Kaplan, Dr. Khodakhah didn't, we
22   just didn't bring up Me Too.  It was Ms. Ramirez who
23   brought it up.  So clearly, even if it started in 2018,
24   it apparently was still very important to her.  It's her
25   mindset, it's her bias that we have to address.  She
```

PROCEEDINGS                    55

brought it up.  The plaintiff didn't.  So they
acknowledge it's nonsense, which we didn't hear an
argument, but because of the Me Too movement we have to,
you know, we have to act.  And then they ask him to step
down.  So (indiscernible) we believe it is nonsense, and
then, oh, by the way, we still have to follow through
and we ask you to step down.  If that doesn't show bias,
I don't know what does, Your Honor.

          And what also I didn't hear, and it's in our
complaint and Dean Tomaselli's counsel saying, oh, he
didn't just act, he just did what he had to do.  He was
acting in authority.  Several of those signatures on
this letter of 13 were from people who retired.
(indiscernible)  We have - anyone looking at this, Dean
Tomaselli looking at this, Yvonne Ramirez looking at
this letter would have to stop and say this person's
retired, this person hasn't been on campus in years.
How can they know about these things?  That's all
alleged in our complaint.

          So, respectfully, Your Honor, our complaint has
more than sufficient evidence as to why their actions
were not just, oh, I was just doing what I had to do.
No, no, no, no, no.  There was plenty of pause to stop
and say wait a second, are these real?  And this is

```
 1                           PROCEEDINGS                  56
 2   where the deliberate indifference (indiscernible).
 3           And I'm sorry to segueing and combining, the
 4   2018 policy that they now look at, and Your Honor, you
 5   know, raised some very important issues that there are
 6   no safeguards to this.  And counsel said, oh, it's not
 7   retroactive.  That's the preamble of the regs say it's
 8   not retro, that the department, the DOE is not going to
 9   look at this retroactively.  I take that to personally
10   mean that something that they did before these rules
11   were enacted we're not going to look at.  Or if you're
12   in the middle of an investigation, you don't have to
13   stop it and do it.  There was no investigation in 2018
14   and 2019 and 2020 and 2021.  It wasn't until these regs
15   were two years in that it started, that they brought
16   charges against him.
17           And why did they use it?  I think Your Honor
18   really is on the right path, respectfully, because it is
19   night and day, there's no, there's basically no notice,
20   there's no appeal.  There's no appeal.  There's no
21   hearing.  There's no cross-examination.  It's back to
22   the Star Chamber, and that's what they did.  And that's
23   what they did.  And looking - I know counsel writes it
24   in their brief.  Again, I just want to go to the actual
25   policy, it's exhibit I, and it's page 3 of I.  I think
```

PROCEEDINGS                    57

1   it's page 3 of H also.  One's the 20, and one's the 21.

2   2022.  It says scope, and it's 58-9, page 3.  This

3   policy governs the conduct of all College of Medicine

4   faculty, administration, whether – excuse me, Your

5   Honor.  Whether supervisors, administrators, and

6   managers, and other staff, whether full time or part

7   time, and it goes on.  It governs the conduct of all

8   College of Medicine.

9           So why, and the New York State law, Title IX

10  policies have to deal with discipline and become part of

11  the employment contract.  That's in our brief, Your

12  Honor, in terms of the cites and the law.  But counsel

13  in their papers write, oh, but it doesn't say, but the

14  policy doesn't say, oh, but it doesn't apply to that,

15  you know, to other conduct.  Exactly, it doesn't.  And

16  they're the drafters of this.  If they wanted to, if the

17  2018 wasn't obsolete, they would, they took it out of

18  the drawer for this case.  If it wasn't obsolete, Your

19  Honor, respectfully, to whom it's applicable, the policy

20  concerns the conduct of all College of Medicine.  There

21  could've, should've been a footnote.  By the way, if the

22  conduct happened prior to the date of this, we're going

23  to use a different policy.  If that's what they really

24  wanted to do, but they didn't.  They didn't.  This

1

2  policy governs the conduct of all College of Medicine

3  faculty.  There's no asterisk, there's no nothing,

4  there's nothing addressing the conduct that it was

5  previously.

6          And, Your Honor, even if they wanted to say the

7  policy is appropriate to determine if the conduct met

8  the policy, which I could potentially understand, if

9  someone brings a charge against you in 2022 for

10 something you did in 2018, I think you have to know for

11 2018 it might have been a policy.  However, but the

12 policies and procedures changed.  The federal

13 government, which they're bound by, changed in 2020.

14 Did away with the Star Chamber.  Did away with all the

15 non-protections of respondents that required federal law

16 that you had to have cross-examination, that you had

17 appeal, that you had, you know, all the rights that they

18 refused to give this gentleman in 2022.  So, again,

19 these all go to the erroneous outcome.  They all go to

20 the deliberate indifference, to the egregious part of

21 the failures to follow procedures.

22          I just want to address briefly the concept that

23 Dean Tomaselli had the right to do whatever he wanted

24 whenever he wanted because he was dean.  I don't believe

25 that's the actual evidence in this case nor is that what

1                                PROCEEDINGS                        59

2  we pled.  As dean he has the right to remove someone

3  (inaudible – problem with audio).  He does not have the

4  right, and why he doesn't, because Einstein's policies,

5  the Title IX and the non-discrimination policies prevent

6  him, the statutes clearly prevent him from taking any

7  adverse action against Dr. Khodakhah absent a finding by

8  clear and convincing evidence.  This was a punitive

9  action.  This was not based on performance.

10            And I know they want to conflate that, and

11  what's also very important, if it was based on

12  performance only, why did Dean Tomaselli provide Dr.

13  Khodakhah a copy of the 2018 Title IX policy?  The only

14  reason, I submit, is because he took – and if you look

15  at his letters, Your Honor, the March and the July, it

16  talks about, specifically talks about discrimination,

17  harassment.  It specifically eliminates these issues as

18  to the reasons why he's being removed, not because of

19  performance.  Okay.  They're just using it as a

20  smokescreen.  Oh, yeah, he has full authority, he has

21  full authority.  He doesn't.  He doesn't.  And he

22  doesn't because of the Title IX and Einstein's own

23  policies and procedures that protect faculty and, more

24  importantly, protect tenured faculty.

25            So in terms of the state and city, Your Honor,

