UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KAMRAN KHODAKHAH,

                              Plaintiff,

        -v-                                               CIVIL ACTION NO. 24 Civ. 0839 (LAK) (RFT)

                                                          **REPORT & RECOMMENDATION**

MONTEFIORE MEDICINE ACADEMIC HEALTH
SYSTEM, INC., et al.,

                              Defendants.

**TO THE HONORABLE LEWIS A KAPLAN, UNITED STATES DISTRICT JUDGE:**

## INTRODUCTION

Plaintiff Kamran Khodakhah filed a first amended complaint (the "FAC") alleging Title IX

claims against Defendants Albert Einstein College of Medicine ("Einstein") and Montefiore

Medicine Academic Health System, Inc. ("Montefiore"); New York State Human Rights Law

("NYSHRL") and New York City Human Rights Law ("NYCHRL") claims against Einstein,

Montefiore, and Dr. Gordon Tomaselli; contract and quasi-contract claims under New York law

against Einstein and Montefiore; and claims of tortious interference with contract against Drs.

Tomaselli, Pablo Castillo, and Bryen Jordan. (*See* ECF 48, FAC ¶¶ 434-563.). Together,

Defendants Einstein, Montefiore, Castillo, and Jordan are the "Einstein Defendants." Pending

before the Court are Defendants' fully briefed motions to dismiss the FAC pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure. (*See* ECF 53; Tomaselli Mot. To Dismiss, ECF 56,

Einstein Defs.' Mot. To Dismiss.) Having carefully reviewed the parties' filings on the docket,

and for the reasons that follow, I respectfully recommend that Your Honor GRANT IN PART and

DENY IN PART the motion to dismiss the claims against Einstein and Montefiore, GRANT the

motion to dismiss the claims against Drs. Castillo and Jordan, and GRANT the motion to dismiss

the claims against Dr. Tomaselli, as specified below.

I.

**BACKGROUND**

A.    **Factual Background**

For purposes of the pending motions to dismiss, the Court must accept Plaintiff's well-

pleaded allegations as true and draw all reasonable inferences in his favor. *See City of*

*Providence v. BATS Glob. Mkts., Inc.*, 878 F.3d 36, 48 (2d Cir. 2017).[1] In the FAC, Plaintiff quotes

from and relies on various official letters from Einstein (*see, e.g.,* ECF 48, FAC ¶¶ 37, 163-66,

190-91, 473-74, 497-503), as well as quoting from and relying on Einstein's Title IX Policies (*see,*

*e.g., id.* ¶¶ 84-89, 90-95, 185-86, 200-01, 301-05, 314-15), and so I consider those documents

on these motions as well as other materials, including agency guidance and publicly available

materials, of which a court may properly take judicial notice.[2] Plaintiff's allegations are

summarized below.

---

[1]    Except as indicated otherwise, this report and recommendation omits internal
quotation marks, alterations, and citations from quoted text.

[2]    *See, e.g., Menaker v. Hofstra Univ.*, 935 F.3d 20, 28-29, 34-35 (2d Cir. 2019) (relying on
Title IX policies); *Doe v. Columbia Univ.*, 831 F.3d 46, 51-53 (2d Cir. 2016) (same). Courts also
routinely consider agency guidance and other publicly available information at the motion to
dismiss stage. *See, e.g., Salazar v. King*, 822 F.3d 61, 67-68, 76-77, 80-81 (2d Cir. 2016)
(considering Dear Colleague Letters issued by the Department of Education as relevant
"informal agency guidance"); *Chen v. Major League Baseball Props., Inc.*, 798 F.3d 72, 79-80 (2d
Cir. 2015) (considering "agency opinion letters"); *HB v. Monroe Woodbury Cent. Sch. Dist.*, No.
11-CV-5881 (CS), 2012 WL 4477552, at *5 (S.D.N.Y. Sept. 27, 2012) (taking judicial notice on a
motion to dismiss of news articles and a Dear Colleague letter as publicly available documents).

1.    Einstein and Its Title IX Policies

Einstein is a private medical school in the Bronx. (*See id.* ¶ 13.) It was previously affiliated with Yeshiva University, but in 2015, it became its own legal entity and began an affiliation with Montefiore, the umbrella organization for Einstein and Montefiore-affiliated clinics and hospitals. (*See id.* ¶¶ 12, 54.)

As a college that receives federal funding, Einstein has a policy to address complaints of sex discrimination in accordance with federal Title IX regulations. (*See id.* ¶ 14.) In 2018, that policy was the Title IX: Non-Discrimination and Anti-Harassment Policy and Complaint Procedures, dated October 26, 2018 ("2018 Title IX Policy"). (*See id.* ¶ 84.) Einstein's 2018 Title IX Policy prohibits sex discrimination, harassment, and sexual misconduct, and established procedures for reporting, investigating, and responding to such prohibited conduct. (*See generally* ECF 58, Declaration of Gabrielle E. Tenzer ("Tenzer Decl.") Ex. G, Einstein 2018 Title IX Policy.) For complaints that did not involve students, the 2018 Title IX Policy established a process involving an investigation but no live hearing, a preponderance of the evidence standard, and no appeal. (*See id*. at 34-36.)

In 2020, the Department of Education issued new Title IX regulations, which defined sexual harassment more narrowly and added new procedural requirements. (*See* ECF 48, FAC ¶¶ 90-91.) Among other changes, the new regulations required colleges to conduct live hearings and permit appeals (if available in comparable proceedings) when adjudicating reports of sexual harassment. *See* 34 C.F.R. § 106.45(b)(6)(i), (b)(8)(i) (2020). The new regulations also permitted the application of a clear and convincing evidentiary standard. *See id*. § 106.45(b)(1)(vii) (2020). The new regulations became effective August 14, 2020, but they

were not retroactive. *See* Nondiscrimination on the Basis of Sex in Education Programs or

Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,061 (May 19, 2020);

*see also* Department of Education Office for Civil Rights ("OCR"), Questions and Answers on the

Title IX Regulations on Sexual Harassment 10 (2021) (the "2021 Q&A") ("[T]he 2020

amendments do not apply to alleged sexual harassment occurring before August 14, 2020.").[3]

Einstein revised its policies to comply with the 2020 Title IX regulations by adopting the

Title IX Gender-Based Misconduct, Discrimination and Harassment Policy and Complaint

Procedures for Employees and Non-Students, dated August 14, 2020 ("2020 Title IX Policy")

(*see* ECF 48, FAC ¶ 90), which Einstein re-adopted in 2022 without modification (the "2022 Title

IX Policy") (*see id.*).

The 2020 and 2022 Title IX Policies have a narrower definition than the 2018 Title IX

Policy of "Title IX Sexual Harassment," in that the 2018 Policy referred to "unwelcome or

unwanted" conduct that a complainant subjectively perceived to constitute "conduct" of a

"sexual nature." (ECF 60, Pl.'s Einstein Opp. at 6 (quoting ECF 58, Tenzer Decl. Ex. G, Einstein

---

[3]     The 2021 Q&A stated:

The 2020 amendments took effect on August 14, 2020, and are not retroactive.
This means a school must follow the requirements of the Title IX statute and the
regulations that were in place at the time of the alleged incident; the 2020
amendments do not apply to alleged sexual harassment occurring before August
14, 2020. This is true even if the school's response was on or after this date. In
other words, if the conduct at issue in the complaint took place prior to August
14, 2020, the 2020 amendments do not apply even if the complaint was filed with
a school on or after August 14, 2020.

*Doe v. Trs. of Columbia Univ. in City of New York*, No. 21-CV-5839 (ER), 2022 WL 3666997, at *7
(S.D.N.Y. Aug. 25, 2022) (quoting 2021 Q&A).

2018 Title IX Policy at 19).) The later policies clarify that the term refers to "sexual harassment that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to Einstein's education program or activity." (*Compare* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 7-9, *with id.* Ex. G, Einstein 2018 Title IX Policy at 18-19.)

The 2020 and 2022 Title IX Policies entitle the complainant and the respondent to receive more information about the Title IX investigation than was the case under the 2018 Title IX Policy, including "the identities of the parties involved," "a statement that the parties may have an advisor of their choice who may be, but is not required to be, an attorney," and "an explanation that the parties may inspect and review evidence." (*Compare* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 15, *with id.* Ex. G, Einstein 2018 Title IX Policy at 34-36.) Interim sanctions under every Title IX policy permit Einstein to "take reasonable and prudent interim measures," including, among other measures, "bans from areas of campus." (ECF 58, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy at 10; *id.* Ex. I, Einstein 2022 Title IX Policy at 16.)

The 2020 and 2022 Title IX Policies provide the parties to a Title IX investigation with equal opportunities to present witnesses and evidence and explicitly prohibit any party from being "restricted from discussing the allegations under investigation or from gathering and presenting relevant evidence." (*Compare* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 19, *with id.* Ex. G, Einstein 2018 Title IX Policy at 11, 34-36.) The 2018 Title IX Policy contained no such provision. (*See generally id.* Ex. G, Einstein 2018 Title IX Policy.)

The 2020 and 2022 Title IX Policies require respondents to be "presumed not responsible for the alleged conduct," while the 2018 Title IX Policy contained no instruction on

the presumption of responsibility. (*Compare* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 15, *with id.* Ex. G, Einstein 2018 Title IX Policy at 34-36.) The 2020 and 2022 Title IX Policies require that a Title IX violation be proved by "a clear and convincing standard of evidence," while the 2018 Title IX Policy applied "a preponderance of evidence" standard. (*Compare* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 15, *with id.* Ex. G, Einstein 2018 Title IX Policy at 21.)

The 2020 and 2022 Title IX Policies entitle the parties to receive a copy of the investigative report after the investigation is complete, but the 2018 Title IX Policy entitled the parties to be given the investigative report only if a separate faculty policy required such disclosure. (*Compare* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 21, *with id.* Ex. G, Einstein 2018 Title IX Policy at 35.)

The 2020 and 2022 Title IX Policies require a live, recorded hearing during which the parties have equal opportunities to explain their positions, present fact and expert witnesses, present other evidence, examine all relevant evidence used in the investigation, and question the opposing party through their chosen advisor. The later policies require Einstein to appoint one or more neutral "Decisionmaker(s)" to preside over the hearing, determine whether questions to the parties or witnesses are relevant, question the parties directly, evaluate all relevant evidence, and issue a written decision following the hearing; the school's Title IX Coordinator is not allowed to be a Decisionmaker. (*See* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 20-23.) The 2018 Title IX Policy provided that the investigator would make a recommendation on the respondent's responsibility after preparing the investigative report;

the recommendation was then provided to Einstein's Vice President for Human Resources to determine the disciplinary action, if any. (*See id.* Ex. G, Einstein 2018 Title IX Policy at 35.)

The 2020 and 2022 Title IX Policies allow for an appeals process, while the 2018 Title IX Policy does not permit appeals in complaints involving employees only (as opposed to students). (*Compare* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 23-24, *with id.* Ex. G, Einstein 2018 Title IX Policy at 35.)

      2.    Plaintiff Becomes an Einstein Faculty Member
           And Chair of the Neuroscience Department

Plaintiff joined Einstein's faculty in 2001 as an Assistant Professor, with a limited term appointment in the Neuroscience Department. (*See* ECF 48, FAC ¶ 36.) Plaintiff's appointment was in accordance with Einstein's System of Appointments Policy, as set forth in both his 2000 Offer Letter and his 2001 Appointment Letter. (*See id.* ¶ 37; ECF 58, Tenzer Decl. Ex. A, 2000 Offer Letter at 1; *id.* Ex. B, 2001 Appointment Letter.) In those letters, Einstein informed Plaintiff that other Einstein policies were found in a faculty handbook. (*See* ECF 48, FAC ¶¶ 35-37; ECF 58, Tenzer Decl. Ex. A, 2000 Offer Letter at 1; *id.* Ex. B, 2001 Appointment Letter.)

Einstein granted Plaintiff tenure in 2012. (*See* ECF 48, FAC ¶ 44.) Two years later, in 2014, another institution made Plaintiff a job offer. (*See id.* ¶ 48.) Einstein provided Plaintiff with a retention package, including, among other commitments, that "should one or more of [Plaintiff's three existing grants] not be renewed," Einstein would provide "generous interim support . . . to better enable [Plaintiff] to recapture that grant." (*Id.* ¶¶ 48-53; *see also* ECF 58, Tenzer Decl. Ex. C, 2014 Retention Letter at 2.) Plaintiff accepted the package and remained at Einstein. (*See* ECF 48, FAC ¶ 51.)

In 2013, Plaintiff was made Interim Chair of the Neuroscience Department, and in 2016, he was appointed Chair. (*See id.* ¶¶ 46, 59; ECF 58, Tenzer Decl. Ex. D, 2016 Chair Appointment Letter.) Dr. Castillo developed a grudge against Plaintiff due to those appointments. (*See* ECF 48, FAC ¶¶ 57-59.) According to the Chair Appointment Letter, Plaintiff was to serve for an "indefinite term" and, "[a]s with all Department Chair appointments, continuation [was] subject to performance as determined by the Dean." (ECF 58, Tenzer Decl. Ex. D, 2016 Chair Appointment Letter; *see also* ECF 48, FAC ¶ 59.)

In 2018, Dr. Tomaselli became Dean of Einstein, and Plaintiff was critical of Tomaselli's performance in that role. (*See* ECF 48, FAC ¶¶ 65-66.)

In 2021, a female graduate student gave a presentation to the Neuroscience Department regarding Einstein's female graduate students' negative perceptions of the administration's responses to allegations of student mistreatment and sexual harassment. (*See id.* ¶ 392.) At the time, Victoria Freedman, Associate Dean for Graduate Programs in Biomedical Sciences, expressed to Plaintiff that it would be "critical" for Einstein to improve those perceptions. (*Id.* ¶ 393.)

3.    Plaintiff Is Removed as Chair of the Neuroscience Department

In February 2022, Plaintiff received a "Letter of Concern" signed by thirteen of his colleagues in the Neuroscience Department, which raised issues about "demeaning and unprofessional comments . . . [,] autocratic behaviors," and mistreatment of administrative staff by Plaintiff as well as alleged sexual indiscretions with two female junior faculty members. (*Id.* ¶¶ 108-10, 113, 121.) Four of his colleagues, including Drs. Castillo and Jordan, led the effort in drafting the Letter. (*See id.* ¶¶ 18-19, 107-08.) Castillo and Jordan also began spreading

false rumors that Plaintiff was sexually involved with two female junior faculty members. (*See id.* ¶ 113.)

Around the same time, Dr. Jordan, who held a leadership position in the Neuroscience Department related to graduate student education, shared with Dean Freedman a student survey, which included "numerous accounts of students detailing inappropriate and harmful comments and actions by" Plaintiff. (*Id.* ¶¶ 119-20.) Plaintiff reached out to Einstein's Vice President of Human Resources and Title IX Coordinator, Ms. Yvonne Ramirez, for guidance. (*See id.* ¶ 122.) Ramirez and Einstein's Executive Dean, Dr. Edward Burns, said that they believed that the allegations were false (*see id.* ¶¶ 125-27) but nevertheless suggested that Plaintiff step down as Chair because of the "climate" following the #MeToo movement, which had occurred several years earlier in 2017-18; they told Plaintiff that Einstein would need to appear "responsive" to the Letter of Concern due to the #MeToo movement. (*Id.* ¶¶ 126-28.) Plaintiff declined to step down and instead suggested to Ramirez and Burns that they "look into the Letter of Concern." (*Id.* ¶¶ 122-23, 128.)

On March 10, 2022, Einstein's then-Dean, Dr. Tomaselli, notified Plaintiff by letter that Einstein was engaging a third-party investigator to review the allegations in the Letter of Concern (the "Chair Investigation") and that Plaintiff would be suspended as Chair while the investigation was pending, "to protect all parties from fear of retaliation," given the power differential between the Chair and the rest of the Neuroscience Department. (*Id.* ¶¶ 134-36.) The investigation took place over the next several months. (*See id.* ¶ 158.)

Dr. Tomaselli informed the Neuroscience Department that Plaintiff was stepping down as Chair because he was under investigation and that an Interim Chair would be appointed. (*See*

*id.* ¶ 140.) Einstein took the position that the Chair Investigation involved behavior outside the scope of Title IX, so that the applicable Title IX Policy did not govern that proceeding. (*See* ECF 57, Einstein Defs.' Mem. at 27-28.) Plaintiff asserts that the Chair Investigation was covered by Title IX; that his demotion from Chair during the pendency of that investigation violated Einstein's 2022 Title IX Policy, in that he was disciplined before there was any investigation or findings against him; and that the process provided to him in connection with the Chair Investigation was insufficient. (*See* ECF 48, FAC ¶¶ 151, 172.)

