**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KAMRAN KHODAKHAH,

*Plaintiff*,

v.

MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., et al.,

*Defendants*.

No. 1:24-cv-00839-LAK-RFT

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., AND ALBERT EINSTEIN COLLEGE OF MEDICINE'S MOTION FOR SUMMARY JUDGMENT

Roberta A. Kaplan
Christopher R. Le Coney
Tasha N. Thompson
KAPLAN MARTIN LLP
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 316-9500
rkaplan@kaplanmartin.com
cleconey@kaplanmartin.com
tthompson@kaplanmartin.com

Gabrielle E. Tenzer
Anna Collins Peterson
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
gtenzer@heckerfink.com
apeterson@heckerfink.com

September 25, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iv

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

I. Plaintiff Is Appointed Chair of the Neuroscience Department, "Subject to Performance as Determined by the Dean" ..... 3

II. Faculty and Students Raise Concerns About Plaintiff's Conduct as Chair ..... 4

III. Einstein Initiates an External Investigation into Plaintiff's Conduct as Chair ..... 7

IV. Plaintiff and Fifty-Eight Others Participate in the Chair Investigation ..... 9

V. Einstein Receives an Investigative Summary ..... 10

VI. Plaintiff Acknowledges His Misconduct ..... 12

VII. Following the Chair Investigation, Plaintiff Is Removed as Chair ..... 13

VIII. Einstein Commences Title IX Investigations in which Plaintiff Is the Respondent ..... 14

IX. Einstein's Relationship to Montefiore ..... 15

X. Einstein's Policies ..... 15

PROCEDURAL BACKGROUND ..... 16

LEGAL STANDARD ..... 16

ARGUMENT ..... 17

I. Defendants Are Entitled to Summary Judgment on Plaintiff's Title IX Claim ..... 17

A. Plaintiff's Title IX Claim Fails Under an Erroneous Outcome Theory ..... 18

1. There Can Be No Dispute of Material Fact as to the "Accuracy" of the Dean's Exercise of His Discretion ..... 19

2. No Reasonable Jury Could Conclude that Einstein Acted on the Basis of Plaintiff's Sex in Removing Him as Chair ..... 20

a. There Is No Direct Evidence of Bias Based on Plaintiff's Sex ..... 21

b. No Circumstantial Evidence Supports an Inference of Bias Based on Plaintiff's Sex ..... 22

c. Einstein Had Legitimate, Non-Discriminatory, Non-Pretextual Reasons for Removing Plaintiff as Chair .................................................... 28

B. Plaintiff's Title IX Claim Fails Under a Deliberate Indifference Theory ................. 30

II. Defendants Are Entitled to Summary Judgment on Plaintiff's NYCHRL and NYSHRL Claims for Similar Reasons.................................................................... 34

III. There Is No Evidence in Support of Plaintiff's Claims Against Montefiore ...................... 34

CONCLUSION.......................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................... 16, 34

*Anderson v. Univ. Orthopaedic*,
No. 16 Civ. 7311, 2016 WL 10567969 (S.D.N.Y. Dec. 23, 2016) .................... 30

*Bart v. Golub Corp.*,
96 F.4th 566 (2d Cir. 2024) .................... 21

*Bassi v. N.Y. Med. Coll.*,
No. 23-278, 2024 WL 3717317 (2d Cir. Aug. 8, 2024) .................... 29

*Beard v. Banks*,
548 U.S. 521 (2006) .................... 17

*Bickerstaff v. Vassar Coll.*,
196 F.3d 435 (2d Cir. 1999) .................... 19

*Carela v. N.Y.C. Parks & Recreation Dep't*,
No. 98 Civ. 2753, 2005 WL 2105546 (S.D.N.Y. Sept. 1, 2005) .................... 30

*Carmody v. N.Y. Univ.*,
No. 21 Civ. 8186, 2023 WL 5803432 (S.D.N.Y. Sept. 7, 2023) .................... 34

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................... 17, 35

*Clark v. Port Auth. of N.Y. & N.J.*,
No. 24 Civ. 2790, 2026 WL 834861 (S.D.N.Y. Mar. 26, 2026) .................... 17

*Corbin v. Triborough Bridge & Tunnel Auth.*,
No. 24 Civ. 1613, 2026 WL 2240726 (S.D.N.Y. Aug. 4, 2026) .................... 35

*Crowther v. Bd. of Regents of the Univ. Sys. of Ga.*,
No. 25-183, 2026 WL 1377024 (U.S. May 18, 2026) .................... 17

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) .................... 17, 18, 33, 34

*Doe v. Colgate Univ.*,
760 F. App'x 22 (2d Cir. 2019) .................... 18, 20, 22

*Doe v. N.Y. Univ.*,
No. 20 Civ. 1343, 2023 WL 5293688 (S.D.N.Y. Aug. 17, 2023) .................................. 20

*Doe v. N.Y. Univ.*,
No. 23-1246, 2024 WL 4834965 (2d Cir. Nov. 20, 2024) ............................................ 21

*Doe v. N.Y. Univ.*,
438 F. Supp. 3d 172 (S.D.N.Y. 2020)................................................................................ 28

*Doe v. Princeton Univ.*,
No. 20 Civ. 4352, 2026 WL 2655154 (D.N.J. Sept. 9, 2026).......................................... 28

*Doe v. Sacks*,
714 F. Supp. 3d 402 (S.D.N.Y. 2024)................................................................................ 33

*Doe v. Trs. of Columbia Univ.*,
No. 21 Civ. 5839, 2022 WL 3666997 (S.D.N.Y. Aug. 25, 2022) .................................. 20

*Doe v. Trs. of Hamilton Coll.*,
No. 22 Civ. 214, 2024 WL 1675130 (N.D.N.Y. Apr. 18, 2024) .............................. 23, 26

*Ebadi v. Diamond Standard Inc.*,
No. 24 Civ. 00103, 2026 WL 591569 (S.D.N.Y. Mar. 3, 2026) .................................... 34

*Gentleman v. State Univ. of N.Y. Stony Brook*,
No. 21-1102, 2022 WL 1447381 (2d Cir. May 9, 2022)................................................. 29

*Heim v. Daniel*,
81 F.4th 212 (2d Cir. 2023) .............................................................................................. 19

*Lieberman v. Gant*,
630 F.2d 60 (2d Cir. 1980)................................................................................................. 20

*Macias v. Barrier Free Living, Inc.*,
No. 16 Civ. 1735, 2018 WL 1603566 (S.D.N.Y. Mar. 28, 2018) .................................. 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................................................... 17

*McDonald v. Pharney Grp. LLC*,
No. 23 Civ. 06025, 2026 WL 787750 (S.D.N.Y. Mar. 20, 2026) .................................. 34

*McPherson v. N.Y.C. Dep't of Educ.*,
457 F.3d 211 (2d Cir. 2006)............................................................................................... 30

*Menaker v. Hofstra Univ.*,
935 F.3d 20 (2d Cir. 2019)........................................................................................ 33

*Nambiar v. Cent. Orthopedic Grp., LLP*,
158 F.4th 349 (2d Cir. 2025) ..................................................................................... 29

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
633 F.3d 81 (2d Cir. 2011)........................................................................................ 33

*Porter v. Dartmouth-Hitchcock Med. Ctr.*,
92 F.4th 129 (2d Cir. 2024) ....................................................................................... 22

*Quinones v. Montefiore Med. Ctr.*,
No. 24 Civ. 1516, 2026 WL 1831862 (S.D.N.Y. June 25, 2026).................................... 22

*Radwan v. Manuel*,
55 F.4th 101 (2d Cir. 2022) ....................................................................................... 21

*Ramsaran v. Booz & Co. (N.A.) Inc.*,
No. 14 Civ. 708, 2015 WL 5008744 (S.D.N.Y. Aug. 24, 2015) ..................................... 29

*Roe v. Icahn Sch. of Med.*,
No. 25 Civ. 8157, 2026 WL 2655470 (S.D.N.Y. Sept. 9, 2026)..................................... 19

*Roe v. St. John's Univ.*,
91 F.4th 643 (2d Cir. 2024) ................................................................................. 31, 33

*Schiebel v. Schoharie Cent. Sch. Dist.*,
120 F.4th 1082 (2d Cir. 2024) ............................................................................. *passim*

*Simons v. Yale Univ.*,
712 F. Supp. 3d 267 (D. Conn. 2024)......................................................................... 23

*Stouter v. Smithtown Cent. Sch. Dist.*,
687 F. Supp. 2d 224 (E.D.N.Y. 2010) ........................................................................ 30

*Tubbs v. Stony Brook Univ.*,
343 F. Supp. 3d 292 (S.D.N.Y. 2018)......................................................................... 33

*Valerio v. Metro. Transp. Auth.*,
No. 23 Civ. 1938, 2024 WL 2305386 (S.D.N.Y. May 20, 2024).............................. 21, 22

*Vengalattore v. Cornell Univ.*,
No. 18 Civ. 1124, 2024 WL 4135875 (N.D.N.Y. Sept. 10, 2024) .................................. 23

*Vengalattore v. Cornell Univ.*,
36 F.4th 87 (2d Cir. 2022) ............................................................................................ 17

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000)............................................................................................ 28

*Wellner v. City of New York*,
No. 16 Civ. 7032, 2019 WL 1511022 (S.D.N.Y. Mar. 22, 2019) ................................... 31

*Wright v. Goord*,
554 F.3d 255 (2d Cir. 2009)............................................................................................ 17

*Young v. United Parcel Serv., Inc.*,
575 U.S. 206 (2015)........................................................................................................ 21

*Yusuf v. Vassar Coll.*,
35 F.3d 709 (2d Cir. 1994)........................................................................... 18, 20, 21

**STATUTES**

N.Y. Exec. Law § 296.................................................................................................... 34

**FEDERAL RULES**

Fed. R. Civ. P. 56.................................................................................................. 16, 17

## PRELIMINARY STATEMENT

Plaintiff Kamran Khodakhah challenges the discretionary decision of the Dean of Defendant Albert Einstein College of Medicine ("Einstein") to replace him as Chair of Einstein's Neuroscience Department as discrimination based on Plaintiff's sex. After years of litigation and extensive discovery, the undisputed factual record underlying the Dean's decision is clear. Plaintiff served as Chair "subject to performance as determined by the Dean." While Chair, Plaintiff called students by nicknames like "Hobble" (for a student who used walking aids) and "Barely Legal" (for a young female student). He insulted students and staff by calling them "morons." He brought alcohol to class and into his lab, in violation of Einstein policy, and consumed it with students. Toward the end of his time as Chair, students and faculty in the Neuroscience Department complained to Einstein's senior faculty and administrators about Plaintiff's "bullying," his "fear tactics," his "autocratic and inappropriate behaviors," and the destructive impact of his conduct on the Neuroscience Department and its students and staff.

