**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KAMRAN KHODAKHAH,

*Plaintiff*,

v.

MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF MEDICINE,

*Defendants*.

No. 24 Civ. 839 (LAK) (RFT)

# DEFENDANTS' MOTION TO PRECLUDE PLAINTIFF'S PROFFERED EXPERT TESTIMONY OF DR. MARC JANOSON

Roberta A. Kaplan
Christopher R. Le Coney
Tasha N. Thompson
KAPLAN MARTIN LLP
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 316-9500
rkaplan@kaplanmartin.com
cleconey@kaplanmartin.com
tthompson@kaplanmartin.com

Gabrielle E. Tenzer
Anna Collins Peterson
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
gtenzer@heckerfink.com
apeterson@heckerfink.com

# TABLE OF CONTENTS

*Page*


PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 4

A. The Single Claim That Remains ........ 4

B. Janoson's Training and Experience ........ 6

C. Janoson's Limited and Rushed Evaluation ........ 8

1. Janoson Disclaimed His Causation and [redacted] Opinions ........ 9

2. Janoson Did Not Corroborate the Account He Was Given ........ 9

3. Janoson Disregarded the Limitations of Both Tests He Used ........ 11

D. The Records Janoson Never Reviewed Contradict the History He Accepted ........ 13

LEGAL STANDARD ........ 15

ARGUMENT ........ 17

I. JANOSON IS NOT QUALIFIED TO OFFER HIS [redacted] AND [redacted] OPINIONS ........ 17

A. Janoson's Training and Experience Do Not Match the Opinions He Offers ........ 17

B. Informal MMPI-2 "Mentorship" Does Not Supply the Missing Qualifications ........ 19

II. JANOSON'S METHODOLOGY IS UNRELIABLE AT EVERY STEP ........ 20

A. Janoson Based His [redacted] and [redacted] Opinions on an MMPI-2 Protocol His Chosen Scoring System Declared Invalid ........ 20

B. Janoson Diagnosed [redacted] From a Screening Instrument That Required Clinical Confirmation ........ 23

C. Janoson Accepted Khodakhah's Account Without Verification and Considered No Alternative Cause ........ 26

III. JANOSON'S OPINIONS WILL NOT HELP THE FACTFINDER RESOLVE THE SOLE SURVIVING CLAIM ........ 30

A. Janoson Does Not Connect Khodakhah's Alleged Injuries to the Chair Investigation ........ 30

B. Janoson's [redacted] Opinion Is Not Expert Testimony ........ 32

IV. AT A MINIMUM, RULE 403 AND RULE 37 REQUIRE EXCLUSION OF JANOSON'S MOST PREJUDICIAL OPINIONS ........ 33

CONCLUSION ........ 35

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Accely v. Consol. Edison Co. of N.Y.*,
2023 WL 3025436 (S.D.N.Y. Apr. 20, 2023) .......... 3, 31, 32, 34

*Alcantara v. Artus*,
2014 WL 415954 (E.D.N.Y. Feb. 4, 2014) .......... 23, 27-28

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .......... 16, 20

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) .......... 4

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... 16

*El Ansari v. Graham*,
2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019) .......... 26, 27

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .......... 22, 26

*Harriram v. City University of New York*,
2026 WL 801900 (S.D.N.Y. Mar. 23, 2026) .......... 4

*Matthews v. Hewlett-Packard Co.*,
2017 WL 6804075 (S.D.N.Y. Dec. 22, 2017) .......... 27, 32

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) .......... 16, 33, 34

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010) .......... 19

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) .......... 17, 18

*Stagl v. Delta Air Lines, Inc.*,
117 F.3d 76 (2d Cir. 1997) .......... 16

*United States v. Robertson*,
2015 WL 520220 (E.D.N.Y. Feb. 9, 2015) .......... 22

*United States v. Shenghur*,
466 F. App'x 61 (2d Cir. 2012) ........................................................ 27

*United States v. Shenghur*,
734 F. Supp. 2d 552 (S.D.N.Y. 2010)........................................................ 27

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007)........................................................ 16

*Williams v. E. Meadow Union Free Sch. Dist.*,
2026 WL 790580 (E.D.N.Y. Mar. 20, 2026)........................................................ 27, 32

**RULES**

Fed. R. Civ. P. 26........................................................ 5, 34, 35

Fed. R. Civ. P. 37(c)(1)........................................................ 35

Fed. R. Evid. 403 ........................................................ *passim*

Fed. R. Evid. 702 ........................................................ *passim*

## PRELIMINARY STATEMENT

The only question left in this case is whether Defendants Albert Einstein College of Medicine ("Einstein") and Montefiore Medicine Academic Health System, Inc. discriminated against Plaintiff Kamran Khodakhah because of his sex when, in 2022, Einstein investigated his conduct and performance as Chair of its Department of Neuroscience without using its Title IX procedures and made the discretionary decision to remove him as Chair. ECF 88 at 12. To prove that this alleged procedural failure caused him emotional distress, Khodakhah offers a single expert: Dr. Marc Janoson, a school psychologist by training. After spending approximately six hours evaluating Khodakhah—administering two computer-scored questionnaires, conducting a single interview with Khodakhah, and speaking once by telephone with his wife—Janoson diagnosed him with [redacted] and [redacted], both of which he attributed to Khodakhah's removal as Chair. Janoson also opined—on the strength of a single subscale of a personality test—that Khodakhah "[redacted]" by Einstein. Janoson's opinions should be excluded for three independent reasons.

*First*, Janoson is not qualified to offer them. His degrees are in school psychology. He has no degree in clinical or forensic psychology, no board certification, no training in the trauma instrument he used to diagnose [redacted], no certification in trauma-related disorders, and no formal training in [redacted]. His professional experience is principally in testing children and screening police candidates, not conducting forensic examinations to determine whether workplace incidents caused a particular claimed psychological injury.

Nor could Janoson identify any formal training he has received in the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2")—the self-administered personality test on which two of his three opinions depend. Instead, he invoked informal "mentorship" by correspondence with three psychologists: one who, according to Janoson, faxed and emailed him MMPI-2 reports

in the late 1990s, and two others to whom Janoson would send test results to ask whether they saw the data "the same way" he did. None of this supposed training through "mentoring" appears on the curriculum vitae Janoson submitted to establish his qualifications. And whatever familiarity with the MMPI-2 that correspondence may have afforded him, it does not qualify Janoson to diagnose [redacted], assess [redacted], or determine whether disputed acts of "[redacted]" actually occurred.

*Second*, Janoson's methodology fails at every step, rendering his opinions unreliable. The third-party standard scoring system he selected for the MMPI-2 classified Khodakhah's profile as "INVALID," warned [redacted]. Janoson did neither. He simply "overrode it [him]self"—something he testified he does "quite frequently"—and then relied on the invalid profile both to diagnose [redacted] and to support his extraordinary conclusion that Khodakhah had [redacted]."

The [redacted] diagnosis fares no better. Janoson derived it from the Detailed Assessment of Posttraumatic Stress ("DAPS"), a self-report questionnaire whose own scoring report identifies [redacted] only as "probable" and directs that the result be confirmed through a clinical interview. Janoson admitted that he never conducted that interview. He instead applied diagnostic criteria that the American Psychiatric Association retired more than a decade ago. The primary reason that his diagnosis is invalid is that he did not identify the type or severity of trauma required for the diagnosis. And he made zero effort to test what Khodakhah told him: Janoson reviewed no medical or psychological records, consulted none of Khodakhah's treating providers, took no meaningful medical, family, trauma, or substance-use history, and considered no alternative causes for the symptoms Khodakhah and his wife reported. Courts have rejected Janoson's testimony for these

very methodological failures before—including his interpretation of MMPI-2 profiles deemed invalid, disregard of testing instructions, and uncritical reliance on a subject's unverified account. The medical records produced by Khodakhah's own providers after Janoson's deposition illustrate why this matters: they not only contradict the history Janoson accepted but disclose medical and neurological history he never investigated despite conceding that it could bear on the symptoms he attributed to psychological injury.

