# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
KAMRAN KHODAKHAH,

PLAINTIFF,

-against- File No.:
1:24-cv-00839

MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF MEDICINE, GORDON TOMASELLI, PABLO CASTILLO, BRYEN JORDAN, JOHN-JANE DOES 1-10,

DEFENDANTS.
-----------------------------------------X

DATE: August 25, 2026
TIME: 10:09 a.m.

*** CONFIDENTIAL ***

EXAMINATION BEFORE TRIAL of the Defendant, ALBERT EINSTEIN COLLEGE OF MEDICINE, by a witness, YVONNE RAMIREZ, taken by the Plaintiff, pursuant to a Notice and to the Federal Rules of Civil Procedure, held at Veritext Legal Solutions, 7 Times Square, 16th Floor, New York, New York 10036, before Amanda Larrea, a Notary Public of the State of New York.

A P P E A R A N C E S:

NESENOFF & MILTENBERG LLP
Attorneys for Plaintiff
KAMRAN KHODAKHAH
363 7th Avenue, 5th Floor
New York, New York 10001
BY: GABRIELLE VINCI, ESQ.

HECKER FINK, LLP
Attorneys for Defendant
MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF MEDICINE
350 Fifth Avenue, 63rd Floor
New York, New York 10118
BY: GABRIELLE E. TENZER, ESQ.
-and-
KATE DONIGER, ESQ.

ALSO PRESENT:
KAMRAN KHODAKHAH
Plaintiff

DANA H.C. LEE
Senior Counsel
ALBERT EINSTEIN COLLEGE OF MEDICINE

***



F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *



Y. RAMIREZ

THE COURT REPORTER: Will you still be needing the rough draft and the final for tomorrow?

COUNSELOR VINCI: If you could get me the final by tomorrow, I won't need the rough draft. I'll take the final for tomorrow.

Y V O N N E R A M I R E Z, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
COUNSELOR VINCI:

Q. Please state your name for the record.
A. Yvonne Ramirez.
Q. What is your current business address?
A. 1300 Morris Park Avenue, Bronx, New York 10461.
Q. Good morning, Ms. Ramirez.
A. Morning.
Q. My name is Gabrielle Vinci. We met very briefly off the record. I am here



Y. RAMIREZ

on behalf of Dr. Khodakhah representing him in an action, a litigation he brought against the Montefiore Medicine Academic Health System and Albert Einstein --

COUNSELOR TENZER: Do you mind if we pause for one moment? Do you know the live note -- off the record.

(Whereupon, an off-the-record conversation was held.)

CONTINUED EXAMINATION BY
COUNSELOR VINCI:

Q. Yes, we're back on. Okay, so a litigation he brought against the Montefiore Medicine Academic Health System and Albert Einstein College of Medicine. If I refer to those two entities simply as Montefiore and Einstein, is that okay with you today?
A. Yes.
Q. Okay. We're here to take your deposition in connection with that case which basically means we're here so that I can ask you questions and you can tell me what you know, what you recall regarding

Y. RAMIREZ
the facts and circumstances underlying Dr. Khodakhah's claims in this action.
Have you ever been deposed before?
A. Yes.
Q. How many times?
A. Five or six.
Q. Were any of those depositions part of a case that you were personally named either as a plaintiff or a defendant?
A. No.
Q. When was the last time you were deposed?
A. Last week.
Q. And in connection with what case were you deposed?
A. It was a case related to --
COUNSELOR TENZER: Objection.
THE WITNESS: Okay.
COUNSELOR TENZER: Is it a publicly filed case?
THE WITNESS: I don't think so, no. I don't know.
COUNSELOR LEE: It was an



Y. RAMIREZ
arbitration, it wasn't a lawsuit.
THE WITNESS: No, it wasn't -- I --
COUNSELOR TENZER: You can answer.
COUNSELOR VINCI: Are you instructing her not to answer?
COUNSELOR TENZER: You can answer as long as it doesn't disclose confidential or privileged information.
THE WITNESS: The case related to a --
COUNSELOR TENZER: No.
Can we take a break?
THE WITNESS: Yeah.
(Whereupon, a brief recess was taken.)
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Ms. Ramirez, before we took a quick break, I had asked you what case you were most recently deposed in, what was the case in connection to, and I understand



