CONFIDENTIAL

Page 54

Y. RAMIREZ

CONTINUED EXAMINATION BY COUNSELOR VINCI:

Q. We just came back from a short break, I'll remind you you're still under oath.

Before we broke, we were about to get into what we looked at as Exhibit 2. Before we do that, though, I did have follow-up questions regarding Exhibit 1. During your review of the results of the student survey, the NGSO survey, did anything raise a concern or an issue to you as implicating Title IX?

A. I reviewed it with that eye. I did not find that there was sufficient information to get to that conclusion.

Q. You would agree that the -- the attachments that were sent to you that we see in Exhibit 1, they include allegations that Dr. Khodakhah had acted in a -- in a gender-based inappropriate manner; is that fair?

A. That was one of the items, yes.

Q. Okay. Would you agree that

Page 55

Y. RAMIREZ

there were several examples of alleged gender-based misconduct --

COUNSELOR TENZER: Objection.

Q. -- noted in the exhibit?

A. I -- I agree that there were comments related to individual characteristics that included gender and included race, ethnicity and other things like that.

Q. When you say that you reviewed the survey sort of with the eye of is Title IX implicated where there was insufficient information to make that determination, did you do anything or take any steps to determine whether or not there was more information available that would implicate Title IX?

COUNSELOR TENZER: Objection.

A. As I indicated earlier, we wanted to speak with Dr. Khodakhah to get some additional information. I needed to speak with Dr. Jordan to get some additional information.

Q. Okay. The second attachment to

Page 56

Y. RAMIREZ

the e-mail -- the first attachment we see are the slides and then the last five pages is another attachment, it starts on leadership; do you see that?

A. Yes.

COUNSELOR VINCI: For the record, it starts at Bates stamp AECOM436.

CONTINUED EXAMINATION BY COUNSELOR VINCI:

Q. Do you know who drafted this?

A. No.

Q. Did you ever make any inquiries to determine who drafted it?

A. The survey was confidential, that's what I was told. I certainly wasn't ready to make any additional inquiries until we spoke with Dr. Khodakhah.

Q. Did you ever ask Dr. Jordan who drafted it when you spoke with him?

A. I don't recall.

Q. Did anyone ever tell you that Dr. Jordan drafted this document?

A. No.

Page 57

Y. RAMIREZ

Q. Was it your understanding that these comments, as they appear here, came from the student survey?

A. That was my understanding.

Q. I know you testified, and correct me if I'm wrong, that you never saw the raw data from the survey; is that right?

A. No.

Q. Did you ever ask to see it?

A. No.

Q. Why not?

A. I do not think that I was conducting an investigation at that point.

Q. Well, in the beginning when you first received the survey, I believe you testified that you wanted to make inquiries into how it was conducted, why it was conducted, who conducted it; is that correct?

A. Mm-hmm.

Q. Would you -- sorry, was that a yes?

A. Yes. I'm sorry.

Y. RAMIREZ
Q. Would you not characterize that as your own investigation into the survey?
A. I'd ask questions to get a little more clarity about the nature of the survey and why it was conducted, but no, I was not investigating at that point, nor would I be investigating at that point.
Q. Okay. So is it fair to say that without having seen the raw data, you cannot confirm, sitting here today, that what is included in the summary of the survey matches with the raw data of the survey?
COUNSELOR TENZER: Objection.
A. I think that would be fair to say, yes.
Q. Okay. I'll hand to you what's been marked as Plaintiff's Exhibit 2 for identification.
COUNSELOR VINCI: For the record, Exhibit 2 is a three-page document Bates stamped AECOM130 through and including 132.
CONTINUED EXAMINATION BY



Y. RAMIREZ
COUNSELOR VINCI:
Q. Ms. Ramirez, just review that exhibit as much or as little as you need to familiarize yourself with it and let me know when you're ready to proceed.
A. Okay.
Q. Do you recognize this document?
A. I believe I've seen it. Yes. I was copied on the e-mail.
Q. Okay. Would you agree with me that the document is a copy of Dr. Khodakhah's response to the letter of concern in addition to the initial e-mail and copy of the letter of concern?
A. It seems to be that.
Q. Okay. Looking at the second page, the e-mail from Dr. Kohn, you were not included as a recipient on this e-mail, correct?
A. No.
Q. But Dr. Khodakhah, in his response, added you as a recipient along with several others, correct?
A. Yes.



