Y. RAMIREZ

his ability to respond to them?

COUNSELOR TENZER: Objection to form. You can answer.

A. Subsequent to my meeting with Dr. Burns and Dr. Khodakhah, I did meet with Dr. Khodakhah to review the survey results with him. So I did not believe that any of that information or, in general, the information he needed to respond should be withheld. So I met with him.

Q. Okay. So you -- let me get the timeline to orient myself. I believe you said you met with Dr. Khodakhah and Dr. Burns on March 2nd; is that correct?

A. Correct.

Q. Subsequent to that meeting -- strike that. Is that the meeting where you focussed on the GEC survey and only at a high level summarized the results of the NGSO survey?

A. We never -- we never got to that discussion.

Q. Subsequent to that March 2nd



Y. RAMIREZ

meeting, you then met again with Dr. Khodakhah?

A. Yes.

Q. When?

A. I would have to check, but I would think it was probably the very next day. It was important to do so. It was important to him and important to us, so it was shortly thereafter.

Q. Okay.

A. But I can't tell you it was March 3rd. It might have been. I have to check.

Q. And at that meeting, did you share the results --

A. Yes.

Q. -- the specific results of the NGSO survey?

A. Yes.

Q. How did you do that? Did you tell him about it? Did you show him the document?

A. No. He --

Q. Dr. Freedman sent to you?



Y. RAMIREZ

A. No, I sat with him and he reviewed the document in its entirety.

Q. What was his response, his reaction at that time?

A. We had conversation about his surprise. He did share and recognized that there were some issues that rang true. I say "rang true," that he thought were, perhaps may have been misunderstood, so it was a general discussion of that nature. I certainly -- because we were sharing information that had been provided confidentially, we certainly discussed issues of retaliation and our anti-retaliation policy and he acknowledged that.

Q. And I just want to make sure that the record is crystal clear. When you say you showed him the document, did you show him the survey results that you received from Dr. Freedman that is in Exhibit 1?

A. Yes.

Q. Okay. Did you show him the



Y. RAMIREZ

survey results that you received from Dr. Jordan that is in Exhibit 5?

A. I -- to be honest, I don't recall right now.

Q. Okay.

A. I did show him the survey results that Victoria, Dr. Freedman, had shared along with the comments.

Q. Was anybody else present for this second meeting with you and Dr. Khodakhah?

A. No, just Dr. Khodakhah and I.

Q. Where did it take place?

A. My office. I want to say it was in my office.

Q. Did you take any notes during that meeting?

A. I don't think so.

Q. Do you know -- did you notice if Dr. Khodakhah took any notes?

A. I -- I think Dr. Khodakhah has a very keen mind and recalls, he did not take any notes.

Q. How long did that meeting last?

Y. RAMIREZ

A. It was at least an hour. It could have been more.

Q. During that meeting, did you discuss your reaction to the concerns that were raised with Dr. Khodakhah?

A. No.

Q. At any point in time, did you discuss believing that the concerns or the allegation were meritless?

A. What? I'm sorry?

Q. Meritless.

A. Did I discuss that the --

Q. Yes.

A. No, I don't -- I -- no. The purpose of the meeting was to share the survey with him. That's what I did.

Q. During the meeting, well -- strike that. After sharing the survey with him, did you discuss with Dr. Khodakhah the steps that were going to be taken in response to the concerns that were raised?

A. We had not finalized the steps. We discussed them the day before with Dr. Khodakhah and Dr. Burns present.



Y. RAMIREZ

Q. What steps had you discussed during the prior March 2nd meeting?

A. Prior to the March 2nd meeting or --

Q. At the March 2nd meeting.

A. At the March 2nd meeting, we discussed with Dr. Khodakhah his -- really stressing how important it was that his name be cleared and he wanted a full investigation conducted and we agreed. I don't know that we had determined it should be an external investigator or not. I think that's what we were leaning to.

Q. Okay. During the March 2nd meeting with Dr. Khodakhah and Dr. Burns, did you ever state that the college needed to appear responsive to these complaints, these concerns rather?

A. Our college needs to be responsive to any complaint, not just appear to be responsive.

Q. Well, did you say at any point during that meeting that the college needs to appear responsive to the concerns?



Y. RAMIREZ

A. I did not say that.

Q. Okay. Did you say or give any opinion during that meeting as to your belief that the concerns were baseless?

A. I don't think I had the information necessary to make that determination.

Q. Well, whether or not you had the information necessary, did you make any such statement during the meeting on March 2nd?

A. I don't recall.

COUNSELOR TENZER: Objection.

