# EXHIBIT O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:24-cv-00839-LAK-RFT
-----------------------------------x
KAMRAN KHODAKHAH,
Plaintiff,
- against -
MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC.; MONTEFIORE HEALTH SYSTEM, INC.; MONTEFIORE MEDICAL CENTER; ALBERT EINSTEIN COLLEGE OF MEDICINE; GORDON TOMASELLI; PABLO CASTILLO; BRYEN JORDAN; and JOHN-JANE DOES 1-10,
Defendants.
-----------------------------------x
September 21, 2026
2:05 p.m.

CONFIDENTIAL TRANSCRIPT

Remote video-teleconference deposition via Zoom of GORDON TOMASELLI, pursuant to Subpoena, before Jineen Pavesi, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

A P P E A R A N C E S :

NESENOFF & MILTENBERG LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
Attorneys for Plaintiff
BY: GABRIELLE VINCI, ESQ.
gvinci@nmllplaw.com

HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Attorneys for Albert Einstein College of Medicine, Pablo Castillo, Bryen Jordan, Montefiore Health System, Inc., Montefiore Medical Center, and Montefiore Medicine Academic Health System, Inc.
BY: CHLOE GOODWIN, ESQ.
cgoodwin@heckerfink.com
ANNA COLLINS PETERSON, ESQ.
apeterson@heckerfink.com
- and -
KAPLAN MARTIN LLP
1133 Avenue of the Americas
New York, New York
BY: CHRISTOPHER R. LE CONEY, ESQ.
cleconey@kaplanmartin.com

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
One Rockefeller Plaza
New York, New York 10020
Attorneys for Witness Gordon Tomaselli
BY: SARA LUZ ESTELA, ESQ.
sestela@ecbawm.com

ALSO PRESENT:
KAMRAN KHODAKHAH
DANA LEE, ESQ., Albert Einstein College of Medicine
CHELSEA GILCHRIST, Veritext IT Concierge



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the Attorneys for the respective parties hereto that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any notary public with the same force and effect as though signed and sworn to before this Court.



THE COURT REPORTER: Ms. Estela, are you ordering a copy of the transcript?

MS. ESTELA: Yes, I am ordering.

THE COURT REPORTER: Do you need a rush on final or a rough transcript today?

MS. ESTELA: No, just regular delivery, the others may be ordering it rush but I don't need it quickly.

THE COURT REPORTER: Okay, thank you.

(Pause.)

G O R D O N T O M A S E L L I, having been first duly sworn remotely upon agreement of all counsel, as hereinafter certified, was examined and testified as follows:

EXAMINATION BY
MS. VINCI:

Q. Good afternoon, Dr. Tomaselli, my name is Gabrielle Vinci, I am one of the attorneys representing Kamran





Khodakhah in an action he has brought against Albert Einstein College of Medicine and Montefiore Health System.

Throughout this afternoon's proceedings, I will refer to Albert Einstein College of Medicine simply as Einstein or as the college, if that is okay with you, sir.

A. Yes.

Q. We're here this afternoon to take your deposition, which pretty much means I'll be asking you questions which you will answer under oath regarding what you know and what you recall about the facts and circumstances underlying Dr. Khodakhah's claims in this action.

Have you been deposed before?

A. Yes.

Q. When was the last time you were deposed?

A. I think a couple of years ago.

Q. Was that in connection with a case where you were a named party, meaning either as a named plaintiff or defendant?

Page 6

TOMASELLI - CONFIDENTIAL
A. Yes.
Q. What was the nature of that case?
A. It was this case actually, it was the prior iteration of this case.
Q. I understand there had been, underlying at the college level, a hearing related to Dr. Khodakhah and the underlying investigations.
Is that what you're referring to --
A. Yes.
Q. -- or -- okay.
Outside of that proceeding, have you ever been deposed as a witness or as a party in a case similar to today where you took an oath in front of a court reporter or a judge to give testimony under oath?
A. No.
Q. And you understand, sir, that you are here today subject to a subpoena?
A. Yes.
MS. VINCI: And so I'll

