TOMASELLI - CONFIDENTIAL
if you say that he was at that time, I wouldn't argue with you.
Q. Did you ever have discussions regarding the survey results that we see in Defendants' Exhibit 9 with Dr. Jordan?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. Yes.
Q. Tell me about that discussion, what did you say to him, what did he say to you.
A. I don't recall the details, but as I pointed out about the section that's questions, comments and concerns, there clearly were some concerns on the part of the students regarding the behavior of their chairman.
Q. At the time of learning of this survey, did you speak to Dr. Khodakhah about the results?
A. I don't recall when I spoke to Dr. Jordan about this nor had seen this document, so I don't recall specifically talking about the survey to Dr. Khodakhah.


TOMASELLI - CONFIDENTIAL
I know it was transmitted in communications with him, but that was later.
Q. When you say it was transmitted in communications with him --
A. Letters from myself, letters from HR, letters from a number of sources to him about what was happening at the time in the investigation, et cetera.
Q. Is the him you're referring to Dr. Khodakhah or Dr. Jordan?
A. Dr. Khodakhah.
Q. Is it your testimony that these survey results were transmitted to Dr. Khodakhah during the investigation?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I don't know if they were specifically transmitted, but they were certainly available to review.
Q. Do you know if Dr. Khodakhah ever asked to review the survey results?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.


TOMASELLI - CONFIDENTIAL
A. I do not know.
Q. Do you know if he was ever told that he could review the survey results?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. Do not know.
Q. Did you ever tell him that he could review the survey results?
A. Not that I recall.
MS. VINCI: Chelsea, if we could bring up Exhibit 13, please.
THE VERITEXT CONCIERGE: One moment.
(Pause.)
THE VERITEXT CONCIERGE: Exhibit 13 should be available now.
Q. Dr. Tomaselli, this is another multi-page document that's previously Bates stamped Exhibit 13; take as much or as little time as you require, sir, to look through it.
My first question is going to be have you ever seen this before.
(Witness perusing document.)


TOMASELLI - CONFIDENTIAL
A. I do recall seeing this document, I'm not sure when though.
Q. How did this document first come to your attention?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I don't recall.
Q. Who first showed you this document?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I don't recall that either.
Q. If you look at the first page of the first slide of the document, it is entitled "NGSO Followup Survey Results."
What is the NGSO, if you know?
A. Neuroscience Graduate Student Organization, or something like that I think.
Q. And do you know did that organization have any chairperson or head of the organization?
MR. LE CONEY: Objection.
A. I don't recall.

Page 58

TOMASELLI - CONFIDENTIAL

Q. Were you aware that the NGSO had administered the survey?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. As I mentioned, I don't know who administered the survey.

Q. Is it your understanding that this is a separate survey from the one that we just looked at in Exhibit 9?

A. Yes.

MS. ESTELA: Objection.

Q. Do you have any knowledge as to how the data for this survey was collected?

MR. LE CONEY: Objection.

MS. ESTELA: Objection.

A. I do not know the details or I don't recall the details, anyway.

Q. Have you ever seen the raw data from the survey that was collected?

MR. LE CONEY: Objection.

A. I don't recall.

Q. Did you ever speak to Dr. Bryen Jordan about the results of this NGSO

Page 59

TOMASELLI - CONFIDENTIAL

followup survey?

MS. ESTELA: Objection.

A. I don't recall speaking to him about specific surveys, just in general.

Q. Do you know who prepared this summary of the NGSO followup survey result?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. Don't know.

Q. If you scroll down to page 39 of 41, you will see there is a Bates stamp at the bottom AECOM 438, sir.

(Witness complying.)

A. Yes.

Q. There is a heading there about halfway down the page that says [redacted]

Do you see that?

A. Yes, I do.

Q. And this section includes, among other things, allegations from students that Dr. Khodakhah had engaged in various forms of gender-based misconduct,

Page 60

TOMASELLI - CONFIDENTIAL

would you agree with that?

MR. LE CONEY: Objection.

MS. ESTELA: Objection.

A. I don't know if it is gender-based; it says sexist and racist.

Q. The [redacted] correct?

A. Excuse me?

Q. The [redacted] correct?

A. [redacted]

Q. So, again, in addition to other concerns, this section, would you agree, notes or summarizes allegations that Dr. Khodakhah engaged in misconduct based on students' gender?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. It is interesting, gender is in the title, doesn't appear to be in the body of the text here; sexist, racist, do appear though.

