# EXHIBIT U

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:24-cv-00839-LAK-RFT
-----------------------------------x
KAMRAN KHODAKHAH,
Plaintiff,
- against -
MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC.; MONTEFIORE HEALTH SYSTEM, INC.; MONTEFIORE MEDICAL CENTER; ALBERT EINSTEIN COLLEGE OF MEDICINE; GORDON TOMASELLI; PABLO CASTILLO; BRYEN JORDAN; and JOHN-JANE DOES 1-10,
Defendants.
-----------------------------------x
September 10, 2026
1:30 p.m.

Remote video-teleconference deposition via Zoom of EDWARD BURNS, pursuant to notice, before Jineen Pavesi, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

A P P E A R A N C E S :

NESENOFF & MILTENBERG LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
Attorneys for Plaintiff
BY: GABRIELLE VINCI, ESQ.
gvinci@nmllplaw.com

HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Attorneys for Albert Einstein College of Medicine, Pablo Castillo, Bryen Jordan, Montefiore Health System, Inc., Montefiore Medical Center, and Montefiore Medicine Academic Health System, Inc.
BY: GABRIELLE E. TENZER, ESQ.
gtenzer@heckerfink.com
KATE DONIGER, ESQ.
kdoniger@heckerfink.com
DAPHNA SPIVACK, ESQ.
dspivack@heckerfink.com

ALSO PRESENT:
NEIL MARTIN, Veritext IT Concierge, for beginning of deposition



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the Attorneys for the respective parties hereto that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any notary public with the same force and effect as though signed and sworn to before this Court.



THE COURT REPORTER: Are you going to be ordering a transcript, Ms. Doniger?

MS. TENZER: We will be ordering one if we have not done so already.

THE COURT REPORTER: Okay, thanks.

Do you need a rough transcript?

MS. DONIGER: Yes, please.

(Pause.)

THE COURT REPORTER: Ms. Vince, do you need a rough transcript?

MS. VINCE: No, if I am getting daily transcript, I don't need a rough.

THE COURT REPORTER: Okay, thank you.

(Pause.)

E D W A R D B U R N S, having been first duly sworn remotely upon agreement of all counsel, as hereinafter certified, was examined and testified as follows:

EXAMINATION BY



MS. VINCI:

Q. Could you state your full name for the record, please, sir.

A. Edward Roy Burns.

Q. Good afternoon, Dr. Burns, thank you for being here today.

If you're not already aware, my name is Gabrielle Vinci, I am one of the attorneys representing Dr. Kamran Khodakhah in a case he has brought against Albert Einstein College of Medicine and Montefiore Health Systems.

Throughout today I'll just be referring to those entities as Einstein and Montefiore, is that okay with you, sir?

A. Sure.

Q. We're here this afternoon to take your deposition, which basically means I'll be asking you questions to see what you know and what you remember about the facts and circumstances underlying Dr. Khodakhah's claims.

Have you ever been deposed

Page 6

BURNS

before?

A. Once, about 30 years ago.

Q. So not sure what you remember from the deposition 30 years ago, but for today's purposes I'll go over some guidelines about how logistically today will work and guidelines for the deposition itself.

The first being that all of our answers and questions need to be verbal, it's difficult for the court reporter to take or note in the transcript a gesture such as a nod or some sort of hand gesture.

It's also difficult, especially over Zoom, to decipher between an uh-huh or an um-hum, so if you could please give clear, articulate and verbal responses to my questions, that is very appreciated.

In addition, if you would please allow me to finish my question before starting your answer and I'll show you the same courtesy to allow you to finish your answer before beginning my

Page 7

BURNS

next question, again, for the sake of the transcript, it's difficult to take two people talking over one another.

If at any point in time you don't understand or don't hear my question, please let me know; we will have the question read back to you or I'll rephrase it until it is meaningful to you.

If you answer a question, I'm going to assume that you understood the question as it was posed.

Is that okay?

A. Yes.

Q. If at any point in time the court reporter asks you to repeat your answer, please, as best as possible, just repeat exactly what you said; she's not asking you to change your answer unless you feel necessary, she's just wanting to make sure we have a clear transcript.

Finally, this is a deposition, it is not an endurance test, although some may argue otherwise; you are entitled to take a break whenever you need one, for

Page 8

BURNS

whatever reason you need one. The only caveat to that, sir, is if there is a question pending, please answer that question and then we'll proceed with that break.

Is that okay?

A. Sure.

Q. We are conducting this deposition remotely, we discussed off the record that you are in a room with your counsel, Attorney Tenzer and Attorney Doniger; is anybody else in the room with you, sir?

