# EXHIBIT V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
KAMRAN KHODAKHAH,

PLAINTIFF,

-against- Civil Action No.:
1:24-cv-00839-LAK-RFT

MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF MEDICINE, and JOHN-JANE DOES 1-10,

DEFENDANTS.
-----------------------------------------X

DATE: September 9, 2026
TIME: 2:37 P.M.

** VOLUME I **

HIGHLY CONFIDENTIAL

REALTIME VIDEOTAPED DEPOSITION of the Third-Party Witness, ERIC PRUSAN, ESQ., taken by the Plaintiff, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held remotely, at all parties' locations, before Karyn Chiusano, a Notary Public of the State of New York.

A P P E A R A N C E S:

NESENOFF & MILTENBERG, LLP
Attorneys for the Plaintiff
KAMRAN KHODAKHAH
363 Seventh Avenue ~ Fifth Floor
New York, New York 10001
BY: GABRIELLE VINCI, ESQ.
gvinci@nmllplaw.com

HECKER FINK LLP
Attorneys for the Defendants
MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC. AND
ALBERT EINSTEIN COLLEGE OF MEDICINE
350 Fifth Avenue ~ 63rd Floor
New York, New York 10118
BY: GABRIELLE TENZER, ESQ.
KATE DONIGER, ESQ.
gtenzer@heckerfink.com
kdoniger@heckerfink.com, ESQ.

ALSO PRESENT:
DAN ACOSTA, Concierge
DANA LEE, In-House Counsel,
Albert Einstein
DR. KAMRAN KHODAKHAH

* * *



F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness 30 days after service of the original and one copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial.

* * * *





E R I C P R U S A N, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MS. VINCI:

Q. Please state your name for the record.
A. Eric, ERIC, Prusan, P as in Peter, R-U-S, as in Sam, A-N, as in Nancy.
Q. What is your address?
A. P.O. Box 27, Garden City, New York 11530.
THE COURT REPORTER: Any time you're ready, I'm ready for you.
MS. VINCI: Okay.
MS. TENZER: Can we just -- I'm sorry -- oh, sorry. We were having trouble with the -- with the realtime but apparently it's -- it's up now.
Thank you.
MS. VINCI: Okay.
Q. Good afternoon, Mr. Prusan. My name is Gabrielle Vinci. We met very





briefly right before we went on the record.
As you know, I am counsel for Dr. Kamran Khodakhah, who's also joining me today. And we are here to take your deposition related to an action that Dr. Khodakhah has brought against the Albert Einstein College of Medicine as well as the Montefiore Health System.
Throughout the afternoon, I might just refer to those entities as "Einstein" and "Montefiore" if that's okay with you?
A. That works.
Q. Great.
So, we're here, obviously, for your deposition to basically determine what you know and can recall regarding certain facts and circumstances underlying Dr. Khodakhah's claims.
And you are an attorney yourself, sir; correct?
A. That is correct.
Q. Okay. So, while this might be sort of second nature to you, for the

Page 6

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
record, I'm going to go over just some ground rules for the deposition.
First is: All answers must be verbal.
As well as please allow me to finish my question before you start your answer, and I'll allow you the same courtesy with respect to finishing your answer before I go on to my next question.
Particularly, over Zoom, it's difficult for the court reporter to hear and capture what everyone is saying if we're talking over each other.
If, at any point in time, you don't hear or don't understand a question, please let me know. I will rephrase it to however many times I need to until it becomes meaningful to you.
If, at any point in time, you need a break for any reason, please let me know. We will take a break. I just ask that if there's a question pending, you answer that question, and then we will take that break. Okay?

Page 7

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
A. Understood.
Q. Okay. We are taking this deposition here via Zoom, virtual means.
Where are you currently located, sir?
A. Garden City.
Q. Okay. Are you in your home? In an office? In some other --
A. In my home.
Q. Okay. Is anybody else present in the room you're taking this deposition?
A. No.
Q. Other than the deposition Zoom screen, are there any other windows open on your computer?
A. No.
Q. Okay. I will ask that for the duration of the deposition, at least while we are on the record, that you give your full attention to the deposition.
Again, if you need to attend to any other matters or look into anything else outside of the deposition, just ask for a break. We'll take a break so that

Page 8

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
you can do so. Okay?
A. Yes.
Q. Is there any reason having heard or listened to those guidelines that you believe you would not be able to proceed with today's deposition?
A. No.
Q. Okay. Are you under the influence of any substances, recreational or otherwise, that would inhibit your ability to understand and answer my questions?
A. No.
Q. Okay. Are you -- to your knowledge, do you currently suffer from any medical conditions that would, sitting here today, inhibit your ability to understand and respond to my questions?
A. No.
Q. You are here for this deposition subject to a subpoena; correct?
A. Yes.
Q. So, for the record, I'm going to show what we'll mark as Plaintiff's

