**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**KAMRAN KHODAKHAH,**

***Plaintiff,***

**v.**

**MONTEFIORE HEALTH SYSTEM, INC., MONTEFIORE MEDICAL CENTER, MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF MEDICINE, GORDON TOMASELLI, PABLO CASTILLO, BRYEN JORDAN, and JOHN and JANE DOES 1-10,**

***Defendants.***

**Civil Action No. 1:24-cv-00839**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., AND ALBERT EINSTEIN COLLEGE OF MEDICINE'S MOTION FOR SUMMARY JUDGMENT**

**NESENOFF & MILTENBERG, LLP**
**Andrew T. Miltenberg, Esq.**
**Stuart Bernstein, Esq.**
**Gabrielle M. Vinci, Esq.**
**363 Seventh Ave, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

***Attorneys for Plaintiff***

## TABLE OF CONTENTS


**INTRODUCTION** ..... 1

**STATEMENT OF FACTS** ..... 2

**I. Plaintiff's Appointment as Chair of the Department** ..... 2

**II. Members of the Department's Efforts to Concoct and Manipulate Reports of Misconduct Against Plaintiff** ..... 4

**III. Einstein's Human Resources Department and Title IX Coordinator Becomes Aware of Alleged Student and Faculty Complaints Against Plaintiff** ..... 5

**IV. Defendants Determine without Sufficient Inquiry that the Allegations against Plaintiff do not even Potentially Implicate Title IX and Deny Plaintiff His Statutorily Protected Procedural Rights in the Chair Investigation** ..... 9

**V. Einstein Ignores Evidence Calling into Question the Validity of the Underlying Complaints Against Plaintiff** ..... 11

**VI. Plaintiff is Removed as Chair of the Department based on the Findings of the Chair Investigation.** ..... 13

**ARGUMENT** ..... 13

**I. Legal Standard on Summary Judgment** ..... 13

**II. Viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that preclude granting summary judgment on Plaintiff's Title IX Claims** ..... 15

**A. Erroneous Outcome** ..... 15

**i. A Reasonable Jury Could Find Articulable Doubt as to the Accuracy of the Chair Investigation** ..... 16

**ii. A Reasonable Jury Could Find the Suggestion that Gender Bias was a Motivating factor in the Chair Investigation** ..... 18

**B. Deliberate Indifference** ..... 22

**III. Viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that preclude granting summary judgment on Plaintiff's State and City Human Rights Laws Claims.** ..... 26

**IV. Viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that preclude dismissal of Montefiore** ..... 27

**CONCLUSION** ..... 28

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 14

*B.B. v. New School*,
No. 17 Civ. 8347, 2018 WL 2316342 (S.D.N.Y. Apr. 30, 2018) .......... 15

*Bautista v. PR Gramercy Square Condo.*,
642 F. Supp. 3d 411 (S.D.N.Y. 2022) .......... 27

*Brierly v. Deer Park Union Free School Dist.*,
359 F.Supp.2d 275 (E.D.N.Y. 2005) .......... 15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 13

*Cronin v. Aetna Life Ins. Co.*,
46 F.3d 196 (2d Cir. 1995) .......... 21

*Doe v. Colgate Univ. Bd. of Trs.*,
760 F. App'x 22 (2d Cir. 2019) .......... 16

*Doe v. Colgate Univ.*,
No. 12 Civ. 1069, 2017 WL 4990629 (N.D.N.Y. Oct. 31, 2017), *aff'd*, 760 F. App'x 22 (2d Cir. 2019) .......... 19

*Doe v. Columbia Univ.*,
831 F.3d 46 (2d Cir. 2016) .......... 18, 21, 26

*Doe v. Columbia Univ.*,
No. 25 Civ. 2132, 2026 WL 810421 (S.D.N.Y. Mar. 23, 2026) .......... 15

*Doe v. Hobart and William Smith Coll.*,
750 F. Supp. 3d 79 (W.D.N.Y. 2024) .......... 16

*Doe v. Rochester Inst. of Tech.*,
No. 21 Civ. 6761, 2024 WL 1051953 (N.D.N.Y. Mar. 11, 2024) .......... 19

*Doe v. Syracuse Univ.*,
457 F. Supp. 3d 178 (N.D.N.Y. 2020) .......... 16

*Doe v. Trs. of Hamilton Coll.*,
No. 22 Civ. 214, 2024 WL 1675130 (N.D.N.Y. Apr. 18, 2024) .......... 19

*Edelman v. NYU Langone Health Sys.*,
141 F.4th 28 (2d Cir. 2025) .......... 22

*Gallo v. Prudential Residential Serv.*,
22 F.3d 1219 (2d Cir. 1994) .......... 13

*Griffin v. Ambika Corp.*,
103 F.Supp.2d 297 (S.D.N.Y. 2000) .......... 15

*Griffin v. Sirva Inc.*,
835 F.3d 283 (2d Cir. 2016)........................................................................................ 27

*Henry v. Wyeth Pharms.*,
616 F.3d 134 (2d Cir. 2010)........................................................................................ 22

*Holcomb v. Iona Coll.*,
521 F.3d 130 (2d Cir. 2008)........................................................................................ 21

*Jaroslawicz v. Seedman*,
528 F.2d 727 (2d Cir. 1975)........................................................................................ 14

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005)........................................................................................ 14

*JP Morgan Chase v. J.H. Elec. of New York, Inc.*,
69 A.D.3d 802 (2d Dep't 2010) ................................................................................... 23

*Kohler v. Ford Motor Company, Inc.*,
93 A.D.2d 205 (3d Dep't 1983) ................................................................................... 23

*Lewis v. Vill. of Deposit*,
40 A.D.2d 730 (1972) .................................................................................................. 23

*McCarthy v. Dun & Bradstreet Corp.*,
484 F.3d 184 (2d Cir. 2007)........................................................................................ 14

*Menaker v. Hofstra Univ.*,
935 F.3d 20 (2d Cir. 2019)................................................................... 18, 19, 24, 26

*Moore v. Johnson*,
147 A.D.2d 621 (1989) ................................................................................................ 23

*Nambiar v. Central Orthopedic Grp., LLP*,
158 F.4th 349 (2d Cir. 2025) ....................................................................................... 22

*Pealo v. AAF McQuay, Inc.*,
140 F.Supp.2d 233 (N.D.N.Y. 2001) ........................................................................... 15

*Pryor v. Jaffe & Asher, LLP*,
992 F.Supp.2d 252 (S.D.N.Y. 2014)............................................................................ 26

*Roe v. Icahn Sch. of Med. at Mt. Sinai*,
No. 25 Civ. 8157, 2026 WL 2655470 (S.D.N.Y. Sept. 9, 2026) ............................... 16, 19

*Roe v. St. John's Univ.*,
91 F.4th 643 (2d Cir. 2024) .................................................................................... 15, 19

*Rule v. Brine, Inc.*,
85 F.3d 1002 (2d Cir. 1996)........................................................................................ 14

*Schiebel v. Schoharie Cent. Sch. Dist.*,
120 F.4th 1082 (2d Cir. 2024) ............................................................................... passim

