# EXHIBIT 16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KAMRAN KHODAKHAH,**<br><br>*Plaintiff,*<br><br>v.<br><br>**MONTEFIORE HEALTH SYSTEM, INC., MONTEFIORE MEDICAL CENTER, MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., ALBERT EINSTEIN COLLEGE OF MEDICINE, GORDON TOMASELLI, PABLO CASTILLO, BRYEN JORDAN, and JOHN and JANE DOES 1-10,**<br><br>*Defendants.* | **Civil Action No. 1:24-cv-00839** |

**DECLARATION OF DR. JOANNA KRZYSPIAK**

Dr. Joanna Krzyspiak affirms the following under penalty of perjury:

1. I am a former graduate student in Dr. Kamran Khodakhah's laboratory at Albert Einstein College of Medicine. I have known Dr. Khodakhah for twelve years and know him well as a mentor, scientist, faculty, and Chair of the Department of Neuroscience.

2. I have been deeply troubled by the manner in which the investigation in Dr. Khodakhah as Chair of the Department of Neuroscience was conducted. My concern is based on what happened to me personally and what I witnessed afterwards.

3. In February 2022, Dr. Bryen Jordan contacted me to discuss the results of a survey concerning the Neuroscience Department. He told me that the survey reflected distrust of departmental leadership, particularly Dr. Khodakhah. My understanding at the time was that Dr.

Jordan intended to speak directly with Dr. Khodakhah about concerns within the Department and about ways those concerns might be addressed.

4. Dr. Jordan discussed a situation concerning Dr. Khodakhah in which he allegedly placed his hand on a woman's knee while they were in a car. Dr. Jordan asked for my perspective as a woman, a former student, and someone who knows Dr. Khodakhah well. This incident was later part one of two complaints that resulted in the Title IX investigation. Additionally, he provided examples from the survey, that were supposed to be confidential, that related to verbal comments by Dr. Khodakhah related to race, and physical contact such as hair pulling.

5. Because some of the survey comments were vague, Dr. Jordan asked me to provide context that could assist him in that discussion. I understood that he was gathering information so that he could explain to Dr. Khodakhah that there were issues that needed to be addressed, and he said that it would be helpful to have concrete discussion points rather than make vague statements. I told Dr. Jordan that what I was telling him was not secret and that he could refer to my comments when speaking with Dr. Khodakhah. I even offered to participate in that conversation myself.

6. My comments were instead added to the results of a survey that I had never completed, and were presented as part of the body of student feedback, which were then incorporated into formal allegations against Dr. Khodakhah.

7. I later learned that statements derived from that conversation and earlier, personal verbal conversations that I had with Dr. Jordan, had been incorporated into the materials being used against Dr. Khodakhah. Those additional statements were Dr. Jordan's characterization of our conversation, not language written by me, and I believed they conveyed a meaning and an implication concerning Dr. Khodakhah's intent that I had not expressed.

8. I was increasingly distressed when I discovered how my statements had been used. I had believed I was helping facilitate a conversation intended to address concerns within the Department, rather than supplying evidence for a formal investigation into Dr. Khodakhah or supporting an effort to remove him as Chair.

9. When I expressed my distress to Dr. Jordan, he apologized and acknowledged the problem. He showed me the survey over a Zoom call where he scrolled through the document to show me what was added that was mine. In that process, I was able to see some of the other survey responses that, again, were supposed to be confidential.

10. On March 12, 2022, Dr. Jordan told me in writing that he would contact Human Resources and have whatever additions that were related to me removed. He further told me that when he would meet with the lead investigator, he would explain that he had taken my comments out of context and that they should not be considered.

11. Dr. Jordan then told me that he had communicated with Human Resources relating to my concerns, and that Yvonne Ramierez had indicated that Dr. Khodakhah would never see the survey. When I subsequently met with the investigator myself, however, the statements were still included among the allegations being considered against Dr. Khodakhah.

12. When I spoke with Yvonne Ramirez in August of 2022, I asked her to confirm if Dr. Jordan had ever attempted to correct his error, and she stated that he never contacted her about the issue.

13. During March 2022, Dr. Jordan contacted members of the Department and former members of Dr. Khodakhah's laboratory seeking information about negative experiences with Dr. Khodakhah.

14. I am aware of at least three former laboratory members who he contacted during March and another laboratory member contacted during April. From my conversations with these lab members, it appeared that Dr. Jordan was actively seeking unfavorable information about Dr. Khodakhah.

15. From talking to other members of the department outside of the lab, they informed me that the survey material was being circulated more broadly than I initially had been told. It was shown to students and to faculty members, despite the fact that Dr. Jordan had assured me that the survey had been seen only by himself, Dr. Myles Akabas, and two student leaders.

16. I later learned that survey material was being shown or circulated to faculty in connection with efforts to obtain support for a faculty letter concerning Dr. Khodakhah, and to students to acquire more information to include in the survey results.

