UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KAMRAN KHODAKHAH,

*Plaintiff*,

v.

MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., et al.,

*Defendants*.

No. 1:24-cv-00839-LAK-RFT

**PLAINTIFF'S RESPONSE TO DEFENDANTS MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., AND ALBERT EINSTEIN COLLEGE OF MEDICINE'S RULE 56.1 STATEMENT OF MATERIAL FACTS AND PLAINITFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56.1 and Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Plaintiff Kamran Khodakhah ("Plaintiff") submits this response in opposition to Defendants Montefiore Medicine Academic Health System, Inc. ("Montefiore") and Albert Einstein College of Medicine ("Einstein," and together with Montefiore, "Defendants") Rule 56.1 Statement of Material Facts[1,2]:

## I. The Parties

1. Defendant Einstein is a private medical school located in the Bronx, New York. *See* ECF 132, ¶ 13.

**Response**: Undisputed.

2. Defendant Montefiore is a not-for-profit corporation. *See* ECF 29 at 2.

[1] All references to Defendants' Exhibits are cited herein as "Def. Ex. __" and annexed to the Declaration of Gabrielle Tenzer (ECF 174).

[2] All exhibits submitted by Plaintiff are annexed to the Declaration of Andrew Miltenberg and cited herein as "Ex. __".

**Response**: Undisputed.

3. Plaintiff is a professor in Einstein's Neuroscience Department, where he has been employed since 2001 and received tenure in 2012. *See* Ex. A at 2; Ex. B at 2.

**Response**: Undisputed.

## II. Plaintiff's Service as Chair of Einstein's Neuroscience Department

4. Plaintiff was appointed to the position of Chair of the Neuroscience Department at Einstein in May 2016. *See* Ex. C at 2-3.

**Response**: Undisputed.

4.1. As Chair of the Department of Neuroscience (the "Department"), Plaintiff had responsibility, to varying degrees, for, among other things, faculty recruitment, faculty appointment and supervision, faculty evaluations, management of department staff, assistance in ensuring students graduated, student laboratory assignments and lab resources, and addressing student concerns. *See* Def. Ex. D at 48:13-52:22.

4.2. Under Plaintiff's leadership as Chair, the Department went from a struggling department with a declining number of faculty and substandard infrastructure to Einstein's largest and most successful department. *See* Ex. 15 at ¶¶ 3-4. He is described by his peers as "hands-down the hardest working chair" a "role model chair", and an "exemplar" professional. *See* Ex. 15 at ¶ 4, Ex. 11 at ¶¶ 7, 12. Plaintiff's esteemed colleagues have commended Dr. Khodakhah for his tenacity, as well as his commitment to diversity, transparency, and fairness. *See*. Ex. 11 at ¶¶ 7-8.

4.3. Even during the COVID-19 pandemic, Plaintiff was able to recruit "outstanding junior faculty, renovate the animal facility, acquire state-of-the-art equipment, and form an excellent new administrative team." *See* Ex. 17 at ¶ 2. Plaintiff always advocated for

the Department and cared deeply for its faculty and students. *Id*.

4.4. Indeed, the harshest criticism of Dr. Khodakhah from even those that raised concerns regarding him is his tendency to be "gregarious and speak[] his mind", and "express himself in spirited ways" that are sometimes not received well. *See* Ex. 15 at ¶ 5, Ex. 11 at ¶ 9.

5. Plaintiff was recommended for appointment as Chair by the Neuroscience Chair Selection Committee, *see* Ex. C at 2, which was led by Einstein's then-Executive Dean Edward Burns, *see* Ex. D at 53:8-19 (ECF 174-4).

**Response**: Undisputed.

6. The terms of Plaintiff's appointment as Chair were memorialized in a letter from then-Dean Allen Spiegel, dated May 3, 2016. *See* Ex. C. The appointment letter stated that Plaintiff's appointment as Chair was for "an indefinite term." *See* Ex. C at 2. The appointment letter further stated: "As with all Department Chair appointments, continuation is subject to performance as determined by the Dean." *See* Ex. C at 2.

**Response**: Undisputed.

6.1. Under Plaintiff's leadership as Chair, the Department went from a struggling department with a declining number of faculty and substandard infrastructure to Einstein's largest and most successful department. *See* Ex. 15 at ¶¶ 3-4. He is described by his peers as "hands-down the hardest working chair" a "role model chair", and an "exemplar" professional. *See* Ex. 15 at ¶ 4, Ex. 11 at ¶¶ 7, 12. Plaintiff's esteemed colleagues have commended Dr. Khodakhah for his tenacity, as well as his commitment to diversity, transparency, and fairness. *See*. Ex. 11 at ¶¶ 7-8.

6.2. Indeed, the harshest criticism of Dr. Khodakhah from even those that raised concerns

regarding him is his tendency to be "gregarious and speak[] his mind", and "express himself in spirited ways" that are sometimes not received well. *See* Ex. 15 at ¶ 5, Ex. 11 at ¶ 9.

7. During his tenure as Chair, several staff members left the Neuroscience Department. *See, e.g.*, Ex. E at 2 (Plaintiff noting that "my grant administrator, administrator and assistant left in the fall in close succession").

**Response**: Undisputed.

7.1. None of the staff members who left reported their reason for leaving the Department as having anything to do with their interactions with Plaintiff. *See* Def. Ex. L at 61:64:19; Def. Ex. R at 1.

8. Plaintiff used offensive nicknames for students, such as "Hobble" (for a student on crutches), "Al Qaeda," and "Barely Legal" (for a young female student). Ex. F at 11; Ex. G at Response Nos. 61-62, 64-65; *see also* Ex. H at 89:7-18. He also commented to a student, in a conversation about the student's graduation plans, "you should enjoy making love, not just the climax." Ex. D at 212:21-23.

**Response**: Undisputed to the extent Plaintiff used nicknames and made the referenced remark. Plaintiff disputes the characterization of the nicknames as "offensive".

8.1. Plaintiff made the remark "you should enjoy making love, not just the climax" to a student as an analogy for working in science and the pursuit of publication of a "high-profile paper". The student did not appear offended at the time and, after Plaintiff apologized if he had offended her, she asked when Plaintiff was talking about. *See* Def. Ex. D at 211:4-213:15.

8.2. Plaintiff referred to a student as "Hobble" without knowledge that the student was

disabled. *See* Def. Ex. D at 283:21-284:15.

8.3. During the investigation, Plaintiff provided explanations for his use of nicknames, some of which were not included in the later prepared investigative summary. *See* Def. Ex. F; Def. Ex. D at 284:22-285:9.

8.4. Plaintiff utilizes nicknames for students and others as a way to address and cope with [redacted], and to address his difficulty remembering names. *See* Def. Ex. F at 10.

9. Plaintiff routinely called students "morons." Ex. G at Response No. 69; Ex. D at 216:2-10. He used "moron" to describe "[l]iterally, everybody." Ex. D at 215:8-18.

**Response**: Undisputed that Plaintiff called students "morons" and used the term "moron". Plaintiff disputes that he "routinely" called students "morons".

9.1. Plaintiff used, and uses, the term "moron" colloquially and not in any way to be offensive or a remark on someone's intellect. *See* Def. Ex. D at 215:5-216:4.

10. Plaintiff brought alcohol to class and into his lab and drank with students and lab members. Ex. G at Response Nos. 76, 78, 80, 82, 84, 86.

**Response**: Undisputed.

## III. In 2022, Faculty and Students Raise Concerns About Plaintiff's Performance as Chair

11. During Plaintiff's tenure as Chair, senior faculty and administrators at Einstein, including Dean Gordon Tomaselli, Executive Dean Edward Burns, Associate Dean for Graduate Programs Victoria Freedman, and Vice President for Human Resources and Title IX Coordinator Yvonne Ramirez, became aware of complaints about Plaintiff's conduct from students and/or faculty in the Neuroscience Department. *See* Ex. I; Ex. J; Ex. K; Ex. L at 17:17-18:11; Ex. M; Ex. N; Ex. O at 29:14-31:10, 47:22-48:10.

**Response**: Undisputed that the referenced individuals became aware of complaints about

Plaintiff's conduct allegedly from students and/or faculty in the Neuroscience Department.

11.1. Prior to 2022, Plaintiff had never been the recipient of any discipline or counseling at Einstein. There had never been a complaint against him by either students, faculty, or staff at Einstein. *See* Def. Ex. L at 31:13-32:9, 50:16-22.

**A. Student Concerns About Plaintiff's Conduct**

12. In January 2022, a student survey was administered in the Neuroscience Department (the "GEC Survey"). *See* Ex. D at 84:9-86:17; Ex. I; Ex. P. The survey was administered by Dr. Bryen Jordan, a professor appointed by Plaintiff to chair the Neuroscience Department's Graduate Education Committee ("GEC"),. *See* Ex. I; Ex. P at 2, 5; *see also* Ex. D at 74:17-75:24, 195:21-196:4, 256:14-18.