```
 1                        PROCEEDINGS              60
 2  the pleading is a lot more liberal and lower.  We can go
 3  on and a couple more in irregularities, Your Honor, are
 4  important.  Ms. Ramirez - oh, very important, Your
 5  Honor.  I know counsel spent some time going back and
 6  forth with you about that she knows of no cases not
 7  responsible in places and responsible in some places.
 8  Just so the record is clear, he was found not
 9  responsible in the first allegation, in the first
10  complainant, it was a male investigating.  The second
11  investigator was female who found accidentally, when he
12  fell, some kind of sexual harassment.   And then Ms.
13  Ramirez, again, talking about --
14            THE COURT:  Is it your position the gender of
15  the investigator is sufficient to allege an inference of
16  bias?
17            MR. BERNSTEIN:  Your Honor, we're not alleging,
18  that is not at all, I don't think that's all that we've
19  alleged here.  We've alleged countless allegations of
20  gender bias.  I am just pointing out that these
21  investigators that a male found him not responsible and
22  a female found him --
23            THE COURT:  Well, what's the significance of
24  that?
25            MR. BERNSTEIN:  Well, I think the significance
```

```
 1                          PROCEEDINGS                    61

 2   just goes to the fact that there were different

 3   investigations.  Because counsel is saying oh, we've

 4   never heard of such --

 5            THE COURT:  She didn't say it's different

 6   investigators.  You said --

 7            MR. BERNSTEIN:  No, there were different

 8   investigators.  I don't think that --

 9            THE COURT:  I know, but you didn't say, well,

10   different investigators came to different conclusions.

11   You pointed out the different investigators were of

12   different genders.

13            MR. BERNSTEIN:  I think it's – you know, Your

14   Honor, if that was the only thing I was arguing in front

15   of you, I think I would a difficult case.  I am just

16   pointing out, and if you want, I'll withdraw it.  Our

17   case is not at all, at all resting on that, resting on

18   that fact.  Your Honor, but Ms. Ramirez, who doubled as

19   the HR coordinator and the person who found him,

20   sanctioned him, you know, wore two hats there, in her

21   decision in sanctioning my client, relied upon – again,

22   there's another, I apologize, let me give the

23   background.

24            As to more knowledge that Dr., that Dean

25   Tomaselli didn't suspend Dr. Khodakhah simply because he
```

1                          PROCEEDINGS                    62

2  had the right to, and how do we know that also is Ms.

3  Ramirez in sanctioning, in issuing the sanctions in

4  December of 2023, said that the conduct that Dean

5  Tomaselli suspended him for was a second offense.  So

6  clearly she's relying on that as some type of Title IX

7  violation and increased the sanction.  Another peg to

8  show that Dean Tomaselli's actions were just not based

9  on performance and within his rights because under Title

10 IX, under the polices and procedures of Einstein at the

11 time, he didn't have the right to do it absent clear and

12 convincing evidence, absent a hearing, absent a finding.

13 He didn't have the right to do what he did based on

14 Title IX allegations.  Again, if it was just,

15 quote/unquote, "performance," again, I can't have that

16 argument intelligently with you right now because that's

17 not the facts of this case.

18          THE COURT:  If performance is a factor but not

19 the only factor, would that be problematic?

20          MR. BERNSTEIN:  I don't know, Your Honor,

21 because performance has never been alleged.

22          THE COURT:  Well, I mean I think (inaudible –

23 problem with audio) are suggestions that there was

24 (problem with audio) based on reasons other than gender.

25          MR. BERNSTEIN:  I don't think so, Your Honor.

```
 1                         PROCEEDINGS                     63
 2   I think they're all pretty much having to do some type
 3   of harass – so if it doesn't come within Title IX, it
 4   would come under discrimination policy.  They have two
 5   separate policies.  So the short answer, Your Honor,
 6   absent it only being performance only, no, I don't think
 7   my answer would change.  He would not have the right.
 8   Because those other policies that were in place at
 9   Einstein provided Dr. Khodakhah protection.  The answer
10   is no, Your Honor.  Absent it being strictly
11   performance, maybe he was drunk or he came in or he
12   missed 17 meetings and we lost, and the school lost
13   money and lost things of that nature, that's
14   performance.
15             THE COURT:  But serving alcohol to students
16   isn't performance?
17             MR. BERNSTEIN:  No, I don't believe so, Your
18   Honor.  I don't.  And, again, those – but, again, we're
19   looking at a report, we've never seen that report.
20   There's never been anything, that's just Dean Tomaselli
21   sending a letter and telling people.  What I find also
22   interesting, in July of 2022 when he suspends Dr.
23   Khodakhah, he tells him don't tell anyone, don't reach
24   out to anyone, don't talk to anyone.  Twenty-two minutes
25   later Dean Tomaselli emails the whole department.
```