Many people contacted Drs. Tomaselli and Burns as well as Ramirez to say that the charges against Plaintiff were false and had been instigated by Drs. Castillo and Jordan; faculty members also told the investigator that the charges were baseless. (*See id.* ¶¶ 164-69, 223-33.) Nevertheless, on July 11, 2022, Einstein informed Plaintiff by letter that the Chair Investigation, which had "involved interviews with 59 current or former members of the Department, including [Plaintiff], other faculty, research fellows, current and former staff, and current and former students," had confirmed misconduct by Plaintiff, including: (1) general mistreatment of students; (2) inappropriate use of discriminatory nicknames; (3) multiple instances of race-, disability-, and gender-based comments and insensitive comments; (4) references to students and others as "morons" in front of students and faculty; (5) inappropriate and unwanted physical touching, including pulling female students' ponytails, stomach touching, shoulder touching, and pushing; (6) serving alcohol to and drinking alcohol with students in classes and in the lab, which directly violated Einstein's Drug and Alcohol Policy; (7) inappropriate behavior at on- and off-campus Einstein events, believed to be due to intoxication; and (8) persistent mistreatment, intimidation, and abuse of staff, including by threatening the loss of their jobs

and privileges such as vacation and personal time. (*See id.* ¶ 164; ECF 58, Tenzer Decl. Ex. E, July 11, 2022 Chair Dismissal Letter.)

Dr. Tomaselli removed Plaintiff as Chair of the Department. (*See* ECF 48, FAC ¶¶ 163, 166; ECF 58, Tenzer Decl. Ex. E, July 11, 2022 Chair Dismissal Letter.) Plaintiff contends that the demotion sanctioned him without due process in violation of Einstein's 2022 Title IX Policy and the 2016 Chair Appointment Letter. (*See* ECF 48, FAC ¶¶ 148-53.) Specifically, Plaintiff complains that he had not been the subject of a formal complaint, had not been told the identities of his accusers or provided notice of the charges, had not been adjudicated responsible for any misconduct by clear and convincing evidence, and had not been provided a copy of any final investigative report prior to the demotion – procedures that would have been required under the 2022 Title IX Policy that Plaintiff argues should have governed the Chair Investigation (*see id.* ¶¶ 102, 163-73, 486-89), although not under the 2018 Title IX Policy. (*See* ECF 58, Ex. G, Einstein 2018 Title IX Policy at 35.) Moreover, Tomaselli demoted Plaintiff when he allegedly had reason to know that the allegations against Plaintiff were false. (*See* ECF 48, FAC ¶¶ 125, 154-56, 159-60.)

4.    Plaintiff Is Found Responsible for Violating Einstein's Title IX Policy

On July 11, 2022, the same day that Tomaselli told Plaintiff of the demotion from the position as Chair, Einstein sent Plaintiff notice that it would investigate allegations by two junior faculty members ("Complainant 1" and "Complainant 2") that Plaintiff had sexually harassed each of them (the "Title IX Notices"). (*See id.* ¶¶ 174-76.) Complainant 1 alleged that, when she had interviewed for her job at Einstein, Plaintiff had "placed his hand on her bare knee" and asked her "impermissible questions" about her husband, and that at a professional gathering,

he had greeted her with a kiss. (*Id.* ¶ 175.) Complainant 2 alleged that Plaintiff had twice placed his hand on her back as they waited in line at a reception hosted by the Neuroscience Department (*see id.* ¶¶ 176, 265-66) and placed his hands on her breastbone and slapped her upper thigh at a different Einstein reception (*see id.* ¶¶ 176, 265).

The following day, Plaintiff forwarded both Title IX Notices, which included each Complainant's name and allegations, to multiple Einstein faculty members whom he considered asking to serve as witnesses for him. (*See id.* ¶ 188; *see also* ECF 58, Tenzer Decl. Ex. F, July 13, 2022 Interim Suspension Letter.) In response to Plaintiff's sharing this information, Dr. Tomaselli banned Plaintiff from campus, revoked his access to his Einstein email and other college information technology systems, and Tomaselli instructed Plaintiff to refrain from discussing the pending investigations with faculty members. (*See* ECF 48, FAC ¶¶ 190-92; ECF 58, Tenzer Decl. Ex. F, July 13, 2022 Interim Suspension Letter.) Tomaselli justified these prohibitions under Section III.H of Einstein's Appointments Policy, which provides for the summary paid suspension of an employee against whom written charges of for cause dismissal have been made, "pending final action upon such charges," when "continuance of the Faculty member in his duties threatens immediate harm." (ECF 48, FAC ¶ 196.) Plaintiff alleges that the provision was inapplicable to his situation. (*See id.* ¶ 197.)

After Plaintiff was removed from campus, in July and August 2022, many faculty members reached out to Einstein's Title IX Office and Tomaselli, among others, to say that the allegations against Plaintiff in the Chair Investigation and by Complainants 1 and 2 were false and had been motivated by grudges held by Drs. Castillo and Jordan, but Einstein did not reopen the Chair Investigation. (*See id.* ¶¶ 206-10, 223-36.) In response to the outreach by

faculty, Tomaselli sent an email to the Neuroscience Department stating that, although the Chair Investigation had concluded, Einstein "was commencing separate investigations of other additional allegations that [Plaintiff] had engaged in conduct that may violate additional Einstein policies." (*Id.* ¶¶ 211-12.)

Einstein retained a third party to investigate the allegations by Complainants 1 and 2 (the "Title IX Investigations"). (*See id.* ¶ 255.) Those investigations were conducted pursuant to Einstein's 2018 Title IX Policy, which was in place at the time of the alleged harassment, rather than Einstein's 2022 Title IX Policy, which was in place at the time of the investigations. (*See id.* ¶¶ 175-76, 183.)

Consistent with the 2018 Title IX Policy, Einstein gave Plaintiff the opportunity to submit "names of possible witnesses" to the Title IX Coordinator or the investigator. (ECF 48, FAC ¶ 262; ECF 58, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy at 34.) Einstein did not permit Plaintiff himself to contact his witnesses and instead contacted them for him; but the investigator did not interview all witnesses identified by Plaintiff. (*See* ECF 48, FAC ¶¶ 251-53, 262-63.) By contrast, the investigator permitted Complainant 2 to contact her witnesses. (*See id.* ¶¶ 262-63.) The 2022 Title IX Policy explicitly says that the parties cannot be restricted from gathering and presenting evidence. (*See* ECF 58, Tenzer Decl. Ex. I, Einstein 2022 Title IX Policy at 19.)

The FAC does not describe the investigation of Complainant 1's allegations, except to allege that the male investigator recommended Plaintiff be found not responsible for sexual harassment – a recommendation adopted by the Title IX Coordinator in December 2023. (*See id.* ¶¶ 249-51.)

The investigator in Complainant 2's proceeding interviewed witnesses and gathered evidence, and Plaintiff reviewed the preliminary investigative report, which was shared with Plaintiff even though there was no requirement under the 2018 Title IX Policy to share the report. (*See id.* ¶ 258.) In December 2023, Einstein's Title IX Coordinator adopted the investigator's recommendation that Plaintiff be found responsible for sexual harassment of Complainant 2 on the ground that the four instances of touching – twice on Complainant 2's back, once on her breastbone, and once on her upper thigh – taken in their totality, were sexual in nature. (*See id.* ¶¶ 251, 293; ECF 58, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy at 18.) Plaintiff argues that the incidents never happened and that the described behavior he was found to have directed at Complainant 2 did not qualify as sexual harassment under the 2022 Title IX Policy. (*See* ECF 48, FAC ¶ 265.)

The sanctions imposed on Plaintiff included a prohibition on working with students or serving in a faculty governance role for three years as well as a requirement that his lab be relocated to a different building. (*See id.* ¶ 306.) In setting these sanctions, the Title IX Coordinator noted that Plaintiff had previously been found to have engaged in inappropriate behavior in the Chair Investigation, so that the sexual harassment finding was a "second offense." (*Id.* ¶ 300.) Plaintiff argues that considering alleged misconduct adjudicated outside the Title IX grievance process, such as in the Chair Investigation, was impermissible. (*See id*. ¶¶ 301-05.)

Plaintiff faults Einstein for evaluating the Title IX complaints against Plaintiff under the "obsolete" 2018 Title IX Policy. (*Id.* ¶ 405.) He contends that he was found responsible for sexual harassment of Complainant 2 after he was prohibited from personally contacting his

witnesses and the investigator declined to contact and fully interview all of them (*see id*.
¶¶ 259, 262); based on the overly permissive preponderance of evidence standard (*see id*.
¶¶ 94, 280-81; ECF 60, Pl.'s Einstein Opp. at 7) and an overly broad definition of sexual
harassment (*see* ECF 48, FAC ¶ 86); by Ramirez, who was both the Title IX Coordinator and the
decisionmaker in his Title IX case and who therefore had a conflict of interest (*see* ECF 48, FAC
¶¶ 94, 296-99; ECF 60, Pl.'s Einstein Opp. at 20-21). He further asserts that his sanctions were
impermissibly enhanced based on unsubstantiated behavior that had led Dr. Tomaselli to
dismiss Plaintiff from his position as Chair on July 11, 2022 (*see* ECF 60, Pl.'s Einstein Opp. at
18), and that he was denied an appeal (*see* ECF 48, FAC ¶ 315). The result was that Einstein and
Montefiore were able to "manipulate the policy to fit the evidence rather than impartially
appl[ying] the policy" and therefore to "hold Plaintiff responsible for the erroneous allegations
. . . ." (ECF 60, Pl.'s Einstein Opp. at 17-18 (quoting *Schiebel v. Schoharie Cent. Sch. Dist.*, 120
F.4th 1082, 1103 (2d Cir. 2024)).)

Plaintiff also argues that Tomaselli's July 13, 2022 order barring Plaintiff from campus,
which Plaintiff says was based on an erroneous charge of retaliation, constituted discipline
without due process. (*See* ECF 60, Pl.'s Einstein Opp. at 18; ECF 48, FAC ¶¶ 196, 204.)

5.    The Retaliation Investigations

Following Plaintiff's dissemination of the Title IX Notices to his colleagues in July 2022,
Einstein and Montefiore investigated whether that outreach by Plaintiff to potential witnesses
violated the anti-retaliation provisions of the 2022 Title IX Policy. (*See* ECF 58, Tenzer Decl. Ex. F,
July 13, 2022 Interim Suspension Letter; ECF 48, FAC ¶¶ 328-32.) After a hearing, in May 2024, a

third-party hearing officer determined that Plaintiff's conduct did not violate the Title IX Policy.

(*See* ECF 48, FAC ¶¶ 326, 331-32.)

Following Dr. Tomaselli's email to the Neuroscience Department in or around August

2022 stating that although the Chair Investigation had concluded, Einstein was starting separate

investigations of other alleged misconduct by Plaintiff (*see id.* ¶¶ 211-12), Plaintiff filed a

retaliation complaint against Tomaselli, arguing that the email had improperly "disclosed the

fact of [Plaintiff's] pending Title IX investigations" and that Tomaselli had removed him from

campus without basis, both in retaliation for Plaintiff's efforts to defend himself in the Title IX

Investigations. (*Id.* ¶¶ 211, 219.) Einstein and Montefiore investigated whether Tomaselli's

actions violated the anti-retaliation provisions of the 2022 Title IX Policy. (*See id.* ¶¶ 333-44.)

Following a hearing, a third-party hearing officer determined in May 2024 that Tomaselli's

conduct did not violate the 2022 Title IX Policy. (*See id.* ¶ 334.) Plaintiff argues that the

unreasonable delay of timely adjudication of his retaliation claim violated the 2022 Title IX

Policy and also breached his employment agreement with Einstein and the implied covenant of

good faith and fair dealing. (*See id.* ¶¶ 512-17; ECF 60, Pl.'s Einstein Opp. 32-33.)

**B.    Procedural Background**

Plaintiff filed this action on February 5, 2024. (*See* ECF 1, Compl.) Plaintiff filed the FAC

on September 23, 2024, bringing Title IX claims against Einstein and Montefiore; NYSHRL and

NYCHRL claims against Einstein, Montefiore, and Tomaselli; contract and quasi-contract claims

under New York law against Einstein and Montefiore; and claims of tortious interference with

contract against Tomaselli, Castillo, and Jordan. (*See* ECF 48, FAC ¶¶ 70, 76, 79, 88, 91, 93-94,

96.)

This matter was referred to me on February 8, 2024, for general pretrial supervision and dispositive motions. (*See* ECF 19, Order of Reference.) Defendants filed motions to dismiss. (*See* ECF 53, Tomaselli Mot. To Dismiss; ECF 56, Einstein Defs.' Mot. To Dismiss.) The motions were fully briefed by January 17, 2025. (*See* ECF 55, Tomaselli Mem. of Law in Supp. ("Tomaselli Mem."); ECF 57, Einstein Defs.' Mem. of Law in Supp. ("Einstein Defs.' Mem."); ECF 59, Pl.'s Tomaselli Opp.; ECF 60, Pl.'s Einstein Opp.; ECF 63, Tomaselli Reply; ECF 64, Einstein Defs.' Reply.). I held oral argument on Defendants' motions to dismiss on April 25, 2025. (*See* ECF 68.)

II.

**LEGAL STANDARD FOR MOTIONS TO DISMISS**

Judgment on a Rule 12(b) motion for "failure to state a claim upon which relief can be granted" is appropriate when the complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In deciding a Rule 12(b)(6) motion for failure to state a claim, the Court "must accept as true all of the allegations contained in a complaint[,]" but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

In evaluating a Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated

17

by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Extrinsic evidence may not be considered by the court, because "a Rule 12(b)(6) motion . . .

challenges the complaint as presented by the plaintiff, taking no account of its basis in

evidence." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). However, an exception exists

for extrinsic documents that are "integral" to the complaint, in that the plaintiff relied heavily

upon such documents' "terms and effect" in drafting the complaint, so long as it is "clear on the

record that . . . no dispute exists regarding the authenticity or accuracy of the document[s]." *Id.*

## III.

## <u>DISCUSSION</u>

### A.    Plaintiff's Claims Against Montefiore

Defendant Montefiore argues that it should be dismissed from this case because

Plaintiff relies on improper group pleading and fails to allege either specific actions that

Montefiore took against him or facts showing that Montefiore was responsible for Einstein's

actions. (*See* ECF 57, Einstein Defs.' Mem. at 10.)[4] Plaintiff responds that Montefiore and

Einstein jointly employed him, pointing out that determining whether entities were joint

employers is a question of fact that is generally not amenable to determination on a motion to

dismiss; he argues that he has sufficiently alleged a joint employment relationship and has

appropriately put Montefiore on notice of what he claims it did. (*See* ECF 60 Pl.'s Einstein Opp.

---

[4]    Montefiore also argues that Plaintiff has failed to allege a basis to pierce the corporate
veil between Montefiore and Einstein (*See* ECF 57, Einstein Defs.' Mem. at 11), but Plaintiff
does not discuss veil piercing in his opposition to the Einstein Defendants' motion to dismiss,
and so I do not understand Plaintiff to be arguing that the claims against Montefiore should
survive because the Court should pierce the corporate veil.

at 13-14.) For the reasons set forth below, I respectfully recommend that Your Honor DENY the

motion to dismiss the claims against Montefiore based on an impermissible group pleading

theory.

Plaintiff's allegations that Montefiore's chief legal officer oversaw Plaintiff's disciplinary

decisions, that Montefiore managed benefits for both Montefiore and Einstein employees, that

Montefiore's CEO is the ultimate decisionmaker on hiring and firing, and that Montefiore had

discretion over Einstein's finances (*see* ECF 48, FAC ¶¶ 25-31) are sufficient to allege a joint

employment relationship. *See Bautista v. PR Gramercy Square Condo.*, 642 F. Supp. 3d 411, 421-

22 (S.D.N.Y. 2022) (finding the plaintiff's allegations sufficient to support a joint employment

relationship, where the plaintiff pleaded facts suggesting there was a commonality of hiring,

firing, and pay between the two defendants). Montefiore is correct that when "a complaint

lumps all the defendants together in each claim and provides no factual basis to distinguish

their conduct, it fails to satisfy [Rule 8's] minimum standard." *S.G. v. Bank of China, Ltd*., No. 23-

CV-2866 (LAK), 2024 WL 1861158, at *2 (S.D.N.Y. Apr. 29, 2024) (dismissing a complaint for

impermissible group pleading where the "complaint list[ed] the defendants' names individually

but with no distinction as to what acts are attributable to whom"); *see also Atuahene v. City of

Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (permitting dismissal of a complaint that failed to

differentiate between defendants and failed to identify any factual basis for the legal claims).

However, a complaint may survive dismissal despite some group pleading if the complaint "puts

[the defendants] on notice of what the claim is and the ground upon which it rests." *Bautista,*

642 F. Supp. 3d at 423.

The FAC puts Montefiore on notice that Plaintiff is accusing it of improperly investigating and making decisions on his disciplinary issues. Montefiore argues that Plaintiff's only allegations that it discriminated against him or breached his contract are conclusory and are contradicted by his own more specific allegations about the events underlying this case. (*See* ECF 57, Einstein Defs.' Mem. at 10-11.) In particular, Montefiore contends that Plaintiff's allegation that "the investigation of disciplinary issues and decisions on disciplinary issues as regards Einstein employees were made by [Montefiore]" (*id.* ¶ 24) is contradicted by Plaintiff's allegations that it was Einstein personnel who conducted investigated Plaintiff's conduct and sanctioned him. (*See* ECF 57, Einstein Defs.' Mem. at 10-11.) Montefiore concludes that the FAC fails to provide Montefiore with notice of what it is alleged to have done. (*See id.*) But there is no necessary inconsistency between an allegation that Montefiore investigated Plaintiff and made decisions about his discipline and an allegation that specific Einstein employees investigated Plaintiff and made decisions about his discipline. Thus, what Montefiore actually appears to be arguing is that Plaintiff's allegations are false, which is not an appropriate argument at this stage of the litigation. *See Iqbal*, 556 U.S. at 678. It is certainly possible that Plaintiff will be unable to prove his allegations against Montefiore, but that possibility has no bearing on whether, on a motion to dismiss, the Court should dismiss Plaintiff's claims against Montefiore for failure to put Montefiore on notice of what Plaintiff claims it did wrong.