Plaintiff's first response was to call for an investigation. Einstein did exactly what he asked —it hired an outside firm to investigate these complaints (the "Chair Investigation"). Fifty-nine witnesses participated, including Plaintiff himself. Plaintiff, then and now, admitted to much of the conduct. Considering the information gathered in the Chair Investigation, Einstein's Dean concluded that Plaintiff's leadership had "contributed to a toxic environment" and removed him as Chair, replacing him with another man. Plaintiff kept his tenured professorship, which he holds to this day.

Plaintiff disputes none of this. What he disputes is why Einstein chose, at the outset, to treat the complaints about him as a question of his fitness to lead a department rather than as a Title IX complaint. Plaintiff says the answer is that he is a man. The record says otherwise. At the

time, Einstein expressly considered whether the allegations concerning Plaintiff should be treated as a Title IX matter and concluded they should not. Nonetheless, Einstein accounted for the possibility that its initial assessment might prove incomplete by instructing the outside investigator to refer any Title IX allegations he encountered to Einstein's Title IX Coordinator. And that is ultimately what happened, leading to two separate Title IX proceedings conducted pursuant to Einstein's Title IX Policy.

Against this record, Plaintiff offers nothing from which a reasonable jury could infer that he was removed as Chair because of his sex. Rather, he blames four colleagues—all of them men—for orchestrating his ouster as Chair, but does not contend that any of them was motivated to do so by his sex; asked that question under oath, he answered "No." He has produced no evidence that Einstein was under pressure to discriminate against male faculty; the 2021 student presentation on which the FAC hung that theory has vanished from the case. All that is left is Plaintiff's own recollection that Einstein's then-Executive Dean once referred to the "climate" created by the #MeToo movement and a resulting need to be "responsive"—a recollection that neither witness present at the time corroborates and that this Court has already concluded does not, "without more," "show the influence of gender." ECF 79 at 24. Discovery has not supplied "more."

At bottom, what Plaintiff has challenged under Title IX as an "erroneous outcome" is, in fact, a subjective performance assessment not capable of being factually inaccurate. What Plaintiff has claimed was a procedurally irregular process giving rise to an inference of gender bias is, in fact, an investigation Einstein was under no requirement to conduct, and in which Plaintiff received notice and a meaningful opportunity to be heard. Plaintiff's allegations of contemporaneous pressure on Einstein to discriminate against him based on his sex have turned out to be nothing more than that—allegations, for which no supporting proof has been disclosed in discovery.

Moreover, the summary judgment record establishes, beyond dispute, that Einstein had legitimate, non-discriminatory, and non-pretextual reasons for removing Plaintiff as Chair.

Plaintiff's last-ditch effort to show that Einstein discriminated against him based on his sex—through an unpleaded claim of deliberate indifference to purportedly false, discriminatory allegations—falls far short: there is no evidence of any false allegation, let alone one motivated by gender bias, and no reasonable jury could conclude that Einstein's decision to remove Plaintiff as Chair "was so 'inexplicable'" as to draw an inference of deliberate indifference. *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1097 (2d Cir. 2024).

In sum, after two and a half years of litigation, thousands of documents produced, numerous depositions, and expert discovery, this case boils down to a claim—but no evidence—of gender discrimination. There is therefore no genuine factual dispute for trial on Plaintiff's claims under Title IX or its state and city analogues. There is also no evidence that Montefiore Medicine Academic Health System, Inc. ("Montefiore") played any role in the Chair Investigation or Plaintiff's removal as Chair. The Court should grant summary judgment for Defendants.

## STATEMENT OF FACTS

### I. Plaintiff Is Appointed Chair of the Neuroscience Department, "Subject to Performance as Determined by the Dean"

Plaintiff has been a professor in the Neuroscience Department of Einstein, a private medical school in the Bronx, since 2001. ¶¶ 1, 3.[1] Plaintiff was granted tenure in 2012, and in 2013, he was appointed interim Chair of Einstein's Neuroscience Department. ¶ 3; Ex. D at 35:24-36:14. Plaintiff became Chair of the Department in May 2016. ¶ 4. His appointment letter provided

[1] Citations to "¶ _" refer to paragraphs of the Rule 56.1 Statement of Undisputed Material Facts in Support of the Motion for Summary Judgment of Defendants Montefiore and Einstein. Citations to "Ex. _" refer to exhibits to the Declaration of Gabrielle E. Tenzer in Support of Defendants Montefiore and Einstein's Motion for Summary Judgment.

that Plaintiff served as Chair for an "indefinite term" and, "[a]s with all Department Chair appointments, continuation [was] subject to performance as determined by the Dean." ¶ 6. In 2018, Dr. Gordon Tomaselli became Einstein's Dean, a position he held until July 2023. Ex. O at 15:3-5.

## II. Faculty and Students Raise Concerns About Plaintiff's Conduct as Chair

Approximately five and a half years into Plaintiff's tenure as Chair, students and faculty in the Neuroscience Department reported concerns about his conduct and leadership.

***The GEC Survey.*** In January 2022, a student survey was administered in the Neuroscience Department by Dr. Bryen Jordan, a professor appointed by Plaintiff to chair a faculty body that supports students and their mentors, referred to as the Neuroscience Department's Graduate Education Committee ("GEC"). ¶ 12. The survey collected responses from 51 students and recent graduates (the "GEC Survey"). ¶ 13. Nearly half of the survey respondents indicated that they did not feel "comfortable sharing concerns or making suggestions to" Plaintiff in his role as Chair. *Id*. Only about a third indicated that they were confident that the Department's leadership would take appropriate action on concerns they raised. *Id.* And less than half felt that departmental leadership was "fair and collegial." *Id*. Dr. Jordan sent a summary of the GEC Survey results to Plaintiff on January 24, 2022. *Id*.

***The NGSO Survey.*** A month later, on February 24, 2022, Associate Dean for Graduate Programs Victoria Freedman received an email from the leaders of the student-run Neuroscience Graduate Student Organization ("NGSO"), reporting that they had conducted their own survey of students in the Neuroscience Department (the "NGSO Survey"). ¶¶ 11, 14. In the email, the student leaders shared a presentation deck summarizing the NGSO Survey results, which reflected that respondents had significant negative feelings about Plaintiff's performance as Chair, including his ineffectiveness at supporting students and overall Department morale, as well as students' lack of

confidence in Plaintiff to treat them respectfully. ¶¶ 14-15. The presentation also reflected, among other things, that some students had "witnessed or experienced [Plaintiff] act inappropriately," including through "bullying"; that at least one student had reported that Plaintiff "calls people names insulting their intelligence and uses offensive nicknames for students"; and that another "heard plenty of stories" of "sexual, racialized, and ableist comments." Ex. J at 25; ¶ 16.

The NGSO student leaders also shared with Dr. Freedman a document "detail[ing] the anonymous comments students provided, which [the student leaders had] summarized to further anonymize and to prevent potential retaliation." Ex. J at 2. That document revealed even more specific concerns about Plaintiff's behavior. Several comments described Plaintiff's efforts to control students, including one that described Plaintiff [redacted] *Id.* at 42. Another comment reported that Plaintiff [redacted] *Id.* Another described how Plaintiff would [redacted] ¶ 17. Yet another reported that Plaintiff [redacted] *Id.* The student comments described other instances of inappropriate remarks or conduct, including [redacted] *Id.*

After receiving these materials, Dr. Freedman shared them with then-Executive Dean Edward Burns and Ms. Yvonne Ramirez, Einstein's Vice President for Human Resources and Title

IX Coordinator. ¶¶ 11, 18. The concerns raised in the NGSO Survey results and comments were also shared with Dean Tomaselli. ¶ 18.

***The Letter of Concern.*** Also on February 24, 2022, Plaintiff received a letter signed by thirteen Neuroscience Department faculty (the "Letter of Concern"). ¶ 19. The Letter of Concern stated that its authors were "very much concerned about [the] current state" of the Department, and that they hoped to "make clear how serious the situation [was] and lead to a change in direction and a return to a healthier departmental culture." *Id*. The Letter of Concern noted that Plaintiff's actions, including "demeaning and unprofessional comments," had been a primary cause of recent departures of administrative staff, and observed that the GEC Survey had shown "that a majority of our students have a negative outlook about departmental leadership," including due to Plaintiff's "autocratic and inappropriate behaviors." ¶ 20. Dr. Burns and Dean Tomaselli were copied on the Letter of Concern, and in the Dean's view, the letter was "more than sufficient" to justify an investigation. ¶ 21.