*Third*, even if Janoson were qualified (which he is not) and his methods were sound (which they were not), his opinions would not help the factfinder decide anything actually in dispute. His report never mentions sex, gender, Title IX, or the procedures Einstein used in the Chair Investigation. Instead, Janoson attributes Khodakhah's distress indiscriminately to his removal as Chair, allegations of sexual misconduct addressed in separate proceedings from which no claim survives, and the asserted loss of his reputation and laboratory. He admitted he made no attempt to separate the psychological effects of those events from any distress caused by the one point that remains at issue: Einstein's decision not to employ Title IX procedures in the Chair Investigation and its discretionary decision to remove him as Chair. This is the same defect that led Judge Chin to exclude Janoson's testimony in another employment-discrimination case, where his report repeated the plaintiff's account of workplace mistreatment without connecting the claimed emotional injury to the allegedly unlawful conduct. *Accely v. Consol. Edison Co. of N.Y.*, 2023 WL 3025436, at *2 (S.D.N.Y. Apr. 20, 2023). That failure is not incidental; it leaves Janoson without an opinion on causation relevant to the surviving claim. And his assertion that Khodakhah was [redacted] is not expert testimony at all. It incorrectly uses a psychological test to endorse one party's account of contested events—something no test can establish and which Janoson himself disclaimed under oath.

For each of these independent reasons, Janoson's testimony should be excluded. At an absolute minimum, Rules 702 and 403 preclude Janoson from telling the jury that Khodakhah was [redacted] or attributing his emotional distress to accusations, investigations, and other events that are no longer part of this case.

## BACKGROUND

### A. The Single Claim That Remains

Khodakhah, a tenured professor of neuroscience, commenced this action on February 5, 2024, challenging Einstein's investigations into his workplace conduct and the resulting discipline under Title IX, the New York State and City Human Rights Laws, and various contract theories. *See generally* ECF 48 ("AC"). On July 31, 2025, this Court recommended dismissal of nearly all of those claims. ECF 79 at 79–80. Judge Kaplan adopted that recommendation in relevant part on September 16, 2025, dismissing every claim arising from the two separate Title IX investigations into allegations that Khodakhah had sexually harassed junior faculty, including claims challenging the interim campus ban and sanctions imposed in connection with those proceedings. ECF 88 at 3–6, 12.[1]

What remains of this case is narrow: Khodakhah's discrimination claims under Title IX, the NYSHRL, and the NYCHRL, and only "to the extent that those claims arise out of the chair investigation." ECF 88 at 12. Those claims turn on whether Einstein's decisions to investigate the concerns regarding Khodakhah's performance as Chair using procedures other than its Title IX policy and to remove him as Chair were motivated by his sex. *See* ECF 79 at 27–29, 35.[2]

[1] Emotional-distress damages are unavailable on Khodakhah's Title IX claim under the reasoning of *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022). *See Harriram v. City University of New York*, 2026 WL 801900, at *10 (S.D.N.Y. Mar. 23, 2026) ("Although *Cummings* arose in the context of the Rehabilitation Act and ACA, its reasoning applies equally to Title IX.").

[2] For the reasons set forth in Defendants' Motion for Summary Judgment submitted today, the record contains no evidence from which a reasonable factfinder could conclude that the decisions were motivated by Plaintiff's sex.

At the April 1, 2026 conference, the Court permitted expert discovery to proceed but directed that any challenge be raised "through the vehicle of in limine motions or Daubert motions," Apr. 1, 2026 Hr'g Tr. (ECF 129) at 14:20–23, and set June 15, 2026, as the deadline for initial expert disclosures. ECF 128 ¶ 2. When asked whether that deadline presented a problem, Khodakhah's counsel responded: "I do not foresee that being a problem, no." ECF 129 at 15:4–7.

Three days before the deadline, Khodakhah sought an extension, representing that his "retained expert advised that he required additional time to complete necessary interviews, additional testing of Plaintiff, and finalize his report." ECF 135 at 1. The Court extended the deadline to June 29 while observing that Khodakhah "had ample notice of the deadlines," "could have retained an expert in time" to meet them, and had failed to comply with the Court's individual practices by waiting until the eve of the deadline to seek relief. ECF 137 at 1.

In truth, Janoson had not even started. He first saw Khodakhah on June 17, 2026, five days after the extension request, and signed his report nine days later, on June 26. Ex. A ("Janoson Rep.") at 1, 8.[3] Janoson later testified that he had been told he "had to do the evaluation very quickly" and had "about seven days" to complete it. Ex. B ("Janoson Dep.") at 71:21–72:4. By the time he submitted his report, he had billed just ten hours for the engagement, four of which he spent drafting the report. *Id.* at 75:22–76:22.

Plaintiff's resulting expert disclosure was incomplete. Khodakhah's June 29 submission consisted only of Janoson's eight-page report and curriculum vitae. Exs. A, C. It omitted the test data, notes, and other "facts or data considered" by Janoson, as well as the required lists of his recent publications and prior expert testimony. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii), (iv), (v). On July 21, Einstein served a deficiency letter identifying those omissions and demanding the missing

[3] Citations to "Ex. __" refer to the exhibits to the Declaration of Tasha N. Thompson, filed herewith.

materials. But Khodakhah did not cure the deficiencies before Einstein's July 29 rebuttal deadline, forcing Einstein to prepare its rebuttal reports without access to Janoson's underlying test materials and notes on which his opinions purportedly rested.

Einstein nevertheless timely served rebuttal reports from Dr. Madelon Baranoski, a licensed clinical psychologist and Professor Emerita in the Yale Department of Psychiatry's Law and Psychiatry Division, and Dr. Maya Prabhu, a board-certified forensic psychiatrist and Associate Professor in the same Division. Ex. D ("Baranoski Rep."); Ex. E ("Prabhu Rep."). Both concluded that Janoson's evaluation departed from accepted forensic practice and that his diagnoses and conclusions were not substantiated. Baranoski Rep. at 3, 12; Prabhu Rep. ¶¶ 24, 40.[4]

Only on August 5—fifteen days after Einstein's deficiency letter and one week after its rebuttal reports were due—did Khodakhah produce limited additional materials, including test results and Janoson's handwritten notes. Ex. F. Janoson was deposed on August 13, 2026.

### B. Janoson's Training and Experience

Janoson has been licensed to practice psychology in New York since 1980. Janoson Dep. at 55:8–17. His formal education, however, is in school psychology—not clinical or forensic psychology. His 1973 master's degree was from a "school psychology program" whose "main drift was psychological testing of children." *Id.* at 13:17–14:15. His 1976 Ph.D. was in "school community psychology," which Janoson described as a program directed toward developing expertise with school-age patients. *Id.* at 15:5–16:2; Ex. C ("Janoson CV"). His dissertation concerned "[i]mitation learning in children." Janoson Dep. at 16:15–23.

[4] Although Plaintiff produced Janoson's notes and underlying test data, as well as Plaintiff's relevant medical and psychological records, well after the rebuttal-report deadline, Drs. Baranoski and Prabhu have since reviewed those materials. As reflected in their declarations, attached as Exhibits K and L to the Thompson Declaration, their opinions remain unchanged: the materials only confirm their conclusions regarding the deficiencies in Janoson's report.