Y. RAMIREZ
your attorney put in an objection on the record advising you to respond to the extent it does not impact confidentiality or privilege, I certainly am not asking for any privileged information, but are you able to respond to my question as to identifying what the case you were recently deposed in was?
A. It was a work-related case.
Q. Okay. Was that case publically filed in court to your knowledge?
A. I'm not sure.
Q. Do you know if that case was filed as a confidential arbitration?
A. I'm not sure.
Q. Okay. As you've recently been deposed, I'm sure what I'm about to say is going to sound familiar, but for the sake of the record and everyone here, I'll just go over the ground rules for the deposition today.
The first is, as you can see, we have a court reporter here. She's taking over everything that everyone says



Y. RAMIREZ
or taking down everything everyone says, I should say. Therefore, I would ask all of your responses be verbal. It's difficult for her to note in the transcript a nod of the head or any sort of gesture. It's also difficult to distinguish in the transcript or even here at the table between uh-huh or an mm-hmm, so if you could give clear, verbal answers, I would appreciate that, but also ask that you allow me to finish my question before you respond and I will show you the same courtesy just so we don't have two people talking over each other and the transcript is clear.
If at any point in time I interrupt you or cut you short while you're answering, I don't mean to, please let me know and I will stop so you can complete your answer and then we'll move on.
If I ask you a question that you don't understand or don't hear, please let me know, I'll rephrase it as many times as I need to until it becomes meaningful to you or have the question read back to you.

CONFIDENTIAL

Page 10

Y. RAMIREZ

If the court reporter asks you to repeat your response, I would ask that you try as hard as you can to say exactly what you said so she can properly get down your response in the transcript.

Lastly, this is a deposition, it is not an endurance test. I do not know how long or short we'll be here today, but if at any point in time you need a break for any reason, please let me know, I'm happy to take as many breaks as you need. The one caveat to that is if there's a question pending, please answer the question and then we'll take a break, okay?

A. Yes.

Q. Do you have any questions in terms of the process or logistics for today?

A. No.

Q. Have you brought any documents related to Dr. Khodakhah's case with you today?

A. No.

Q. Are you currently taking any

Page 11

Y. RAMIREZ

medication, prescription or otherwise, that impacts your ability to understand my questions?

A. No.

Q. Or that impacts your ability to respond truthfully to my questions?

A. No.

Q. Are you under the influence of any drugs or alcohol as you sit here today?

A. No.

Q. Is there any reason you could think of that you would not be able to proceed with today's deposition?

A. No.

Q. Have you ever been arrested?

A. No.

Q. Okay. You testified to being deposed five or six times, have you ever been -- given testimony as a witness at trial in court before?

A. No.

Q. Okay. Have you ever given testimony as a witness in an arbitration or other proceeding?

Page 12

Y. RAMIREZ

A. No.

Q. Have you ever been a party to a civil litigation before, whether as a plaintiff or a defendant?

A. Yes.

Q. How many times?

A. Just once.

Q. And were you the plaintiff in that case or the defendant in that case?

A. Defendant.

Q. And is that a case that was filed in court?

A. I really don't know. It's a very long time ago.

Q. How long?

A. Probably 25 years ago.

Q. Okay. And to the best of your recollection, how did that case resolve?

A. I think it was settled.

Q. What was the nature of that case?

A. It was a traffic car accident.

Q. Did you review any documents in preparation for your deposition today?

Page 13

Y. RAMIREZ

A. I reviewed my files.

Q. When you say you reviewed your files, what specifically did you review?

A. Notes, files on -- or documents related to -- to this case.

Q. Can you recall any specific documents?

A. I have a lot of documents related to this case.

Q. Can you recall any specific documents that you reviewed in preparation for your deposition today?

A. I reviewed my --

COUNSELOR TENZER: Objection.

You can answer.

A. I reviewed my notes and the documents that I have relating to this case are certainly on the record, so we look at documents related to notices, for example.

Q. When you say the documents related to the case that you have are on the record, to your understanding, were all the documents you reviewed in preparation for your deposition produced in discovery

Y. RAMIREZ
in this case?
A. Yes.
COUNSELOR TENZER: Objection.
THE WITNESS: Sorry.
CONTINUED EXAMINATION BY
COUNSELOR VINCI:
Q. You said, for example, you reviewed notices, any other categories of documents that you reviewed?
A. I reviewed reports, notices, e-mail exchanges.
Q. E-mail exchanges between who?
A. I reviewed e-mail exchanges between myself and other individuals involved in the case, between myself and Dr. Khodakhah, between myself and our attorneys.
Q. Did you speak to anyone in preparation for your deposition today?
A. I spoke with my attorneys, our attorneys. That's it.
Q. Okay. Not asking for the substance of any discussion with your counsel.