Y. RAMIREZ
Q. Do you know why Dr. Khodakhah added you as a recipient to this?
A. I do not know specifically why.
Q. Okay. Prior to receiving Dr. Khodakhah's response to the letter of concern, had you spoken to him about the letter?
A. No.
Q. Had you spoken to Dr. Burns about the letter prior to this response?
A. Sorry, I would have to check. I'm not sure when I spoke with Ed, but it was before we met with Kamran, with Dr. Khodakhah.
Q. Okay. What would you have to check?
A. I don't know. My calendar, my notes.
Q. Okay. Are you aware of any documents that would refresh your recollection as to sort of the timeline of when you learned of these concerns and spoke to Dr. Burns and spoke to others?
A. No. We met with Dr. Khodakhah,



Y. RAMIREZ
I think, on March 2nd, so it was some time between his e-mail and receipt of this letter and March 2nd.
Q. Okay. Turning to the letter of concern which is the third page of the document, Bates stamp AECOM132, in the second paragraph there's a reference to a recent departure of three experienced administrators, do you see that in the first sentence of the second paragraph?
A. Yes.
Q. Okay. Do you know which administrators are being referred to there?
A. I believe the one administrator which I think Dr. Khodakhah mentions was Amanda. Sorry, I don't know her last name.
Q. Okay. Do you know what position Amanda held?
A. I believe she held the position of departmental administrator.
Q. When did she leave the department?
A. I think it was towards the end of 2021. Sorry, that's my guess. I think

CONFIDENTIAL



Y. RAMIREZ
at the end of 2021. She did work part-time for us for a while in that same role.
Q. Okay. Do you have any understanding of why she chose to leave employment with Einstein?
A. I believe she was relocating.
Q. Had she raised any issues to you regarding discomfort that she had working with Dr. Khodakhah?
A. Not to me.
Q. Do you know if she raised such issues to anyone else in the Neuroscience Department?
A. I do not know.
Q. Was there another administrator named Maria?
A. Maria, I was under -- I think I'm under the impression that Maria was one of the administrative assistants.
Q. Do you know Maria's last name?
A. No. Sorry.
Q. When did she leave employment with Einstein -- strike that. Did her employment end with just the department or



Y. RAMIREZ
with the college?
A. If it's the Maria I'm thinking of, she transferred to another department.
Q. Okay. To your knowledge, was her transfer the result of any issues that she had with Dr. Khodakhah?
A. Not to my knowledge.
Q. What about a Chelsea?
A. Chelsea was Dr. Khodakhah's executive assistant, administrative assistant.
Q. When did she leave employment with Einstein? Strike that. Did she leave the department or Einstein?
A. I'm not sure of the time table. She was still at Einstein, I believe, when -- when this -- when these discussions started, when Dr. Khodakhah received the letter.
Q. Okay. So as of February 25th, 2022, Ms. Chelsea was still at Einstein to your recollection?
A. I would have to check.
Q. As you sit here today, is that



Y. RAMIREZ
what you recall?
A. I recall she was there after Dr. Khodakhah stepped down or -- or when he was no longer chair.
Q. Okay.
A. Whether she left and came back, I would have to check.
Q. Okay. What would you have to check?
A. I would have to check her record.
Q. Okay. And do you know if her, we'll say, stopping working with Dr. Khodakhah, whether that was to remain at Einstein or go elsewhere, was that a result of any issue she had with Dr. Khodakhah?
A. I'm not aware of that.
Q. Do you have any understanding or information regarding how the letter of concern came to be, who organized it, the faculty, who drafted it, anything of its organization?
COUNSELOR TENZER: Objection.



Y. RAMIREZ
A. No.
Q. Did you make any inquiries into how the staff, you know, created this document or how the faculty created it rather?
A. No.
Q. The letter in the second paragraph also references recruiting efforts and recruiting new staff being difficult; do you see that?
A. Yes.
Q. As of February of 2022, were there difficulties in recruiting staff to the Neuroscience Department?
A. I don't think those difficulties were very different from general difficulties with recruiting staff post-pandemic or in general. We're a great medical school in The Bronx, but it is hard to attract candidates to The Bronx, so that's always a consideration. I'm not sure what the timeline was. I do know we filled the administrative position and the clerical positions. Chelsea would be one

CONFIDENTIAL

Page 66

Y. RAMIREZ

of those individuals, but I -- I really would need to check the records.

Q. Do you recall in February of 2022 Dr. Khodakhah pleading for more funding to recruit new staff and employees to the department?

A. I recall Dr. Khodakhah telling me so.

Q. Okay. Would you agree that lack of funding contributed to any difficulties recruiting staff?

A. I would say that in general Einstein was in a, I guess we'll call it, a pause. We were not doing as much hiring. We were coming out of the pandemic. Our budget deficits were greater than we could sustain and so we had to freeze not only hiring, but salaries, I believe, as well.