A. I don't recall saying anything like that.

Q. Do you recall if Dr. Burns said anything of that nature?

A. He may have.

Q. Did you agree with Dr. Khodakhah that it would be prudent for the college to conduct an investigation into the allegations to clear his name?

A. I think we had agreed even before I showed him the survey that we were



Y. RAMIREZ

going to do so.

Q. Okay. Did anyone at the college or -- strike that. Did anyone in the Neuroscience Department, to your knowledge, disagree with the decision that an investigation was necessary?

A. Not to my knowledge, but we didn't ask anyone in neuroscience if they thought the investigation was necessary.

Q. Did you discuss the need for an investigation into the student survey and letter of concern issues with Dr. Tomaselli?

A. I cannot and do not recall.

Q. What if anything else did you discuss with Dr. Khodakhah during that March 2nd meeting with him and Dr. Burns?

A. With Dr. Burns?

Q. Yes.

A. We discussed the nature of the complaints. We did express concern about the ability of Dr. Khodakhah's ability to continue in the role.

Q. What role specifically?

CONFIDENTIAL

Page 114

Y. RAMIREZ
A. Of chair. And I -- I do recall that Dr. Burns, although I didn't disagree, suggested that he consider resigning as chair.
Q. What was Dr. Khodakhah's reaction to hearing the concerns of -- as to his ability to continue as chair and suggestion to step down?
COUNSELOR TENZER: Objection.
You can answer.
A. Dr. Khodakhah was very thoughtful about his response, but he made it clear that he had no intention of stepping down. He wanted his name cleared and demanded an investigation. If at the end of that investigation there was a finding that he had, in fact, conducted himself in the manner in which the survey suggests, that he would resign. So -- but those were the steps.
Q. At what point was it determined, definitively determined, that an external investigator would be -- would conduct the investigation into the survey

Page 115

Y. RAMIREZ
and the letter?
COUNSELOR TENZER: Objection.
You can answer.
A. I think it was rather quickly after I met with Dr. Khodakhah in my office to review the survey.
(Whereupon, an E-mail Communication was marked as Exhibit 6 for identification as of this date by the reporter.)
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Ms. Ramirez, you've been handed what's been marked as Exhibit 6 for identification. Please let me know when you've had a chance to review it and when you're ready to proceed.
A. Okay.
Q. Do you recognize this document?
A. It's an e-mail from Dr. Khodakhah to me, I guess, in response to an e-mail I wrote to him.
Q. I want to look at your e-mail at the bottom of the first page. It starts

Page 116

Y. RAMIREZ
"I was able to speak with Ed tonight and I need to get some additional information before we can finalize a plan. We will want to meet again with you." Do you see that?
A. Yes.
Q. Ed is Dr. Burns, correct?
A. Ed is Dr. Burns, yes.
Q. What did you speak with Dr. Burns about that you're referencing here in your e-mail?
A. We had discussed next steps, possible next steps. We had not yet met with Dr. Khodakhah.
Q. Sorry. Go ahead.
A. Sorry. Go ahead.
Q. You state here "We will want to meet again with you," to Dr. Khodakhah, does that refresh your recollection to any meeting with Dr. Khodakhah on or prior to March 1st, 2022 at 9:52 p.m.?
A. I recall the March 2nd meeting, but no. Sorry, I don't.
Q. So you discuss with Dr. Burns

Page 117

Y. RAMIREZ
possible next steps and you reference here needing to finalize a plan, what additional information were you looking for before you could finalize the plan?
A. We needed to have discussion with our counsel and discuss how an investigation might proceed.
Q. Okay. Again, outside of any discussions that occurred with counsel, you've testified as to at that point, sort of the option of engaging an external investigator to run the investigation, what other potential next steps or potential options were there to look into the concerns raised in the letter and student surveys?
A. I'm not sure I understand your question. The next step would have been a discussion with Dr. Khodakhah and based on that, we would launch an investigation.
Q. Was it ever considered to conduct an internal investigation, meaning using investigators within Einstein?
A. No.

Y. RAMIREZ

Q. Did anybody -- again, not trying to get into any privileged discussions, did anybody at Einstein suggest that the investigation should be internal?

A. No.

Q. Did anybody suggest that there should not be an investigation at all?

A. No.

Q. If you look at Dr. Khodakhah's e-mail to you at the top in the last paragraph, the third sentence, it starts at the top, the end of the top line, "A number of additional faculty contacted me or came to see me in support and begging me not to even consider resignations today." Do you see that?

A. Yes.

Q. Prior to the start of any official investigation, did any faculty at Einstein come to you in support of Dr. Khodakhah?