Page 7

TOMASELLI - CONFIDENTIAL
introduce or, rather, Ms. Chelsea will introduce what I've premarked as Plaintiff's 22.
(Pause.)
THE VERITEXT CONCIERGE: It should be available now; please refresh.
(Plaintiff's Exhibit 22, Subpoena for Dr. Gordon Tomaselli, was marked for identification, as of this date.)
Q. Are you able to see that, sir?
A. It's got blue shading on it so it is very difficult -- oh, there it is, okay.
Q. Just for identification for the record, is this a copy of the subpoena that was served upon you via your counsel for today's appearance?
A. It looks like it, but I actually don't even know if I've seen the actual version of the subpoena, but it looks like it, yes.
Q. Whether or not you've seen the subpoena, you understand that you're here

Page 8

TOMASELLI - CONFIDENTIAL
subject to my office serving a subpoena on your counsel, correct?
A. Yes.
Q. You can put that away.
Before we move forward today, I just want to go over some ground rules, some protocols for the day, just to help the deposition go as smoothly as possible.
The first is obviously I will be asking you questions, you'll be giving answers; I ask that you please allow me to finish my question before you move on with your answer and I will show you the same courtesy, to allow you to finish, sir, before I move on to my next question; for the sake of the transcript, it's difficult for our court reporter to take down two people talking over one another.
I will also ask that in response to my questions, you give clear verbal answers; it is difficult in a transcript to note down any sort of gesture or less clear responses like uh-huh or um-hum, it's very difficult to

Page 9

TOMASELLI - CONFIDENTIAL
note down correctly, so please give clear verbal answers to my questions.
If you don't hear a question or don't understand a question as I've posed it, please let me know; we'll either have the question read back to you or I will rephrase the question until it becomes meaningful to you.
If you answer a question as I have posed it, I am going to take that to mean that you understood it as I have posed it, okay?
A. Yes.
Q. Pursuant to court order, we are here for a maximum of three hours on the record; however, that being said, if at any point in time you need to take a break, please let me know, we will take as many breaks as you need.
The only caveat to that is if there is a question pending, please answer that question and then we will take that break, okay?
A. Yes.

Page 10

TOMASELLI - CONFIDENTIAL

Q. Where are you currently located, sir?
A. Baltimore, Maryland.
Q. Are you in your home, in your office, somewhere else?
A. Home.
Q. Is there anybody else in the room with you during the deposition?
A. No.
Q. I will ask that as we may be going over some topics that have been marked confidential as part of this case, if anyone does come into the room, you let us know and we can either take a break until they leave or address how to proceed at that time.
Other than the Zoom platform and the Exhibit Share site, are there any other tabs or windows open on the devices you're using to take this deposition?
A. Plenty of them for my job, my current job.
Q. Sorry?
A. Yes.

Page 11

TOMASELLI - CONFIDENTIAL

Q. What else is open on your screen, sir?
A. A number of panels that relate to my current employment.
Q. I'd ask you to please close those panels, sir, and confirm that you will give your full attention to the proceedings today, at least while we're on the record.
Certainly if anything comes up that you need to attend to right away, we will take a break and accommodate your need to do so, but while on the record I'll ask that the Zoom and the Exhibit Share are the only tabs that you have open.
Please let me know when you have been able to do that.
A. Yeah, I'm doing it right now.
Q. Thank you.
(Witness complying.)
Q. Do you have any questions regarding sort of the logistics or procedure for today?

Page 12

TOMASELLI - CONFIDENTIAL

A. No.
Q. Is there any reason that you can think of that you would not be able to proceed with today's deposition?
A. No.
Q. Do you have any documents with you, sir, related to the claims in this case?
A. No.
Q. Have you reviewed any documents in preparation for your deposition?
A. Yes.
Q. What documents did you review?
MS. ESTELA: Objection.
I am going to direct him not to answer that question.
MS. VINCI: On what grounds?
MS. ESTELA: On the attorney/client privilege grounds, the material that we discussed specifically is covered by the privilege.
MS. VINCI: I am not asking what was discussed, I am asking what he has reviewed.

Page 13

TOMASELLI - CONFIDENTIAL

MS. ESTELA: I am going to direct him not to answer based on privilege.
Q. Separate from any documents that you may or may not have reviewed with your counsel, sir, did you review any documents to refresh your recollection as to the claims and what happened underlying the claims in this action?
A. Yes.
Q. What documents did you independently review?
MS. ESTELA: She asked you specifically not the ones we reviewed together, but if you looked outside of what we looked at together.
A. Then the answer would be no.
Q. Other than your counsel, have you spoken to anyone in preparation for your deposition?
A. No.
Q. What is your highest level of education?
A. Graduate level education.