Q. The body of this section does note allegations that Dr. Kamran

Page 61

TOMASELLI - CONFIDENTIAL

inappropriately touched students without their consent, correct?

MS. ESTELA: Objection.

MR. LE CONEY: Objection, are we referring to a specific part, counsel?

MS. VINCI: We can go through it one-by-one.

Q. If you look at the first [redacted]

MS. ESTELA: Can you direct us to where you're reading from, I don't know where you're talking about.

Q. Under [redacted]

Page 62

TOMASELLI - CONFIDENTIAL

[redacted]

Do you see that?

A. Yes.

Q. And [redacted]

A. Correct.

Q. Do you see that, in your estimation, is that behavior based on gender?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. I think either gender could be offended by that frankly.

Q. I'm not saying based on one particular gender, I'm just saying based upon gender.

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

Page 63

TOMASELLI - CONFIDENTIAL

A. Yes, I wouldn't say it is based on gender.

Q. What would you say it is misconduct based on?

A. Just in general it's inappropriate and that extends beyond gender.

Q. Continuing on, [redacted]

Do you see that?

A. Yes.

Q. Would you characterize making sexist remarks as misconduct based upon gender?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. Again, no, not based on gender necessarily.

Q. [redacted]

Page 64

TOMASELLI - CONFIDENTIAL

[redacted]

A. Yes.

Q. [redacted]

Do you see that?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. Yes, I see it.

Q. Would you consider those allegations to be allegations of conduct based on gender?

MR. LE CONEY: Objection.

MS. ESTELA: Objection.

A. Again, overwhelmingly just inappropriate.

Q. [redacted]

Page 65

TOMASELLI - CONFIDENTIAL

[redacted]

Do you see that?

MR. LE CONEY: Objection.

MS. ESTELA: Objection.

MR. LE CONEY: Are we on a different page now?

MS. VINCI: Yes.

A. I don't see that.

(Witness perusing document.)

A. Okay, yes.

Q. Do you see those two students' reports in this summary, sir?

A. Yes.

Q. [redacted]

MS. ESTELA: Objection.

A. Yes.

Q. Do you think that those

TOMASELLI - CONFIDENTIAL

comments are based upon gender?

MR. LE CONEY: Objection.

MS. ESTELA: Objection.

A. I think both genders have orgasms, so, no, I just think it is inappropriate.

Q. Did you understand any of these students to be reporting that Dr. Khodakhah created an uncomfortable environment for female students?

MR. LE CONEY: Objection.

MS. ESTELA: Objection.

A. I think the environment that was created was uncomfortable for all students, not specific genders.

Q. Regardless of what you believe the environment to be, did you understand any of the students to be reporting that Dr. Khodakhah created an uncomfortable environment specifically for females?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

MS. ESTELA: It is not clear what time period you're talking about.



TOMASELLI - CONFIDENTIAL

MS. VINCI: In this survey.

MS. ESTELA: I don't believe the testimony has established that Dr. Tomaselli saw the survey or at what point, so I think we need some clarity about the timing.

Q. In reviewing the survey now -- strike that.

You testified before that you had seen this survey, correct, the results --

MS. ESTELA: Objection, I don't believe that was the testimony.

A. Part of it is timing; I had seen and heard summaries of the surveys.

Q. You had testified that you had seen this document.

A. I had seen this document, I'm not sure of the timing of when I saw it actually.

Q. At the time that you first saw this document, did you understand any of the complaints, as summarized in the survey results, to allege that Dr. Kamran,



TOMASELLI - CONFIDENTIAL

Dr. Khodakhah, my apology, had created an uncomfortable environment specifically for female students?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. The uncomfortable environment was created for all students; if you read further down this document, there are a number of allegations of inappropriate nicknames and a host of other things that would make a student of any gender feel uncomfortable.

Q. I understand.

So it is your testimony that your interpretation of the survey results did not lead you to believe that any part of them raised a concern regarding gender-based misconduct by Dr. Khodakhah?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. Yes, overall aggregate bad behavior; again, not focusing on any one group, because all groups were actually subject to this kind of demeaning kind of



TOMASELLI - CONFIDENTIAL

behavior.

Q. You testified earlier that at least as of the time that you suspended Dr. Khodakhah as chair, the allegations were potential violations of Einstein's code of conduct, is that right?

A. That's correct.

Q. What other policies were in place at Einstein as of that time related to what we would consider inappropriate conduct by a faculty member?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. I am not sure I understand the question.