A. No.

Q. With respect to the screen, the device that you are using for today's deposition, other than the Zoom screen, the Zoom platform, are there any other windows open?

A. No, not that I can see.

Q. I would ask that during the time that we are in the deposition, certainly when on the record and you're giving testimony, that your full attention

Page 9

BURNS

be dedicated to the deposition; if anything comes up that you need to attend to or speak with counsel, again, for whatever reason, we will take a break, okay?

A. That's why I shut off my phone.

Q. And we appreciate that, thank you.

Have you brought any documents with you to the deposition today?

A. No.

Q. Did you review any documents in preparation for today's deposition?

A. Yes.

Q. What documents did you review?

A. Just some e-mails.

Q. E-mails between who, between you and others or people not involving you, what e-mails did you review?

A. E-mails between me and others.

Q. What was the subject of those e-mails?

A. Well, the subject was Dr. Khodakhah, but I have very fuzzy memory of

BURNS

[redacted]

But I'll try to remember as best as I can for the purposes of the deposition.

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]



BURNS

Q. [redacted]

Q. Do you currently suffer from any condition that would affect your ability to understand my questions?

A. No.

Q. Going back to the e-mails that you testified reviewing in preparation for today, you said they were e-mails between you and others regarding Dr. Khodakhah; do you recall who those e-mails were between, you and who were the others?

A. Well, there were e-mails with Yvonne Ramirez.

Q. Did you review any other documents other than the e-mails between you and Ms. Ramirez?

A. Yes, there were some e-mails that I looked at yesterday or two days



BURNS

ago, but I didn't actually remember the e-mails that I received or sent.

Q. The e-mails that you looked at within the last few days, a day or two ago, were those e-mails between you and Ms. Ramirez or other communications?

A. I think predominantly between me and Ms. Ramirez.

Q. Other than e-mail, did you review any other type of document in preparation for today?

A. No.

Q. I am going to say this, I am not looking for the substance of any discussion, just a yes or no at this point, sir; did you speak to anyone in preparation for your deposition?

A. No.

Q. Are you aware of any other depositions that have been taken in this case?

A. No.

Q. [redacted]



BURNS

[redacted]

Are you currently taking any medications, prescription or otherwise, that affect your memory, to your understanding or to your knowledge?

A. No.

"Otherwise," that's very cute, no.

Q. Are you taking any medication, prescription or otherwise, that would affect your ability to understand and respond to my questions today?

A. No.

Q. Are you currently under the influence of any alcohol or any recreational substance?

A. No, that's what I thought you meant.

Q. Oh, I did not mean that.

A. No.

Q. Have you ever been arrested?

A. No.

Q. Sitting here right now in this

BURNS

moment, is there anything you can think of that would inhibit your ability to proceed with the deposition today?

A. No.

Q. Have you ever been a party to your own litigation, sir, either as a plaintiff or defendant?

A. Yeah, about 30 or 40 years ago I was a defendant in a medical malpractice suit and that's what I was deposed on, and it was dismissed of course -- not of course, but it was dismissed.

Q. But other than that suit, you have not been a party to any other litigation?

A. No.

Q. What is your highest level of education, sir?

A. M.D., medical school.

Q. Where did you earn your M.D. from?

A. Albert Einstein.

Q. What degree or degrees did you earn in undergraduate school?



BURNS

A. None, I had a bachelor's degree and my M.D. degree is my highest degree.

Q. What do you have your bachelor's degree in?

A. English.

Q. Where did you earn your bachelors in English?

A. Yeshiva University.

Q. You are currently a professor emeritus at Einstein, correct?

A. Yes.

Q. When did you become a professor emeritus?

A. Upon retirement in July of 2025; emeritus just means retired.

Q. Congratulations on your retirement, sir.

A. Thank you.

Q. Irrespective of your retirement from Einstein, are you currently working anywhere?

A. No.

Q. How long did you work at Einstein, and I understand that there was



BURNS

a restructuring, if you will, regarding Yeshiva's relationship with Einstein --

A. Yes.

I think 45 years would be the correct answer, it transcended the restructuring.

Q. What was the last position you held at Einstein?

A. Executive dean.

Q. For how long were you the executive dean?

A. Approximately 25 years.

Q. What were your job responsibilities as executive dean?

A. I would say dual responsibilities; one, to effect the -- excuse me, I am having a fuzzy moment.

Q. Take your time, sir, please.

A. One is to effect the policies of the dean and, two, to represent the faculty to the dean.

Q. What was the reporting structure between you and the dean?

A. I reported directly to the



BURNS

dean.