Page 9

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
Exhibit 13, continuing from our prior deposition.
(Whereupon, Plaintiff's Exhibit 13, E-mail to Eric Prusan from Gabrielle Vinci of August 31, 2026, attaching the subpoena and notice of deposition, was marked for identification as of this date.)
Q. Are you able to see that, sir?
A. Yes.
Q. Okay. Would you agree with me, sir, that this is my e-mail to you of August 31st, 2026, attaching the subpoena for -- and notice of deposition for you to appear today?
A. Yes.
Q. Okay. Prior to today's deposition, did you do anything to prepare for your testimony?
A. No.
Q. Did you review any documents in preparation for today?
A. No.
Q. And we sort of talked about

documents prior to going on the record, but to reiterate it on the record, do you have any documents related to Dr. Khodakhah or this litigation with you today?

A. No.

Q. When did you first learn about Dr. Khodakhah's lawsuit against Einstein and Montefiore?

A. The first time that you contacted me.

Q. Okay. Did you -- since that first contact, did you speak to anyone besides potential counsel for -- for yourself regarding this lawsuit?

A. Other than Ms. Tenzer to ask her if she was representing me, no.

Q. Okay.

A. And you, of course, but via e-mail, but that was it.

Q. And Ms. Tenzer or Ms. Tenzer's office is not representing you; correct?

A. That is correct.

Q. Are you represented at this deposition by any counsel?





A. Nobody is specifically physically here, no.

Q. Okay. Other than Attorney Tenzer, have you spoken to anyone affiliated with Einstein about this law suit since learning about it?

A. No.

Q. Have you spoken to Dr. Khodakhah about this lawsuit since learning about it?

A. No.

Q. Okay. Where did you earn your law degree from, sir?

A. It's now Western Michigan. At the time it was called Thomas Cooley.

Q. Okay.

A. And I have an LLM in environmental law from Pace University.

Q. Okay. And what year did you earn your LLM?

A. '92.

Q. Okay. And what about your J.D.?

A. '91.





Q. Did you pursue any schooling beyond earning your LLM degree?

A. No.

That was enough.

Q. And are you admitted to practice law in New York?

A. Yes.

Q. When were you admitted?

A. '93.

Q. Have you been admitted to practice law in any other jurisdictions, any other states --

A. Connecticut.

Q. -- or --

A. And the federal courts in New York State, and the Second Circuit Court of Appeals, as well as United States Supreme Court.

Q. And are all those admissions and licenses to practice in those jurisdictions, do you keep them active?

A. Let me rephrase.

I'm not admitted in the Western District. I am admitted and up to date





with all admission information in the Northern, Southern, and Eastern.

Q. Are you currently working as an attorney?

A. Yes.

Q. Where do you work?

A. I work for a firm called Lebedin Kofman. That's L-E-B-E-D-I-N, K-O-F-M-A-N, LLP.

Q. And how long have you been at Lebedin Kofman?

A. About a year and a half.

Q. And what type of law do you practice for that firm?

A. Strictly criminal defense.

Q. Prior to Lebedin Kofman, where were you working?

A. I worked at T&M from -- that's T&M USA from, roughly, February '22 to September of '23.

And then I was on my own from '23 till probably February '25; that's when I started with Lebedin Kofman.

Q. What is, in your own -- in your

Page 14

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
own words, what is T&M USA?
A. T&M USA is a investigation and security firm.
Q. Okay. And what did you do there during your employment?
A. Investigations, and some of their collection of fees work.
Q. What type of investigations did you do for T&M?
A. Well, obviously, I did this one. I did some criminal defense investigations as well.
Q. Prior to working at T&M, had you had experience investigating allegations of misconduct?
A. I was a criminal defense lawyer in my own practice from '93 till I started working for T&M, so I did plenty of investigations regarding clients who were charged with criminal offenses, and divorces as well.
So, specifically, at universities, no; but otherwise, yes.
Q. Okay. Had you had any

Page 15

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
experience prior to working at T&M with investigating --
MS. VINCI: Well, strike that.
Q. If I say or reference something called "Title IX," do you have any understanding of what that is?
A. I understand what it is, yes.
Q. Okay. Prior to working at T&M, did you have any experience conducting any investigations pursuant to Title IX?
A. No.
Q. Okay. Have you had any experience investigating allegations of discrimination in the workplace, whether at a university or a different type of entity?
A. Yes.
Q. What was the extent of that experience?
A. I did multiple state and federal court discrimination cases.
Q. When you say you did multiple cases, that was as an attorney on a case?
A. Yes.
Q. Did you have any experience not