*Schwapp v. Town of Avon*,
118 F.3d 106 (2d Cir. 1997)........................................................................................ 14

*Shain v. Ctr. for Jewish History, Inc.*,
418 F.Supp.2d 360 (S.D.N.Y. 2005)........................................................................ 21

*Taddeo v. L.M. Berry & Co.*,
526 Fed. Appx. 121 (2d Cir. 2013)........................................................................ 14

*Vengalattore v. Cornell Univ.*,
36 F.4th 87 (2d Cir. 2022) ........................................................................ 19

*Vengalattore v. Cornell Univ.*,
No. 18 Civ. 1124, 2024 WL 4135875 (N.D.N.Y. Sept. 10, 2024) ................. 16, 18, 19, 21

*Winston v. Verizon Servs. Corp.*,
633 F.Supp.2d 42 (S.D.N.Y. 2009) ........................................................................ 26

*Xiaolu Peter Yu v. Vassar Coll.*,
97 F. Supp. 3d 448 (S.D.N.Y. 2015)........................................................................ 19

*Yusuf v. Vassar Coll.*,
35 F.3d 709 (2d Cir. 1994)........................................................................ 15

**Statutes**

20 U.S.C. § 1681(a) ........................................................................ 15

**Rules**

Fed. R. Civ. P. 8........................................................................ 23

Local Rule 56.1 ........................................................................ 2

## INTRODUCTION

Plaintiff Kamran Khodakhah ("Plaintiff" or "Dr. Khodakhah") by and through his undersigned counsel submit this Memorandum in Opposition to Defendants Montefiore Medicine Academic Health System, Inc. ("Montefiore") and Albert Einstein College of Medicine ("Einstein," and together with Montefiore, "Defendants") Motion for Summary Judgment.

This action stems from Defendants' gross mishandling of an investigation against Plaintiff whereby Defendants intentionally and knowingly deprived Dr. Khodakhah of the rights and protections afforded him under Title IX of the Education Amendments of 1972 ("Title IX"). Briefly, Dr. Khodakhah previously served as Chair of Einstein's Department of Neuroscience (the "Department"). Over the course of his tenure as Chair, Plaintiff succeeded in transforming the Department into one of the nation's pre-eminent Neuroscience programs and Einstein's largest Ph.D. program.

In the late Winter/early Spring of 2022, senior faculty members of the Department targeted Plaintiff with knowingly damaging and fallacious allegations of misconduct, including and especially accusations of sexual misconduct, gender based misconduct and discrimination, and sexual harassment. Despite notice and knowledge of these efforts, and acknowledgment of the falsity of the allegations against Plaintiff, Defendants instituted an investigation against Plaintiff using an external investigator (the "Chair Investigation"), something that Plaintiff fully supported. Throughout the Chair Investigation, and here again on their motion, Defendants sought to minimize, if not entirely ignore, the glaringly obvious allegations of sexual and/or gender based misconduct that, on their face, triggered Plaintiff's protections as a respondent under Title IX. As a result, Plaintiff has never been provided the substantive and procedural safeguards afforded to him under both federal law and Einstein' own Title IX Policies, resulting in a complete inability

to sufficiently, let alone effectively, defend against the allegations and supposed evidence against him. As a result, Defendants were able to reach their pre-determined conclusion finding Plaintiff responsible for, among other things, sexual misconduct leading to Plaintiff's removal as Chair.

At issue on this motion is Plaintiff's claims that the Chair Investigation was unlawful under Title IX, the New York State Human Rights Law, and the New York City Human Rights Law. (ECF As discussed herein, the evidence including Defendants' deposition testimonies and the documentary evidence demonstrate that there are numerous issues of fact precluding summary judgment on Plaintiff's remaining claims. Accordingly, Defendants' motion should respectfully be denied in its entirety.

## STATEMENT OF FACTS[1]

Plaintiff respectfully refers the Court to Plaintiff's Response to Defendants' Statement of Material Facts pursuant to Local Rule 56.1, the Defendants' Statement pursuant to Local Rule 56.1, where not disputed, Plaintiff's Additional Statement of Material Facts, the Declaration of Andrew Miltenberg, and all exhibits annexed thereto for a full recitation of the facts relevant to the determination of this motion. For the Court's convenience, Plaintiff provides the following high-level summary of the relevant facts underlying Plaintiff's remaining claims:

### I. Plaintiff's Appointment as Chair of the Department

Plaintiff is a renowned neuroscientist and medical researcher who is employed as a tenured professor of neuroscience, psychiatry and behavioral sciences, and neurology at Einstein, a subsidiary of Montefiore. (56.1 ¶¶ 2-3)._In May of 2016, Plaintiff was appointed to the position of Chair of the Department of Neuroscience (the "Department"). (56.1 ¶ 4). Pursuant to his Chair

[1] Unless cited directly to an Exhibit or a Declaration, all statements of fact contained herein are followed by a citation to the appropriate paragraph number of Plaintiff's or (if undisputed) Defendants' Rule 56.1 Statement as (56.1 ¶ _), which therein contain a fuller citation to the appropriate source for the statement of fact.

appointment letter, Plaintiff's continued appointment a Chair was "subject to performance as determined by the Dean." (56.1 ¶ 5).

As Chair of the Department of Neuroscience (the "Department"), Plaintiff had responsibility, to varying degrees, for, among other things, faculty recruitment, faculty appointment and supervision, faculty evaluations, management of department staff, assistance in ensuring students graduated, student laboratory assignments and lab resources, and addressing student concerns. (56.1 ¶ 4).

Under Plaintiff's leadership as Chair, the Department went from a struggling department with a declining number of faculty and substandard infrastructure to Einstein's largest and most successful department. (56.1 ¶ 4). He is described by his peers as "hands-down the hardest working chair" a "role model chair", and an "exemplar" professional. (56.1 ¶ 4). Plaintiff's esteemed colleagues have commended Dr. Khodakhah for his tenacity, as well as his commitment to diversity, transparency, and fairness. Indeed, the harshest criticism of Dr. Khodakhah from even those that raised concerns regarding him is his tendency to be "gregarious and speak[] his mind", and "express himself in spirited ways" that are sometimes not received well. (56.1 ¶ 4).

In or around 2018, Gordon Tomaselli ("Dean Tomaselli") was appointed Dean of Einstein. (56.1 ¶ 79). Plaintiff maintained a professional relationship with Dean Tomaselli; however, early into Dean Tomaselli's tenure as dean, disagreements arose regarding Dean Tomaselli's performance and support for the College and Department. (56.1 ¶ 81). Plaintiff's disagreements with Dean Tomaselli concerned, among other things, the dean's lack of responsiveness to emails, reneging on offer letters to staff and new hires, failure to address budget concerns for the College and department, and failure to support the animal facility vital to the department's research efforts. (56.1 ¶ 82). As a result of Dean Tomaselli's poor performance, Plaintiff tendered his resignation

as Chair in 2021 which he later withdrew after being persuaded to remain as Chair by Montefiore's Chief Executive Officer, Dr. Philip Ozuah ("Dr. Ozuah"). (56.1 ¶ 84).