17. This was particularly troubling because, although names were not formally attached to survey statements, the Neuroscience Department was a relatively close community. In many instances, the circumstances described in a comment could make the person involved readily identifiable.

18. My concern that the process was not neutral was heightened significantly by statements Dr. Jordan made to me before the investigation had reached any conclusion.

19. In early March 2022, Dr. Jordan told me that Dr. Khodakhah would be given a "graceful exit" as Chair. These statements struck me as highly unusual because they were made before any investigation was conducted or any conclusions were determined.

20. At the same time, information and rumors about the allegations spread through the Department. The result was that people were left to assume the worst while Dr. Khodakhah had limited ability to correct inaccurate impressions or explain what had occurred.

21. The Dean subsequently sent communications to the Department referring to additional allegations and an unsafe environment. Those communications further damaged Dr. Khodakhah's reputation at a time when the relevant facts had not been transparently communicated.

22. Dr. Khodakhah was then barred from campus during portions of this process. This affected not only him personally and professionally but also the members of his laboratory, whose scientific work, mentoring relationship, and day-to-day functioning depended on their mentor.

23. Before these events, I knew Dr. Khodakhah as someone who had invested an enormous amount of his professional life in building his laboratory and the Neuroscience Department. He cared deeply about scientific excellence and about making the Department better. He worked intensely and set high expectations for himself and the people around him.

24. The investigation and the manner in which it was handled destroyed the professional reputation he had spent decades building. In a relatively small scientific community, allegations such as these affect how colleagues, collaborators, trainees, and others perceive a person, even before any verdict of the allegations has been determined.

25. Shortly before the Society for Neuroscience (SfN) Conference in 2022, where Dr. Khodakhah was scheduled to give a prestigious talk, someone contacted the administrators of SfN to reveal that there was an active Title IX allegation against him.

26. Even though there was no determination of his guilt at the time, the administrators cancelled his lecture, sending additional rumors and questions through the scientific community that further damaged his reputation.

27. Within the Neuroscience Department, I observed relationships deteriorate and the community divide into factions. People became uncertain who they could trust, resulting in

longstanding professional and personal relationships becoming strained. The consequences therefore extended well beyond the formal loss of a leadership position. Dr. Khodakhah lost the ability to function normally within a department, laboratory, and the scientific community at large that was a huge portion of his life.

28. I saw the effect on the people closest to him professionally. Members of his laboratory were distressed by what was happening to their mentor and by the uncertainty surrounding the future of the laboratory and their own work. What was particularly painful was the gap between the person many of us had known through years of daily interaction and the portrayal that was circulating through the Department as a result of the investigation.

29. Some of his colleagues began distancing themselves from him, or didn't speak up on his behalf against the Dean even though they wanted to, for fear of their jobs. This caused an even bigger chasm between the department, and Dr. Khodakhah along with his lab who stood by him.

30. Over the course of the investigation, I personally observed a significant change in Dr. Khodakhah's emotional state as well. He has always been unusually resilient and capable of functioning under considerable professional pressure. During the investigation, however, I saw him visibly distressed in a way I had never seen before. On multiple occasions he appeared close to tears when talking about the allegations. He described himself at different points as hurt, angry, disappointed, sad, betrayed, worn down, and ultimately "devastated."

31. The stress manifested physically by affecting his sleep and ability to function normally. His sleep problems persisted for months. By late July, he described himself as extremely tired and confirmed that he was still not sleeping normally.

32. What appeared to affect him most deeply was what the investigation suggested about how others viewed his character. Early in the process, he told me that he believed his name had been permanently smeared regardless of the ultimate outcome. He repeatedly expressed a sense of betrayal by a department to which he had devoted years of work, while at the same time questioning himself and asking how he could have been better. He also struggled with the belief that he was being demonized by colleagues and with the possibility that people believed he did not care about trainees when in fact he actually did.

33. My support for Dr. Khodakhah is grounded in twelve years of knowing him, working with him, and observing both the person he was before this investigation and the effect that the investigation has had on him afterward.

34. I was also personally drawn into the process in a way that gave me firsthand insight into how information was gathered, characterized, and used against him.

35. A process that should have been careful, neutral, and fair instead left me with the impression that information was being sought and used to support a conclusion that had already been decided. My own statements were incorporated into investigative material in ways I did not intend or consent to, assurances made to me about correcting that problem were false, and I witnessed the consequences as allegations and rumors spread through the Department while Dr. Khodakhah had limited ability to respond to them.

36. I believe these circumstances are important to understanding what happened to Dr. Khodakhah. The manner in which the process was conducted caused profound and lasting harm to

him personally and professionally, and my own experience raises serious concerns about whether the process fairly and accurately reflected the information on which it relied.

**Dated: Bronx, New York**
**October 12, 2026**

**Dr. Joanna Krzyspiak**