**Response**: Partially disputed. The Graduate Education Committee ("GEC") did not request that the survey be conducted and there is no basis for Plaintiff to confirm its authenticity. *See* Def. Ex. D at 81:23-82:7, 16-23; 85:4-9. Ms. Ramirez never saw the raw data from the GEC Survey and took no steps to ascertain or investigate the validity of the summarized GEC Survey data. *See* Def. Ex. L at 33:23-24, 42:22-43:2, 57:6-12, 58:9-17.

13. Dr. Jordan sent a summary of the GEC Survey results to Plaintiff on January 24, 2022, stating that the GEC Survey collected responses from 51 students and recent graduates, including 46 of the 48 then-current students in the Department. *See* Ex. P at 2. The survey reflected that nearly half of responding students indicated that they did not feel "comfortable sharing concerns or making suggestions to" Plaintiff in his role as Chair. Ex. I at 11. Only about a third of respondents indicated that they were confident that the Department's leadership would take appropriate action on concerns they raised. *See* Ex. I at 12. Less than half of respondents agreed that departmental leadership was "fair and collegial." Ex. I at 13. On February 28, 2022, Dr. Jordan

sent the survey results to Ms. Ramirez, who shared the survey results with Dr. Burns the following day. Ex. I at 2.

**Response**: Partially disputed. On January 24, 2022, Dr. Jordan, the then chair of the GEC, sent "one or two pages" of a purported GEC survey to Plaintiff. *See* Def. Ex. D at 73:18-74:21. This was the first time that Plaintiff heard about any GEC survey. *Id*. Dr. Jordan did not share the breakdown of responses with Plaintiff at that time. *See* Def. Ex. P. In response to seeing the limited survey results, Plaintiff felt "disappointed that [the students were not] more excited about the department" and wished to discuss ways for improvement at the next GEC meeting. *See* Ex. Def. Ex. D at 76:9-2, 79:9-80:12.

13.1. The GEC survey default report reflected, among other things, that: (i) 66% of responding students felt connected to their peers outside of the lab; (ii) 57% of responding students felt connected to the faculty; (iii) 80% of responding students felt the Department was collegial; (iv) 46% of responding students were satisfied with the Department's commitment to diversity and creation of an inclusive atmosphere; (v) 80% of responding students were satisfied with the Department's commitment to promoting gender equality; (vi) 51% of responding students felt comfortable or felt neutral about bringing their concerns or making suggestions to Plaintiff; (vii) 60% of responding students were confident or felt neutral about the Department's leadership taking action in response to concerns; and (viii) 68% of responding students were satisfied overall with the Department. *See* Def. Ex. I.

14. Following the GEC Survey, leaders of the student-run Neuroscience Graduate Student Organization ("NGSO") reported to Dr. Freedman on February 24, 2022, that they had "received numerous accounts of students detailing inappropriate and harmful comments and

actions by the Chair," including through a survey they had conducted of students in the Neuroscience Department (the "NGSO Survey"). Ex. I at 2; Ex. J at 2-3. In their email to Dr. Freedman, the student leaders shared two documents: a presentation deck summarizing the results of the NGSO Survey, and a separate summary of anonymous comments provided by students. Ex. J at 4-40, 41-48.

**Response**: Undisputed that the referenced email contains the quoted statements in Defendants' Paragraph 14. The NGSO survey results were never shared; the only information from the NGSO survey shared with Dr. Freedman was a purported summary of the data from the NGSO survey (the "NGSO Summary"). *See* Def. Ex. J at 1; Def. Ex. L at 38;16-39:2. Dr. Jordan improperly included manipulated statements from students (both current and former) as part of the anonymous NGSO Summary. *See* Ex. 16 at ¶¶ 3-7; Ex. 6.

15. The NGSO Survey results shared with Dr. Freedman reflected that many students had indicated in their survey responses that Plaintiff was not effective at supporting students or Department morale, students lacked confidence in Plaintiff to treat them respectfully, and students feared retaliation by Plaintiff. *See* Ex. J. For example, the survey results indicated that, when asked to "rate [Plaintiff's] effectiveness at supporting students" on a scale of 1 (very effective) to 5 (not effective at all), 64.5% of responding students selected 4 or 5. *See* Ex. J at 16. And when asked to "rate [Plaintiff's] effectiveness at supporting departmental morale" on a scale of 1 (very effective) to 5 (not effective at all), survey results indicated that 61.3% of respondents selected 4 or 5. *See* Ex. J at 17. When asked to rate their confidence that "if [they] brought an issue to [Plaintiff], he would treat you and the issue respectfully" on a scale of 1 (very confident) to 5 (completely unconfident), survey results indicated that 66.7% of respondents selected 4 or 5. *See* Ex. J at 20.

In addition, when asked whether they "fear that if [they] brought an issue to [Plaintiff, they] would face retaliation" on a scale of 1 (It is a major concern) to 5 (I do not have this concern), survey results indicated that 35.5% selected 1 or 2. *See* Ex. J at 22.

**Response**: Disputed. The NGSO survey results were never shared; the only information from the NGSO survey shared with Dr. Freedman was the NGSO Summary. *See* Def. Ex. J at 1; Def. Ex. L at 38;16-39:2. Defendants cannot state with any degree of certainty that the data in the NGSO Summary matched the data collected as part of the NGSO Survey, and made no inquiries to ensure its accuracy. *See* Def. Ex. L at 33:23-24, 42:22-43:2, 57:6-12, 58:9-17. Dr. Jordan improperly included manipulated statements from students (both current and former) as part of the anonymous NGSO Summary. *See* Ex. 16 at ¶¶ 3-7; Ex. 6. According to the NGSO Summary when asked to rate the overall "leadership at Kennedy", on a scale of 1 (very satisfactory) to 5 (completely unsatisfactory), 53.2% of respondents selected 3 or 2. *See* Def. Ex. J at 8. With respect to Plaintiff specifically, when asked to rate Plaintiff's "effectiveness as chair" on a scale of 1 (very effective) to 5 (not effective at all), 56.6% of respondents selected 3 or 2. *See* Def. Ex. J at 14. When asked whether Plaintiff "should continue to be the Chair of the Neuroscience Department" on a scale of 1 (absolutely) to 5 (definitely not), 56.67% of respondents selected 3, 2, or 1. *See* Def. Ex. J at 26.

16. The NGSO Survey results shared with Dr. Freedman also indicated that some students had "witnessed or experienced [Plaintiff] act inappropriately," including through "bullying" and had "heard . . . stories" of "sexual, racialized, and ableist comments." Ex. J at 25. The NGSO Survey results also included that Plaintiff "calls people names insulting their intelligence and uses offensive nicknames for students." *See* Ex. J at 25.

**Response**: Disputed. The NGSO survey results were never shared; the only information from the NGSO survey shared with Dr. Freedman was the NGSO Summary. *See* Def. Ex. J at 1; Def. Ex. L at 38;16-39:2. Defendants cannot state with any degree of certainty that the data in the NGSO Summary matched the data collected as part of the NGSO Survey, and made no inquiries to ensure its accuracy. *See* Def. Ex. L at 33:23-24, 42:22-43:2, 57:6-12, 58:9-17 Dr. Jordan improperly included manipulated statements from students (both current and former) as part of the anonymous NGSO Summary. *See* Ex. 16 at ¶¶ 3-7; Ex. 6. When asked "if you have witnessed or experienced [Plaintiff] act inappropriately", 53.8% of responses indicated alleged gender-based misconduct and 30.8% of responses alleged sexual misconduct. *See* Def. Ex. J at 25.

17. The summary of anonymous student comments shared by the NGSO's student leaders contained additional accounts of Plaintiff's behavior towards students. *See* Ex. J at 42-45. One comment described how Plaintiff would [redacted] Ex. J at 45. The comments reported that Plaintiff [redacted] Ex. J at 45. The student comments described instances in which Plaintiff [redacted] Ex. J at 44-45.

**Response**: Disputed. The NGSO Summary contained anonymous allegations, not accounts, or purported misconduct on the part of Plaintiff. *See* Def. Ex. J at 44-45.

Defendants cannot state with any degree of certainty that the data in the NGSO Summary matched the data collected as part of the NGSO Survey, and made no inquiries to ensure its accuracy. *See* Def. Ex. L at 33:23-24, 42:22-43:2, 57:6-12, 58:9-17. The allegations included manipulated statements from former students who never consented to the inclusion of their remarks in the survey. *See* Ex. 16 at ¶¶ 3-7; Ex. 6. The accusations included allegations of specifically [redacted]. *See* Def. Ex. J at 44-45. Such accusations included allegations that Plaintiff (i) [redacted] (ii) [redacted] (iii) [redacted] (iv) [redacted] (v) [redacted] *Id.*

18. After receiving these documents from the NGSO student leaders, Dr. Freedman shared them with Dr. Burns and Ms. Ramirez. Ex. J; Ex. K; Ex. L at 34:2-8. Dean Tomaselli learned of the concerns expressed in the documents from Dr. Burns. Ex. O at 47:22-48:10.