```
 1                        PROCEEDINGS                  64
 2  Respectfully, it's – Your Honor, there's more than,
 3  respectfully, there's more than enough evidence in front
 4  of you to deny their motion at this stage, and this is
 5  (indiscernible).
 6            THE COURT:  Now what are the infirmities in the
 7  procedures specifically in your view?
 8            MR. BERNSTEIN:  I'm sorry?
 9            THE COURT:  What are the infirmities in the
10  procedure in your view?
11            MR. BERNSTEIN:  (inaudible – problem with
12  audio)  First, there's the suspension or the removal as
13  chair without violation of the policies.  There's the
14  use of the 2018 policies to adjudicate the two Title IX
15  matters.  I mean that's just a flagrant violation.
16  There's Einstein going more towards, you know, coupled
17  both deliberated indifference.  Einstein ignored reports
18  of the allegations were just false.
19            THE COURT:  I'm sorry, what did you say?  I
20  didn't hear the last --
21            MR. BERNSTEIN:  Einstein just ignored the
22  allegations that those reports were just false, and
23  there's no basis for it.  As we've established, Ms.
24  Ramierz and Dean Burns said that they were nonsense, and
25  the signatures to the letters, several of those
```

1                              PROCEEDINGS                    65

2  individuals hadn't been on campus.  So (indiscernible)

3  any intelligence person to say wait a second, we got to

4  look at this, how does this person potentially know this

5  information, they haven't even been on campus

6  (indiscernible) retired.  Again, the 2018 policy, that

7  the plaintiff was denied the rights and policies under

8  Einstein's own Title IX and non-discrimination policies

9  such as clear and convincing, you can't be --

10           THE COURT:  Well, that's just they used the

11 2018 policies, right?

12           MR. BERNSTEIN:  No, I'm sorry, what?

13           THE COURT:  Isn't that they just used the 2018

14 policy rather than the --

15           (interposing)

16           MR. BERNSTEIN:  Well, right, but under those

17 other policies, there are a lot more specific rights.

18 But, yes, if you want to encompass that all in one, they

19 used the 2018 policy instead of affording him all the

20 rights that he is entitled legally under the 2022

21 policy.  That Ms. Ramirez manipulated the evidence to

22 fit the outcome, that she inappropriately used Dean

23 Tomaselli's letter and actions as to heighten his

24 suspension.  That's, Your Honor, respectfully, I think

25 those are pretty specific and significant - and then,

PROCEEDINGS                          66

yes, the – I guess I might have encompassed it – the

removal from campus for two years for alleged violation

of the retaliation policy when he was found not

responsible, and there's no provision as testified to by

Dean Tomaselli and Ms. Ramirez that there's no provision

in Einstein's policy preventing him from

(indiscernible).

         And, Your Honor, I just – there is – and,

again, the legal standard for the intentional tortious

interference, we don't have to, you know, the but for,

we don't have to prove that at this point.  And also

someone's motive, Second Circuit and New York State is,

you know, motive, whether it was intentional or outside

the scope, that's something for summary judgment because

we can't get into someone's motive at this point, in the

pleading stage.  So I don't believe that that's

appropriate at this juncture.

         Okay, Your Honor, if you have any other

questions, I think I will sit down.  Thank you.

         MS. KAPLAN:  We start, excuse me, Your Honor,

with the retaliation issue.  In order for Dr. Khodakhah

to have a claim of retaliation under the facts alleged,

he would've had to have, he would have to allege that

when he reached out to these people to get witnesses for

1                              PROCEEDINGS                    67

2   a proceeding, he was complaining that he was a victim of

3   sex discrimination.  He didn't make that claim.  He's

4   making that claim now.  He didn't make that claim then,

5   and he wasn't retaliated against for complaining about

6   sex discrimination.  He was retaliated against because

7   he was told not to identify the names of the two

8   complainants who were understandably scared of him

9   retaliating against them if he found out who they were

10  in terms of their professional futures.  That's what

11  retaliation is about here, Your Honor.  It's not about

12  sending out a letter for victims not talking about sex

13  discrimination and then being punished for violating the

14  policies, and that's somehow we're in topsy turvy world.

15  Somebody could (indiscernible).  It doesn't make any

16  sense.

17          And he knew that he shouldn't identify those

18  women, and he did it anyway, arguably, because he wanted

19  people to know who they were, and he wanted them to

20  suffer for accusing him.  That's not a claim of sex

21  discrimination.  That's retaliation what he was trying

22  to do against them, Your Honor.

23          THE COURT:  Ms. Kaplan, is that clearly alleged

24  in the complaint, that is, is it clearly alleged that he

25  was retaliated against for revealing names as opposed to

```
 1                    PROCEEDINGS                    68
 2   (inaudible – problem with audio)?
 3        MS. KAPLAN:  So the issue whether it was
 4   seeking witnesses or it was retaliating names, that was
 5   litigated, as we said before, both parties were found
 6   not to be responsible.  At the time, however, when
 7   Einstein was acting in the moment, Einstein told him,
 8   and Dr. Tomaselli had told him not to reveal their
 9   names, believed reasonably that it was retaliation, he
10   was violating policies by disclosing their names to all
11   those people.
12        And let's just be real, Your Honor, we all, we
13   live in a world where people investigate things and
14   things like that.  You don't send a letter.  I've never
15   on behalf of a client in 30 years sent a letter to 50
16   emails saying to people these are the people accusing me
17   of stuff and please email me back if you have
18   information.  That's not what happens.  You contact them
19   if you think they do, you find out if they do.  You
20   don't send mass emails.  On its face what it looked like
21   he waws doing was subjecting them to retaliation for
22   complaining about him.  They're the ones that
23   encountered retaliation, not him.
24        With respect to the 2023 conference that you
25   heard my friend speak of, Your Honor, that with all
```

1
2  respect was a problem of his own making.  When he sent
3  out that letter to all those people who then probably
4  sent out that email to another 50 people, he made it
5  clear to the whole neuroscience community what was
6  happening.  He himself waived confidentiality, and
7  whatever gossip or people knew at conferences or
8  anywhere else was his fault.  Einstein was trying to
9  keep it confidential, and that's why, that additional
10 letter, that's why they reacted why they did and that's
11 why it's so concerning for him to complain now that they
12 somehow told people and that's the problem.  That wasn't
13 the problem.  He sent out a mass email, he admits it, to
14 multiple people, and he didn't say to them don't talk
15 about it with anyone else.  And we know how people are,
16 they talk about it with other people.  I don't know to
17 this day who told the conference organizers, but
18 everyone in the neuroscience community could have thanks
19 to his own actions.
20         Number two, Your Honor, the fact that, or the
21 alleged fact that Dr. Khodakhah was told by
22 (indiscernible) allegations first came in that they
23 thought they were nonsense, they were being sympathetic
24 to him, they were nonsense, but, you know, we have to
25 investigate.  That disproves a gender bias or plausible