**B.    Plaintiff's Title IX Erroneous Outcome and Deliberate Indifference Claims**

Plaintiff alleges that the following actions by Defendants were discriminatory under Title IX: (1) conducting the Chair Investigation without the procedural protections of the 2022 Title IX Policy, including by removing Plaintiff from his position as Chair on an interim basis while the

investigation was ongoing and failing to issue a formal complaint identifying his accusers and

providing notice of the charges, using a preponderance of the evidence standard to assess his

behavior, and neglecting to provide him with a copy of a final investigative report prior to the

permanent demotion; (2) conducting the two Title IX Investigations without the procedural and

other protections of the 2022 Title IX Policy, including full access to witnesses, a clear and

convincing evidence standard, a narrower definition of sexual harassment, an independent

decisionmaker, and a right to an appeal; (3) barring Plaintiff from campus and issuing a gag

order to Plaintiff, among other sanctions, after he contacted potential witnesses in connection

with the two Title IX Investigations; (4) informing Plaintiff's departmental colleagues of the Title

IX Investigations following the conclusion of the Chair Investigation; and (6) considering the

results of the Chair Investigation in imposing sanctions for the finding of responsibility in one of

the two Title IX Investigations.

For the reasons set forth below, I respectfully recommend that Your Honor GRANT IN

PART the motion to dismiss Plaintiff's Title IX discrimination claims to the extent those claims

are predicated on the Title IX Investigations; and that Your Honor should DENY IN PART the

motion to dismiss Plaintiff's Title IX discrimination claims to the extent that claim is predicated

on the Chair Investigation.

    1.    <u>Plaintiff's Erroneous Outcome Claims</u>

        a.  Legal Standards

To challenge the outcome of a Title IX proceeding under an "erroneous outcome"

theory, a plaintiff must allege, among other elements, "specific facts that support a minimal

plausible inference" of gender discrimination. *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir.

21

2016); *see also Schiebel*, 120 F.4th at 1096; *Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30-31 (2d Cir. 2019). A plaintiff may establish a minimal plausible inference of gender bias through "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that [ ] tend to show the influence of gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

In the absence of such direct evidence of gender bias, a plaintiff may plead a prima facie case of sex discrimination by alleging that the school "(a) t[ook] an adverse employment action against an employee, (b) in response to allegations of sexual misconduct, (c) following a clearly irregular investigative or adjudicative process, (d) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex." *Menaker*, 935 F.3d at 39; *see also Feibleman v. Trs. Of Columbia Univ.*, No. 19-CV-4327 (VEC), 2020 WL 882429, at *9 (S.D.N.Y. Feb. 24, 2020) (holding that "procedural irregularities or preferential treatment during the disciplinary proceeding, combined with a concrete motive to discriminate on the basis of gender, is sufficient to create at least a minimal inference that a [plaintiff] was subjected to gender bias").

The Second Circuit has made clear that the latter test "requires clear irregularities to raise an inference of bias" and that "minimal irregularities (absent other indicia of bias) do not suffice to suggest discrimination." *Menaker*, 935 F.3d at 34 n.50. However, the Second Circuit has "expressly declined to define precisely what sort of irregularities meet the standard of clearly irregular investigative or adjudicative process . . . ." *Id.* at 34.

b.  Analysis of Plaintiff's Erroneous Outcome Claims

Defendants argue that Plaintiff fails adequately to plead a Title IX erroneous outcome

claim, because he never alleges direct evidence of gender bias or facts supporting a concrete

motive for gender-based discrimination along with clear procedural irregularities. (*See* ECF 57,

Einstein Defs.' Mem. at 13.) Plaintiff responds that pressure from the #MeToo movement,

which was highlighted by a graduate student's presentation about Einstein's responses to

student complaints, provided the requisite motive to discriminate based on gender, and that

the failure to apply the 2022 Title IX Policy to the investigations of his behavior was clearly

procedurally irregular. (*See* ECF 60, Pl.'s Einstein Opp. at 20-21.) Defendants counter that the

#MeToo movement does not support a minimal plausible inference of gender bias and that the

identified procedural irregularities were not sufficiently irregular. (*See* ECF 64, Einstein Defs.'

Reply at 6.) For the reasons set forth below, I conclude that Plaintiff's allegations about the

Chair Investigation, in combination with a concrete motive to discriminate, support an

erroneous outcome claim.

*i.  Concrete Motive for Gender Discrimination*

Plaintiff does not appear to identify any direct evidence of gender bias, relying instead

on circumstantial evidence. Plaintiff makes several allegations to support his accusation that

Einstein had a concrete motive for gender discrimination. Most fall short. For example, Plaintiff

alleges that Burns and Ramirez made statements reflecting gender bias when Plaintiff spoke to

them about the Letter of Concern; they "told [him] that, given the climate in the wake of the

#MeToo movement, Einstein needed to appear responsive to the anonymous allegations," and

therefore they arranged for the Chair Investigation. (ECF 48, FAC ¶¶ 122-33, 448(d).) But

23

Einstein was required to respond to allegations of misconduct under Title IX regulations, *see* 34

C.F.R. § 106.45, and pursuant to its own policies (*see* ECF 58, Tenzer Decl. Ex. G, 2018 Title IX

Policy). Plaintiff acknowledges that promptly responding to allegations of student mistreatment

is required by Einstein's accrediting body (*see* ECF 48, FAC ¶¶ 394-96), and he himself

"suggested to Ms. Ramirez and Dean Burns that they look into the Letter of Concern." (*Id.*

¶ 123.) In light of the independent obligation to respond to the allegations, any statements that

Einstein needed to appear responsive because of the #MeToo movement do not, without more,

"show the influence of gender" on the investigations into Plaintiff's conduct. *Prasad v. Cornell*

*Univ.*, No. 15-CV-322 (TJM), 2016 WL 3212079, at *14 (N.D.N.Y. Feb. 24, 2016) (holding that a

plaintiff must allege particular facts, such as patterns of decision making or statements by

university officials, to sufficiently "show the influence of gender" on the outcome of a

disciplinary proceeding).[5]

---

[5]    Plaintiff's reliance on national pressure from a 2011 Dear Colleague Letter by the Department of Education also does not, without more, support his gender bias allegations: the letter had been withdrawn well before Plaintiff's disciplinary proceedings (*see* ECF 48, FAC ¶¶ 448(e), 374-85). Courts have rejected plaintiffs' efforts to use the 2011 Dear Colleague Letter to establish claims of gender bias. *See, e.g., Doe v. New York Univ.*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020) (holding that the plaintiff could not rely on 2011 Dear Colleague Letter to plead discriminatory motive "because at the time of the complaint, investigations and hearings, the letter had already been withdrawn"); *Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019). *But see Doe v. Columbia Univ.*, 551 F. Supp. 3d 433, 470 (S.D.N.Y. 2021) (finding a plausible inference of sex discrimination where a plaintiff alleged that the school was sensitive to pressure from the #MeToo movement and "was thus motivated to favor female complainants over male respondents").

That the 2018 Title IX Policy used the gender-neutral word "victim" rather than "complainant" (ECF 48, FAC ¶ 85) similarly fails support a claim of gender bias. *See, e.g., Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 661 n.6 (D. Conn. 2019) (explaining that the use of the word "victim" rather than "complainant . . . is gender neutral on its face" and fails to "support any inference of gender bias"); *Doe v. Colgate Univ.*, No. 15-CV-1069 (LEK) (DEP), 2017 WL

Plaintiff has however alleged something more – that a female graduate student made a

presentation to the Neuroscience Department about Einstein students' perceptions of the

administration's responses to allegations of mistreatment of female students (*see* ECF 48, FAC

¶¶ 392, 448(e)). Plaintiff argues that the presentation (of which faculty members and

administrators were aware) provided a motive to favor female complainants over male

respondents – a contention that the Einstein Defendants do not address, other than to say at

oral argument that it is implausible that Plaintiff would have been found not responsible in one

of the Title IX Investigations if Einstein had been biased against him based on gender. (*See* ECF

75, Tr. at 11:6-13.) That kind of post hoc defense has not fared well. *See, e.g., Menaker*, 935

F.3d at 36-37 ("An employer cannot . . . deny an inference of procedural irregularity through

post-hoc rationalization.").

"[W]hen combined with clear procedural irregularities in a university's response to

allegations of sexual misconduct, even minimal evidence of pressure on the university to act

---

4990629, at *15 (N.D.N.Y. Oct. 31, 2017) (same), *aff'd,* 760 F. App'x 22 (2d Cir. 2019); *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 478-79 (S.D.N.Y. 2015) (same).

Plaintiff also does not help his case by suggesting that because the employees of Grand River Solutions, the outside investigator in his Title IX proceedings, were primarily women, they were predisposed to be biased against him (*see* ECF 48, FAC ¶ 255). The gender of an investigator does not support a plausible inference of bias against another gender. *See Doe v. Colgate Univ.*, 760 F. App'x at 31-32 (rejecting the argument that a female former police detective was a biased investigator). That the Managing Director of Grand River Solutions was previously the Title IX coordinator at an institution whose investigation in a case wholly unrelated to this one was "set aside" by a California court (*see* ECF 48, FAC ¶ 256) similarly does not show that gender bias influenced Plaintiff's case. *See Doe v. Colgate Univ.*, 2017 WL 4990629, at *11 (holding that plaintiff's assertion that an individual's background in a separate matter precluded their ability "to work as an unbiased Title IX investigator" lacked a factual basis and was therefore inadmissible).

based on invidious stereotypes will permit a plausible inference of sex discrimination."

*Menaker*, 935 F.3d at 33. Plaintiff's allegation that the 2021 student presentation to the

Neuroscience Department resurrected the specter of the #MeToo movement at Einstein is

sufficient to support an erroneous outcome claim if Plaintiff also adequately alleges clear

procedural irregularities.

Plaintiff also suggests that Dr. Tomaselli demonstrated gender bias against him through

Tomaselli's handling of the Chair Investigation, his decision to ban Plaintiff from campus after

Plaintiff contacted potential witnesses in connection with the Title IX Investigations, and his

disclosure of the Title IX Investigations to the Neuroscience Department. (*See* ECF 48, FAC

¶¶ 199, 219.) But Plaintiff's own allegation that he had previously criticized Tomaselli's

performance as dean (*see id.* ¶¶ 82-83) undermines the plausibility of any conclusion that the

basis for any bias against him on Tomaselli's part was Plaintiff's gender rather than his

statements that Tomaselli was an ineffective dean. *See Nungesser v. Columbia Univ.*, 169 F.

Supp. 3d 353, 366 (S.D.N.Y. 2016) ("Personal animus is not gender-based harassment, and

cannot form the basis for a Title IX violation.")[6]

### ii.   Clear Procedural Irregularities

Plaintiff identifies three broad categories of irregularities in his disciplinary proceedings:

(1) applying the wrong policy, which led, among other issues, to using incorrect definitions of

proscribed behavior and an insufficiently stringent evidentiary standard; (2) imposing unduly

---

[6]     Plaintiff has not alleged that Tomaselli's resentment of Plaintiff's criticisms of
Tomaselli's performance as dean led Tomaselli to weaponize the Title IX investigatory process
against Plaintiff, and so I do not address whether such a theory would be sufficient to plead
gender-based discriminatory animus on Tomaselli's part.

harsh and/or unauthorized sanctions, including sanctions put in place during the pendency of the investigations before any determination of responsibility and sanctions based on predicate conduct that should not have been considered; and (3) treating Plaintiff's and the Complainants' witnesses differently. (*See* ECF 48, FAC ¶ 447.)

A.  Failure To Apply a Title IX Policy to the Chair Investigation

Plaintiff alleges that "the 2022 Title IX policy unambiguously applied to govern the conduct of all Einstein faculty, without regard to the date of the alleged occurrence" and therefore concludes that Einstein's failure to apply its 2022 Title IX Policy to the Chair Investigation in 2022 constituted procedural irregularity. (*Id.* ¶ 186.) The Einstein Defendants respond that the Chair Investigation addressed allegations of improper behavior by Plaintiff unrelated to sexual harassment or any other type of gender discrimination and therefore fell outside the scope of Einstein's applicable Title IX Policy. (*See* ECF 57, Einstein Defs.' Mem. at 27-28.) However, while the Chair Investigation primarily involved charges falling outside the scope of Title IX, such as allegations of violations of the school alcohol policy and abusive behavior to students and colleagues regardless of gender (or membership in any other protected class), the investigation also included some allegations of Title IX violations, such as unwanted touching of female junior faculty. (*See* ECF 48, FAC at 164.)

At this stage of the litigation, drawing all inferences in Plaintiff's favor as I must, *see Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 489 (S.D.N.Y. 2023), I conclude that Plaintiff has adequately alleged that the Chair Investigation implicated conduct governed by Title IX, which means that the investigation should have been conducted under the procedures required by the applicable Title IX Policy. However, as discussed below, I conclude that the applicable policy

was the 2018 Title IX Policy, as the Einstein Defendants argue, and not the 2022 Title IX Policy, as Plaintiff contends. *See infra* Part III.B.1.b.ii.B. Under the 2018 Title IX Policy, Plaintiff should have been afforded procedural protections that he was not – at a minimum, he should have been entitled to receive and respond to a written copy of the allegations against him and present relevant evidence and witnesses. (*See* ECF 58, Tenzer Decl. Ex. G, 2018 Title IX Policy at 24.)

As a result of the failure to apply Title IX procedures to the Chair Investigation, the finding that Plaintiff was responsible for "[r]epeated inappropriate and unwanted physical touching, including pulling female students' ponytails, stomach touching, shoulder touching, and pushing" (ECF 48, FAC ¶ 164) and the final decision to remove him as Chair reflected procedural irregularities, in that the school "fail[ed] to comply with its internal Title IX policies." *Roe v. St. John's Univ.*, 91 F.4th 643, 654 (2d Cir. 2024) (concluding that a school's failure to comply with its own policies constituted procedural irregularities).[7]

Moreover, while Plaintiff does not allege who made the decision not to conduct the Chair Investigation pursuant to the applicable Title IX Policy, his allegations support a conclusion that Ramirez and Dr. Burns were part of that decision making process: he alleges that he told them about the Letter of Concern and asked them to look into it, and that they responded that the school would need to appear responsive. (ECF 48, FAC ¶¶ 123, 126.) Drawing all inferences in Plaintiff's favor, as I must at this stage, *see Doe v. Yeshiva Univ.*, 703 F.

---

[7]    The interim sanction of demoting Plaintiff from his position as Chair during the pendency of the investigation was permissible under the 2018 Title IX Policy. (*See* ECF 58, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy at 10.)

Supp. 3d at 489, I conclude that the failure to carry out the Chair Investigation under a Title IX

Policy, combined with adequately pleaded discriminatory motive – the graduate student

presentation in 2021 that reanimated concerns first raised during the #MeToo movement –

supports an erroneous outcome claim. *See, e.g., Doe v. Columbia Univ.*, 551 F. Supp. 3d 433,

470 (S.D.N.Y. 2021) (holding that, when combined with clear procedural irregularities, evidence

of public pressure on a university to disfavor male respondents was enough to sustain an

erroneous outcome claim).

B.  Application of the 2018 Title IX Policy
To Plaintiff's Title IX Investigations

Einstein and Montefiore were not obligated to apply the 2022 Title IX Policy to the Title

IX Investigations because that policy was in force at the time of the investigations, as opposed

to the 2018 Title IX Policy, which was in place at the time of the alleged misconduct. Plaintiff's

premise that the 2022 Title IX Policy was applicable to investigations that began in 2022 is not,

as he suggests, compelled by the language of the policy, which merely states: "This Policy

governs the conduct of all College of Medicine faculty . . . and covers their treatment of each

other and of students, as well as others with whom they come into contact at or near the

College of Medicine and/or at College of Medicine-sponsored and affiliated activities and

events." (ECF 58, Tenzer Decl. Ex. I, 2022 Title IX Policy at 3.) Nor is the Einstein Defendants'

position – that the 2022 Title IX Policy could not be applied to behavior dating back to 2018 and

2019 – required by the policy language. The 2022 Title IX Policy is silent on whether its

application depends on the date of the alleged conduct. As Plaintiff points out, that policy never

states that it applies only to conduct occurring while that policy was in place (*see* ECF 60, Pl.'s

29

Einstein Opp. at 19); but as the Einstein Defendants note, it never says that it applies regardless of the date of the alleged conduct (*see* ECF 64, Einstein Defs.' Reply at 4-5).