Plaintiff responded to the Letter of Concern in a February 25, 2022 email to the Neuroscience faculty, Ms. Ramirez, Dean Tomaselli, and Dr. Burns. ¶ 22. In his email, Plaintiff expressed "surprise" at his colleagues' concerns, while acknowledging that his subordinates may not have shared their concerns with him directly "because of the power differential." *Id*. He further stated that he had copied Dr. Burns and Ms. Ramirez to ask that they "interview [] staff" to "uncover the facts" and "provide all of us with a candid evaluation of the nature of my interactions with the staff, and the reasons for their low morale." *Id*. Plaintiff wrote that "if [he] contributed to [the staff] leaving by being in anyway unprofessional, [he was] not worthy of serving as the Chair and [would] promptly resign from the position." *Id.*

The following day, Plaintiff emailed Dr. Burns and Ms. Ramirez to reiterate that "the best

approach" would be "a full review" so that "we can reassure the faculty and positively move forward." ¶ 23. A few days later, on March 8, 2022, Plaintiff sent a lengthy email to Dr. Burns, acknowledging that "a subset of faculty" had made "[t]wo assertions . . . 1) that [Plaintiff had] been abusive of the administrative personnel and hence the reason for their departure, and [Plaintiff's] inability to recruit new staff, and 2) that the students have grave concerns." ¶ 30. Through his email and its numerous attachments, Plaintiff sought to demonstrate that "the assertions made in the letter that [he had] been in any way mistreating the administrative staff [were] incorrect." *Id.* And with respect to the assertions of student concerns, Plaintiff emphasized his belief that "it is extremely important that their complaints me [sic] are paid attention to and addressed," and noted that he "was the first to propose that [Einstein] should have a full enquiry conducted by an independent outside firm." *Id.*

## III. Einstein Initiates an External Investigation into Plaintiff's Conduct as Chair

Upon receiving the Letter of Concern and the results of the student surveys, Ms. Ramirez and Dr. Burns conferred and agreed that they should speak with Plaintiff. Ex. L at 51:25-52:16. First, however, Ms. Ramirez and Dr. Burns discussed whether the complaints about Plaintiff implicated Title IX. Ex. N at 2. Dr. Burns suggested that "as long as [Ms. Ramirez assessed] there [we]re no Title IX issues to be concerned with," then they should meet with Plaintiff and propose an "in-situ sabbatical from being the Chair." ¶ 24. Ms. Ramirez informed Dr. Burns that she did not believe there were "any [T]itle IX violations" at issue in the Letter of Concern or survey results, and that there was "obvious inappropriate conduct which needs to be addressed but nothing that rises to the level of sexual misconduct or assault." *Id*. Ms. Ramirez reached this conclusion, in part, because the NGSO Survey was "an anonymous survey with a lot of references that weren't directly experience[d]" by the survey respondents (or what she "would consider hearsay") and therefore did not provide "sufficient information" to initiate a Title IX investigation. *Id*.; Ex. L at

81:20-25.

Dr. Burns and Ms. Ramirez met with Plaintiff in person on or around March 1, 2022, for at least an hour, during which Plaintiff reiterated that he wanted a full investigation to be conducted.[2] ¶ 25. Dr. Burns and Ms. Ramirez agreed that an investigation was appropriate. ¶ 27. Also around March 1, 2022, Ms. Ramirez met with Plaintiff to review the student comments accompanying the NGSO Survey results, which took at least one hour. ¶ 26.

Shortly thereafter, Einstein's in-house Senior Counsel retained T&M USA, LLC ("T&M"), a professional investigative firm, to conduct the Chair Investigation. ¶ 28. Dean Tomaselli then notified Plaintiff of the decision to commence the Chair Investigation. ¶ 31. He explained that Einstein had received "concerns from the Neuroscience faculty and students related to [Plaintiff's] leadership as chair," and that Einstein would, as Plaintiff had requested, "engage external investigators to assist the College" in investigating these reports. *Id.* The Dean observed that the concerns from faculty and students revealed that they were "fearful of retaliation," and he concluded that "the power differential [was] too great, and the loss of confidence and impact on morale too significant to allow [Plaintiff] to continue as chair while this investigation t[ook] place." ¶ 33. Accordingly, Dean Tomaselli suspended Plaintiff's appointment as Chair until the Chair Investigation was concluded. ¶ 31. Plaintiff replied that he "wholeheartedly agree[d] with the College's appointment of an external independent investigator." ¶ 34.

The Dean announced the Chair Investigation to the Neuroscience Department via email on March 10, 2022, explaining that Einstein had retained T&M to conduct the investigation and that the College "hope[d] to have [the Department's] full cooperation." ¶ 35. A few days later, a

[2] Dr. Burns and Ms. Ramirez both testified to having had positive relationships with Plaintiff at the time. ¶ 27; *see* Ex. U at 19:15-24; Ex. L at 169:7-10. Dr. Burns further testified that, at the time, they had hoped that an investigation would reveal the allegations concerning Plaintiff to be unfounded. ¶ 27; *see* Ex. U at 82:10-83:6, 83:14-23, 85:4-18.

professor informed Ms. Ramirez that "vulnerable" members of the Department had "expressed concerns regarding the independent investigator and whether their comments will remain anonymous." ¶ 38. Another professor separately emailed Ms. Ramirez to convey student concerns about whether any report of the investigation would contain identifiable information and, if so, whether it would be provided to Plaintiff. *Id*.

In response to these concerns, Dean Tomaselli emailed the Department again to explain that "details of the interviews" would "not [be] shared with the College" and that Einstein was "committed to protecting the confidentiality of all individuals who participate[d] in this process." ¶ 39. In the Dean's view, "there weren't specific Title IX . . . allegations at that point," but the investigation would assist Einstein in understanding if Title IX was implicated, and so he also noted in his email that if the investigator came "across a situation which may lead to a Title IX complaint," those allegations would be referred to the College's Title IX Coordinator and handled in a "separate process." *Id*. In his email, the Dean provided students, faculty, and staff with the investigator's contact information and encouraged them to participate. ¶ 40; Ex. EE at 3-4.

## IV. Plaintiff and Fifty-Eight Others Participate in the Chair Investigation

T&M conducted the Chair Investigation from March to May 2022. ¶ 41. The investigative team consisted of a supervisor and Mr. Eric Prusan, an attorney with approximately 30 years of legal experience at the time. ¶ 40. Shortly after T&M was engaged, Mr. Prusan had an introductory call with Plaintiff. ¶ 42. Mr. Prusan told Plaintiff he would reach out for a further conversation after having gathered other information, and invited Plaintiff to contact him with questions. *Id*. In response, Plaintiff promised "unrestricted cooperation" and made several suggestions about how the investigation should proceed, including that T&M interview a "wide array of staff, faculty, [and] students" and "give [Plaintiff] specifics" of any allegations made. *Id*; Ex. FF at 2. Around the same time, Plaintiff shared with Mr. Prusan the email that Plaintiff had sent to Dr. Burns

regarding his treatment of staff and student concerns. ¶ 43.

Plaintiff, accompanied by his counsel, met with Mr. Prusan for over four hours at T&M's office on May 19, 2022. ¶ 44. During the meeting, Plaintiff was given the opportunity to respond to the specific allegations against him, including that he "pulled people's hair, poked them in their stomach," "told them they should wear high heels," "gave nicknames," called students and the Dean "moron[s]," used "racist language," engaged in "bullying or retaliation," and consumed alcohol in class or in his lab, as well as concerns about at least two administrative staff. *Id.* Following the meeting, Plaintiff provided Mr. Prusan with "additional information and clarifications," as well as dozens of documents, including information about the departures of several staff; about Plaintiff's teaching, alcohol use, and use of nicknames; and about allegations related to bullying and retaliation. ¶ 45.

T&M interviewed 58 other witnesses, who were primarily current or former students, faculty, and staff of Einstein's Neuroscience Department. *See* ¶ 41. In addition to these interviews, T&M reviewed information provided by Einstein, the Letter of Concern, the student survey results, correspondence between Plaintiff and Einstein, Plaintiff's course evaluations, and other materials provided to T&M by Plaintiff and other witnesses. *See* ¶¶ 41, 45. T&M conducted the investigation confidentially and, consistent with the Dean's email to the Department, T&M never identified investigation participants to Einstein. ¶ 46. During the investigation, when Ms. Ramirez was contacted by individuals with concerns relating to Plaintiff or the investigation, including a former student, a former member of Plaintiff's lab, and Plaintiff himself, she directed them to T&M. ¶ 47.

## V. Einstein Receives an Investigative Summary

T&M provided a summary of its investigation to Einstein in early July 2022 (the "Investigative Summary"). ¶ 48. T&M's Investigative Summary recounted the evidence T&M reviewed and the testimony of the witnesses it interviewed, without identifying witnesses by name,

other than Plaintiff and one other professor. *Id*. The Investigative Summary described allegations, and reflected additional details, of Plaintiff's concerning behavior. Ex. F at 6. Students reported that Plaintiff [redacted] ¶ 50. Students reported that [redacted] ¶ 52. And while some students described Plaintiff as [redacted] ¶ 49. Additionally, over a dozen witnesses reported [redacted] ¶ 54. And several witnesses reported that they observed Plaintiff [redacted] *Id*.