Janoson later completed a two-year, part-time certificate program in family forensic psychology, but that program focused on child-custody and divorce proceedings and termination of parental rights—not criminal or personal-injury psychology. *Id.* at 17:15–19:6, 43:10–44:10. He has no degree in clinical or forensic psychology, *id.* at 17:6–12, 22:9–14; is not board-certified in forensic psychology, *id.* at 49:24–50:2; holds no certification in [redacted] or other trauma-related disorders, *id.* at 50:11–15; and has no formal training in either the DAPS—the instrument he used here to diagnose [redacted]—or [redacted] assessment, *id.* at 23:22–24:2, 53:19–54:2. Janoson once considered seeking board certification in forensic psychology, but decided against it because "the studying, the mastery of the material that I would have had to master to be certified" was "too much." *Id.* at 57:20–58:19.

Janoson's professional experience is similarly removed from the task he undertook here. After graduate school, Janoson evaluated children with metabolic disorders in a pediatrics department, *id.* at 28:8–29:25; administered intelligence and screening tests to children and adults seeking disability benefits, *id.* at 32:2–33:4; and reviewed the files of police-academy applicants whom the NYPD had psychologically disqualified, *id.* at 38:8–39:7. Although Janoson has described himself as a forensic psychologist since 1998 and has performed criminal and psychological-personal-injury work, his current practice centers on screening Nassau County police candidates and handling NYPD disqualification appeals. Janoson CV; Janoson Dep. at 41:5–42:16. He described his office as "swamped" with those "well-paying" appeals; clinical treatment accounts for only ten to twenty percent of his practice. Janoson Dep. at 49:1–50:10. Most importantly, Janoson could not recall ever having been retained to determine "whether alleged workplace conduct caused [redacted] or another psychological injury" and was "not sure that I've done one where the workplace is the purported cause." *Id.* at 54:19–55:7.

Nor could Janoson identify during his deposition any formal training in the MMPI-2—the instrument on which his [redacted] diagnosis and [redacted] opinion depend. Instead, he identified three informal mentors. The first, Tom Lazzaro, was a forensic psychologist whose book Janoson encountered in the Syracuse University bookstore while on vacation. *Id.* at 19:21–20:6. After telling his wife, "I have to study with him," Janoson arranged what he described as "mentorship" during which Lazzaro would "email or fax" Janoson forensic reports for discussion. Janoson explained why he sought Lazzaro out: "I was not trained in the MMPI. I was not trained in the other forensic instruments." *Id.* at 20:7–21:24.

The other two relationships were similarly informal. Janoson described "correspondence regarding forensic examinations" with David Nichols, to whom he would send test protocols and ask whether Nichols "views the data the same way that I do." *Id.* at 22:21–23:21, 44:4–12. With Alex Caldwell, Janoson described an "ongoing conversation" of the same general kind, although he could not recall when it began. *Id.* at 24:3–21. When asked directly whether he had received any formal training in interpreting the MMPI-2's validity scales "other than that mentoring," Janoson's answer was unequivocal: "No." *Id.* at 53:11–18.

None of these purported mentoring relationships appears on the curriculum vitae Janoson submitted to establish his qualifications. The CV mentions Caldwell only as the co-presenter of a 2001 workshop. *Id.* at 50:16–51:9; Janoson CV. Lazzaro and Caldwell are deceased. And although Nichols is not, Janoson neither sent him his report in this case nor consulted him in interpreting Khodakhah's test results. Janoson Dep. at 89:11–23, 90:18–21.

**C. Janoson's Limited and Rushed Evaluation**

Janoson was retained "[redacted]" Janoson Rep. at 1. His "Forensic Opinion," occupying less than a page, offered three principal

conclusions: that Khodakhah [redacted]. *Id.* at 1–2.

1. Janoson Disclaimed His Causation and [redacted] Opinions

At his deposition, however, Janoson disclaimed the causation opinion he had been retained to provide: "I'm not saying that I know the cause. He [Khodakhah] says he knows the cause." Janoson Dep. at 156:17–157:8. He likewise acknowledged that he could not say Khodakhah had [redacted] that he was not offering an opinion that [redacted], and that the MMPI-2 cannot establish the truth of disputed historical events. *Id.* at 158:17–159:9.

At the same time, Janoson went beyond his report, volunteering a new opinion that Khodakhah is "[redacted]." *Id.* at 153:15–19. He also disclosed, for the first time, that Khodakhah's "[redacted]—an MMPI-2 scale meant to measure [redacted] something Janoson "didn't mention in the report." *Id.* at 153:7–14.

2. Janoson Did Not Corroborate the Account He Was Given

The evaluation underlying Janoson's opinions was limited, and as noted above, conducted on a rushed basis. On June 17, Khodakhah took the MMPI-2—a 567-item true-or-false personality questionnaire scored by computer—in Janoson's office; on June 18, Khodakhah took the DAPS, a 104-item questionnaire on which the test-taker reports his own trauma history and symptoms; on June 24, Janoson interviewed him; and on June 25, Janoson spoke with Khodakhah's wife by

telephone. Janoson Rep. at 3–7; Janoson Dep. at 118:13–18, 145:2–5. Janoson could not recall how long those sessions lasted, and his report does not say. Janoson Dep. at 109:17-111:7, 145:2-5.

Those two tests and two conversations supplied essentially the entire factual basis for Janoson's opinions. In his deposition, he initially testified that those interviews and tests were "a complete list of the information" he considered and that he had considered no other document, record, communication, or information. *Id.* at 93:5–16. He later recalled that he had "briefly" reviewed the complaint, but dismissed it as "legal mumbo jumbo" that he did not understand. *Id.* at 96:19–97:6. He also reviewed Khodakhah's curriculum vitae and publications—not to verify anything in his report, but to form an "impression" of "how distinguished a man he really is." *Id.* at 98:7–25. As Janoson ultimately acknowledged, "all of the information" reported in his evaluation came from Khodakhah or his wife. *Id.* at 104:18–105:4.

Critically, Janoson made no effort to corroborate the "information" that was provided to him by the Khodakhahs. He reviewed no psychological, psychiatric, medical, neurological, medication, employment, or personnel records. Nor did he review any document concerning the Chair Investigation, the allegations it addressed, the procedures Einstein employed, or the decision to remove Khodakhah as Chair. *Id.* at 106:5–108:14. Although Janoson unsuccessfully attempted to contact Dr. [redacted]—he never requested her records and testified that, even had he reached her, he would not have done so. *Id.* at 101:17–104:16.

The gaps extended to the history Janoson himself obtained. He did not know whether the accusation that Khodakhah was a "[redacted]" which he repeated in his report, arose from the Chair Investigation or from the separate Title IX proceedings. *Id.* at 99:7–101:14. His intake form contained no section for [redacted]. *Id.* at 131:9–132:12. He did not inquire into [redacted] because, "considering

he was a professor of neuroscience, I didn't think he was [redacted]"—although he agreed that [redacted] "would have been relevant." *Id.* at 131:14–19; 132:15–18. He likewise conceded that asking about Khodakhah's parents' medical history "may have been a good question in retrospect." *Id.* at 132:4–8. And although he relied on Khodakhah's wife as a collateral source, he asked her nothing about other [redacted] and made no effort to verify what she told him. *Id.* at 146:6–14. Janoson could identify "no" independent source establishing Khodakhah's psychological functioning before the events at issue. *Id.* at 143:16–24.

Janoson likewise performed no differential assessment of other potential explanations for the symptoms he attributed to Khodakhah's psychological condition. He did not evaluate possible medical or neurological causes of Khodakhah's reported [redacted]; accepted without verification Khodakhah's statements concerning [redacted]; and did not consider [redacted]. *Id.* at 137:20–139:22, 143:8–15.