Y. RAMIREZ
A. Thank you.
Q. Other than counsel for Montefiore and/or Einstein, did you speak to anyone about your deposition today?
A. No.
Q. Going back to the documents that you reviewed, you mentioned your notes, are those handwritten notes, computerized notes, what type of notes are they?
A. They're handwritten notes.
Q. What were your notes regarding that you reviewed?
A. Notes from meetings.
Q. Any particular meetings that you can recall reviewing the notes for?
A. No.
Q. What is your highest level of education?
A. I have a master's degree.
Q. What is your master's degree in?
A. What is -- I'm sorry?
Q. What is your master's degree



Y. RAMIREZ
in?
A. It is an MBA.
Q. Where did you earn your master's degree?
A. I earned my master's degree at Pace University.
Q. When did you earn it?
A. 2010.
Q. Okay. What do you -- what undergraduate degree have you earned or degree?
A. It's a business degree.
Q. Where did you earn your business degree?
A. At Pace.
Q. And when did you earn your bachelor's?
A. Long time ago. I want to say '88. I want to say '88.
Q. Okay. Did you earn any other degrees between your bachelor's undergraduate business degree and your MBA at Pace?
A. No, not degrees.



Y. RAMIREZ
Q. Okay. Did you earn any professional certifications between that time?
A. I've taken certification programs.
Q. What have you taken certification programs in?
A. There's one in negotiations, another one in coaching.
Q. Any others?
A. No.
Q. Do you hold any professional licenses other than your two academic degrees?
A. No.
Q. You're currently employed by Einstein, correct?
A. Yes.
Q. And what is your title?
A. Vice president for human resources.
Q. How long have you held that role?
A. Since 2016.

CONFIDENTIAL



Y. RAMIREZ
Q. Do you also act as the College's or Einstein's Title IX coordinator?
A. Yes.
Q. And have you also held that role since 2016?
A. Yes.
Q. When did you hold the role of Title IX coordinator?
A. It was after 2018.
Q. And how did it come to be that you became the Title IX coordinator at Einstein?
A. It was previously a function of Yeshiva University. And when we, meaning the college, became an independent institution, Yeshiva no longer served as a Title IX overseer, so I guess I was lucky and got the assignment.
Q. So this was not a role that you had applied for, it was a role that was just assigned to you?
A. It was added to my portfolio.
Q. At that time, did you have to



Y. RAMIREZ
take any sort of trainings or courses at Einstein related to being a Title IX coordinator?
A. Yes, I -- I -- I did.
Q. Okay. What trainings did you take?
A. I take annual trainings as well.
Q. I'm talking specifically about when you became the Title IX coordinator in 2018, at that time that they sort of tacked on that role to your job, did you have to take any trainings in how to act as a Title IX coordinator, what a Title IX coordinator does, anything around the new role that you were assuming?
A. Yes. I took a training for Title IX coordinators.
Q. Was that required by Einstein?
A. No.
Q. Prior to 2018, did you have any experience acting or working as a Title IX coordinator?
COUNSELOR TENZER: Objection.



Y. RAMIREZ
You can answer the question.
A. I assisted with investigations, but not as Title IX coordinator.
Q. In what way did you assist with investigations?
A. I assisted in conducting an investigation.
Q. Did you act as the investigator in these instances?
A. Excuse me.
Q. Did you act as the investigator in these instances?
A. In a few instances.
Q. Other than performing the investigation yourself, in what other way did you assist in the investigations prior to 2018?
A. That's it.
Q. Now, were these instances where you assisted investigations, were they at Einstein?
A. They would have been at Yeshiva University.
Q. Prior to your employment with



Y. RAMIREZ
Einstein, had you held a role in HR before?
A. Yes.
Q. Okay. Where did you work immediately prior to Einstein?
A. Yeshiva University.
Q. Where did you work immediately before Yeshiva University?
A. I was at Pace University.
Q. What position or positions did you hold at Pace?
A. When I left Pace, I was vice president for human resources.
Q. Okay. For what time period in total did you work at Pace?
A. Was over 25 years.
Q. For that entire time span, were you working within human resources?
A. Yes.
Q. What position did you start at Pace?
A. I started as a recruiter.
Q. Then after being a recruiter, what position did you hold?
A. I was involved in compensation.