Q. And did Dr. Khodakhah advocate for higher compensation for those in the Neuroscience Department?

A. I don't know for sure.

Q. Prior to seeing the letter of concern, did you have any belief that the

Page 67

Y. RAMIREZ

difficulties in recruiting new staff had anything to do with the environment Dr. Khodakhah created?

A. No.

Q. In the third paragraph of the letter, the second sentence references, quote, "a recent survey reveals that a majority of our students have a negative outlook about departmental leadership." Do you see that?

A. Yes.

Q. Do you know which survey they are referencing there?

A. I would have to guess that it's the GEC or the NGSO survey.

Q. The GEC, is that the Graduate Education Committee?

A. Sounds right.

Q. Was Dr. Khodakhah apart of that committee?

A. I think he appointed that committee, but I don't think that would have been a chair's role.

Q. Do you know if he attended

Page 68

Y. RAMIREZ

their meetings?

A. He might have.

Q. Do you know who is appointed the chair of that committee?

A. I think they were faculty appointed. Certainly Bryen Jordan was probably one. I don't know who for sure the other person is.

Q. Do you know if Pablo Castillo held any position on that committee?

A. Not to my understanding.

Q. Do you know if Pablo Castillo held any position with the NGSO committee? Sorry, yes, the NGSO committee?

A. I do not know.

Q. Looking at the letter of concern, do you see the signatories at the bottom after "Sincerely"?

A. Yes.

Q. As of February 2022, were all of these individuals employed by Einstein?

A. I do think they were all. The only name I don't recognize for sure is Anne Etgen. Sorry, E-T-G-E-N.

Page 69

Y. RAMIREZ

Q. What position did Dr. Kohn hold as of February 2022?

A. Dr. Kohn was an investigator, senior member of the faculty of neuroscience. I -- our faculty often have more than one appointment in the departments, so I'm not sure, but his primary appointment was neuroscience.

Q. What about Dr. Pereda?

A. Neuroscience.

Q. Okay. And you already said you don't recognize Anne Etgen?

A. I honestly don't recognize who Anne Etgen is.

Q. What about -- we discussed Bryen Jordan. What about Dr. Hall, what position did he hold?

A. I think he was an investigator, as was Dr. Spray.

Q. What about Dr. Hebert?

A. Hebert, yes, investigator.

Q. Okay. With the exception of Anne Etgen, again, who you don't know recognize, were all the individuals on this

Y. RAMIREZ
first group of signatories active employees at Einstein, meaning they actively mentored or --
A. You say "the first group", is that those names under Adam Kohn?
Q. Yes.
A. Yes, that's my understanding.
Q. Looking to the other section, Dr. Pena, what position does he hold?
A. He's a full-time faculty investigator, full-time professor.
Q. Dr. Bennett?
A. I think was a professor emeritus.
Q. Okay. Does that mean that he did not actively teach classes at Einstein?
A. I think that's fair to say.
Q. Okay. When was the last time that Dr. Bennett taught classes at Einstein to your knowledge?
A. I do not know.
Q. Was it close in time to 2022?
A. I do not know.
Q. Do you know of any interactions



Y. RAMIREZ
in, we'll say, 2021 and early 2022 between Dr. Khodakhah and Dr. Bennett that would inform Dr. Bennett's opinion of how Kamran ran the department?
COUNSELOR TENZER: Objection.
A. No. I never had a discussion with Dr. Bennett.
Q. Dr. Akabas?
A. Yes, Dr. Akabas.
Q. What position did he hold?
A. He's a full professor in the Department of Neuroscience. I do believe he's still doing research. He's also the director of our MSTP program, Medical Science Training Program.
Q. And what about Dr. Castillo?
A. Dr. Castillo is a full professor in the Department of Neuroscience, primary appointment.
Q. Okay. What about Dr. Walkley?
A. Dr. Walkley was, at the time, a full professor of the Department of Neuroscience. He also directed one of the programs. Not sure if we call it an



Y. RAMIREZ
institute, but he directed one of the programs that was under the auspices of neuroscience.
Q. Okay. And what about Dr. Zukin?
A. Dr. Zukin was a full professor at -- in the Department of Neuroscience. I do think Dr. Zukin may have been out on disability at that time. I'm not too sure. I know she was very sick and I think she's since passed away.
Q. Do you recall the time period that Dr. Zukin was out on disability?
A. I recall having discussions with our folks in benefits about Dr. Zukin, so...
Q. Do you recall the time period she was out on disability?
A. I would have to check for sure.
Q. Do you know if she was out on disability as of February 24th, 2022?
A. I would have to check for sure. She may have been.
Q. Okay. Did you ever speak to