A. Not prior.

Q. Okay. Are you aware of any



Y. RAMIREZ

faculty, again, prior to the start of the investigation, coming to Dr. Burns in support of Dr. Khodakhah?

A. I honestly don't know that.

Q. Okay. Did faculty come to you in support of Dr. Khodakhah after the start the investigation?

A. Sure.

Q. Who?

A. Well, Dr. Radulovic, Dr. John Alpert, Dr. Nicola are the -- are those that I recall specifically coming forward or -- or reaching out.

Q. Okay. How did Dr. Radulovic reach out to you?

A. She contacted me and Ed and said I would like to meet with you.

Q. Okay. And did you meet with her?

A. Sure.

Q. And what, at that time, did she share with you with respect to the investigation against Dr. Khodakhah?

A. I think she's very supportive



Y. RAMIREZ

of Dr. Khodakhah. Thought he had done a lot of good for the department. Was probably one of the reasons why she came to work -- working with him was one of the reasons she came to work to Einstein. That's kind of the sum and substance of the discussion.

Q. Okay. During your meeting with Dr. -- with her, did you or Dr. Burns share the details of the student survey results?

A. No.

Q. Did she ask you or Dr. Burns to take any specific action with respect to Dr. Khodakhah?

A. No.

Q. When did you meet with Dr. Radulovic?

A. I think it was already April when she came to speak with us and she came with Dr. Alpert, so we met with both of them. Dr. Alpert is the chair of the Department of Psychiatry and Behavioral Health, Behavioral Sciences, one -- something like that.



Y. RAMIREZ

Q. So you met with them together or they came at the same time and you met with them separately?

A. No. We had a conversation together.

Q. Okay. Did you take any notes during that meeting with Dr. Radulovic and John Alpert?

A. I may have.

Q. Do you recall reviewing any notes of that meeting in preparation for today's deposition?

A. I do not think so.

Q. Okay. Do you know if Dr. Burns took any notes during that meeting?

A. No.

Q. Are you aware of anyone else that Dr. Radulovic had expressed her support for Dr. Khodakhah to?

A. She came speaking on her behalf, not on anyone else's behalf if that's what you're asking me. She was not speaking for anyone else.

Q. It's not.

Y. RAMIREZ
A. Sorry.
Q. It's okay.
Do you know if Dr. Radulovic met with Dr. Tomaselli to express her support of Dr. Khodakhah?
A. Oh, no. I do not know that.
Q. Do you know if Dr. Alpert met with Dr. Tomaselli?
A. I do not know that.
Q. And what about Dr. Nicola? When did you speak to him about the investigation into Kamran and his support of Kamran?
A. It was actually probably around the summer, I want to say not right away.
Q. And how did you correspond or discuss Dr. Nicola's support of Dr. Kamran with you, Dr. Khodakhah?
A. How did I do that? He contacted me to schedule an appointment. I think we had a Zoom meeting.
Q. And what did Dr. Nicola share at that point?
A. At that point, he was certainly



Y. RAMIREZ
concerned about Dr. Khodakhah. Wanted to express his desire to make sure that there was a fair process. He was particularly concerned because he was -- he understood that, and these were his words, that Kamran had a gag order and couldn't discuss the matter. Those were his words. I don't recall when exactly that meeting took place. I do recall the meeting simply because it was an odd way to phrase he shouldn't talk about the investigation or the case.
Q. Was the investigation -- and I understand that there was a series of investigations. When I reference the investigation, I'm talking about the one we've been referencing all morning, was that investigation still ongoing at the time that you met with Dr. Nicola over Zoom?
A. It might have been. I may be confusing the different investigations, but I'm not confusing the discussion or the terms that he used.



Y. RAMIREZ
Q. Okay.
A. No, actually it was before. So it was during this investigation.
Q. Who made the decision to -- the ultimate decision to hire an external investigator to conduct the investigation?
A. I -- I would like to ask Gabby a question, if I may?
COUNSELOR TENZER: Can we take a break for a moment?
COUNSELOR VINCI: Sure. That's fine.
(Whereupon, a brief recess was taken.)
(Whereupon, the referred-to question was read back by the reporter.)
THE WITNESS: Dr. Burns and I made that recommendation and ultimate decision would have to be with the dean.
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Okay. Do you know if the dean,



Y. RAMIREZ
at any point, disagreed with the suggestion to engage in external investigator?
A. I'm not aware that -- I didn't speak to the dean directly about that. That was Ed's job, Dr. Burns' job.
Q. Okay. Just want to close a loop on one thing before we move on. We were discussing your Zoom meeting with Dr. Nicola where Dr. Nicola expressed concern about Dr. Khodakhah and the investigation. During that discussion, did Dr. Nicola share anything about Dr. Jordan?
A. No.
Q. Do you recall Dr. Nicola advising you that Dr. Jordan was sharing confidential information about the student survey with other's at Einstein?
A. I don't recall that not, no.
Q. Do you recall Dr. Nicola stating that Dr. Jordan told him to just wait, there would be Title IX allegations coming against Dr. Khodakhah?
A. No.
Q. Are you aware of Dr. Jordan

Y. RAMIREZ

making any such statements to the faculty at Einstein?