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 14

TOMASELLI - CONFIDENTIAL
Q. What is the highest degree that you have earned as a graduate level of education?
A. M.D.
Q. Where did you earn your M.D.?
A. Albert Einstein College of Medicine.
Q. In what year did you earn your M.D.?
A. 1982.
Q. Are you currently employed?
A. Yes.
Q. Where are you currently employed?
A. American Heart Association.
Q. For how long have you worked with the American Heart Association?
A. Just about ten months.
Q. What is your role there?
A. Executive vice-president for research.
Q. You were previously employed as the dean of Albert Einstein College of Medicine, correct?

Page 15

TOMASELLI - CONFIDENTIAL
A. Yes.
Q. From what years did you serve as dean of the college?
A. 2018 through 2023.
Q. Prior to starting as dean in 2018, what role or roles did you have at Albert Einstein College of Medicine?
A. I did not have a role at Albert Einstein.
Q. During the years 2018 to 2023, when you served as dean, did you have any other position or positions at the college?
A. Executive vice-president, dean, and that was for Montefiore Medicine Academic Health.
Q. For how long did you serve as the executive vice-president for Montefiore?
A. Same time period.
Q. Were you previously a professor at any point with Albert Einstein College of Medicine?
A. No.

Page 16

TOMASELLI - CONFIDENTIAL
Q. How did it come to be that you became dean at Albert Einstein?
A. I was asked to apply for the position and did.
Q. Who asked you to apply for the position?
A. The former president of Montefiore Medicine Academic Health, Steve Safyer.
Q. Is it your understanding that a hiring committee was convened to find the new dean of the college as you were applying?
A. Yes.
Q. Were you aware that Dr. Khodakhah was on that committee?
A. No -- actually, I was reviewed by the committee, interviewed by the committee, and I do recall him being on that committee actually.
Q. Did you know Dr. Khodakhah before he served on the hiring committee for the deanship?
A. No.

Page 17

TOMASELLI - CONFIDENTIAL
Q. Do you have any understanding of Dr. Khodakhah's opinion of you as an applicant for the deanship?
A. No.
MR. LE CONEY: Objection to form.
Q. Would it surprise you, sir, to learn that you were Dr. Khodakhah's top pick for the dean's position?
MS. ESTELA: Objection.
You can answer.
A. No, no.
Q. Have you ever spoken to him about his opinion of you during the application process?
A. No, during the application process, no.
Q. After you became dean, did you ever speak to him regarding his impression of you while going through the application process?
A. No.
Q. What were your job responsibilities as dean of the college?

Page 18

TOMASELLI - CONFIDENTIAL
A. Oversight of the academic and educational components and activities of the School of Medicine.
Q. Did you have any employees who reported directly to you, sir?
A. Yes.
Q. By title, who were those employees?
A. Executive vice deans and other vice deans; those were mainly the people that reported to me.
Q. At the time that you became dean in 2018, Dr. Khodakhah was chair of the Department of Neuroscience, correct?
MS. ESTELA: Objection.
A. Yes.
Q. What was the reporting structure between yourself and Dr. Khodakhah at that time?
A. Department chairs reported to the dean.
Q. During the first year of your deanship, how would you describe your working relationship with Dr. Khodakhah?

Page 19

TOMASELLI - CONFIDENTIAL
MS. ESTELA: Objection.
You can answer, if you understood the question.
A. Not unlike my working relationship with other department chairs.
Q. And what was that working relationship like with Dr. Khodakhah and other department chairs?
MS. ESTELA: Objection.
You can answer.
A. Just generally getting some feedback about the department's activities and oftentimes the discussions were around, with the department chairs, were around funding.
Q. Do you recall there being any disagreements between you and Dr. Khodakhah with respect to your support of the neuroscience department?
A. No more than other departments complained about not getting enough support from the dean's office.
Q. Would you characterize Dr. Khodakhah as being more or less vocal

Page 20

TOMASELLI - CONFIDENTIAL
than other department leaders regarding issues with your support of his department?
MS. ESTELA: Objection.
You can answer to the extent --
A. I wouldn't say more or less actually.
Q. Do you recall Dr. Khodakhah complaining to you about how you were performing in your role as dean?
MS. ESTELA: Objection.
You can answer.
A. Not to me directly.
Q. Are you aware of him making such complaints to others?
A. I do recall having heard some things about that.
Q. Who did you hear that from?
A. Don't recall; several people though.
Q. What can you recall about the nature of Dr. Khodakhah's complaints about you?
A. I think they were pretty much