Q. I will rephrase the question.

At that time did, separate from the code of conduct, did Einstein have any policies related to discrimination?

A. I'm sure that the code of conduct incorporated anything that was related to discrimination, so I'm not sure if there was separate kinds of line items like that.

Page 70

TOMASELLI - CONFIDENTIAL
Q. At that time did Einstein maintain any separate policies related to harassment?
A. I am unaware of if there were separate policies over and above the kind of policies of general behavior for Einstein.
Q. At that time did Einstein maintain a policy related to a law called Title IX?
A. Yes.
Q. In your understanding, sir, what specifically did that policy address, what conduct?
MR. LE CONEY: Objection.
A. Title IX generally referred to kind of misbehavior as it relates to sex, sexuality, those kinds of things.
Again, not gender-specific, but across the board.
Q. To your knowledge, was there any review or assessment by anyone at Einstein as to whether or not the complaints raised by the students against

Page 71

TOMASELLI - CONFIDENTIAL
Dr. Khodakhah implicated Title IX?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. There was no allegations of any Title IX violations until after the original investigation by T&M where several were identified.
Einstein was not investigating -- was not doing a Title IX investigation at that time.
Q. Is it fair to say as of the time these complaints were received, the student survey results and letter of concern were received, Einstein had determined that Title IX was not implicated by the concerns raised?
MS. ESTELA: Objection.
A. No, I wouldn't interpret it that way, it was unknown at that time.
Q. But if Title IX had been implicated by the survey results or letter of concern, then an investigation would have had to follow the Title IX policy, is that right?

Page 72

TOMASELLI - CONFIDENTIAL
MR. LE CONEY: Objection.
A. That is correct, and the Title IX coordinator would have been involved.
Q. Again, that coordinator was Ms. Ramirez, correct?
A. That is correct.
Q. Do you know whether or not Ms. Ramirez did any assessment to determine at the outset of the investigation whether or not Title IX was implicated by the concerns raised?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I do not know.
Q. Did you ever ask her to run such an assessment?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. No, our conversation was that there would be an investigation of all of these allegations at the outset, we would see what that investigation showed.
MS. VINCI: Why don't we take a five or so minute break and come back.

Page 73

TOMASELLI - CONFIDENTIAL
(Recess taken.)
BY MS. VINCI:
Q. Dr. Tomaselli, welcome back from the break.
We have made available what was previously marked as Defendants' Exhibit 15.
Take your time to review the document, sir; my first question to you will again be do you recognize it.
(Witness perusing document.)
A. Yes, I do recognize it.
Q. This appears to be a letter from yourself to Dr. Khodakhah dated March 10, 2022, notifying him of the investigation and suspending him as chair, is that correct?
A. That is correct.
Q. Other than yourself, who, if anyone, made the determination to suspend Dr. Khodakhah as chair?
A. This was discussed amongst the leadership group, but the decision was mine.

Page 74

TOMASELLI - CONFIDENTIAL
Q. Who was the leadership group?
A. We discussed this with Dr. Burns, myself, Yvonne Ramirez and Dana Lee.
Q. What I am going to ask you, sir, is regarding discussions you had with Dr. Burns and Ms. Ramirez regarding this topic.
When I do so, I'm only asking for discussions that you had without counsel, and what I mean by that is counsel was not on the e-mail chain, was not in the room, was not part of the discussion at all.
Did Dr. Burns ever express to you disagreement with the decision to suspend Dr. Khodakhah as chair pending the investigation?
A. No, not that I recall.
Q. Did Ms. Ramirez ever express such disagreement?
A. No, not that I recall.
Q. Did any member of the faculty, the neuroscience faculty, express

Page 75

TOMASELLI - CONFIDENTIAL
disagreement with your decision to suspend Dr. Khodakhah?
A. I do not recall; I certainly never got a written request and it wouldn't have been their place, anyway.
Q. Regardless of whether or not it was their place, can you recall anybody verbally disagreeing with the decision to suspend Dr. Khodakhah?
A. No --
MS. ESTELA: Objection.
A. No, and the only reason I mentioned that is they weren't given an opportunity to protest the removal.
Q. If you look at the bottom, last paragraph on this first page, the last sentence of it reads, "If the results of the investigation confirm that you have violated the college's policies against harassment, discrimination, bullying or other prohibited conduct, you will be subject to disciplinary measures in accordance with our policies."
Do you see that, sir?