Q. And what was the reporting structure between you and the chairs of the various departments of the college?

A. The chairs reported to me or to the dean; they either would speak to me or to the dean, either one.

Q. You are familiar with Dr. Khodakhah, correct?

A. Oh, sure.

Q. You worked with him at Einstein for a long time?

A. Yes.

Q. When did you first meet Dr. Khodakhah?

A. I believe it was on the day that he received his tenure as a full professor.

Q. And at some point Dr. Khodakhah assumed the position of chair of the Neuroscience Department, correct?

A. Yes.

Q. Did you have any involvement in his promotion or his becoming the chair of

Page 18

BURNS
the department?
A. Yes, I chaired the committee that chose him to become chair of the department.
Q. Did you support his candidacy to become chair of the department?
A. Most definitely.
Q. Why?
A. Because he was an accomplished scientist and that is what we most look at for people who are chairs of basic science departments.
Q. Who else was in the running to become chair at the same time as Dr. Khodakhah?
MS. TENZER: Objection.
A. I don't recall other candidates.
Q. At that point, roughly I believe it was 2016 when Dr. Khodakhah was first becoming chair, had you had a chance to work with him in the classroom and see him as a professor?
A. No.

Page 19

BURNS
Q. As of the time that Dr. Khodakhah was promoted to chair, were you aware of any complaints from students regarding his performance as a professor?
A. No.
Q. Or any complaints from students regarding his performance as a mentor?
A. No.
Q. Were you aware of any complaints from faculty regarding his performance in the work environment, how he created the work environment?
A. No.
Q. How would you have described your working relationship with Dr. Khodakhah up until 2022?
A. Excellent.
Q. Would you have considered him a friend?
A. Yes.
Q. Did that relationship change following 2022?
A. No.
Q. Do you still see Dr. Khodakhah

Page 20

BURNS
outside of Einstein?
A. I saw him a couple of weeks ago, we had lunch together.
Q. Other than the lunch a few weeks ago, have you had any communications with Dr. Khodakhah?
A. No.
Q. Gordon Tomaselli is the former dean of the college, correct?
A. Yes.
Q. For what time period did he serve as dean?
A. I don't actually recall the period of time, he served after his predecessor, Dr. Spiegel, I can't recall the dates.
Q. Do you recall who was dean at the time that Dr. Khodakhah became chair?
A. Again, I don't have a clear view of the dates, but Dr. Spiegel was the prior dean to Dr. Tomaselli, so it is one or the other.
Q. During the time that you, Dr. Khodakhah and Dr. Tomaselli worked

Page 21

BURNS
together, were you aware of any issues between Dr. Khodakhah and Dr. Tomaselli?
MS. TENZER: Objection.
A. No.
Q. Were you aware of any complaints that Dr. Khodakhah had regarding Dr. Tomaselli's performance as a dean?
A. No.
Q. Were you aware of any issues Dr. Tomaselli had with respect to Dr. Khodakhah's performance as chair?
MS. TENZER: Objection.
A. Yes.
Q. I understand we're going to get into certain investigations and reports today, but other than that.
A. Other than that, no.
Q. In early 2022, I'm going to bring you to the spring of 2022, you learned of some allegations, some concerns, regarding Dr. Khodakhah's behavior as chair of the department, do you recall that?

Page 22

BURNS
A. Yes.
MS. TENZER: Objection.
A. Yes, I do.
Q. Sorry, I did not mean to cut you off.
At that time what did you learn, sir?
A. I learned that there were some senior members of the faculty that thought that Dr. Khodakhah was not doing a good job as chair.
Q. How did you learn about those concerns?
A. I was asked to meet with some senior members of the faculty, they came into this room actually that we're sitting in now and they informed me that they thought that Dr. Khodakhah was not doing a good job as chair.
Q. Do you recall when that meeting was?
A. No, I don't remember when it was, I just remember it was a Friday because I wanted to go home.

Page 23

BURNS
Q. Who were the senior members of the department that you met with?
A. I'll have to -- if you give me a moment to recall.
Q. Please take your time.
A. Dr. Castillo, Dr. Kohn, Alberto, I forget his last name.
That's who I remember coming to the meeting; there were others, but that's who I remember coming to the meeting.
Q. Dr. Castillo, that's Pablo Castillo?
A. Yes.
Q. And Dr. Kohn, would that be Adam Kohn?
A. Yes.
Q. And would it be Dr. Alberto Pereda?
A. Yes, that's his last name.
Q. What specifically did Dr. Castillo report was his issue or his concern with Dr. Khodakhah's performance as chair?
MS. TENZER: Objection.