Page 16

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
as an attorney but as an independent investigator investigating claims of discrimination in the workplace?
A. No.
Q. Did you have any -- while working at T&M, did you receive any training related to conducting investigations at universities?
A. Yes.
Q. What training did you receive?
A. From -- from my superiors, they told me how the investigations worked, told me how to conduct them, and I watched them conduct a couple before I started my own.
And I was always under the supervision of somebody whenever I was doing any investigations.
Q. What did your superiors at T&M tell you in terms of how the investigations work?
A. It was more of watch them conduct them, rather than giving specific instructions. So, I would watch interviews, I would speak to them about

Page 17

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
procedures, and then, when they felt that I was ready, they allowed me to start conducting some of my own interviews.
Q. In this sort of observation style or on-the-job training at T&M for investigations, was there a particular investigative style that you were taught to implement?
A. I am not sure I understand the question, but never -- never a discussion with styles. Just how it -- just following their leads.
Q. Okay. And in following their lead, what did you learn in terms of how to conduct an investigative interview?
A. To be as open and honest as I could be with the client about my experience and as open and honest with their answers when drafting reports and keeping my opinions out of it, which was different than being a lawyer.
Q. You conducted an investigation at Einstein in the spring of 2022 regarding allegations of misconduct against

Page 18

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
Dr. Khodakhah.
Do you recall that?
A. Yes.
Q. How did you become involved in that investigation?
A. My superior asked me to conduct some interviews in it.
Q. Who was your superior at that time?
A. I don't remember her first name, but her last name was Kirschstein.
Q. Would that be Laura Kirschstein?
A. Yes.
Q. At the time that Ms. Kirschstein asked you to conduct some interviews as part of the investigation, what, if any, information were you provided regarding --
A. Don't remember.
Q. -- about what it was about?
A. Don't remember.
Q. Were you provided at that time any documents related to the investigation?

Page 19

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
MS. TENZER: I'm going to object.
As we discussed, it was a privileged investigation, and we -- we have privilege over the report, but not over the investigation [sic].
MS. VINCI: Okay.
Q. Other than asking you to conduct interviews for the investigation, did your superior task you with anything else related to the investigation of Dr. Khodakhah?
A. Just writing the report with her supervision. By --
THE COURT REPORTER: I didn't hear you.
A. By "her," I meant Ms. Kirschstein.
Q. Okay. At the time that you were given this assignment, were you told who the parties to the investigation were, meaning it was an investigation at Einstein or an investigation of this particular individual?

Page 20

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
Any specifics related to what the investigation pertained to?
A. Yes.
Q. What were you told?
MS. TENZER: Again, I -- the -- the -- the investigation is privileged.
The report -- we waive privilege over the report, but not over the investigation.
MS. VINCI: I understand, but you can absolutely object.
I am not pushing him, but I am going to ask the question.
And I see -- I acknowledge you're objecting.
MS. TENZER: And I am objecting on privileged grounds.
Q. When did you begin your investigation into Dr. Khodakhah or the allegations against Dr. Khodakhah?
A. I don't remember, but I know it was sometime in the spring of 2022. I believe it was the spring of 2022.

Page 21

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
Q. In the spring of 2022, just talking generally, not -- not necessarily about this investigation, what was your process for starting an investigation, the steps that you typically took? How would you normally run an investigation at that time?
A. Well, at that time, I wasn't running anything, because I was just re- -- I was just hired. So while I knew what I was doing, I knew Ms. Kirschstein was outstanding at this, and I knew that -- that she had a certain way that she liked to do things the way -- you know, so I watched her interviews of people. And based on what I saw in her interviews, I tried to emulate her.
Q. What the --
A. And with the report itself, I would I looked at other reports and tried to make sure my report was somewhat like theirs.
Q. What was the certain way that Ms. Kirschstein liked to run

investigations?
A. Just the way she questioned witnesses and gave them information about who she was.
Q. In what way did she question witnesses?
A. Very professionally, very cordially, and asked direct questions, and let the witnesses do the talking. She never, ever put words into a -- a witness' mouth, nor did she ask leading questions.
Q. And you say that she would ask direct questions, but not leading; is that right?
A. Yes. Yeah.
There's a big -- and I think you understand the nuance of the difference: Yes?
Q. I -- I believe so, but my -- my question to you for the record is: Can you explain the difference in your mind between a -- a direct and a leading question?
A. All right. So, for example, a leading question would be: Do you believe