## II. Members of the Department's Efforts to Concoct and Manipulate Reports of Misconduct Against Plaintiff

Beginning in February of 2022, senior faculty members of the Department began pressuring students and colleagues for information to be used against Plaintiff in an anticipated complaint of sexual misconduct to Einstein. (56.1 ¶¶ 85, 92). This pressure, and the resulting information forced out of students and faculty, formed the basis of a letter of concern later delivered to Plaintiff, and an anonymous student survey which data has never been actually reviewed and was only summarized by the same offending senior faculty. (56.1 ¶ 85-100).

By way of example, Bryen Jordan ("Dr. Jordan"), chairman of the Department's Graduate Education Committee ("GEC") contacted students to discuss a survey concerning the Department and falsely represented that he was gathering examples to speak directly to Plaintiff about. (56.1 ¶¶ 85-86). One such student Dr. Jordan contacted was [redacted] ("Dr. [redacted] a former graduate student of Plaintiff's laboratory. (56.1 ¶ 87). When speaking with Dr. [redacted] Dr. Jordan described an occurrence where Plaintiff allegedly [redacted] an allegation that was later used as the basis for a Title IX investigation against Plaintiff. (56.1 ¶¶ 87-88). Dr. Jordan sought information from, and the perception of, Dr. [redacted] as a woman in response to the allegation and asked her to provide more information and examples to allegedly discuss with Plaintiff. (56.1 ¶ 89). Instead, Dr. Jordan misused Dr. [redacted] statements without her consent as part of the basis for a later misconduct investigation against Plaintiff. (56.1 ¶¶ 90-91).

By way of further example, in or around February 2022, Pablo Castillo ("Dr. Castillo") and a group of select senior faculty approached other faculty members, including Dr. Jelena Radulovic

("Dr. Radulovic") to pressure them to join in a letter of complaint against Plaintiff. (56.1 ¶¶ 95-96). In particular, Dr. Castillo and his "collaborators" exerted significant pressure on junior faculty to join in complaints against Plaintiff. *Id.* Dr. Castillo, with the knowledge and support of Dean Tomaselli, pursued Title IX allegations and incriminating information/evidence of Plaintiff's alleged sexual misconduct from faculty and students. (56.1 ¶¶ 98-100). This information, months later, became at least the partial basis for two formal Title IX investigations against Plaintiff. *Id.*

### III. Einstein's Human Resources Department and Title IX Coordinator Becomes Aware of Alleged Student and Faculty Complaints Against Plaintiff

In January 2022, a student survey was administered amongst the Department. (56.1 ¶ 12). While purporting to be from the GEC, a faculty body that supports students and their mentors, the GEC did not request that the survey be conducted and there is no basis to confirm its authenticity. *Id*. Plaintiff was only provided a one or two page summary of the survey by Dr. Jordan, chairman of the GEC, before the survey's default report (the "Default Report") were shared with Yvonne Ramirez ("Ms. Ramirez"), Einstein's Title IX Coordinator, and Edward Burns ("Dr. Burns") in February of 2022. (56.1 ¶¶ 13, 18).

The Default Report reflected, among other things, that: (i) 66% of responding students felt connected to their peers outside of the lab; (ii) 57% of responding students felt connected to the faculty; (iii) 80% of responding students felt the Department was collegial; (iv) 46% of responding students were satisfied with the Department's commitment to diversity and creation of an inclusive atmosphere; (v) 80% of responding students were satisfied with the Department's commitment to promoting gender equality; (vi) 51% of responding students felt comfortable or felt neutral about bringing their concerns or making suggestions to Plaintiff; (vii) 60% of responding students were confident or felt neutral about the Department's leadership taking action in response to concerns; and (viii) 68% of responding students were satisfied overall with the Department. (56.1 ¶ 13).

Following the alleged GEC survey, and unbeknownst to Plaintiff, the Neuroscience Graduate Student Organization ("NGSO") conducted another student survey within the Department. (56.1 ¶ 14). A summary of this survey was then shared with Associate Dean for Graduate Programs Victoria Freedman, who shared it with Ms. Ramirez and Dr. Burns on or about February 25, 2022. (56.1 ¶ 18). Notably, the NGSO survey results were never shared; the only information from the NGSO survey shared with Dr. Freedman was a purported summary of the data from the NGSO survey (the "NGSO Summary"). (56.1 ¶¶ 14-18). The NGSO Summary included a summary of alleged student comments charging Plaintiff with misconduct. *Id.* The comments included anonymous allegations of [redacted] by Plaintiff such as:

a. "[redacted]

b. "[redacted]

c. [redacted]"

d. [redacted]

e. [redacted]

f. [redacted]"

g. [redacted]

h. [redacted]

i. [redacted]

j. [redacted]

k. [redacted]"

(56.1 ¶¶ 101-102).

The NGSO Summary also reported that, when asked "if you have witnessed or experienced [Plaintiff] act inappropriately", 53.8% of responses indicated alleged gender-based misconduct and 30.8% of responses alleged sexual misconduct. (56.1 ¶ 103).

Also in February 2022, Plaintiff received a letter (the "Letter of Concern") signed by thirteen faculty in the Neuroscience Department, which stated that its authors were "very much concerned about [the] current state" of the Department, and that they hoped to "make clear how serious the situation [was] and lead to a change in direction and a return to a healthier departmental culture." (56.1 ¶ 19). The Letter of Concern was the same letter Dr. Castillo had pressured senior and junior faculty into signing. *Id.* Of the signatories to the Letter of Concern, one was a Professor Emeritus who had not actively worked for Einstein and had been retired for over a decade, and at least two of the signatories had not presented on campus in several years due to personal medical issues. *Id.*

The Letter of Concern referenced various concerns regarding the state of the Department and Plaintiff's leadership as Chair, and alleged, without any details or specifics, difficulty in hiring and recruiting for the Department, Plaintiff's "autocratic and inappropriate behaviors", as well as the results of a recent survey, which Plaintiff believed to be referencing the purported GEC survey of which he had seen one or two pages of. (56.1 ¶ 21). Plaintiff was puzzled upon receipt of the

Letter of Concern as "a large number of the statements" were "totally wrong" and believed that there had been "some major misunderstanding". (56.1 ¶ 22).