**Response**: Undisputed.

18.1. Dr. Burns was already aware of the survey results from a prior discussion with Dr. Jordan. In response to Dr. Freedman's notice of the NGSO Summary, Dr. Burns originally responded "let's see how this plays out". *See* Ex. 1. Dr. Burns later shared the materials with Ms. Ramirez. *See* Def. Ex. K.

**B. Faculty Concerns About Plaintiff's Performance as Chair**

19. On February 24, 2022, Plaintiff received a letter (the "Letter of Concern") signed by thirteen faculty in the Neuroscience Department, which stated that its authors were "very much concerned about [the] current state" of the Department, and that they hoped to "make clear how

serious the situation [was] and lead to a change in direction and a return to a healthier departmental culture." Ex. M.

**Response**: Undisputed.

19.1. Prior to sending the Letter of Concern, senior members of the Department had met with then-Executive Dean, Edward Burns ("Dr. Burns") regarding their concerns. At such time, Dr. Burns encouraged the faculty members not to send the Letter to Plaintiff, but to determine, as was the Department's usual way, a manner in which to work out the issues collegially with Dr. Khodakhah. *See* Def. Ex. U at 22:9-25:23, 29:9-21.

19.2. Members of the Department, including Pablo Castillo, lobbied to coerce senior and junior faculty to sign the Letter of Concern in an effort to attack Plaintiff and remove him as Chair or even as a faculty member altogether. *See* Ex. 15 at ¶¶ 6-12, Ex. 11at ¶¶ 15, 23; Ex. 17 at ¶¶ 6-9, 13; Def. Ex. D at 112:9-114:4, 148:9-149:3.

19.3. Of the signatories to the Letter of Concern, ne was a Professor Emeritus who had not actively worked for Einstein and had been retired for over a decade, and at least two of the signatories had not presented on campus in several years due to personal medical issues. *See* Def. Ex. L at 68:17-72:24; Def. Ex. D at 158:8-19.

20. The Letter of Concern asserted that Plaintiff's actions, including "demeaning and unprofessional comments," had been a primary cause of recent departures of administrative staff, and observed that the GEC Survey had shown "that a majority of our students have a negative outlook about departmental leadership," including due to Plaintiff's "autocratic and inappropriate behaviors." Ex. M.

**Response**: Undisputed that the Letter of Concern contains the referenced quoted

statements. Plaintiff disputes that the Letter of Concern made any 'observations' or references specifically to the GEC survey as argued in Defendants' Paragraph 20. The Letter of Concern referenced various concerns regarding the state of the Department and Plaintiff's leadership as Chair, and alleged, without any details or specifics, difficulty in hiring and recruiting for the Department, Plaintiff's "autocratic and inappropriate behaviors", as well as the results of a recent survey. *See* Def. Ex. M.

21. Dr. Burns and Dean Tomaselli were copied on the Letter of Concern. Ex. M. In Dean Tomaselli's view, the Letter of Concern "alone would be more than sufficient to initiate an investigation" of Plaintiff's performance as Chair. Ex. O at 45:17-47:10.

**Response**: Undisputed that Dr. Burns and Dean Tomaselli were copied on the Letter and that Dean Tomaselli testified as quoted herein.

## IV. Plaintiff and Einstein Respond to Faculty and Student Concerns Regarding Plaintiff's Leadership

22. Plaintiff responded to the Letter of Concern in a February 25, 2022 email to the Neuroscience faculty, Ms. Ramirez, Dean Tomaselli, and Dr. Burns. Plaintiff expressed "surprise" at his colleagues' concerns, while acknowledging that his subordinates may not have shared their concerns with him directly "because of the power differential." Ex. R at 2. In his email, Plaintiff stated that he had copied Dr. Burns and Ms. Ramirez to ask that they "interview [] staff" to "uncover the facts" and "provide all of us with a candid evaluation of the nature of my interactions with the staff, and the reasons for their low morale." Ex. R at 2-3. Plaintiff further wrote that "if [he] contributed to [the staff] leaving by being in anyway unprofessional, [he was] not worthy of serving as the Chair and [would] promptly resign from the position." Ex. R at 3.

**Response**: Undisputed.[3]

22.1. Plaintiff was puzzled upon receipt of the Letter of Concern as "a large number of the statements" were "totally wrong" and believed that there had been "some major misunderstanding". *See* Def. Ex. D at 103:23-104:11.

22.2. For example, the Letter of Concern referenced "recent departure of three experienced administrators" as being due to their interactions with Plaintiff. *See* Def. Ex. M.

22.3. None of the staff or administrators referenced reported their reason for leaving the Department as having anything to do with their interactions with Plaintiff. *See* Def. Ex. L at 61:64:19; Def. Ex. R at 1.

22.4. The Letter of Concern further referenced "recent failures to fill vacancies in the office" as being due to low office morale caused by Plaintiff. *See* Def. Ex. M.

22.5. While there was potentially low morale in the department, such was caused by the inability to hire and recruit new employees due to budgetary constraints, and the resultant effect it had on the workload of those in the Department. *See* Def. Ex. D at 101:3-102:8.

22.6. Plaintiff went to great lengths to work with Dean Tomaselli to address recruitment and budgetary issues to address these concerns but was rebuffed by the dean. *See* Def. Ex. L at 66:24-67:5.

22.7. Indeed, all of Einstein's departments experienced difficulties recruiting staff following the COVID-19 pandemic. Adding to this difficulty was a "pause" on hiring and salaries at Einstein following the pandemic. *See* Def. Ex. L at 65:13-67:5. The difficulties in recruiting, hiring, and maintaining staff in the department had nothing

[3] Plaintiff's emailed response is dated in UTC. The timestamp on the email, February 25, 2022 at 4:31 a.m. UTC, correlates to February 24, 2022 at 11:31 p.m. Eastern. *See* Def. Ex. D at 134:20-135:21.

to do with Plaintiff or the environment he created in the Department as Chair. *Id*.

22.8. With respect to the Letter of Concern's reference to "a recent survey" revealing the "students have a negative outlook about departmental leadership", the only survey Plaintiff was vaguely aware of at that time was the GEC survey. The GEC survey results showed, on a scale of 1 (strongly agree) to 5 (strongly disagree), a score of 3.229 for the prompt "I am confident that if I raised a concern to the leadership in the Department that they would take appropriate action." *See* Def. Ex. I at 28.

22.9. In Plaintiff's response to the Letter of Concern, Plaintiff addressed the categories of concerns referenced in the Letter of Concern, including the reference to departure of staff, difficulty recruiting, student survey results, and invited the faculty to meet with him so he could "hear your specific concerns to see how I can serve the department better". *See* Def. Ex. R.

22.10. Dr. Khodakhah also copied Yvonne Ramirez ("Ms. Ramirez") from Einstein's Human Resources Department ("HR") on his response and requested that she and Dr. Burns "interview the staff who have departed, and our current staff, so that they can uncover the facts, and con provide me and the Dean with their frank assessment." *Id*. In doing this, Plaintiff wished for HR to conduct an investigation into the faculty's concerns. *See* Def. Ex. D at 138:16-139:4, 143:2-5.

23. On February 26, 2022, Plaintiff emailed Dr. Burns and Ms. Ramirez again to reiterate that "the best approach" would be "a full review" so that "we can reassure the faculty and positively move forward." Ex. E at 2. Plaintiff also offered "categorical assertions" responding to the Letter of Concern, including that he "d[id] not believe [he had] ever treated a staff member unprofessionally, or disrespectfully," and that, aside from one student complaint years prior, he

could not "think of anything that [he] may have done to make the general student population have concerns with [his] actions." Ex. E at 2.

**Response**: Undisputed.

24. On February 27, 2022, Dr. Burns told Ms. Ramirez in an email that "as long as [she thought] there [we]re no Title IX issues to be concerned with," then they should meet with Plaintiff and propose an "in-situ sabbatical from being the Chair." Ex. S at 3. In a February 27, 2022 email, Ms. Ramirez informed Dr. Burns of her assessment that she did not believe there were "any [T]itle IX violations" at issue in the Letter of Concern or student survey results. Ex. N at 2. She went on to say that there was "obvious inappropriate conduct which needs to be addressed but nothing that rises to the level of sexual misconduct or assault." Ex. N at 2. Ms. Ramirez reached this conclusion, in part, because the NGSO Survey was "an anonymous survey with a lot of references that weren't directly experience[d]" by the survey respondents (or what she "would consider hearsay"), Ex. L at 81:12-82:6, and because the NGSO Survey did not contain "sufficient information" to permit her to conclude that the allegations implicated Title IX, Ex. L at 54:7-17.