```
 1                        PROCEEDINGS                    70
 2   inference of gender discrimination, and it proves that
 3   they were doing the right thing.  When the complaints
 4   first come in, under his allegations, they're like,
 5   look, we're sorry, we have to investigate this, we're
 6   going to investigate it, we think it's nonsense.  Then
 7   they hired an outside firm to investigate it.  And sure
 8   enough, the investigative firm says it happened.
 9   That's, again, what you want educational institutions to
10   do, to give someone the benefit of the doubt, to hire an
11   outside investigator, and then when the facts came to be
12   what that investigators finds them to be, to take
13   appropriate action.  And here really we're just talking
14   about (indiscernible) from the (indiscernible).
15            On Schiebel, Your Honor, I don't want to beat a
16   dead horse here.  First of all, the facts are incredibly
17   different.  They just are.  There was no process
18   (indiscernible) whatsoever.  Here, multiple people were
19   interviewed, reports were done, investigators were
20   hired.  You're just not in the same universe with each
21   other on the facts.
22            With respect to (indiscernible) his outcome
23   claim that's just based on discrimination, I understand
24   that's what Judge Menashi said.  I understand it was a
25   three-person panel, and no one dissented.  I get all
```

PROCEEDINGS                71

1  that, but I do not understand, Your Honor, how the

2  access to educational opportunity language which is

3  clear, I just circled it myself, in the *Davis* opinion

4  gets written out, and now you can (indiscernible) oh,

5  there's discrimination, it's deliberate indifference.

6  That'll be a problem for Your Honor and for the Second

7  Circuit to work out.  I can't wrap my head around it.

8           I'm just reading from Justice O'Connor's

9  opinion, when she's talking about the guarantee of equal

10 access to educational benefits.  That's what she's

11 talking about for deliberate indifference.  So, again,

12 while we'll have to deal with that, again, I'm sure,

13 Your Honor, in the future.

14          With respect to this question about what regs

15 apply, look, if we did it the other way, people would be

16 arguing the other side.  What Einstein has been trying

17 to do, and this is public, is follow the Title IX

18 guidance and follow (indiscernible) letters.  And when

19 they say you apply the policy that was applicable at the

20 time of the conduct, that's what we did.  There's no

21 secrets that Einstein's holding from anyone and that

22 following the regs disproportionately different cases,

23 it's following the regs.  And Mr. Khodakhah and his

24 lawyer, Mr. Bernstein, he litigates these cases, know

```
 1                         PROCEEDINGS                72
 2    what the regs say, and the regs say what they say, and
 3    that's what we're doing.  So I don't understand what the
 4    claim is there, we were doing what we were told to do by
 5    the federal government.
 6              THE COURT:  Does the fact that there are
 7    subsequent regulations that provide more protections
 8    reflect a view that the prior regulations were
 9    inadequate?
10              MS. KAPLAN:  So the regulations in my 13 years
11    of doing this have changed multiple times.  Every time
12    there's a new president, there's a new set of
13    regulations.  But it doesn't come right away.  So the
14    new president gets elected, this happened from Biden to
15    Trump first time, it happened from, excuse me, from
16    Obama to Trump, number one, they changed them; then from
17    Trump to Biden, they changed them again; they change
18    them every time.  So the clearest thing to do then is to
19    follow the rule that they cite, which is apply the
20    policy that was in effect at the time of the conduct.
21    Welcome to the wild and crazy world of Title IX
22    regulation, Your Honor, we are literally in a situation
23    where there have been four changes with four presidents
24    since I started doing this.
25              So they do, again, the easiest way to do it is
```

1                          PROCEEDINGS                    73

2  just follow the regs and be clear, and they were on

3  notice of that.

4          With respect to the allegations made about the

5  state court case, obviously how Einstein responds to an

6  answer is based very specifically on what the specific

7  allegation is.  There in the complaint it was about

8  specific conduct that applied specifically to that

9  person.  Einstein, being careful, said (indiscernible)

10  information and belief, that's completely consistent

11  with whatever the investigators did and what they said.

12  They didn't give Einstein all their notes of whatever

13  the individual person said, and they took the

14  responsible, and responsible and honest response to the

15  pleading which is right now we don't have information

16  and belief.  You and I, Your Honor, many other people in

17  this courtroom have drafted answers in our past and

18  that's what you do in an answer, you're careful about

19  how you plead.

20          There was (indiscernible) behavior here.  It

21  wasn't all sexual or allegedly sexually discriminatory.

22  He called people names, he called people racist names,

23  he called people moron.  I don't know if any, I don't

24  think moron violates any discrimination statute, but it

25  is an offensive thing to say to your students.  He

```
 1                         PROCEEDINGS                    74

 2   pushed people, he touched them, everyone in the class

 3   had a nickname supposedly.  Some nicknames were kind of

 4   offensive.  (indiscernible) even Title (indiscernible),

 5   Your Honor.

 6             THE COURT:  And I guess my question is, and

 7   that was part but not all of the decision, some of the

 8   decision related to what might fall under Title IX.

 9   Would it (inaudible)?

10             MS. KAPLAN:  I'm sorry, Your Honor, can you

11   repeat the question?

12             THE COURT:  Yeah, if the decision to suspend

13   was based in part on issues that might fall under Title

14   IX and in part on issues like calling someone a moron,

15   is that behavior permissible on the part of the school

16   and on the part of the administrator of the school?