The Einstein Defendants argue that Plaintiff's proffered interpretation – that the 2022 Policy covers pre-policy conduct that is investigated while that policy is in place – is contrary to guidance from the Department of Education. (*See* ECF 57, Einstein Defs.' Mem. at 17-18.) They point out that the procedural changes in the 2022 Title IX Policy derived from changes in the Title IX regulations in 2020 (*see id.*), which the Department of Education indicated were not retroactive: "[T]he 2020 amendments do not apply to alleged sexual harassment occurring before August 14, 2020. This is true even if the school's response was on or after this date." 2021 Q&A, *supra* note 3*,* at 10; *see also* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,061 (May 19, 2020) ("[T]he Department will not enforce these final regulations retroactively."); *Doe v. Trs. of Columbia Univ.*, No. 21-CV-5839 (ER), 2022 WL 3666997, at *11 (S.D.N.Y. Aug. 25, 2022) (holding that the 2020 Title IX regulations did not apply retroactively, stating that "it is clear Columbia acted in compliance with Department of Education regulations when it applied its 2019 [Title IX] Policy to Doe's complaint, which arose from a sexual assault she alleges took place on January 8, 2019"). Plaintiff provides no substantive response to this argument.

Accordingly, Plaintiff has not pleaded facts supporting a conclusion that the use of the 2018 Title IX Policy to govern the Title IX Investigations demonstrated that the school "fail[ed] to comply with its internal Title IX policies." *Roe v. St. John's Univ.*, 91 F.4th at 654. The use of the 2018 Title IX Policy in connection with Plaintiff's Title IX Investigations, even combined with adequately pleaded discriminatory motive, does not support an erroneous outcome claim due

to a lack of causal connection between the bias and the outcome. *See, e.g., id.* at 653 (holding

that a plaintiff must allege the erroneous outcome was reached due to gender bias); *Yusuf*, 35

F.3d at 715 (explaining that in an erroneous outcome claim, there must be "a causal connection

between the flawed outcome and gender bias").

<blockquote>C.   The Sanctions Imposed in the Title IX Investigations</blockquote>

Plaintiff asserts that both the interim sanctions imposed after he reached out to

potential witnesses in connection with the Title IX Investigations – a suspension that included

"immediate removal" from Einstein's campus (ECF 48, FAC ¶¶ 190-91) – and the sanctions

imposed after he was found responsible in one of the two investigations – the relocation of his

laboratory, three-year bar from serving in a faculty governance role, and three-year suspension

from working with students (*see id.* ¶ 306) – were unduly harsh and therefore demonstrate

clear procedural irregularity. (*See* ECF 60, Pl.'s Einstein Opp. at 17-18.)

Plaintiff's allegation that neither the 2022 Title IX Policy nor the 2018 Title IX Policy

permitted Plaintiff to be disciplined prior to an adjudication and proof of responsibility (*see* ECF

48, FAC ¶ 149) is incorrect. Both policies permit interim sanctions. (*See* ECF 58 Tenzer Decl. Ex.

G, Einstein 2018 Title IX Policy at 10 (permitting Einstein to "take reasonable and prudent

interim measures," including "bans from areas of campus"); *id*. Ex. I, 2022 Title IX Policy at 16-

17 (same).) Therefore, Plaintiff's suspension and campus ban were not procedurally irregular.

As to the sanctions after Plaintiff was found responsible for sexual harassment in one of

the Title IX Investigations – including the relocation of his laboratory, bar from leadership roles,

and suspension from work with students  – both the 2018 and the 2022 Title IX Policies state

that the school could impose, among other sanctions, "a warning, disciplinary probation,

restriction from employment by the College, . . . loss of privileges, no contact, [and] exclusion

from areas of the campus and facilities . . . ." (ECF 58 Tenzer Decl. Ex. G, Einstein 2018 Title IX

Policy at 35; *id*. Ex. I, 2022 Title IX Policy at 25.) Accordingly, the sanctions imposed were not

precluded by any Title IX Policy.

Plaintiff next relies on a regulation that requires recipients of federal funds to "[t]reat

complainants and respondents equitably . . . by following a grievance process that complies

with this section before the imposition of any disciplinary sanctions or other actions that are

not supportive measures . . . against a respondent" to conclude that enhancing his sanctions

based on the Chair Investigation was improper. (ECF 48, FAC ¶¶ 151, 302 (citing 34 C.F.R.

§ 106.45(b)(1)(i) (2020).) This argument fares no better.

The Einstein Defendants argue that the cited regulation does not, as Plaintiff suggests,

mean that prior misconduct that was not adjudicated consistent with the 2020 Title IX

regulations must be ignored when imposing sanctions, because such an interpretation would

prevent schools from considering either pre-2020 misconduct or misconduct falling outside the

scope of Title IX when sanctioning repeat offenders. (*See* ECF 57, Einstein Defs.' Mem. at 18-

19.) The 2018 Title IX Policy permits consideration of past misconduct in setting sanctions (*see*

ECF 58, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy at 25-26, 45), and the regulation cited by

Plaintiff requires only that the grievance process must comport with the regulatory

requirements – not that all conduct on which a sanction is based must have been adjudicated

under the same process. As the Einstein Defendants contend, it would be irrational for a school

considering what sanctions to impose for a Title IX violation to be precluded from considering

either pre-2020 behavior or behavior falling outside the ambit of Title IX. The wrinkle here is

that the findings of the Chair Investigation included that Plaintiff was responsible for behavior falling within the scope of Title IX (such as unwanted touching) as well as for other conduct (such as being abusive toward students regardless of gender or any other protected characteristic). I have not located cases discussing the procedural requirements for this kind of hybrid investigation.

While there is no way to know to what extent the findings in the Chair Investigation were based on conduct falling within as opposed to outside the scope of Title IX, Plaintiff was found to have engaged in significant misconduct that was unrelated to gender (or any other protected class) discrimination: student mistreatment and name-calling, violations of Einstein's Drug and Alcohol Policy, intimidation and abuse of staff, and inappropriate behavior at Einstein events, believed to be due to intoxication. (*See* ECF 48, FAC ¶ 164.) Those findings did not require the process set out in any Einstein Title IX Policy. Accordingly, I am unpersuaded that Einstein's failure to apply the 2018 Title IX Policy to the Chair Investigation so tainted that investigation that it was improper for Einstein to have relied on that investigation's findings to enhance the sanctions imposed on Plaintiff following the Title IX Investigations. The enhanced sanctions therefore do not support Plaintiff's erroneous outcome claim.

### D.   Handling of Witnesses in the Title IX Investigations

Plaintiff alleges that in connection with the Title IX Investigations, it was procedurally irregular for him to have been required to provide the names of witnesses to the Title IX Coordinator or investigator, rather than being permitted to contact the witnesses himself. (*See id.* ¶¶ 262, 447(e)). He also alleges that the investigator in the Title IX Investigations improperly declined to interview all his witnesses. (*See id.* ¶ 447(e).)

A plaintiff pleads procedural irregularity with respect to witnesses when he alleges a defendant "accept[s] an unsupported accusatory version over Plaintiff's" and "decline[s] even to explore the testimony of Plaintiff's witnesses." *Doe v. Columbia*, 831 F.3d at 57. That Plaintiff was instructed to provide the names of witnesses to the Title IX Coordinator or investigator, rather than to contact the witnesses himself (*see* ECF 48, FAC ¶¶ 262, 447(e)), does not constitute a clear procedural irregularity. The approach comported with the 2018 Title IX Policy, which gave complainants and respondents the opportunity to provide the Title IX Coordinator with the "names of possible witnesses." (ECF 58, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy at 34.)

Plaintiff alleges that the investigator "was agreeable when Complainant 2 offered to reach out and speak with her 20 witnesses." (ECF 48, FAC ¶ 263.) But Plaintiff has not alleged that the 2018 Title IX Policy precluded the investigator from allowing Complainant 2 to make the initial outreach. To be sure, it would have been far better for the investigator to have contacted Plaintiff's witnesses and Complainant 2's witnesses in the same way. However, failure to do so does not in and of itself rise to the level of a clear procedural irregularity. *See Roe v. St. John's Univ.*, 91 F.4th at 654 (2d Cir. 2024) (explaining that "the allegation that a university conducted its disciplinary proceedings in a less-than-flawless manner does not automatically permit a factfinder to reasonably infer that a university has committed sex discrimination").

As to the allegation that the investigator failed to interview some of Plaintiff's witnesses, the only one whom Plaintiff specifically identifies is his wife; Plaintiff alleges the investigator "declined to fully interview" her (ECF 48, FAC ¶ 259) but does not allege how his

wife's interview was incomplete, what other potential witnesses the investigator neglected to contact (*see id.* ¶ 262), or what information his wife or any other potential witnesses would have provided.

Under Einstein's Title IX Policy, the investigator in a Title IX matter has discretion to decide what is relevant. (*See* ECF 58, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy.)[8] While a failure to interview multiple witnesses identified as having valuable evidence would constitute clear procedural irregularity, *see Vengalattore v. Cornell Univ.*, 36 F.4th 87, 107-08 (2d Cir. 2022), without even minimal allegations by Plaintiff about the witnesses he identified who were not contacted by the investigator, or about the evidence his wife would have provided if interviewed fully, Plaintiff has not plausibly alleged that Defendants "accepted an unsupported accusatory version over Plaintiff's," as was the case in *Doe v. Columbia*, 831 F.3d at 57.

***

Plaintiff has adequately alleged that the failure to apply the 2018 Title IX Policy to the Chair Investigation was clearly procedurally irregular but not that the Title IX Investigations were conducted in a clearly procedurally irregular way. The clear procedural irregularity of the Chair Investigation, combined with sufficiently alleged discriminatory motive, is adequate to plead a Title IX discrimination claim predicated on the failure to apply the 2018 Title IX Policy to the Chair Investigation.

---

[8]     The 2018 Title IX Policy states: "Depending on the nature of the allegations, the investigation may include interviews with the complainant and respondent, interviews of witnesses, collection of documentation (including email and other communications relevant to the complaint), a review of documents or any other steps deemed important by the investigator in order to thoroughly and fairly conduct the investigation." (ECF 58, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy at 11.)

2.    Plaintiff's Deliberate Indifference Claims

a.  Legal Standards

A plaintiff may state a deliberate indifference claim by alleging that the school's "response to sex discrimination [was] clearly unreasonable in light of known circumstances." *Schiebel,* 120 F.4th at 1094-95. Such is the case when the grievance process was so clearly irregular as to indicate that the process was a "sham." *Id.* at 1095. As relevant here, "[i]f a respondent [in a Title IX investigation] plausibly alleges that he was targeted by a discriminatory accusation, and the [school] imposed discipline or sanctions under circumstances that indicate deliberate indifference to the truth or falsity of the accusation, the respondent has stated a deliberate indifference claim under Title IX." *Id*. at 1097; *see also Menaker*, 935 F.3d at 34-35 (holding that the plaintiff had pleaded a Title IX violation by alleging that the defendant had "completely disregarded the process provided for in its written Harassment Policy," including by failing to "interview potential witnesses, provide [the plaintiff] the opportunity to submit a written response, and produce a written determination of reasonable cause," and that the defendant had terminated the plaintiff even though a top university administrator "knew that at least one of the accusations against [the plaintiff] was false").

A plaintiff generally may plead deliberate indifference in one of two ways. He may point to significant procedural irregularities, "such as the [school]'s failure to comply with its own grievance policies or with applicable Title IX regulations," *Schiebel*, 120 F.4th at 1095, or a grievance process that was so "objectively deficient" that it cannot be said to have aimed at uncovering the truth. *Roe v. St. John's Univ.*, 91 F.4th at 655; *see also Schiebel*, 120 F.4th at 1098 (concluding that the plaintiff had alleged clear procedural irregularities in that the school

"did not provide [the plaintiff] with even the rudiments of due process"). Alternatively, a plaintiff may plead that the decision was "inexplicable," *Roe v. St. John's Univ.*, 91 F.4th at 655, such as when the allegations raise "grave doubts as to the merits of the decision," *id.* at 656, or when the school "ignored [the plaintiff's] allegations that the accuser had lied" or knowingly "shut[ ] [its] eyes to [the] risk" that it was imposing sanctions based on a malicious and therefore discriminatory accusation*, Schiebel,* 120 F. 4th at 1097-98.

      b.   Analysis of Plaintiff's Deliberate Indifference Claims

Plaintiff argues even if he has not adequately alleged gender-based bias, his claim should proceed under a deliberate indifference theory, which requires him to allege that the school "was deliberately indifferent to the truth or falsity of the accusations of sexual misconduct made against him." (ECF 60, Pl.'s Einstein Opp. at 15 (citing *Schiebel*, 120 F.4th at 1096-97).) The Einstein Defendants counter that the procedural irregularities identified by Plaintiff fall far short of the egregiously deficient procedures that could support a deliberate indifference claim (*see* ECF 64, Einstein Defs.' Reply at 3-4) and that Plaintiff has not adequately alleged that the finding of responsibility in one of the Title IX Investigations was "inexplicable." (*Id.* at 5 (citing *Schiebel*, 120 F.4th at 1097).)

For the reasons set forth below, Plaintiff has not adequately alleged a deliberate indifference claim under Title IX based on the Title IX Investigations or the Retaliation Investigation into Tomaselli's conduct.[9] Accordingly, if Your Honor disagrees with my conclusion

---

[9]     I do not address whether the Chair Investigation would support a Title IX discrimination claim under a deliberate indifference theory because I conclude that the Chair Investigation supports a Title IX discrimination claim under an erroneous outcome theory.

that Plaintiff has adequately alleged an erroneous outcome claim in connection with the Chair Investigation, Your Honor should grant the motion to dismiss Plaintiff's Title IX discrimination claims.

### i. Procedural Irregularities

Plaintiff has not described a Title IX grievance process that was a "sham," *Schiebel,* 120 F.4th at 1095, or one that was so "objectively deficient" that it cannot be said to have aimed at uncovering the truth, *Roe v. St. John's Univ.*, 91 F.4th at 655. The investigation underlying *Schiebel* was a sham primarily because the Title IX investigator (1) presumed the plaintiff's guilt, as indicated by her construing his description of the events as an admission; (2) provided the plaintiff with insufficient notice that downplayed the allegations against him; (3) failed to gather enough evidence to reach a determination about responsibility; and (4) and acted as both the investigator and the decisionmaker. *See Schiebel,* 120 F. 4th at 1100. By contrast, the Title IX Investigations described in the FAC were conducted using a reasonable if imperfect process.

Plaintiff alleges that the Title IX Investigations were procedurally irregular due to the application of the 2018 Title IX Policy. (*See* ECF 48, FAC ¶ 94.) But application of that version of the Title IX Policy was appropriate. *See supra* Part III.B.1.b.ii.B. And Plaintiff has not alleged that Einstein failed to comply with its 2018 Title IX Policy. (*See generally* ECF 48, FAC.)

Plaintiff was provided with prompt notice of the charges against him; Einstein did not downplay the seriousness of the allegations. (*See id.* ¶¶ 174-76.) In accordance with the 2018 Title IX Policy, Plaintiff received a formal adjudication process (*see id.* ¶ 87), conducted by a third-party investigator (*see id.* ¶ 255) who interviewed witnesses (albeit not all the witnesses

38

identified by Plaintiff) (*see id.* ¶¶ 210, 259-63), and who prepared and shared with Plaintiff a written preliminary investigative report (*see id.* ¶ 258).

Plaintiff suggests that the investigator was biased against him because she was female (*see id.* ¶ 255) and makes conclusory assertions that she was hostile towards him during the interview, without describing how she expressed the alleged hostility other than noting that she reminded him of the directive not to contact witnesses about the investigations. (*See id.* ¶¶ 257, 262.) While Plaintiff complains that his wife was not fully interviewed and that other witnesses he identified were not contacted, he does not share what information the investigator failed to elicit. (*See id.* ¶¶ 259, 280.) Unlike the allegations about an incomplete investigation in *Vengalattore*, 36 F.4th at 107-08, Plaintiff's allegations do not support a conclusion that the investigation was so incomplete as to be a sham.

The investigator recommended that Plaintiff be found responsible for sexual harassment of Complainant 2 based on a preponderance of the evidence standard. (S*ee id.* ¶ 89.) However, unlike in *Schiebel,* the investigator was not the ultimate decisionmaker; that responsibility fell to the Title IX Coordinator, who adopted the investigator's finding and then determined the sanctions. (*See id.* ¶¶ 251, 293.) That the 2022 Title IX Policy does not permit the Title IX Coordinator to be the decisionmaker does not mean that it was improper for the Title IX Coordinator to have that responsibility in Plaintiff's Title IX Investigations, which were carried out under the 2018 Title IX Policy.

Plaintiff complains that "[u]nder a fair application of even the old 2018 Title IX Policy's preponderance of the evidence standard, it should have been clear to an impartial decision-maker that Complainant 2 had failed to prove her second allegation." (*Id.* ¶ 286.) But

disagreement with the outcome of an investigation is insufficient to support a conclusion that

the process was a sham. *See Doe v. Vassar Coll.*, No. 19-CV-9601 (NSR), 2019 WL 6222918, at *8

(S.D.N.Y. Nov. 21, 2019) (erroneous outcome case); *see also Davis v. Monroe Cty. Bd. of Educ.*,

526 U.S. 629, 648 (1999) (deliberate indifference case).

The FAC similarly fails to support Plaintiff's position that the Retaliation Investigation

into Tomaselli's conduct was a sham. That investigation provided procedural protections even

though it was undoubtedly imperfect. Plaintiff alleges that Einstein declined to provide him

with relevant documents and failed to interview key witnesses, including himself, but he never

specifies what materials he believes were lacking or what the additional evidence would have

shown. (*See* ECF 48, FAC ¶ 343.) As with Plaintiff's allegations about the Title IX Investigations,

his allegation that the investigation into Tomaselli's behavior was not sufficiently thorough is

insufficient to support a conclusion that the investigation was a sham.