The Investigative Summary also corroborated the Letter of Concern's allegations regarding the effect of Plaintiff's conduct on staff and Department morale. Staff described how Plaintiff [redacted] *See* ¶ 53. Of the seven current and former staff members interviewed, six described Plaintiff as [redacted] *See id*. Senior faculty described Plaintiff's leadership as [redacted] ¶ 49. Witnesses [redacted] *Id*. Further, [redacted]

[redacted] *Id*. Nearly all PhD students interviewed, and all junior professors except three, expressed concern [redacted] ¶ 55.

The Investigative Summary also noted positive observations about Plaintiff, including [redacted] ¶ 56. It also shared Plaintiff's own responses to the allegations, including [redacted] ¶ 57. Where Plaintiff denied having engaged in conduct reported by other witnesses, the Investigative Summary reflected that as well [redacted] *Id*.; Ex. F at 14.

## VI. Plaintiff Acknowledges His Misconduct

The Investigative Summary recounted Plaintiff's confirmation of the veracity of many of the allegations against him. Plaintiff acknowledged [redacted] ¶ 51. He admitted that [redacted] *Id*. Plaintiff additionally confirmed to the investigator that [redacted] ¶ 54. He also admitted that [redacted] ¶ 57.

In this litigation, Plaintiff has continued to admit to much of the misconduct identified in the course of the Chair Investigation. Specifically, Plaintiff has admitted that he:

- Called a student who used crutches by the nickname "Hobble." ¶¶ 8, 50-51.
- Called a student by the nickname "Barely Legal." *Id*.
- Called students "morons," ¶ 9, and used the insult "moron" to describe "everybody." Ex. D at 215:5-216:10 (Plaintiff testifying that he called "everyone" "morons," and "when I use the word 'moron,' for me, it's like idiot or [] stupid").

- On more than one occasion, brought alcohol to, and consumed alcohol with a student or students during, a class he taught. ¶ 10.
- On more than one occasion, brought alcohol to, and consumed alcohol in, his lab with a member or members of his lab. *Id*.
- Referred to orgasm in a conversation with a student, claiming it was appropriate in the context of a discussion about graduation. Ex. D at 210:23-212:23 (Plaintiff testifying he told a student "you should enjoy making love, not just the climax").

Despite his acknowledgement of his conduct, in his deposition, Plaintiff testified that the Letter of Concern and student surveys were part of a concerted effort by four colleagues to oust him as Chair. *See* Ex. D at 104:12-105:9. Plaintiff expressed the belief that although these colleagues may have had any number of motivations for wanting him removed as Chair, Plaintiff's sex was not one of them. *Id.* at 121:4-133:19, 133:22-134:2 ("Q. But you have no reason to . . . believe that any of [the four professors] opposed you because of your sex? A. No."); ¶¶ 66-68.

## VII. Following the Chair Investigation, Plaintiff Is Removed as Chair

Based on the Chair Investigation, it was "very clear" to Dean Tomaselli that Plaintiff "would not be able to serve as chair any longer," and the Dean made the decision to remove Plaintiff as Chair. ¶ 58. Plaintiff was informed of the results of the Chair Investigation on July 11, 2022, in a letter from the Dean. *Id*. In his letter, the Dean acknowledged that Plaintiff was "an excellent scientist" and had "accomplished great things for the Department." ¶ 59. The Dean explained, however, that the investigation had revealed "that [Plaintiff's] leadership methods have contributed to a toxic environment." *Id*. He further assessed that the investigation had "confirmed the most serious concerns regarding [Plaintiff's] behavior," including:

1) "[P]ersistent general mistreatment of students";
2) "[P]ersistent and inappropriate use of discriminatory nicknames";
3) "[R]epeated instances of racist, disability, and gender-based comments and insensitive and politically incorrect comments";

4) "[R]epeated references to students and others as 'morons' in front of both students and faculty";

5) "[R]epeated inappropriate and unwanted physical touching, including pulling female students' ponytails, stomach touching, shoulder touching, and pushing";

6) "[R]epeated instances of serving alcohol to and drinking alcohol with students in classes and in the lab, which is in direct violation of Einstein's Drug and Alcohol Policy";

7) "[I]nappropriate behavior at on- and off-campus Einstein events, believed to be due to intoxication"; and

8) "[P]ersistent mistreatment, intimidation, and abuse of staff, including by threatening the loss of their jobs and privileges such as vacation and personal time."

*Id*. The letter also noted that "students and faculty alike expressed to the investigators a fear of retaliation if they were to report or complain about [Plaintiff's] behavior in any way, including by participating in the investigation." *Id*. The Dean concluded that Plaintiff's conduct was "outside the bounds of an appropriate professor/student/employee relationship" and "violate[d] Einstein policies," and that "the impact of [Plaintiff's] behavior on the environment and morale of the Department [was] too significant to have [Plaintiff] continue in a leadership position." ¶¶ 59-60. Accordingly, the Dean exercised his discretion to remove Plaintiff as Chair. ¶ 60.

As Dean Tomaselli explained, his decision to end Plaintiff's leadership role did not affect Plaintiff's tenure status. ¶ 61. To this day, Plaintiff remains a tenured faculty member at Einstein. *See id*. Plaintiff was replaced as Chair by another male professor, Dr. Adam Kohn. ¶ 62.

## VIII. Einstein Commences Title IX Investigations in which Plaintiff Is the Respondent

The same day that Plaintiff was removed as Chair, he was notified by Einstein of two Title IX complaints in which he was the respondent. ¶¶ 63, 65. The complaints were based on conduct that had come to light and been referred to Ms. Ramirez during the Chair Investigation. *See id*. Beyond referring the allegations of possible Title IX violations to Einstein, T&M did not play any

role in investigating or adjudicating these Title IX complaints. ¶ 64. Plaintiff was notified that these investigations would proceed under Einstein's Title IX Policy. ¶ 65. Following the two Title IX investigations, which were conducted by a different outside investigation firm, Plaintiff was found responsible for sexual harassment as to one complaint and not responsible as to the other. *See* ECF 79 at 13-14, 29-42 (recommending Plaintiff's claims based on the Title IX investigations be dismissed); ECF 88 at 2-7 (adopting recommendation).

## IX. Einstein's Relationship to Montefiore

Einstein has been affiliated with Montefiore since 2015, but the two institutions remain independent and separate entities. ¶¶ 76-77. Separate from Montefiore, Einstein has its own employer ID, manages its own payroll, and handles its own human resources activities. ¶ 77. Although Ms. Ramirez communicates with Montefiore's Chief Human Resources Officer, Ms. Gloria Kenny, as an advisor, Ms. Ramirez did not report to Ms. Kenny with respect to the Chair Investigation, nor did Ms. Kenny have any authority to determine the outcome of the Chair Investigation. *See* ¶ 78; Ex. L at 28:2-29:10, 134:12-20. Indeed, Montefiore plays no role in the conduct or outcome of investigations at Einstein. *See* ¶ 78; Ex. L at 28:2-29:10, 134:12-20.

## X. Einstein's Policies

Einstein's Code of Conduct provides, among other requirements, that "[a]ll employees are expected to maintain a professional environment conducive to the development of the students." ¶ 69; Ex. RR at 5. Faculty in particular "are expected to . . . respect each student as a valuable individual." ¶ 69; Ex. RR at 5.

To further ensure a professional environment, Einstein's Employee Handbook "prohibits . . . the unauthorized use of alcohol at any Einstein facilities or in connection with any Einstein activities." ¶ 70. Violations of the alcohol policy may result in "appropriate disciplinary action, up to and including termination of employment." *Id.*

Like other colleges that receive federal funding, Einstein also has policies that prohibit discriminatory conduct, including certain forms of sexual and gender-based misconduct ("Title IX Policy"). ¶ 71. Einstein's Title IX Policy establishes procedures for the investigation and adjudication of allegations of prohibited conduct, noting that "reporting anonymously may affect the College[]'s ability to investigate and respond effectively." *See* ¶¶ 71-74; Ex. UU at 14-15, 17-27.

## PROCEDURAL BACKGROUND

Plaintiff initiated this action on February 5, 2024, *see* ECF 1, and filed the FAC on September 23, 2024, asserting claims against Einstein, Montefiore, and several individual defendants, including discrimination claims under Title IX and its state and city analogues related to the two Title IX investigations, a claim of Title IX retaliation, several state law causes of action purportedly based on contractual obligations or promises on the part of Einstein, and related claims against the individual defendants. *See* ECF 48. On September 16, 2025, the Court adopted a Report and Recommendation dismissing all of Plaintiff's claims save for three against Einstein and Montefiore under Title IX, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), to the limited extent those claims arise from the Chair Investigation. *See* ECF 88 at 12.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a motion for summary judgment, where the non-moving party "has the ultimate burden of proof at trial," the moving party may "satisfy its burden by demonstrating that the nonmovant cannot produce admissible evidence that supports the existence of a triable issue of fact." *Clark v. Port Auth. of N.Y. & N.J.*, No. 24 Civ. 2790, 2026 WL 834861, at *3 (S.D.N.Y. Mar. 26, 2026) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute for trial." *Id.* (citing *Beard v. Banks*, 548 U.S. 521, 529 (2006)). To defeat a summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986), and "may not merely rest on the allegations or denials of his pleading," *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Rather, the non-moving party must point to "specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).

## ARGUMENT

### I. Defendants Are Entitled to Summary Judgment on Plaintiff's Title IX Claim

Title IX prohibits discrimination on the basis of sex and provides a private right of action for damages when a plaintiff has suffered "intentional conduct that violates the clear terms of the statute." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999).[3] The Second Circuit recognizes two paths for a plaintiff to challenge university actions under Title IX. The plaintiff may allege that a university "affirmatively discriminated on the basis of sex in its own official actions," or he may allege that the university discriminated by virtue of being "deliberately indifferent" to actual knowledge of gender-based discrimination in its programs.