3. <u>Janoson Disregarded the Limitations of Both Tests He Used</u>

The objective testing on which Janoson relied presented additional problems. Janoson submitted Khodakhah's MMPI-2 answers to the Minnesota Report, a computerized scoring and interpretation service. Janoson Rep. at 2–3; Baranoski Rep. at 3. The resulting validity chart stated in capital letters: "[redacted]" The same warning appeared on the clinical and content-scale profiles. Janoson Dep. at 160:13–23; Ex. F at 3–5. The accompanying narrative explained that Khodakhah had responded [redacted]," that his profiles were "[redacted] and that he may have responded [redacted]. Ex. F at 6. It expressly warned "[redacted]" directed that [redacted], and recommended readministration of the test if appropriate. *Id.*; *see* Janoson Dep. at 162:1–22.

Janoson did neither. His report acknowledged that Khodakhah's [redacted] Janoson Rep. at 3. Yet Janoson did not investigate why Khodakhah [redacted] and did not readminister the test. Janoson Dep. at 162:23–163:9. Although he suggested that a different scoring service might treat the profile differently, he did not submit the results to one. Instead, Janoson testified, he "overrode it [him]self." Janoson Dep. at 167:4–13. He explained that he overrides such invalidations "quite frequently" because he does not "like using the canned stuff." *Id.* at 166:15–167:3. He then relied on that invalidated profile to diagnose [redacted]"; his report also cited the MMPI-2, together with the DAPS, in support of his [redacted] diagnosis. Janoson Rep. at 1, 5–7.

The DAPS presents a different but equally fundamental problem. It is a self-report instrument designed to assess trauma exposure and posttraumatic symptoms associated with a particular reported event. The version Janoson administered evaluates [redacted] under the DSM-IV-TR. Janoson Dep. at 173:11–22. But the American Psychiatric Association replaced the DSM-IV-TR with the DSM-5 in 2013 and published the current DSM-5-TR in 2022, and the diagnostic criteria for [redacted] differ materially between the two versions. Prabhu Rep. ¶¶ 30–31.

Even under those superseded criteria, the DAPS did not itself diagnose Khodakhah with [redacted]. Its output characterized the result as merely "probable" and expressly instructed that the diagnostic estimate "should be followed up with a face-to-face, DSM-IV-TR-based clinical interview to ensure the accuracy of this estimation." Ex. F at 55; Janoson Dep. at 175:18–176:4. Janoson admitted that he "did not follow up with a DSM-IV-TR-based clinical interview" and conducted no structured [redacted] of any kind. Janoson Dep. at 176:5–11. He agreed that a

probable diagnosis generated by a self-report instrument is only "part" of a clinical diagnosis, but explained his reliance on it this way: "because I'm a data guy, it's a main part of it. You know, my mantra is show me the data." *Id.* at 174:16–23.

Thus, the two principal testing instruments on which Janoson relied suffer from opposite but complementary defects: he disregarded the MMPI-2 scoring system when it told him the results were invalid, while treating the DAPS scoring system's "probable" [redacted] result as sufficient without performing the confirmatory clinical interview that the instrument itself required. And in neither instance did he test his conclusions against the medical records, treatment history, alternative causes, or independent factual evidence that he could have but never obtained.

**D. The Records Janoson Never Reviewed Contradict the History He Accepted**

Janoson's failure to verify the Khodakhahs' account mattered. Records subsequently produced by Khodakhah's own treating providers—including records created before Janoson's evaluation—complicate and contradict the history he accepted on several material points.

*First*, Janoson reported that, [redacted] Khodakhah had "[redacted]." Janoson Rep. at 2. [redacted] records tell a different story. Khodakhah first saw her for a [redacted] Dr. [redacted] recorded that this was Khodakhah's [redacted]" which included the investigation, [redacted]" Ex. G at MONTE_0000172–73. Her [redacted] *Id.* at MONTE_0000174.

*Second*, Dr. [redacted] contemporaneous [redacted] bears little resemblance to Janoson's. Throughout more than [redacted]

[redacted] *See, e.g.*, Ex. G at MONTE_0000006; *see generally id.* at MONTE_0000006–0000173 ([redacted]). [redacted] *Id.* at MONTE_0000006-07, 0000172-75.

Dr. [redacted]—nearly two months after Janoson diagnosed [redacted], five days after his deposition, and at Khodakhah's [redacted] Ex. G at MONTE_0000002–03. Even then, [redacted]. *Id.* The same note records that Khodakhah [redacted] *Id.* at MONTE_0000003.

*Third*, Khodakhah's primary-care records contain precisely the [redacted] that Janoson never obtained. At annual examinations in [redacted] Ex. H at SUMMIT_000012, 000016–17.

Those records also identify [redacted] *Id.* at SUMMIT_000010–11. Janoson obtained no medication history; he simply accepted Khodakhah's statement [redacted] Janoson Dep. at 139:6–7. The records similarly document [redacted] Ex. H at SUMMIT_000011–12. Janoson, meanwhile, testified that

Khodakhah [redacted] Janoson Dep. at 139:16–17, 140:21–142:9; Ex. F at 57. Most significantly, both sets of medical records disclose [redacted]. Ex. G at MONTE_0000174; Ex. H at SUMMIT_000011, 000016.

*Fourth*, [redacted] records produced after Janoson's deposition document [redacted] that Janoson never discovered. [redacted] Janoson learned none of this.

**LEGAL STANDARD**

Rule 702 permits expert testimony only from a witness "qualified as an expert by knowledge, skill, experience, training, or education," and only if "the proponent demonstrates to the court that it is more likely than not" that the testimony will assist the factfinder, is based on sufficient facts or data and reliable principles and methods, and reflects a reliable application of

those principles and methods to the facts of the case. Fed. R. Evid. 702. The Court acts as gatekeeper, and Khodakhah bears the burden of establishing each requirement. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Each requirement is independent. A witness whose expertise is "too general or too deficient" for the opinions offered is not qualified. *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997). Reliability requires the Court to examine not merely an expert's ultimate conclusion, but the facts, methodology, and reasoning used to reach it; "any step" that renders the analysis unreliable renders the resulting testimony inadmissible. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). And even reliable expert testimony is admissible only if it "fit[s]" the case—that is, if it bears sufficiently on an issue in the case and assists, rather than confuses, the factfinder in resolving a dispute. *Daubert*, 509 U.S. at 591. Expert testimony likewise may not usurp the factfinder's role by vouching for a party's credibility or resolving disputed factual questions that the factfinder is equally capable of deciding. *Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir. 2005).

Finally, satisfying Rule 702 does not end the inquiry. Expert testimony remains subject to Rule 403 and may be excluded where its probative value "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. That safeguard carries particular force with expert testimony "given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397 (citing *Daubert*, 509 U.S. at 595); *see also Daubert*, 509 U.S. at 595 (recognizing that the trial judge "exercises more control over experts than over lay witnesses").

## ARGUMENT

### I. JANOSON IS NOT QUALIFIED TO OFFER HIS [redacted] AND [redacted] OPINIONS

Janoson lacks the qualifications to offer the opinions he has been proffered to give. The question is not whether Janoson is qualified to practice psychology generally. It is whether his "knowledge, skill, experience, training, or education" qualifies him to offer the particular opinions proffered here: diagnosing [redacted]. Fed. R. Evid. 702. It does not.

Although courts in the Second Circuit take "a liberal view of the qualification requirements of Rule 702," the Court must still determine "whether the experience of a particular witness warrants placing that individual's view before the trier of fact." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) (Kaplan, J.). Janoson has neither formal training in the subjects on which he proposes to opine nor practical experience sufficient to fill that gap.