CONFIDENTIAL

Page 22

Y. RAMIREZ
Q. Did you have a job title?
A. I was manager of compensation.
Q. After being manager of compensation, what position did you hold?
A. I was director of benefits.
Q. Okay. And after being director of benefits, what position did you hold?
A. Vice president of human resources.
Q. While employed in HR at Pace University, did you have any occasion to conduct Title IX investigations?
A. No.
Q. When did you commence employment with Yeshiva?
A. It was 2008. 2008.
Q. What position did you hold in 2008?
A. I was the chief HR officer.
Q. For how long were you the chief HR officer?
A. Until the end of 2015.
Q. When you then became officially employed by Einstein, there was the split?

Page 23

Y. RAMIREZ
A. I -- I -- yes, I accepted employment with Einstein.
Q. As the vice president of HR at Einstein, could you describe what your job duties and responsibilities are?
A. I oversee the HR function that includes talent acquisition, recruitment, onboarding, compliance and those -- in that area, I oversee compensation, systems, benefits, employee relations and labor relations and learning.
Q. And learning?
A. Learning.
Q. What do you mean by "learning"?
A. Training.
Q. As part of your role, are you responsible for overseeing the investigation of misconduct complaints at Einstein?
A. As it relates to employees, yes.
Q. In what ways do you oversee the investigation of misconduct complaints against employees or related to employees I

Page 24

Y. RAMIREZ
should say?
A. I have individuals on my team who will conduct investigations.
Q. How many individuals are on your team?
A. Who conduct investigations?
Q. Yes.
A. Two.
Q. Who are they?
A. Jennifer Eastridge (phonetic) who handles labor and right now I have a vacancy for an employee relations manager.
Q. Okay. In 2022, did you have individuals on your team who conducted investigations?
A. Yes.
Q. Who were they?
A. Oh, I don't remember now. 2022? Robert Condeleri (phonetic) I believe was still there in 2022.
Q. Okay. Can you recall any other investigators on your team in 2022?
A. He oversaw -- he oversaw both employee relations and labor relations so

Page 25

Y. RAMIREZ
they reported to him. Anyone who was involved with investigations reported to him.
Q. In terms of title, who do you report to at Einstein?
A. I report to the dean of the College of Medicine.
Q. Who is that currently?
A. Dr. Yaron Tomer.
Q. And in 2022, was that Dr. Tomaselli?
A. No.
Q. Who was the dean of the College of Medicine in 2022?
A. Gordon Tomaselli, Dr. Tomaselli.
Q. Yes. I must have -- I apologize if there was a misunderstanding. I believe I asked if that was the dean in 2022?
A. I believe he was the dean in 2022.
Q. Other than having conducted investigations prior to becoming, or

CONFIDENTIAL

Page 26

Y. RAMIREZ
assisted in investigations I should say, prior to becoming the Title IX coordinator, had you had any other experience with Title IX either as a hearing officer, an appellate officer, any other professional experience with Title IX?
COUNSELOR TENZER: Objection. You can answer.
A. No.
Q. Einstein maintains policy and procedure related to investigating complaints under Title IX; is that right?
A. Yes.
Q. And that's been true since 2018?
A. Yes.
Q. Okay. Do you have any other role in drafting that policy or those policies?
A. If you mean, excuse me, am I involved in -- in drafting and reviewing, yes.
Q. Okay. And in what way are you involved in drafting and reviewing?

Page 27

Y. RAMIREZ
A. I -- just that. I review our Title IX policies have been primarily drafted by outside counsel.
Q. Who else is involved in the drafting and reviewing of the Einstein Title IX policy?
A. Our general counsel and in the past, the director of employee relations, employee slash labor relations.
Q. What is your understanding of the relationship between Einstein and Montefiore?
A. Einstein is an independent and separate entity. We maintain or we have our own employer ID, we maintain our own records, we manage our own payroll, activities related to human resources are at the college.
Q. Do you report to anyone at Montefiore?
A. I have a dotted line relationship with the CHRO of Montefiore Health System and I sit on her leadership team.