Y. RAMIREZ
any of the signatories to the letter of concern regarding what is written in the letter?
A. No.
Q. Did you ever ask any of them for specifics with respect to the concerns that they raised in their letter?
A. No.
Q. Prior to meeting with Dr. Khodakhah, had you had any discussions with Dr. Tomaselli regarding the letter of concern --
COUNSELOR TENZER: Objection.
Q. -- other than what you testified to, that you spoke with him and he indicated to you that he was already aware of it?
COUNSELOR TENZER: Objection.
You can answer.
A. I don't recall that we had a discussion before meeting with Dr. Khodakhah. I didn't.
Q. Okay. Looking at Dr. Khodakhah's e-mail in response to the first

CONFIDENTIAL

Page 74

Y. RAMIREZ
page of the exhibit, Paragraph 4, he invites human resources, you, together with Dean Burns to look into the concerns raised in the letter and uncover the facts to give your frank assessment; do you see that?
A. Yes.
Q. Okay. With respect to the concerns that were raised in the letter, was there any particular policy or procedure for investigating the type of concerns raised?
A. Not sure I understand the question.
Q. Sure. Looking at the concerns raised in the February 24th, 2022 letter, in reviewing the letter, did it implicate any particular policy being violated at Einstein?
A. Looking at the letter?
Q. Yes.
A. I don't see any particular policy being violated.
Q. In reviewing the letter, regardless of it not stating a particular

Page 75

Y. RAMIREZ
policy, in reviewing the letter, did you determine that a particular policy had to be followed in looking into the concerns that were raised?
COUNSELOR TENZER: Objection.
A. No.
Q. Did any of the signatories to the letter request that you follow a particular policy to investigate their concerns?
A. No.
Q. Did Dr. Tomaselli request that a particular policy be followed?
A. No.
Q. Did Dr. Burns?
A. Dr. Burns and I discussed how we would follow through to look into the matter, but...
Q. Okay. And in your discussion with Dr. Burns about how to follow through, did he suggest that any particular policy at Einstein should be used to investigate the concerns in the letter?
COUNSELOR TENZER: Objection.

Page 76

Y. RAMIREZ
And I'm going to remind the Witness that she can answer, but not to disclose any privileged conversations or information.
A. I -- I would say that Dr. Burns and I met with counsel and that our discussions related to how we were -- how we would expect to move forward. Again, we wanted to speak with Dr. Khodakhah before we decided anything.
Q. Okay. Outside of any discussions with counsel, prior to meeting with Dr. Khodakhah, had you personally determined that a particular investigative procedure had to be followed to look into the concerns in the letter?
COUNSELOR TENZER: Objection.
A. No.
Q. Do you -- did Dr. Burns ever share his -- again, outside of what was discussed with counsel, his personal opinion as to which policy or procedure should be used to investigate the concerns in the letter?

Page 77

Y. RAMIREZ
A. No.
Q. When did you ultimately meet -- I'll say when did you first meet with Dr. Khodakhah to discuss the concerns raised in the letter and the student survey?
A. I believe the date was March 2nd.
Q. Prior to March 2nd, so the time between when you received the information and when you met with Dr. Khodakhah, had you gathered any further information related to the concerns that were raised in either the survey or the letter of concern?
A. No.
COUNSELOR VINCI: Exhibit 3.
(Whereupon, E-mail Communication was marked as Exhibit 3 for identification as of this date by the reporter.)
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Ms. Ramirez, you've been handed what's been marked as Plaintiff's

Y. RAMIREZ
Exhibit 3. Again, take however much or little time you need to familiarize yourself with the document and let me know when you're ready.
A. Okay.
Q. Do you recognize this document?
A. It is an e-mail from me to Dr. Burns.
Q. Okay. The beginning of the document --
COUNSELOR VINCI: And for the record, it is Bates stamped AECOM193 through 195.
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. On the first page the document, starting were the top appears to be e-mail correspondence between you and Dr. Burns and leading down to the bottom, it appears to be a forwarded version of Dr. Khodakhah's response to the concern that we looked at in the prior e-mail, would you agree, the prior exhibit?
A. Yes.