A. I'm not aware.

Q. Are you aware of Dr. Jordan making any such statements to students at Einstein?

A. No.

(Whereupon, a Letter was marked as Exhibit 7 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY COUNSELOR VINCI:

Q. Ms. Ramirez, you've been handed what's been marked as Plaintiff's Exhibit 7. Let me know when you're ready to proceed.

A. Okay.

Q. Could you identify this document for the record, please, Ma'am?

A. This is a letter dated March 10th to Dr. Khodakhah from Dr. Tomaselli.

Q. And this letter is giving notice to Dr. Khodakhah of the College's engagement of the -- an external



Y. RAMIREZ

investigator and also Dr. Khodakhah's suspension of chair; is that right?

A. Suspending the appointment as chair, yes.

Q. Whose decision was it to suspend Dr. Khodakhah as chair?

A. I assume that was Dr. Tomaselli's decision.

Q. Did you have any discussions with Dr. Tomaselli about whether or not to suspend Dr. Khodakhah as chair pending the investigation?

A. Not directly, no.

Q. Did you have any indirect discussions with him?

A. We spoke -- Ed and I spoke about that, whether or not that should be part of our recommendation. Ultimately, he spoke with Dr. Tomaselli.

Q. Did you believe that it should be part of the recommendation to the dean?

A. Yes. Under the circumstances, yes.

Q. Okay. Do you recall, did



Y. RAMIREZ

Dr. Burns believe that should be part of the recommendation to the dean?

A. I believe we were both in agreement on that.

Q. Okay. Did you have any role or any part in drafting what is this March 10th notice to Dr. Khodakhah?

A. I may have reviewed it.

Q. But the substance of the notice itself, to your understanding, who drafted that?

A. I don't know.

Q. Okay. There was also a notice sent out to the Neuroscience Department about the investigation in Dr. Khodakhah's suspension as chair; is that right?

A. I recall there was a notice to the department, yes, of the investigation and the suspension.

(Whereupon, an E-mail was marked as Exhibit 8 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY



Y. RAMIREZ

COUNSELOR VINCI:

Q. Ms. Ramirez, you've been handed what's been marked as Plaintiff's Exhibit 8 for identification. Please review the exhibit and let me know when you're ready to proceed.

A. Okay.

Q. Okay. Is this the notice to the Neuroscience Department at Einstein of the investigation into Dr. Khodakhah and his suspension as chair?

A. Yes.

Q. Okay. You helped to draft this, the substance of this e-mail, correct?

A. Did I help to draft it? I helped to review it, yes.

Q. To your knowledge, who drafted the substance of the e-mail?

A. Honestly, I don't recall.

(Whereupon, an E-mail Communication was marked as Exhibit 9 for identification as of this date by the reporter.)

CONFIDENTIAL

Page 130

Y. RAMIREZ
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Ms. Ramirez, you've been handed what's been marked as Plaintiff's Exhibit 9. Once again, please review that and let me know when you're ready to proceed.
A. Yes.
Q. Do you recognize this document?
A. I see it is an e-mail from me to Ed.
Q. Okay. Continuing down on the first page, there's an e-mail that appears from you to yourself dated March 8th, 2022; do you see that?
A. Mm-hmm.
Q. It's the subject Forward Final Draft of Neuro Message; do you see that?
A. Mm-hmm.
Q. And it appears to be, to me, an early draft of the notice to the Department of Neuroscience regarding the investigation and Dr. Khodakhah's suspension; is that accurate?

Page 131

Y. RAMIREZ
A. I think you're accurate, yes.
Q. Who drafted this draft if you know?
A. I know I added the part about T&M U.S.A. and -- T&M U.S.A.
Q. That's the entity handling the external investigation, correct?
A. Correct.
Q. If you look at the second page of the exhibit, it's the final sentence of that first paragraph, it states "Our goal is to complete this investigation by April 15th, 2022." Do you see that?
A. Yes.
Q. Who came up with the end goal of April 15th, 2022?
A. Probably a discussion amongst all of us and after consultation with T&M.
Q. Okay. And if we look at Exhibit 9, the copy that actually went out on the second page, it reads instead, "Our goal is to complete this investigation as quickly as possible." Do you see that?
A. This is the one that went out?