Page 21

TOMASELLI - CONFIDENTIAL
similar to other complaints about resources, resources for departments, which were, again, in our circumstance in relatively short supply and needed to be managed.
Q. Did you ever discuss those complaints directly with Dr. Khodakhah?
A. I don't know that we discussed complaints; we certainly discussed resources to the Department of Neuroscience.
Q. Did there come a time that Dr. Khodakhah did or attempted to resign as chair?
A. Yes.
Q. When was that?
A. Don't recall the exact date.
Q. What is your understanding of why Dr. Khodakhah resigned as chair?
A. Frankly, it really wasn't exactly clear to me.
Q. Were you aware that he resigned as chair over your lack of support for the department.

Page 22

TOMASELLI - CONFIDENTIAL
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I wasn't aware of the reason and still am not really clear.
Q. At that time who did Dr. Khodakhah tender his resignation to?
A. Ultimately it came to me.
Q. What, if anything, did you do at that time regarding his resignation?
A. I'm trying to recall exactly the sequence of events, but we had a discussion at some level and I asked him to think it over a bit more, this was early in my tenure.
Q. At the time that Dr. Khodakhah tendered his resignation to you, who was the president of Montefiore?
A. Steve Safyer, I believe.
Q. When did president, and apologize if I mispronounce his name, Ozuah --
A. Ozuah.
Q. -- when did President Ozuah take over?

Page 23

TOMASELLI - CONFIDENTIAL
A. I also don't know the exact date there, I can't recall the exact date.
Q. At that time Dr. Khodakhah ultimately did not resign, correct?
A. Correct.
Q. Why not, if you know?
MS. ESTELA: Objection --
A. I don't know -- sorry -- I don't know.
Q. Are you aware that the president of Montefiore at that time pleaded with Dr. Khodakhah not to leave?
MS. ESTELA: Objection.
A. No.
Q. Were you ever spoken to by the president of Montefiore regarding Dr. Khodakhah's resignation?
A. No.
Q. Did you have any opinions one way or the other whether Dr. Khodakhah should resign at that time?
A. I asked him to stay on, so my opinion at that time was to have him stay on.

Page 24

TOMASELLI - CONFIDENTIAL
Q. Were you happy that he ultimately decided to stay on?
A. At the time, yes.
MS. ESTELA: Objection.
Q. From the start of your deanship in 2018 until we'll say about 2021, how would you describe Dr. Khodakhah's performance as chair of the department?
A. I thought he was doing a good job.
Q. Did you during that time period, again, 2018 to 2021, did you receive any complaints regarding his performance as chair?
A. I do recall an occasional complaint, but not more than some other chairs had actually gotten as well related to operational kinds of issues.
Q. Who did those complaints come from?
A. Don't recall; generally faculty though are the ones who usually had issues.
Q. Did you ever hear of any

Page 25

TOMASELLI - CONFIDENTIAL
students complaining of Dr. Khodakhah during that 2018 to 2021 period?
A. I didn't hear from students at all at that time about any issues.
Q. Even if they did not come directly to you, during that time period were you aware of any complaints against Dr. Khodakhah regarding his performance as chair?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. If I was aware, I don't recall.
Q. Just as sort of a housekeeping matter, Dr. Tomaselli, defense counsel or your counsel will interpose objections to my questions; unless you are instructed by counsel not to respond or not to give an answer, you do still have to answer the question.
I see you waiting for the instruction after that; if the instruction is not to respond, your counsel and I can take that up, but otherwise you do still need to respond to the question.

Page 26

TOMASELLI - CONFIDENTIAL

In early 2022, you learned of concerns regarding Dr. Khodakhah's behavior as chair in the department, do you recall that?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. Yes.

Q. What specifically did you learn at that time?

A. There was a letter signed by more than a dozen faculty members alleging mistreatment of staff, students and junior faculty and there was a student survey that was in preparation that also made several claims of student mistreatment by Dr. Khodakhah.

Q. Let's start with the student survey reference; what do you mean by there was a student survey, quote, in preparation, close quote?