Page 76

TOMASELLI - CONFIDENTIAL
A. Yes.
Q. Other than the code of conduct, what policies against harassment, discrimination, bullying or other prohibited conduct are you referring to here?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I don't think there are any other that need to be referred to, it is the code of conduct, any one of those types of behavior would be violation of the code of conduct.
Q. And what policy or policies are you referring to with respect to disciplinary measures?
MS. ESTELA: Objection.
A. So in accordance with Einstein policies, I don't recall the details of those policies, but there are sanctions that are possible and included within the policies.
Q. But sitting here today you cannot recall any particular policy you're

Page 77

TOMASELLI - CONFIDENTIAL
referring to?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. Yeah, I don't recall the specific policy, but the sanctions are everything up to and including dismissal from the College of Medicine.
Q. To your understanding, was the investigation conducted subject to or pursuant to, rather, any particular policy of the college?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. I don't recall.
Q. Did you have any opinion as to whether or not the investigation should proceed pursuant to any particular policy at the college?
MR. LE CONEY: Objection.
A. I'm not sure I even understand the question.
Q. Did you have any opinion as to how the investigation should be conducted?
MS. ESTELA: Objection.

Page 78

TOMASELLI - CONFIDENTIAL
A. My only opinion was that it should be independent.
MS. VINCI: Can you bring up Exhibit 17, please.
THE VERITEXT CONCIERGE: One moment.
(Pause.)
THE VERITEXT CONCIERGE: I am going to have to mark this as 17 A as well and I think we may need to do that moving forward, and so that should be coming through now as 17 A.
Q. Dr. Tomaselli, once again, you can review the document as much or as little time as you need.
My first question will be do you recognize it.
(Witness perusing document.)
A. I do recognize it.
Q. This appears to be an e-mail from yourself to the neuroscience department notifying the department of the investigation as well as Dr. Khodakhah leaving the role of chair, is that

Page 79

TOMASELLI - CONFIDENTIAL
correct?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. That's correct.
Q. And you write here in the third paragraph, "During the pendency of this investigation, Dr. Khodakhah will step down from his role as chair," correct?
A. Which paragraph, third --
Q. Third paragraph, kind of the second really full paragraph, but --
A. Yes, yes.
Q. And we've already established that Dr. Khodakhah chose not to step down, rather you suspended him as chair, right?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. That is correct.
Q. But in your mind, writing here that he will step down from his role is the same as noting that he was suspended from his role, is that right?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.

Page 80

TOMASELLI - CONFIDENTIAL
A. Given the option to step down, if he said no, then he would be suspended, yes.
Q. If the two are the same, why did you not just write that he has been suspended as chair?
MR. LE CONEY: Objection.
A. Not sure about the timing of this with respect to Dr. Burns' conversation with Dr. Khodakhah requesting that he step down.
But, again, giving Dr. Khodakhah the opportunity to step down rather than being suspended was the rationale.
Q. Did you send this to the Department of Neuroscience before or after Dr. Khodakhah had been suspended as chair?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. Don't recall the specific timing, whether or not he had been actually suspended by the time they'd gotten this or whether it was imminent.

Page 81

TOMASELLI - CONFIDENTIAL
Q. Do you recall -- you don't remember the events, whether or not he had rejected to step down as chair as of the time of this e-mail -- strike that.
This e-mail is dated March 10, 2022, correct?
A. Yes.
MS. VINCI: Chelsea, can you bring up what's been marked as Plaintiff's Exhibit 18.
THE VERITEXT CONCIERGE: One moment.
(Pause.)
THE VERITEXT CONCIERGE: That should be available now.
Q. Are you able to access that, sir?
A. Yes.
Q. We've shared what's been previously marked as Plaintiff's Exhibit 18, it is another e-mail, for the record, it is another e-mail correspondence, this one from Dr. Khodakhah to Dr. Burns, copying Ms. Ramirez and Ms. Lee.