Page 24

BURNS
A. All of the people at this meeting said that Dr. Khodakhah did not give proper respect to the senior members of the department.
Q. Did you ever witness Dr. Khodakhah act in a manner that you believed was disrespectful to the senior members of the department?
A. No.
Q. Did they give any examples as to the ways in which Dr. Khodakhah did not properly respect the senior members of the department?
A. They did, but I don't recall what they were.
Q. Was Dr. Tomaselli part of this meeting?
A. No.
Q. What was your response to hearing these concerns from the senior members of the department?
A. They brought to the meeting a letter that discussed their concerns and my response to them was that to send such

Page 25

BURNS
a letter to Dr. Khodakhah would irreversibly harm them in terms of their relationship with their chair, so I urged them to rethink their desire to send this to Dr. Khodakhah and that they should take the weekend to cool off a bit.
Q. Why did you feel that sending their letter would irreversibly harm their relationship with Dr. Khodakhah as chair?
A. Because Einstein is a very collegial institution; for a group of senior faculty members to send such a note to the chair would be very highly unusual and I tried to convince them that they should work things out and just remain collegial.
Q. What was their response to your suggestion?
A. Well, it was a Friday afternoon and I ended the meeting and I told them that they should spend the time rethinking their position.
Q. Following that meeting, and I'm sticking with, let's say, until that

Page 26

BURNS
Monday, did you advise anybody else at Einstein regarding the concerns of senior members in the department regarding Kamran?
A. No.
Q. Did those senior members send the letter to Dr. Khodakhah?
A. Yes, they did.
Q. I am going to share my screen, sir, with an exhibit that was previously marked as Plaintiff's 2.
Are you able to see that on your screen, sir?
A. Yes.
Q. I am going to scroll down to the third page of the document, and by all means, sir, please take your time to review it as much or as little as you need, let me know when you're ready to proceed.
If you need me to scroll or to zoom in, just please say so.
A. Give me a moment, please.
Q. Take your time.

Page 27

BURNS
(Witness perusing document.)
A. Could you scroll up, please.
(Witness perusing document.)
A. Okay.
Q. Have you had a chance to review this page 3 of the document, sir?
A. I'm reading it now.
It seems to be similar to what they said to me on that Friday, that fateful Friday, at least part of it does.
I think it's more detail than what they related to me.
Q. My question to you, sir, would be, to your knowledge, is this the letter, to your recollection, rather, is this the letter that the senior members of the Neuroscience Department shared with you during that Friday meeting?
A. It is a little bit more --
MS. TENZER: Objection.
A. -- it's a little bit more detailed than what they shared with me on that Friday.
Q. If we scroll up to the

Page 28

BURNS
originating e-mail, you see here on page 2 of the document, the e-mail is from Dr. Kohn to Dr. Corrode copying several other doctors in the department, attaching this letter that we see on page 3.
A. Yes.
Q. The e-mail from Dr. Kohn was sent February 24, 2022; does that help refresh your recollection of when you had that initial meeting with the senior members of the department regarding their concerns about Dr. Khodakhah?
MS. TENZER: Objection.
A. Can you repeat the question, please.
Q. So the e-mail sending this letter of concern we see here was sent on February 24th of 2022, a Thursday.
A. Uh-huh.
Q. Does that help to refresh your recollection or sort of orient you in time as to when you met with the senior members of the department, as you termed it, on that fateful Friday?

Page 29

BURNS
MS. TENZER: Objection.
A. I see this e-mail and I'm copied on it, but I don't recall seeing it before the fateful Friday, to use your terminology, if it is okay.
Q. Did you review this letter at the time you received it, this e-mail?
A. Okay, so I reviewed a copy of this letter, not through the e-mail, but this is the letter that they presented to me, although it was not as involved as this letter and it was not signed either.
Q. So I understand that at that Friday meeting the senior members shared a letter with you.
A. Right.
Q. That you urged them to take the weekend to consider sending or reconsider sending?
A. Yes.
Q. And then we see here this letter of February 24th, 2022.
A. Yes.
Q. That I understand you're saying

BURNS

is more detailed than the letter previously shared with you during the meeting.

My question is, when you received this February 24th, 2022, letter over e-mail, did you review it at that time?

A. I don't recall, but since the letter is similar to what I had been shown a couple of days ago, I'm sure I reviewed it.

Q. At the time that you received this letter via e-mail, did you discuss the contents of the letter with any of the signatories to the letter?

A. No.

Q. Did you discuss the substance or the contents of this letter with Dr. Tomaselli, who is copied here at the bottom?

A. Yes, I discussed it with him, I believe it was Monday morning.

Q. What at that time did you and Dr. Tomaselli discuss regarding the



BURNS

letter?

A. I don't recall.

Q. Did you go over any of the specific concerns that were raised in the letter while speaking with Dr. Tomaselli?

A. I must say I don't recall at all what the content of the conversation was, but obviously we had to respond to this letter.