that such-and-such happened?
But she didn't ask that. She would ask them: What happened?
So, she would never say what she wanted the answer to be in the question.
Q. So, it's fair to say that her style was to ask more open-ended questions of interviewees?
A. Yes.
Q. And is that a style that you adopted?
A. Yes.
Q. And is that a style that you implemented during the investigation at Einstein?
A. Yes.
Q. Did you discuss -- prior to starting the investigation at Einstein, did you discuss with Ms. Kirschstein the scope of your investigation and what you were looking into?
A. Other than that we were investigating alleged comments and actions



by Dr. Khodakhah, no.
Q. Did you discuss with Ms. Kirschstein the way in which you intended to conduct interviews as part of the investigation?
A. As I said before:
I watched her and basically asked the same questions she had asked of other witnesses when I -- when I interviewed the witnesses that I interviewed.
Q. Would you have considered Ms. Kirschstein a co-investigator as part of the investigation at Einstein?
A. No.
She was the boss. I was the co-investigator.
Q. Okay. So, to what extent -- or rather, what was her involvement in the actual investigation?
Did she also interview witnesses?
Was she just who you reported to?



What was the extent of her involvement?
A. She did the first few interviews. After that, I reported to her after every couple of interviews and asked how -- I asked her how she wanted me to proceed.
Q. Did you discuss with Ms. -- Ms. Kirschstein who it was that you were going to interview as part of the investigation?
A. I'm not sure of the question.
You asking me before each witnesses or overall?
MS. TENZER: Again, I -- also just -- I'd like to just make sure and -- and in terms of who was in- -- who was interviewed that would be -- that we would be asserting a privilege over that.
THE WITNESS: (Indicating.)
MS. VINCI: Well, understood, Counsel.
I'm not asking him who was

interviewed. I'm not asking him that information.
Q. I'm asking him right now: When it came to sort of determining who to interview, did you consult with Ms. Kirschstein regarding who it was you wanted to talk to as part of your investigation?
MS. TENZER: Again, the conduct in the investigation is privileged.
We have waived privilege over the report, not over the investigation.
Q. During your investigation, did you have any point of contact at Einstein?
A. I wouldn't call it a point of contact, but I did speak to --
THE WITNESS: Counsel, are you all right with this?
A. -- I did speak with Dana a couple of times.
Q. I'm not asking for the substance of any --
A. Yeah.



So, I did speak to Dana a couple of times during the investigation, but there was no point of contact that I contacted before every interview or any interview.
THE WITNESS: Oh, wait a minute.
My -- they're having trouble with the volume so hang on.
MS. TENZER: Can you --
THE COURT REPORTER: Say that again?
THE WITNESS: I can't hear you.
MS. VINCI: Going in and out.
THE COURT REPORTER: I can't hear you.
THE WITNESS: Yeah.
MS. TENZER: All right.
THE COURT REPORTER: Hold on a second.
Still can't hear you.
MS. VINCI: We can go off the record, while they're --
THE COURT REPORTER: Okay.



Great.
MS. VINCI: -- you can step out.
(Whereupon, a short recess was taken.)
MS. VINCI: I think we can go back on.
Q. Mr. Prusan, we were discussing before the short break that you had sort of watched Ms. Kirschstein and -- and her investigative or interviewing styles being very open and cordial.
You implemented that during your investigation at Einstein; correct?
A. Yes.
Q. Did that style during your investigation ever change?
Meaning, were there any points where you conducted an interview more pointedly or more leadingly, I will say.
A. I don't remember.
I don't think so, but there may have been -- there may have been that time. I just can't say for sure, one way or the



other.
Q. Do you know how many interviews you conducted as part of the investigation?
A. Over 50.
Q. How many interviews did Ms. Kirschstein conduct?
A. Don't remember.
Q. And where would you conduct these interviews over --
A. At the office.
Q. -- Zoom? In person?
A. At the office, over Zoom, and Dr. Khodakhah came to the office.
Q. Now, again, I want us to be sort of more broader at that time your -- your process in general.
Following an interview or --
MS. VINCI: Strike that.
Q. During interviews in investigations, would you take notes during interviews?
A. Either I would take notes or there was a note taker present.
Q. Okay. What would you do with

those notes afterward?
A. I would usually read them and summarize them.
Q. Okay. And then, would you retain them in any file? Destroy them?
What happened after you -- after you would use them to make a summary?
A. No.
I would -- I never destroyed them. They would be -- I kept them for the final report that I was going to write.
Q. Okay. And then, after the final report, what happened to your notes?
A. That, I can't tell you because I left the -- the firm just as the final report was given. But I know I -- I left everything as per our company policy at the company.
Q. In preparing to take interviews or conduct interviews, rather, in the investigation at Einstein, did you go into them with questions, with prepared questions, or prepared goals or was it more like you said: Tell me everything you