For example, the Letter of Concern referenced "recent departure of three experienced administrators" as being due to their interactions with Plaintiff. (56.1 ¶ 22). None of the staff or administrators referenced reported their reason for leaving the Department as having anything to do with their interactions with Plaintiff. *Id.* The Letter of Concern further referenced "recent failures to fill vacancies in the office" as being due to low office morale caused by Plaintiff. *Id.* Any diminution of morale in the Department was caused by the inability to hire and recruit new employees due to budgetary constraints, and the resultant effect it had on the workload of those in the Department. *Id.* Plaintiff went to great lengths to work with Dean Tomaselli to address recruitment and budgetary issues to address these concerns but was rebuffed by the dean. *Id.* Indeed, all of Einstein's departments experienced difficulties recruiting staff following the COVID-19 pandemic. *Id.* Adding to this difficulty was a "pause" on hiring and salaries at Einstein following the pandemic. *Id.*

Plaintiff responded to the Letter of Concern in a February 25, 2022 email to the Neuroscience faculty, Ms. Ramirez, Dean Tomaselli, and Dr. Burns. *Id.* In Plaintiff's response to the Letter of Concern, Plaintiff addressed the categories of concerns referenced in the Letter of Concern, including the reference to departure of staff, difficulty recruiting, student survey results, and invited the faculty to meet with him so he could "hear your specific concerns to see how I can serve the department better." *Id.* Dr. Khodakhah also requested that Ms. Ramirez and Dr. Burns "interview the staff who have departed, and our current staff, so that they can uncover the facts, and can provide me and the Dean with their frank assessment." *Id.* In doing this, Plaintiff wished for HR to conduct an investigation into the faculty's concerns. *Id.*

### IV. Defendants Determine without Sufficient Inquiry that the Allegations against Plaintiff do not even Potentially Implicate Title IX and Deny Plaintiff His Statutorily Protected Procedural Rights in the Chair Investigation

As of February 2022, Einstein maintained a Title IX Gender Based Misconduct, Discrimination and Harassment Policy and Complaint Procedures policy (the "Title IX Policy") as applicable to both employees, students, and non-students. (56.1 ¶¶ 72-74, 104-106). The Title IX Policy, and its various versions and editions from 2018 through 2022 and continuing, prohibited sexual harassment and mandated that allegations of potential Title IX-Sexual Harassment follow a strict investigative and adjudicative process. *Id.* Einstein's 2018, 2020 and 2022 versions of the Title IX Policy defined Title IX-Sexual Harassment as "any *unwelcome* or *unwanted* sexual advances, or other verbal, physical, demonstrative, or electronic conduct or communication of a sexual nature, or which is directed at an individual because of the individual's sex. *Id.*

The 2018, 2020, and 2022 Title IX Policies all provided the following examples of potential Title IX-Sexual Harassment: "comments of an overtly sexual nature"; "remarks of a sexual nature about an individual's clothing or body"; "remarks speculating about an individual's sexual orientation, activity or previous sexual experiences"; "verbal harassment of abuse of a sexual nature"; "making offensive gender-based remarks"; "unwanted touching, hugging, or brushing against an individual's body"; "bullying, yelling, or name-calling"; and "sexually discriminatory remarks made by someone which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation…" (56.1 ¶¶ 106). On their face, the allegations raised in the NGSO Summary [redacted] violation under the 2018, 2020, and 2022 Title IX Policies, mandating that Einstein follow its Title IX Policy in investigating the allegations against Plaintiff. (56.1 ¶ 107).

Despite this, mere days after reviewing the NGSO Survey, Letter of Concern, and Default

Report, Ms. Ramirez determined that there were no Title IX violations and "nothing that rises to the level of sexual misconduct…". (56.1 ¶ 109). Ms. Ramirez came to this determination because the allegations (i) included some non-gender or sex-based allegations, (ii) were anonymous and would have taken more work than Ramirez was willing to do to further investigate, and (iii) consisted of secondhand accounts of alleged behavior. (56.1 ¶ 110). However, none of these are actual barriers to finding that allegations raise a potential Title IX violation and Ms. Ramirez admitted that that at least some of the allegations in the NGSO Summary "could have" implicated Title IX. (56.1 ¶¶ 111-112). Despite this Ms. Ramriez conceded that she did not do any further investigation into whether Einstein should pursue an investigation pursuant to the Title IX Policy. (56.1 ¶ 112). Nor did Dr. Burns, who "took it as a matter of fact" that Title IX was not even potentially implicated, or Dean Tomaselli who was of the belief that the gender-based complaints in the NGSO Summary were not gender-based because "either gender could be offended". (56.1 ¶¶ 113-115).

In response to the student surveys and Letter of Concern, Ms. Ramirez, Dr. Burns, and others at Einstein, including Dean Tomaselli and Legal Counsel, determined the best approach to investigate the allegations raised. (56.1 ¶ 25). During meetings with Plaintiff, Plaintiff suggested, if not insisted upon, the hiring of an outside investigator to conduct what should have been an unbiased inquiry into the allegations against him. (56.1 ¶ 25). During discussions with Dr. Burns, Plaintiff was asked to step down as Chair during the pendency of an investigation, a suggestion Plaintiff flatly and unequivocally rejected. (56.1 ¶ 25).

Ultimately, it was determined, with Plaintiff's full support, to have an external investigator conduct an investigation. (56.1 ¶ 27). Notably, before formal notice of the investigation was provided to Plaintiff or the Department, Einstein had already determined that Plaintiff would not

be permitted the ability to appeal or contest any findings, and intended to present and force Plaintiff to agree to such terms. (56.1 ¶ 28). Despite a vast number of allegations against Plaintiff implicating potential violations of Title IX, Einstein determined not to conduct a Title IX investigation. Rather, a general investigation using an outside investigator, Eric Prusan ("Mr. Prusan" of T&M USA LLC was instigated (the "Chair Investigation"). (56.1 ¶¶ 40, 115).

On March 10, 2022, Dean Tomaselli formally notified Plaintiff of the Chair Investigation and suspended Plaintiff's as Chair during the pendency of the investigation. (56.1 ¶¶ 31-33). Despite unequivocally having suspended Plaintiff, Dean Tomaselli lied to members of the Department and stated that Plaintiff would step down from his position as Chair. (56.1 ¶ 35). This was a blatant and intentional falsity. (56.1 ¶ 35). As part of the Chair Investigation, Plaintiff submitted what he believed to be relevant evidence to Mr. Prusan and sat for an over four hour interview with Mr. Prusan. (56.1 ¶¶ 42-45). The bulk of the interview focused on Mr. Prusan's impression that "Dean Tomaselli was against [Plaintiff]". Only roughly 45 minutes of the interview was dedicated to Plaintiff answering Mr. Prusan's pointed questions regarding the allegations against him. *Id*.

## V. Einstein Ignores Evidence Calling into Question the Validity of the Underlying Complaints Against Plaintiff

During the investigation, faculty and students raised concerns regarding the validity of the underlying survey data and the manner in which Einstein was pursuing the investigation against Plaintiff. (56.1 ¶ 119). By way of example, in or around March of 2022, Dr. [redacted] learned that statements she had made in confidence to Dr. Jordan were included, without her consent, in the NGSO Summary. (56.1 ¶ 120). On April 14, 2022, Dr. [redacted] notified Mr. Prusan and Ms. Ramirez that Dr. Jordan had manipulated statements she made to him in confidence and, without her consent, included them in the NGSO Summary in "a derogatory manner" and in such a way as

to "change[] the nature of the conversation to the extent that it comes off as a very harsh allegation, that is now part of an investigation that is damaging [Plaintiff's] career…" (56.1 ¶ 121). Despite knowledge that Dr. [redacted] statements were improperly and without her consent, included in the NGSO Summary, they remained as part of the basis for the investigation and the claims against Plaintiff were not changed to reflect the inaccuracy of Dr. [redacted] alleged allegation. (56.1 ¶ 122). Additional students also reported that their statements regarding interactions with Plaintiff had been twisted and manipulated into salacious allegations of misconduct which they never personally lodged or agreed to. (56.1 ¶ 123).