> **Response**: Partially disputed. The NGSO survey results were never shared; the only information from the NGSO survey shared with Dr. Freedman was the NGSO Summary. *See* Def. Ex. J at 1; Def. Ex. L at 38;16-39:2. Defendants cannot state with any degree of certainty that the data in the NGSO Summary matched the data collected as part of the NGSO Survey *See* Def. Ex. L at 33:23-24, 42:22-43:2, 57:6-12, 58:9-17. Ramirez did not make any inquiries or attempts to determine whether Title IX was even potentially implicated by the allegations in the NGSO Summary. *See* Def. Ex. L at 33:23-24, 42:22-43:2, 57:6-12, 58:9-17. Ramirez did not make any inquiries into the actual responses to the NGSO Survey, the identity of the respondents to the NGSO Survey, or the validity of the

statements contained in the NGSO Summary. *See* Def. Ex. L at 33:23-24, 42:22-43:2, 57:6-12, 58:9-17, 91:18-92:16. Ms. Ramirez maintained that there could not be a determination that Title IX was implicated because the allegations (i) included more than just gender or sex based allegations, (ii) were anonymous and therefore would have taken a lot of work to make an assessment of whether there was a Title IX violation implicated, and (iii) consisted of secondhand accounts of alleged behavior. *See* Def. Ex. L at 81:12-83:17. Ms. Ramirez admits, however, that none of these are barriers to finding that allegations raise a potential Title IX violation. *See* Def. Ex. L at 81:12-83:17. Despite testifying that she wished to discuss the matter with Plaintiff during her Title IX assessment, prior to meeting with Plaintiff, Ms. Ramirez was confident there were no Title IX violations potentially implicated by the NGSO survey. *See* Def. Ex. L at 81:12-83:17. Ms. Ramirez also admits that the allegations as raised in the NGSO Summary "could have" implicated Title IX but that she did nothing more to determine whether Einstein should follow the Title IX procedures. *See* Def. Ex. L at 81:12-83:17, 93:15-94:18. Dr. Burns did not make any inquiries into whether Title IX was implicated by the NGSO Summary allegations and "took it as a matter of fact that there were [no Title IX issues." *See* Def. Ex. U at 47:17-48:25.

25. Dr. Burns and Ms. Ramirez met in-person with Plaintiff around March 1, 2022. Ex. D at 156:10-23; Ex. L at 116:18-24. The meeting lasted at least an hour, during which Plaintiff reiterated that he wanted a full investigation. Ex. D at 152:2-153:20; Ex. L at 111:2-14.

**Response**: Undisputed.

25.1. Despite testifying that she wished to discuss the matter with Plaintiff during her Title IX assessment, prior to meeting with Plaintiff, Ms. Ramirez was confident there were

no Title IX violations potentially implicated by the NGSO survey. *See* Def. Ex. L at 81:12-83:17; Def. Ex. N at 1.

25.2. During Plaintiff's meetings with Ms. Ramirez and Dr. Burns, they acknowledged that they knew the allegations against Plaintiff were false and acknowledged the lack of merit in the Letter of Concern, but they needed to appear responsive and deal with the concerns carefully because of the #MeToo movement, and to "appear to be responsive to complaints raised by various groups". *See* Def. Ex. D. at 157:3-163:21; Def. Ex. L at 112:3-19; Def. Ex. U at 65:17-66:5.

25.3. In a meeting between Dr. Burns and Plaintiff, Dr. Burns asked Plaintiff to step down from his position as Chair while Einstein investigated the concerns raised by students and faculty. *See* Ex. 3. Plaintiff advised that he would think about it and consider the option to step down with his family. *Id*.

25.4. Plaintiff separately advised Ms. Ramirez that he had been contacted by several faculty members who advised him of division amongst the faculty regarding the Letter of Concern and disagreement with the way the Letter of Concern was handled. *See* Ex. 2.

26. Also around March 1, 2022, Ms. Ramirez met with Plaintiff and reviewed the summary of anonymous student comments with him. Ex. D at 198:11-199:12; Ex. L at 109:7-110:3; Ex. T at 3. This meeting took at least one hour. Ex. L at 109:7-110:3.

**Response**: Undisputed.

27. Dr. Burns and Ms. Ramirez ultimately agreed with Plaintiff that an investigation was appropriate. Ex. D at 190:15-21, 193:11-194:4; Ex. L at 111:7-14; Ex. U at 53:14-54:7. They both had positive relationships with Plaintiff at the time. Ex. L 169:7-10; Ex. U at 19:15-24. At

the time, Dr. Burns hoped that an investigation would reveal the allegations concerning Plaintiff to be unfounded. *See* Ex. U at 82:10-83:6, 83:14-23, 85:4-18.

**Response**: Undisputed.

28. On March 3, 2022, Einstein's in-house Senior Counsel, Dana Lee, retained T&M USA, LLC ("T&M"), a professional investigative firm, to conduct an investigation into Plaintiff's alleged behavior (the "Chair Investigation"). *See* Ex. F at 3; Ex. V at 14:3-4.

**Response**: Undisputed.

28.1. As of March 2, 2022, Einstein had already determined that if they pursued an investigation, Plaintiff would not be permitted the ability to appeal or contest any findings, and intended to present and force Plaintiff to agree to such terms. *See* Ex. 4.

29. Einstein's retention of T&M was consistent with its usual practice of engaging an outside investigator to conduct the investigation where a conduct complaint involves a student. *See* Ex. F at 2; Ex. L at 92:19-93:2.

**Response**: Undisputed.

30. On March 8, 2022, Plaintiff sent a lengthy email to Dr. Burns with twelve attachments, including emails and other documents. Ex. W. In this email, Plaintiff acknowledged that "a subset of faculty" had made "[t]wo assertions . . . 1) that [Plaintiff had] been abusive of the administrative personnel and hence the reason for their departure, and [Plaintiff's] inability to recruit new staff, and 2) that the students have grave concerns." Ex. W at 2. In his email, Plaintiff sought to demonstrate that "the assertions made in the letter that [he had] been in any way mistreating the administrative staff [were] incorrect." Ex. W at 3. Regarding student concerns, Plaintiff stated in the email that "it is extremely important that their complaints me [sic] are paid attention to and addressed," and that he "was the first to propose that [Einstein] should have a full

enquiry conducted by an independent outside firm." Ex. W at 4. Nevertheless, in the email, Plaintiff rejected "the College's request for [him] to step down, and have an interim chair, as the enquiry [was] conducted." Ex. W at 4.

**Response**: Undisputed.

30.1. In Plaintiff's March 8, 2022 email, Plaintiff unequivocally rejected the suggestion to step down pending the investigation. *See* Def. Ex. W at 1.

31. On March 10, 2022, Dean Tomaselli notified Plaintiff by letter that Einstein would conduct an investigation into the concerns expressed by faculty and students. *See* Ex. X. In the letter, Dean Tomaselli explained that Einstein had received "concerns from the Neuroscience faculty and students related to [Plaintiff's] leadership as chair," and that Einstein would, as Plaintiff had requested, "engage external investigators to assist the College" in investigating these reports. *See* Ex. X at 2. In addition, in the letter, Dean Tomaselli informed Plaintiff that he was suspending Plaintiff's appointment as Chair until the Chair Investigation was concluded. *See* Ex. X at 2.

**Response**: Undisputed.

32. Dean Tomaselli discussed the decision to suspend Plaintiff as Chair with Dr. Burns, Ms. Ramirez, and Einstein's Senior Counsel, but it was ultimately Dean Tomaselli who made the decision. Ex. O at 73:20-74:5.

**Response**: Undisputed.

33. In his March 10, 2022 letter to Plaintiff, Dean Tomaselli observed that faculty and students had expressed that they were "fearful of retaliation," and he concluded that "the power differential [was] too great, and the loss of confidence and impact on morale too significant to allow [Plaintiff] to continue as chair while this investigation t[ook] place." Ex. X at 2. Dean

Tomaselli instructed Plaintiff that he was "not to communicate with any faculty or students about the investigation." Ex. X at 3.

**Response**: Undisputed.

34. Plaintiff responded to Dean Tomaselli, in part, by noting in an email that he "wholeheartedly agree[d] with the College's appointment of an external independent investigator." Ex. Y at 2. In that same email, Plaintiff said that he "look[ed] forward to a speedy investigation." Ex. Y at 2.

**Response**: Undisputed.

35. On March 10, 2022, Dean Tomaselli announced the Chair Investigation to the Neuroscience Department by email, explaining that Einstein had retained T&M to conduct the investigation and that the College "hope[d] to have [the Department's] full cooperation." Ex. Z at 3. In the email, Dean Tomaselli informed the Department that Plaintiff would step down as Chair during the pendency of the investigation and that the Dean's office would select a new Interim Chair. *See* Ex. Z at 3.

**Response**: Undisputed.

35.1. Plaintiff expressly did not step down as Chair. *See* Def. Ex. W. Dean Tomaselli was aware of Plaintiff's refusal to step down as Chair as of the time of his March 10 notice to the Department. *See* Def. Ex. O at 39:15-40:15, 79:6-82:22. Dean Tomaselli's statement to the Department regarding Plaintiff "step[ping] down as Chair during the pendency of the investigation" was a lie. *Compare* Def. Ex. W *with* Def. Ex. X and Def. Ex. Y; *See* Def. Ex. O at 79:6-19; Def. Ex. D at 357:4-358:7.