17             MS. KAPLAN:  So I think for, when a dean has

18   the discretion to make someone chair or not, it's an

19   internal matter of how the department and how the

20   university is structured, when that is given to the dean

21   in his discretion, I think he can make that decision

22   based on certainly all the factors here, including

23   factors that pertain to sex discrimination.  That's why

24   the separate, the phase 2 investigation was done

25   separately because those were actual complainants who
```

```
 1                         PROCEEDINGS                    75

 2   made those allegations, and they had to investigate them

 3   under Title IX.  They were on notice, and that's why

 4   they did it.  But I don't think the dean had any

 5   requirement that he somehow shut all the women's stuff

 6   out of his head and just decided on the drinking and the

 7   other stuff, although that would've been sufficient.  I

 8   don't think that's what the law requires.

 9             THE COURT:  I guess my question is to what

10   extent is his behavior could have multiple motivations.

11   I mean discretion is discretion, but you can exercise

12   your discretion for any legal reason but not for an

13   illegal one.

14             MS. KAPLAN:  I think the fact that these people

15   raised all these complaints, that they were investigated

16   properly, and it turned out that there was truth to

17   them, and some of them related to women, some of them

18   were related to morons, some of them related to

19   drinking, some of them related just kind of bad behavior

20   to staff, I think that's more than sufficient to remove

21   him as chair.  More than sufficient.  There's no Title

22   IX rights that he has to stay as chair.  It's a

23   completely discretionary thing about how the head of the

24   department is supposed to interact with their students,

25   their colleagues, etc.  And it was clear from the
```

PROCEEDINGS                          76

1

2  survey, from the letter from his colleagues that there

3  was a fundamental problem in how Dr. Khodakhah was

4  acting with his staff, or at least how they believed he

5  was acting with his staff, which in itself would be

6  enough to remove him as chair.  You can't be chair of a

7  department where people think you're abusing them.

8           The Star Chamber, I know Mr. Bernstein for a

9  long time, and he's a very able counsel, but the Star

10 Chamber illusion, Your Honor, is kind of ridiculous.  A

11 Star Chamber maybe in this context would be the facts in

12 *Schiebel*, but those are not the facts here where

13 Einstein went out of its way to hire outside

14 investigators so they would be considered to be

15 objective.  Obviously, it's absurd to say the male

16 investigator found the way he did because he has a Y

17 chromosome and the woman investigator found the way she

18 did because she doesn't have a Y chromosome, that's

19 obviously absurd.  There's not any support for that in

20 the law, and there's no – that's one of the problems

21 that he has is coming up with a plausible inference of

22 gender bias.

23           THE COURT:  What about counsel's point that a

24 lot of the things that you've been speaking about this

25 morning are not part of the complaint?

```
 1                         PROCEEDINGS                    77
 2            MS. KAPLAN:  Well, I don't think that's true.
 3   I think everything I'm speaking about is either in the
 4   complaint or referenced in the complaint, the Title IX
 5   policies, etc.  I don't think we're talking about
 6   anything - he doesn't deny that with respect to the
 7   Title IX investigations, he was found responsible for
 8   some and not responsible for others.
 9            THE COURT:  I don't think he's denying it, but
10   he's saying, he's just not mentioning the one where he
11   lost.
12            MS. KAPLAN:  Well, I think if you're in a
13   situation - let me put it this way, Your Honor.  I don't
14   think a plaintiff in mentioning one part of something
15   where the whole thing is referenced in the complaint can
16   somehow selectively plead, shall we say, to only plea
17   the facts relevant to a whole investigation that they
18   think help them in the case but don't talk about the
19   results of the rest.  I don't think that's appropriate.
20   I don't think there's really any denial on his part that
21   it happened.  I don't think he can deny that it was two
22   women.  I don't think he does deny that it was separate
23   complainants.
24            And so I think if that were what he was saying,
25   we're talking about the selective kind of pleading in a
```

complaint that I think would create problems

(indiscernible), Your Honor, under the rules, under Rule

11, you just can't not be candid with the court about

one part happening and not another part happening.  I

think it's all in here anyway, but I don't think that

there's really any facts here that you need to find that

are out of the complaint other than the point he made

about the retaliation, also both sides lost at the end.

I think the rest of it is all kind of one big ball of

wax.

          Let's see if I have anything else, Your Honor.

I'm going to try to wrap up.

          Your Honor, I think you can see from today's

discussion what kind of a world we're now in with

respect to Title IX, and, frankly, Your Honor, given

what's going on in the world today, it's not just Title

IX.  Anything you do here with Title IX is going to

apply to Title VI.

          If this complaint, if all you need to do to

sustain a complaint is to allege that the women found

against me, the men found for me, or that they followed

the government regs and applied the policies

(indiscernible) but that is biased or they were

concerned about me retaliating, but I didn't complain

1
2  that that was sex discrimination but it is sex
3  discrimination although I didn't say it, and, therefore,
4  that gives me a claim there.  If that's the world we're
5  in, Your Honor, I would respectfully submit that there
6  isn't a case that alleging Title IX or Title VI that
7  wouldn't have to be relitigated for a second time in
8  federal court.
9          And that is not, if you read *Davis* and you read
10 the other decisions, that is not what the Supreme Court
11 intended.  It makes it impossible for educational
12 institutions like Einstein to function.  They have to do
13 these investigations.  They can't just throw up their
14 hands.  And then when they do that, no matter what they
15 find out, they get sued.  We are in a situation, maybe
16 we're already there, Your Honor, of real chaos in
17 educational institutions.  They're just trying to do
18 their best by following the regs, hiring independent
19 investigators, following the facts of the
20 investigations.  And if all it takes to get another bite
21 at the apple with discovery and all the class of
22 discovery in federal court, I respectfully submit we are
23 in a state of true chaos when it comes to educational
24 and higher educations.  Maybe we're already there, Your
25 Honor, but I don't think that's what the Supreme Court