More concerning is Plaintiff's observation that the investigation of his complaint against

Tomaselli took nearly two years to complete. (*See id.* ¶ 333.) As Plaintiff points out, under the

2022 Title IX Policy, which Einstein used to conduct that investigation, Einstein was supposed to

complete the investigation within 60 days of his filing a complaint. (*See id.* ¶ 222.) "While

delayed investigation does not necessarily qualify as deliberate indifference, it can when that

delay is lengthy and unjustified." *Ware v. Univ. of Vermont & State Agric. Coll.*, 722 F. Supp. 3d

379, 426 (D. Vt. 2024).

To be sure, Defendants are correct that the 2022 Title IX Policy does not commit the

school to resolving complaints within 60 days under all circumstances, because the timeline

"may be extended for good cause." (ECF 58, Tenzer Decl. Ex. I, 2022 Title IX Policy at 24.) But it

is unclear why the investigation into Tomaselli's conduct – which involved the interview of two witnesses only (*see* ECF 48, FAC ¶ 341) – took as long as it did; the Chair Investigation, which involved interviews of dozens of witnesses, was resolved within about four months. (*See id.* ¶¶ 154, 164; ECF 58, Tenzer Decl. Ex. E, July 11, 2022 Chair Dismissal Letter.)

This nearly two-year delay was significant. However, I am not persuaded that it supports a conclusion that the investigation was designed to avoid uncovering the truth. Unlike in cases finding that the plaintiff had adequately pleaded a deliberate indifference claim based on delay, Plaintiff here has not alleged that the school failed to apprise him of his right to lodge a complaint or delayed opening an investigation into Tomaselli's conduct. *See Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 649 (1999) (holding that the plaintiff had adequately pleaded that the defendant's "response to reports of . . . misconduct was clearly unreasonable in light of the known circumstances" by alleging that that the defendant had "fail[ed] to respond in any way over a period of five months to complaints of . . . misconduct"); *Ware,* 722 F. Supp. 3d at 426 (holding that the plaintiff had stated a deliberate indifference claim based on delay where the school had misinformed the plaintiff of her options for making a complaint). The long delay in completing the investigation into Tomaselli's conduct was a clear flaw in the process, but not one that in my view supports a conclusion that the investigation was a sham or that Einstein and Montefiore were deliberately indifferent to the truth.

### ii.  *Inexplicable Decisions*

Plaintiff also argues that the decision finding him responsible in one of the Title IX Investigations was inexplicable, because the school "ignored [Plaintiff's] allegations that the

accuser had lied" or knowingly "shut[ ] [its] eyes to [the] risk" that it was imposing sanctions based on a malicious and therefore discriminatory accusation, *Schiebel*, 120 F.4th at 1097-98. (*See* ECF 60, Pl.'s Einstein Opp. at 16.) Specifically, he alleges that Ramirez and Dean Burns told him they knew the allegations leading to the Chair Investigation (some of which were reprised in the Title IX Investigations) were false (ECF 48, FAC ¶¶ 125, 206); and that the school and its investigator ignored statements by multiple witnesses that the two Complainants' allegations against Plaintiff were false (*see id.* ¶¶ 154-55).

There is a difference between ignoring a plaintiff's allegations that the accuser has lied and considering such allegations but concluding that the weight of the evidence indicates that the accuser was truthful. The former is impermissible, the latter is not. Plaintiff here has not alleged facts suggesting that the investigator ignored witness statements that the allegations against him were false. Instead, he says that the investigator's "findings of fact and credibility determinations . . . were incorrect and contrary to the weight of the evidence." (*Id.* ¶ 447(g).) But a district court generally will not "second-guess a university's credibility determinations and overall evaluation of the evidence" in a Title IX proceeding. *Doe v. Vassar Coll.*, 2019 WL 6222918, at *8 (erroneous outcome case); *see also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. at 648 (deliberate indifference case). There is no reason to depart from that practice here.

Accordingly, Plaintiff fails adequately to plead a deliberate indifference claim based on the finding that he was responsible for sexual harassment of Complainant 2. His factual allegations do not suggest Einstein was "deliberately indifferent to the truth or falsity of the accusations of sexual misconduct made against him." *Schiebel*, 120 F.4th at 1097.

C.    **Plaintiff's Title IX Retaliation Claim**

Plaintiff alleges that Einstein and Montefiore retaliated against him by, among other acts, banning him from campus, directing him not to discuss the Title IX Investigations with potential witnesses, and disclosing the Title IX Investigations to his colleagues after he sent out messages revealing the details of those investigations as part of his outreach to potential witnesses. (*See* ECF 48, FAC ¶¶ 188, 203, 219, 456-58.) The Einstein Defendants respond that Plaintiff has not pleaded a Title IX retaliation claim because he has not alleged and cannot allege that he engaged in protected activity. The Einstein Defendants go on to argue that even if Plaintiff has adequately pleaded a prima facie retaliation claim, that claim should nevertheless be dismissed, because the school has come forward with legitimate non-discriminatory reasons for its actions, including preventing Plaintiff from interfering with the Title IX Investigations. (*See* ECF 57, Einstein Defs.' Mem. at 22).

For the reasons set forth below, I respectfully recommend that Your Honor GRANT the Einstein Defendants' motion to dismiss the Title IX retaliation claims.

1.    Alleging a Prima Facie Case of Retaliation

a.    Legal Standards

Title IX, unlike some other civil rights statutes, does not contain a private right of action, but the Supreme Court has held that there is a "private right of action implied by Title IX," which "encompasses claims of retaliation" when a college or university "retaliates against an individual because he has complained about sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005). The Supreme Court has declined to expand claims of Title IX retaliation beyond the statutory text based on regulations. *See id.* at 178 & n.2 ("[P]laintiffs may

not assert claims under Title IX for conduct not prohibited by that statute."); *see also Burgess v. Harris Beach PLLC*, 346 F. App'x 658, 661 (2d Cir. 2009) ("[T]here is no private right of action to enforce [a] regulation to the extent that it extends Title IX protections beyond the plain meaning of the statute.").

"Title VII and Title IX are governed by the same substantive standards for reviewing claims of both harassment and retaliation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013). To state a claim for Title IX retaliation, a plaintiff must plead a prima facie case by alleging: "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).

### i.  Protected Activity

Protected activity in discrimination cases typically includes "reporting discrimination, testifying in a proceeding, or otherwise participating in an investigation about discrimination." *Castro v. Yale Univ*., 518 F. Supp. 3d 593, 611 (D. Conn. 2021). There is a dearth of caselaw addressing whether mounting a defense in a sexual harassment investigation is protected activity that would support a prima facie case of retaliation. There does not appear to be any relevant caselaw from the Second Circuit or from this District. The few cases I have seen suggest that such participation would not be sufficient unless the plaintiff specifically stated that he was complaining of sex discrimination. *See, e.g., Doe v. Bd. of Trs. of N. Ill. Univ.*, No. 17-CV-7991, 2024 WL 4346627, at *9 (N.D. Ill. Sept. 30, 2024) ("Plaintiff's retaliation claim fail[ed] because he did not engage in a protected activity by merely defending himself against Roe's

sexual assault allegation."); *Du Bois v. Bd. of Regents of Univ. of Minnesota*, 987 F.3d 1199,

1205 (8th Cir. 2021) (holding that "[n]o part of Title IX designates participation in a sexual

harassment investigation on the side of the accused as protected activity."); *Doe v. Belmont

Univ.*, 367 F. Supp. 3d 732, 756, 760 (M.D. Tenn. 2019) (concluding a plaintiff who was solely

"defending himself against [a student's] sexual misconduct charges during . . . [a] Title IX

investigation" rather than "actively complaining" of discrimination did not engage in protected

activity), *case dismissed*, No. 19-5369, 2019 WL 5079251 (6th Cir. Sept. 18, 2019).

 I am not convinced that this proposition is correct as a general matter. It is true for an

*accuser* to adequately plead that she engaged in protected activity, she must allege that she

made clear that she was complaining about sex discrimination rather than unspecified

unfairness. *Compare Castro*, 518 F. Supp. 3d at 611 (holding that a plaintiff who had filed

complaints about her supervisor's sexual harassment had adequately alleged protected activity

under both Title VII and Title IX) *with Johnson v. City Univ. of New York*, 48 F. Supp. 3d 572, 577

(S.D.N.Y. 2014) (concluding that complaints about bullying and harassment were insufficient to

place an employer on notice that the plaintiff "intended to complaint about activity prohibited"

by statute) *and Doe v. State Univ. of New York Purchase Coll.*, No. 21-CV-8417 (KMK), 2024 WL

4266545, at *13-14 (S.D.N.Y. Sept. 23, 2024) (finding that communications containing oblique

complaints of discriminatory conduct were insufficient to put the defendant on notice of Title IX

protected activity). But a *respondent* is differently situated by virtue of having been named in a

proceeding involving allegations of sex discrimination. In some cases, efforts by a respondent to

defend himself should perhaps be viewed as protected activity, when it is clear from the

context that his defense encompasses a complaint about sex discrimination.

### ii.  Adverse Action

"[A]ny action that could well dissuade a reasonable worker from making or supporting a charge of discrimination" may qualify as an adverse action. *Castro*, 518 F. Supp. 3d at 611 (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)).

### iii.  Causal Connection

There must also be a causal connection between the protected activity and the adverse action taken by the defendant. *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d at 495. "Close temporal proximity" between the protected activity and the adverse action "may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) (Title VII case).

### b.  Analysis

The Einstein Defendants argue that "claims of Title IX retaliation are circumscribed by controlling interpretations of the scope of the private right of action under Title IX" (ECF 57, Einstein Defs.' Mem. at 22), which is based on the statute itself. *See Jackson*, 544 U.S. at 178. Put another way, their argument is that exercising a right created by regulation does not lead to a protected interest for the purposes of a Title IX retaliation claim. Plaintiff does not dispute that his alleged protected activity – reaching out to potential witnesses – was grounded in regulations and the 2022 Title IX Policy. (*See* ECF 60, Pl.'s Einstein Opp. at 22 (citing 34 CFR §§ 106.45, 106.71).)

Courts in the Second Circuit have held that protected activity may include "participating in an investigation about discrimination." *E.g., Castro*, 518 F. Supp. 3d at 611; *State Univ. of New York Purchase Coll.*, 2024 WL 4266545, at *12. However, such "participation and

46

opposition" rights are generally derived from a statute. *See, e.g.*, 42 U.S.C. § 2000e-3 (making it

unlawful for an employer to retaliate against any employee who "made a charge, testified,

assisted, or participated in any manner in any investigation, proceeding or hearing under [Title

VII]"); 42 U.S.C. §§ 12203(a)-(b) (same as to disability discrimination under Titles I, II, and III of

the ADA). Title IX does not contain a comparable provision. Given the guidance in *Jackson,* that

protected activity under Title IX is limited to conduct described in the statute, 544 U.S. at 178,

Plaintiff's witness outreach based on regulations does not qualify as protected activity.[10]

Moreover, even to the extent that witness outreach could count as protected activity

under Title IX, Plaintiff's witness outreach would not qualify. As the Einstein Defendants note,

Plaintiff made no claim of sex discrimination when defending himself. (*See* ECF 57, Einstein

Defs.' Mem. at 21.) While Plaintiff's response – that "[p]articipation by any individual in any

manner in a Title IX investigation or proceeding constitutes protected activity under Title IX"

(ECF 48, FAC ¶ 458) – is inconsistent with the Supreme Court's instruction in *Jackson*, it also

cannot be that Plaintiff would need to say magic words when performing his outreach to

potential witnesses – I am being accused of sex discrimination for reasons that discriminate

against me based on my sex – to adequately plead that he engaged in protected activity. The

enormously detailed FAC, however, contains no allegation that Plaintiff, in reaching out to

potential witnesses, was suggesting that he was facing the Title IX Investigations due to

discrimination based on his sex. To the extent that the FAC contains any information on

---

[10]    Nor can a school's internal policies serve as a basis for a Title IX retaliation claim. *See Nungesser*, 244 F. Supp. 3d at 363 n.11 (rejecting a Title IX retaliation claim based on the school's policy against intimate partner violence because school "policies do not define the scope of actionable conduct under Title IX").

Plaintiff's view of why he was being targeted, it implies that Plaintiff told others he was facing

complaints because certain colleagues held "politically motivated" grudges against him – which

has nothing to do with his sex. (*See id.* ¶¶ 158-62 (stating that, after the Chair Investigation

began in or around March 2022, "faculty members informed the investigator that a handful of

senior male faculty members had instigated false, politically motivated allegations against

Plaintiff").) In the absence of any allegations supporting a plausible inference that Plaintiff had

conveyed a complaint of sex discrimination, Plaintiff has not adequately pleaded that he

engaged in protected activity. *See State Univ. of New York Purchase Coll.*, 2024 WL 4266545, at

*13-14 (holding that oblique complaints of discriminatory conduct were not sufficient to put

the defendant-institution on notice of protected activity).

 If Your Honor disagrees with the conclusion that Plaintiff has failed adequately to allege

protected activity, there can be no dispute that Plaintiff has pleaded the other elements of a

prima facie retaliation case. Defendants were aware of Plaintiff's allegedly protected activity –

Dr. Tomaselli expressly stated that Plaintiff's outreach to potential witnesses was the reason for

interim sanctions imposed on Plaintiff, which included barring him from all campus buildings

and deactivating Plaintiff's school email accounts and linked accounts. (*See* ECF 48, FAC ¶¶ 190-

92.) Those sanctions "could well dissuade a reasonable worker from making or supporting a

charge of discrimination." *McKinney v. New York*, No. 19-CV-3920 (NSR), 2022 WL 602970, at *6

(S.D.N.Y. Mar. 1, 2022) (citing *Vega.*, 801 F.3d at 90). Tomaselli himself linked the witness

outreach to the disciplinary measures, but if further support were needed to demonstrate

causation, Plaintiff was informed of his removal from campus on July 13, 2022, just one day

after he reached out to witnesses (*see* ECF 48, FAC ¶¶ 188-90): the close temporal proximity of

the events permits an inference that the witness outreach was the cause of the disciplinary

actions. *See, e.g.*, *Zhornitsky v. Yale Sch. of Med.*, No. 24-CV-0018 (KAD), 2024 WL 4880695, at

*10 (D. Conn. Nov. 25, 2024) ("[T]emporal proximity between the protected activity and

adverse action of less than one day is close enough in time to permit an inference of

causation.").

      2.    <u>Legitimate Non-Discriminatory Reasons for Defendants' Actions</u>

      a.  Legal Standards

Once a plaintiff pleads a prima facie case of retaliation, "the burden shifts to the

defendant to articulate a legitimate [non-retaliatory] reason for its actions." *Papelino*, 633 F.3d

at 92 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "[A]n entity may not

be held liable for retaliation if it had a legitimate non-retaliatory reason for taking the action

alleged to be retaliatory." *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 959 (N.D. Ill. 2017),

*aff'd*, 933 F.3d 849 (7th Cir. 2019). However, the question whether a defendant had a

legitimate non-discriminatory reason for its actions is an issue that "is not properly decided on

a motion to dismiss for failure to state a claim." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230-31

(2d Cir. 2014) ("Whether there existed non-pretextual, non-discriminatory explanations for the

defendants' employment decisions – a question as to which the defendants bear the burden of

production – is not properly decided on a motion to dismiss for failure to state a claim.").

      b.  Analysis

The Einstein Defendants assert that Tomaselli directed Plaintiff not to discuss his Title IX

investigations with other faculty members, some of whom may have been potential witnesses,

to prevent him from influencing their testimony. (*See* ECF 57, Einstein Defs.' Mem. at 22-23;

ECF 48, FAC ¶ 253.) An effort to protect the integrity of the Title IX Investigations could provide a legitimate non-retaliatory reason for that directive. *See Carton v. Reno*, 310 F.3d 108, 113 (2d Cir. 2002) (holding in the context of a Privacy Act claim that "imped[ing] the investigation by intimidating the complaining witnesses" is a legitimate concern "both as a matter of investigative technique" and to promote "a fair and complete investigation"). However, this argument is not properly considered on a motion to dismiss. *See Brown,* 756 F. 3d at 230-31.[11]

**D.    Plaintiff's State and Local Law Claims**

If Your Honor agrees that Plaintiff has stated a Title IX discrimination claim based on the Chair Investigation (or any Title IX claim), it is necessary to consider the substance of Defendants' motions to dismiss Plaintiff's state and local law claims. For the reasons set forth below, I respectfully recommend that Your Honor GRANT IN PART and DENY IN PART the pending motions to dismiss Plaintiff's state law claims, as specified below.

If Your Honor disagrees that Plaintiff has stated a Title IX claim, I respectfully recommend that the Court decline to exercise supplemental jurisdiction over Plaintiff's state and local law claims.