[3] The Second Circuit has held that university employees may bring claims under Title IX. *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106 (2d Cir. 2022). Defendants preserve for review the argument that Title IX does not confer a private right of action based on sex discrimination in employment. *See Crowther v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 25-183, 2026 WL 1377024 (U.S. May 18, 2026) (granting certiorari to address circuit split on this issue).

*Schiebel*, 120 F.4th at 1096-97; *see also Davis*, 526 U.S. at 650. Here, Einstein is entitled to summary judgment on Plaintiff's official action claim—which he premises on the purported "erroneous outcome" of the Chair Investigation— because (1) Plaintiff's removal as Chair was a matter plainly committed to the discretion of the Dean and therefore cannot be "erroneous," and (2) there is no evidence that Plaintiff's sex played any role in the Dean's exercise of that discretion.

As to any potential deliberate indifference claim, Einstein is entitled to summary judgment on both procedural and substantive grounds. Procedurally, Plaintiff did not plead in his FAC that Einstein was deliberately indifferent with respect to the Chair Investigation. Indeed, Plaintiff did not hint at this unpled theory until almost a year after commencing this action, when he argued in his opposition to Defendants' motion to dismiss that he had sufficiently alleged a deliberate indifference claim related to the Title IX investigations in which he was a respondent—an argument that this Court rejected. ECF 60 at 16-20; ECF 79 at 36-38. But even if Plaintiff had pled a deliberate indifference claim as to the Chair Investigation (which he did not), as a substantive matter, he still cannot point to any evidence (1) that any of the allegations lodged against him by Neuroscience Department students, faculty, and staff, of which Einstein was aware, were both false and motivated by gender bias, or (2) that Einstein's response to those allegations was so clearly unreasonable that it was somehow a sham or its outcome inexplicable, as he must to create a triable question of deliberate indifference.

### A. Plaintiff's Title IX Claim Fails Under an Erroneous Outcome Theory

To succeed on his erroneous outcome theory, Plaintiff must demonstrate both (1) "articulable doubt" as to the "accuracy of the outcome" of the proceeding, and (2) "that gender bias was a motivating factor behind the erroneous finding." *Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019) (summary order) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). No evidence in the record is sufficient to raise a genuine dispute of material fact as to either

the "accuracy" of Dean Tomaselli's discretionary decision to remove Plaintiff as Chair or that gender bias played any role in it.

### 1. There Can Be No Dispute of Material Fact as to the "Accuracy" of the Dean's Exercise of His Discretion

Plaintiff's erroneous outcome theory necessarily fails at summary judgment because the "outcome" of the Chair Investigation was a discretionary leadership decision, not a factual finding that Plaintiff can contest as incorrect. As a matter of law, an erroneous outcome claim requires an "erroneous finding" because the term "'outcome' refers to factual findings, not a discretionary disciplinary decision." *Roe v. Icahn Sch. of Med.*, No. 25 Civ. 8157, 2026 WL 2655470, at *3 (S.D.N.Y. Sept. 9, 2026).

There is no such factual finding at issue here. The Chair Investigation involved a wide-ranging inquiry into Plaintiff's performance as Chair of the Neuroscience Department, a role that he, like all Department Chairs at Einstein, held "subject to performance as determined by the Dean." Ex. C at 1. There was no requirement that any particular process be followed or even that any investigation be conducted, but instead simply that the Dean determine, in his sole discretion, whether Plaintiff's performance in his role as Chair was satisfactory. At bottom, this was a discretionary personnel decision, not a disciplinary proceeding.

The Dean formed the opinion that "the impact of [Plaintiff's] behavior on the environment and morale of the Department [was] too significant." *See* Ex. NN at 6. Based on that assessment of Plaintiff's performance, the Dean decided, in his discretion, to remove Plaintiff as Chair. Plaintiff cannot challenge that decision as "erroneous" under Title IX. *See Icahn Sch. of Med.*, 2026 WL 2655470, at *3. For good reason: courts have long recognized that a college's academic appointments, including who they employ and promote, are a form of "self-determination" beyond the court's intervention. *See, e.g.*, *Heim v. Daniel*, 81 F.4th 212, 230 (2d Cir. 2023); *Bickerstaff v.*

*Vassar Coll.*, 196 F.3d 435, 455–56 (2d Cir. 1999); *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980).

In any event, the justifications for the Dean's exercise of his discretion in removing Plaintiff as Chair are unimpeachable: the Dean received reports from members of the Neuroscience Department about their concerns with Plaintiff's performance as Chair, *see supra* at 4-7; an outside investigation confirmed those reports of Plaintiff's mistreatment of students, faculty, and staff, *see supra* at 9-12; and Plaintiff admitted to acts of misconduct that, on their own, would have been a reasonable basis for removing him as Chair, *see supra* at 12-13 (admitting to using offensive nicknames for students, calling them and others morons, and serving them alcohol in his classroom and lab). Indeed, since Plaintiff admits to engaging in much of the conduct at issue, there can be no genuine dispute as to whether he was "wrongly found to have committed an offense," which is a necessary element of an erroneous outcome claim. *Yusuf*, 35 F.3d at 715; *see also, e.g.*, *Doe v. Trs. of Columbia Univ*., No. 21 Civ. 5839, 2022 WL 3666997, at *15 (S.D.N.Y. Aug. 25, 2022) ("[e]rroneous outcome claims rest on allegations" that the plaintiff did not commit the conduct at issue).

Accordingly, there is no triable issue of fact on the first prong of Plaintiff's "erroneous outcome" claim. That alone is sufficient to grant summary judgment on this claim.

### 2. No Reasonable Jury Could Conclude that Einstein Acted on the Basis of Plaintiff's Sex in Removing Him as Chair

Even if there were an "erroneous outcome" at issue in this case (there is not), to defeat summary judgment, Plaintiff "must demonstrate a genuine dispute of material fact as to whether [Einstein's] actions were motivated by gender bias." *Doe v. Colgate Univ*., 760 F. App'x at 30. There is no direct evidence in the record of gender bias on Einstein's part, and Plaintiff has failed to develop circumstantial evidence sufficient to create a triable issue of fact. *See, e.g.*, *Doe v. N.Y.*

*Univ.*, No. 20 Civ. 1343, 2023 WL 5293688, at *4 (S.D.N.Y. Aug. 17, 2023) (plaintiff may prove "discriminatory intent" by adducing direct or circumstantial evidence of gender bias), *aff'd*, No. 23-1246, 2024 WL 4834965 (2d Cir. Nov. 20, 2024). Even if Plaintiff were able to make out a *prima facie* case of bias through circumstantial evidence, the undisputed facts establish Einstein had a legitimate, non-discriminatory, non-pretextual justification for removing him as Chair.[4]

**a. There Is No Direct Evidence of Bias Based on Plaintiff's Sex**

In the context of a gender bias claim, direct evidence can include, for example, "a workplace policy, practice, or decision [that] relies expressly on a protected characteristic," *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015), or "statements by members of the disciplinary tribunal" or "pertinent university officials," *Yusuf*, 35 F.3d at 715.

The summary judgment record here is entirely devoid of direct evidence from which a reasonable jury could find that Einstein's actions were motivated by gender bias.[5] No policy, practice, or decision at issue relies on sex, expressly or otherwise. *See* ¶ 75. Plaintiff does not claim that the Dean, Dr. Burns, Ms. Ramirez, or Mr. Prusan opposed him or were biased against him because of his sex. *See, e.g.*, ¶¶ 66-68. Indeed, according to Plaintiff, the only "indication of gender bias" was a remark about the #MeToo movement that Dr. Burns allegedly made—a remark

---

[4] In cases involving only circumstantial evidence, courts in the Second Circuit use "the *McDonnell Douglas* burden-shifting framework to assess 'whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment.'" *Valerio v. Metro. Transp. Auth.*, No. 23 Civ. 1938, 2024 WL 2305386, at *5 (S.D.N.Y. May 20, 2024) (quoting *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024)), *aff'd*, No. 24-1614, 2025 WL 686028 (2d Cir. Mar. 4, 2025); *see also Radwan v. Manuel*, 55 F.4th 101, 130 (2d Cir. 2022) (applying *McDonnell Douglas* at summary judgment in Title IX case). Under that framework, a plaintiff "must first establish a *prima facie* case by showing that," among other things, "the facts imply a discriminatory intent.'" *Doe v. N.Y. Univ.*, 2023 WL 5293688, at *4 (citation omitted). If the plaintiff does so, the burden shifts to the defendant "to proffer a legitimate non-discriminatory reason for the adverse action," which the plaintiff may rebut by showing the proffered reason was pretextual. *Id*. (internal quotation marks and citation omitted).

[5] The Second Circuit has not explicitly adopted a particular causation standard for Title IX claims. *Compare Schiebel*, 120 F.4th at 1096 (requiring that sex-based bias was a motivating factor), *with Radwan*, 55 F.4th at 131-32 (declining to decide whether "motivating factor" or but-for standard applied). Here, Plaintiff cannot prevail even under the lower "motivating factor" standard. *See Doe v. N.Y. Univ.*, 2024 WL 4834965, at *1 n.2 (concluding summary judgment was appropriate under either standard).

Plaintiff now concedes he "[doesn't] think . . . was a bias against [him]." Ex. D at 171:7-12; 222:22-223:7. But the Court has already concluded that, even if it occurred, that comment would be insufficient to demonstrate gender bias. *See* ECF 79 at 24.