#### A. Janoson's Training and Experience Do Not Match the Opinions He Offers

Janoson's formal education is in school psychology. His graduate training focused on psychological testing and treatment of school-age children, and his only formal forensic training was a two-year, part-time program addressing child custody, divorce, and termination of parental rights—not [redacted]. Janoson Dep. at 13:14–16:24, 17:17–19:6; *see supra* Background § B.

The mismatch between that training and his opinions here is substantial. Janoson has no degree in clinical or forensic psychology, no board certification in forensic psychology, no certification in [redacted], no formal training in the DAPS, and no formal training in [redacted] *See supra* Background § B. Yet he diagnosed Khodakhah with [redacted] and expanded his opinions at deposition to

describe Khodakhah as "[redacted]" and [redacted]. Janoson Rep. at 2, 7; Janoson Dep. at 152:7–154:8.

Nor does Janoson's practical experience supply the missing expertise. To be sure, his experience extends beyond school psychology: he has performed disability and criminal-forensic evaluations, and his curriculum vitae generally identifies "psychological personal injury evaluations." Janoson CV at 1–2; Janoson Dep. at 45:23–47:8. But neither his report nor his CV identifies a practice focused on [redacted]. His current practice instead centers on police-candidate screenings and NYPD psychological-disqualification appeals—work with which, by his own account, his office is "swamped"—while clinical treatment constitutes only ten to twenty percent of his practice. Janoson Dep. at 47:17–49:23. And although Janoson testified that he has assessed [redacted] and its possible origins, he could not identify a prior engagement in which he was asked to determine whether workplace conduct caused [redacted]. *Id.* at 54:19–55:7.

*Rezulin* illustrates the problem. There, Judge Kaplan sustained the defendants' challenge to the qualifications of a hepatologist who lacked formal training in diabetology or endocrinology and whose broader medical experience did not supply the missing expertise necessary to provide an opinion concerning the risks and benefits of a diabetes drug. 309 F. Supp. 2d at 559. The same principle applies here. General experience evaluating children, disability claimants, criminal defendants, or police applicants does not establish expertise in diagnosing [redacted] And Janoson makes no effort to explain how it does. His report simply attaches a "curriculum vitae attesting to my qualifications in the field of forensic psychology." Janoson Rep. at 1. Rule 702 requires more than an expert's assertion that he is qualified; it requires qualifications that bear on the opinions he actually proposes to give.

**B. Informal MMPI-2 "Mentorship" Does Not Supply the Missing Qualifications**

Janoson's answer is that he was mentored, informally, in the MMPI-2. That answer fails for three reasons.

To begin, the mentorship Janoson described bears little resemblance to formal training. Receiving a psychologist's reports by fax and email over four years that Janoson can date only as "from '96 to 2000" or "[m]aybe from '98 to 2002," Janoson Dep. at 20:2–21:19, and sending test protocols to two others to ask whether they saw the data the same way he did, *id.* at 22:21–24:21, may be collegial, but it is not a curriculum. His account identifies no coursework, supervised clinical hours, examination, certification, or other assessment of his competence. And when asked whether he had received any formal training in interpreting the MMPI-2's validity scales apart from this mentorship, Janoson answered: "No." *Id.* at 53:3–18.

Experience, of course, can qualify an expert without formal credentials. But when experience supplies the asserted expertise, the witness must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Janoson offers no such explanation. None of the three mentoring relationships appears as training or supervision on the curriculum vitae identified in his report as establishing his qualifications, which he confirmed was "current and accurate." Janoson Rep. at 1; Janoson Dep. at 12:5–13. Nor did any mentor review Janoson's work in this case: Lazzaro and Caldwell are deceased, and Janoson chose not to consult Nichols about either his report or Khodakhah's test results. Janoson Dep. at 89:11–23, 90:18–21.

More fundamentally, even accepting Janoson's description of that mentorship in full, it does not address most of the opinions he proposes to offer. His work with Nichols was "strictly" and

"exclusively" about the MMPI-2, *id.* at 44:2–12, as was his work with Caldwell, *id.* at 24:3–21. Nothing Janoson described involved [redacted]. *Id.* at 23:22–24:2, 50:11–15, 53:19–55:7. Whatever familiarity those informal exchanges may have given Janoson in interpreting the MMPI-2, they cannot establish qualifications in subjects they did not address.

Nor does Janoson's prior service as an expert fill that gap. Rule 702 does not ask whether a witness has been permitted to testify as an expert before; it asks whether his knowledge, training, and experience qualify him to offer the particular opinions presented now. Here, Janoson's formal training concerns school psychology and family-forensic matters; much of his current practice concerns police-candidate screening and disqualification appeals; and the informal mentorship he invokes principally concerned one personality inventory. None supplies the missing expertise to diagnose [redacted]. Janoson therefore is not qualified to offer those opinions here.

## II. JANOSON'S METHODOLOGY IS UNRELIABLE AT EVERY STEP

Even if Janoson were qualified (which he is not), his opinions would still be inadmissible. Rule 702 requires Khodakhah to establish that Janoson's opinions are "the product of reliable principles and methods" and "reflect[] a reliable application" of those principles and methods to the facts of this case. Fed. R. Evid. 702(c)–(d). When an expert relies on "data, a methodology, or studies that are simply inadequate to support the conclusions reached," *Daubert* and Rule 702 require exclusion. *Amorgianos*, 303 F.3d at 266. Each of Janoson's opinions suffers from that defect.

### A. Janoson Based His [redacted] and [redacted] Opinions on an MMPI-2 Protocol His Chosen Scoring System Declared Invalid

Janoson's [redacted] diagnosis and [redacted] opinion depend entirely on one source: Khodakhah's MMPI-2 results. Janoson Rep. at 1, 5–7. Yet the Minnesota Report, the

computerized scoring system Janoson selected, declared in capital letters: "[redacted]." Ex. F at 2–4 (Minnesota Report at 2–4). It explained that Khodakhah had responded "[redacted]," and that he may have [redacted] It therefore warned [redacted]. *Id.*; Janoson Dep. at 160:11–163:9; *see supra* Background § C.

Janoson did none of those things. He did not investigate why Khodakhah [redacted] He did not readminister the test. And he did not submit the protocol to another scoring service. Janoson Dep. at 162:23–163:9, 167:4–13. Instead, he "overrode it [him]self" and proceeded to rely on the [redacted] scores that the Minnesota Report had warned him not to use for clinical decisionmaking. *Id.* at 167:4-13; Janoson Rep. at 3-5.

Janoson identified no reliable methodology for doing so. He testified that an invalidity determination is not "a cosmic truth," invoked what he described as Dr. Nichols's threshold for discarding a protocol, suggested that another scoring service might have accepted Khodakhah's results, and explained that he overrides "canned scoring" "quite frequently." Janoson Dep. at 165:12–167:16. But Janoson never submitted this protocol to another scoring service, he developed no case-specific explanation for Khodakhah's [redacted] responses, and he cited no test manual, study, or other authority supporting his decision to disregard the validity determination. His disagreement with the Minnesota Report was therefore just that: his disagreement.

Nor does Janoson's discussion of [redacted] answer the validity problem. His report states that Khodakhah [redacted]

[redacted] Janoson Rep. at 4, 7. But malingering and validity are different questions. The Minnesota Report did not invalidate Khodakhah's protocol because it concluded that he was deliberately exaggerating symptoms. It invalidated the protocol because [redacted]—a problem that may result from fatigue, rushing, misreading, misunderstanding, or guessing. Baranoski Rep. at 7–8. A respondent therefore can answer honestly and still produce an invalid profile. Janoson's conclusion that Khodakhah [redacted] does nothing to establish that the scores he relied upon were valid or interpretable.