Page 28

Y. RAMIREZ
Q. When you say CHRO --
A. Chief Human Resources Officer.
Q. Who is that currently?
A. Gloria Kenny.
Q. And to your knowledge, how long has she served in that role?
A. Probably since -- in that role, since 2021, I think. I'm not sure.
Q. Okay. Is it Ms. Kenny or Dr. Kenny?
A. Sorry?
Q. Is it Ms. or Dr.?
A. Ms.
Q. Does Ms. Kenny have any supervisory authority over you?
A. We operate in a matrix, but primarily the dean is my supervisor.
Q. When you say you operate in a matrix, can you explain that?
A. Sure. As I mentioned before, I sit on her leadership team.
Q. In that capacity, does she act as a supervisor to you?
A. Not really. She certainly is

Page 29

Y. RAMIREZ
an advisor.
Q. Do you in any way report to her with respect to investigations happening at Einstein against employees?
A. No.
Q. Does she have any authority to determine the outcome of investigations at Einstein?
A. No. No.
Q. Okay. You're familiar with Dr. Khodakhah, correct?
A. I know Kamran, yes.
Q. When did you first meet him?
A. I've known Kamran for a long time. Probably as far back as when I was with Yeshiva University.
Q. Did you have anything to do -- strike that. He was already employed at Einstein when you started, correct?
A. Yeah. Yes.
Q. And throughout his tenure, he has had changes in title and promotions; is that right?
A. I believe so.

CONFIDENTIAL

Page 30

Y. RAMIREZ
Q. Did you have any involvement in his -- any of his promotions or title changes?
A. No.
Q. From the time you met Kamran until 2022, how would you describe your relationship with him?
A. We were colleagues. We have worked together on committees in particular. We worked together on -- or in the area of diversity. Kamran was certainly one of our important leaders in that area and we relied on him to bring the faculty perspective to discussion, so... He certainly was very good at giving feedback and advice and he was -- he is, I should say, sorry, you're still here. He is very committed to issues of diversity. That was my experience. Other than that, he was a department head. As with any other department head, we support the activities of the department and the activities related to providing advice or giving counsel on issues of human

Page 31

Y. RAMIREZ
resources, primarily staff, employees.
Q. Okay. When you say he was -- Dr. Khodakhah was an important leader in the area of diversity, in what way was he an important leader at Einstein?
A. He took up the leadership role. He was front and center on a lot of discussions. I think he -- I'm pretty sure he did oversee a committee. He was very much involved in the development of a strategic plan for diversity.
Q. Okay. Up until when you first met Dr. Khodakhah in 2022, had you ever received a complaint about his professionalism at Einstein?
A. Yeah, I've known Dr. Khodakhah before 2022. Sorry, you said 2022.
Q. I said from the time you met him up until 2022.
A. No, not that I'm -- not that I recall.
Q. Okay. Did you ever receive any complaints from faculty about his performance in his role?

Page 32

Y. RAMIREZ
A. No.
Q. Did you ever receive any complaints from students about his performance as a teacher or as a mentor?
A. No.
Q. Did you receive any complaints about Dr. Khodakhah prior to 2022?
A. No.
Q. In 2022, in early 2022, you did learn of some, say, concerns from staff and students; is that right?
A. And faculty, yes, that's right.
Q. What specifically did you learn?
A. There were concerns related to his leadership of the department, his interactions with students primarily. I believe concerns expressed by the faculty in the department and those were related about the management of the department and the staffing in the department.
Q. How did you learn about concerns related to Kamran's leadership of the -- it's the Neuroscience Department,

Page 33

Y. RAMIREZ
correct?
A. Yes.
Q. How did you learn about concerns about his leadership of the Neuroscience Department?
A. There was a letter of concern written by several faculty that was shared with me.
Q. Okay. How did you learn about concerns related to his interactions with students?
A. There was a survey that was developed, I believe, by the Department of Neuroscience where students reported a variety of different experiences. Some of them good, but some troubling as they relate to individual's characteristics. Primarily that. Communication with students and students were concerned about the way that their issues were managed or handled through the department.
Q. Did you talk to any students personally about their concerns?
A. No.

CONFIDENTIAL

Page 34

Y. RAMIREZ
Q. Okay. How did you come to learn of the students survey that you referenced?
A. That was also shared with me by our associate dean for graduate division.
Q. And who was that in 2022?
A. Victoria Freedman.
COUNSELOR VINCI: Okay. I am going to have marked as an exhibit this.
(Whereupon, Kamran Khodakhah left the deposition room.)
COUNSELOR VINCI: I just want to note for the record that Exhibit 1 is a multipage document, parts of it, the beginning of it, which is marked highly confidential, attorney eyes only, pursuant to the protective order in this case. Also pursuant to that protective order, this document can be shown to the Witness. Dr. Khodakhah is not a permissible viewer of the document, or at least the highly confidential portion of