Y. RAMIREZ
Q. Looking at your e-mail, the first e-mail of yours on the first page from February 25th, 2022, 12:01 a.m., you write "Ed, This references our earlier conversation today - correct? Is there more?" Do you see that?
A. Yes.
Q. What earlier conversation are you referring to?
A. It might have been a telephone conversation if I recall correctly.
Q. Okay. And on this telephone conversation, was it just you and Dr. Burns or were there any other participants?
A. I don't recall.
Q. Did you take any notes during that phone call?
A. I may have.
Q. In reviewing your notes in preparation for today, did you find any notes related to this telephone discussion with Dr. Burns?
A. I did not.
Q. Okay. To the best of your



Y. RAMIREZ
recollection, what did you discuss at that time with Dr. Burns?
A. We discussed receipt of the letter of concern and we --
Q. Did you -- sorry. Go ahead.
A. And we discussed receipt of the survey.
Q. Did you -- in those discussions, did you discuss having just received -- the fact that you received the letter and the survey or was it more in depth than that?
COUNSELOR TENZER: Objection.
A. I think I only received the information we've been discussing on the day prior to my conversation with Dr. Burns. Actually, was on the day, because this is 12:01, so on Thursday, I received the information from the letter of concern and the survey.
Q. Okay. During your discussion with -- your phone discussion with Dr. Burns that you believe is referenced here in your e-mail, did you discuss the



Y. RAMIREZ
substance of the letter with him?
A. I don't recall that we discussed in -- anything in detail. We talked about the receipt of the letter and also Dr. Khodakhah's e-mail. I had received the survey directly from Dr. Freedman. We discussed that and we discussed how to move forward in our next step, which was to contact Dr. Khodakhah and meet with him.
Q. Moving up on the exhibit on Page 1 to your first e-mail of February 27th, 2022 you write, "Thank you Ed. I have reviewed these materials as well as the letter of concern shared by Kamran. I do not believe we have any Title IX violations." Do you see that?
A. Yes.
Q. Why did you not believe there were any Title IX violations?
A. I didn't think the survey was, first of all, anonymous, and much of it -- references are, what I would consider hearsay. No one said I witnessed. One or

Y. RAMIREZ
two people said this happened to me. But other than that, it was an anonymous survey with a lot of references that weren't directly experience I guess is what I would say.
Q. Does a complainant to a Title IX report or Title IX complaint have to identify him, her, their selves, in order for it to trigger Title IX?
A. We often -- not often, but from time to time get anonymous complaints filed. They are very difficult to investigate as you might imagine so.
Q. Well irrespective of how difficult or easy it is to investigate, an anonymous complaint can implicate Title IX, correct?
COUNSELOR TENZER: Objection.
A. Yes.
Q. Again, in terms of what can or cannot trigger Title IX, in your -- in your opinion, your experience, is it only complaints of firsthand accounts?
A. No.



Y. RAMIREZ
Q. Okay. So references, somebody reporting that they witnessed something or saw something happen to somebody else or around them, that can also trigger Title IX, correct?
A. It could.
Q. Okay. So beyond the fact that the complaints in the student survey, the concerns rather, were anonymous and largely referenced indirect experiences, was there any other reason that you believed that there was not a Title IX violation implicated?
COUNSELOR TENZER: Objection.
A. I -- I -- I don't think I can answer that question right now. I would have to go back and look at the details of the survey. I did answer it on the 27th.
Q. Okay. So as of February 27th, 2022, you were confident there was not, in your assessment, a Title IX violation implicated in the student survey?
A. Based on my review of the materials.



Y. RAMIREZ
Q. Did you do anything else to assess whether or not any of the concerns raised in the student survey implicated Title IX?
COUNSELOR TENZER: Objection.
A. It was a confidential survey. I understand students were very concerned about participating in -- in discussions about the content of the survey. We had not yet talked to Dr. Khodakhah who actually raised the issue promptly after he received the letter from the concerned faculty. I think we were looking at every possibility, but again, we did not want to pursue a course of action until we had had a discussion with Dr. Khodakhah.
Q. Okay. At any point in time -- well, strike that. Had any of the allegations implicated Title IX as of February of 2022, Einstein had a policy and procedure for pursuing reports, correct, under Title IX?
A. Yes.
COUNSELOR TENZER: Objection.



Y. RAMIREZ
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. And to the best of your recollection, what was that procedure? When a Title IX complaint or Title IX report is received, what was the procedure for responding to it under the policy?
A. There's intake to try to gather some additional information. The Title IX coordinator does have to make a determination of whether or not there's a violation of Title IX. As Title IX coordinator, I would discuss the complaint and concerns and, I guess, my initial impression with counsel, with our general counsel.
Q. Okay. And sorry, were you finished? I don't want to cut of you off.
A. No, that's it.
Q. If it was determined that Title IX violation was -- there was a potential Title IX violation, what, as of February 2022, was the procedure for initiating an investigation and pursuing an

CONFIDENTIAL

Page 86

Y. RAMIREZ
investigation?
A. The procedure in a situation where we do not have a complainant specifically or information and specifics about an allegation, we would meet with the respondent to gather some additional information. Most of our Title IX investigations, particularly as they relate to students, we would have conducted by an external investigator.
Q. Did you take any steps to determine which students submitted which comments to the survey?
A. Absolutely not.
Q. Did you ever inquire from Dr. Jordan if he was aware of which students submitted which comments?
A. I do not recall.
Q. Do you know if anyone had advised any of the students to the survey that Title IX was available, should they feel that they had, you know, experienced misconduct of that nature?
COUNSELOR TENZER: Objection.