Page 132

Y. RAMIREZ
Q. Yes.
A. Okay. Yes.
Q. Was there discussion, again, outside of discussions with counsel, was there discussion that the goal of April 15th, 2022 was not attainable?
A. It may have been ambitious.
Q. Okay. Did you you personally have any discussions with T&M U.S.A. about how long it would take them to investigate the concerns raised in the survey and the letter?
A. I don't recall the direct conversation. I -- I do not appoint them. That happens through the office of general counsel. I would agree that it's ambitious and we had no sense of how many people had to be interviewed. The only thing I do know is we had over 200 names which is significant, so...
Q. Okay.
A. So I think that was better wording, rather than promise a completion date for all concerned.

Page 133

Y. RAMIREZ
Q. You state in your e-mail to Ed Burns in Exhibit 9, the very first e-mail on the first page.
A. "Please review below - we need a final decision"?
Q. Right. What did you mean by "we need a final decision" --
A. We need to agree on the steps regarding the investigation.
Q. Okay. So as of March 8th, 2022, did you still not know what steps you were going to take with respect to the investigation into Kamran?
A. Ed and I were recommending -- sorry, Dr. Burns and I were recommending an investigator be appointed -- an external investigator be appointed so we needed to finalize that.
Q. Do you have any understanding as to the process by which T&M U.S.A. was chosen as the external investigating company?
A. No, I do not.
Q. And that decision was made by

CONFIDENTIAL

Page 134

Y. RAMIREZ
counsel, correct?
A. Yes.
Q. Did you apprise anyone at Montefiore about what was happening with respect to the investigation into Kamran?
A. I think Dr. Tomaselli did so. I recall a conversation with Dr. -- with Ms. Kenny, who I mentioned earlier, as part of a normal update regarding college business.
Q. Okay. Forgive me if this misstates your testimony, I believe earlier you testified that Ms. Kenny does not get involved in the investigations at Einstein; is that right?
A. No, she doesn't get involved in the investigation -- she doesn't determine or dictate how the investigations are going to be conducted.
Q. Okay. Did you seek -- strike that. But you still advised her of investigations that are happening at Einstein?
A. All the time, yeah.

Page 135

Y. RAMIREZ
Q. Do you seek any advice from her with respect to conducting the investigations?
A. This was just an FYI discussion. It wasn't to seek advice.
Q. Whether or not it was to seek advice, did she provide any advice to you?
A. No.
Q. Did she have any response or reaction at all to the notice of the investigation against Dr. Khodakhah?
A. She thanked me for letting her know.
Q. What formed your belief that Dr. Tomaselli advised people at Montefiore about the investigation into Dr. Khodakhah --
A. I thought I saw that Dr. Tomaselli copied Dr. Ozuah on the March 10th letter to Dr. Khodakhah.
Q. And who is Dr. Ozuah with respect to Montefiore?
A. Dr. Ozuah is the CEO of Montefiore Health System, Montefiore

Page 136

Y. RAMIREZ
Einstein. The dean reported to Dr. Ozuah.
Q. Do you -- did you have any discussions with Dr. Ozuah about the investigation into Kamran?
A. No.
Q. Are you aware of any -- the substance of any discussions between Dr. Tomaselli and Dr. Ozuah regarding Dr. Khodakhah?
A. No.
Q. With respect to the investigation itself, I understand it was conducted by Eric Prusan?
A. Yes.
Q. To your knowledge, was he following any particular policy or procedure at Einstein to investigate the concerns raised in the survey and the letter?
COUNSELOR TENZER: Objection.
You can answer.
A. Mr. Prusan was given access to our policies, to the two documents we had been discussing today. He's a professional

Page 137

Y. RAMIREZ
and we asked him to do what he normally does. We provided the students and faculty and staff of the Neuroscience Department with his contact information and encouraged individuals who wanted to participate to do so without any concern as to their statements being shared with anyone and so Mr. Prusan did conduct the investigation in that manner. The only other thing I asked or advised him is that if any Title 9 issue came up, that he should let us know right away.
Q. Did he ever advise you that in his opinion or to his belief a Title 9 issue arose?
A. He, much later, I want to say it was some time in April or May, I'm fuzzy about exact dates right now, he did say that there was the possibility of a potential Title IX complaint.
Q. Did he share any specifics with you as to the nature of the complaint, the specifics of the complaint, anything of that --