A. I hadn't seen the final results of that survey at the time that the letter from the faculty came in and that was the earliest that I had heard of specific

Page 27

TOMASELLI - CONFIDENTIAL

problems.

Q. Let's take a look at the letter.

If you can please take a look at what's been previously marked as Defendants' Exhibit 10.

MS. VINCI: Chelsea, it is just noted as Exhibit 10 in the Exhibit Share.

THE VERITEXT CONCIERGE: Would you like me to restamp it as Exhibit 10 or just keep it?

MS. VINCI: No, that would be too confusing.

THE VERITEXT CONCIERGE: That is coming through now, you should be able to refresh and see Exhibit 10.

Q. Are you able to see that document?

A. No, I still have Plaintiff's 22, I keep refreshing and that's what's coming up.

THE VERITEXT CONCIERGE: Sir, in the top left do you see a back arrow --

THE WITNESS: I do.

Page 28

TOMASELLI - CONFIDENTIAL

THE VERITEXT CONCIERGE: Click that, it should bring you back to the list of documents.

THE WITNESS: Okay.

THE VERITEXT CONCIERGE: Do you see Exhibit 10 in the list now?

THE WITNESS: Yes.

So we're not refreshing, we're going back.

(Witness perusing document.)

A. Yes, okay.

Q. I will ask you to review that letter, sir, and let me know when you've had a chance to do so.

My first question is going to be do you recognize this document.

A. I do recognize it.

Q. Is this the letter signed by faculty members that you just testified to?

A. Yes.

Q. Prior to receiving this letter -- strike that.

How did you receive this

Page 29

TOMASELLI - CONFIDENTIAL

letter?

A. Do not recall.

Q. Do you recall if it was sent to you via e-mail?

MS. ESTELA: Objection.

A. Do not recall.

Q. Prior to seeing this letter, had you been made aware of any concerns that the faculty within the neuroscience department had regarding Dr. Khodakhah?

MS. ESTELA: Objection.

A. Yes.

Q. When were you first made aware of concerns that the faculty had regarding Dr. Khodakhah?

A. It was around this time, but I don't recall exactly when.

Q. How did you become aware of those concerns?

A. Faculty complaints and I think they went through some of the folks that report to me, whether it was Dr. Burns or others, but I don't recall the detail, I just recall that there were some

TOMASELLI - CONFIDENTIAL

complaints.

Q. Dr. Burns, that was Ed Burns, correct?

A. That's correct.

Q. He was the executive dean at that time?

A. That is correct.

Q. What, if anything, can you recall about the details or specifics of the concerns regarding Dr. Khodakhah that the faculty raised separate from this letter?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. I think the letter probably summarizes most of the complaints that the faculty had.

Q. Were you aware that senior faculty members had spoken to Dr. Burns about their concerns prior to sending this letter?

MS. ESTELA: Objection.

A. Yes.

Q. Did you speak to Dr. Burns regarding that, sir?



TOMASELLI - CONFIDENTIAL

A. Yes, not sure exactly when it was, but, yes, I did.

Q. At that time did Dr. Burns share with you details of the faculty's concerns regarding Dr. Khodakhah?

A. Yes, but very few in the way of details, just kind of a relatively large overview.

Q. And at that time what, if any, steps did you take to address the faculty's concern?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. We didn't actually start to do our own investigation until this information came in.

We wanted to get more information to make sure that there weren't specific kinds of things that we needed to be concerned about, that we needed to investigate, so once we got written complaints such as these, then we started -- then we had discussions about



TOMASELLI - CONFIDENTIAL

how we should proceed.

Q. So after receiving this letter that is Defendants' Exhibit 10, what, if any, steps did you take to address the concerns raised in the letter?

A. This was in the context of other things and we decided that this should be investigated.

Q. When you say we decided, who is the we?

MR. LE CONEY: Objection.

Dr. Tomaselli, I just want to introduce myself as counsel for defendants and defendants are asserting privilege over your communications with Dana Lee or anyone else that touched on legal advice, including the investigation that was conducted, and so I may be objecting further as we go with respect to privilege over those discussions you may have had with Ms. Lee or others that reflected legal advice.

THE WITNESS: Okay.

A. There was an executive group



TOMASELLI - CONFIDENTIAL

that actually met that included a number of people, including myself, Dr. Burns, our human resources leader, as well as counsel.