Page 82

TOMASELLI - CONFIDENTIAL
I understand you were not a recipient to this e-mail, but do you see that it is dated March 8, 2022, sir?
A. Yes.
Q. And if you look at the first sort of full paragraph that Dr. Khodakhah writes, it starts "as promised."
A. Correct.
Q. It says, "As promised, during the weekend I discussed your suggestion regarding an interim chair with my wife, and we remain strongly opposed."
Do you see that?
A. Yes.
Q. Is it fair to say that as of March 8, 2022, Dr. Khodakhah had rejected the suggestion to step down as chair?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I don't know that, but based on this e-mail, it sounds like it.
Q. But you cannot say whether or not between March 8, 2022, and your e-mail to the department on March 10, 2022, if

Page 83

TOMASELLI - CONFIDENTIAL
you had learned that he rejected --
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I do not recall.
Q. You can put that away, sir.
A. Excuse me?
Q. You can put that away.
Following notice to the department, did any faculty members speak out in support of Dr. Khodakhah to you?
MS. ESTELA: Objection.
A. Don't recall anybody speaking out in support directly to me.
Q. Do you recall learning of faculty members speaking out in support of Dr. Khodakhah to others?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. Don't recall any hearsay, do not recall.
Q. Did any of the faculty question why the college was pursuing an investigation against Dr. Khodakhah?
MS. ESTELA: Objection.

Page 84

TOMASELLI - CONFIDENTIAL
MR. LE CONEY: Objection.
A. I don't recall specific inquiries, although one of the reasons for having at least one of the town halls was to inform the department about the current situation and the plans moving forward.
Q. What were, as you say, the plans moving forward?
MR. LE CONEY: Objection.
A. The plans moving forward were what the college was going to do in response to the letter from the faculty and the results of the student surveys.
Q. Are you familiar with a Dr. Aviv Bergman?
A. I am.
Q. Who is Dr. Bergman?
A. He is a faculty member at the College of Medicine.
Q. Did Dr. Bergman ever ask you why the college was doing an investigation against Dr. Khodakhah?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.

Page 85

TOMASELLI - CONFIDENTIAL
A. I do not recall him asking me that.
Q. Do you recall Dr. Bergman ever telling you that you could just remove Dr. Khodakhah without this investigation?
MS. ESTELA: Objection.
A. No, he didn't have to tell me that.
Q. Whether he had to or not, do you recall if he ever did?
A. No --
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. No, I don't recall him ever saying that to me.
Q. Do you recall Dr. Bergman ever raising a concern that this investigation would hurt Dr. Khodakhah's reputation in the college?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. No, I don't recall ever hearing that from him either.
Q. Who is Dr. John Alpert?

Page 86

TOMASELLI - CONFIDENTIAL
A. John who?
Q. Alpert.
A. Alpert, he is the chair of psychiatry at the Albert Einstein College of Medicine and Montefiore Medicine Academic Health.
Q. Did Dr. Alpert ever raise concern regarding the college's investigation of Dr. Khodakhah to you?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I do not recall him raising any concerns about it.
Q. Did Dr. Alpert ever raise to you disagreement with the decision to continue an investigation against Dr. Khodakhah?
A. I do not recall him ever raising any opposition to the investigation.
Q. Did any students speak to you in support of Dr. Khodakhah following notice of the investigation?
MS. ESTELA: Objection.

Page 87

TOMASELLI - CONFIDENTIAL
A. I do not recall any students speaking to me in favor or opposed.
Q. While Dr. Khodakhah was suspended as chair, did he continue to teach?
A. His lab was still open, he was still mentoring post-docs and students, yes.
Q. During the pendency of the investigation when he was on suspension as chair, did you receive any other complaints from anyone in his lab regarding alleged misconduct?
MS. ESTELA: Objection.
A. I do not recall receiving any communication regarding misbehavior from people in his lab.
Q. Did you receive any further complaints regarding alleged misconduct during that time period from any of the faculty?
MR. LE CONEY: Which time period, objection.
Q. During the pendency of the

Page 88

TOMASELLI - CONFIDENTIAL
investigation while Dr. Khodakhah was suspended as chair.
A. So the one thing that did happen was there was communication regarding the investigation to faculty and to students which he was supposed to refrain from and there were concerns from students about that correspondence.
MS. VINCI: Chelsea, can you bring up Defendants' Exhibit 18.
THE VERITEXT CONCIERGE: One moment.
(Pause.)
THE VERITEXT CONCIERGE: That should be available now as 18 A.
Q. Dr. Tomaselli, I am showing you what's been previously marked as Defendants' Exhibit 18, if you could take a look at that document and let me know when you're ready to proceed.
(Witness perusing document.)
A. Yes.
Q. If we look at Exhibit 18, Defendants' Exhibit 18, the bottom of the

Page 89

TOMASELLI - CONFIDENTIAL
first page is sort of the sender/recipient information for an e-mail from Dr. Khodakhah to what appears to be the neuroscience department, copying you and others, that continues onto the second page, where Dr. Khodakhah is addressing your notice regarding the investigation as well as issues related to the department and things that are happening in the department.
Do you see that?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. Yes.
Q. Is this the e-mail correspondence you testified as having happened during the investigation that Dr. Khodakhah was not supposed to do?
A. I don't understand the question.
Q. You testified just a few moments ago that one thing that did happen during the pendency of the investigation was communication to the faculty and to