Q. Do you recall Dr. Tomaselli suggesting how the college should respond to the letter?

MS. TENZER: Objection.

A. No, I don't recall what he said, but we were both very concerned about it.

Q. Other than speaking with Dr. Tomaselli after receiving this letter, did you speak to anybody else within Einstein?

MS. TENZER: Objection.

A. I did not.

Q. Did you speak to Dr. Khodakhah at the time that this letter was sent, so



BURNS

around February 24th, 2022, regarding this letter?

A. I don't recall.

Q. Between the time that you met with the senior members of the department and this letter being sent on February 24th, did you speak to Dr. Khodakhah to warn him that members of the department were unhappy with his performance?

MS. TENZER: Objection.

A. I don't recall doing so.

Q. After speaking to Dr. Tomaselli regarding the concerns within the Neuroscience Department faculty, what, if any, other steps did you take to address the concerns raised in the letter?

MS. TENZER: Objection.

A. I don't recall, I personally, don't recall taking any steps.

Q. Do you recall around the same time, February of 2022, learning of alleged concerns that students within the department had concerning Dr. Khodakhah?

A. That was mentioned in the



BURNS

letter, so I believe I must have read the letter.

Q. Separate from what was mentioned in the letter, did you come to learn of any concerns that students had regarding Dr. Khodakhah and his performance or his behavior as chair?

A. No.

Q. Were you aware of at that time, again, February 2022, were you aware of any surveys that were administered to students regarding the department and their experience in the department?

MS. TENZER: Objection.

A. I think this was a practice done in all departments by the graduate school, but nothing specific for neuroscience.

Q. Did you ever learn that there was concern within the Neuroscience Department regarding the results of the survey?

MS. TENZER: Objection.

A. I seem to recall that there

Page 34

BURNS

were concerns, but I'm not aware of what they were specifically.

Q. I am going to share with you again, sir, a document that we will mark, I believe we're up to Plaintiff's 14.

(Plaintiff's Exhibit 14, Bates stamped AECOM 222, was marked for identification, as of this date.)

Q. Are you able to see that, sir?

A. Yes.

MS. VINCI: For the record, Plaintiff's 14 is a one-page document, it is Bates stamped AECOM 222, that would be the little marker here, sir.

Q. Please take your time to review the document, let me know when you're ready to proceed with some questions regarding it.

(Witness perusing document.)

A. I see it, and I see it is addressed to me, so I assume that it was sent.

I don't recall this particular memo.

Page 35

BURNS

MS. TENZER: Wait until she asks you a question.

THE WITNESS: Oh, okay.

Q. So looking at Exhibit 14, you see the e-mail on the bottom is one from Dr. Bryen Jordan to you dated February 22, 2022.

He starts the e-mail saying he hopes to talk to you about concerns regarding Kamran, Dr. Khodakhah.

In February 2022, do you recall Dr. Jordan bringing to your attention concerns he had regarding Dr. Khodakhah?

A. No.

Q. He mentions a recent department survey revealing a generalized mistrust of Kamran among the students.

Do you have any recollection of a survey that the results showed a mistrust of Kamran amongst the students?

MS. TENZER: Objection.

A. No.

MS. VINCI: I saw you say it, Gabrielle, but you're muted, so I don't

Page 36

BURNS

know --

MS. TENZER: It is reflected on the record; I said objection.

Q. Did Dr. Jordan ever show you a survey regarding studentS' concerns about Kamran and his behavior in the department?

A. I don't recall his showing me.

Q. Dr. Jordan's e-mail goes on to state that he, Dr. Jordan, reached out to students himself and received lots of comments.

Do you see that, sir?

A. I see it.

Q. Did Dr. Jordan discuss with you comments he received from students?

A. No, I don't recall ever speaking to Dr. Jordan about this.

Q. Your response to Dr. Jordan was that he could give you a call right then, but you don't recall whether or not he did call you in response to this e-mail, is that correct?

A. That's correct.

Q. I will show you now, sir, what

Page 37

BURNS

we'll mark as Plaintiff's 15.

(Plaintiff's Exhibit 15, Bates stamped 225 and then 220 through 221, was marked for identification, as of this date.)

Q. Again, please take your time to review and let me know when you need me to scroll and when you're ready to proceed.

MS. VINCI: This is Bates stamped 225 and then 220 through 221.

MS. TENZER: Can you clarify why they're missing, was it produced this way or are there pages missing?

MS. VINCI: No, I kind of put it together so that the pages were relevant; the ones in between were on a different topic, so I just put them together as one exhibit, it seemed to be the same sort of chain.

MS. TENZER: What you're saying is this is not the full document, that there were pages taken out of the middle of the document?