know.
A. Tell -- tell me everything you know. I didn't want to have prepared questions, other than the intro questions that I introduced myself and what my job was.
Other than that, it was sort of like a witness on the witness stand that you -- you don't know a lot about, so you ask them questions, open-ended questions.
Q. As part of your investigation, you interviewed Dr. Khodakhah; correct?
A. Yes.
Q. How many times did you interview him?
A. I believe once, in person.
Q. Okay. And do you recall where, sort of, in the order of witnesses he fell? Towards the beginning of you -- your interviews? In the middle? Towards the end?
A. The end.
Q. As of the time that you interviewed Dr. Khodakhah, can you recall



how many other interviews you had done?
MS. TENZER: Again, we waived privilege over the report, but not over the investigation.
Q. As of the time that you interviewed Dr. Khodakhah, had you formed any opinion as to the merits of the allegations against him?
A. No.
Q. Did you approach Dr. Khodakhah's interview in any different way than the other interviews you conducted?
A. Other than preparing questions based on the interviews who I had done, so in that form, I had questions to ask him based on information that I believe I had learned, so in that way it was different. It wasn't as open-ended as the others.
Q. During his interview, did you question him about specific allegations you'd learned from past interviews?
A. Yes.
Q. And did you ask him for his



response to those allegations?
A. Yes.
Q. And in some instances, he would deny the allegations; correct?
A. Yes.
Q. And in other instances, he would not necessarily deny them, but provide context related to what the allegation was.
Do you recall that?
A. Yeah.
I do.
Q. What, if anything --
MS. VINCI: Or strike that.
Q. Did you do anything after hearing Dr. Khodakhah's response to the allegation to follow up on what he was saying was the reason or the response to these -- these accusations?
MS. TENZER: Again, I -- I gave some leeway because you were asking about questions with Dr. Khodakhah, but the priv- -- the privilege stands as to the investigation.

Q. How many interviews did you conduct after Dr. Khodakhah?
A. Don't remember.
Q. Do you recall conducting any interviews after Dr. Khodakhah?
A. I really don't recall. It was four years ago. Over four years ago.
Q. At the end of your investigation, you created a summary report; correct?
A. Yes.
Q. Okay. And that was one of the things that you were tasked with from Ms. Kirschstein; is that right?
A. Yes.
Q. Did Ms. Kirschstein in any way assist you in drafting that report?
MS. TENZER: Again, we're -- the -- the investigation is privileged.
We fully waive privilege over it.
MS. VINCI: And I -- I'm asking about the drafting of the report,



whether or not --
THE COURT REPORTER: One at a time.
I can't get both of you.
One at a time.
MS. TENZER: Again, you can -- the -- the report, we have waived privilege over the report, not over the drafting of the report.
Q. Okay. As of the time that you put together the summary report, had you, yourself, reached any opinion or conclusion as to the allegations against Dr. Khodakhah?
A. No.
That wasn't my job.
Q. Whether or not it was your job, did you have any opinion in your own mind personally about the allegations against Dr. Khodakhah?
MS. TENZER: Objection.
THE COURT REPORTER: I didn't get a response.
Q. When were the --



MS. VINCI: I thought there was an objection.
THE COURT REPORTER: Yeah.
But I didn't get a response, though.
MS. VINCI: Counsel, you objecting on the grounds of privilege?
MS. TENZER: No.
I'm just -- can you repeat the question?
THE COURT REPORTER: Sure.
Q. Whether or not it was your job to do so, did you personally form any opinion as to the merits of the allegations against Dr. Khodakhah as of the time you were drafting your report?
MS. TENZER: Again, I -- I am going to object on the grounds of privilege.
MS. VINCI: His personal opinion in his mind is not -- where is the privilege?
MS. TENZER: It's part of the



investigation. He conducted an investigation, and you're asking him for what was in his mind.
He is the investigator conducting the investigation. I don't think that you can separate.
MS. VINCI: Well, he is separating it. He is saying he didn't do it as part of the investigation; that wasn't his job. I am asking his personal opinion.
MS. TENZER: I -- I -- I -- I don't think we're here to ask for Mr. Prusan's personal opinion. You're -- you're -- you're deposing him as the investigator in this investigation.
MS. VINCI: Of course I was. It's a perfectly reasonable question.
All right. We will mark that for a ruling.
Q. Do you recall when you began drafting your report, Mr. Prusan?
A. Do you mean time frame or

during the investigation?
Q. Time frame.
Do you recall when in time you started to draft your report?
A. Sometime in June. Late May, early June I am guessing. I don't -- you know what? I am guessing. I don't remember.
But if I had to, I would say that.
Q. And at that point, what was the status of the investigation?
A. I can't tell you. I don't remember. I don't remember when I interviewed Dr. Khodakhah, so I can't tell you that.
Q. Who did you deliver your report to once it was completed?
A. Ms. Kirschstein.
And you know what?
I may have sent a copy to Ms. --
MS. TENZER: I -- I -- I -- I stated an objection.