Ms. Ramirez still took no steps to determine whether the remaining allegations in the NGSO Summary were similarly tainted or false. (56.1 ¶ 124). Moreover, as of March 3, 2022, Ms. Ramirez was aware that students wanted their comments removed from the NGSO Summary and advised that the comments could be removed but that the students should be assured before they asked to remove comments that the NGSO Summary would never be shown to Plaintiff. (56.1 ¶ 125). Ms. Ramirez had already shown Plaintiff the NGSO Summary including the students' alleged comments. (56.1 ¶ 126).

By way of further example, several faculty members met with Dr. Burns and Ms. Ramirez to express concern over the targeted attack on Plaintiff and the manner in which Einstein was handling the investigation. (56.1 ¶ 127). Ms. Ramirez took no action to investigate reports that the allegations against Plaintiff were not raised in good faith. (56.1 ¶ 128). Moreover, several faculty members were interviewed as part of the investigation conducted by Mr. Prusan including, but not limited to, [redacted]. (56.1 ¶ 129). Dr. [redacted] met with Mr. Prusan on or about April 20, 2022. During his interview, Dr. [redacted] shared [redacted]

[redacted]. (56.1 ¶ 130). In response, Mr. Prusan [redacted]. Dr. Alpert met with Ms. Ramriez and Dr. Burns to express his concerns regarding the handling of the investigation. (56.1 ¶¶ 132-133). Rather than substantively address, Dr. Alpert's concerns, Ms. Ramirez and Dr. Burns implored Dr. Alpert to convince Plaintiff to resign. *Id*.

### VI. Plaintiff is Removed as Chair of the Department based on the Findings of the Chair Investigation.

On or about July 4, 2022, Mr. Prusan provided Einstein with an investigative summary report (the "Report") summarizing his factual findings from the Chair Investigation. (56.1 ¶ 48). Despite knowledge of Plaintiff's desire and demand to view the Report, Plaintiff was never permitted a copy of the Report to review. (56.1 ¶ 118).

Based upon the findings of the Chair Investigation, as "confirmed" in the Report, Plaintiff was permanently removed as Chair of the Department. (56.1 ¶¶ 58-59). In a letter dated July 11, 2022, Dean Tomaselli based the decision to remove Plaintiff as Chair on the Report's confirmation that Plaintiff (allegedly) engaged in repeated instances of misconduct including alleged [redacted]. (56.1 ¶¶ 58-61). Plaintiff's removal as Chair did not impact Plaintiff's position as a tenured faculty member, which he continues to hold to date. (56.1 ¶ 61).

## ARGUMENT

### I. Legal Standard on Summary Judgment

The Second Circuit has ruled that the granting of a motion for summary judgment is a drastic remedy, which must be used "sparingly." *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219 (2d Cir. 1994). The burden is on the moving party to establish the absence of any material factual issues. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In making this determination, the

court "must resolve all ambiguities, credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment, and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 484 F.3d 184 (2d Cir. 2007). A fact is "material" if it is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In reviewing such a motion, "the judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). If there are any doubts as to the existence of a triable issue of fact or if a material issue of fact is arguable, summary judgment must be denied. *Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir. 1975).

The Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Taddeo v. L.M. Berry & Co.*, 526 Fed. Appx. 121, 122 (2d Cir. 2013). For this reason, the Second Circuit has repeatedly cautioned against granting summary judgment in employment discrimination cases because the employer's intent is often at issue and is difficult to determine. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Indeed, "in the context of employment discrimination cases, summary judgment is 'ordinarily inappropriate' because the

allegations therein require exploration into an employer's motivation and intent for an employment decision." *Pealo v. AAF McQuay, Inc.*, 140 F.Supp.2d 233, 236 (N.D.N.Y. 2001) (*quoting Griffin v. Ambika Corp.*, 103 F.Supp.2d 297, 306 (S.D.N.Y. 2000)); *Brierly v. Deer Park Union Free School Dist.*, 359 F.Supp.2d 275, 289 (E.D.N.Y. 2005) (Opining that "[s]ummary judgment … should be granted with caution in employment discrimination cases").

For the reasons set forth below, Defendants' Motion should be denied in its entirety.

## II. Viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that preclude granting summary judgment on Plaintiff's Title IX Claims

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). Hence, "Title IX bars the imposition of [] discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

A person accused of sexual misconduct who alleges the university discriminated on the basis of the plaintiff's sex when disciplining the plaintiff, may allege both an "official action" claim or a deliberate indifference" claim. *See Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1096-1097 (2d Cir. 2024). *See also*, *Doe v. Columbia Univ.*, No.: 25 Civ. 2132, 2026 WL 810421, at *5 (S.D.N.Y. Mar. 23, 2026) (*citing B.B. v. New School.*, No.: 17 Civ. 8347, 2018 WL 2316342, at *4 (S.D.N.Y. Apr. 30, 2018)).

### A. Erroneous Outcome

The crux of an erroneous outcome claim is that "due at least in part to plaintiff's sex, the [defendant] wrongly concluded that the plaintiff committed misconduct." *Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024) To prevail on a Title IX erroneous outcome claim, a plaintiff

must demonstrate "(1) [] some articulable doubt [as to] the accuracy of the outcome of the disciplinary proceeding, and (2) circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Roe v. Icahn Sch. of Med. at Mt. Sinai*, No. 25 Civ. 8157, 2026 WL 2655470, at *3 (S.D.N.Y. Sept. 9, 2026). *See also*, *Doe v. Hobart and William Smith Coll.*, 750 F. Supp. 3d 79, 98 (W.D.N.Y. 2024); *Doe v. Syracuse Univ.*, 457 F. Supp. 3d 178, 200 (N.D.N.Y. 2020); *Doe v. Colgate Univ. Bd. of Trs.*, 760 F. App'x 22, 30 (2d Cir. 2019).

Defendants argue that Plaintiff's erroneous outcome claim must fail because Plaintiff does not challenge a factual finding but Dean Tomaselli's discretionary personnel decision. *See* Def. Mem. (ECF 171) at 19. This entirely misses the mark.

**i. A Reasonable Jury Could Find Articulable Doubt as to the Accuracy of the Chair Investigation**

Plaintiff challenges as unlawful Defendants' determination not to apply the Title IX Policy to the Chair Investigation, and instead permitted Mr. Prusan discretion in the manner in which the Chair Investigation unfolded which denied Plaintiff the rights and protections afforded to him as a respondent under Title IX. As a result of that determination, and the resulting deficient Chair Investigation, Dean Tomaselli based his decision to remove Plaintiff as Chair".