36. That same day, Plaintiff emailed professors in the Neuroscience Department and others about the investigation, stating that the engagement of an outside firm was "at [his] request,"

and expressing that he had "absolutely no doubt that once their investigations [we]re completed, [he would] be exonerated of all allegations." Ex. AA at 3.

**Response**: Undisputed.

37. Plaintiff contacted Dr. Jordan about the investigation on March 16, 2022, claiming that he was "certain that the detailed scrutiny of the outside firm will establish the facts" and claiming that he was "gathering information that might be necessary for a defamation attorney." Ex. BB at 3.

**Response**: Undisputed.

38. After the investigation was announced, members of the Neuroscience Department expressed concern about the confidentiality of the investigation. *See, e.g.*, Ex. CC; Ex. DD. For example, on March 14, 2022, a neuroscience professor informed Ms. Ramirez by email that "vulnerable" members of the Department "expressed concerns regarding the independent investigator and whether their comments will remain anonymous." Ex. CC at 2. Another neuroscience professor separately emailed Ms. Ramirez the same day to convey student concerns about whether any report of the investigation would contain information that identified them and, if so, whether it would be provided to Plaintiff. *See* Ex. DD at 2.

**Response**: Undisputed.

39. On March 16, 2022, Dean Tomaselli emailed the Department to explain that "details of the interviews" would "not [be] shared with the College" and that Einstein was "committed to protecting the confidentiality of all individuals who participate[d] in this process." Ex. EE at 3. In his email, Dean Tomaselli also noted that "the investigator may come across a situation which may lead to a Title IX complaint, and in this case they will quickly notify the person being interviewed that the College's Title IX Coordinator should be contacted and a

separate process be invoked." Ex. EE at 3. At the time, Dean Tomaselli believed that, although "there weren't specific Title IX kind of allegations at that point," the investigation would assist Einstein in understanding whether Plaintiff's conduct implicated Title IX. Ex. O at 104:11-105:2.

**Response**: Undisputed that the referenced exhibit and testimony contains the language quoted in Defendants' Paragraph 39.

## V. The Chair Investigation

### A. The T&M Review

40. The T&M investigative team consisted of a supervisor and Mr. Eric Prusan, a lawyer with approximately 30 years' legal experience. *See* Ex. V at 11:13-14:25; 17:23-18:15, 24:13-25:8. Einstein provided students, faculty, and staff in the Neuroscience Department with Mr. Prusan's contact information and encouraged individuals to participate on a confidential basis. *See* Ex. L at 136:12-137:13; Ex. EE at 3.

**Response**: Undisputed.

41. T&M conducted investigative work from March to May 2022. Ex. F at 3. T&M conducted interviews with fifty-nine current or former members of the Neuroscience Department and Einstein administrators, including Plaintiff. *See* Ex. F at 4-5. In addition to its interviews, T&M reviewed materials provided by Einstein, the Letter of Concern, the 2022 student survey results, correspondence between Plaintiff and Einstein, email communications provided by witnesses, Plaintiff's student course evaluations, and other materials provided directly by interviewees. *See* Ex. F at 4-5, 16. Einstein instructed T&M that, if Title IX allegations arose during the Chair Investigation, the investigator should refer the individual to Ms. Ramirez as Einstein's Title IX Coordinator. *See* Ex. L at 136:16-137:13; Ex. O at 109:18-110:10; Ex. H at 96:19-97:13; Ex. F at 5 n.8.

**Response**: Undisputed.

41.1. The inclusion of a reference specifically to Title IX indicated to Plaintiff the potential for "gender-based discrimination allegations" against him as part of the investigation. *See* Def. Ex. D at 360:2-13.

42. Shortly after T&M was engaged, Plaintiff had an introductory call with Mr. Prusan, after which Mr. Prusan told Plaintiff that he would reach out to Plaintiff for a further conversation after gathering other information, and invited Plaintiff to contact him with any questions. Ex. FF at 2-3. In response, Plaintiff promised "unrestricted cooperation" and made several suggestions about how the investigation should proceed, including that T&M interview "[a] wide array of staff, faculty, [and] students" and "give [Plaintiff] specifics" of any allegations made. Ex. FF at 2.

**Response**: Undisputed.

43. Around the same time, on March 17, 2022, Plaintiff shared with Mr. Prusan the March 8, 2022 email Plaintiff sent to Dr. Burns responding to staff and student concerns. Ex. GG. Plaintiff also shared documents demonstrating his work as Chair. Ex. GG.

**Response**: Undisputed.

44. On May 19, 2022, Plaintiff, with his counsel, met with Mr. Prusan for over four hours at T&M's office. Ex. V at 29:3-14; Ex. D at 280:21-281:9; Ex. HH. During the meeting, Plaintiff was given the opportunity to respond to specific allegations against him, including that he "pulled people's hair, poked them in their stomach," "told them they should wear high heels," "gave nicknames," called students and the Dean "moron[s]," used "racist language," engaged in "bullying or retaliation," and consumed alcohol in class or in his lab, as well as concerns about at least two administrative staff. *See* Ex. V at 32:25-33:13, 57:25-58:12; *see also* Ex. D at 281:16-282:7, 291:7-16, 297:23-300:11, 368:4-20.

**<u>Response</u>**: Undisputed.

<u>44.1.</u>The bulk of Plaintiff's interview focused on Plaintiff's impression of Dean Tomaselli. Roughly 45 minutes of the interview consisted of Mr. Prusan asking Plaintiff questions about the allegations against him while the remaining three and a half hours was dedicated to "why he had the impression – Dean Tomaselli was against me." *See* Def. Ex. D at 281:16-282:11.

45. Following the meeting, Plaintiff provided Mr. Prusan with "additional information and clarifications," including information about the departures of several staff, his teaching, alcohol use, use of nicknames, and his responses to other allegations related to bullying and retaliation. Ex. Q. Plaintiff also provided Mr. Prusan with dozens of documents. Ex. Q; Ex. II; Ex. JJ; Ex. KK; Ex. ZZ. Mr. Prusan acknowledged receipt, told Plaintiff he would "review the information," and asked follow-up questions. Ex. Q at 2-3; Ex. ZZ at 4.

**<u>Response</u>**: Undisputed. *See also*, Ex. 7.

46. T&M conducted its investigation confidentially and did not provide Einstein with the names of interviewees. *See* Ex. L at 140:11-17, 159:22-160:4; Ex. F at 5.

**<u>Response</u>**: Undisputed.

47. During the investigation, when Ms. Ramirez was contacted by individuals with concerns relating to allegations against Plaintiff or to the investigation, including a former student who left Einstein the year before, a former member of Plaintiff's lab, and Plaintiff himself, she directed those individuals to T&M. *See* Ex. LL at 2; Ex. MM; Ex. L at 167:17-168:5.

**<u>Response</u>**: Undisputed.

**B. T&M's Investigative Summary Documents Extensive Concerns About Plaintiff's Leadership of the Department**

48. T&M delivered its Investigative Summary to Einstein in early July 2022. *See* Ex. F at 2. T&M's Investigative Summary recounted the evidence T&M reviewed and the testimony of the witnesses it interviewed, without identifying witnesses by name, other than Plaintiff and one other professor. Ex. F.

**<u>Response</u>**: Undisputed.

49. The Investigative Summary described the faculty's and students' concerns with Plaintiff's leadership of the Department and conduct as Chair, as expressed to the investigators. For instance, the Investigative Summary noted that senior faculty described Plaintiff as [redacted] Ex. F at 6, 8. Witnesses [redacted] Ex. F at 8. Even students who described Plaintiff as [redacted] Ex. F at 6. In addition, [redacted] Ex. F at 15.

**<u>Response</u>**: Undisputed only that the Investigative Summary contains the quoted passages referenced in Defendants' Paragraph 49.

50. The Investigative Summary also recounted reports by witnesses that Plaintiff [redacted] Ex. F at 7. For instance, the Investigative Summary reported that Plaintiff [redacted]

[redacted] Ex. F at 11.

**Response**: Undisputed only that the Investigative Summary contains the quoted passages referenced in Defendants' Paragraph 50.

51. The Investigative Summary reported that Plaintiff admitted [redacted] Ex. F at 11. For instance, the Investigative Summary reported that Plaintiff acknowledged that "his use of the nickname 'Hobble' was a mistake" and that "Barely Legal is not appropriate now." Ex. F at 11; *see also* Ex. H at 89:7-18; Ex. G at Response No. 66.

**Response**: Undisputed only that the Investigative Summary contains the quoted passages referenced in Defendants' Paragraph 51.

52. The Investigative Summary reported that Plaintiff [redacted] Ex. F at 7-8.

**Response**: Undisputed only that the Investigative Summary contains the quoted passages referenced in Defendants' Paragraph 52.