```
 1                        PROCEEDINGS                  80
 2   and the Second Circuit thinks the law should be.  I
 3   think there has to be true evidence of kind of the crazy
 4   procedural irregularities you see in Schiebel or really
 5   overt statements of gender bias.
 6           And Me Too, as I said before, is not a
 7   statement of gender bias anyway, any more than the Dear
 8   Colleague letter is, because there were men who
 9   complained that they'd been harassed too and they'd been
10   discriminated against too.  It wasn't all women.  There
11   are plenty of gay men or non-gay men made the same
12   allegations.  So I don't think you could say on its own
13   it's enough, we're living in a world where people say
14   what they say, but I just, I think you have to be
15   concerned here, Your Honor, about judicial resources and
16   the proper administration of Title IX and ultimately
17   Title VI case law if that's all it takes to cast a
18   motion and get into discovery.  Thank you, Your Honor.
19           MS. ESTELA:  Just briefly, Judge.  On the
20   knowledge piece, the knowledge (indiscernible) claim has
21   to be specific as to the obligation that defendant
22   purportedly induced another person (inaudible - problem
23   with audio).
24           Mr. Bernstein spoke about how I had come up
25   here and said that everything that Dean Tomaselli did
```

1                              PROCEEDINGS                    81

2    was abundantly reasonable.  That's not what our argument

3    is, Judge.  The argument is that the complaint alleges

4    that there were other grounds for Dean Tomaselli's

5    decisions.  The complaint is full of those other

6    grounds, we've spoken all morning about them, and it's

7    the existence of those that undermines the claim that

8    Dean Tomaselli was acting with a pure personal

9    (indiscernible) motive.

10            And that is, that allegation is necessary to

11   qualify for this exception to the exception to a very

12   rarely used (indiscernible) which is the tortious

13   interference with contract claim.  So it's not that, you

14   know, we're arguing that he was reasonable and that his

15   motive was simply to do the right thing.  It's that the

16   complaint alleges that there were other grounds, and

17   that defeats his claim, that defeats the claim.

18            On the (indiscernible) complaint, there's no

19   allegation in the complaint about Dean Tomaselli's

20   knowledge of that or involvement with drafting and

21   filing the answer.  In the July 13 letter, and that's

22   the letter that Dean Tomaselli sent regarding the

23   removal from campus temporarily while the school

24   investigated the non-retaliation, and there's two things

25   to note about that.  One, Mr. Bernstein said how it was

1                          PROCEEDINGS                    82

2   a two-year removal.  At the time, and if you look at the

3   letter which is attached as exhibit C to our motion and

4   it's quoted and so part of the record here, that the

5   letter says that it was temporary.  So it wasn't like,

6   (indiscernible) says it's a two-year suspension or

7   removal; it was a temporary removal while the school

8   looked into whether the conduct was retaliatory and

9   violated the policies.  The school (indiscernible)

10  determined that it wasn't.  And so the claim that, you

11  know, this July 13 letter was improper and it violated

12  policy or that Dean Tomaselli removed him from campus

13  for two years isn't a claim that the complaint actually

14  makes.

15          In terms of the July 11 and the March 10

16  letters which related just to Dr. Khodakhah's position

17  as chair, that was a discretionary position that he held

18  as chair.  It didn't impact his faculty appointment

19  which he maintained and still does.  It was specifically

20  related to his (indiscernible) and leading the

21  department which in his own account was in a state of

22  discord during this period.  So the discretionary

23  decision to remove him as chair was just that, it was

24  discretionary (indiscernible) in that misconduct and

25  performance are somehow unrelated is implausible and the

```
 1                          PROCEEDINGS                    83
```

 2  complaint actually alleges that there were a number of

 3  behaviors that formed the grounds for the decision to

 4  remove, to suspend and ultimately remove Dr. Khodakhah

 5  from that discretionary position as chair.

 6          The other thing is just about that, regarding

 7  the suspension and the inclusion of the Title IX policy.

 8  It's possible and plausible that you could both include

 9  a Title IX policy and make a discretionary decision, and

10  that's what happened and that's what's alleged in the

11  complaint.

12          And the last thing I wanted to note about the

13  tortious interference claim, Mr. Bernstein noted that

14  malice is not an appropriate issue for the Court to

15  decide, and that should be allowed to go forward.  And I

16  would say there's many cases that have ruled on this

17  specific issue on motions to dismiss, have granted

18  motions to dismiss because plaintiffs have not

19  adequately alleged malicious motive and a pure profit

20  motive which is what's required for tortious

21  interference claim.  We've cited a number of them with

22  facts (indiscernible) case that I referenced in my

23  opening is one of them.  So it's completely appropriate

24  in circumstance like this one to dismiss a tortious

25  interference claim on that failure to adequately allege

```
 1                        PROCEEDINGS                    84
 2   malice.
 3          I think I'll end just saying that makes sense,
 4   Judge, because it isn't intentional, it's not widely
 5   used, it's a person such as Dean Tomaselli acting on
 6   behalf of their employer when they engage in alleged
 7   misconduct.  They're not to be individually liable under
 8   this tort, and that's why the exception to hold him
 9   individually liable is narrow.  There's a requirement
10   that a plaintiff plead malice, and he hasn't here.  So
11   the claim should be dismissed.  If you could just give
12   me one second.
13          MS. KAPLAN:  Your Honor, while we're waiting,
14   if I may, I just want to make sure you have these
15   references.  So I don't think we have this missing
16   pleading problem in the complaint at all.  If you look
17   at paragraphs 249 and on, those are allegations about
18   what happened, the results in the Title IX
19   investigation, and there's an acknowledgement that in
20   one he was found responsible and the other he was found
21   not.  And with respect to the retaliation issues, Your
22   Honor, I think there's similar allegations about those
23   starting at page 326, going through to paragraph 348.
24   So I don't think we have a missing fact allegation
25   problem, Your Honor.
```