---

[11]    The stated non-retaliatory reason for Tomaselli's direction that Plaintiff must not discuss the Title IX Investigations with potential witnesses would also be insufficient on the merits to support dismissal, because the reason does not explain all Einstein's alleged retaliatory behavior. Einstein never says how banning Plaintiff from campus, precluding his use of his Einstein email account, and emailing the entire Neuroscience Department to say that he was still under investigation after the conclusion of the Chair Investigation (*see* ECF 48, FAC ¶¶ 219, 222) were calculated to protect the integrity of the Title IX Investigations.

1.    <u>Substantive Analysis of Plaintiff's State Law Claims</u>

In the event that Your Honor agrees with my recommendation to deny in part the

Einstein Defendants' motion to dismiss Plaintiff's Title IX claims, I analyze the adequacy of

Plaintiff's pleadings of his state and local law causes of action.

a.    Plaintiff's Claims Under the NYSHRL and NYCHRL

Plaintiff alleges that Einstein and Montefiore violated the NYSHRL and NYCHRL as a

result of the same conduct that he alleges violated Title IX: discriminating against him by

applying the 2018 Title IX Policy to the Chair Investigation and the Title IX Investigations (*see*

ECF 48, FAC ¶¶ 547, 559); and retaliating against him by sanctioning him after his outreach to

potential witnesses at the beginning of the Title IX Investigations (*see id.* ¶ 560).

The FAC asserts NYSHRL and NYCHRL claims against Dr. Tomaselli based on the same

allegations, but following Tomaselli's motion to dismiss, Plaintiff recast his NYSHRL and NYCHRL

claims against Tomaselli as aiding and abetting claims – presumably because the NYSHRL does

not provide for individual liability other than for aiding and abetting, *see* N.Y. Exec. L. § 296(1);

*id.* § 296(4); *Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 329 (S.D.N.Y. 2024).[12] Plaintiff

therefore has abandoned his direct NYSHRL and NYCHRL claims against Tomaselli and is

proceeding against him under those statutes only on an aiding and abetting theory. *See Adams*

*v. New York State Educ. Dep't*, 752 F. Supp. 2d 420, 452 n.32 (S.D.N.Y. 2010) (citing cases), *aff'd*

---

[12]    The NYCHRL, however, permits individual liability against co-workers provided that they have supervisory authority. *See Russell v. New York Univ.*, 42 N.Y.3d 377, 388 (2024) (stating that the NYCHRL permits coworker liability only if the co-worker has a "role in administering the compensation, terms, conditions, or privileges of plaintiff's employment").

*sub nom. Ebewo v. Fairman*, 460 F. App'x 67 (2d Cir. 2012). It is unclear that Plaintiff is permitted to advance a new theory of liability for the first time in his opposition to the motion to dismiss, but I nevertheless address the merits of his aiding and abetting claims.[13]

The caselaw states that claims under the NYCHRL are subject to a more lenient standard and a more liberal construction than Title IX claims. *See, e.g., Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, No. 23-CV-1932 (JLR), 2024 WL 3849192, at *19 (S.D.N.Y. Aug. 16, 2024) (applying "the more lenient requirements of the NYCHRL"). Although "it is as of yet unclear whether" the 2019 amendment of the NYSHRL renders the analysis co-extensive with the well-established standards under the NYCHRL, "[c]ourts have nonetheless assumed for purposes of a Rule 12(b)(6) motion that the amended NYSHRL aligns with the NYCHRL." *Brazzano v. Thompson Hine LLP*, No. 24-CV-01420 (ALC) (KHP), 2025 WL 963114, at *11 (S.D.N.Y. Mar. 31, 2025); *see also Mitchell,* 2024 WL 3849192, at *21 (holding that the standard for pleading an NYSHRL claim is "closer to the standard of the NYCHRL" than to Title VII, which shares the same standards as Title IX). Thus, to the extent that Your Honor agrees that Plaintiff has adequately pleaded a claim against Einstein and Montefiore for discrimination under Title IX based on the Chair Investigation, it follows that he has also adequately pleaded claims against Einstein and Montefiore under the NYSHRL and NYCHRL based on the Chair Investigation. *See Doe v. Yeshiva Univ.*, 703 F. Supp. 3d at 506 (concluding that a plaintiff who states a Title IX claim also states a claim under the NYCHRL and NYSHRL). Accordingly, I respectfully recommend that Your Honor

---

[13]    A plaintiff generally "cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [the defendant's] motion to dismiss." *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 657 (S.D.N.Y. 2024); *see also Sutton v. Stony Brook Univ.*, No. 18-CV-7434 (JS) (ARL), 2020 WL 6532937, at *7 n.5 (E.D.N.Y. Nov. 5, 2020).

DENY IN PART the motion to dismiss the NYSHRL and NYCHRL claims against Einstein and Montefiore to the extent those claims arise out of the Chair Investigation.

But this is not the end of the analysis. Because the standard for pleading a Title IX claim differs from the standard for pleading claims under the NYSHRL and the NYCHRL, the Court must assess whether the allegations that do not state a claim under Title IX are sufficient to adequately plead claims under state and local law; specifically, the Court must consider whether (1) irregularities during the Title IX Investigations support claims under the NYSHRL and the NYCHRL against Einstein and Montefiore; and (2) Plaintiff has stated a claim under the NYSHRL and the NYCHRL against Einstein and Montefiore based on retaliation for his witness outreach at the beginning of the Title IX Investigations. And because Plaintiff did not sue Tomaselli under Title IX (nor could he), the Court must assess whether Plaintiff has adequately pleaded a claim against Tomaselli for aiding and abetting under the NYSHRL and NYCHRL.

> i.  *NYSHRL and NYCHRL Claims Against*
> *Einstein and Montefiore Based on the Title IX Investigations*

"NYSHRL and NYCHRL claims are both analyzed using the three-step burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085-CV, 2025 WL 704278, at *2 (2d Cir. Mar. 5, 2025) (citing *Furfero v. St. John's Univ.*, 94 A.D.3d 695, 696 (2d Dep't 2012) and *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 113-14 (1st Dep't 2012)). "The core inquiry under the NYCHRL is whether the plaintiff can show that h[is] employer treated h[im] less well, at least in part of a discriminatory reason." *Crowley v. Billboard Mag.*, 576 F. Supp. 3d 132, 142 (S.D.N.Y. 2021); *see also Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75-76 (2d Cir.

2015) (explaining that a NYCHRL plaintiff "must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions"); *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 43-46 (1st Dep't 2011) (noting that to determine whether a plaintiff has adequately pleaded a prima facie case under the NYCHRL, a court must ask, "Do the initial facts described by the plaintiff, if not otherwise explained, give rise to the *McDonnell Douglas* inference of discrimination?"). The same analysis applies to the NYSHRL. *See Brazzano*, 2025 WL 963114, at *10.

Procedural irregularities may be sufficient to establish that an employee was treated less well because of his protected characteristic. *See Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256 (GHW), 2021 WL 4434935, at *27 (S.D.N.Y. Sept. 23, 2021) (finding allegations of procedural irregularities sufficient to plead a NYSHRL claim); *Doe v. New York Univ.*, No. 20-CV-1343 (GHW), 2021 WL 1226384, at *25 (S.D.N.Y. Mar. 31, 2021) (holding that "allegations [of procedural irregularities] give rise to a minimal inference of discriminatory intent . . . sufficient to plead a discrimination claim under Title IX, and therefore also under the NYCHRL).

Plaintiff alleges claims under the NYSHRL and NYCHRL against Einstein and Montefiore arising out of the Title IX Investigations. As set forth above, however, Plaintiff has not alleged facts supporting an inference that the process he was afforded in the Title IX Investigations was irregular. *See supra* Part III.B.1.b.ii. He therefore has not pleaded that Einstein and Montefiore treated him less well than similarly situated employees, and so he fails adequately to allege a discrimination claim under the NYSHRL or the NYCHRL against Einstein and Montefiore based on the Title IX Investigations. Accordingly, I respectfully recommend that Your Honor GRANT IN

PART the motion to dismiss the NYSHRL and NYCHRL claims against Einstein and Montefiore to the extent those claims are based on the Title IX Investigations.

> ii.  *NYSHRL and NYCHRL Claims Against Tomaselli*
> *Arising Out of the Chair Investigation and the Title IX Investigations*

Plaintiff is pursuing NYSHRL and NYCHRL aiding and abetting claims against Tomaselli arising out of alleged discrimination in connection with both the Chair Investigation and the Title IX Investigations. As to the claims arising out of the Title IX Investigations, Plaintiff has failed adequately to plead NYSHRL and NYCHRL aiding and abetting claims against Tomaselli, because a predicate to an aiding and abetting claim is properly pleading "discrimination by a principal," *Nezaj*, 719 F. Supp. 3d at 333. I therefore turn to whether Plaintiff has adequately pleaded that Tomaselli aided and abetted Einstein and Montefiore's allegedly unlawful behavior under the NYSHRL and NYCHRL in connection with the Chair Investigation.

As to aiding and abetting, the NYSHRL makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this [article], or attempt to do so." *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d at 507 (quoting N.Y. Exec. Law § 296(6)). To state a claim for aiding and abetting under either the NYSHRL or the NYCHRL, a plaintiff must "plead that the defendant actually participated" in the employer's "unlawful conduct." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020). Thus, Plaintiff has stated a NYSHRL or NYCHRL aiding and abetting claim against Tomaselli in connection with the Chair Investigation if Plaintiff has plausibly alleged that Tomaselli "actually participated" in Einstein and Montefiore's unlawful conduct.

In connection with the Chair Investigation, Plaintiff alleges that Tomaselli "participated as the principal decision-maker"; removed Plaintiff as Chair while the investigation was pending based on the claims of "anonymous accusers" notwithstanding Plaintiff's denial and statements by Ramirez and Burns to Plaintiff that the charges were "nonsense"; disregarded statements by multiple faculty members and students who defended Plaintiff; and, after the conclusion of the investigation, sanctioned Plaintiff by permanently removing him from the Chair position. (ECF 59, Pl.'s Tomaselli Opp. at 30 (citing ECF 48, FAC 56 ¶¶ 125-36, 159, 207, 224-33).)

Tomaselli argues that Plaintiff's aiding and abetting claims fail because Plaintiff alleges that Tomaselli "resented and felt threatened by [Plaintiff's] persistent and outspoken criticism of [Tomaselli's] performance as a dean," and does not allege that Tomaselli's actions were motivated by discriminatory animus. (ECF 63, Tomaselli Reply at 15.) But Plaintiff is not required to allege that Tomaselli exhibited discriminatory animus; it is sufficient to allege that Tomaselli "actually participate[d] in the conduct giving rise to [the predicate] discrimination claim," *Bueno v. Eurostars Hotel Co., S.L.*, No. 21-CV-535 (JGK), 2022 WL 95026, at *9 (S.D.N.Y. Jan. 10, 2022), or that he "failed to take adequate actions to correct the discrimination." *Hicks v. IBM*, 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999).

Plaintiff must, however, allege that Tomaselli actually participated in Einstein and Montefiore's unlawful conduct in connection with the Chair Investigation, *see McHenry*, 510 F. Supp. 3d at 68, which was the failure to conduct the investigation under the governing Title IX Policy. While Plaintiff asserts that Tomaselli was the "principal decision-maker" (ECF 59, Pl.'s Tomaselli Opp. at 30), the facts alleged in the FAC do not support that position with respect to the Chair Investigation, other than in connection with the interim demotion during the

pendency of the investigation and the sanctions after the conclusion of the investigation.

Plaintiff has not made any concrete factual allegations suggesting that Tomaselli could have

prevented the Chair Investigation once the school was presented with the Letter of Concern; or

that Tomaselli had any input into or control over the decision not to conduct the Chair

Investigation under the 2018 Title IX Policy; or that Tomaselli influenced the third-party

investigator's conclusions.[14] Plaintiff thus has not adequately alleged that Tomaselli's

involvement in the Chair Investigation supports aiding and abetting claims. *See McHenry*, 510 F.

Supp. 3d at 77 (rejecting an aiding and abetting claim against an executive where the pleading

did not concretely allege any conduct by the executive "to guide investigations" carried out by

an outside firm, "or indeed any conduct . . . in connection with [the investigations], tending to

make these investigations shams"); *Doe v. Yeshiva Univ.,* 703 F. Supp. 3d at 509 (rejecting an

aiding and abetting claim in the absence of an allegation that the employee was coordinating

with the third-party investigator).

---

[14]    While Plaintiff alleges that Tomaselli ignored faculty members and students who defended Plaintiff (*see* ECF 48, FAC ¶¶ 154-56), Plaintiff does not explain why Tomaselli should have had any role after the outside investigator was retained in deciding whether the accusations in the Letter of Concern were well-founded. Plaintiff acknowledges that the outside investigator was told by certain faculty members that the allegations of misconduct were false and had been engineered by "a handful of senior male faculty members" because of Department politics. (*Id.* ¶ 159.) Plaintiff alleges that one of his former students, Dr. Jane Roe, approached Jordan and Ramirez, not Tomaselli, to protest that the Letter of Concern and underlying survey did not accurately reflect her experience. (*See id.* ¶¶ 224-33.) And Plaintiff alleges that in August 2022, after the conclusion of the Chair Investigation, current and former members of his lab emailed Dr. Philip Ozuah, Montefiore's CEO, and not Tomaselli, a letter "protesting presumptions being made about [Plaintiff], with very limited information and before any verdict had been made." (*Id.* ¶ 207.)

As to the sanctions, both the interim demotion and the ultimate removal of Plaintiff as Chair were permissible under the 2018 Title IX Policy, and so those actions do not support a conclusion that Tomaselli aided and abetted unlawful behavior by Einstein and Montefiore as a result. *See Villar v. City of New York*, 135 F. Supp. 3d 105, 132 (S.D.N.Y. 2015) (concluding that aiding and abetting liability does not attach to a supervisor for an interim sanction); *Melman*, 98 A.D.3d at 114 ("A challenge . . . to the correctness of an employer's decision does not, without more, give rise to the inference that the adverse action was [unlawful].").

### iii.  NYSHRL and NYCHRL Retaliation Claims

The NYSHRL makes it unlawful "for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. L. § 296(7). The NYCHRL similarly makes it unlawful for "any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter . . ." N.Y. City Code § 8-107(7). As relevant here, the NYSHRL and NYCHRL each prohibits sex discrimination, and each provides express statutory protection of an employee's right to participate in "any proceeding." Therefore, to determine whether Plaintiff's witness outreach at the beginning of the Title IX Investigations constituted protected activity under state and local law, I examine how courts have interpreted employee participation rights under the NYSHRL and NYCHRL. *See Patel v. See City of New York*, 699 F. App'x 67, 69 (2d Cir.

2017) ("Protected activity is an assertion of rights covered by the provision of law under which the plaintiff is suing.").

Plaintiff characterizes his alleged protected activity as "s[eeking] to secure potential witnesses in his Title IX proceedings" (ECF 48, FAC ¶ 459) and "exercis[ing] his right to participate in the Title IX process by reaching out to colleagues who might serve as witnesses" (*id.* ¶ 188). Although "[t]here is no requirement that, to have engaged in protected conduct and thus presented a *prima facie* claim of retaliation, an employee must have used specific words," *Zhou v. State Univ. of New York Inst. of Tech.*, 499 F. App'x 105, 108 (2d Cir. 2012), the "onus is on the speaker to clarify to the employer that [he] is complaining of unfair treatment due to [his] membership in a protected class and that [he] is not complaining merely of unfair treatment generally." *Butler v. City Sch. Dist. of New Rochelle*, 19-CV-7395 (VB), 2020 WL 6639121, at *2 (S.D.N.Y. Nov. 12, 2020); *see also Fattoruso v. Hilton Grand Vacations Co., LLC,* 525 F. App'x 26, 28 (2d Cir. 2013) (affirming the conclusion that the employer was not put on notice of alleged disparate treatment based on sex by the plaintiff's complaints "express[ing] dismay over [the employer's] favoritism").

The description in the FAC of Plaintiff's witness outreach does not meet even the minimal burden of pleading protected activity under state and local law by alleging that Plaintiff made clear that he was complaining of unfair treatment based on his sex – particularly since the FAC suggests that Plaintiff understood the motivation behind the school's investigations into his conduct to be certain colleagues' professional jealousy or other animus unrelated to his sex. (*See* ECF 48, FAC ¶¶ 58, 161, 205-06.) Plaintiff therefore has failed adequately to plead a retaliation claim under the NYSHRL or the NYCHRL. And in the absence of an underlying

retaliation claim, the FAC fails to state aiding abetting claims against Tomaselli. *See Jain v. McGraw-Hill Cos., Inc.,* 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011) (holding that "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor").

Accordingly, I respectfully recommend that Your Honor GRANT the motion to dismiss the NYSHRL and NYCHRL retaliation claims against Einstein and Montefiore; and GRANT the motion to dismiss the NYSHRL and NYCHRL aiding and abetting retaliation claim against Tomaselli.

### b.  Plaintiff's Breach of Contract Claims

To state a claim for breach of contract under New York law, a plaintiff must allege "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and resulting damages." *Atane Eng'rs, Architects & Land Surveyors, D.P.C. v. Nassau Cnty.*, 227 A.D.3d 708, 709-10 (2d Dep't 2024).