In his deposition, Plaintiff attempted to testify that "gender was a factor" in the Dean's decision to remove him as Chair because after he was removed, the Dean allegedly told another professor that additional Title IX allegations against Plaintiff had arisen. *See* Ex. D at 318:14-319:12. Plaintiff's third-hand recounting of what another professor told Plaintiff that the Dean had allegedly said to that professor is clearly not admissible evidence. *See, e.g.*, *Quinones v. Montefiore Med. Ctr.*, No. 24 Civ. 1516, 2026 WL 1831862, at *4 (S.D.N.Y. June 25, 2026) (explaining testimony about what plaintiff was told another person had said "is classic hearsay" and cannot be relied upon to defeat summary judgment). In any event, a factually accurate statement by the Dean about the existence of Title IX complaints against Plaintiff, ¶¶ 63, 65, does not come close to direct evidence that the Dean was motivated by gender bias in removing Plaintiff as Chair. *Cf. Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 150 (2d Cir. 2024) (decisionmaker's response that employee was being terminated because they were "on disability" was direct evidence of disability discrimination sufficient to survive summary judgment).

**b. No Circumstantial Evidence Supports an Inference of Bias Based on Plaintiff's Sex**

Because Plaintiff cannot point to any direct evidence of gender bias, he must instead adduce circumstantial evidence sufficient for a jury to conclude that his removal as Chair was motivated by his sex. *See, e.g.*, *Valerio*, 2024 WL 2305386, at *5. In Title IX erroneous outcome cases, plaintiffs commonly seek to satisfy this burden by adducing evidence that the disciplinary process was somehow irregular, combined with contemporaneous pressure on the college to discriminate. *See, e.g.*, *Doe v. Colgate*, 760 F. App'x at 30-33 (considering and rejecting Plaintiff's evidence of

internal and external pressure and of procedural issues in the disciplinary process and affirming summary judgment for defendant); *Doe v. Trs. of Hamilton Coll.*, No. 22 Civ. 214, 2024 WL 1675130, at *8 (N.D.N.Y. Apr. 18, 2024) (permitting Title IX claim to survive summary judgment in light of "evidence of procedural irregularities and external pressure"); *Vengalattore v. Cornell Univ.*, No. 18 Civ. 1124, 2024 WL 4135875, at *10 (N.D.N.Y. Sept. 10, 2024) (similar). The undisputed facts here show that the Chair Investigation was procedurally sound and there is no genuine dispute that Einstein was free from any pressure to discriminate against male faculty.

***The Chair Investigation Was Procedurally Sound.*** There is no evidence of any procedural irregularity in the Chair Investigation capable of supporting an inference that Einstein acted with discriminatory intent towards Plaintiff because of his sex.

At summary judgment, courts have considered procedural irregularities such as the appointment of a biased decision-maker, *Doe v. Trs. of Hamilton Coll.*, 2024 WL 1675130, at *7, or the imposition of successive discipline for the same offense, *Simons v. Yale Univ.*, 712 F. Supp. 3d 267, 283-84 (D. Conn. 2024), to be sufficient circumstantial evidence of bias. But the central premise of a "procedural irregularity" is that the college has taken some action inconsistent with its policies and procedures setting forth the manner in which a complaint is to be investigated and adjudicated. *See, e.g.*, *Doe v. Trs. of Hamilton Coll.*, 2024 WL 1675130, at *7 (finding appointment of hearing officer with a conflict of interest could violate policy's guarantee of a "fair, timely, impartial" process); *Vengalattore*, 2024 WL 4135875, at *6 (finding plaintiff marshalled sufficient evidence that university "deviated from its procedures" as described in specific policies).

Here, as discussed above, there were no policies or procedures governing the Dean's exercise of his discretion to remove faculty from the position of Department Chair. Plaintiff, like other Department Chairs, continued in the role "subject to performance as determined by the

Dean." ¶ 6. There was no prescribed process for the Dean's evaluation of Plaintiff's performance or his resulting decision that Plaintiff could not continue as Chair. Accordingly, there could be no procedural irregularities.

Moreover, the allegations at issue were primarily about Plaintiff's abuse of his authority as Chair, including concerns about his effectiveness at supporting students and Department morale, his "autocratic and inappropriate" behavior, and the impact his leadership had on staff departures and the Department in general. *See* Ex. M at 2; Ex. J at 21; Ex. I at 8, 11; Ex. Q at 4. While some of Plaintiff's alleged behavior—for example, his use of the nickname "Barely Legal" for a female student—may have implicated sex or gender, at the outset, Dr. Burns raised the question and Ms. Ramirez specifically considered whether any of the allegations rose to the level of a potential Title IX violation such that they should be reviewed under Einstein's Title IX Policy. *See* Ex. S at 3 (Dr. Burns informing Ms. Ramirez that "as long as you think there are no Title IX issues to be concerned with then my opinion is that this becomes a major administrative issue"); Ex. N at 2 (Ms. Ramirez describing the allegations as "nothing that rises to the level of sexual misconduct or assault"); Ex. L at 54:9-17 (Ms. Ramirez testifying that she "reviewed [the NGSO comments] with that eye" of whether they "implicat[ed] Title IX"). Ms. Ramirez concluded that because the allegations were anonymous, they did not provide "sufficient information" to launch a Title IX investigation, a circumstance expressly recognized in Einstein's Title IX Policy. *See* ¶ 24; *see also* Ex. UU at 14-15; Ex. L at 54:7-17; 81:20-82:6 (Ms. Ramirez testifying that the reports were anonymous and "what I would consider hearsay"); Ex. L at 82:3-5 (Ms. Ramirez describing the NGSO Survey as "an anonymous survey with a lot of references that weren't directly experienced").

Even so, Einstein did not ignore the possibility that during the course of the Chair

Investigation, allegations could come to light that might warrant application of Einstein's Title IX Policy. To the contrary, Einstein instructed the T&M investigator that if he identified any Title IX allegations, he should refer them promptly to Ms. Ramirez. *See* ¶¶ 39, 63-64. Dean Tomaselli also notified members of the Neuroscience Department that if allegations were made that would implicate Title IX, the investigator would refer the matter to Einstein's Title IX Coordinator and "a separate process [would] be invoked." ¶ 39. And that is exactly what happened: when allegations arose during the Chair Investigation that did warrant investigation pursuant to Einstein's Title IX Policy, those allegations were referred to Ms. Ramirez. ¶¶ 63-64. Plaintiff received notice of those allegations pursuant to, and those allegations were investigated and adjudicated consistent with, Einstein's Title IX Policy. *See* ¶ 65; *see also* ECF 79 at 29-35 (recommending that claims based on Title IX investigations be dismissed); ECF 88 at 2-6 (adopting recommendation).

In any event, there is no genuine dispute that the Chair Investigation afforded Plaintiff robust process. Einstein went to the length of hiring an outside firm to conduct the investigation—at Plaintiff's urging and with Plaintiff's full support. *See*, *e.g.*, Ex. Y at 2 (Plaintiff urging Dean Tomaselli to move forward with a "speedy investigation"), Ex. K at 2, Ex. N, Ex. L at 94:6-96:8, 106:5-118:10. Plaintiff received notice of the allegations against him when Dr. Jordan sent him a summary of the GEC Survey results on January 24, 2022, ¶ 13; when his faculty colleagues sent the Letter of Concern to him on February 24, 2022, ¶ 19; and when Ms. Ramirez spent over an hour reviewing the NGSO Survey comments with him around March 1, 2022, ¶ 26. Plaintiff repeatedly acknowledged that he had received the allegations. *See, e.g.*, ¶¶ 23, 30, 34, 36, 37, 42, 44, 45. *Cf. Schiebel*, 120 F.4th at 1100 (noting school "withheld the details of the allegations and minimized the seriousness that [the school] ascribed to the allegations").

Plaintiff was also given ample opportunity to respond to the allegations, including by providing evidence and participating in the investigation. Plaintiff sent multiple emails to Dr. Burns and Ms. Ramirez responding to the concerns that faculty and students had raised. *See, e.g.*, ¶¶ 23, 30. After T&M was engaged, Plaintiff participated in an introductory phone call with the investigator, ¶ 42; sat for an interview of more than four hours, ¶ 44; and provided T&M with numerous documents, ¶ 45. During his interview, Plaintiff was accompanied by counsel and was asked directly about most, if not all, of the specific allegations against him. ¶ 44. After his interview, Plaintiff provided T&M with additional, detailed information related to the allegations against him, along with dozens of additional documents. ¶ 45. *Cf. Schiebel*, 120 F.4th at 1101 (noting plaintiff was "confronted with the allegations at a meeting that lasted twenty-five minutes" and had not been previously informed of the investigation).

There is also no evidence that the investigation was biased. *See Doe v. Trs. of Hamilton Coll.*, 2024 WL 1675130, at *7. T&M is an independent, professional investigative firm, and no evidence in the record so much as hints at gender bias on T&M's part. ¶ 28. Indeed, Plaintiff testified in his deposition that neither the investigator, Mr. Prusan, nor anyone at T&M made statements that were derogatory of men. *See* Ex. D at 308:13-310:10. T&M interviewed 59 witnesses—primarily current or former students, faculty, and staff of Einstein's Neuroscience Department, both male and female. *See* ¶ 41. The Dean provided Mr. Prusan's contact information to the Department and encouraged individuals to participate. ¶ 40. To further encourage broad participation, interviewees were promised confidentiality, and T&M never identified investigation participants to Einstein. ¶¶ 39, 46. In addition to these interviews, T&M reviewed information provided by Einstein, the Letter of Concern, the student survey results, correspondence between Plaintiff and Einstein, Plaintiff's course evaluations, and other materials provided to T&M by

Plaintiff and other witnesses. *See* ¶¶ 41, 45. The Investigative Summary provided an even-handed description of Plaintiff's behavior and accomplishments and relayed Plaintiff's proffered explanations for his conduct throughout. *See* ¶ 56; Ex. F at 3 n.2, 4 n.4 & 5, 9-15; *supra* at 12.