Janoson's report also did not disclose the full import of the validity failure. Although it acknowledged that the computerized system had invalidated the protocol, it omitted both the Minnesota Report's express warning [redacted] from the results and its direction to [redacted] Janoson Rep. at 3–4; Ex. F at 5. Dr. Baranoski explains that the Minnesota Report is the standard scoring method and that interpreting an MMPI-2 profile after that system has declared it invalid "is inconsistent with accepted practice and undermines the reliability of the resulting conclusions." Baranoski Rep. at 3, 8. Janoson identified no methodological authority supporting a contrary approach. His own assurance that he could override the validity determination is not enough. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (a court need not admit an opinion "connected to existing data only by the *ipse dixit* of the expert").

Courts have identified the same methodological failure in Janoson's work before. In *United States v. Robertson*, Janoson administered the MMPI-2 twice to a criminal defendant, and both times "the computer-scored test reports were marked invalid." 2015 WL 520220, at *2 (E.D.N.Y. Feb. 9, 2015). Janoson nevertheless interpreted the results, "against what appear[ed] to be the prevailing opinion in the profession that treating the defendant's scores as valid 'would be misleading if not unethical.'" *Id.* at *7. As here, Janoson invoked Caldwell and Nichols, testifying

that "based on his training" by them, "he would regularly override scoring rejections of MMPI-2 assessments." *Id.* at *2.

*Alcantara v. Artus* reflects the same pattern. There, on habeas review, the district court recounted the state trial court's findings that Janoson "disregarded instructions on tests and presented evidence of their results notwithstanding guidelines suggesting they could not be used for those purposes." 2014 WL 415954, at *2 (E.D.N.Y. Feb. 4, 2014). Addressing Janoson's reliance on an MMPI profile despite a scoring-service warning that using the results would be "misleading and unethical," the state court in that case characterized his conduct as "unethical, egregious." Ex. J at 7, 9 (Alcantara Hr'g Tr. at 510, 512).

The precise validity defects in *Robertson* and *Alcantara* were not identical to the one here, but the methodological failure was: Janoson treated psychological test results as interpretable after the scoring system or governing instructions warned that they were not. Here, he did so without investigating the validity problem, repeating the test, obtaining an alternative scoring, or identifying scientific authority supporting his override. Because that invalid MMPI-2 protocol supplies the stated basis for Janoson's [redacted] diagnosis and [redacted] opinion, neither opinion satisfies Rule 702.

**B. Janoson Diagnosed [redacted] From a Screening Instrument That Required Clinical Confirmation**

Janoson's [redacted] diagnosis fares no better. It rests on the DAPS, a trauma-specific self-report questionnaire. Janoson Rep. at 2, 6–7; Janoson Dep. at 175:6–17. But the DAPS did not diagnose Khodakhah with [redacted]. Nor could it; Janoson's own report describes its output as only a [redacted] Janoson Rep. at 6, and the DAPS itself states merely that Khodakhah is [redacted] the DSM-IV-TR criteria for [redacted], Ex. F at 55. More importantly, it expressly directs that this estimate [redacted]." *Id.*

Janoson did not perform that follow-up. Although he separately interviewed Khodakhah, he admitted that he did not conduct the specified DSM-IV-TR diagnostic interview or any structured [redacted] interview. Janoson Dep. at 175:22–176:11. Nor did his general interview independently supply the missing clinical assessment: Janoson testified that he evaluated Khodakhah's thought process, thought content, insight, and judgment only "through psychological testing." *Id.* at 120:11–18.

That shortcut is inconsistent with accepted forensic practice. As Dr. Baranoski explains, psychological tests "cannot diagnose" and "cannot be interpreted in the absence of a clinical interview with collateral information"—information derived from records or sources other than the patient. Baranoski Rep. at 10. Such testing may suggest a diagnosis, but cannot "independently establish" one. *Id.* at 11. Janoson nevertheless converted the DAPS's self-reported estimate into a forensic diagnosis of [redacted] without performing the clinical inquiry that the instrument itself directed. Janoson Rep. at 2, 7.

There is a separate problem with the diagnostic standard Janoson applied. He concluded that Khodakhah satisfied the DSM-IV-TR criteria for [redacted], even though the American Psychiatric Association replaced the DSM-IV-TR with the DSM-5 in 2013 and published the current DSM-5-TR in 2022. Prabhu Rep. ¶¶ 30–31. The problem is not merely that the DAPS was developed under an earlier edition of the DSM. It is that Janoson adopted the instrument's DSM-IV-TR output as his forensic diagnosis in 2026 without determining whether Khodakhah satisfied the materially different current criteria. Indeed, Janoson applied the DSM-5 to his [redacted] diagnosis while offering no explanation for applying superseded criteria to [redacted]. *Id.* ¶ 31; Baranoski Rep. at 8.

More fundamentally, Janoson never identified [redacted]" Prabhu Rep. ¶ 32. The workplace events Janoson identified as Khodakhah's "[redacted]

[redacted]—do not satisfy that requirement. Janoson Rep. at 6; Prabhu Rep. ¶ 32. Those events may have been distressing, but they are not the type of [redacted] required [redacted] under the DSM-IV-TR, DSM-5, or DSM-5-TR. Baranoski Rep. at 9-11; *see* Prabhu Rep. ¶¶ 22, 32, 38.

Khodakhah's own DAPS responses compound the problem. On the DAPS's checklist of [redacted]. Ex. F at 44; Janoson Dep. at 180:19–182:5. The DAPS itself cautioned that such additional traumas could generate symptoms of their own, influence symptoms attributed to the index event, and require further assessment. Ex. F at 43–44. Yet Janoson asked no follow-up questions. He did not determine when those events occurred, whether any had caused psychological symptoms, or whether any such symptoms predated the events at Einstein. Janoson Dep. at 182:6–183:5.

That leaves Janoson's opinion with an unavoidable dilemma. If the workplace events were the relevant trauma, they do not satisfy [redacted] which is required for a [redacted] diagnosis. If one of Khodakhah's earlier [redacted] experiences supplied the [redacted], Janoson never determined which event did so, whether it produced symptoms, or whether those symptoms predated the events at Einstein. On either theory, Janoson failed to establish the essential link between a [redacted], Khodakhah's symptoms, and the workplace events to which Janoson attributes them.

The DAPS computer output cannot fill that gap. Janoson took a self-report instrument that generated only a "probable" diagnosis, omitted the clinical confirmation the instrument itself required, applied superseded diagnostic criteria, identified an index event that does not qualify as

[redacted], and failed to investigate the several potentially [redacted] Khodakhah himself reported. That is not a reliable basis for concluding that Einstein caused Khodakhah to [redacted]. *See El Ansari v. Graham*, 2019 WL 3526714, at *6 (S.D.N.Y. Aug. 2, 2019) (excluding diagnosis where the expert "provided no analysis to show how the DSM-V guidelines were actually applied"); *Joiner*, 522 U.S. at 146. The [redacted] opinion should be excluded.

**C. Janoson Accepted Khodakhah's Account Without Verification and Considered No Alternative Cause**

The third methodological defect infects every opinion Janoson offers: he accepted Khodakhah's account without verifying its factual premises or considering alternative explanations. Janoson initially confirmed that the complete universe of information he considered consisted of his interviews with Khodakhah and his wife and the results of the MMPI-2 and DAPS. Janoson Dep. at 93:5–16. And he ultimately acknowledged that every factual premise reported in his evaluation came from Khodakhah or his wife. *Id.* at 104:18-105:4. He reviewed no medical, psychological, neurological, medication, employment, or investigative records. *Id.* at 107:20–108:11. He took no meaningful medical or family medical history, established no independent pre-2022 psychological baseline, obtained no comprehensive trauma history, and performed no differential assessment of other potential causes. *Id.* at 131:9–132:12, 137:20–139:22; *see supra* Background § C.