Page 35

Y. RAMIREZ
it, and so I asked him to step out and he has. We will invite him back in when we finish going over that portion of the exhibit.
(Whereupon, an E-mail Exchange with Attachment was marked as Exhibit 1 for identification as of this date by the reporter.)
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Ms. Ramirez, I'm going to hand you what's been marked as Plaintiff's Exhibit 1. I apologize, there seems to have been a printing issue, but I will represent for record that Exhibit 1 is a multipage document Bates stamped AECOM398 through 439.
I'm certainly not asking you to read line and chapter, but familiarize yourself with the document and let me know when you're ready to proceed.
COUNSELOR TENZER: Are you sure this is the full document?
COUNSELOR VINCI: Yes. That's

Page 36

Y. RAMIREZ
-- that's -- that's what I had in the production.
COUNSELOR TENZER: It looks like it ends in the middle, you know what I'm saying? The last page it says -- it may not be -- we can check.
COUNSELOR VINCI: Yes, I'll double check, but I had checked it before.
COUNSELOR TENZER: We're checking. I wanted to make sure. Since there's no Bates range, it's hard to --
COUNSELOR VINCI: Sure. Off the record.
(Whereupon, an off-the-record discussion was held.)
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Ms. Ramirez, have you had an opportunity to review what we've marked as Exhibit 1?
A. Yes.

Page 37

Y. RAMIREZ
Q. Okay. Do you recognize this document?
A. Yes, I do.
Q. Can you identify it for the record? State what it is?
A. It is the survey that was shared with me by Victoria Freedman as I indicated earlier.
Q. Okay. The first two pages of this document of this exhibit appear to be the e-mail between, well, Dr. Freedman's e-mail to you forwarding an e-mail from a [redacted] nd [redacted] o you see that?
A. Mm-hmm.
Q. Who is [redacted] r who was [redacted] s of February 2022?
A. I have no idea. I'm going to assume it's a student.
Q. Same question for [redacted]
Do you know who she was?
A. Assume a student.
Q. And Dr. Freedman references or -- in the e-mail to Dr. Freedman that she

CONFIDENTIAL



Y. RAMIREZ
forwards to you, they write "Following a previous NGSO meeting," what is NGSO, if you know?
A. I think it stands for Neuroscience Graduate. I don't know what the SO stands for.
Q. Okay. And Dr. Freedman references that she had already forwarded this e-mail to Ed Burns; do you see that?
A. Yes.
Q. Who is Ed Burns as of February '22?
A. Ed was the executive dean at the Einstein College of Medicine.
Q. Okay. [redacted] -mail at the bottom references the attached PowerPoint slide, and [redacted] omments that the slide summarized a survey we sent out to the neuroscience students to assess the thoughts on the leadership of the Neuroscience Department; do you see that?
A. Yes.
Q. Okay. Did you ever see the raw data from the survey?



Y. RAMIREZ
A. I don't think so.
Q. Okay. You can turn to the exhibits that start on Page 3 of the document.
COUNSELOR VINCI: I'll note for the record that these are now marked as confidential. I understand, counsel, yours does not have the Bates stamp. You can confirm on mine if you would like. And as such, I will invite Dr. Khodakhah back in. Off the record.
(Whereupon, an off-the-record discussion was held and Kamran Khodakhah came back in the deposition room.)
COUNSELOR VINCI: We're back on the record. Dr. Khodakhah has rejoined us in the deposition room. There was an issue raised by counsel about the completeness of the exhibit as it appeared the last page sort of ended abruptly, I checked the production and can confirm that the



Y. RAMIREZ
following pages appear to be blank and then two pages of the signature block. So it is my assessment that this is, in fact, the complete document.
I'm also going to hand, for the record, Dr. Khodakhah a copy of the exhibit. The two highly confidential pages have been removed.
COUNSELOR TENZER: Can we pause for a moment?
COUNSELOR VINCI: Sure.
COUNSELOR TENZER: Thanks.
COUNSELOR VINCI: Confirming with counsel, I removed the highly confidential portions.
Kamran that's marked as Exhibit 1 so you have a copy as well.
MR. KHODAKHAH: Thank you.
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Looking at the exhibit to the Exhibit 1, starting on the third page of the document, do you recognize this first