Page 87

Y. RAMIREZ
A. All students receive orientation, as part of their orientation, Title IX training, all students are required to take annual refreshers or reviews of training on Title IX.
Q. I want to refer you back to Exhibit 1.
COUNSELOR VINCI: Let me do it this way, let me mark Exhibit 4.
(Whereupon, a Title IX Policy was marked as Exhibit 4 for identification as of this date by the reporter.)
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Ms. Ramirez, you've been handed what's been marked as Plaintiff's Exhibit 4. Again, I don't expect you to read it line for line, but take as much or as little time you need to familiarize yourself with the document and let me know when you're ready to proceed.
A. What are your questions?
Q. Do you recognize this document

Page 88

Y. RAMIREZ
is my first one.
A. I do.
Q. Can you identify it for the record, please?
A. It is our Title IX policy on Gender-Based Misconduct, Discrimination and Harassment Policy and Complaint Procedures For Students.
Q. To your knowledge, was this the policy that was in effect at the time you received the survey results?
A. This policy was published March 20th -- March 18th of 2022, so if I'm correct, there should be a revision date. Oh, it's not here. Well, sorry, it was revised March 18th of 2022.
Q. To your knowledge, were there major differences between this policy as we see here in Exhibit 4 and the Title IX policy immediately preceding it?
A. I believe this policy, give me a moment. Sorry for taking so long.
Q. That's okay. Take your time.
A. I believe this policy was

Page 89

Y. RAMIREZ
updated as a result of federal requirements.
Q. Do you know if it is -- if there were major updates or major differences in the policy as we see here and its predecessor?
A. It's --
Q. Let me withdraw that. To your recollection, what changes were made to the prior policy to create this one that we see here as Exhibit 4?
COUNSELOR TENZER: Objection.
A. I believe the most significant change, as a result of directives from Washington, this incorporates a hearing process that is slightly different than what it was before.
Q. Okay. If you look at the seventh page of the document, it is Bates stamp PLTF8.
A. Of this document?
Q. Yes, of the policy.
A. Okay.
Q. Do you see there under section

CONFIDENTIAL

Page 90

Y. RAMIREZ
-- about halfway down the page, Section III.C.2 Sexual Harassment?
A. Mm-hmm.
Q. Would you agree that this appears to be the policy's definition and description of sexual harassment or what constitutes sexual harassment?
A. Yes.
Q. And continuing onto Page 8 of the document, there are examples of conduct that may constitute sexual harassment, correct?
A. Yes.
Q. Okay. And at the very end of that paragraph, it says "In certain circumstances, such conduct may constitute a Titled IX Violation." Right?
A. Yes.
Q. Okay. Looking back at Exhibit 1, and by all means, you can leave Exhibit 4, that portion out in front of you, if you turn to Exhibit 1 on page -- it's -- it's the second to last page, that one.

Page 91

Y. RAMIREZ
COUNSELOR VINCI: For the record, it is Bates stamped AECOM438.
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Do you see under [redacted]
A. Yes.
Q. The first three student entries noted there, would you agree that they refer to allegations that Dr. Khodakhah inappropriately touched students?
A. That's what it's saying.
Q. According to the policy definition, is inappropriately touching a student an example of sexual harassment or inappropriately touching a person?
A. Inappropriately touching a person, I think it depends on where that person is touched and whether or not it's a recurring type of thing and whether or not the person said I don't want to be touched that way. It's not their responsibility, but I do think that there's not enough information here to pursue any particular

Page 92

Y. RAMIREZ
claim. We have a lot of different allegations under [redacted]
Q. And again, you didn't, other than reviewing the document, you didn't make any inquiries to gather more information or more specifics related to the entries that are on this document?
A. The Department of Neuroscience has the largest PhD class, I believe, at the college. This was done anonymously. It would have meant sitting down and meeting with every student.
Q. Which you did not do?
A. No, I did not do because I would not do the investigation. Let me make that clear.
Q. Who would do the investigations? Is that an outside investigator that you referenced before?
A. If we determined that an investigation was necessary, we would have to and we would hire an external investigator. Not always, but usually in a

Page 93

Y. RAMIREZ
case involving students, we do.
Q. Okay. Looking again at the second to last page of Exhibit 1, the next student entry refers to Dr. Khodakhah [redacted] do you see that?
A. Okay.
Q. Was it your assessment that those allegations did not implicate Title IX as sexual harassment as defined in the policy?
A. They could have.
Q. But you determined that Title IX violation was not implicated?
COUNSELOR TENZER: Objection.
A. We needed more information.
Q. What, if any, steps did you take to get more information specifically

CONFIDENTIAL

Page 94

Y. RAMIREZ

with respect to whether or not any of the allegations in the student survey implicated Title IX?