Y. RAMIREZ

A. No. I asked him to please get back to the individual who spoke to him and to encourage them to contact me.
Q. And did that individual ever reach out to contact you about possible Title IX violation against Dr. Khodakhah?
A. Eventually I was able to connect with that individual.
Q. Who was that individual?
A. That was, I believe, [redacted]
Q. When did [redacted] ontact you regarding her Title IX report against Dr. Khodakhah?
A. I think it was late April, early May. Late April, early May.
Q. And at that time, did [redacted] request that an investigation be started?
A. No.
Q. Did she state that she did not want an investigation started?
A. No. She wanted information about the process. I gave her a copy of the policy. We talked about the process.
Q. Which policy did you give her a



Y. RAMIREZ

copy of?
A. I believe I pointed her to our Title IX policy.
Q. Was it the one we had looked at earlier today, a March 18th, 2022 Title IX policy --
A. That was probably the one. We maintain a document library, so in that library, the policies are up-to-date, so I would have referenced that link.
Q. Okay. At some point, did [redacted] dvise that she did want an investigation conducted, a Title IX investigation conducted?
A. No. She was very hesitant and also guarded with information.
Q. But a Title IX investigation was ultimately commenced regarding Dr. Khodakhah's interactions with [redacted] correct?
A. That's correct.
Q. Who decided to start that investigation?
A. I -- I -- I'm the complainant



Y. RAMIREZ

in that investigation, so I filed the complaint.
Q. Why did you -- why did you file the complaint if [redacted] as not interested in pursuing an investigation?
A. I filed the complaint because it was our obligation to do, to have an investigation. Later, [redacted] ame came up, communicated with her.
Q. When you say [redacted] ame came up, did this also come to you from Eric Prusan?
A. No. Eric didn't give me any names, period. He asked -- I asked him to let the individuals know to contact me, [redacted] id.
Q. I guess what I'm trying to determine is you say [redacted] ame came up, was this another instance where Eric told you we may have another Title IX issue and you implored him to have the complainant, if they felt comfortable, contact you?
A. I think I would have to check.



Y. RAMIREZ

I'm not sure that [redacted] articipated in the investigation with the first investigation.
Q. Okay. How, then, did [redacted] name come up?
A. I think it was a reference that was made. I think it may have been [redacted] I would have to check, but I think it was [redacted] who raised her name and indicated that she had had a difficult experience with Dr. Khodakhah, but was -- [redacted] s [redacted] as concerned certainly about raising any concern or complaint about Dr. Khodakhah.
Q. And did you -- when did [redacted] ame come to you -- and her experience with Dr. Khodakhah come to your attention?
A. I want to say it's a few weeks after I spoke with [redacted] I did ask [redacted] f she was aware of any -- potentially any other individuals who had a similar complaints as hers or possibly had

CONFIDENTIAL

Page 142

Y. RAMIREZ

experienced any form of harassment and so she did share that, [redacted] ame, but it took several weeks. One, she -- she was traveling. I think they were both traveling. They were both nervous about coming forward.

Q. Did you ultimately decide to also start an investigation into [redacted] experience with Dr. Khodakhah?

A. I think after I spoke with [redacted] es. I ultimately did decide that.

Q. And you were the complainant for that investigation as well?

A. For both.

Q. Okay. Did you have any discussions with Eric Prusan regarding information that you received from [redacted] and [redacted] s it related to his investigation?

A. No, I don't think so, no.

Q. How much or how little were you involved in Eric Prusan's investigation?

A. I was involved to the extent that he would check in with us if he needed

Page 143

Y. RAMIREZ

any additional information, like contact information or so on, he would let us know, but basically every -- I want to say every other week, eight to ten days, he would check in and let us know how the investigation was going.

Q. Would he share any of the evidence or -- or the information that he gathered as part of the investigation?

COUNSELOR TENZER: I just, I want to object to the -- as you know, we are maintaining that the investigation is privileged. I want to make sure that we don't breach that privilege.

CONTINUED EXAMINATION BY COUNSELOR VINCI:

Q. When you say that he would check in with us, who is "us"?

A. General counsel and myself.

Q. Did you ever speak to Mr. Prusan about his investigation one on one, meaning not with counsel or not in the presence of counsel?

Page 144

Y. RAMIREZ

A. No.

Q. Okay. During Mr. Prusan's investigation, did it come to your attention that students raised an issue as to the validity of the survey results?

A. I do not recall that he reported that. Again, he reported very minimal because his assignment was to conduct a confidential investigation.

Q. Did any -- sorry. Go ahead.

A. I'm sorry. Go ahead.

Q. Did any students report to you concerns about their -- about the survey results that formed at least part of the basis of Mr. Prusan's investigation?