Q. The human resources leader, would that be Yvonne Ramirez?

A. Yes.

Q. Did you have any discussions with any of the signatories to this letter regarding their specific concerns with Dr. Khodakhah?

A. Yes.

Q. Who did you speak to?

A. It wasn't at the time of this letter, but afterwards; it included Bryen Jordan, David Spray, Pablo Castillo, Steve Walkley, Myles Akabas, and Adam Kohn as well.

Q. What specifically did Dr. Jordan tell you his concerns were regarding Dr. Khodakhah?

MS. ESTELA: Objection.

A. I don't recall --

THE WITNESS: Sorry, Sara, did

TOMASELLI - CONFIDENTIAL
you want to --
MS. ESTELA: Objection, but you can answer.
Thank you.
A. I don't recall the specifics of the conversation, I just know in general these were the things that really were part of virtually all of the conversations that I had with the neuroscience faculty.
Q. When you say these were the things that were part of virtually all of your conversations, what things are you referring to?
MR. LE CONEY: Objection.
A. Meaning unprofessional behavior, criticisms of staff, comments to students that were at times viewed as discriminatory and just kind of creating a general environment that was not well-suited to education academic advancement.
Q. What examples did the faculty members give you of those incidents?
MS. ESTELA: Objection.



TOMASELLI - CONFIDENTIAL
MR. LE CONEY: Same.
A. There were a number of examples of students being called out and being called derogatory names as part of this and also criticisms of staff that caused either staff to resign or be less effective because of the -- because of their being criticized.
Those are the kinds of things that were part of these discussions.
Q. Did you seek out these discussions with the signatories to the letter or did they come to you or something else?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. So we had a couple of discussions with the neuroscience department as a group and some of them spoke out at those meetings and others made appointments to see me outside of those meetings.
Q. When you say "we had a couple of discussions" --



TOMASELLI - CONFIDENTIAL
A. Meaning me as the dean had basically town halls with the department.
Q. How many town halls did you hold?
A. I recall three, but there may have been more.
Q. Did you take any notes during these town hall meetings?
A. I did not.
Q. To your knowledge, was there any attendee at the town hall whose job or whose purpose was to take notes during the meeting?
MS. ESTELA: Objection.
A. No.
Q. As of February 2022, how many faculty members were within the neuroscience department?
A. I don't recall the number.
Q. Was it more than 13?
A. Yes.
Q. How much more than 13?
A. Don't know.
MS. ESTELA: Objection.



TOMASELLI - CONFIDENTIAL
Q. Was it more than 20?
A. Depends how you count them, some people were in multiple departments and what their primary department was is usually how they were counted.
I will repeat; I don't know the number.
Q. Did you ever speak to -- strike that.
Is it fair to say that this letter is not signed by all of the faculty of the neuroscience department, correct?
A. Correct.
Q. Did you ever speak to any of the faculty who did not sign the letter about their impression of Dr. Khodakhah?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. There were actually faculty who didn't sign the letter who were intimidated and didn't sign the letter for that reason.
Q. Who were the faculty that were intimidated?

Page 38

TOMASELLI - CONFIDENTIAL
A. I can't recall.
Q. How do you know faculty were intimidated not to sign the letter?
A. Well, I actually choose not to answer that in fact.
Q. Well, it is not really an option here; you are here to give testimony if there is not an objection to it, there is no basis to not respond to it, so I will ask you again.
How were you aware that faculty were intimidated not to sign the letter of concern?
MS. ESTELA: Objection.
A. They reported this through the human resources director.
Q. How were you aware they reported it through the human resources director?
A. I met with her on a regular basis.
Q. How regular?
A. I don't recall, but it was several times per month.

Page 39

TOMASELLI - CONFIDENTIAL
Q. What did she tell you about faculty being intimidated to sign the letter of concern?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. She was concerned about the power differential, that their chairman was, you know, kind of the person who the complaints were lodged against.
Q. What, if anything, did you do to address that concern?
A. This was around the time that we started the investigation.
Q. Separate from the college starting the investigation, what, if anything, did you do to address the concern of faculty that felt intimidated by Dr. Khodakhah?
MS. ESTELA: Objection.
A. Once we decided to engage an investigatory group, Dr. Khodakhah was asked to step down as chair of the department.
Q. But he did not step down,

Page 40

TOMASELLI - CONFIDENTIAL
correct?
A. He was asked by Dr. Burns to step down --
THE WITNESS: Did you want to object, Sara, sorry.
MS. ESTELA: Yes, thank you.
A. He was asked to step down by Dr. Burns and did not step down, so he was forced to step down by me pending the results of the investigation.
Q. You decided to suspend him as chair, correct?
MS. ESTELA: Objection.
A. That's correct.
Q. In your mind, is suspension the same as stepping down?
MR. LE CONEY: Objection.
A. Yes.
Q. Do you believe that others within the neuroscience department equate suspension with stepping down?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I have no way of knowing that.