Page 90

TOMASELLI - CONFIDENTIAL
students that he was supposed to refrain from.
I'm asking you, sir, is this that such communication?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. Yeah, I think this is one of several.
Q. How many such communications do you recall Dr. Khodakhah sending?
A. I don't recall the number.
Q. How many students complained about Dr. Khodakhah's communication?
A. Don't recall the number and -- yes, don't recall the number.
Q. How many faculty complained about Dr. Khodakhah's communication?
A. Don't recall the number.
Q. What did you do in response to those complaints, alleged complaints, from faculty and students regarding Dr. Khodakhah's communication?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.

Page 91

TOMASELLI - CONFIDENTIAL
A. Again, I'm trying to get the timeline here as correct as I can from recollection.
Ultimately he was suspended from campus because of repeated communications with faculty members, blind copies to other faculty members and other people who we never actually discovered regarding details of the investigation, despite multiple admonitions not to do that.
Q. That occurred after he was removed as chair permanently, correct?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. Yes.
Again, I apologize for the timeline, I've been through this so many times it's kind of difficult for me to kind of keep the timeline straight, but you're correct, that may have been after removal as permanent chair.
Q. I am just asking you specifically during the time what has come

Page 92

TOMASELLI - CONFIDENTIAL
to be known as the chair investigation was going on, so the time that he was suspended but prior to his removal as chair.
Did you receive any complaints from students regarding communications they received from Dr. Khodakhah?
A. I don't recall.
Q. During that same time period, so during the suspension but prior to the permanent removal, did you receive any complaints from faculty regarding communications they received from Dr. Khodakhah?
A. Again, I don't recall.
Q. What was the process during that time to find an interim chair for the neuroscience department?
A. During what time are you referring to, the time that he was suspended?
Q. Yes.
A. So there was a discussion amongst some of the leadership of the

Page 93

TOMASELLI - CONFIDENTIAL
department as well as leadership of the School of Medicine, can't recall who exactly were parts of those discussions, but there were a number, and from those discussions a name became kind of prominent as a good choice for serving as an interim chair.
Q. And who was that, what was that name?
A. Dr. Adam Kohn.
Q. And Dr. Kohn did in fact assume the title or the role of interim chair during Dr. Khodakhah's suspension, correct?
A. Correct.
Q. Did he continue to serve in that role following Dr. Khodakhah's permanent removal as chair?
A. Yes.
Q. During Dr. Khodakhah's suspension as chair and Dr. Kohn's role as interim chair, were you advised of any issues related to how their roles were represented on Einstein's website?

TOMASELLI - CONFIDENTIAL
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. The question is was I advised?
Q. Yes, did you come to learn of any concerns that Dr. Khodakhah raised regarding how his role of chair was being represented on Einstein's website during the period of his suspension?
A. Not that I recall.
Q. Did you have any opinion as to how his role as chair should be represented on Einstein's website during his suspension?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. He wasn't chair, so there shouldn't be a role representing him as chair of the department.
Q. Did you have any expectation that Dr. Khodakhah would return as chair of the department following the investigation?
MR. LE CONEY: Objection.
A. We were waiting to see what the



TOMASELLI - CONFIDENTIAL
investigation would show.
Q. When did you make -- strike that.
Who made the ultimate determination to remove Dr. Khodakhah as chair as a result of the investigation?
A. I did.
Q. When did you make that decision?
A. I don't recall the exact timing, but when we'd gotten the results of the T&M investigation, it was very clear that he would not be able to serve as chair any longer permanently.
Q. Do you recall when you received those results?
A. Don't recall, it was in 2022, probably middle part of the year, but I don't recall.
Q. Prior to receiving those results, did you ever advise any staff members at Einstein that Dr. Khodakhah would not be returning as chair?
MS. ESTELA: Objection.



TOMASELLI - CONFIDENTIAL
MR. LE CONEY: Objection.
A. No, I didn't advise any staff members that he wouldn't be returning.
Q. Do you know an individual woman named Chelsea Pegues, P-E-G-U-E-S, Pegues?
A. Name's familiar, but I'm not sure that I know her.
Q. Did you have any discussions with Chelsea regarding her employment at Einstein and concern that Dr. Khodakhah would return as chair?
MS. ESTELA: Objection.
A. No.
Q. Do you recall ever telling Chelsea not to worry because Dr. Khodakhah would not be coming back?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. No.
MS. VINCI: Chelsea, can you bring up Defendants' Exhibit 19, please.
THE VERITEXT CONCIERGE: One moment.
(Pause.)