MS. VINCI: No, what I'm saying

Page 38

BURNS
is I put together two complete e-mail chains into one exhibit.
MS. TENZER: So it is two different documents smushed together?
MS. VINCI: Correct.
MS. TENZER: Thank you.
Q. Dr. Burns, the first page of this document appears to be an e-mail between yourself and Dr. Freedman copying Dr. Jordan where she advises you that Dr. Jordan had brought up to her some, quote, significant graduate student concerns in the Neuroscience Department, end quote.
A. Yes.
Q. Do you recall receiving this e-mail from Dr. Freedman?
A. Yes, I do.
Q. You respond to her, "I am somewhat aware from Bryen. Let's see how this plays out."
At that time what were you aware of from Bryen?
A. Nothing specific, but he had

Page 39

BURNS
e-mailed me that he has concerns; I don't know any of the specifics.
Q. At the time you had responded back to Dr. Freedman, to your recollection, had you already had a call with Dr. Jordan regarding the student's concerns?
A. I don't recall, I told him to call me, there is an e-mail that says call me; I don't recall his actually speaking to me.
Q. Is it fair to say that you don't recall telling Dr. Jordan -- you don't recall one way or the other whether or not you discussed how to handle the student concerns with Dr. Jordan?
MS. TENZER: Objection.
A. I don't recall actually speaking to Dr. Jordan at all.
Q. The next set of e-mails in this exhibit starts on page Bates stamped AECOM 220, and it is a link or a message from Dr. Freedman to yourself and you respond to her that you received the materials and

Page 40

BURNS
were able to read them, do you see that?
A. Yes.
Q. What materials did Dr. Freedman send you?
A. I don't recall exactly what she sent me, but I assume she sent me the results of the survey.
Q. Do you recall ever seeing the results of the departmental survey?
A. No.
Q. But based on what you did review at the time, per your e-mail, you forwarded the materials to Ms. Ramirez, correct?
A. Correct.
Q. And at that time Ms. Ramirez was the vice-president of human resources and Title IX coordinator, is that right?
A. Yes.
Q. At the time that you forwarded the materials -- strike that.
Other than forwarding the materials to Ms. Ramirez and advising Dr. Freedman that you would, did you have

Page 41

BURNS
anymore discussions with Dr. Freedman regarding the student survey?
MS. TENZER: Objection.
A. I don't recall.
Q. Did you have anymore discussions with Dr. Freedman regarding whatever materials it was that she sent to you?
A. No -- I mean, I don't recall, not no, I just don't recall.
MS. TENZER: Gabrielle, we have been going for almost an hour, would it be okay to take a quick break.
MS. VINCI: Absolutely, take five, ten minutes.
MS. TENZER: That sounds great, thank you.
(Recess taken.)
BY MS. VINCI:
Q. Dr. Burns, we just took a short break --
MS. TENZER: Actually, I think Dr. Burns wanted to say something.
A. In just reviewing my responses,

Page 42

BURNS

I think I perhaps misspoke when you asked me if I had discussed this case prior to the deposition and I answered no, but I also answered that I saw a couple of documents, so obviously I had seen the documents because counsel had shown them to me a day or two before.

MS. TENZER: What he's saying, you asked a question if he had spoken to anyone about the deposition in advance of the deposition and his response was no, but he spoke with counsel in advance.

THE WITNESS: Yes.

Q. Thank you for clarifying that, Dr. Burns.

When you say in reviewing your responses you realized that you had misspoke, what did you review with respect to your prior response?

A. I had --

MS. TENZER: We have realtime.

Q. So you had reviewed the realtime of your testimony during the break?

Page 43

BURNS

A. Yes.

Q. Other than that prior response, having reviewed the realtime transcript, are there any other responses that you wish to change?

A. No.

Q. Dr. Burns, prior to the break we had been discussing notifications that you received regarding various concerns within the Neuroscience Department regarding Dr. Khodakhah and we had referenced a student survey or surveys within the department.

I'm going to show you what we'll mark as Plaintiff's Exhibit 16.

(Plaintiff's Exhibit 16, Bates stamped AECOM 403 through 440, was marked for identification, as of this date.)

MS. VINCI: For the record, it is a multi-page document Bates stamped AECOM 403 through 440.

Q. I'll go through the document, I'll scan through it, sir.

My first question to you is

Page 44

BURNS

going to be have you ever seen this before?

A. I don't recall ever seeing this at all.

Q. Were you aware -- strike that.

Do you have any understanding of what NGSO refers to?

A. I believe it stands for neuroscience graduate survey, I don't know what the O stands for.

Q. Were you aware that the NGSO had conducted a survey regarding students' perception or students' experience within the Neuroscience Department?