THE WITNESS: Sorry.
THE COURT REPORTER: We didn't hear it.
I just want to let you know, Ms. Tenzer.
I'm sorry.
Q. Following delivery of your report to Ms. Kirschstein, did you have any other involvement in the investigation into Dr. Khodakhah?
A. No.
MS. VINCI: I'll share what was previously marked as Plaintiff's Exhibit 11.
Q. I'll say, Mr. Prusan, if it is -- if it will be easier for you for purposes of -- of questioning to e-mail this to you so that you may peruse it at your own leisure, I will do so.
I -- unfortunately, as we learned before, I cannot use the chat feature for you to open it up separately.
A. Let's see how it goes first and then make a decision.



Q. Sure.
MS. VINCI: For the record: I'm showing the witness what has been previously marked as Plaintiff's Exhibit 11. And it is a multipage document Bates-stamped AECOM00001002 through 1023.
(Whereupon, Exhibit 11, PREVIOUSLY MARKED: Report of Eric Prusan dated July 4, 2022, was tendered.)
Q. And I will quickly scan, sir.
Do you recognize this document?
A. I do.
Q. Can you identify it for the record? What is it?
A. It looks like the report that I drafted in the Dr. Khodakhah investigation.
Q. The report is dated July 4th, 2022.
Do you see that?
A. Yes.
Q. Does that help refresh your recollection as to when it was that you



started to draft your report?
A. It -- I'm -- that makes sense that my earlier answer was correct.
Q. Okay. So, around late May, early June 2022?
A. Yes.
Q. Do you recall how long it took you to draft the report?
A. No.
Q. I want to go through some specific areas in your report and ask you questions about that, sir, if I may.
Looking at Page 3 of the report, this last full paragraph here starts:
"T&M's mandate..."
Can you see that?
A. Yes.
Q. Can you just read that to yourself? Let me know when you have had a chance to do so.
(Witness reviews document.)
A. Okay.
Q. Okay. Where did this

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *

mandate --

MS. VINCI: Strike that.

Q. What is your understanding of -- of where this mandate came from?

Why did you include this in your report?

MS. TENZER: Objection; privilege.

MS. VINCI: I mean, now we're at the report, Counsel, and you're saying that you're -- they waived privilege as to the report and I am asking him about why he included things in his report, and you're claiming privilege.

So, is today's deposition just going to be every question is privileged? You can -- he can confirm what's written in the report and nothing more?

MS. TENZER: As we discussed, the dir- -- the -- the direction of the investigation is privileged, so the -- the -- the mandate -- I mean,



* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *

and where that comes from, that's part of the privilege.

MS. VINCI: No. I am asking what his basis was for including this in the report.

And you're objecting on privileged grounds as to what his basis was for including it in the report?

MS. TENZER: Yes.

I mean, if you want, we can -- we can take a break and --

MS. VINCI: Yeah. Let's take a five-minute break.

MS. TENZER: Okay. Great. Thank you.

(Whereupon, a short recess was taken.)

MS. VINCI: Okay. We'll go back on.

Q. Welcome back, Mr. Prusan. We just took another short break.

Has anybody else -- has anybody else entered the room with you?



* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *

A. One of my sons just came down to get our dog but, other than that, no.

Q. Okay. We're turning your attention back to the report, which is Plaintiff's Exhibit 11 here on the screen.

Beginning at the bottom of the third page, do you see where it writes:

[redacted]

And then it notes, as it continues, for the breakdown of the -- I guess, the categories or status of the -- of the interviewees with respect to faculty member, candid -- Ph.D. candidate students.

Do you see that?

A. Yes.

Q. And then, at the end of the fifth -- of the Paragraph 8 notes the -- the breakdown of the interviewees by gender.

Do you see that?

A. Yes.

Q. Why did you include that in



* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *

your report?

A. I was told to.

MS. TENZER: Again, I just -- this is -- the -- the investigation is privileged.

He -- we -- we would instruct the witness not to respond to the extent it is going to reveal any directions that were given about how to conduct the investigation.

MS. VINCI: And again, Counsel, we understand that you're asserting a privilege.

Regardless of the agreement with assertion of privilege, we're going to ask the questions and you pose your -- your objection, and the day will continue as -- as such.

Q. Who told you to include that breakdown of gender in your report?

MS. TENZER: Again, objection on the grounds of privilege.

Q. Following in the report, you reference here that:

Page 46

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *

[redacted]

Do you see that?