To establish 'articulable doubt', a plaintiff must "point to evidence of 'particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the part of a complainant or witness, particularized strengths of the defense, or other reason to doubt the veracity of the charge.'" *Vengalattore v. Cornell Univ.*, 18 Civ. 1124, 2024 WL 4135875, at *6 (N.D.N.Y. Sept. 10, 2024) (*quoting Doe v. Syracuse Univ.*, 457 F. Supp. 3d 178, at 200 (N.D.N.Y. 2020)). A plaintiff can also point to "particular procedural flaws affecting the proof." *Id.*

Here, the record is replete with evidence from which a reasonable jury could find articulable doubt in the commencement and pursuit of the Chair Investigation. As several non-

party witnesses have attested, prior to HR's receipt of the NGSO Summary and Letter of Concern, senior faculty members of the Department sought to collect incriminating information from students and faculty specifically related to Plaintiff's alleged sexual misconduct as Chair of the Department. Such faculty members used misleading and corrupt tactics to garner information from students and faculty, in particular junior faculty, which was then manipulated into far more salacious and harsher criticisms of Plaintiff. As a result, many of the signatories to the Letter of Concern regretted their decision and the statements included in the NGSO Summary comment section were inaccurate and included remarks not actually submitted by any students.

The record also contains evidence that the faculty spearheading the Letter of Concern and student surveys which formed the basis of the Chair Investigation acted in bad faith with the motive not to protect students, as Defendants are prone to argue, but to oust Plaintiff for personal motivations. The record further reflects that several faculty and students reported to Mr. Prusan, Dr. Burns, and Ms. Ramirez that the information and allegations underlying the Chair Investigation were false or manipulated, a fact Defendants acknowledged but did nothing about.

Moreover, the record includes significant evidence from which a reasonable jury could find "particular procedural flaws" giving rise to articulable doubt. Specifically, the record reflects that, on its face, Einstein maintained enforceable policies with respect to the investigation and adjudication of Title IX related allegations of misconduct. The record further reflects that, at a minimum, the NGSO Summary contained purported student allegations of [redacted] against Plaintiff that, on their face, met the [redacted] under any of its iterations. The record further reflects that Einstein's Title IX Coordinator, Ms. Ramirez, admitted that some of the allegations in the NGSO Summary implicated Title IX but that she did not take any steps to further inquire whether Title IX should

be followed. *See Vengalattore v. Cornell Univ*., 18 Civ. 1124, 2024 WL 4135875, at *6 (finding an articulable procedural flaw where the university applied a non-Title IX policy to an investigation where some of the conduct alleged triggered its Title IX policy). Defendants' attempt to characterize the gender-based misconduct allegations as mere inappropriate, but not gender-based, behavior is unavailing. "An employer cannot escape its promise of procedural protections by recharacterizing accusations of sexual misconduct in more generic terms. Nor can it deny an inference of procedural irregularity through *post-hoc rationalization.*" *Menaker v. Hofstra Univ*., 935 F.3d 20, 37 (2d Cir. 2019).

The Chair Investigation was not pursued under Einstein's Title IX Policy. Defendants' admitted intentional failure to pursue the Chair Investigation under the Title IX Policy was not just a "procedural flaw", it was the complete disregard for procedure and an intentional decision not to afford Plaintiff a presumption of innocence and fundamental due process. Indeed, as a result, Plaintiff was not afforded any of the procedural or substantive safeguards guaranteed by the Title IX Policy and law; Plaintiff was not, among other things, (i) afforded the presumption of innocence, (ii) afforded an opportunity to have written detailed notice of the allegations against him and from whom they emanated from, (iii) provided an opportunity to respond to any evidence gathered as part of the Chair Investigation, (iv) provided an opportunity to view, let alone respond to, the Report, or (v) appeal the Report's findings or his subsequent removal as Chair. *See Schiebel v. Schoharie Cent. Sch. Dist*., 120 F.4th at 1097–98 (wholesale disregard of the school's own policies is a clear procedural irregularity); *Doe v. Columbia Univ.*, 831 F.3d 46, 56-57 (2d Cir. 2016).

**ii. A Reasonable Jury Could Find the Suggestion that Gender Bias was a Motivating factor in the Chair Investigation**

To demonstrate gender bias, a plaintiff may rely upon, among other things, "statements

made by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend show the influence of gender." *Vengalattore v. Cornell Univ.*, 2024 WL 4135875, at *9 (*quoting Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 474-75 (S.D.N.Y. 2015).

Alternatively, a plaintiff can establish an inference of gender bias by showing "a combination of (1) procedural irregularities that show a biased process, and (2) surrounding circumstances that suggest that 'this bias was likely a sex-based bias." *Vengalattore*, at *9 (*quoting Doe v. Rochester Inst. of Tech.*, 21 Civ. 6761, 2024 WL 1051953, at *10 (N.D.N.Y. Mar. 11, 2024) (*quoting Menaker v. Hofstra Univ*., 935 F.3d at 31) (internal quotation marks removed). Such circumstances that raise an inference of gender bias include "'an atmosphere of public pressure' to suggest that the university was motivated to 'act based on invidious stereotypes,' and 'statements by members of the disciplinary tribunal [or] statements by pertinent university officials' that disclose a discriminatory intent." *Id*. Public pressure is sufficient to show gender bias when "coupled with evidence of procedural irregularities" because "procedural irregularity alone *already* suggests bias that even minimal evidence of sex-based pressure on the [defendant] is sufficient to establish bias on account of sex." *Id*. (*citing Vengalattore v. Cornell Univ*., 36 F.4th 87, 106-07 (2d Cir. 2022), *Doe v. Trs. of Hamilton Coll*., No. 22 Civ. 214, 2024 WL 1675130, at *8 (N.D.N.Y. Apr. 18, 2024), and *Menaker v. Hofstra Univ*., 935 F.3d at 33, n. 48). Notably, the standard to demonstrate an inference of gender bias is "low". *Roe v. Icahn Sch. of Med. at Mt. Sinai*, No. 25 Civ. 8157, 2026 WL 2655470, at *3 (*quoting Roe v. St. John's Univ*., 91 F.4th 652). *See also*, *Doe v. Colgate Univ*., No. 12 Civ. 1069, 2017 WL 4990629, at *12 (N.D.N.Y. Oct. 31, 2017), *aff'd*, 760 F. App'x 22 (2d Cir. 2019); *Doe v. Rochester Inst. of Tech.*, 2024 WL 1051953, at *11.

Contrary to Defendants' contentions, a reasonably jury could find that Defendants' actions were motivated, at least in part, by gender bias against Plaintiff. Here, the record reflects that Einstein acted on reports of false information that it acknowledged were not true because it had to appear to be responsive to certain groups, particularly in the wake of the #MeToo movement. In February 2022, Einstein's administrators, Ramirez and Burns, were both aware that Plaintiff had been the target of false allegations and told Plaintiff that they, themselves, believed the allegations against Plaintiff were baseless. In the subsequent months, multiple persons, including faculty, reported to Ms. Ramirez and Dr. Burns that Plaintiff had been targeted by false allegations of [redacted] and that Dr. Castillo and Dr. Jordan, were identified as instigators of the allegations. In addition, students also came forward to Ms. Ramirez that the [redacted] allegations underlying the Chair Investigation were false and manipulated statements used by Dr. Jordan. Moreover, the record reflects that as early as February 2022, Einstein was aware of potential Title IX allegations against Plaintiff and, rather than investigate them under the appropriate policy, used them as a springboard to garner additional accusations of [redacted] against Plaintiff.