53. The Investigative Summary contained reports about Plaintiff's treatment of staff members, with six of the seven staff members interviewed describing Plaintiff as [redacted] Ex. F at 12. Staff members reported that Plaintiff [redacted] *See* Ex. F at 12.

**Response**: Undisputed only that the Investigative Summary contains the quoted passages

referenced in Defendants' Paragraph 53.

54. The Investigative Summary contained reports of Plaintiff's [redacted] Fifteen individuals reported that Plaintiff [redacted] *See* Ex. F at 13. At least six individuals reported that they observed Plaintiff [redacted] Ex. F at 13.

**Response**: Undisputed only that the Investigative Summary states as referenced in Defendants' Paragraph 54.

55. The Investigative Summary reported that nearly all PhD students, and all junior professors except three, expressed concern [redacted] *See* Ex. F at 13.

**Response**: Undisputed only that the Investigative Summary states as referenced in Defendants' Paragraph 55.

56. The Investigative Summary also included reports of Plaintiff's positive contributions as Chair. For instance, the Investigative Summary reported that [redacted] Ex. F at 6.

**Response**: Undisputed only that the Investigative Summary states as referenced in Defendants' Paragraph 56.

57. The Investigative Summary included the explanations offered by Plaintiff for his behavior and comments. *See, e.g.*, Ex. F at 9, 13. For instance, the Investigative Summary reported

that Plaintiff [redacted] Ex. F at 9. The Investigative Summary noted Plaintiff's explanation that [redacted] Ex. F at 13. And it recounted Plaintiff's [redacted] Ex. F at 14.

**<u>Response</u>**: Undisputed only that the Investigative Summary states as referenced in Defendants' Paragraph 57.

**VI. Following the Chair Investigation, Plaintiff Is Removed as Chair**

58. Based on the results of the Chair Investigation, it was "very clear" to Dean Tomaselli that Plaintiff "would not be able to serve as chair any longer." Ex. O at 95:11-15. The results of the Chair Investigation were discussed in a meeting with Dean Tomaselli, Dr. Burns, Ms. Ramirez, and Einstein's Senior Counsel, and it was Dean Tomaselli who made the decision to remove Plaintiff as Chair. Ex. O at 92:25-93:8; 101:7-102:10; Ex. L at 161:16-25; Ex. U at 88:22-89:4; *see also* Ex. D at 317:19-23. Plaintiff was informed of the results of the Chair Investigation on July 11, 2022, in a letter from Dean Tomaselli. *See* Ex. NN at 5.

**<u>Response</u>**: Undisputed.

59. The Dean's letter explained that while Plaintiff was "an excellent scientist" and had "accomplished great things for the Department," T&M's investigation had "confirmed that [Plaintiff's] leadership methods have contributed to a toxic environment." Ex. NN at 5. The Dean's letter explained that the investigation had "confirmed the most serious concerns regarding

[Plaintiff's] behavior, including: (1) persistent general mistreatment of students; (2) persistent and inappropriate use of discriminatory nicknames; (3) repeated instances of racist, disability, and gender-based comments and insensitive and politically incorrect comments; (4) repeated references to students and others as 'morons' in front of both students and faculty; (5) repeated inappropriate and unwanted physical touching, including pulling female students' ponytails, stomach touching, shoulder touching, and pushing; (6) repeated instances of serving alcohol to and drinking alcohol with students in classes and in the lab, which is in direct violation of Einstein's Drug and Alcohol Policy; (7) inappropriate behavior at on- and off-campus Einstein events, believed to be due to intoxication; and (8) persistent mistreatment, intimidation, and abuse of staff, including by threatening the loss of their jobs and privileges such as vacation and personal time." *See* Ex. NN at 5-6. The letter further noted that "students and faculty alike expressed to the investigators a fear of retaliation if they were to report or complain about [Plaintiff's] behavior in any way, including by participating in the investigation." Ex. NN at 6. The letter explained that Plaintiff's conduct was "outside the bounds of an appropriate professor/student/employee relationship and violate[d] Einstein policies." Ex. NN at 6.

**Response**: Undisputed that the referenced exhibit contains the quoted statements in Defendants' Paragraph 59.

60. Dean Tomaselli concluded that "the impact of [Plaintiff's] behavior on the environment and morale of the Department [was] too significant to have [Plaintiff] continue in a leadership position." Ex. NN at 6. Accordingly, Dean Tomaselli exercised his discretion to remove Plaintiff as Chair "effective immediately." Ex. NN at 6; Ex. O at 95:5-8.

**Response**: Undisputed that the referenced exhibit contains the quoted statements in Defendants' Paragraph 60.

61. Dean Tomaselli explained that his decision to end Plaintiff's leadership role did not extend to Plaintiff's tenured faculty appointment. *See* Ex. NN at 6. Plaintiff currently remains a tenured faculty member at Einstein and continues to receive a salary from Einstein. *See* Ex. G at Response Nos. 101-02.

**Response**: Undisputed.

62. Dr. Adam Kohn, a male professor, replaced Plaintiff as interim Chair. *See* Ex. O at 93:12-20; Ex. PP at 4; Ex. QQ at Response Nos. 116-18.

**Response**: Undisputed.

**VII. Plaintiff's Separate Title IX Proceedings**

63. During the Chair Investigation, Ms. Ramirez, as Einstein's Title IX Coordinator, was notified of allegations that Plaintiff had engaged in sexual misconduct and harassment of two female faculty members. *See* Ex. NN at 2.

**Response**: Undisputed.

63.1. Ms. Ramirez learned of the first set of allegations in or around late April of 2022. In speaking with the potential complainant, Ms. Ramirez made it a point to ask if she knew any other individuals who would come forward with misconduct or harassment allegations against Plaintiff, and one person was identified. Neither of the potential complainants wanted to pursue an investigation and so, in July of 2022 (four months later), Ms. Ramirez took it upon herself to initiate two Title IX investigations against Plaintiff as the stand-in complainant. *See* Def. Ex. L at 137:14-140:9, 141:21-142:15.

64. Beyond referring the allegations of possible Title IX violations to Einstein, T&M did not play any role in investigating or adjudicating those Title IX complaints. *See* Ex. H at 97:9-24.

**Response**: Undisputed.

65. Plaintiff was notified that complaints had been filed relating to these allegations on July 11, 2022, and that these investigations would proceed under Einstein's Title IX policy. *See* Ex. NN at 8, 12.

**Response**: Undisputed.

65.1. Ms. Ramirez learned of the first set of allegations in or around late April of 2022. In speaking with the potential complainant, Ms. Ramirez made it a point to ask if she knew any other individuals who would come forward with misconduct or harassment allegations against Plaintiff, and one person was identified. Neither of the potential complainants wanted to pursue an investigation and so, in July of 2022 (four months later), Ms. Ramirez took it upon herself to initiate two Title IX investigations against Plaintiff as the stand-in complainant. *See* Def. Ex. L at 137:14-140:9, 141:21-142:15

**VIII. Lack of Bias**

66. Dr. Jordan, Dr. Kohn, and the other faculty who drafted the Letter of Concern did not oppose Plaintiff because of his sex. *See* Ex. D at 104:12-105:9, 133:22-134:2.

**Response**: Undisputed.

67. Neither Dr. Burns nor Ms. Ramirez demonstrated any bias against men in connection with the Chair Investigation. *See* Ex. D at 220:19-24, 222:16-23.

**Response**: Disputed. Dr. Burns and Ms. Ramirez demonstrated a bias against Plaintiff in pursuing allegations of sexual misconduct they knew and acknowledged were false due to the pressure to appear responsive in the wake of the #MeToo movement. Def. Ex. D. at 157:3-163:21; Def. Ex. L at 112:3-19. Ms. Ramirez further ignored evidence of the allegations' falsity and manipulation of the NGSO Summary's allegations against Plaintiff.

*See* Ex. 6, Ex. 16.

68. Neither Mr. Prusan nor anyone at T&M made statements that were derogatory of men. *See* Ex. D at 308:13-310:11.

**Response**: Undisputed.

**IX. Einstein Policies**

69. Einstein's Code of Conduct provides that all employees, including faculty, are expected to maintain a professional environment conducive to the development of students, and to respect each student. *See* Ex. RR at 5. The Code of Conduct specifies that faculty "are expected to . . . respect each student as a valuable individual." Ex. RR at 5.

**Response**: Undisputed.

70. Einstein's Employee Handbook "prohibits the . . . unauthorized use of alcohol at any Einstein facilities or in connection with any Einstein activities," and violations of that policy may result in "appropriate disciplinary action, up to and including termination of employment." *See* Ex. SS at 26.

**Response**: Undisputed.

71. Einstein maintains policies that prohibit certain forms of sexual and gender-based misconduct, consistent with federal regulations. *See* Ex. UU; Ex. VV. Those policies have been amended over time to align with federal regulations. *See* Ex. UU; Ex. VV; Ex. WW; Ex. XX; Ex. YY.