```
 1                        PROCEEDINGS                    85
 2            MS. ESTELA:  That's it, Judge.  The factual
 3   allegations in the complaint are insufficient to sustain
 4   any of the claims against anyone and specifically our
 5   client.  Thank you.
 6            THE COURT:  Thank you.  Mr. Bernstein.
 7            MR. BERNSTEIN:  May I have five minutes?
 8            THE COURT:  Yeah.
 9            MR. BERNSTEIN:  Thank you.  Just first with
10   regards to defendant Tomaselli, I'm not going to go
11   through it, but, Your Honor, we pled in the complaint
12   paragraphs 107 to 125, paragraph 134, 139, the litany of
13   animosity between Dean Tomaselli and my client.  Because
14   as chair, my client did everything he can to hold Dean
15   Tomaselli's feet to the fire and, you know, called him
16   out for his lack of leadership and poor performances and
17   non-defending of the Einstein departments.  So there is
18   clear malice and animosity alleged in our complaint
19   predating the 2022 action taken by Dean Tomaselli.  So
20   it is clearly alleged there.
21            Kind of which dovetails a little, and I
22   apologize, I didn't just touch on it in my first
23   argument, with regards to Montefiore.  Respectfully,
24   Your Honor, again, at the pleading phase we were at, we
25   have alleged that Montefiore's chief legal counsel had
```

```
 1                        PROCEEDINGS                    86
 2   oversight of the disciplinary decision related to the
 3   plaintiff.  That Montefiore managed the benefits of
 4   employment of Einstein's employees including the
 5   plaintiff.  Montefiore's president and CEO was the
 6   ultimate decisionmaker for employees and Einstein,
 7   Montefiore had discretion over Einstein's budget and
 8   resources.
 9            And potentially the most important one in my
10   mind and it dovetails exactly both these issues, and
11   this is on paragraph 78 of our complaint, that our
12   client was going to resign as chair due to Dean
13   Tomaselli's ineffectiveness and failure to protect not
14   only the neuroscience department but other departments.
15   And my client has been very quiet here, so you don't
16   know him, Your Honor, but my client has a background
17   that's in here.  He, you know, basically fled from Iran.
18   He doesn't hold his tongue.  He stands up for what he
19   believes is right, and that is the, what underlies a lot
20   of this, and he did that and he did that very voicefully
21   against Dean Tomaselli, so much that he was, Dean
22   Tomaselli was not doing anything for the department, and
23   my client was stepping down as chair.  And as alleged in
24   paragraph 78, the president of Montefiore, Dr. Phil
25   Ozuah, O-Z-U-A-H, specifically stepped in, specifically
```

1
2    came to my client and convinced him to stay as chair and
3    promised him that they would get the funding needed.
4         So it's clear at this stage we have more than
5    enough pled Montefiore's, whether singular or joint
6    employer which discovery is going, respectfully is going
7    to have to bear out.  So we have more than enough pled
8    our, met our burden.
9         Your Honor, and just very briefly, going back
10   to Roundabush, I'm reading from Dr., from Dean
11   Tomaselli's letter of July 11, and I guess it's exhibit,
12   it's 58-5 in Einstein's motions, and he lists several of
13   the reasons why my client was being removed.  And it
14   says, one of them, persistent general mistreatment of
15   students, persistent inappropriate use of discriminatory
16   nicknames, repeated inappropriate and unwarranted
17   physical touching including pulling hair, including
18   pulling female students' ponytails, thumb touching,
19   shoulder touching, and pushing.  That's some of the
20   allegations, and I reference that because, again, that's
21   written on July 11 of 2022 on Einstein Montefiore
22   letterhead, both their letterheads are on it.
23        And I reference that because, if you look at
24   paragraphs, it's on page 50 of the amended complaint,
25   paragraphs 316 to 320, the Roundabush answer, in its

PROCEEDINGS                    88

1
2  answer Einstein denied Roundabush, denied Roundabush
3  allegations in which she claimed plaintiff had subjected
4  her and other women to mistreating including pulling
5  hair and sexual inappropriate comments.  So in July of
6  2022 they said they had that evidence and they suspended
7  him.  In 2024 in their answer which was filed February 6
8  of 2024, they don't deny information, they deny actually
9  that my client subjected Ms. Roundabush and other women
10  to pulling hair and sexual inappropriate.  Einstein
11  denies having knowledge or information sufficient to
12  form a belief as to Roundabush allegations plaintiff
13  used inappropriate nickname for students.  In July of
14  2022 they had no, Dean Tomaselli had no problem and
15  Einstein had no problem suspending him for that exact
16  allegation.  But in 2024 they deny they have information
17  and belief.
18       And the last one, Einstein denied, not
19  information and belief, denied Roundabush allegations
20  that plaintiff ever subjected her to a discriminatory or
21  abusive environment or he ever caused unwanted physical
22  conduct.
23       So appreciate the position that they're in as
24  attorneys representing when things, he said something
25  two years ago and now it comes back, but that,

```
 1                          PROCEEDINGS                    89
 2   respectfully, Your Honor, shows that something isn't
 3   right, that either the Roundout [sic] answer is maybe
 4   whatever, but certainly in July of 2022 did they have
 5   this information, we've never seen the report.  We don't
 6   know.  What we only know is that two years later they
 7   contradicted themselves.  And not just for Ms.
 8   Roundabush; they specifically say to other women.  So
 9   either they had it in 2022 or they didn't.
10   Respectfully, Your Honor, we have met our burden at this
11   stage in pleading.
12           And just lastly, because Your Honor asked, I'm
13   reading from 58-9, page 19, this is Einstein's policy
14   entitled Procedures for Complainants in Title IX
15   Violations.  And it's the third paragraph.  Parties will
16   have equal opportunities to present witnesses and
17   inculpatory and exculpatory evidence.  Neither party is
18   restricted from discussing the allegations under
19   investigation or from gathering and presenting relevant
20   evidence.  Both Dean Tomaselli and Ms. Ramirez was asked
21   to show the hearing officer any provision in this policy
22   that contradicts that or limits what Dr. Khodakhah could
23   do with regard to that complaint, and they couldn't
24   because there is nothing.  He has every right to do it.
25   And he did it.
```