At the outset, I note that the FAC is far from clear precisely which documents Plaintiff contends constitute his employment contracts.[15] Based on Plaintiff's briefing, it appears that he considers the relevant contracts to be the 2000 Offer Letter, 2001 Appointment Letter, 2012 Tenure Appointment Letter, 2014 Retention Agreement, 2016 Chair Appointment Letter, and all

---

[15]    The FAC contains different descriptions of the employment contract. (*See* ECF 48, FAC ¶ 473 (suggesting that the contract included the "terms of [Plaintiff's] appointment letters and the specific procedures set forth in Einstein's various employment policies"); *id.* ¶ 173 (stating that the contract included Plaintiff's "appointment and promotional letters"); *id.* ¶¶ 503-05 (indicating that the contract included the 2014 Retention Letter).)

Einstein's policies pertaining to employment, which he argues are incorporated by reference into his employment contract.[16]

### i.  Contract Claim Arising Out of Einstein's Title IX Policies

Plaintiff alleges that Einstein and Montefiore breached his employment contract by violating the terms of the school's Title IX Policies in connection with his disciplinary proceedings, including in the Chair Investigation, the Title IX proceedings, and adjudicating his retaliation complaint against Tomaselli. (*See* ECF 48, FAC ¶ 473.) This argument is based on the premise that "employment policies incorporated by reference in an appointment letter constitute a contract which is binding on the employer." (*Id.* ¶ 472.) The Einstein Defendants respond that Plaintiff's appointment letters did not incorporate by reference any Title IX Policy. (*See* ECF 57, Einstein Defs.' Mem. at 24.) Plaintiff counters that even if the Title IX Policy is not incorporated by reference, it was an implied contract. (*See* ECF 60, Pl.'s Einstein Opp. at 27.)

"Under New York law, a document is incorporated by reference into a contract if (1) it is clearly identified in the agreement, and (2) the contract contains language that clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract, rather than merely to acknowledge that the referenced material is relevant to the contract*." Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.,* 203 F. Supp. 3d 312, 322

---

[16]    Plaintiff states that he "has alleged the existence of a valid employment contract between himself and Defendants Einstein and Montefiore based on a series of documents . . . ." (ECF 60, Pl.'s Einstein Opp. at 26 (citing Plaintiff's 2000 Offer letter, Plaintiff's 2001 Appointment Letter, Plaintiff's 2012 Tenure Appointment Letter, Plaintiff's 2014 Retention Letter, and Plaintiff's 2016 Chair Appointment Letter, in addition to "Einstein's published policies, including the Title IX and Discrimination Policies, which set forth Einstein's specific procedures and policies for the adjudication of complaints brought for sexual harassment and non-Title IX discrimination")).)

(S.D.N.Y. 2016). None of the documents that Plaintiff cites clearly indicates that any Title IX Policy is incorporated by reference.

The 2000 Offer Letter explicitly incorporated the College's System of Appointments, reciting that Plaintiff's "faculty appointment is subject to the terms outlined in this letter and to the provisions of the College's System of Appointments." (ECF 58, Tenzer Decl. Ex. A, 2000 Offer Letter at 1.) The same 2000 Offer Letter referred to other policies using different language, simply stating where they could be found: "other policies of the College of Medicine applicable to faculty can be found in the . . . Faculty Handbook." (*Id*.) Similarly, the 2001 Appointment Letter states: "Your faculty appointment is in the In Residence Status in accordance with the System of Appointments, Titles and Compensation Arrangements at the Albert Einstein College of Medicine." (*Id*. Ex. B, 2001 Appointment Letter at 1.) And like the 2000 Offer Letter, the 2001 Appointment Letter states: "the Faculty Handbook . . . , as well as other College policies, is being sent to you" (*id.* at 17); the 2001 Appointment Letter does not expressly incorporate any other policies.

References to unspecified "other College policies" (*id.*) are insufficient under New York law to transform the policies into binding contracts. *See Nat'l Union Fire Ins. Co. of Pittsburg*, 203 F. Supp. 3d at 322 (finding no incorporation because the language "does not specifically identify the payment agreements" at issue). Even if Plaintiff were correct these two letters incorporated the Title IX Policies, the letters expired over twenty years ago. (*See* ECF 58, Tenzer Decl. Ex. A, 2000 Offer Letter at 1 (describing an appointment "for a three-year period"); *id.* Ex. B, 2001 Appointment Letter (describing Plaintiff's appointment as "terminating on June 30, 2002").)

In addition, when a school has discretion unilaterally to alter a policy, courts have concluded that the policy is not a binding agreement. *See Maas v. Cornell Univ.*, 94 N.Y.2d 87, 94 (1999) (finding no contract when the "handbook clearly states that it can be altered at any time (impliedly unilaterally)"). Each version of Einstein's Title IX Policy provides the college with significant discretion to make unilateral changes. (*See, e.g.*, Tenzer Decl. Ex. G, Einstein 2018 Title IX Policy at 15 ("The College reserves the right to modify and/or amend any or all of the terms and/or procedures outlined herein at any time, in its sole discretion."); *id.* Ex. I, 2022 Title IX Policy at 17, 27 (noting that Einstein, "in its sole discretion, reserves the right to depart from the prescribed steps" laid out in the Policy and to "modify and/or amend [them] at any time").) As the New York Court of Appeals has observed, these types of "feature[s] [are] hardly the harbinger of a legally binding set of arrangements." *Maas*, 94 N.Y.2d at 94. I therefore conclude that Plaintiff has not adequately alleged any breach of contract based on the Title IX Policies, because those policies were not binding contracts.

Plaintiff argues that a university's policies, "if duly authorized, are contractual in nature" and binding on both the school and faculty. *See Holm v. Ithaca Coll.*, 175 Misc. 2d 717, 720 (Sup. Ct. Tompkins Cty.), *aff'd*, 256 A.D.2d 986 (3d Dep't 1998), *leave denied*, 93 N.Y.2d 804 (N.Y. 1999). However, courts generally caution against interpreting general policies as enforceable contracts, and it is well-established that New York law requires a specific promise by a defendant to sufficiently allege an implied contract. *See McCudden v. Canisius Coll.*, 236 A.D.3d 1441, 1444 (4th Dep't 2025) (holding that a student-plaintiff's allegations unsupported by any "specific promise" failed to plead the existence of an implied contract); *Maas*, 94 N.Y.2d at 94 (explaining that the school policy "[wa]s heavily informational in nature and d[id] not express or

support the implication of any promise on the part of the university"). Given that the Title IX

Policies speak about general principles and make no specific promises, those policies are not

implied contracts.

Even if the Title IX Policies contained specific promises that would suggest the policies

were implied contracts, the Einstein Defendants correctly argue that their ability to modify or

amend any provision at any time demonstrates that the Title IX Policies fail to reflect

contractual intent (*see* ECF 64, Einstein Defs.' Reply at 8). *See Maas*, 94 N.Y.2d at 94 (holding

that the university's sexual harassment policy, which was informational in nature and subject to

unilateral alteration, did not constitute an implied contract because it lacked specific promises

and did not reflect an intent to create binding obligations).

In the event that Your Honor disagrees with this conclusion, I respectfully recommend

that Your Honor deny the motion to dismiss the breach of contract claim based on the Title IX

Policies to the extent the claim is premised on the failure to apply the applicable Title IX Policy

to the Chair Investigation but otherwise to grant the motion to dismiss the breach of contract

claim. *See supra* Part III.B.1.b.

### ii.  *Contract Claim Arising Out of the 2016 Chair Appointment Letter*

Plaintiff alleges that the Chair Investigation breached the 2016 Chair Appointment

Letter. (*See* ECF 48, FAC ¶ 173.) The 2016 Chair Appointment Letter stated that continuation of

Plaintiff's appointment, "[a]s with all Department Chair appointments, . . . [wa]s subject to

performance as determined by the Dean." (ECF 58, Tenzer Decl. Ex. D, 2016 Chair Appointment

Letter at 1; *see also* ECF 48, FAC ¶ 497.) Plaintiff asserts that the "disciplinary reasons" for his

removal as Chair, including student mistreatment, violations of Einstein's alcohol use policies,

and abuse of staff, relate to alleged misconduct rather than to his "performance" as Chair. (ECF 48, FAC ¶ 498; *see* ECF 60, Pl.'s Einstein Opp. at 28.) His position is unpersuasive. As the Einstein Defendants argue, it is "difficult to imagine any considerations that would be more related to an individual's performance as department chair." (ECF 57, Einstein Defs.' Mem. at 27.)

*iii.  Contract Claim Relating to the 2014 Retention Letter*

Plaintiff alleges that Einstein also breached its obligations under the 2014 Retention Letter, in which Einstein agreed to provide Plaintiff with funding for his lab. (*See* ECF 48, FAC ¶¶ 501-05.) The Einstein Defendants argue that 2014 Retention Letter provided interim funding only, not indefinite funding, so that Einstein was not required to provide continued funding. (*See* ECF 57, Einstein Defs.' Mem. at 28.)

The 2014 Retention Letter stated: "should one or more of your [three named] grants not be renewed, we are committed to providing generous interim support . . . to better enable you to recapture that grant." (ECF 58, Tenzer Decl. Ex. C, 2014 Retention Letter at 2.) Under New York law, "in interpreting contracts, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 500 (S.D.N.Y. 2020) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006)), *aff'd*, 29 F.4th 118 (2d Cir. 2022); *see also Trakansook v. Nahal Realty Corp.*, 180 A.D.2d 485, 485 (1st Dep't 1992) (refusing to adopt a plaintiff's contractual interpretation that "unnaturally strains the contract language . . . beyond its ordinary meaning"). The plain meaning of "interim" is temporary. *See* Interim, Black's Law Dictionary (12th ed. 2024) (defining "interim" as "[d]one, made, or occurring for an intervening time; temporary or provisional"). Plaintiff's contention that by promising interim support, Einstein

instead promised support "indefinitely, subject to [Plaintiff's] retirement or the termination of his tenured employment" (ECF 48, FAC ¶ 502), contradicts the plain language of the parties' unambiguous written agreement. (*See* ECF 58, Tenzer Decl. Ex. C, 2014 Retention Letter at 2.)

Where, as here, the written agreement is unambiguous, the Court looks no further. *See Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 361 (S.D.N.Y. 2016) ("Extrinsic evidence of the parties' intent may only be considered where an agreement is ambiguous."). Moreover, Plaintiff's allegations about communications concerning the 2014 Retention Letter reinforce the conclusion that Einstein promised Plaintiff interim financial support only. (*See* ECF 48, FAC ¶¶ 356-59 (March 26, 2015 email from Dean Burns stating that "[i]n your case it's interim support promised in your retention package").) Finally, the FAC never actually alleges that Einstein stopped funding Plaintiff's lab, instead alleging that the lab continues to receive interim funding, even though Plaintiff's last relevant grant expired over a year ago. (*See id.* ¶¶ 361-62 ("Einstein's position is that, when his two years interim support runs completely out of money in six months, Einstein will fire all the personnel who work in Dr. Khodakhah's laboratory because their positions will be unfunded.").)

*** 

For the foregoing reasons, Plaintiff has failed to state a claim for breach of his employment contract, and I therefore respectfully recommend that Your Honor GRANT the motion to dismiss the breach of contract claims against Einstein and Montefiore.

c.  Plaintiff's Claims for Breach of the Implied Covenant
Of Good Faith and Fair Dealing and for Promissory Estoppel

Plaintiff alleges breach of the implied covenant of good faith and fair dealing in

connection with yet another putative employment contract – the Tenure and Compensation

Policy – as well as the Title IX Policy, the 2016 Chair Appointment Letter, and the 2014

Retention Letter. (*See id.* ¶¶ 518-24.) He also alleges promissory estoppel. (*See id.* ¶¶ 525-33.)

He claims that breach of the covenant of good faith and fair dealing and the promissory

estoppel arose out of, among other events: (1) his suspension as Chair and ban from campus,

(2) overly harsh sanctions following the finding that he was responsible for sexual harassment

of Complainant 2, (3) Einstein's failure to abide by its Title IX Policy by declining to investigate

reports that the allegations against Plaintiff were false, even though Einstein had reason to

know the allegations were false, (4) his dismissal as Chair for misconduct rather than job

performance, (5) disciplining him without adjudication, (6) the decision to apply the "obsolete"

2018 Title IX Policy, (7) the delay of the adjudication of his retaliation claim against Dr.

Tomaselli, and (8) failure to provide continued funding for his research. (*See id.* ¶ 523; ECF 60,

Pl.'s Einstein Opp. at 31-33.) Plaintiff argues these actions were designed to prevent him from

fulfilling his obligations under the Tenure and Compensation Policy, which leaves him subject to

dismissal for neglect of duties. (*See* ECF 60, Pl.'s Einstein Opp. at 32.) The Einstein Defendants

respond that this claim is duplicative of Plaintiff's breach of contract claims and therefore

cannot survive a motion to dismiss. (*See* ECF 57, Einstein Defs.' Mem. at 29.) Plaintiff makes no

effort to explain how his claims for breach of the implied covenant of good faith and fair dealing

are not duplicative. (*See* ECF 60, Pl.'s Einstein Opp. at 31-33.)

In any claim for breach of contract under New York law, including breach of the implied covenant of good faith and fair dealing, a plaintiff must first establish the existence of a valid and enforceable contract before claiming a breach of its terms. *See 19 Recordings Ltd. v. Sony Music Ent.*, 97 F. Supp. 3d 433, 438 (S.D.N.Y. 2015) (establishing first that the defendants did not contest the existence of a contract before analyzing the breach of contract claims, including a claim for alleged breach of the implied duty of good faith and fair dealing).

The implied covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Tompkins Fin. Corp. v. John M. Floyd & Assocs., Inc.*, 144 A.D.3d 1252, 1257 (3d Dep't 2016). In addition, "[a] claim for violation of the [implied] covenant [of good faith and fair dealing] survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract." *JN Contemp. Art*, 29 F.4th at 128. Therefore "raising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing." *Jordan v. Verizon Corp.*, No. 08-CV-6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008); *see also Yu*, 97 F. Supp. 3d at 482 ("[A] breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed."). There cannot be a claim for breach of an implied covenant where there is an applicable contract provision addressing the issue. *See In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 470 (S.D.N.Y. 2013) (holding that "an obligation cannot be implied which is inconsistent with or negates the express terms of the contract"),

*reconsideration denied,* No. 13-CV-1419 (PKC), 2013 WL 6182949 (S.D.N.Y. Nov. 18, 2013), *aff'd,* 788 F.3d 98 (2d Cir. 2015).

Similarly, "where claims for promissory estoppel are duplicative of a plaintiff's stated claim for breach of contract, such claims will be dismissed." *Drummond v. Akselrad*, No. 23-CV-0179 (LJL), 2023 WL 3173780, at *10 (S.D.N.Y. May 1, 2023). Further, "the existence of a valid and enforceable contract governing a particular subject matter precludes recovery under a promissory estoppel cause of action arising out of the same subject matter." *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 500 (S.D.N.Y. 2023).

Plaintiff's predicates for his claims of breach of the covenant of good faith and promissory estoppel overlap with the bases for his breach of contract claims. For example, he identifies his suspension as Chair and removal as Chair as violating the 2016 Chair Appointment Letter as well as the covenant of good faith; and the suspension and removal also provide a basis for his promissory estoppel claims. (*See* ECF 60, Pl.'s Einstein Opp. at 31-33.) Moreover, a provision of the 2016 Chair Appointment Letter covers the circumstances under which Plaintiff could be removed as Chair. (*See* ECF 58, Tenzer Decl. Ex. D, 2016 Chair Appointment Letter ("As with all Department Chair appointments, continuation is subject to performance as determined by the Dean.").)

Plaintiff points to the denial of funding for his lab as violating the 2014 Retention Letter as well as the covenant of good faith; and the denial is also a basis for his promissory estoppel claim. (*See* ECF 48, FAC ¶¶ 523, 527-32.) He discusses a provision of the 2014 Retention Letter in claiming breach of contract. (*See id.* ¶¶ 53, 503 ("should one or more of [Plaintiff's] grants not be renewed, [Einstein] [is] committed to providing generous interim support . . . .").)

69

Plaintiff contends that overly harsh sanctions, inadequate investigations of his conduct, discipline without adjudication, reliance on an obsolete Title IX Policy, and delay in adjudicating his retaliation claim against Tomaselli violated Einstein's Title IX Policy, Einstein's Discrimination/Harassment Policy,[17] the covenant of good faith and fair dealing; those same predicates also support his promissory estoppel claims. (*See* ECF 60, Pl.'s Einstein Opp. at 28-32.) And he points to specific provisions of the Title IX Policy that he claims were violated by those events. (*See* ECF 48, FAC ¶ 488 ("Both the 2022 Title IX Policy and the Discrimination/Harassment Policy specifically required – at a minimum – that Einstein (i) provide [Plaintiff] a fair and impartial investigative report, with any findings and outcome; and (ii) prove by a clear and convincing standard of evidence that [Plaintiff] had committed the alleged violation prior to the imposition of discipline."); ECF 48, FAC ¶ 489 ("In breach of the contract, Einstein failed to afford [Plaintiff] the minimal procedural protections required under its employment policies, specifically, § III.I of the 2022 Title IX Policy and § X.B of the Discrimination/Harassment Policy, when it permanently dismissed [Plaintiff] from his appointed Chairmanship on July 11, 2022, for a disciplinary reason (alleged misconduct), without,

---

[17]    "The Discrimination/Harassment Policy provides procedures for complaints of alleged discrimination and harassment based on an individual's protected characteristics, including sexual misconduct that does not arise to a Title IX violation." (ECF 48, FAC ¶ 97 (citing 2020 Title IX Policy § III.C.2, available at ECF 58, Tenzer Decl. Ex. H, at 7).) The 2020 Title IX Policy states: "Sexual harassment that does not rise to the level of Title IX Sexual Harassment may be otherwise prohibited by Einstein's Discrimination and Harassment Policy (Non-Title IX)." (ECF 58, Tenzer Decl. Ex. H, 2020 Title IX Policy § III.C.2 at 7.) There does not appear to be a copy of the Einstein Discrimination/Harassment Policy on the docket and no indication in the FAC what provisions of that policy allegedly were breached.

providing him the procedural protections specifically required under Einstein's employment policies.").)