***There Was No Pressure on Einstein to Discriminate.*** In addition to there being no evidence of any procedural irregularities in the Chair Investigation, there is also no evidence in the record from which a reasonable jury could infer that internal or external pressure drove Einstein to discriminate against Plaintiff because of his sex. At the motion to dismiss stage, the Court credited (as it was required to) Plaintiff's allegation that a female graduate student's 2021 presentation to the Neuroscience Department "resurrected the specter of the #MeToo movement at Einstein" and "provided a motive to favor female complainants over male respondents." ECF 79 at 25-26. But Plaintiff has adduced no evidence in discovery relating to this alleged presentation. In fact, in response to an interrogatory asking Plaintiff to "describe all facts . . . that support [his] contention that Defendants were motivated by gender bias," Plaintiff makes no mention of the student presentation and instead claims that others falsified allegations against him and Einstein was deliberately indifferent to those false allegations. *See infra* at 30-33; Ex. OO at 3.

Indeed, Plaintiff's only claimed evidence of pressure to discriminate relates to his allegation in the FAC that Dr. Burns and Ms. Ramirez asserted that Einstein needed to be responsive to student concerns in light of the #MeToo movement. ECF 48 ¶ 126. But the Court has already concluded that "any statements that Einstein needed to appear responsive because of the #MeToo movement do not, *without more*, 'show the influence of gender' on the investigations into Plaintiff's conduct." ECF 79 at 24 (emphasis added).

Discovery in this case has not supplied the "more." Rather, the only evidence of these

purported statements adduced in discovery is Plaintiff's own testimony repeating his allegations, which was not corroborated by either Ms. Ramirez or Dr. Burns. Ex. D at 159:5-9, 180:4-8; *see also id.* at 164:16-19; Ex. L at 111:15-112:2 (Ms. Ramirez testifying she did not say the College needed to "appear" responsive); Ex. U at 65:17-66:5 (Dr. Burns testifying he "[did not] recall" making a comment about the "current climate" requiring schools to "appear" responsive).[6] And there is no evidence in the record of the kinds of "on-campus protests" and "criticism by the student body" related to the handling of Title IX proceedings that, when combined with evidence that "all of the Title IX adjudications contemporaneous" to those protests "resulted in an adverse finding against the male respondent," have been found sufficient to survive summary judgment. *Doe v. Princeton Univ.*, No. 20 Civ. 4352, 2026 WL 2655154, at *7-8 (D.N.J. Sept. 9, 2026); *cf. Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020) (granting motion to dismiss, observing "the MeToo movement occurred on college campuses across the country, and therefore, does not provide sufficient support that [defendant] specifically was under public pressure").

### c. Einstein Had Legitimate, Non-Discriminatory, Non-Pretextual Reasons for Removing Plaintiff as Chair

In any event, Einstein had legitimate, non-discriminatory, and non-pretextual reasons to remove Plaintiff as Chair. *See, e.g.*, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (explaining in Title VII case that "[e]ven if the plaintiff succeeds in presenting a *prima facie* case, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action.").

It is well-settled that concerns about overall performance, bullying, or retaliation are legitimate, non-discriminatory reasons for personnel decisions such as demotion. *See, e.g.*,

---

[6] Neither Ms. Ramirez nor Dr. Burns was asked in their deposition about any reference to the #MeToo movement. *See generally* Ex. L; Ex. U.

*Gentleman v. State Univ. of N.Y. Stony Brook*, No. 21-1102, 2022 WL 1447381, at *4-5 (2d Cir. May 9, 2022) (concluding evidence demonstrating an instructor's "verbal abuse, bullying, public shaming, and . . . negative student evaluations" formed legitimate, nondiscriminatory reason for nonrenewal of contract); *see also Ramsaran v. Booz & Co. (N.A.) Inc.*, No. 14 Civ. 708, 2015 WL 5008744, at *7 (S.D.N.Y. Aug. 24, 2015) (collecting cases). Here, the Letter of Concern and student surveys alerted Einstein to just such concerns about Plaintiff's performance, including, for example, reports of Plaintiff "call[ing] students idiots and morons in class," ¶ 17; behavior that resulted in "office staff crying in their offices and in the hallways," Ex. M at 1; and a significant number of students reporting that they feared retaliation "if they brought an issue" to Plaintiff, Ex. J at 22; *see supra* at 4-7. The Chair Investigation substantiated those concerns. *See supra* at 10-12. And Plaintiff himself has even admitted much of this inappropriate conduct, including using the insult "moron" to describe "everybody," ¶ 9, Ex. D at 215:5-12; 216:6-10, calling students by nicknames including "Hobble" and "Barely Legal," ¶¶ 8, 50-51, Ex. G at Response Nos. 61-62, 64, 66; bringing alcohol to and consuming alcohol with students during a class he taught, ¶ 10, Ex. G at Response Nos. 76, 80, 82; bringing alcohol to and consuming alcohol in his lab, Ex. G at Response Nos. 78, 86; and telling a student as she considered her graduation plans that she "should enjoy making love, not just the climax," ¶ 8, Ex. D at 212:22-3; *see supra* at 12-13. There can therefore be no genuine dispute that this behavior occurred, and that it supplied a legitimate, non-discriminatory reason for removing Plaintiff as Chair. *See, e.g.*, *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 365 (2d Cir. 2025) (affirming grant of summary judgment to defendant where "undisputed evidence establishes that defendants received numerous complaints" about plaintiff, including complaints of "unprofessional conduct," "contentious interactions," and "heated conversations," and allegations of yelling at staff); *Bassi v. N.Y. Med. Coll.*, No. 23-278, 2024 WL

3717317, at *2 (2d Cir. Aug. 8, 2024) (affirming grant of summary judgment for college where "[t]he record [wa]s replete with examples of Plaintiff's poor performance"); *Carela v. N.Y.C. Parks & Recreation Dep't*, No. 98 Civ. 2753, 2005 WL 2105546, at *8 (S.D.N.Y. Sept. 1, 2005) (granting summary judgment where plaintiff had violated policy by drinking beer during workday (collecting cases)).

Nor does the record give rise to a triable question of fact about pretext. While Plaintiff may believe that the complaints about him from students, faculty, and staff were unfounded, the factual validity of the complaints is not relevant to the question of pretext: what matters is "what motivated the employer," not "the truth of the allegations against plaintiff." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). That Plaintiff was replaced as Chair by another male professor, ¶ 62, also "severely undercuts" any suggestion that Plaintiff's removal was a result of gender bias, *Macias v. Barrier Free Living, Inc.*, No. 16 Civ. 1735, 2018 WL 1603566, at *6 (S.D.N.Y. Mar. 28, 2018); *Anderson v. Univ. Orthopaedic*, No. 16 Civ. 7311, 2016 WL 10567969, at *4 (S.D.N.Y. Dec. 23, 2016) (no "inference of discrimination on the basis of sex or race" when "one of the replacements is the same sex and same race" as plaintiff); *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 233 (E.D.N.Y. 2010) (that replacement was the same sex as plaintiff "weighs against a finding of discrimination").

**B. Plaintiff's Title IX Claim Fails Under a Deliberate Indifference Theory**

The FAC pleads a Title IX erroneous outcome claim, *see* ECF 48 at 70-75, not once using the term "deliberate indifference," *see generally id.* Yet in his opposition to Defendants' motion to dismiss, Plaintiff argued that he had "sufficiently alleged both Title IX erroneous outcome and deliberate indifference claims." ECF 60 at 15-20. After the Court dismissed the bulk of Plaintiff's claims, ECF 79 at 37-42, ECF 88 at 6-7, Plaintiff moved to further amend his pleading, *see* ECF 93, but his proposed Second Amended Complaint still styled his Title IX claim as "Erroneous

Outcome," ECF 94-1 at 82-87, and the phrase "deliberate indifference" remained absent, *see generally id.* In any event, the Court denied Plaintiff's motion. *See* ECF 125. The Court should therefore disregard any effort by Plaintiff to now assert a deliberate indifference theory at this late date. *See, e.g.*, *Wellner v. City of New York*, No. 16 Civ. 7032, 2019 WL 1511022, at *2 & n.3 (S.D.N.Y. Mar. 22, 2019) (denying reconsideration of summary judgment based on plaintiff's failure to plead theory in her complaint, where plaintiff's counsel previously "mentioned" the theory but did not amend the pleading to include it).

Even if the Court were to permit Plaintiff to proceed under a deliberate indifference theory, Einstein would still be entitled to summary judgment. Although such a claim has never been pled in this case, in his interrogatory responses, Plaintiff claims that the Dean and two other faculty "intentionally manufactured false allegations of sexual misconduct" against him and that Einstein was "aware of the falsity of the allegations" but "prohibited Plaintiff from being able to defend himself." Ex. OO at 3. To prevail under this putative deliberate indifference theory, Plaintiff would have to show that "he was targeted by a discriminatory accusation" motivated by gender bias, and that Einstein "imposed discipline or sanctions under circumstances that indicate deliberate indifference to the truth or falsity of the accusation." *Schiebel*, 120 F.4th at 1097. Plaintiff may demonstrate such circumstances by showing either that (1) Einstein's response "was so 'objectively deficient' that it cannot be said to have been aimed at uncovering the truth," or (2) Einstein's decision to remove him as Chair "was so 'inexplicable' that the same inference [of deliberate indifference] could be drawn." *Schiebel*, 120 F.4th at 1097 (quoting *Roe v. St. John's Univ.*, 91 F.4th 643, 655 (2d Cir. 2024)). Plaintiff cannot make any such showing here.