The omission proved consequential. The medical records Janoson never obtained document [redacted]. Ex. I at MGB_00000013, 00000032–33, 00000105, 00000122, 00000185. Janoson nevertheless attributed Khodakhah's reported [redacted] Indeed, although Janoson conceded that [redacted] "would have been relevant," he never asked about [redacted] because, "considering

he was a professor of neuroscience, I didn't think he was [redacted]." Janoson Dep. at 131:14–19, 132:15–18.

That is not a reliable method for determining either diagnosis or causation. Dr. Prabhu explains that an accurate medical, psychiatric, and social history is the "essential basis of a forensic evaluation" because it permits the evaluator to assess baseline functioning, competing contributors, and whether symptoms can reliably be attributed to one event rather than another. Prabhu Rep. ¶ 25. And where, as here, the subject has received [redacted], accepted practice calls for review of the treatment records or consultation with the treating provider—and an explanation if neither is possible. Baranoski Rep. at 5; *see* Prabhu Rep. ¶¶ 25(c), 26. Janoson did neither.

Courts routinely exclude psychological opinions when analogous omissions leave diagnosis or causation dependent on unverified self-report. *See El Ansari*, 2019 WL 3526714, at *5–6; *Matthews v. Hewlett-Packard Co.*, 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017) (excluding causation opinion where expert reviewed no medical records or relevant literature and conducted no differential diagnosis); *Williams v. E. Meadow Union Free Sch. Dist.*, 2026 WL 790580, at *9 (E.D.N.Y. Mar. 20, 2026) (precluding opinion where psychologist failed to review medical records, address alternative causes, or conduct differential diagnosis).

Prior decisions involving Janoson underscore the same concern. In *United States v. Shenghur*, Judge Rakoff criticized Janoson's "willingness in his report to transform a passing reference to a term he knew nothing about into an assertion that [the defendant] had been diagnosed with a serious mental illness," concluding that it "speaks volumes about the credibility of his conclusions generally." 734 F. Supp. 2d 552, 555–56 (S.D.N.Y. 2010), *aff'd*, 466 F. App'x 61 (2d Cir. 2012) (summary order). And in *Alcantara*, Judge Gleeson recounted the state court's adverse

assessment of Janoson's methodology based on, among other things, his failure to consult the subject's family, colleagues, and criminal record. 2014 WL 415954, at *2.

Janoson's explanation—that he "only had six days to do this"—does not cure the defect. Janoson Dep. at 102:22–103:2. Rule 702's reliability requirements do not depend on how much time an expert was given to complete his work. And the compressed schedule was not imposed by the Court: Khodakhah had more than two years to prepare his damages case and obtained an extension of his expert deadline after representing that additional time was needed to "complete necessary interviews" and conduct "additional testing." ECF 135 at 1. The resulting evaluation still contained no review of the records necessary to test the history Janoson was given.

The records Janoson never requested show why those omissions matter. Khodakhah told him that [redacted]. Janoson Rep. at 2; Janoson Dep. at 101:15-102:2. Dr. [redacted] records show that [redacted] *Id.* at MONTE_0000002–03.

The primary-care records contain still more information that any differential assessment would have had to confront. [redacted] Ex. H at SUMMIT 000012, 000016–17. The records also document [redacted]

[redacted] Ex. G at MONTE_0000174; Ex. H at SUMMIT_000010–12, 000016–17; *see supra* Background § D. These are not extraneous details. They bear directly on Khodakhah's baseline functioning, the reliability of the history Janoson accepted, the appropriate diagnosis, and potential alternative explanations for the symptoms Janoson attributed to workplace events.

The same problem extends to Khodakhah's reported [redacted]. Janoson attributed "[redacted]. Janoson Dep. at 136:5–12. He did not ask about [redacted] because he "[redacted]"; agreed that a [redacted] "would have been relevant"; and admitted that he never assessed whether Khodakhah's [redacted]." Janoson Dep. at 131:14–19, 132:15–18, 143:8–15. Dr. Prabhu explains that [redacted]" and that the [redacted] Janoson recorded "cannot be attributed to [redacted]" Prabhu Rep. ¶¶ 18(a), 25(a), 35(b), which in fact is present in this case. *See supra* Background § D.

None of this establishes that Khodakhah experienced no emotional distress, and Einstein's experts offer no opinion that he did not. Baranoski Rep. at 3; Prabhu Rep. ¶ 36. The point is narrower and dispositive under Rule 702: Janoson lacked a reliable basis to determine the nature or severity of any distress, when it began, or what caused it. He accepted Khodakhah's account, failed to test it against readily available records, and did not investigate competing explanations. He did not independently evaluate the history on which his opinions depend; he simply transcribed Khodakhah's version of it.

## III. JANOSON'S OPINIONS WILL NOT HELP THE FACTFINDER RESOLVE THE SOLE SURVIVING CLAIM

Finally, even if Janoson were qualified (he is not) and his methods reliable (they are not), his opinions would remain inadmissible because they will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The surviving theory in this case is narrow: that Einstein's decisions not to use Title IX procedures for the Chair Investigation and to remove Khodakhah as Chair were motivated by sex bias. ECF 88 at 2–3, 12; ECF 79 at 27–29, 35. Janoson's opinions neither address that theory nor identify any psychological injury attributable to it. And his only opinion that comes close to addressing the merits—that a personality test [redacted] is not a proper subject of expert testimony.

### A. Janoson Does Not Connect Khodakhah's Alleged Injuries to the Chair Investigation

Every claim arising from the separate Title IX investigations, the interim campus ban, and the sanctions imposed in those proceedings has been dismissed. ECF 88 at 3–6, 12. Even assuming emotional-distress damages are available under Khodakhah's state and city law claims, he must connect that distress to the discrimination that remains in the case. Janoson's report does not attempt to do so. It never mentions sex, gender, Title IX, or the procedures used in the Chair Investigation. It establishes no timeline for Khodakhah's symptoms and offers no analysis distinguishing distress allegedly caused by the surviving claim from distress associated with other events.

Instead, the report repeats Khodakhah's own attribution. Khodakhah "[redacted]." Janoson Rep. at 2. He told Janoson that he "[redacted] *Id.*

That matters because Khodakhah's narrative combines distinct events, only some of which even touch on the surviving claim. Khodakhah's removal as Chair arose from the Chair Investigation. But the sexual-harassment accusations, campus ban, and later sanctions arose in substantial part from the separate Title IX proceedings, every claim concerning which has been dismissed. ECF 88 at 3–6, 12. Janoson made no effort to separate the psychological effects of those events. He did not even know whether the "[redacted]" accusation repeated in his report concerned the Chair Investigation, the later Title IX proceedings, or both. Janoson Dep. at 100:21–101:7. And he performed no differential assessment of the potential causes of the symptoms he recorded. *Id.* at 139:18–22. Among other things, he did not consider the [redacted]" and [redacted]. Ex. G at MONTE_0000002–03, 0000172–73.

*Accely* is directly instructive. There, as here, Janoson was retained to support an emotional-distress claim in an employment-discrimination case. His evaluation consisted principally of personality testing, including the MMPI-2, and his report recited the plaintiff's allegations but "d[id] not purport to draw any connection" between the allegedly unlawful conduct and the claimed emotional harm. 2023 WL 3025436, at *2. Judge Chin concluded that the report would not assist the factfinder because it "merely reiterate[d] [the plaintiff's] allegations." *Id.* The court found it unnecessary to decide whether the testimony otherwise satisfied *Daubert*: it was irrelevant and unhelpful under Rules 401 and 702(a), and its limited probative value was "substantially outweighed by the risk of unfair prejudice, confusion, and delay" under Rule 403. *Id.*

The same reasoning applies with even greater force here. Janoson offers diagnoses and a narrative of Khodakhah's grievances, but no expert analysis connecting those diagnoses to the alleged sex discrimination that remains in the case. He does not distinguish distress caused by the alleged denial of Title IX procedures from distress caused by the underlying investigation and

removal as Chair. He does not distinguish either from distress caused by the separate Title IX proceedings or other stressors. And he does not establish when the symptoms he diagnoses began. His testimony therefore provides no expert basis for determining what injury, if any, the surviving alleged discrimination caused.