Y. RAMIREZ
attachment?
A. I've seen it before.
Q. This appears to be copies of slides related to, as the first page says, NGSO follow-up survey results; do you see that?
A. Yes.
Q. Referencing a follow-up survey result, do you know what the survey was following up on?
A. I understand that the survey was following up on a previous survey that was conducted by this committee or -- or the graduate student committee -- education GEC. So it was a follow-up to a previous survey, that is what my understanding is.
Q. When did you learn about the GEC survey?
A. I think when I received the NGSO follow-up survey in discussion with Dr. Freedman.
Q. Okay.
A. I understood that the process was that there was a previous survey and --

Y. RAMIREZ
and -- and the students and faculty on that committee felt it was important -- it's what she said, it was important that this follow-up survey be conducted.
Q. Did you ever talk to any student or faculty on the NGSO about their follow-up survey?
A. I -- I spoke with Bryen Jordan.
Q. Did Dr. Jordan hold any particular role as part of the NGSO?
A. I got the sense that he was sharing that committee.
Q. When did you speak to Dr. Jordan about the follow-up survey?
A. Probably within a few days after I received the survey from Dr. Freedman.
Q. Okay. Is the GEC committee different from the NGSO committee?
A. I don't know.
Q. Did you ever speak to anyone that you knew to be on the GEC committee about that survey?
A. I think the only one was Bryen



Y. RAMIREZ
Jordan.
Q. At the time that you received the survey results that we see in Exhibit 1, did you review them?
A. Yes.
Q. Okay. Did anything stand out to you as particularly concerning or troubling?
A. I, based on my review, most of it was troubling and concerning.
Q. Okay. What did you do in response -- your sort of immediate step in response to receiving this information from Dr. Freedman?
A. As I mentioned, I wanted to understand more about the survey, how it was conducted, who was involved and why -- primarily why this survey was -- was created.
Q. Okay. Other than talking to Dr. Jordan to make those inquiries, did you speak to anybody else?
A. I recall, as I said, speaking with Dr. Freedman. I recall speaking with



Y. RAMIREZ
Dr. Burns.
Q. What did Dr. Burns tell you with respect to the survey and why it was conducted?
A. He didn't. He was receiving the survey, more or less, at the same time I received the survey.
Q. What, if anything, was his reaction after his review of the survey?
A. Same concerns.
Q. What about other than what you've already testified to, did you discuss anything else related to the survey with Dr. Freedman?
A. No.
Q. Other than learning about the GEC survey from Dr. Jordan, what, if anything, else did you discuss with him related to the student survey results?
A. Just that.
Q. You only discussed that there was a prior survey, the GEC survey?
A. I mentioned that I talked to him about the reason for the survey, the



Y. RAMIREZ
original survey may have been a, I got the sense, was -- was not a new concept, but, again, I don't recall if that was the actual case. We did talk about this survey, concerns that had been raised by the GEC and the students on that -- I believe there are students on that committee. Dr. Jordan had been tasked with working with the department, the chair, and the faculty and the students to help to provide students, I think, with a voice in the department and improving the overall experience of the graduate students in the department.
Q. To your knowledge, what if any role did Dr. Jordan play in formulating the survey in terms of the questions?
A. I don't know. I don't recall.
Q. Did you ever ask him what his role was in creating the survey?
A. I got the sense that the students actually developed the survey, the follow-up survey at the very least.
Q. What gave you the sense that it

Y. RAMIREZ

was developed by the students?

A. I think Dr. Jordan said it was student led.

Q. Do you know, regardless of it being student led, if he oversaw the enforcement of the survey? That's probably the wrong word.

COUNSELOR TENZER: Objection.

A. Maybe administration.

Q. Thank you.

A. I think because he was the person responsible for the GEC and that group was sponsoring I guess is the word I would use, the survey. But, yes, he oversaw the process from development to administration.

Q. Do you -- do you know the matter in which the survey was disseminated to students to fill out?

A. No. Electronically I assume, but...

Q. To your understanding, were -- was anybody on the NGSO able to change student responses after they had been



Y. RAMIREZ

submitted?

COUNSELOR TENZER: Objection.

A. I wouldn't know that.

Q. Okay.

A. But no, I don't think so.

Q. Would you agree it would be inappropriate to change student responses on a survey?

A. It would be inappropriate to change student responses on anything.

Q. I apologize if I asked you this already. Did you speak to any of the students on the NGSO about the survey that they conducted?

A. No, I did not.

Q. Why not?

A. I had just received the survey, I wanted to discuss it with Dr. Burns. We had also received, or I guess Dr. Burns had also received, a letter of concern. Our -- Dr. Burns and I both agreed that it would be appropriate to meet with Dr. Khodakhah to begin discussions about the survey and the letter of concern.