COUNSELOR TENZER: Objection.

A. We met with Dr. Khodakhah on March 2nd. We received, or I received this letter on February 24th by e-mail. February 27th, had a discussion with Dr. Burns about how to proceed and then we met with Dr. Khodakhah.

Q. Did you learn anything more during your meeting with Dr. Khodakhah that informed your decision whether or not there had been a Title IX violation implicated by the student survey results?

A. We spoke with Dr. Khodakhah about next steps.

Q. Okay.

A. And based on his input to the process, decided to have an investigation conducted by an external investigator.

Q. If you could turn to Exhibit 3. Again, it's the one that we were just looking at prior to going to --

Page 95

Y. RAMIREZ

A. The e-mail?

Q. Yes. So again, looking at your e-mail of February 27th, 2022, you say in the third paragraph quote "That said, we have a major problem and I would like to know more about what may have triggered the survey and the letter. I know they refer to administrative turnover/departures as the prime reason but I suspect there is more." Closed quote. Do you see that?

A. Yes.

Q. Why did you suspect there was more to what triggered the survey and the letter?

A. Not the survey, but the letter which mentions not only the staff complaints, but also complaints by students.

Q. So why did you suspect there was more?

A. Because it says there were -- additionally, there were more complaints. There was negative feedback, a concern from trainees and faculty, but also students.

Page 96

Y. RAMIREZ

Q. What did you do to address your suspicions that there was more underlying the concerns raised in the letter?

A. We spoke with Dr. Khodakhah and we -- "we," meaning Dr. Burns and I, recommended that we have a full investigation.

Q. Prior to speaking to Dr. Khodakhah, did you speak to Dr. Tomaselli about your suspicions that there was more --

A. I did not speak with Dr. Tomaselli.

Q. Do you know if Dr. Burns did?

A. I do not know.

COUNSELOR VINCI: Okay. I think now is probably a good time to break for lunch. We can go off the record.

(Whereupon, a brief recess was taken.)

CONTINUED EXAMINATION BY COUNSELOR VINCI:

Q. Welcome back, Ms. Ramirez. We

Page 97

Y. RAMIREZ

took a quick lunch break. I will remind you that you are still under oath. Are you ready to proceed?

A. Yes.

Q. Prior to the break, we had started to talk about your correspondence with Dr. Burns leading up to your meeting with Dr. Khodakhah. Prior to meeting with Dr. Khodakhah, did you receive any additional information regarding the student surveys that were conducted?

A. No. When you say, sorry, additional, other than what we --

Q. Other than what you were sent by --

A. No. No.

Q. -- Dr. Freedman and --

A. No. No.

COUNSELOR VINCI: Exhibit 5.

(Whereupon, E-mail Communication and Attachment was marked as Exhibit 5 for identification as of this date by the reporter.)

Y. RAMIREZ
CONTINUED EXAMINATION BY
COUNSELOR VINCI:
Q. Ms. Ramirez, you've been handed what we marked as Exhibit 5 for identification. Please review the exhibit in as much or as little detail as you are comfortable to proceed with questions.
COUNSELOR TENZER: Are you ready?
THE WITNESS: Sorry. I'm ready.
CONTINUED EXAMINATION BY
COUNSELOR VINCI:
Q. That's okay.
Have you had a chance to review Exhibit 5?
A. Yes.
Q. Do you recognize this document?
A. Yes.
Q. Okay. Can you identify it for the record? Just state what it is, please?
A. It's an e-mail on top from me to Dr. Burns.
Q. And sorry --



Y. RAMIREZ
A. References a conversation I had with Dr. Jordan.
Q. Okay. And you included at the bottom is an e-mail from Dr. Jordan to yourself, the subject line Neuroscience Student Survey; do you see that?
A. Yes.
Q. And if you continue, flip over two more pages, you see a Default Report For the State of the Department of Neuroscience; do you see that?
A. Yes.
Q. Okay. And is it your understanding that this is what we've been referring to as the GEC survey?
A. Yes. I think you are correct.
Q. And was this communication from Bryen Jordan, was this the first time that you had seen the GEC survey results?
A. They were not shared with me by Dr. Freedman, so, yes, this would be the first time.
Q. I know you testified you had spoken to Dr. Jordan after hearing from