A. There was one individual who contacted me because she had a formal grievance against Dr. Khodakhah.

Q. Who was that individual?

A. An individual by the name of [redacted] s the -- I think is the pronunciation, [redacted] There was another individual who I don't think was a student at the time, who contacted me late in

Page 145

Y. RAMIREZ

August.

Q. Who is that individual?

A. Trouble with her last name, but her first name was [redacted] I want to say [redacted]

She -- she had been in the department and graduated.

Q. Would that be [redacted] nd I probably will also struggle for the record, [redacted]

A. I'll take that.

COUNSELOR VINCI: [redacted]

CONTINUED EXAMINATION BY COUNSELOR VINCI:

Q. We'll call her [redacted] or clarity sake.

A. Probably the best thing to do.

Q. When did [redacted] ontact you regarding the investigation into Kamran?

A. It was following the investigation that Eric conducted. It was late summer. I don't know the exact date.

CONFIDENTIAL

Page 146

Y. RAMIREZ
It was late summer.
Q. Late summer 2022?
A. That would be it, yes.
Q. And how did she contact you?
A. I know she sent me an e-mail, she did contact me by phone, I believe. I'm pretty sure. Her concern was more about being quoted in the survey and also the investigation and that's what we were talking about on that phone call.
Q. What was her concern about being quoted in the survey that she related to you?
A. She didn't want her name included in the report or there wouldn't be, I mean, I tried to assure her of that, but she also didn't want any of her comments included because she felt that they would -- then she would be easy to identify. I think that was her concern.
Q. Wasn't her concern that Bryen Jordan had used statements that she said to her in the survey without her consent?
COUNSELOR TENZER: Objection.

Page 147

Y. RAMIREZ
A. She didn't bring that up in the phone call -- sorry, she didn't -- she brought it up later on in an e-mail.
Q. Okay. What else did she bring up in the e-mail that she had not brought up in the phone call?
A. She talked about the validity of the survey. I think she may have even suggested in that e-mail that Dr. Jordan had only used the word coerced, manipulated was what she said. She was upset that her comments would be included in any materials related to Dr. Khodakhah and she wanted them strickened.
Q. To your understanding, based on what she shared with you, was she upset that her comments were included in the survey at all or was she upset that manipulated comments were included in the survey?
COUNSELOR TENZER: Objection.
You can answer.
A. I think she was upset that her comments were included at all.

Page 148

Y. RAMIREZ
Q. Did she share with you that she never took the survey?
A. No, she didn't share that.
Q. Are you aware that she reported that she never took the survey?
A. No, not to me. I don't think so, not to me.
Q. Do you know how her comments would be included in the survey if she never took it?
A. I don't know how they would.
Q. After speaking with [redacted] did you make any inquiries as to whether or not Dr. Jordan had actually manipulated her statements in the survey?
A. After my phone call with [redacted] contacted Mr. Prusan. I shared what she had requested.
Q. When was a phone call with [redacted]
A. It must have been late July or some -- some time around that. I don't really know exactly. I think she sent me an e-mail in August and in her e-mail she

Page 149

Y. RAMIREZ
said, you know, thank you for talking with me last week, so I assume it was very close to that time period.
Q. When did Mr. Prusan's investigation end?
A. July.
Q. Okay. So it's your testimony that you spoke to -- strike that. Did you contact Mr. Prusan after the conclusion of his investigation to share [redacted] concerns about her name being in the report?
A. Yeah.
Q. What was his response?
A. I don't think he included anyone's comment. I don't think he included her comments in the report. He just contacted me, he said there's nothing in the report that leads to her, so...
Q. Okay. Other than contacting Mr. Prusan about [redacted] oncerns, did you do anything to make inquiries or look into her allegation that Dr. Jordan had manipulated her statements and submitted

CONFIDENTIAL

Page 150

Y. RAMIREZ
them with the survey?
COUNSELOR TENZER: Objection.
You can answer.
A. No.
Q. Would it have been appropriate for him to do that?
A. I'm not sure what would have been appropriate under these circumstances. We discussed -- I thanked her very much, I shared the information with the appropriate individuals and I also spoke with Mr. Prusan about her concern. So we had another investigation already underway.
Q. I believe earlier today we talked about changing students responses to a survey and you had testified that it would never be appropriate to do that; is that correct?
A. That's correct.
Q. So would it be appropriate to manipulate a students responses to a survey?
COUNSELOR TENZER: Objection.
A. I -- I'm not -- no, it wouldn't

Page 151

Y. RAMIREZ
be appropriate. I'm not aware that that happened.
Q. But there was an allegation that that happened?
A. Yes.
Q. And did you do anything to investigate if that violated any of Einstein's policies?
A. I think that was covered by the first investigation, but no, I did not pursue it any further. It was actually, I think, Dr. Khodakhah who may have shared an e-mail from [redacted] ith Dr. Burns and myself.
Q. You believe whether or not -- strike that.
COUNSELOR VINCI: Can you read back the last question and answer?
(Whereupon, the referred-to question and answer was read back by the reporter.)
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. So you believe that whether Dr.