Page 41

TOMASELLI - CONFIDENTIAL
Q. Was suspending Dr. Khodakhah your way of addressing the concerns of the faculty who felt intimidated from signing the letter of concern?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. My reason for suspending him was he was in violation allegedly of the code of conduct of the Albert Einstein College of Medicine; as such, until this investigation was concluded and we decided one way or the other whether he was, my decision was, again, in the interest of the college, to not have himself as the leader of this department.
Q. At that time was he allegedly in violation of any other policies of the college?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. At that time I don't recall if there were any others, but what he was alleged of being in violation of was more than sufficient to justify the suspension.

Page 42

TOMASELLI - CONFIDENTIAL
Q. You testified that Dr. Burns had asked Dr. Khodakhah to step down, is that right?
A. That is correct; Dr. Burns informed me that he asked Dr. Khodakhah to step down.
Q. Were you aware that Dr. Burns was going to ask that of Dr. Khodakhah?
A. Yes --
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
THE WITNESS: Sorry.
A. We discussed that before Dr. Burns asked him; he did not do it on his own.
This was, again, something we discussed, Dr. Burns and myself.
Q. Did you support giving Dr. Khodakhah the option to voluntarily step down?
A. Yes.
Q. Were any other actions discussed between you and Dr. Burns regarding Dr. Khodakhah's status as chair

Page 43

TOMASELLI - CONFIDENTIAL
pending the investigation?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I'm not sure I understand the question actually.
Q. Were any measures -- strike that.
Did you and Dr. Burns discuss any measures other than Dr. Khodakhah stepping away as chair that could be taken during the pendency of the investigation?
MS. ESTELA: Objection.
A. I don't recall anything else that we discussed in that regard.
Q. In response to the letter, Dr. Khodakhah requested that an investigation be conducted, correct?
MS. ESTELA: Objection.
A. It was going to happen anyway; I mean, we were planning on having this investigation, it wasn't a matter of anybody, of Dr. Khodakhah requesting it, it was going to happen.
Q. Well, regardless of that,

Page 44

TOMASELLI - CONFIDENTIAL
Dr. Khodakhah in response to receiving the letter of concern requested that an investigation take place, correct?
A. No, after the decision was made to do the investigation, he requested that it be -- that it happen.
Q. When was the decision made to do the investigation?
A. I do not recall the specific date.
Q. Do you recall how, in relation to February 24th, 2022, how long after that date the decision was made to have an investigation?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. No, I do not.
Q. Do you recall Dr. Khodakhah's response to the neuroscience department, response of the letter of concern to the neuroscience department?
MR. LE CONEY: Objection.
A. Not in detail, I think there was a response.

Page 45

TOMASELLI - CONFIDENTIAL
Q. Do you recall him asking Ms. Ramirez in HR and Dr. Burns to make inquiries and interviews to get to the bottom of the faculty's concerns?
MR. LE CONEY: Objection.
A. No.
Q. Did that request from Dr. Khodakhah come before or after the decision to have an investigation?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. My recollection is after.
Again, his request did not factor into our decision to do this, to investigate these allegations.
Q. What did factor into the decision to investigate the allegations?
MR. LE CONEY: Objection, and Dr. Tomaselli, just reminding you that we're asserting privilege over any advice you received from Ms. Lee and others as counsel.
THE WITNESS: Yes, thank you.
A. Well, you have Exhibit 10,

which is again sufficient evidence, we had some information from the student survey demonstrating misconduct on the part of Dr. Khodakhah as it relates to students, more than sufficient evidence to make sure that these -- to determine whether or not these allegations were true.

Q. Sufficient evidence to determine whether or not these allegations were true; what evidence did you have at the time that you received the letter and the survey results?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. Well, documentation from, again, the faculty members listed here and other concurrent reports of behavior that was inappropriate for a chairman of a department.