TOMASELLI - CONFIDENTIAL
THE VERITEXT CONCIERGE: That should be available now as 19 A.
Q. Dr. Tomaselli, we're showing you what has been previously marked by defendants as Defendants' Exhibit 19.
Please take a look at that, sir, and let me know when you're ready to proceed.
(Witness perusing document.)
A. Okay.
Q. Do you recognize this exhibit, sir, what this document is?
A. Yes.
Q. It appears to be an e-mail from the Office of the Dean, your office, dated March 16, 2022, to the neuroscience department, sort of a followup regarding the investigation against Dr. Khodakhah, is that accurate?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. Correct.
Q. And in the second sentence of the first full paragraph, you type here,

TOMASELLI - CONFIDENTIAL
"We have asked the investigating officials to issue a report to the college that will include a summary of findings and recommendations."
Do you see that?
A. I do.
Q. To your understanding, who would be privy to that summary of findings and recommendations?
A. To my recollection, it would be the leadership of the college and health system as well as the person being investigated.
Q. So Dr. Khodakhah?
A. Correct.
Q. Did you ever discuss with Dr. Khodakhah his ability to review the report?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I don't recall discussing that specifically.
Q. Are you aware that Dr. Khodakhah was not provided an opportunity



TOMASELLI - CONFIDENTIAL
to review the report by the college?
A. No.
Q. Did you ever tell any members of the neuroscience department faculty that Dr. Khodakhah had been provided a copy of the report?
MR. LE CONEY: Objection.
A. I don't recall speaking to any members of the neuroscience faculty about that.
Q. Did you see a copy of the investigator's report with summary findings and conclusions?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. I'm sure I did, but I don't recall it.
I certainly saw summary of the findings, that's for sure, but I am not sure, I can't recall about the detailed report.
MS. VINCI: Chelsea, can you pull up Defendants' Exhibit 21, please.
THE VERITEXT CONCIERGE: That



TOMASELLI - CONFIDENTIAL
should now be available at 21 A.
Q. Dr. Tomaselli, we're showing you what was previously marked as Defendants' Exhibit 21; again, it is a multiple page document, please review the document as much or as little as you feel comfortable.
My question to you is going to be have you ever seen this before.
(Witness perusing document.)
A. I don't recall seeing it in its entirety.
I certainly have seen pieces of it, including the appendices.
Q. Other than the appendices, what, if any, other sections of this report can you recall seeing previously?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I just don't recall, sorry.
Q. At the time that you made the decision to permanently remove Dr. Khodakhah as chair, had you seen the full investigative report as we see here in



TOMASELLI - CONFIDENTIAL
Defendants' Exhibit 21 or just excerpts of it?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I don't recall.
Q. Other than with legal counsel, did you discuss your decision to remove Dr. Khodakhah as chair with anyone from Einstein before actually enacting the removal?
MR. LE CONEY: Objection.
MS. ESTELA: Objection.
A. The summary of the report was presented at a meeting, as I recall, with, again, Dr. Burns and Ms. Ramirez and I think Dana Lee was at that meeting as well, so I'm not sure if I'm supposed to discuss that because counsel was present.
Q. No, I am not asking for the substance of discussions where counsel was present.
Outside of discussions where counsel was present, did you discuss what action should be taken in response to the

findings of the investigation with Dr. Burns?
A. I recall discussing it with both Dr. Burns and Ms. Ramirez.
Again, all of the topics in this report were part of the summary and based on that I made the decision that Dr. Khodakhah should not return as chair of the department.
Q. In those discussions, did Dr. Burns ever express disagreement with the decision not to return Dr. Khodakhah as chair?
MR. LE CONEY: Objection.
A. Not that I'm aware of.
Q. During your discussion, again, outside of the presence of counsel, did Ms. Ramirez express any disagreement with the decision to remove Dr. Khodakhah as chair?
A. No, not that I am -- not that I recall --
MS. ESTELA: Objection.
THE WITNESS: Sorry.