MS. TENZER: Objection.

A. Yeah, I believe there was something that came out in that initial -- in the initial... excuse me.

Q. Take your time.

A. -- the initial memo that the chairs sent to Dr. Tomaselli or to Dr. Khodakhah, they referred to something about the graduate students, so it could be that it was that, or it says followup,

Page 45

BURNS

maybe there was more surveys.

Q. But you don't recall sitting here today having ever seen or reviewed these survey results?

A. No, I have not, did not.

Q. In your meetings with the senior members of the department regarding their concerns with Dr. Khodakhah, did you ever ask to see the results of the surveys they were referencing?

A. No.

Q. Do you know if the survey results were ever shared with Dr. Tomaselli?

A. I'm not aware, I just don't know.

Q. Did you ever discuss the fact of the surveys with Dr. Tomaselli?

MS. TENZER: Objection.

A. Could you repeat the question, please.

Q. Did you ever discuss the fact that these surveys had been conducted with Dr. Tomaselli?

BURNS

A. Yes.

Q. What did you discuss with him with respect to the Neuroscience Department surveys?

A. Well --

MS. TENZER: Objection.

A. -- without knowing what the contents of the survey were, we discussed whether some action should be taken.

Q. And what was your opinion with respect to whether or not action should be taken?

A. I believe we decided to send the results to Ms. Ramirez for her input.

Q. Did Dr. Tomaselli in your discussions regarding what steps to take, did he suggest any other action besides referring to Ms. Ramirez?

MS. TENZER: Objection.

A. Not at that time.

Q. Sir, I am going to share on the screen what's been previously marked as Plaintiff's Exhibit 3.

Once again, sir, please take



BURNS

your time to review the exhibit, let me know if you need me to scroll as you read.

My first question to you is going to be do you recognize the exhibit.

(Witness perusing document.)

A. Well, again, since it is an e-mail from Ms. Ramirez to me, I assume I saw it.

I don't recall today whether or not the contents, but I take it as a fact that she sent it to me.

Q. You have no reason to doubt that this was sent to you and that you received it at the time?

A. Correct.

Q. Ms. Ramirez writes at the e-mail at the top of the first page, Bates AECOM 193, she writes that she "has reviewed the materials and the letter of concern as shared by Kamran," Dr. Khodakhah.

At this point do you have any understanding of specifically what material, in addition to the letter of



BURNS

concern, Ms. Ramirez had reviewed?

MS. TENZER: Objection.

A. No, I assume she's referring to the survey.

Q. At this time did you discuss the survey with Ms. Ramirez?

A. No, but I would say that I would not, because it was a confidential survey and there was no need for me to know about it.

Q. She continues to write in her e-mail, "I do not believe we have any Title IX violations."

Do you see that?

A. Yes.

Q. Did you discuss with Ms. Ramirez her determination that there was not any Title IX violation at that time?

MS. TENZER: Objecting.

A. I took it as a matter of fact that there were none.

Q. You trusted her assessment?

A. Yes, exactly.



BURNS

Q. Did you yourself perform any assessment as to whether the concerns raised by faculty and students implicated Title IX?

A. No.

MS. TENZER: Objection.

Q. She continues to write, "I would like to know more about what may have triggered the survey and the letter. I know they referred to administrative turnover/departures as the prime reason, but I suspect there is more."

Do you see that?

A. I see it.

Q. Did Ms. Ramirez ever share with you why she suspected there was more reason to have triggered the survey and letter?

A. No.

Q. Did you suspect or have any suspicions that the reason for the survey and the letter was something other than what had been already shared with you?

MS. TENZER: Objection.

BURNS

A. No.

Q. Did you speak with Dr. Khodakhah regarding HR's inquiry into the letter of concern in the student survey at the time you were learning about it?

MS. TENZER: Objection.

A. No.

Q. Did Dr. Khodakhah ask that you and HR, Ms. Ramirez, conduct an investigation into the concerns that were raised?

A. I don't recall that, it's possible, I just don't recall it.

Q. Looking back again at Plaintiff's Exhibit 2 that we saw earlier today, the initial pages of the document appear to be an e-mail from Dr. Khodakhah to the department copying various other individuals at Einstein, including yourself.

It seems to be a response to that letter of concern that was sent to him, do you see that, sir, and, again, please take your time to review the time



BURNS

until you're ready.

(Witness perusing document.)

A. Continue scrolling, please, it is a long e-mail.

(Witness perusing document.)

A. Okay, I'm prepared to answer questions.

MS. TENZER: Is there more, I just want to make sure you see the whole thing.

(Witness perusing document.)