A. Yes.

Q. Okay. What did you tell witnesses regarding who and for what purposes T&M was retained?

A. What I told them was that we were hired to do an investigation of Dr. Khodakhah.

Q. Did any of the witnesses question why an investigation was being conducted?

MS. TENZER: Again, objection on the grounds of privilege.

MS. VINCI: Okay.

Q. What did you explain to witnesses regarding your professional

Page 47

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *

background?

A. I told them I'd been a lawyer for 30 years; did investigations in criminal, matrimonial, and discrimination cases in that 30 years.

Q. Did any witnesses question if you were an attorney for Einstein?

MS. TENZER: Objection; privilege.

Q. What did you explain was the goal of your interviews?

MS. TENZER: Objection; privilege.

Q. What did you share with witnesses regarding who the information would be -- they -- the information they provided would you shared with?

MS. TENZER: Objection; privilege.

Q. Did you have any understanding as to who your report at the end of your investigation would be shared with?

MS. TENZER: Objection; privilege.

Page 48

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *

Q. Did you understand or have any understanding whether or not Dr. Khodakhah would be provided a copy of your report at the end of the investigation?

MS. TENZER: Objection; privileged.

Q. Moving down in that same -- same paragraph, you note here -- follow kind of my cursor. It says:

[redacted]

Do you see that, sir?

A. Yes.

Q. In what way did it appear that witnesses remained concerned they would be retaliated against?

A. They said it.

Q. How many witnesses said that?

A. I can't tell you that. More than one, more than five.

Q. More than ten?

A. I can't remember.

Page 49

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *

Q. And what did you do in response to hearing this fear of retaliation?

A. I told them that it was going to be --

MS. TENZER: Objection.

THE WITNESS: Sorry.

MS. TENZER: I said: "Objection; privilege."

Q. Did you feel that any fear of retaliation from Dr. Khodakhah that the witnesses felt, real or otherwise, impacted the way in which they participated in the investigation?

MS. TENZER: Objection; privilege.

Q. Did you take any steps to assess whether a witness' desire that Dr. Khodakhah not return as chair impacted the way in which they provided information in the investigation?

A. Say that again, please.

Q. Sure.

Did you take any steps to assess whether a witness' fear of

Page 50

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
Dr. Khodakhah returning as chair impacted the way they provided information in the investigation?
MS. TENZER: Objection; privileged.
Q. Did you take any steps to assess whether any witnesses were exaggerating their concerns regarding Dr. Khodakhah in the interest of keeping him from returning as chair?
MS. TENZER: Objection; privilege.
Q. Moving to the bottom of that same page, the last paragraph here references material provided by Einstein, including:
[redacted]
Do you see that?
A. Yes.

Page 51

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
Q. Okay. And at the end of this report, sir, you attach certain documents --
MS. VINCI: I will quickly scan down to that.
Q. -- as sort of exhibits to your report.
Do you see that?
A. Yes.
Q. Why did you not attach all of the documents referenced as having been reviewed?
MS. TENZER: Objection; privileged.
Q. Did you personally review all of the documents that are listed in this paragraph?
A. Yes.
Q. Did you -- did anything in that -- in your review of these survey results, the 2022 survey results --
MS. VINCI: Strike that.
Q. How many surveys did you review as part of your investigation?

Page 52

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
A. I can't recall.
Q. Do you recall if it was two surveys?
A. No.
I don't.
Q. Did anything that you reviewed in the survey results as part of your investigation raise any concern to you as being and implicating Title IX?
MS. TENZER: Objection; privileged.
Q. What was the substance of the correspondence between Dr. Khodakhah and Einstein that you reviewed?
A. I have no recollection exactly what I reviewed or didn't review at all.
Q. Okay. So, you have no recollection of what the -- even general substance of the correspondence you reviewed was?
A. No.
I have no recollection.
I haven't looked at that report in four years.

Page 53

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
Q. Okay. Do you recall the substance of the student course evaluations that you reviewed?
A. At a very general sense, yes, but nothing specific.
Q. Very generally, what was the substance of the course evaluations that you reviewed?
A. That Dr. Khodakhah gave students nicknames.
Q. Anything else from the course evaluations that you can recall?
A. No.
Q. To your knowledge, prior to this investigation, had any student of Dr. Khodakhah's raised a complaint regarding his teaching to Einstein?
THE COURT REPORTER: Regarding his what to Einstein?
MS. VINCI: His -- his teaching.
MS. TENZER: We're having a hard time hearing you, Gab- -- Gabrielle.