Further, as described *supra*, the record contains substantial evidence from which a reasonable jury could conclude the Chair Investigation suffered from significant procedural defects and flaws. Defendants admit that the "central premise of a 'procedural irregularity' is that the college has taken some action inconsistent with its policies and procedures setting forth the manner in which a complaint is to be investigated and adjudicated." *See* Def. Mem. (ECF 171) at 23. As described *supra*, that is precisely what occurred here. The allegations against Plaintiff that were investigated as part of the Chair Investigation unequivocally, and by Ms. Ramirez's own admission, implicated Title IX. Yet, as Dean Tomaselli emphatically confirmed, the Chair

Investigation was not a Title IX investigation. Defendants did not simply act inconsistent with their policies and procedures, their actions were completely devoid of *any* implementation of their policies and procedures. This failure to act in accordance with the Title IX Policy, coupled with record evidence and statements and pressure on Defendants to pursue the knowingly false sexual misconduct allegations against Plaintiff is fatal to Defendants' argument for dismissal. *See Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th at 1097–98 (wholesale disregard of the school's own policies is a clear procedural irregularity); *Doe v. Columbia Univ.*, 831 F.3d 46, 56-57 (2d Cir. 2016); *Vengalattore*, at *6, 10.

Defendants contend that even if Plaintiff can show an inference of gender bias (which Plaintiff has), Einstein still had a legitimate, non-discriminatory and non-pretextual basis to remove Plaintiff as Chair, namely, Dean Tomaselli's discretionary determination that Plaintiff's performance did not meet the standards of the Chair position. A reasonable jury could find this alleged legitimate reason to be pretextual.

In proving pretext, a plaintiff may rely upon the same evidence that comprised her *prima facie* case, without more. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). It is well-settled that a plaintiff need not show that the employer's proffered reasons are false or that they did not play a role in the employment decision. Rather, a plaintiff only needs to show that those were not the ***only*** reasons, and that the discriminatory motive played ***some*** role in the decision. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (emphasis added). Notably, "the issue of pretext is 'ordinarily for the jury to decide at trial rather than for the judge to determine on a motion for summary judgment." *Shain v. Ctr. for Jewish History, Inc.*, 418 F.Supp.2d 360, 366 (S.D.N.Y. 2005).

Here, as discussed in detail *supra*, Defendants relied upon the Report and the findings of

the Chair Investigation as a basis to remove Plaintiff as Chair of the Department. Those findings necessarily relied upon the procedurally flawed Chair Investigation which unlawfully failed to follow Defendants' Title IX Policy and which investigated knowingly false allegations of misconduct, sexual or otherwise, against Plaintiff. Evidence of the collusion of personnel to bring false allegations of misconduct later relied upon as a legitimate basis for adverse action is sufficient to raise an issue of fact as to pretext. *See Nambiar v. central Orthopedic Grp., LLP.*, 158 F.4th 349, 367-68 (2d Cir. 2025); *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 50 (2d Cir. 2025). Moreover, the record contains evidence from which a reasonable jury could find that Defendants' actions were motivated at least in part by gender bias sufficient to raise an issue of fact as to pretext. Specifically, as described *supra*, Ms. Ramirez and Dr. Burns, who consulted with Dean Tomaselli regarding Plaintiff's removal as Chair, directly made statements acknowledging the falsity of the allegations against Plaintiff yet pursued the investigation to appear responsive. *See Henry v. Wyeth Pharms.*, 616 F.3d 134, 149 (2d Cir. 2010).

For the foregoing reasons, Defendants' motion should be denied.

**B. Deliberate Indifference**

Defendants maintain that Plaintiff cannot sustain a Title IX Deliberate Indifference claim because (i) Plaintiff did not plead such a claim in his first Amended Complaint and (ii) Plaintiff cannot demonstrate that Einstein was deliberately indifferent to the allegations underlying the Chair Investigation against Plaintiff. Defendants' arguments should be rejected.

Preliminarily, Plaintiff acknowledges that his first cause of action asserts a claim for Title IX -Erroneous Outcome. *See* ECF 48 at 70. However, as Defendants acknowledge, (i) Plaintiff argued, and the court analyzed, Plaintiff's title IX claim under a deliberate indifference theory in relation to Defendants' prior motion to dismiss, (ii) Plaintiff has asserted a deliberate indifference

theory throughout discovery in his responses to interrogatories; and in fact, (iii) Plaintiff's first cause of action includes allegations supporting a Title IX deliberate indifference theory of liability. *See* ECF 48 at 72-75. A complaint does not need to specifically and individually identify each cause of action in order to sufficiently allege a claim against a defendant. Rather, a complaint is sufficient to assert a cause of action if it allege[s] the material elements of the cause of action. *See* Fed. R. Civ. P. 8; *Lewis v. Vill. of Deposit*, 40 A.D.2d. 730 (1972); *Kohler v. Ford Motor Company, Inc.*, 93 A.D.2d 205 (3d Dep't 1983). Generally, the test of the sufficiency of the complaint and cause of action is whether it gives sufficient notice of the transaction, occurrences, or series of transactions or occurrences intended to be proved and whether the requisite elements of any cause of action known to our law can be discerned from its averments. *See Moore v. Johnson*, 147 A.D.2d 621 (1989); *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802 (2d Dep't 2010).

Here, Defendants' have undoubtedly been on notice of Plaintiff's assertion of a Title IX deliberate indifference theory of liability since the Motion to Dismiss stage, as Plaintiff's pleadings have included allegations in support of such a theory (even if not explicitly named) and Plaintiff argued the theory to the Court, and have had the opportunity to garner discovery in defense of such a theory. Accordingly, Defendants' argument that Plaintiff cannot demonstrate a Title IX deliberate indifference claim on procedural grounds should be denied.

A plaintiff may demonstrate a Title IX deliberate indifference claim by showing that "the [school] was deliberately indifferent to the truth or falsity of the accusations of sexual misconduct made against him." *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1096-97 (2d Cir. 2024). A plaintiff may state a deliberate indifference claim by showing "the grievance process was so clearly irregular as to indicate that the process was a "sham." *Id.* at 1095. "Procedural irregularities such as the recipient's failure to comply with its own grievance policies or with applicable Title

IX regulations provide probative evidence of deliberate indifference, and a wholesale failure to employ established procedures for investigating sexual harassment complaints might establish it." *Id*.

"If a respondent plausibly alleges that he was targeted by a discriminatory accusation, and the recipient imposed discipline or sanctions under circumstances that indicate deliberate indifference to the truth or falsity of the accusation, the respondent has stated a deliberate indifference claim under Title IX." *Id.* at 1097; *see also Menaker v. Hofstra Univ*., 935 F.3d 20, 34 (2d Cir. 2019) (analyzing discrimination under Title VII).