**Response**: Undisputed.

72. From 2020 to 2022, Einstein maintained a policy entitled "Title IX Gender Based Misconduct, Discrimination and Harassment Policy and Complaint Procedures for Employees and Non-Students" (the "Title IX Policy"), which prohibited forms of quid pro quo harassment, sexual

harassment, sexual assault, dating violence, domestic violence, and stalking that violate Title IX, and specified the procedures for investigating and adjudicating allegations of such violations. *See* Ex. UU at 12.

**Response**: Undisputed.

73. The Title IX Policy notes that "reporting anonymously may affect the College of Medicine's ability to investigate and respond effectively." Ex. UU at 15.

**Response**: Undisputed.

74. From 2020 to 2022, Einstein also maintained a substantially similar policy governing Title IX complaints and violations involving a student. *See* Ex. VV. That policy also notes that "reporting anonymously may affect the College of Medicine's ability to investigate and respond effectively." Ex. VV at 18.

**Response**: Undisputed.

75. None of these policies expressly rely on or discriminate based on an individual's sex. *See* Ex. RR; Ex. SS; Ex. UU, Ex. VV, Ex. WW, Ex. XX; Ex. YY.

**Response**: Undisputed.

## X. Einstein and Montefiore's Relationship

76. In September 2015, Einstein began an affiliation with Montefiore. *See* Ex. SS at 5.

**Response**: Undisputed.

77. Despite this affiliation, Einstein is an independent and separate entity, maintaining a separate employer ID number, separate payroll accounts, and separate human resources functions. *See* Ex. L at 27:11-29:10.

**Response**: Disputed. Ms. Ramirez has a "dotted line relationship" with Montefiore's Chief Human Resources Officer, Gloria Kenny ("Ms. Kenny"). Ms. Ramirez sat on Ms. Kenny's

leadership team. Ms. Kenny has supervisory authority over Ms. Ramirez in that they "operate in a matrix". Ms. Ramirez kept Ms. Kenny apprised of the investigation against Plaintiff. *See* Def. Ex. L at 27:11-17, Ex. 13. Montefiore's President and Chief Executive Officer, Phillip Ozuah ("Dr. Ozuah") had a direct hand in Plaintiff's continued employment and was also kept apprised of the investigation by Dean Tomaselli. Def. Ex. D at 68:13-69:8 (174-4); Ex. 14; Ex. 12.

78. With respect to human resources functions, Montefiore's Chief Human Resources Officer has no authority to determine or dictate how investigations of employees at Einstein are conducted or to control the outcome of such investigations, nor does Einstein's Vice President for Human Resources report to Montefiore's Chief Human Resources Officer with respect to such investigations. *See* Ex. L at 27:20-29:10, 134:12-20.

**Response**: Disputed. Ms. Ramirez has a "dotted line relationship" with Montefiore's Chief Human Resources Officer, Gloria Kenny ("Ms. Kenny"). Ms. Ramirez sat on Ms. Kenny's leadership team. Ms. Kenny has supervisory authority over Ms. Ramirez in that they "operate in a matrix". Ms. Ramirez kept Ms. Kenny apprised of the investigation against Plaintiff. *See* Def. Ex. L at 27:11-17, Ex. 13.

**PLAINTIFF' STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO FED. R. CIV. P 56.1**

**A. Plaintiff's Relationship and History of Disagreements with Dean Tomaselli.**

79. In or around 2018, Gordon Tomaselli ("Dean Tomaselli") was appointed Dean of Einstein. *See* Ex. Def. D at 54:25-55:12.

80. Plaintiff served on the search committee who selected Dean Tomaselli's for hire; Dean Tomaselli was Plaintiff's top choice to fill the role. *See* Def. Ex. D at 55:13-56:7.

81. Plaintiff maintained a professional relationship with Dean Tomaselli; however,

early into Dean Tomaselli's tenure as dean, disagreements arose regarding Dean Tomaselli's performance and support for the College and Department. *See* Def. Ex. D at 56:11-68:12.

82. Plaintiff's disagreements with Dean Tomaselli concerned, among other things, the dean's lack of responsiveness to emails, reneging on offer letters to staff and new hires, failure to address budget concerns for the College and department, and failure to support the animal facility vital to the department's research efforts. *Id.*

83. As a result of Dean Tomaselli's poor performance, Plaintiff tendered his resignation as Chair in 2021 which he later withdrew after being persuaded to remain as Chair by Dr. Ozuah. *See* Def. Ex. D at 68:13-69:8.

84. Still, Dean Tomaselli described his relationship with Plaintiff as "not unlike [his] working relationship with other department chairs" and Plaintiff's complaints as "no more than other departments" and "pretty much similar to other complaints about resources [and] resources for departments." *See* Def. Ex. O at 19:18:23-21:3.

**B. Members of the Department's Efforts to Concoct and Manipulate Reports of Misconduct Against Plaintiff as Part of the Letter of Concern and Student Surveys**

85. Beginning in February of 2022, senior faculty members of the department engaged in a concerted campaign against Plaintiff. In so doing, the senior faculty sought to garner, and where necessary, fabricate salacious allegations of misconduct against Plaintiff with the intent to oust Plaintiff as Chair. *See* Ex. 11; Ex. 15; Ex. 16; Ex. 17.

86. By way of example, Dr. Jordan contacted students to discuss a survey concerning the Neuroscience Department. Dr. Jordan represented that the survey revealed a distrust of Plaintiff and led students to believe that he was gathering examples to speak directly to Plaintiff about. *See* Ex. 16 at ¶ 1, 13-15.

87. In February of 2022, Dr. Jordan contacted [redacted] ("Dr. [redacted]"), a

former graduate student of Plaintiff's laboratory. In his discussion, he described certain situations that had come to his attention, such as Plaintiff's alleged [redacted], and asked for Dr. [redacted] perspective on the scenario as a woman and former student. *See* Ex. 16 at ¶¶ 3-5.

88. This incident, as described and known to Dr. Jordan as of February 2022, formed the basis of one of the later brought Title IX investigations against Plaintiff. *See* Def. Ex. NN.

89. Dr. Jordan asked [redacted] to provide further examples and context of her interactions with Plaintiff to assist in his anticipated discussion with Plaintiff. *See* Ex. 16 at ¶¶ 3-5.

90. Instead, Dr. Jordan used Dr. [redacted] statements and incorporated them into the NGSO Summary without her prior knowledge or consent. *See* Ex. 16 at ¶¶ 6-8. Dr. [redacted] never took the purported NGSO survey or any student survey as related to the investigation against Plaintiff. *See* Ex. 6; *See* Ex. 16 at ¶¶ 6-7.

91. Dr. Jordan used manipulated statements from students, such as Dr. [redacted], to draft the NGSO Summary, and then used that document as a means to coerce faculty into signing the Letter of Concern. *Id*.

92. Senior faculty members persistently lobbied their colleagues in the Department to sign the Letter of Concern. *See* Ex. 15 at ¶¶ 7-8; *See* Ex. 11 at ¶¶ 15-13; *See* Ex. 17 at ¶¶ 4-9.

93. Some of those who joined as signatories to the Letter of Concern were led to do so under false pretenses; rather than use the Letter of Concern to open a conversation with Plaintiff about the Department, the Letter of Concern was used to push the "malevolent feelings of some of the senior male faculty" against Plaintiff. *See* Ex. 15 at ¶¶ 5-8.

94. As of March 2022, Dr. Jordan already predicted, and it was his intent, that Plaintiff

would be removed as Chair due to his efforts to collect damning allegations against Plaintiff. *See* Ex. 16 at ¶¶ 19-22.

95. By way of further example, Pablo Castillo ("Dr. Castillo") and a group of select senior faculty approached other faculty members, including Dr. Jelena Radulovic ("Dr. Radulovic") to pressure them to join in a letter of complaint against Plaintiff. *See* Ex. 17 at ¶¶ 6-9.

96. In particular, Dr. Castillo and his "collaborators" exerted significant pressure on junior faculty to join in complaints against Plaintiff. *Id*.

97. Those that never witnessed any inappropriate conduct by Plaintiff, such as Dr. Radulovic, refused to sign despite mounting pressure. *Id*.

98. Dr. Radulovic attests that Dr. Castillo, with the knowledge and support of Dean Tomaselli, pursued Title IX allegations and incriminating information/evidence of Plaintiff's alleged sexual misconduct from faculty and students. This information, months later, became at least the partial basis for two formal Title IX investigations against Plaintiff. *See* Ex. 17 at ¶¶ 4-10, 13-14, 23.

99. Dean Tomaselli was aware of Dr. Castillo and Dr. Jordan's efforts and supported them. *Id*.

100. Dean Tomaselli, Dr. Jordan, and Dr. Castillo weaponized Title IX to achieve their own malicious intentions against Plaintiff. *Id*.

**C. Defendants Determine without Sufficient Inquiry that the Allegations against Plaintiff do not even Potentially Implicate Title IX and Deny Plaintiff His Statutorily Protected Procedural Rights in the Chair Investigation**

101. The NGSO Summary consisted, among other things, of anonymous allegations of [redacted] by Plaintiff. *See* Def. Ex. J.