```
 1                        PROCEEDINGS                  90
 2             And what's interesting also, and if you look,
 3   he sent that email to eight people, he never sent it to
 4   the complainants.  So the only way the complainants
 5   found out about it if someone else might have violated
 6   Title IX and said something.  He sent it to eight staff
 7   members asking, and as discovery will show, and I know
 8   Einstein has the letter, he specifically asked if you
 9   have any information, because, again, it talks about the
10   allegations, and he basically said, look, I interviewed
11   all of you people.  We all, I took you all in my house.
12   I did all this.  Does anyone have any information?  This
13   is what I'm being charged with, if anyone can provide
14   some information to help me.  And the policy doesn't
15   prevent him from doing that.
16             And last what I'm going to say is Ms. Kaplan
17   talks about that Einstein, you know, basically does, did
18   what they had to do, they couldn't do anything, they're
19   stuck between a rock and a hard place.  They wrote their
20   policy, and I read you the policy.  It says it applies
21   to all staff, and that policy includes the hearing,
22   includes an appeal, it includes notice, all the things
23   that they didn't give him that policy contains.  And so
24   if Einstein is left between a rock and a hard place with
25   all the differing OCR changes, then all they had to do
```

```
 1                      PROCEEDINGS              91
 2    is say we will follow the applicable regulation at the
 3    time of the investigation, but they don't.  It's the
 4    same one sentence, and respectfully, they don't because
 5    that's not what they did.  They applied the 2020 regs up
 6    until at least 2022, when it came to Dr. Khodakhah, and
 7    there are a lot of levels, and I, unfortunately, only
 8    provided a little, it starts with Jordan and Castillo.
 9    It's all in the complaint, Your Honor.  It starts with
10    Jordan and Castillo orchestrating this letter,
11    orchestrating these private, these secret surveys, these
12    mysterious surveys.  And it goes up, it goes up then to
13    Tomaselli.
14            All of these people have grievances against Dr.
15    Khodakhah, and it all, and so, respectfully, so maybe I
16    didn't, my Star Chamber comment was based on the more
17    knowledge that I have that's in the facts of the way
18    this has, this whole investigation rose from bottom to
19    top to where we are today.  And, Your Honor, thank you
20    very much, and thank you for your time.
21            THE COURT:  Thank you very much.  Okay, I will
22    issue a report and recommendation in due course.  One
23    thing I did want to raise is something I always raise,
24    and that's the possibility of either referral to
25    mediation or a settlement conference.  I certainly don't
```

1

2   need to explain to you why settlement can be beneficial

3   or at least an effort at settlement can be beneficial.

4   I'll ask for the parties to send me a joint letter let's

5   say in a week just letting me know if now would be an

6   appropriate time or a productive time for a mediation

7   referral or settlement conference.

8           MS. KAPLAN:  Can I say something?

9           THE COURT:  Yeah.

10          MS. KAPLAN:  So I think you're going to hear

11  from us that we would, we think that's a good idea.

12  Look, the fundamental problem in this case, what Dr.

13  Khodakhah (indiscernible) get, he is still working at

14  Einstein.  He didn't leave.  The punishments he got, one

15  of the punishments he got, he's still a faculty member

16  at Einstein with his lab and everything else.  It's

17  arguable as a matter of common sense outside the law

18  there should be a separation between these entities, and

19  I think a mediation to try to achieve that would be a

20  very good idea.  But it's not something that's, to be

21  clear, that's something he can get in this case.

22          THE COURT:  Well, and that's one of the

23  benefits of mediation, right, you can get things that

24  you can't otherwise get a court to order sometimes for

25  sure.

```
 1                        PROCEEDINGS                    93
 2              MR. BERNSTEIN:  I don't want to speak out of,
 3    you know, turn, but whatever, you want a response?
 4              THE COURT:  No, no, no.  You can think about
 5    it, you can talk to your respective clients.  Just, you
 6    know, a short letter letting me know if now would be a
 7    productive time if you'd like an order to go to
 8    mediation, if you'd like --
 9              (interposing)
10              MS. KAPLAN:  -- to say, and I don't see any --
11              (interposing)
12              MR. BERNSTEIN:  You want to go off the record?
13              MS. KAPLAN:  The parties tried two mediations,
14    and we haven't succeeded, but we are certainly willing
15    to try again because I think this isn't a marriage but
16    we need a divorce, and maybe Your Honor could help with
17    that.
18              THE COURT:  Right, and it's an iterative
19    process, right, just because you didn't manage to reach
20    an agreement the first ten times doesn't mean you won't
21    on the eleventh.
22              MR. BERNSTEIN:  (indiscernible)
23              THE COURT:  So if I can be of any help, if the
24    court's annex mediation program can be of any help, just
25    let me know.
```

```
 1                        PROCEEDINGS                    94

 2          MR. BERNSTEIN:  Thank you, Your Honor.

 3          THE COURT:  All right, thanks everyone.

 4          (Whereupon, the matter is adjourned.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

95

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of KHODAKHAH v.

MONTEFIORE, et al., Docket #24cv839, was prepared using

digital transcription software and is a true and

accurate record of the proceedings.


Signature_____*Carole Ludwig*_____

                    Carole Ludwig

Date:   April 25, 2025