Because the alleged breaches of the implied covenant are based on the same events as Plaintiff's breach of contract claims, because there are specific provisions of the documents Plaintiff asserts make up his employment contract that cover the behavior he says violated the implied covenant, and because the damages sought for the contract and quasi-contract claims would be the same, the claims for breach of the implied covenant should be dismissed as duplicative. *See JN Contemp. Art*, 29 F.4th at 128. Likewise, because Plaintiff's promissory estoppel claims are duplicative of the alleged breaches of the 2014 Retention Letter and the 2016 Chair Appointment Letter, those claims should also be dismissed. *See Drummond,* 2023 WL 3173780, at *10.[18] For the foregoing reasons, I respectfully recommend that Your Honor

---

[18]    The claims for breach of the implied covenant of good faith fail for two other reasons. Because Plaintiff has not adequately alleged that Einstein's policies, including the Title IX Policy and the Discrimination/Harassment Policy, are valid contracts, *see supra* Part III.D.1.b.i, he cannot proceed with claims alleging the breach of the covenant of good faith in connection with Einstein's policies. *See 19 Recordings Ltd.*, 97 F. Supp. 3d at 438. And under New York law, breach of the implied covenant claims requires allegations that a "defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Affordable Hous. Assocs., Inc. v. Town of Brookhaven*, 49 Misc. 3d 570, 574 (N.Y. Sup. Ct. Suffolk Cty. 2015), *aff'd,* 150 A.D.3d 800 (2d Dep't 2017). Plaintiff alleges that Einstein's actions were "designed to prevent [Plaintiff] from fulfilling his academic obligations" to teach and mentor students, as required under the Tenure and Compensation Policy, which could lead to his termination. (ECF 48, FAC ¶ 523(a).) Until Einstein seeks Plaintiff's termination for failure to meet his teaching and mentoring obligations, his claims for breach of the implied covenant of good faith cannot move forward. *See Joshi v. Trs. of Columbia Univ. in City of New York*, 515 F. Supp. 3d 200, 222 (S.D.N.Y. 2021) (holding that where a plaintiff has not "suffered any cognizable injury," the evidence does not support a claim for the breach of the covenant of good faith and fair dealing), *aff'd,* No. 21-418, 2022 WL 3205883 (2d Cir. Aug. 9, 2022).

GRANT the motion to dismiss the claims for breach of the covenant of good faith and fair dealing and promissory estoppel against Einstein and Montefiore.

      d.  Plaintiff's Tortious Interference Claims
            Against Drs. Tomaselli, Castillo, and Jordan

Plaintiff alleges that by making false and defamatory statements about him and falsifying a student questionnaire about his supposed misconduct, Dr. Jordan tortiously interfered with Plaintiff's employment contracts; that Dr. Castillo encouraged colleagues to sign the Letter of Concern and spread false rumors about Plaintiff; and that Dr. Tomaselli's actions, including his dismissal of Plaintiff as Chair and removal of Plaintiff from campus, also tortiously interfered with Plaintiff's employment contract. (*See* ECF 48, FAC ¶¶ 538-39.)

To state a claim for tortious interference with contract under New York law, a plaintiff must allege: (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc*., 88 N.Y.2d 413, 424 (1996); *see also NBT Bancorp Inc. v. Fleet/Norstar Finan. Grp., Inc*., 87 N.Y.2d 614, 620 (1996) (holding that for a claim of tortious interference under New York law, a contract must have been breached).

Tomaselli, Castillo, and Jordan argue than because Plaintiff has failed adequately to plead a breach of any contract, his tortious interference claim against them necessarily fails. (*See* ECF 55, Tomaselli Mem. at 8; ECF 57, Einstein Defs.' Mem. at 30.) If Your Honor agrees with my assessment that Plaintiff has failed adequately to plead breach of any contract, that

conclusion would also support a determination that Plaintiff has not adequately pleaded tortious interference. *See, e.g., Baylis v. Marriott Corp*., 906 F.2d 874, 877 (2d Cir. 1990) ("Under traditional principles of New York law, a party may not recover for tortious inducement of breach of a contract without proving that the underlying contract has been breached."). Accordingly, I respectfully recommend that Your Honor GRANT the motions to dismiss the tortious interference claims against Tomaselli, Castillo, and Jordan.

Tomaselli, Castillo, and Jordan further assert that Plaintiff's tortious interference claims against them fail for additional reasons, including a failure to allege that they had actual knowledge of the terms of Plaintiff's employment contracts with and a failure to allege that they acted outside the scope of their employment, without justification, or for purely personal gain. (*See* ECF 55, Tomaselli Mem. at 8-9; ECF 57, Einstein Defs.' Mem. at 30-31.) I address these arguments in case Your Honor concludes that Plaintiff has adequately alleged breaches of contract that could serve as predicates for the tortious interference claims. For the reasons set forth below, even if Your Honor concludes that Plaintiff has adequately alleged breaches of contract, I respectfully recommend that motions to dismiss the tortious interference claims against Castillo and Jordan should be denied but that the motion to dismiss the tortious interference claim against Tomaselli should be granted.

### i.  Actual Knowledge of the Contracts

Tomaselli, Castillo, and Jordan are correct that a plaintiff is required to allege actual knowledge of the contract on the part of the defendants, including "some knowledge of the terms and conditions of the allegedly-interfered-with contract." *Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc*., No. 20-CV-0078 (PAE), 2021 WL 1199430, at *8 (S.D.N.Y. Mar. 30,

2021); *see also Medtech Prods. Inc. v. Ranir, LLC,* 596 F. Supp. 2d 778, 813 (S.D.N.Y. 2008)

("With regard to the second element, the plaintiff must provide specific allegations of the

defendant's knowledge and cannot survive a motion to dismiss by making merely a conclusory

assertion of knowledge."). Tomaselli, Castillo, and Jordan contend that, beyond a general

reference to Plaintiff's "employment contract," Plaintiff does not allege what contract or

contractual provisions they induced Einstein to breach (*see* ECF 48, FAC ¶¶ 537-38), let alone

that they had any actual knowledge of Plaintiff's "employment contract" (whatever contract

that might be). (*See* ECF 55, Tomaselli Mem. at 8-9; ECF 57, Einstein Defs.' Mem. at 30-31.).

As noted above, the FAC is unclear which document(s) Plaintiff is relying on as his

employment contracts. *See supra* Part III.D.1.b. Nevertheless, to the extent that Plaintiff has

alleged that Tomaselli interfered with Plaintiff's rights under the Title IX Policy, with the 2016

Chair Appointment Letter, and with the 2014 Retention Letter (*see* ECF 48, FAC ¶¶ 484-85, 489,

495-96, 498-99, 505, 509-10, 523, 539), Plaintiff has also alleged that Tomaselli had actual

knowledge of those documents based on Tomaselli's communications with Plaintiff about

Plaintiff's disciplinary proceedings and sanctions (*see* ECF 59, Pl.'s Tomaselli Opp. at 15-16). *See*

*LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 495 (S.D.N.Y. 2002) ("Although a defendant need

not be aware of all the details of a contract, it must have actual knowledge of the specific

contract."). Likewise, to the extent that Plaintiff has alleged that Castillo and Jordan interfered

with Plaintiff's rights under the Title IX Policy (*see* ECF 48, FAC ¶ 538; ECF 60, Pl.'s Einstein Opp.

at 33-34), the FAC permits an inference that Castillo and Jordan had actual knowledge of the

policies, because they too were Einstein employees and were subject to the same policies. *See*

*LinkCo,* 230 F. Supp. 2d at 495.

*ii.  Acting Outside the Scope of Employment*

To plead a claim under New York law for tortious interference with an employment contract by a fellow employee, a plaintiff must allege that the co-worker acted outside the scope of his employment. *See, e.g., McHenry v. Lawrence*, 66 A.D.3d 650, 652 (2d Dep't 2009) (affirming the dismissal of the plaintiff's tortious interference with employment claim because the defendant co-workers "were acting within the scope of their employment" when engaging in the allegedly tortious conduct). Tomaselli, Castillo, and Jordan contend that they were acting within the scope of their employment when they raised concerns about Plaintiff's leadership of the Neuroscience Department, treatment of staff, and interactions with students. (*See* ECF 55, Tomaselli Mem. at 10-11; ECF 57 Einstein Defs.' Mem. at 31.) The allegations in the FAC support a conclusion that Tomaselli's acts of alleged tortious interference fell within the scope of his employment; but the allegations in the FAC do not support the same conclusion for Castillo and Jordan.

Dr. Tomaselli was formerly the Dean of Einstein School of Medicine, oversaw Einstein's budget, and had discretion over Plaintiff's position as chair of the Neuroscience Department (*see* ECF 48, FAC ¶ 17). Tomaselli's suspension and then dismissal of Plaintiff as Chair in response to concerns raised by faculty and students, later confirmed by a confidential investigation, and Tomaselli's removal of Plaintiff from campus following what Tomaselli viewed as Plaintiff's violation of Einstein's policy against retaliation (*see id.* ¶ 136) fell within the scope of Tomaselli's employment responsibilities – even if, as Plaintiff suggests, that Tomaselli's actions were motivated at least partially by professional disagreements with Plaintiff or personal animosity. *See Johnson v. Medisys Health Network*, No. 10-CV-1596 (ERK) (VVP), 2011

75

WL 5222917, at *10 (E.D.N.Y. June 1, 2011) ("In order to maintain [a tortious interference with employment] claim against her co-employees, the plaintiff is required to allege that they acted outside the scope of their authority."), *report and recommendation adopted as modified,* 2011 WL 4101323 (E.D.N.Y. Sept. 8, 2011); *Kartiganer Assocs., P.C. v. Town of New Windsor*, 108 A.D.2d 898, 899 (2d Dep't 1985) ("An agent cannot be held liable for inducing his principal to breach a contract with a third person, at least where he is acting on behalf of his principal and within the scope of his authority.").

Plaintiff responds that pleading improper motive or malice is sufficient for a breach of contract claim at the motion to dismiss stage. (*See* ECF 59, Pl.'s Tomaselli Opp. at 18.) However, Plaintiff has not alleged that Tomaselli "acted purely from malice or self-interest" as required to plausibly allege that Tomaselli was acting outside the scope of his employment. *Cohen v. Davis*, 926 F. Supp. 399, 404 (S.D.N.Y. 1996) ("A supervisor is considered to have acted outside the scope of his employment if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self-interest.") Accordingly, Plaintiff has not adequately pleaded a tortious interference claim against Tomaselli.

However, the FAC alleges that Jordan fabricated a student survey accusing Plaintiff of misconduct. (*See* ECF 48, FAC ¶ 117.) While Jordan held positions specifically related to graduate student education (*see id.* ¶¶ 117, 119), fabricating a student survey – a type of misrepresentation – would not fall within the scope of his position. *See Cohen,* 926 F. Supp. at 404.

The FAC alleges that Castillo convinced people to sign the Letter of Concern and spread false rumors about Plaintiff. (*See id.* ¶¶ 142, 538.) The FAC contains no discussion of Castillo's role at Montefiore or Einstein other than suggesting that he was a professor on the faculty. (*See id.* ¶¶ 2, 18.) While convincing people to sign the Letter of Concern could fall within the scope of Castillo's employment as a faculty member, spreading rumors about Plaintiff would fall outside the scope of Castillo's position. *See id.*

### iii.  Procuring a Breach of Contract Without Justification

To make out the claim for tortious interference against Tomaselli, Castillo, and Jordan, Plaintiff must allege that they intentionally procured the breach of his employment contract "without justification." *Lama Holding Co*., 88 N.Y.2d at 424; *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co*., 404 F.3d 566, 589 (2d Cir. 2005) ("A claim for tortious interference with contract cannot rest on conduct that is incidental to some other lawful purpose."). Tomaselli correctly argues that his behavior was incidental to a lawful purpose, namely investigating alleged misconduct and protecting Einstein's students and staff, which defeats Plaintiff's claim (*see* ECF 55, Tomaselli Mem. at 12). *See Montano v. City of Watervliet*, 47 A.D.3d 1106, 1110 (3d Dep't 2008) (dismissing a tortious interference with contract claim where "Plaintiff failed to offer proof that [an official's] conduct was not in furtherance of his official duties and not motivated by genuine municipal/public health and safety concerns."). Castillo and Jordan argue that raising concerns about Plaintiff's leadership and interactions with students was specifically related to their roles in furthering graduate student education (*see* ECF 57, Einstein Defs.' Mem. at 31), but the specific behavior alleged – falsifying a survey and spreading rumors – would have no lawful purpose.

###### iv. Acting for Purely Personal Gain

Even if Tomaselli was acting within the scope of his employment when he allegedly caused Einstein and Montefiore to breach Plaintiff's employment contract, there is "a narrow exception" to the requirement that a co-worker accused of tortious interference was acting outside the scope of his employment: a co-worker may be liable for tortious interference if he acted "for purely personal gain," but "an enhanced pleading standard applies." *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 407-08 (S.D.N.Y. 2009). Plaintiff's allegations that Tomaselli took "adverse actions" (ECF 48, FAC ¶ 539) fails to meet the heightened pleading standard. Plaintiff's allegations about Tomaselli's motivations are conclusory and therefore are insufficient to support a claim of tortious interference against Tomaselli. *See, e.g., Campeggi v. Arche Inc.*, No. 15-CV-1097 (PGG), 2016 WL 4939539, at *9 (S.D.N.Y. Sept. 14, 2016) ("Plaintiff's conclusory allegations that the individual defendants acted with malice, without more, are insufficient.").

### E.    Leave To Replead

Defendants urge the Court to dismiss Plaintiff's claims in their entirety and with prejudice. (*See* ECF 55, Tomaselli Mem. at 16; ECF 57, Einstein Def's Mem. at 31.) Plaintiff does not request leave to amend, and the Court is not obligated to grant such leave sua sponte. *See Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison L.L.P.*, 351 F. App'x 472, 474 (2d Cir. 2009) (holding, where the plaintiff did not seek leave to amend in opposition to the motion to dismiss, that the district court did not abuse its discretion by failing to grant him such leave sua sponte). Moreover, a "plaintiff need not be given leave to amend" where, as here, he "fails to specify . . . how amendment would cure the pleading deficiencies in [his] complaint." *Moniodes*

*v. Autonomy Cap. (Jersey) LP*, No. 20-CV-05648 (GHW), 2021 WL 3605385, at *8 (S.D.N.Y. Aug.

11, 2021). However, "[i]n this circuit, [i]t is the usual practice upon granting a motion to dismiss

to allow leave to replead." *Leneau v. Ponte*, No. 16-CV-0776 (GHW), 2018 WL 566456, at *18

(S.D.N.Y. Jan. 25, 2018) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.

1991)). Of course, "leave to amend a complaint may be denied when amendment would be

futile." *Tocker v. Philip Morris Cos*., 470 F.3d 481, 491 (2d Cir. 2006); *see also Moniodes*, 2021

WL 3605385, at *8 (S.D.N.Y. Aug. 11, 2021).

I cannot conclude that amendment would necessarily be futile. Accordingly, I

respectfully recommend that Plaintiff be granted leave to replead the dismissed claims.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that Your Honor:

- DENY the motion to dismiss the claims against Montefiore based on the group pleading doctrine;

- DENY IN PART the motion to dismiss the Title IX discrimination claims against Einstein and Montefiore to the extent that the claims arise out of the Chair Investigation, but otherwise GRANT IN PART the motion to dismiss the Title IX discrimination claims against Einstein and Montefiore;

- GRANT the motion to dismiss the Title IX retaliation claims against Einstein and Montefiore;

- DENY IN PART the motion to dismiss the NYSHRL and NYCHRL claims against Einstein and Montefiore to the extent those claims arise out of the Chair Investigation, but otherwise GRANT IN PART the motion to dismiss those claims;

- GRANT the motion to dismiss the NYSHRL and NYCHRL claims against Tomaselli;

- GRANT the motion to dismiss the contract and quasi-contract claims under New York law against Einstein and Montefiore; and

- GRANT the motions to dismiss the tortious interference with contract claims under New York law against Tomaselli, Castillo, and Jordan.

If Your Honor accepts this recommendation, I also respectfully recommend that Plaintiff be granted leave to amend the dismissed claims.

DATED:     July 31, 2025
           New York, New York

Respectfully Submitted,

**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION**

The parties shall have fourteen days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure to this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Kaplan.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).