As an initial matter, no evidence supports Plaintiff's speculation that certain faculty members "intentionally manufactured false allegations of sexual misconduct" against him. Ex. OO

at 3. In his deposition, Plaintiff theorized that Dr. Jordan wrote the student survey responses and comments based on information Dr. Jordan learned in conversations with students. *See, e.g.*, Ex. D at 200:19-22. Even if true, reporting student experiences as relayed by those students is not the same as *falsifying* those reports. Plaintiff went on in his deposition to identify only one specific example of a student survey comment that he alleged was falsified: that Plaintiff had told a student "[y]ou are just focused on the orgasm." Ex. J at 44-45; Ex. D at 210:23-213:3. But Plaintiff admitted in his deposition that he had told that student "you should enjoy making love, not just the climax." Ex. D at 212:21-23. Plaintiff cannot raise a dispute about whether an allegation was false while admitting to having made that very statement in sum and substance.

Plaintiff also claimed in his deposition that two faculty members encouraged two other faculty who claimed Title IX violations against Plaintiff to come forward. *See* Ex. D at 335:24-337:19. Again, this is not evidence of falsification. Nor are Plaintiff's claims that four professors, who supposedly sought his ouster as Chair, compiled evidence of his misconduct or wrote the Letter of Concern to be harsher than signatories had anticipated. Ex. D at 113:12-20, 122:13-17.

Even if there were evidence that the allegations in the Letter of Concern and the student surveys were somehow false (and there is not), Plaintiff does not contend that the faculty who purportedly engaged in that falsification were motivated by "sex-based discrimination." *Schiebel*, 120 F.4th at 1097. Plaintiff claims that the Letter of Concern and the student surveys were part of a concerted effort by four of his colleagues to have him removed from his position as Chair. Plaintiff testified in his deposition that these faculty had a variety of possible motivations, but he admitted specifically that he does not believe they were motivated by gender bias. *Id.* at 121:4-133:19, 133:22-134:2 ("Q. But you have no reason to . . . believe that any of [the four professors] opposed you because of your sex? A. No."); ¶ 64. This testimony, on its own, is fatal

to Plaintiff's claim: a deliberate indifference claim fails where there is no evidence—or, as here, even any allegations—of gender bias on the part of an accuser. *Schiebel*, 120 F.4th at 1097 (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 39 (2d Cir. 2019)).

Further, Plaintiff can point to no evidence suggesting that Einstein was somehow deliberately indifferent to the allegations against him, false or not. Far from it. For all the reasons set forth above, *supra* at 22-27, no reasonable jury could find that the Chair Investigation was "so 'objectively deficient' that it cannot be said to have aimed at uncovering the truth." *Schiebel*, 120 F.4th at 1097, 1104. Plaintiff was afforded ample process, including an investigation conducted by a neutral third party, and Plaintiff actively participated in that process. *See, e.g.*, *Tubbs v. Stony Brook Univ.*, 343 F. Supp. 3d 292, 313 (S.D.N.Y. 2018) (granting summary judgment for defendant where defendant promptly responded to complaint and procedural requirements were "largely" met); *Doe v. Sacks*, 714 F. Supp. 3d 402, 412 (S.D.N.Y. 2024) (granting motion to dismiss deliberate indifference claim, noting "[w]hile Plaintiff may certainly wish that [the defendant] had gone to greater lengths to identify and discipline the [alleged harassers], the University's response was not, in fact, 'clearly unreasonable'" and "plaintiffs have no 'Title IX right to make particular remedial demands'" (quoting *Davis*, 526 U.S. at 648)); *cf. Schiebel*, 120 F.4th at 1097 (reversing dismissal of a deliberate indifference claim where plaintiff was not afforded "even the rudiments of due process").

Finally, there is no evidence to create a triable issue as to whether Plaintiff's removal as Chair could be characterized as "inexplicable." *Schiebel*, 120 F.4th at 1098; *St. John's Univ.*, 91 F.4th at 656. No reasonable jury could conclude that removing Plaintiff as Chair based on his performance, as confirmed by an outside investigation and Plaintiff's own admissions, *see supra* at 9-13, was "'clearly unreasonable' in light of the known circumstances." *Papelino v. Albany*

*Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (quoting *Davis*, 526 U.S. at 648).

## II. Defendants Are Entitled to Summary Judgment on Plaintiff's NYCHRL and NYSHRL Claims for Similar Reasons

Plaintiff's NYCHRL claim requires that he show he "has been treated less well than other employees because of [his] gender." *Carmody v. N.Y. Univ.*, No. 21 Civ. 8186, 2023 WL 5803432, at *6 (S.D.N.Y. Sept. 7, 2023). Similarly, to survive summary judgment on his NYSHRL claim, Plaintiff must show that he "was subject to 'inferior terms, conditions or privileges of employment because of'" his sex. *McDonald v. Pharney Grp. LLC*, No. 23 Civ. 06025, 2026 WL 787750, at *6 (S.D.N.Y. Mar. 20, 2026) (quoting N.Y. Exec. Law. § 296(1)(h)). Plaintiff has adduced no evidence that he was "treated less well" than other similarly situated employees because of his sex. *Carmody*, 2023 WL 5803432, at *6. In fact, he has not sought, much less obtained, any evidence concerning any similarly situated employee.

Moreover, although these statutes grant broader protections than Title IX, "a plaintiff must still link the adverse employment action to a discriminatory motivation." *Ebadi v. Diamond Standard Inc.*, No. 24 Civ. 00103, 2026 WL 591569, at *9 (S.D.N.Y. Mar. 3, 2026). For all the reasons discussed above, there is no evidence to support the conclusion that Einstein discriminated against Plaintiff on the basis of his sex.

## III. There Is No Evidence in Support of Plaintiff's Claims Against Montefiore

To survive summary judgment, a plaintiff bears the burden of presenting evidence of liability as to each defendant. *See, e.g.*, *Anderson*, 477 U.S. at 252. Yet here, Plaintiff cannot present even "a scintilla of evidence" that Montefiore was involved in any act of discrimination. *Id.* For all the reasons discussed above, Plaintiff has adduced no evidence that his removal as Chair was based on his sex. This is doubly true for Montefiore, which, the evidence shows, played no

role in the Chair Investigation or in the decision to remove Plaintiff as Chair. Rather, the evidence reflects it was Einstein that initially assessed the allegations against Plaintiff, ¶¶ 23–24; that made the decision to engage an outside investigation firm to conduct the Chair Investigation, ¶¶ 27-28; and that decided to remove Plaintiff as Chair, ¶ 58. Indeed, in her deposition, Ms. Ramirez testified clearly that Montefiore plays no role in the conduct or outcome of investigations at Einstein. *See* ¶ 78; Ex. L at 29:3-10. No witness testified to the contrary, and there is no genuine dispute that Dean Tomaselli made the decision to suspend and ultimately remove Plaintiff as Chair. *See* ¶ 58; Ex. O at 95:5-8; Ex. L at 161:16-25; Ex. U at 88:22-89:4; *see also* Ex. D at 317:19-23.

Although the Court previously found that Plaintiff had sufficiently alleged a "joint employment relationship" between Montefiore and Einstein to withstand a motion to dismiss, *see* ECF 79 at 19, that theory does not survive summary judgment. To establish a "joint employment relationship" at summary judgment, Plaintiff must present evidence that Montefiore "possessed or exercised authority to hire, fire, supervise, discipline, compensate, or otherwise control" him. *Corbin v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 1613, 2026 WL 2240726, at *10 (S.D.N.Y. Aug. 4, 2026). But Plaintiff has not adduced any evidence—because no such evidence exists—that Montefiore exercised any such authority over Plaintiff. Rather, the undisputed facts show that Montefiore and Einstein operate separately. *See* ¶¶ 77-78; Ex. L at 27:14-19, 28:23-29:9; 134:4-135:14. Accordingly, Montefiore is independently entitled to summary judgment. *See Celotex*, 477 U.S. at 325 (moving party may prevail at summary judgment by pointing to absence of evidence to support the nonmoving party's case).

## CONCLUSION

For the foregoing reasons, Defendants Einstein and Montefiore respectfully request that the Court grant this motion and dismiss all remaining claims of the FAC with prejudice.

Dated: September 25, 2026

Respectfully submitted,

By: ______________________________

Gabrielle E. Tenzer
Anna Collins Peterson
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
gtenzer@heckerfink.com
apeterson@heckerfink.com

Roberta A. Kaplan
Christopher Le Coney
Tasha N. Thompson
KAPLAN MARTIN LLP
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 316-9500
rkaplan@kaplanmartin.com
cleconey@kaplanmartin.com
tthompson@kaplanmartin.com

*Counsel for Defendants Montefiore Medicine Academic Health System, Inc. and Albert Einstein College of Medicine*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the page and type-volume limitations in Your Honor's Individual Rules of Practice and Local Rule 7.1. Exclusive of the exempted portions of the brief, the brief contains 35 pages, which complies with the limits applicable to a brief under Local Rule 7.1(c) where the Court expresses a limit in pages. This brief has been prepared in proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.

Dated: September 25, 2026

By: ______________________________
Gabrielle E. Tenzer