Allowing Janoson nevertheless to attribute severe psychological injuries to an undifferentiated collection of actionable, dismissed, and unrelated events would also invite the jury to award damages for conduct no longer at issue. Any limited probative value is therefore substantially outweighed by the risks of confusing the issues and misleading the jury. Fed. R. Evid. 403; *see Accely*, 2023 WL 3025436, at *2; *Matthews*, 2017 WL 6804075, at *4 (excluding causation opinion where report consisted largely of "a simple recitation of facts about Plaintiff's personal history" and no differential diagnosis); *Williams*, 2026 WL 790580, at *9.

**B. Janoson's "[redacted]" Opinion Is Not Expert Testimony**

Janoson's "[redacted]" opinion presents a different problem. His report states that an elevation on the MMPI-2 [redacted] Janoson Rep. at 1, 5–7. Those are conclusions about the truth of disputed historical events, dressed in the language of psychological testing.

The MMPI-2 cannot make that determination. As Dr. Baranoski explains, the subscale measures responses associated with [redacted]. It "cannot distinguish between a person's subjective beliefs and what is actually occurring": the score may be elevated when a person has suffered an injustice or when the person incorrectly believes that he has. Baranoski Rep. at 11. Distinguishing between those possibilities requires examination of the underlying events, clinical assessment, and collateral information—none of which Janoson

undertook. *Id.* at 11–12. His use of the subscale to infer [redacted] therefore "violates fundamental principles of psychological testing interpretation." *Id.* at 12.

At deposition, Janoson ultimately conceded the point. He acknowledged that he could not say Khodakhah "[redacted] and disclaimed any opinion that Einstein [redacted]. Janoson Dep. at 158:17–159:4. He further agreed that administering the MMPI-2 "[redacted] *Id.* at 159:5–9.

That concession leaves nothing that would assist the factfinder. If Janoson proposes to testify that [redacted], he would be using the mantle of expertise to resolve disputed historical facts and vouch for Khodakhah's account—matters reserved for the factfinder. *See Nimely*, 414 F.3d at 397–98. If he proposes to testify only that Khodakhah's test results are consistent with his subjective belief that [redacted], the testimony establishes neither that [redacted] was motivated by sex. It merely gives psychological terminology to what Khodakhah himself says he believes.

Under either formulation, the opinion does not apply psychological expertise to a fact the jury needs expert assistance to decide. It either impermissibly resolves the disputed facts or says nothing about them. Rule 702 permits neither.

## IV. AT A MINIMUM, RULE 403 AND RULE 37 REQUIRE EXCLUSION OF JANOSON'S MOST PREJUDICIAL OPINIONS

Even if some portion of Janoson's testimony survived Rule 702, three categories of testimony independently require exclusion under Rule 403 or Rule 37.

*First*, Janoson may not tell the jury that psychological testing establishes that Khodakhah [redacted]" His report presents that conclusion as [redacted] Janoson Rep. at 7, giving a disputed factual assertion the imprimatur of scientific proof. But the test establishes no such thing, as Janoson himself ultimately conceded. Janoson Dep. at 158:17–159:9. A jury hearing from a psychologist that [redacted]

[redacted]. The resulting danger that jurors would substitute the apparent authority of expert testimony for their own assessment of the evidence substantially outweighs any probative value. Fed. R. Evid. 403; *see Nimely*, 414 F.3d at 397–98.

*Second*, Janoson should not be permitted to attribute Khodakhah's psychological injuries to the separate Title IX investigations, the campus ban, or other conduct underlying claims that have been dismissed. ECF 88 at 3–6, 12. Those events form part of the [redacted] described in Janoson's report, Janoson Rep. at 6, and Janoson agreed that the [redacted] Janoson Dep. at 148:19–151:16. Yet Janoson never separated the psychological effects of those events from any distress attributable to the surviving claim. *Id.* at 156:17–157:8. Permitting him to attribute [redacted] to that undifferentiated collection of events would invite the jury to compensate Khodakhah for conduct no longer actionable while providing no reliable means to distinguish permissible from impermissible damages. That is precisely the sort of confusion Rule 403 guards against. *See Accely*, 2023 WL 3025436, at *2 ("[T]he probative value of Dr. Janoson's testimony is low and is substantially outweighed by the risk of unfair prejudice, confusion, and delay.").

*Third*, Janoson should be precluded from offering the new opinions he disclosed for the first time at his deposition: that Khodakhah is [redacted] and that his [redacted] Janoson Dep. at 153:7–18. Rule 26 required Janoson's report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 37 supplies the consequence: a party that fails to disclose an opinion as required by Rule 26 may not use it "at a trial," unless the failure "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Neither exception applies. These were not elaborations on opinions disclosed in Janoson's report. His report never diagnosed [redacted] never disclosed the [redacted] result, and never supplied the bases or reasons for either opinion. Janoson first volunteered them at his August 13 deposition, more than six weeks after the expert-disclosure deadline that the Court had already extended. ECF 137. Khodakhah has identified no justification for their omission, and permitting new opinions of this magnitude after rebuttal reports had already been prepared would defeat the disclosure regime Rule 26 establishes. *See* Fed. R. Civ. P. 37(c)(1).

Rule 403 independently points the same way. A psychologist's pronouncement that a plaintiff is [redacted] carries an obvious potential to dominate a jury's assessment of his mental condition. Here, that opinion was absent from Janoson's report, rests on psychological testing whose principal MMPI-2 protocol had been declared invalid, and comes from a witness who disclaimed any formal training in clinical psychology. Whatever limited probative value the opinion might have is substantially outweighed by the dangers of unfair prejudice, confusion, and misleading the jury.

Thus, even if the Court does not exclude Janoson altogether, it should preclude (1) any opinion that [redacted] (2) any attribution of psychological injury to the dismissed Title IX claims or other events Janoson failed to distinguish from the surviving claim; and (3) the [redacted] opinions omitted from Janoson's expert report.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court exclude Janoson's proffered opinions in their entirety or, at a minimum, preclude the opinions and testimony identified above under Rules 403 and 37.

Dated: September 25, 2026
New York, New York

*/s/ Roberta A. Kaplan*

Roberta A. Kaplan
Christopher R. Le Coney
Tasha N. Thompson
KAPLAN MARTIN LLP
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 316-9500
rkaplan@kaplanmartin.com
cleconey@kaplanmartin.com
tthompson@kaplanmartin.com

Gabrielle E. Tenzer
Anna Collins Peterson
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
gtenzer@heckerfink.com
apeterson@heckerfink.com

*Counsel for Defendants Montefiore Medicine Academic Health System, Inc. and Albert Einstein College of Medicine*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the page and type-volume limitations in Your Honor's Individual Rules of Practice and Local Rule 7.1. Exclusive of the exempted portions of the brief, the brief contains 35 pages, which complies with the limits applicable to a brief under Local Rule 7.1(c) where the Court expresses a limit in pages. This brief has been prepared in proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.

Dated: September 25, 2026
New York, New York

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan

*Counsel for Defendants Montefiore Medicine Academic Health System, Inc. and Albert Einstein College of Medicine*