Y. RAMIREZ

Q. Do you know if Dr. Khodakhah was also privy to the results of the NGSO survey?

A. I really can't answer that question. I could only say my feeling was that he was not aware of the NGSO, this survey you're showing me here.

Q. Right. Right. Did that strike you as odd that he would not be aware of the results of the survey regarding his department?

A. I don't know at what stage -- I mean, no. I don't know that that is odd. It was a student run survey, that I'm almost positive of, and I think it would be up to those students to determine how to share that information.

Q. Did you ever talk to Gordon Tomaselli about the results of the NGSO survey?

A. I'm sure we spoke with the dean, yeah.

Q. What can you recall discussing with the dean?



Y. RAMIREZ

A. I think it was just a matter of we received the survey, we received a letter of concern. He was aware of both.

Q. He stated to you that he had, at that time that you came to him, he was aware of both the survey results and the letter of concern?

A. I think he was -- he -- he -- you know, I don't know how he became aware of the letter of concern and the survey.

Q. But my question is when you spoke to him the first time regarding the survey results, the NGSO survey results, to your knowledge, did he already know of the survey and -- and the feedback that was received?

A. Again, I don't know what he knew or how he got the information. I don't believe I was the first person to speak with him about this. It was probably Dr. Burns if I'm going to take a guess.

Q. What makes you guess or believe that you were not the first person to speak to him about it?

Y. RAMIREZ
A. I --
COUNSELOR TENZER: Objection.
A. Yeah.
COUNSELOR TENZER: You can answer the question.
A. Okay. As I mentioned, when -- when raised, he acknowledged that he was aware of it. I don't know how much detail he had received. Why would Dr. Burns share anything? He was the executive dean. It's like he's chief of staff I would probably refer to it as and had significant responsibility over research and academic departments.
Q. Was this the first time that you had become aware of any complaints by students against Dr. Khodakhah?
A. Yes.
Q. Were you surprised by the complaints that the students raised?
A. Yes.
Q. Did you speak -- at the time that you learned of the complaints, did you speak to Dr. Khodakhah about them?



Y. RAMIREZ
A. Both Dr. Burns and I met with Dr. Khodakhah to discuss receipt of the survey and the letter of concern.
Q. How did you learn about the faculty's letter of concern?
A. Dr. Burns shared it with me.
Q. Did Dr. Khodakhah also share with you the letter of concern?
A. I don't recall that Dr. Khodakhah shared the letter of concern. He shared, certainly, a response to the letter of concern, but I don't -- I got the letter from Ed.
Q. Did you receive the letter of concern before or after seeing Dr. Khodakhah's response to it?
A. Sorry. Can you repeat that?
Q. Were you made aware of the letter of concern before or after Dr. Khodakhah's response to it?
COUNSELOR TENZER: Objection. You can answer.
A. Before.
Q. Okay. And at the time that you



Y. RAMIREZ
learned of the letter of concern, what, if anything, did you discuss with Dr. Burns?
COUNSELOR TENZER: Objection. You can answer the question just as long as you don't disclose any confidential discussions.
A. Ed and I, Dr. Burns and I, discussed the concerns, the content of both the survey and the letter. We talked about how we might move forward in this matter. We agreed that we should first talk to Dr. Khodakhah and we prepared for that discussion, logistics, right, reaching out to Dr. Khodakhah, scheduling a meeting and so on.
Q. Okay. I just want to, as a bit of an aside, your counsel has advised you and has instructed you to obviously answer the question so long as they don't hinge upon confidentiality. I want to be clear, I'm certainly not asking for the substance of any discussions you had with counsel. When I say that, I mean, if you had discussions and counsel was in the room,



Y. RAMIREZ
not direct where legal advice was mentioned or was part of the agenda, I'm not looking for that. That's different from confidentiality. So confidentiality, you thinking that a discussion between you and another person stays between the two of you, that I do expect you to testify to. Issues of privilege, certainly we are not trying to get into that.
COUNSELOR TENZER: I apologize if I said confidential, I meant privileged.
COUNSELOR VINCI: Thank you.
(Whereupon, an E-mail Communication with Attachment was marked as Exhibit for identification as of this date by the reporter.)
COUNSELOR TENZER: Should we maybe take a five or ten minute break?
COUNSELOR VINCI: That's fine, yes.
(Whereupon, a brief recess was taken.)