Y. RAMIREZ
Dr. Freedman, this was the first time you saw the results for the GEC survey?
A. This is the first time he shared -- yes, or anyone else shared the survey with me.
Q. Okay. Do you know or have any information as to how this survey was conducted?
A. No.
Q. Okay. Do you know who came up with the questions for this survey?
A. No.
Q. Do you know how it was administered to the students or the department I should say?
A. No.
Q. Did you ever make any inquiries to Dr. Jordan about the creation of the GEC survey as we see here in Exhibit 5?
A. My conversation with Dr. Jordan was that the students participating on the GEC helped to develop the survey, but that's all I know.
Q. Okay. Do you know if Dr.



Y. RAMIREZ
Jordan had any involvement in developing the survey, the GEC survey?
A. I believe he's co-chair of the committee, so he would have had some oversight, but I don't know the answer to that specifically.
Q. Who was the other co-chair of the GEC committee?
A. I'm not sure I recall. I have his name -- I don't think I saw anyone else's name on any of the materials you've shown me so far, so I don't know.
Q. As of February 2022, were you aware of any friction or rift between Dr. Khodakhah and Dr. Jordan?
A. No.
Q. Were you aware of any issues between Dr. Jordan and Dr. Tomaselli?
A. No.
Q. Had you ever heard that Dr. Khodakhah had criticized Dr. Tomaselli performance as dean?
A. Can you go back? What was the question you asked me, friction between Dr.

Y. RAMIREZ
Tomaselli and Dr. Jordan?
Q. I believe I said Khodakhah, but if I didn't, I'll rephrase --
COUNSELOR TENZER: I think you -- you said were you aware of any issues between Dr. Jordan and Dr. Tomaselli.
COUNSELOR VINCI: Apologies.
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Were you aware of any issues between Dr. Khodakhah and Dr. Tomaselli as of February of 2022?
A. Yes.
Q. What issues were you aware of?
A. I was aware that Dr. Khodakhah was very critical of Dr. Tomaselli and that -- and I am aware of this from Dr. Khodakhah not from anyone else, that Dr. Khodakhah had not received the support that he thought was necessary to run the Department.
Q. In your recollection, was Dr. Khodakhah vocal about his criticisms



Y. RAMIREZ
about Dr. Tomaselli?
A. When you say "vocal," I -- he spoke with me. I don't recall I ever heard him repeat what he told me to anyone else. So to me, he didn't.
Q. Okay. As of February 2022, had Dr. Tomaselli ever shared with you criticisms of Dr. Khodakhah?
A. Dr. Tomaselli criticize Dr. Khodakhah? No.
Q. Were you aware, as of February of 2022, any friction or issues between Dr. Khodakhah and Dr. Castillo?
A. No.
Q. Okay. Looking at the exhibit, your e-mail at the top, you reference a discussion with Bryen, that's Bryen Jordan, after speaking with Victoria Freedman and reference the sort of series of surveys. In the second paragraph you say "Kamran knows of the results of the GEC survey but does not know that the NGSO administered their survey and obviously are not aware of the results or commentary." Do you see



Y. RAMIREZ
that?
A. Yes.
Q. How are you aware that Kamran knew the results of the GEC survey?
A. I believe I was advised by Dr. Jordan that they had been shared.
Q. In what way were they shared with Dr. Khodakhah?
A. I don't know.
Q. To your knowledge, did Dr. Khodakhah have any reaction or response to the GEC results?
A. I don't know.
Q. You go on to state that "Perhaps we then focus our discussion on the outcome of the GEC survey (attached here) and I can help to summarize some of the comments (at a very high level) of the NGSO survey?" Do you see that?
A. Yes.
Q. Is the discussion you're referencing here a discussion with Dr. Khodakhah?
A. Yes.



Y. RAMIREZ
Q. Okay. Why did you only want to summarize at a high level some of the comments of the NGSO survey?
A. What I learned from both Dr. Jordan and actually Dr. Freedman was that this NGSO was conducted anonymously because individuals were concerned that they would be identified, so we were trying to -- Dr. Burns and I were trying to figure out how to preserve the confidentiality that the students thought they had when they answered the questions and -- and -- and still give Dr. Khodakhah the information that was necessary to have our discussion.
Q. And you were the person or -- strike that. Who determined what information was necessary to give Dr. Khodakhah to have a discussion?
COUNSELOR TENZER: Objection.
A. I don't know that we ever made any determination.
Q. Do you believe that not providing Dr. Khodakhah with the specific allegations against him in any way hindered