Page 152

Y. RAMIREZ
Jordan manipulated [redacted] tatements in the survey was investigated by Mr. Prusan?
A. It was part of his investigation. I do not think that he was able -- that I asked him confirm if anyone else made the same allegation.
Q. Did he advise you whether any other participants to the investigation made similar allegations against Dr. Jordan?
A. He said, no, he did not confirm that they --
COUNSELOR TENZER: Again, I want to -- the investigation is privileged, but just...
CONTINUED EXAMINATION BY COUNSELOR VINCI:
Q. Did any student, staff, faculty, anyone else at Einstein other than [redacted] hare with you that they felt the -- the results of the student survey had been manipulated?
A. No.

Page 153

Y. RAMIREZ
Q. Did any former student, staff, faculty of Einstein share with you concerns that the allegations against Dr. Kamran had been manipulated or were untruthful?
A. I think I already said [redacted] was that former student.
Q. Anyone else?
A. No.
Q. How are you aware that Eric Prusan -- strike that. To your knowledge, did [redacted] eport to Mr. Prusan her concerns that her statements in the survey had been manipulated?
A. No.
Q. So how are you aware that he looked into that issue?
A. Sorry?
Q. How are you aware that he investigated that issue?
A. I spoke with him about my conversation with [redacted] I told him or shared with him that she was very insistent that her comments be not be included in any reports. She did not say to me when I

CONFIDENTIAL

Page 154

Y. RAMIREZ

spoke with her on the phone that her comments had been manipulated or that she had not participated in the survey.

Q. But she did state that, to your recollection, in an e-mail to you thereafter, correct?

A. Afterwards, yes. She said a lot of things in the e-mail.

(Whereupon, an E-mail Communication with Attachment was marked as Exhibit 10 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY COUNSELOR VINCI:

Q. Okay. Ms. Ramirez, you've been handed what we marked as Plaintiff's Exhibit 10. Once again, please review and let me know when you're ready to proceed. If it's of any assistance, my questions will be geared towards that second e-mail from [redacted] o yourself. It appears on Page 3.

A. Do you have questions for me?

Page 155

Y. RAMIREZ

Q. Yes. Sorry. Waiting for you to review. Do you recognize this document?

A. The e-mail from Kamran and the e-mail from [redacted] es.

Q. Okay. So looking at the third page of the exhibit, forwarded message from [redacted] o yourself, is this the e-mail that you've been testifying to having received from her regarding her concerns with her statements in the student survey?

A. I think this is the only e-mail I received from her. I don't recall any other e-mail. I recall the conversation.

Q. Okay. And if you look at the bottom paragraph of her e-mail, it starts "I initially believed," do you see that?

A. Mm-hmm.

Q. Okay. And she states that she believed it was a misunderstanding and she spoke to Dr. Jordan about it and she references a March 12th e-mail where Dr. Jordan advises he will tell HR to remove her comments and ask the lead investigator to take out her comments without mentioning

Page 156

Y. RAMIREZ

her name; do you see that?

A. Yes.

Q. Did Dr. Jordan ever contact you in or around March 12th, 2022 to remove [redacted] tatements from the investigation?

A. I don't recall a conversation with Dr. Jordan about [redacted]

Q. Do you recall any discussion between Dr. Jordan and Mr. Prusan regarding removing [redacted] tatements from the investigation?

A. I wouldn't be privy to that conversation. I had a conversation with Mr. Prusan.

Q. And that's what you already testified to?

A. That's right.

Q. Was August of -- in or around August 25, 2022, was that the first time you had heard [redacted] oncerns regarding her statements being included in the student survey?

A. I heard the week before when

Page 157

Y. RAMIREZ

she called me.

Q. Prior to that phone call, had you had any discussions with her about her statements in the student survey?

A. No. No.

Q. Do you recall meeting with her in April of 2022 regarding her concerns that her statements had been manipulated?

A. I really don't, no.

Q. Do you recall having any meeting with [redacted] n April of 2022 regarding her statements in the student survey?

A. No, I'm sorry, I don't.

Q. Okay. So you can't say whether or not it -- whether or not you did meet with her? You don't recall one way or the other?

A. I really don't recall. I recall her and the conversation I had with her and the e-mail. I would think I would have recalled other conversations with her.

Q. In the spring of 2022, other than what we already discussed today, did