Q. The documentation you're referring to, is that the February 24th, 2022, letter?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.





A. That's part of it, yeah.

Q. What other documentation did you have at that time?

A. Again, these other verbal reports of mistreatment on the part of others in the Department of Neuroscience.

But I would again argue that this letter alone would be more than sufficient to initiate an investigation.

Q. You mentioned several times a student survey and results from a student survey.

Who conducted that survey?

MS. ESTELA: Objection.

A. Don't recall.

Q. How many surveys were there?

MS. ESTELA: Objection.

A. I don't recall that either, I know there was at least one, but I'm not sure if there were more than one.

Q. How were you made aware of the student survey?

MR. LE CONEY: Objection.

A. So through, again, our





executive committee who had heard and seen the student survey, again, the HR group as well as I think Dr. Burns made mention of it to me as well.

Q. What did Dr. Burns tell you about the student survey?

A. Don't recall specifics, but there was some concerning allegations in there from students.

Q. Did Dr. Burns tell you anything about the nature of the allegations from students?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. I don't recall if Dr. Burns did or I heard it through other means.

Q. Did Ms. Ramirez give you any information regarding the concerns raised by students in the survey?

MS. ESTELA: Objection.

A. I don't recall the specifics there either.

Q. Did you ever see any data or results from the survey?





A. I did, but I don't recall the specifics, just kind of the overall summary.

Q. What can you recall about the overall summary of the survey?

A. Again, some concerning behaviors on the part of the chairman in terms of how he described people with disabilities, how he described students in general.

So those were kind of the main things.

Q. From your recollection, did any of these concerns relate to making gender-based comments to students?

MS. ESTELA: Objection.

A. I believe there were concerns.

Q. Did any of the concerns involve inappropriate physical contact towards students?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. I believe so, but I may be conflating this with subsequent

Page 50

TOMASELLI - CONFIDENTIAL
investigations and concerns about that specific issue.
Q. From your recollection, did any of these concerns address alleged different treatment of students based on their gender?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. Again, don't recall the details.
MS. VINCI: Chelsea, can we pull up what has been marked as Defendants' Exhibit 9, it is just Exhibit 9 in the bank of documents.
THE VERITEXT CONCIERGE: Yes, one moment.
(Pause.)
THE VERITEXT CONCIERGE: Exhibit 9 is available now.
MS. ESTELA: Is there a page you want him to focus on in reviewing; I note this is 24 pages.
Q. My question to you, sir, is going to be, take as long or as short as

Page 51

TOMASELLI - CONFIDENTIAL
you need to review, really my only question is going to be do you recognize this document.
A. I do.
Q. What do you recognize this document to be?
A. One of the student surveys.
Q. What is your understanding as to who performed the survey, who administered it?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. I don't know, I do not know who performed the survey or I don't recall actually.
Q. Is this the student survey that you have been testifying to being advised of that raised concerns of misconduct by students against Dr. Khodakhah?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I think this is the one, but I'm not sure.
I mean, the summary at the end

Page 52

TOMASELLI - CONFIDENTIAL
of the report certainly is of concern.
Q. Prior to today, had you ever seen this survey data?
A. Yes.
Q. Who first showed it to you?
A. Don't --
MS. ESTELA: Objection.
THE WITNESS: Sorry.
A. I don't recall who first showed it to me.
Q. At the time that you learned of the student survey -- strike that.
What is the graduate education committee?
A. What is the graduate education committee?
Q. Yes.
A. Well, it is a committee that oversees graduate education at the College of Medicine, has some oversight responsibilities and looks at programs, looks at faculty, helps to advise the dean regarding graduate education.
Q. In 2022, did each department

Page 53

TOMASELLI - CONFIDENTIAL
have its own graduate education committee?
A. I am not sure if each department had it, certainly the larger departments did.
Q. Did the neuroscience department have one?
A. As I recall, there were committees that were more global in terms of multiple department, but I think the Department of Neuroscience did have a graduate oversight committee.
Q. And do you remember as of February 2022 who the chairperson of that committee was?
A. I do not.
Q. If I said that it was Dr. Bryen Jordan, does that refresh your recollection at all?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
Q. I did not hear the response, sorry, sir; does that refresh your recollection?
A. I know he was at one point and