A. No, not that I recall.
MS. VINCI: Chelsea, can you pull back up Defendants' 19, please.
THE VERITEXT CONCIERGE: That should be available in the list as 19 A.
Q. Are you able to pull up Defendants' Exhibit 19, in the list of exhibits on your platform it will be 19 A.
A. Yes.
Q. I want to call your attention again to the first full paragraph, the last section of it starts about three full lines up.
A. Yes.
Q. "Of course, the investigator," do you see that, sir?
A. Yes.
Q. "Of course, the investigator may come across a situation which may lead to a Title IX complaint, and in this case they will quickly notify the person being interviewed that the college's Title IX coordinator should be contacted and a separate process be invoked."




Do you see that?
A. Yes.
Q. Why did you feel the need to mention Title IX in this e-mail?
MR. LE CONEY: Objection.
A. Part of just describing the operations of what was going to happen regardless of what the investigation was about, just process.
Q. As of the date of this e-mail, March 16, 2022, had any students, to your knowledge, raised Title IX concerns regarding Dr. Khodakhah?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. That's why the investigation was happening, because we didn't know.
I mean, we had information that there was misbehavior and who knows what that misbehavior entailed, there weren't specific Title IX kind of allegations at that point, but we were beginning an investigation and I wanted to make sure that the departmental members were clear




on the process.
Q. Did any faculty -- strike that.
Over the course of the investigation there were concerns raised implicating Title IX, correct?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. I'm not sure I understand the question; over the course of what investigation and by whom?
Q. We're only talking about one investigation here, sir.
A. I get it, but by whom?
Q. Were you aware, were you ever made aware, that over the course of the investigation into the student survey results and the letter of concern, that issues were raised relating to Title IX against Dr. Khodakhah?
MS. ESTELA: Objection.
MR. LE CONEY: Objection.
A. Again, the complaints were multi-factorial and again that was one of

the reasons for the investigation being done, is to try and sort out what had happened and what the type and extent of misconduct was.

Q. At any point during the investigation, were you made aware that concerns raised to the investigator implicated Title IX?

MS. ESTELA: Objection.

MR. LE CONEY: Objection.

A. Again, not that I am aware of, we weren't informed during the investigation what the investigation was uncovering.

Q. Did you ever discuss with faculty at Einstein that Title IX charges were going to be brought against Dr. Khodakhah?

MR. LE CONEY: Objection.

MS. ESTELA: Objection.

A. No, I do not recall ever discussing that with faculty.

Q. Who is Pablo Castillo?

A. He is a professor in the





Department of Neuroscience.

Q. Did Dr. Castillo ever report to you that there were Title IX concerns regarding Dr. Khodakhah?

A. Not that I recall.

MS. ESTELA: Objection.

Q. Other than removing Dr. Khodakhah as chair, permanently removing Dr. Khodakhah as chair, did you consider any other sanction to take against him as a result of the investigation?

MR. LE CONEY: Objection.

A. Again, in timing here, really what we were doing was, removal as chair was the sanction at the time for the first investigation.

Q. Was there any avenue to appeal your determination to remove Dr. Khodakhah as chair?

MR. LE CONEY: Objection.

A. No.

MS. VINCI: If we can take another five-minute break, I think I might be able to wrap up, I just want to go back





through my notes.

(Recess taken.)

BY MS. VINCI:

Q. Dr. Tomaselli, do you recall following the end of the chair investigation, so after Dr. Khodakhah was permanently removed as chair, that a Title IX investigation was started against Dr. Khodakhah?

A. Yes.

MS. ESTELA: Objection.

Q. Do you have any understanding as to when the concerns related to that Title IX investigation came to Ms. Ramirez's attention?

MR. LE CONEY: Objection.

MS. ESTELA: Objection.

A. I do not recall the specific dates, but I think it was after the initial chair's investigation, as you referred to it.

Q. I don't have any further questions for you today, sir, thank you.

EXAMINATION BY





MR. LE CONEY:

Q. When Title IX allegations were raised, they were referred to Mr. Ramirez as Title IX coordinator, correct?

A. Correct.

Q. And those allegations were then investigated pursuant to Einstein's Title IX policies, correct?

A. Correct.

MR. LE CONEY: Chelsea, if we can pull up Exhibit 21 A.

THE VERITEXT CONCIERGE: That should be available in the list.

Q. Let me know when you have that pulled up.

A. It is pulled up.

Q. Dr. Tomaselli, you were not responsible for managing T&M's investigation at a day-to-day level, were you?

A. That's correct.

Q. Who was?

A. I believe from the standpoint of the college, I'm not sure that anybody