A. Okay.

Q. Would you agree, sir, that the first part of this exhibit, the first e-mail we see starting on page 1, is Dr. Khodakhah's response to that letter of concern sent by senior members of the department?

A. I think the letter speaks for itself, yes.

Q. And in Dr. Khodakhah's e-mail, if you look here at the second-to-the-last paragraph, the last full paragraph, he writes, "Given the severity of these



BURNS

concerns, I believe it is extremely important that we get to the bottom of it. I've cc'd Ms. Yvonne Ramirez, who leads the HR department, and I would be grateful to her if, together with Dean Burns, they would be kind enough to interview the staff who have departed and our current staff so that they can uncover the facts and can provide me and the dean with their frank assessment."

Do you see that?

A. Yes.

Q. So Dr. Khodakhah is asking that you and HR perform some sort of inquiry into the basis for the department's concerns, correct?

MS. TENZER: Objection.

A. That's what it seems, yes.

Q. What steps did you take to perform such an inquiry?

A. I spoke with Ms. Ramirez and she said she would take care of it.

Q. And what was your understanding of how Ms. Ramirez would take care of it?



BURNS

A. I don't know and I don't recall, but it makes sense to say that she would interview the members of the staff that were let go.

Q. Other than interviewing members of the staff that no longer worked at Einstein, did you and Ms. Ramirez discuss any other steps that would be taken to look into the concerns raised by the letter of concern?

MS. TENZER: Objection.

A. No.

Q. Did you and Ms. Ramirez discuss any steps that would be taken to look into the concerns raised in the results from the student survey?

A. Yes, I asked her to look into that.

Q. And what was your understanding of how she was going to look into that?

A. I don't recall exactly, but I think she wanted to hire an external firm to look into it.

Q. Did you have any opinion as to

Page 54

BURNS

whether or not the investigation should be handled internally versus externally?

MS. TENZER: Objection.

A. No, I completely relied and continued to rely on her, her judgment, she has excellent judgment.

Q. At any point in time during your initial discussions with Ms. Ramirez regarding how to address the concerns raised in the Neuroscience Department, did you disagree with the recommendation that she made?

A. No, she didn't make any recommendations yet, because she wanted to have an external group look at the allegations.

Q. At what point in time did you and Ms. Ramirez meet with Dr. Khodakhah to discuss the concerns raised in the Neuroscience Department?

MS. TENZER: Objection.

A. I don't recall meeting with Dr. Khodakhah about these objections.

Q. I'll show you what we'll mark

Page 55

BURNS

as Exhibit 17, I apologize for the length of the exhibit.

(Plaintiff's Exhibit 17, Bates stamped AECOM 80 through and including 82, was marked for identification, as of this date.)

MS. VINCI: For the record, it is an e-mail chain Bates stamped AECOM 80 through and including 82.

Q. Again, sir, please take your time to review and let me know when you're ready to proceed and my first question will be do you recognize this document.

(Witness perusing document.)

A. Again, I will say that since it is addressed to me, I probably saw it, I just don't recall the contents, but it makes sense to say that I saw it at the time.

Q. So Exhibit 17 appears to me to be, if we start at the initiating e-mail on the last page, AECOM 82, you send an e-mail to Dr. Khodakhah saying you think

Page 56

BURNS

it would be a good idea for you and he to have another face-to-face and then you exchange e-mails with him scheduling such a meeting.

Do you see that, sir?

A. Yes.

Q. And then in Dr. Khodakhah's e-mail of March 4, 2022, he references thanking you for taking time to speak with him the day prior, so March 3, 2022.

Do you see that?

A. Yes.

Q. What, if anything, can you recall from that meeting with Dr. Khodakhah on March 3rd, 2022?

A. So I don't recall the meeting, but I do recall having a conversation with him where I suggested to him that since he was under investigation, it would be very correct for him to temporarily step aside as the chair, because we don't want to have a sitting chair being investigated.

Q. As of March 4, 2022, had a formal investigation into Dr. Khodakhah

Page 57

BURNS

already started at Einstein?

MS. TENZER: Objection.

A. I don't know the dates, I don't remember the dates.

Q. The discussion that you do recall having with Dr. Khodakhah where you suggested he should step down as chair during the investigation, was anyone else party to that discussion?

A. I believe I suggested it to Dr. Tomaselli at the time.

Q. And what was Dr. Tomaselli's response to your suggestion?

A. He agreed that it would be helpful for Dr. Khodakhah to step down temporarily during the investigation.

Q. At that time did Dr. Tomaselli suggest any other actions to be taken against Dr. Khodakhah in light of the investigation?

MS. TENZER: Objection.

A. I don't recall his asking anything.

Q. Did you discuss anything --