Page 54

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
MS. VINCI: I'll move close -- I'll move closer.
A. No.
I have no recollection of that.
Q. Okay. Prior to this investigation, were you aware whether Dr. Khodakhah had ever been reported for any misconduct?
A. Before the investigation started?
Q. Yes.
MS. TENZER: I -- I --
A. No.
MS. TENZER: Object -- objection. I --
Q. Continuing on with your report, the -- you include here a summary of the information gathered, as well as continuing on breaking it down by certain categories.
We see physical touching, racially and politically incorrect comments.
Who determined how to sort of categorize the information in your report?

Page 55

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
MS. TENZER: Objection; privilege.
Q. Throughout the report, would you agree, sir, that you note reports by interviewees of both firsthand and secondhand instances of alleged misconduct by Dr. Khodakhah?
A. I'm not sure I understand what you're asking me.
Q. All right. As seen in your report, we will see here on Page 7, under [redacted]
Do you see that?
A. Yes.
Q. So, some of the witnesses during your investigation reported that things happened to them and some reported that they witnessed things happening to others.
Is that fair to say?
MS. TENZER: Objection.

Page 56

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
A. Yes.
THE WITNESS: I'm sorry.
MS. TENZER: Wait. Wait.
Q. With respect to reports from witnesses as to things that they saw, what, if any, steps did you take to corroborate those reports in your investigation?
MS. TENZER: Objection --
THE COURT REPORTER: I didn't hear you.
Investigation what -- objection what?
Ms. Tenzer, objection what?
MS. TENZER: I said: Objection; privilege.
THE COURT REPORTER: Thank you so much.
Q. In the instances where witnesses reported firsthand accounts, so experiences they themselves allegedly had, did you do anything to determine or interview any witnesses to the alleged event?
MS. TENZER: Objection;

Page 57

* HIGHLY CONFIDENTIAL ~ ERIC PRUSAN, ESQ. *
privilege.
Q. Throughout your report, you note Dr. Khodakhah's response to the allegations; correct?
A. Yes.
Q. Okay. During your interview with Dr. Khodakhah, did you ask him about each specific allegation that you write about here in your report?
A. Do I know if it was every single one? I don't remember. But I am sure -- I know that it was more than a majority. I wanted to be as fair and as unbiased as I possibly could be to him.
Q. As part of your interview with Dr. Khodakhah, did you provide him with any list or -- or document, something in writing that details the specific allegations you were following up on?
A. No.
Q. Why not?
MS. TENZER: Objection; privilege.
Q. How then did you present the

allegations for Dr. Khodakhah to respond to during your interview of him?
A. I asked him.
Q. But sitting here today, you can't recall if you asked him about each and every allegation?
A. Any allegation that was mentioned in the report, he was definitely asked about. And I tried to be as fair and give him every opportunity to re- -- retort to the -- to the allegations.
Remember, my goal was not to present an opinion, just the facts.
Q. Did any witness during your investigation report to you that they believed Dr. Khodakhah engaged in these conduct -- in this alleged conduct for harmful purposes?
MS. TENZER: Objection; privilege.
Q. Your report states that, in fact, witnesses reported they did not believe Dr. Khodakhah engaged in conduct to be hurtful.



Is that true?
A. If it says it in the report, then witnesses said that, yes. I have no recollection of that, specifically.
Q. Okay. To what extent, if at all, did the motivation behind Dr. Khodakhah's alleged conduct influence your investigation?
MS. TENZER: Objection.
A. Zero.
MS. TENZER: Privileged.
Q. During your interview with Dr. Khodakhah, did he provide you or request an opportunity to submit witnesses for you to interview yourself?
A. I don't know if we did it during the interview.
Q. He did that in his subsequent writing to you.
Is that true?
A. Don't remember, but it's possible.
Q. Do you recall whether or not you interviewed anyone as a result of



this -- a suggestion by Dr. Khodakhah to talk to certain witnesses?
MS. TENZER: Objection; privileged.
Q. Your report references that -- on Page 2 here that:
[redacted]
Do you see that?
A. Yes.
Q. Did it ever come to your attention or the concern ever raised that the surveys underlying this investigation were not credible sources of information?
MS. TENZER: Objection; privileged.
Q. Do you recall someone who was [redacted]
A. The name is familiar.



Q. She was interviewed as part of your investigation; is that right?
A. I can't say with 100 percent certainty, but I believe so, yes.
Q. Okay. And [redacted] ad reported to you in April of 2022 that statements of hers had been included in a survey that, in fact, she did not take.
Is that true?
A. I have no recollection of that, no.
Q. Did you ever receive reports from any witnesses that the information they were alleged to have submitted on the surveys was not accurate?
MS. TENZER: Objection; privileged.
Q. Did you do anything yourself to investigate whether or not the results of the surveys as you were -- as you reviewed them were accurate?
MS. TENZER: Objection; privileged.
Q. Mr. Prusan, can you recall the