The Second Circuit has made clear:

> As with a deliberate indifference claim by a complainant, a respondent may show deliberate indifference through allegations that the recipient's grievance process was so "objectively deficient" that it cannot be said to have aimed at uncovering the truth or that its decision was so "inexplicable" that the same inference could be drawn. A respondent states a deliberate indifference claim when he plausibly alleges facts that raise 'grave doubts as to the merits of the decision itself, and that the recipient knowingly "shut[ ] [its] eyes to [the] risk" that it was imposing sanctions based on a malicious and therefore discriminatory accusation.

*Schiebel*, 120 F.4th at 1097–98 (internal citations omitted).

Here, contrary to Defendants' contentions, Plaintiff has deduced evidence from which a reasonable jury could find that Einstein was "deliberately indifferent to the truth or falsity of the accusations of sexual misconduct made against him." *Schiebel*, at 1096-97. Specifically, the record reflects that Einstein acted on reports of false information that it acknowledged were not true because it had to appear to be responsive to certain groups, particularly in the wake of the #MeToo movement. Moreover, as described *supra*, the record reflects that senior faculty members of the Department exerted immense pressure on students and other faculty to concoct allegations of misconduct, in particular sexual misconduct, against Plaintiff in an effort to oust Plaintiff as Chair.

Ms. Ramirez, Dr. Burns, and Dean Tomaselli were aware of this conspiracy, and the resulting false allegations that sprang from it, but did nothing to investigate the offending faculty members or otherwise correct the allegations in the Chair Investigation. Defendants maintain that Plaintiff has failed to deduce evidence of such conspiracy. This assertion is directly contradicted by (i) the sworn statements of four non-party witnesses who participated in the Chair Investigation and (ii) the documentary and testimonial evidence in the record. Moreover, to the extent that Defendants attempt to minimize Plaintiff's testimony regarding this conspiracy as inadmissible hearsay, the truth of the matter is that Einstein has, from the early stages of this litigation, placed a gag order on its employees not to act as witnesses for Plaintiff, as evidenced by Plaintiff's counsel's correspondence with relevant witness, Dr. Saleem Nicola. *See* Miltenberg Decl. at Ex. 18. As such, Plaintiff's firsthand account of information shared with him regarding this conspiracy is the only evidence Defendants have permitted Plaintiff to be privy to.

Furthermore, as described in detail, *supra*, the record reflects that the Chair Investigation suffered from significant procedural flaws, the most obvious and damaging of which was the intentional failure to conduct the Chair Investigation pursuant to the Title IX Policy, despite unequivocal evidence that the allegations against Plaintiff, at a minimum, implicated a potential Title IX violation. A reasonable jury could conclude that Defendants' knowing and intentional failure to conduct the Chair investigation pursuant to the Title IX Policy rendered the investigation "objectively deficient" as to demonstrate deliberate indifference. Furthermore, for the reasons stated *supra*, a reasonable jury could find that Defendants' actions were motivated, at least in part, by gender bias.

Accordingly, Defendants' motion with respect to Plaintiff's Title IX Deliberate Indifference claim should be denied.

### III. Viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that preclude granting summary judgment on Plaintiff's State and City Human Rights Laws Claims.

For the reasons that Plaintiff's Title IX claims should not be dismissed, Plaintiff's New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") claims should also not be dismissed. *See Menaker*, 935 F.3d at 33-34 (explaining the elements of a prima facie case of sex discrimination under Title VII claim in a university context).

In *Menaker*, the Second Circuit explained:

> [W]e emphasize that the holding of *Doe v. Columbia* is not limited to Title IX claims rather than Title VII claims. We apply similar principles in both Title VII and Title IX when seeking to identify discriminatory intent. Indeed, our holding in *Doe v. Columbia* was expressly based on Title VII principles. . . . [T]he very same pressures that may drive a university to discriminate against male students accused of sexual misconduct may drive a university to discriminate against male employees accused of the same. . . . [O]nce a university has promised procedural protections to employees, the disregard or abuse of those procedures may raise an inference of bias.

*Id.* (referencing *Doe v. Columbia,* 831 F.3d 46 (2d Cir. 2016)).

It is well-settled that a plaintiff who sufficiently states a claim of discrimination under federal, or other higher standard law, also establishes a claim for discrimination under the more lenient standards of the NYCHRL and post-amendment NYSHRL. *See Pryor v. Jaffe & Asher, LLP.*, 992 F.Supp.2d 252, 260 (S.D.N.Y. 2014) (finding plaintiff stated a claim under the CHRL because she adequately pled a claim under the SHRL, which then implemented a higher standard akin to that of federal law); *Winston v. Verizon Servs. Corp.*, 633 F.Supp.2d 42, 48 (S.D.N.Y. 2009).

Accordingly, Plaintiff's NYSHRL and NYCHRL claims should not be dismissed.

## IV. Viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that preclude dismissal of Montefiore

Plaintiff's claims against Montefiore should not be dismissed. Plaintiff's claims against Montefiore are premised on Montefiore's employment relationship with Plaintiff's direct employer, Einstein. *See Griffin v. Sirva Inc*., 835 F.3d 283, 292 (2d Cir. 2016) (Two doctrines have been developed—the "joint employer" doctrine and the "single employer"—"to allow a plaintiff to assert employer liability in the employment discrimination context against entities that are not her formal, direct employer."); *Bautista v. PR Gramercy Square Condo*., 642 F. Supp. 3d 411, 421 (S.D.N.Y. 2022).

Here, Plaintiff has alleged facts, and the record includes evidence, from which a reasonable jury could find that Montefiore had a joint employer or a single employer relationship with Einstein. Specifically, the record reflects that Montefiore's chief legal counsel had oversight over Plaintiff's disciplinary decisions, that Montefiore managed benefits of both Montefiore and Einstein's employees, that Montefiore's President and CEO hand a direct influence on Plaintiff's employment with Einstein, that Montefiore's Human Resources department was involved in and apprised of the Chair Investigation, and that Montefiore's President and CEO and legal counsel were involved in the Chair Investigation and actions taken against Plaintiff as a result thereof. *See Bautista,* 642 F. Supp. 3d at 421-422.

Accordingly, Defendants' Motion should be denied.

## CONCLUSION

For these reasons, Plaintiff respectfully submit that there are issues of fact, which require that this Court deny Defendants' Motion for Summary Judgment in its entirety.

Dated: October 14, 2026
New York, New York.

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**

**By:** ***/s/ Andrew T. Miltenberg***
**Andrew T. Miltenberg, Esq.**
**Stuart Bernstein, Esq.**
**Gabrielle M. Vinci, Esq.**
**363 Seventh Ave, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

**CERTIFICATE OF COMPLIANCE**

I certify that this memorandum of law contains 8,609 words, excluding the caption, table of contents, table of authorities, signature block, and this certificate, as counted by the word-processing program used to prepare it, and therefore complies with Local Civil Rule 7.1(c) and Judge Tarnofsky's Individual Practices.

***/s/ Andrew T. Miltenberg***
**Andrew T. Miltenberg**