102. Specifically, the NGSO Summary alleged the following reports from students:

a. “[redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted]”

b. “[redacted]”

c. “[redacted]”

d. [redacted]”

e. [redacted]”

f. “[redacted]”

g. [redacted]’”

h. [redacted]”

i. [redacted]”

j. “[redacted]”

k. [redacted]”

*See* Def. Ex. J at 44-45.

103. The NGSO Summary also reported that, when asked “if you have witnessed or experienced [Plaintiff] act inappropriately”, 53.8% of responses indicated alleged gender-based

misconduct and 30.8% of responses alleged sexual misconduct. *See* Def. Ex. J at 25.

104. All potentially applicable versions of Einstein's Title IX Policy, including the 2018, 2020, and 2022 policies, prohibited sexual harassment and mandated that allegations of potential Title IX-Sexual Harassment follow a strict investigative and adjudicative process. *See* Def. Ex. XX; Def. Ex. VV; Def. Ex. YY; Def. Ex. UU; Def. Ex. WW.

105. Einstein's 2018, 2020 and 2022 versions of the Title IX Policy defined Title IX-Sexual Harassment as "any *unwelcome* or *unwanted* sexual advances, or other verbal, physical, demonstrative, or electronic conduct or communication of a sexual nature, or which is directed at an individual because of the individual's sex. *See* Def. Ex. XX at 10-11; Def. Ex. VV at 7-8; Def. Ex. YY at 7-8; Def. Ex. UU at 6; Def. Ex. WW at 18.

106. The 2018, 2020, and 2022 Title IX Policies all provided the following examples of potential Title IX-Sexual Harassment: "comments of an overtly sexual nature"; "remarks of a sexual nature about an individual's clothing or body"; "remarks speculating about an individual's sexual orientation, activity or previous sexual experiences"; "verbal harassment of abuse of a sexual nature"; "making offensive gender-based remarks"; "unwanted touching, hugging, or brushing against an individual's body"; "bullying, yelling, or name-calling"; and "sexually discriminatory remarks made by someone which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation…" *Id.*

107. The allegations raised in the NGSO Summary [redacted] under the 2018, 2020, and 2022 Title IX Policies. *Compare* Def. Ex. J at 25, 44-45 *with* Def. Ex. XX at 10-11; Def. Ex. VV at 7-8; Def. Ex. YY at 7-8; Def. Ex. UU at 6; Def. Ex. WW at 18.

108. Implication of a Title IX policy mandated that Einstein follow its Title IX Policy in

investigating the allegations against Plaintiff. *See* Def. Ex. O at 71:21-72:4 ("Q: But if Title IX had been implicated by the survey results or letter of concern, then an investigation would have had to follow the Title IX policy, is that right? A: That is correct, and the Title IX coordinator would have been involved.").

109. Ms. Ramirez determined within mere days that there were no Title IX violations and "nothing that rises to the level of sexual misconduct…" in the NGSO Summary, GEC Survey, or the Letter of Concern. *See* Def. Ex. N.

110. Ms. Ramirez came to this determination because the allegations (i) included some non-gender or sex-based allegations, (ii) were anonymous and would have taken more work than Ramirez was willing to do to further investigate, and (iii) consisted of secondhand accounts of alleged behavior. *See* Def. Ex. L at 81:12-83:17.

111. Ms. Ramirez admits that none of these are actual barriers to finding that allegations raise a potential Title IX violation. *See* Def. Ex. L at 81:12-83:17.

112. When questioned as to the applicability of the Title IX Policy definition to the individual allegations in the NGSO Summary, Ms. Ramirez admitted that at least some of the allegations in the NGSO Summary "could have" implicated Title IX but she did not do any further investigation into whether Einstein should pursue an investigation pursuant to the Title IX Policy. *See* Def. Ex. L at 81:12-83:17, 91:14-94:18.

113. Dr. Burns did not make any inquiries into whether Title IX was implicated by the NGSO Summary allegations and "took it as a matter of fact that there were [no Title IX issues." *See* Def. Ex. U at 47:17-48:25.

114. Dean Tomaselli understood Title IX to refer to "misbehavior as it relates to sex, sexuality, those kinds of things." *See* Def. Ex. O at 70:9-19.

115. Dean Tomaselli's position was that none of the allegations in the NGSO Summary implicated Title IX because he believed "either gender could be offended" by the alleged behavior and "both genders have orgasms". *See* Def. Ex. O at 61:9-69:2)

116. The Chair Investigation was not conducted pursuant to any rendition of Einstein's Title IX Policy. *See* Def. Ex. O at 70:22-71:11 ("Einstein was not investigating – was not doing a Title IX investigation at that time").

117. Plaintiff was not provided any of the procedural safeguards mandated for respondents under the Title IX Policy. *See* Def. Ex. O at 70:22-71:11.

118. Despite repeated requests, Plaintiff was never provided an opportunity to review the Investigative Summary. *See* Ex. 8; Ex. 9; Ex. 10

**D. Einstein Ignores Evidence Calling into Question the Validity of the Underlying Complaints Against Plaintiff**

119. Faculty and students raised concerns regarding the validity of the underlying survey data and the manner in which Einstein was pursuing the investigation against Plaintiff. *See* Ex. 11; Ex. 15; Ex. 16; Ex. 17.

120. By way of example, in or around March of 2022, Dr. [redacted] learned that statements she had made in confidence to Dr. Jordan were included, without her consent, in the NGSO Summary. *See* Ex. 16 at ¶¶ 6-12.

121. On April 14, 2022, Dr. [redacted] notified Mr. Prusan and Ms. Ramirez that Dr. Jordan had manipulated statements she made to him in confidence and, without her consent, included them in the NGSO Summary in "a derogatory manner" and in such a way as to "change[] the nature of the conversation to the extent that it comes off as a very harsh allegation, that is now part of an investigation that is damaging [Plaintiff's] career…" *See* Ex. 6.

122. Despite knowledge that Dr. [redacted] statements were improperly and without

her consent, included in the NGSO Summary, they remained as part of the basis for the investigation and the claims against Plaintiff were not changed to reflect the inaccuracy of Dr. [redacted] alleged allegation. *See* Ex. 16 at ¶¶ 6-12.

123. Dr. [redacted] was not the only student to come forward and notify Einstein that the allegations against Plaintiff were false and had been conspired and manipulated by the senior faculty. *See* Def. Ex. D at 204:13-209:9; *See* Ex. 16 at ¶¶ 13-15.

124. Ms. Ramirez still took no steps to determine whether the remaining allegations in the NGSO Summary were similarly tainted or false. *See* Ex. 16 at ¶¶ 6-12; Def. Ex. L at 148:13-154:4.

125. Moreover, as of March 3, 2022, Ms. Ramirez was aware that students wanted their comments removed from the NGSO Summary and advised that the comments could be removed but that the students should be assured before they asked to remove comments that the NGSO Summary would never be shown to Plaintiff. *See* Ex. 5.

126. Ms. Ramirez had already shown Plaintiff the NGSO Summary including the students' alleged comments. Def. Ex. D at 198:11-199:12; Def. Ex. L at 109:7-110:3; Def. Ex. T at 3. This meeting took at least one hour. Def. Ex. L at 109:7-110:3.

127. By way of further example, several faculty members met with Dr. Burns and Ms. Ramirez to express concern over the targeted attack on Plaintiff and the manner in which Einstein was handling the investigation. *See* Ex. 17 at ¶¶ 16-20; *See* Ex. 11 at ¶¶ 24-26.

128. Ms. Ramirez took no action to investigate reports that the allegations against Plaintiff were not raised in good faith. *Id*.

129. Several faculty members were interviewed as part of the investigation conducted by Mr. Prusan including, but not limited to, [redacted].

*See* Ex. 11 at ¶ 16.

130. Dr. [redacted] met with Mr. Prusan on or about April 20, 2022. During his interview, Dr. [redacted] shared [redacted] *See* Ex. 11 at ¶ 17.

131. In response, Mr. [redacted] *See* Ex. 11 at ¶¶ 18-19.

132. After Dean Tomaselli advised Dr. Alpert that Plaintiff would be removed as Chair in July of 2022, Dr. Alpert protested to which Dean Tomaselli advised that the investigation resulted in "very troubling findings" and that a Title IX investigation was coming. *See* Ex. 11 at ¶¶ 21-23.

133. Dr. Alpert met with Ms. Ramriez and Dr. Burns thereafter to express his concerns regarding the handling of the investigation. Rather than substantively address, Dr. Alpert's concerns, Ms. Ramirez and Dr. Burns implored Dr. Alpert to convince Plaintiff to resign. *See* Ex. 11 at ¶¶ 24-26.

Respectfully submitted this 14th day of October, 2026.

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**

**By:** ***/s/ Andrew T. Miltenberg***
**Andrew T. Miltenberg, Esq.**
**Stuart Bernstein, Esq.**
**Gabrielle M. Vinci, Esq.**
**363 Seventh Ave, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**