**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KAMRAN KHODAKHAH,

*Plaintiff,*

v.

MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., et al.,

*Defendants.*

No. 1:24-cv-00839-LAK-RFT

**DEFENDANTS MONTEFIORE MEDICINE ACADEMIC HEALTH SYSTEM, INC., AND ALBERT EINSTEIN COLLEGE OF MEDICINE'S RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, Defendants Montefiore Medicine Academic Health System, Inc. ("Montefiore") and Albert Einstein College of Medicine ("Einstein," and together with Montefiore, "Defendants") respectfully submit this response to the additional statements of fact set forth in Plaintiff Kamran Khodakhah's Response to Defendants' Rule 56.1 Statement of Material Facts (ECF 210) ("Pl. 56.1 Resp."), both the numbered paragraphs under the heading "Plaintiff's Statement of Additional Material Facts" (Pl. 56.1 Resp. ¶¶ 79-133) and the decimal-numbered sub-paragraphs that Plaintiff inserted beneath his responses to Defendants' statements (*id.* ¶¶ 4.1-65.1). Defendants respond to the sub-paragraphs notwithstanding that they are neither responses to Defendants' correspondingly numbered statements nor a "separate, short and concise statement of additional material facts," Local Civ. R. 56.1(b), so that no statement is left unanswered. For the Court's convenience, only Plaintiff's additional statements are reproduced below, as filed and with Plaintiff's numbering and section headings retained, each followed by Defendants' response; Defendants' original statements and Plaintiff's responses to them are omitted.

A response of "immaterial" means that the statement, whether or not accurate, does not bear on any issue presented by Defendants' motion. To the extent a statement consists of legal argument or characterization rather than fact, Defendants object; such statements "belong in briefs, not Rule 56.1 statements." *Alliance Sec. Prods., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) (Kaplan, J.); *see Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Kaplan, J.) ("Rule 56.1 statements are not argument."). Defendants further object under Fed. R. Civ. P. 56(c)(2) and (c)(4) to statements supported only by hearsay or by a declarant's stated "perception" rather than personal knowledge, as identified below. Defendants' position on Plaintiff's responses to Defendants' own statements is addressed in Defendants' reply memorandum and is not repeated here.[1]

**PLAINTIFF'S ADDITIONAL STATEMENTS OF FACT INSERTED WITHIN HIS RESPONSES TO DEFENDANTS' RULE 56.1 STATEMENT**

## II. Plaintiff's Service as Chair of Einstein's Neuroscience Department

4.1. As Chair of the Department of Neuroscience (the "Department"), Plaintiff had responsibility, to varying degrees, for, among other things, faculty recruitment, faculty appointment and supervision, faculty evaluations, management of department staff, assistance in ensuring students graduated, student laboratory assignments and lab resources, and addressing student concerns. *See* Def. Ex. D at 48:13-52:22.

**Defendants' Response**: Undisputed.

[1] Citations to "Def. Ex. __" are to the exhibits to the Declaration of Gabrielle E. Tenzer (ECF 174; sealed versions at ECF 169), and citations to "Pl. Ex. __" are to the exhibits to the Declaration of Andrew T. Miltenberg (ECF 209-1; sealed versions at ECF 212). The ECF number of each exhibit (or, for transcripts filed in parts, of the part containing the cited pages) is given in parentheses. "Defs.' 56.1" refers to Defendants' Rule 56.1 Statement (ECF 175), and a Defendants' statement is described as "undisputed" where Plaintiff's response to it states "Undisputed."

4.2. Under Plaintiff's leadership as Chair, the Department went from a struggling department with a declining number of faculty and substandard infrastructure to Einstein's largest and most successful department. *See* Ex. 15 at ¶¶ 3-4. He is described by his peers as "hands-down the hardest working chair" a "role model chair", and an "exemplar" professional. *See* Ex. 15 at ¶ 4, Ex. 11 at ¶¶ 7, 12. Plaintiff's esteemed colleagues have commended Dr. Khodakhah for his tenacity, as well as his commitment to diversity, transparency, and fairness. *See*. Ex. 11 at ¶¶ 7-8.

**Defendants' Response**: Undisputed that the cited declarations contain the quoted opinions; otherwise immaterial.

4.3. Even during the COVID-19 pandemic, Plaintiff was able to recruit "outstanding junior faculty, renovate the animal facility, acquire state-of-the-art equipment, and form an excellent new administrative team." *See* Ex. 17 at ¶ 2. Plaintiff always advocated for the Department and cared deeply for its faculty and students. *Id*.

**Defendants' Response**: Undisputed that Pl. Ex. 17 (ECF 209-18) ¶ 2 states as such; otherwise immaterial.

4.4. Indeed, the harshest criticism of Dr. Khodakhah from even those that raised concerns regarding him is his tendency to be "gregarious and speak[] his mind", and "express himself in spirited ways" that are sometimes not received well. *See* Ex. 15 at ¶ 5, Ex. 11 at ¶ 9.

**Defendants' Response**: Disputed, and immaterial. The statement is opinion, not fact: neither Dr. Hébert nor Dr. [redacted], the cited declarants, says that this is the "harshest criticism" of Plaintiff, and Dr. [redacted] is not among "those that raised concerns" in the Letter

of Concern or the student survey. *See* Def. Ex. M (ECF 174-25) at 2; Def. Ex. J (ECF 174-18) at 42-45.

6.1. Under Plaintiff's leadership as Chair, the Department went from a struggling department with a declining number of faculty and substandard infrastructure to Einstein's largest and most successful department. *See* Ex. 15 at ¶¶ 3-4. He is described by his peers as "hands-down the hardest working chair" a "role model chair", and an "exemplar" professional. *See* Ex. 15 at ¶ 4, Ex. 11 at ¶¶ 7, 12. Plaintiff's esteemed colleagues have commended Dr. Khodakhah for his tenacity, as well as his commitment to diversity, transparency, and fairness. *See* Ex. 11 at ¶¶ 7-8.

**Defendants' Response**: *See* Defendants' response to ¶ 4.2, which is incorporated here.

6.2. Indeed, the harshest criticism of Dr. Khodakhah from even those that raised concerns regarding him is his tendency to be "gregarious and speak[] his mind", and "express himself in spirited ways" that are sometimes not received well. *See* Ex. 15 at ¶ 5, Ex. 11 at ¶ 9.

**Defendants' Response**: *See* Defendants' response to ¶ 4.4, which is incorporated here.

7.1. None of the staff members who left reported their reason for leaving the Department as having anything to do with their interactions with Plaintiff. *See* Def. Ex. L at 61:64:19; Def. Ex. R at 1.

**Defendants' Response**: Disputed. The cited testimony is that Ms. Ramirez did not know why the staff members left ("I do not know"; "Not to me"), not that they reported no reason connected to Plaintiff. Def. Ex. L (ECF 174-21) at 61:13-64:19. Def. Ex. R (ECF 174-43) is Plaintiff's own email, which acknowledges that "it is possible that they chose not to share their concerns with me, and that I may be totally wrong." The Investigative Summary

reports that [redacted] and that one departed administrator's stated reason for leaving "[redacted]" Def. Ex. F (ECF 169-6) at 12 & n.11.

8.1. Plaintiff made the remark "you should enjoy making love, not just the climax" to a student as an analogy for working in science and the pursuit of publication of a "high-profile paper". The student did not appear offended at the time and, after Plaintiff apologized if he had offended her, she asked when Plaintiff was talking about. *See* Def. Ex. D at 211:4-213:15.

**Defendants' Response**: Undisputed, and immaterial.

8.2. Plaintiff referred to a student as "Hobble" without knowledge that the student was disabled. *See* Def. Ex. D at 283:21-284:15.

**Defendants' Response**: Undisputed that Plaintiff testified as such and that the Investigative Summary recorded his explanation, Def. Ex. D (ECF 174-8) at 284:10-15; Def. Ex. F (ECF 169-6) at 11; otherwise immaterial.

8.3. During the investigation, Plaintiff provided explanations for his use of nicknames, some of which were not included in the later prepared investigative summary. *See* Def. Ex. F; Def. Ex. D at 284:22-285:9.

**Defendants' Response**: Disputed. The cited testimony does not identify any explanation Plaintiff gave the investigator that the Investigative Summary omitted. Plaintiff confirmed that the Summary accurately recorded his position on "[redacted]" and complained only that it "didn't say why"; asked what else was left out, he could not say ("I don't recall."). Def. Ex. D (ECF 174-8) at 284:6-285:9. The Investigative Summary records the

explanations he gave ("[redacted]; [redacted]) and notes that the [redacted] Def. Ex. F (ECF 169-6) at 11; Defs.' 56.1 ¶¶ 44-45, 51, 57.

8.4. Plaintiff utilizes nicknames for students and others as a way to address and cope with [redacted] and to address his difficulty remembering names. *See* Def. Ex. F at 10.

**Defendants' Response**: Undisputed that the Investigative Summary reports the explanation Plaintiff offered for his use of nicknames, Def. Ex. F (ECF 169-6) at 11; otherwise immaterial.

9.1. Plaintiff used, and uses, the term "moron" colloquially and not in any way to be offensive or a remark on someone's intellect. *See* Def. Ex. D at 215:5-216:4.

**Defendants' Response**: Disputed in part, and immaterial. The cited testimony does not support the statement: Plaintiff testified that he used [redacted] Def. Ex. D (ECF 174-7) at 215:5-216:4. Plaintiff's subjective intent is not material: students reported being called [redacted] and the Dean's letter identified his [redacted] among the confirmed findings. Def. Ex. J (ECF 174-18) at 44-45; Def. Ex. F (ECF 169-6) at 7; Def. Ex. NN (ECF 174-68) at 5.

## III. In 2022, Faculty and Students Raise Concerns About Plaintiff's Performance as Chair

11.1. Prior to 2022, Plaintiff had never been the recipient of any discipline or counseling at Einstein. There had never been a complaint against him by either students, faculty, or staff at Einstein. *See* Def. Ex. L at 31:13-32:9, 50:16-22.

**Defendants' Response**: Disputed. The cited testimony does not address discipline or counseling, and it establishes only that Ms. Ramirez did not recall complaints before 2022.

Def. Ex. L (ECF 174-20) at 31:13-32:9, 50:16-22. The record shows otherwise: Plaintiff's own February 26, 2022 email acknowledged his "mishandling" of a complaint prior to 2022, which he admits "may" have made "the general student population have concerns with [his] actions." Def. Ex. E (ECF 174-13) at 2; Defs.' 56.1 ¶ 23 (undisputed); students told the investigator that [redacted] Def. Ex. F (ECF 169-6) at 11; and the faculty's Letter of Concern described "recurring accounts from faculty and students of autocratic and inappropriate behaviors," Def. Ex. M (ECF 174-25).

**A. Student Concerns About Plaintiff's Conduct**

13.1. The GEC survey default report reflected, among other things, that: (i) 66% of responding students felt connected to their peers outside of the lab; (ii) 57% of responding students felt connected to the faculty; (iii) 80% of responding students felt the Department was collegial; (iv) 46% of responding students were satisfied with the Department's commitment to diversity and creation of an inclusive atmosphere; (v) 80% of responding students were satisfied with the Department's commitment to promoting gender equality; (vi) 51% of responding students felt comfortable or felt neutral about bringing their concerns or making suggestions to Plaintiff; (vii) 60% of responding students were confident or felt neutral about the Department's leadership taking action in response to concerns; and (viii) 68% of responding students were satisfied overall with the Department. *See* Def. Ex. I.

**Defendants' Response**: Disputed in part, but immaterial. The Default Report reflects that 64.4% (not 66%) of respondents felt connected to their peers and that 73.3% (not 80%) were satisfied with the Department's commitment to gender equality, Def. Ex. I (ECF 174-17) at 4, 9; the "51%" and "60%" figures are reached only by counting "neutral" responses;

and the same report reflects that 48.9% of respondents were not comfortable raising concerns with Plaintiff and that only 33.3% were confident that leadership would take appropriate action, *id.* at 11-12; *see* Defs.' 56.1 ¶ 13.

18.1. Dr. Burns was already aware of the survey results from a prior discussion with Dr. Jordan. In response to Dr. Freedman's notice of the NGSO Summary, Dr. Burns originally responded "let's see how this plays out". *See* Ex. 1. Dr. Burns later shared the materials with Ms. Ramirez. *See* Def. Ex. K.

**Defendants' Response**: Immaterial. Undisputed that Pl. Ex. 1 (ECF 209-2) contains the quoted language and that Def. Ex. K (ECF 174-19) reflects that Dr. Burns forwarded the materials to the Title IX Coordinator "[a]s per college policy." Pl. Ex. 1 predates the NGSO summary and does not refer to any survey results. Defs.' 56.1 ¶ 14 (undisputed).

**B. Faculty Concerns About Plaintiff's Performance as Chair**

19.1. Prior to sending the Letter of Concern, senior members of the Department had met with then-Executive Dean, Edward Burns ("Dr. Burns") regarding their concerns. At such time, Dr. Burns encouraged the faculty members not to send the Letter to Plaintiff, but to determine, as was the Department's usual way, a manner in which to work out the issues collegially with Dr. Khodakhah. *See* Def. Ex. U at 22:9-25:23, 29:9-21.

**Defendants' Response**: Undisputed.

19.2. Members of the Department, including Pablo Castillo, lobbied to coerce senior and junior faculty to sign the Letter of Concern in an effort to attack Plaintiff and remove him as Chair or even as a faculty member altogether. *See* Ex. 15 at ¶¶ 6-12, Ex. 11 at ¶¶ 15, 23; Ex. 17 at ¶¶ 6-9, 13; Def. Ex. D at 112:9-114:4, 148:9-149:3.

**<u>Defendants' Response</u>**: Disputed, but immaterial. None of the cited material is a first-hand account of coercion: it consists of what others told Plaintiff, Def. Ex. D (ECF 174-5) at 112:3-8, 113:9-25; (ECF 174-6) at 148:9-16; "rumors" reported by Dr. [redacted], Pl. Ex. 11 (ECF 209-12) ¶¶ 15, 23; what Dr. Hébert "came to learn" afterwards, Pl. Ex. 15 (ECF 209-16) ¶¶ 7-8; and what junior faculty "reported" to Dr. [redacted], whose own account is that she was asked to sign and declined, Pl. Ex. 17 (ECF 209-18) ¶¶ 7-9. Defendants object to those portions under Fed. R. Civ. P. 56(c)(2) and (c)(4). Plaintiff does not dispute that the faculty who drafted the Letter of Concern did not oppose him because of his sex. Defs.' 56.1 ¶ 66.

<u>19.3.</u> Of the signatories to the Letter of Concern, one was a Professor Emeritus who had not actively worked for Einstein and had been retired for over a decade, and at least two of the signatories had not presented on campus in several years due to personal medical issues. *See* Def. Ex. L at 68:17-72:24; Def. Ex. D at 158:8-19.

**<u>Defendants' Response</u>**: Disputed, but immaterial. The cited testimony does not support the statement. Ms. Ramirez testified that she believed all of the signatories were employed by Einstein as of February 2022, that she did not know when one signatory last taught, and that she "would have to check" whether another was on leave. Def. Ex. L (ECF 174-21) at 68:21-25, 70:10-72:24. The remaining citation is Plaintiff's own account of what he told Dr. Burns and Ms. Ramirez. Def. Ex. D (ECF 174-6) at 158:8-19.

## IV. Plaintiff and Einstein Respond to Faculty and Student Concerns Regarding Plaintiff's Leadership

<u>22.1.</u> Plaintiff was puzzled upon receipt of the Letter of Concern as "a large number of the statements" were "totally wrong" and believed that there had been "some major misunderstanding". *See* Def. Ex. D at 103:23-104:11.

**<u>Defendants' Response</u>**: Undisputed that Plaintiff so testified. Disputed that any statement in the Letter of Concern was "totally wrong" or the product of a "misunderstanding," which the cited testimony does not establish; the Investigative Summary confirmed the Letter's concerns. Defs.' 56.1 ¶¶ 49-58. Otherwise immaterial.

<u>22.2.</u> For example, the Letter of Concern referenced "recent departure of three experienced administrators" as being due to their interactions with Plaintiff. *See* Def. Ex. M.

**<u>Defendants' Response</u>**: Undisputed.

<u>22.3.</u> None of the staff or administrators referenced reported their reason for leaving the Department as having anything to do with their interactions with Plaintiff. *See* Def. Ex. L at 61:64:19; Def. Ex. R at 1.

**<u>Defendants' Response</u>**: *See* Defendants' response to ¶ 7.1, which is incorporated here.

<u>22.4.</u> The Letter of Concern further referenced "recent failures to fill vacancies in the office" as being due to low office morale caused by Plaintiff. *See* Def. Ex. M.

**<u>Defendants' Response</u>**: Undisputed.

<u>22.5.</u> While there was potentially low morale in the department, such was caused by the inability to hire and recruit new employees due to budgetary constraints, and the resultant effect it had on the workload of those in the Department. *See* Def. Ex. D at 101:3-102:8.

**<u>Defendants' Response</u>**: Disputed, but immaterial. The cited testimony is Plaintiff's own opinion about the cause of low morale and does not establish it; it is also internally inconsistent—he testified both that morale was "[p]retty low" and that "I didn't think that the morale was low," and that he "did not have any evidence that anyone was crying. I still

do not." Def. Ex. D (ECF 174-5) at 101:3-8, 101:23-102:8. The Investigative Summary reports the staff members' own accounts. Def. Ex. F (ECF 169-6) at 12-13.

22.6. Plaintiff went to great lengths to work with Dean Tomaselli to address recruitment and budgetary issues to address these concerns but was rebuffed by the dean. *See* Def. Ex. L at 66:24-67:5.

**Defendants' Response**: Disputed, but immaterial. The cited testimony says nothing about Dean Tomaselli, any effort by Plaintiff, or any rebuff; Ms. Ramirez testified only that, before seeing the Letter of Concern, she had no belief that the Department's recruiting difficulties related to the environment Plaintiff created. Def. Ex. L (ECF 174-21) at 66:24-67:5.

22.7. Indeed, all of Einstein's departments experienced difficulties recruiting staff following the COVID-19 pandemic. Adding to this difficulty was a "pause" on hiring and salaries at Einstein following the pandemic. *See* Def. Ex. L at 65:13-67:5. The difficulties in recruiting, hiring, and maintaining staff in the department had nothing to do with Plaintiff or the environment he created in the Department as Chair. *Id*.

**Defendants' Response**: Disputed in part, but immaterial. The Investigative Summary reports the staff members' own accounts of their reasons for leaving. Def. Ex. F (ECF 169-6) at 12.

22.8. With respect to the Letter of Concern's reference to "a recent survey" revealing the "students have a negative outlook about departmental leadership", the only survey Plaintiff was vaguely aware of at that time was the GEC survey. The GEC survey results showed, on a scale of 1 (strongly agree) to 5 (strongly disagree), a score of

3.229 for the prompt "I am confident that if I raised a concern to the leadership in the Department that they would take appropriate action." *See* Def. Ex. I at 28.

**Defendants' Response**: Undisputed as to the quoted score, and immaterial.

22.9. In Plaintiff's response to the Letter of Concern, Plaintiff addressed the categories of concerns referenced in the Letter of Concern, including the reference to departure of staff, difficulty recruiting, student survey results, and invited the faculty to meet with him so he could "hear your specific concerns to see how I can serve the department better". *See* Def. Ex. R.

**Defendants' Response**: Undisputed.

22.10. Dr. Khodakhah also copied Yvonne Ramirez ("Ms. Ramirez") from Einstein's Human Resources Department ("HR") on his response and requested that she and Dr. Burns "interview the staff who have departed, and our current staff, so that they can uncover the facts, and con provide me and the Dean with their frank assessment." *Id*. In doing this, Plaintiff wished for HR to conduct an investigation into the faculty's concerns. *See* Def. Ex. D at 138:16-139:4, 143:2-5.

**Defendants' Response**: Undisputed.

25.1. Despite testifying that she wished to discuss the matter with Plaintiff during her Title IX assessment, prior to meeting with Plaintiff, Ms. Ramirez was confident there were no Title IX violations potentially implicated by the NGSO survey. *See* Def. Ex. L at 81:12-83:17; Def. Ex. N at 1.

**Defendants' Response**: Disputed as characterized. Nothing in the cited testimony suggests that her assessment was complete before she met Plaintiff. Ms. Ramirez testified that her February 27 view was "[b]ased on my review of the materials," that "we were looking at

every possibility," and that "we did not want to pursue a course of action until we had had a discussion with Dr. Khodakhah." Def. Ex. L (ECF 174-21) at 83:20-84:17. The same day, she wrote that she "would like to know more about what may have triggered the survey and the letter" and proposed "further inquiries" before meeting him. Def. Ex. N (ECF 174-26) at 2; Def. Ex. S (ECF 174-44) at 3.

<u>25.2.</u> During Plaintiff's meetings with Ms. Ramirez and Dr. Burns, they acknowledged that they knew the allegations against Plaintiff were false and acknowledged the lack of merit in the Letter of Concern, but they needed to appear responsive and deal with the concerns carefully because of the #MeToo movement, and to "appear to be responsive to complaints raised by various groups". *See* Def. Ex. D. at 157:3-163:21; Def. Ex. L at 112:3-19; Def. Ex. U at 65:17-66:5.

**<u>Defendants' Response</u>**: Disputed. Nothing in the cited testimony is an acknowledgment by Ms. Ramirez or Dr. Burns that any allegation was false. Plaintiff's own account is that the remarks concerned the Letter of Concern's statements "about the staff," Def. Ex. D (ECF 174-6) at 157:17-158:22, 163:2-14, and he does not "recall exactly the verbiage used," *id.* at 164:16-18. The phrase "appear to be responsive to complaints raised by various groups" is from Plaintiff's own March 8, 2022 email, Def. Ex. W (ECF 174-51), and the "groups" were "the staff, the students … [a]nd the faculty," Def. Ex. D (ECF 174-7) at 230:7-25. Ms. Ramirez testified that she "did not say" the College needed to appear responsive and did not have the information to call the concerns baseless, Def. Ex. L (ECF 174-22) at 111:20-112:16; Dr. Burns testified that he "wouldn't say" the Letter's assertions were incorrect and that he never told Plaintiff the College had to look into allegations it disbelieved because of the #MeToo movement, Def. Ex. U (ECF 174-47) at 63:16-20,

65:17-66:18. Plaintiff himself testified: "I don't think it was a bias against me." Def. Ex. D (ECF 174-7) at 222:22-23.

25.3. In a meeting between Dr. Burns and Plaintiff, Dr. Burns asked Plaintiff to step down from his position as Chair while Einstein investigated the concerns raised by students and faculty. *See* Ex. 3. Plaintiff advised that he would think about it and consider the option to step down with his family. *Id*.

**Defendants' Response**: Undisputed.

25.4. Plaintiff separately advised Ms. Ramirez that he had been contacted by several faculty members who advised him of division amongst the faculty regarding the Letter of Concern and disagreement with the way the Letter of Concern was handled. *See* Ex. 2.

**Defendants' Response**: Undisputed that Plaintiff's email relayed what Dr. [redacted] had told him about "heated discussions" among faculty. Pl. Ex. 2 (ECF 209-3). Disputed that the email says anything about how the Letter of Concern was "handled"; it does not, and the point is immaterial in any event.

28.1. As of March 2, 2022, Einstein had already determined that if they pursued an investigation, Plaintiff would not be permitted the ability to appeal or contest any findings, and intended to present and force Plaintiff to agree to such terms. *See* Ex. 4.

**Defendants' Response**: Disputed. Pl. Ex. 4 (ECF 209-5) is an email from Ms. Ramirez to Dr. Burns "outlining possible next steps" on the evening of March 1, 2022. It says nothing about an appeal, contesting findings, or forcing Plaintiff's agreement; it states that "[i]f none of the allegations are … proven or confirmed then he will not be expected to resign" and that recommendations "may result in sanctions which may be somewhere in between."

*Id.* Plaintiff himself had asked for a "full review" and had written that if he had been "in anyway unprofessional" toward staff he would "promptly resign." Defs.' 56.1 ¶¶ 22-23 (undisputed); Def. Ex. R (ECF 174-43) at 3.

30.1. In Plaintiff's March 8, 2022 email, Plaintiff unequivocally rejected the suggestion to step down pending the investigation. *See* Def. Ex. W at 1.

**Defendants' Response**: Undisputed.

35.1. Plaintiff expressly did not step down as Chair. *See* Def. Ex. W. Dean Tomaselli was aware of Plaintiff's refusal to step down as Chair as of the time of his March 10 notice to the Department. *See* Def. Ex. O at 39:15-40:15, 79:6-82:22. Dean Tomaselli's statement to the Department regarding Plaintiff "step[ping] down as Chair during the pendency of the investigation" was a lie. *Compare* Def. Ex. W *with* Def. Ex. X and Def. Ex. Y; *See* Def. Ex. O at 79:6-19; Def. Ex. D at 357:4-358:7.

**Defendants' Response**: Undisputed that Plaintiff declined to step down and that Dean Tomaselli suspended his appointment as Chair. Def. Exs. W, X, Y (ECF 174-51 to -53); Defs.' 56.1 ¶¶ 30-35 (undisputed). Disputed that the Dean's message was "a lie," which is Plaintiff's characterization, not a fact, and is immaterial. The cited testimony does not establish what the Dean knew when he wrote it—he did not "recall the specific timing"—and he explained that "giving Dr. Khodakhah the opportunity to step down rather than being suspended was the rationale." Def. Ex. O (ECF 174-28) at 80:2-25. Plaintiff's same-day reply acknowledged that the Dean had "chosen to suspend my responsibilities as the Chair." Def. Ex. Y (ECF 174-53) at 2.

## V. The Chair Investigation

### A. The T&M Review

41.1. The inclusion of a reference specifically to Title IX indicated to Plaintiff the potential for "gender-based discrimination allegations" against him as part of the investigation. *See* Def. Ex. D at 360:2-13.

**Defendants' Response**: Undisputed that Plaintiff testified to the quoted language; disputed as characterized. The cited testimony is Plaintiff's reading of Dean Tomaselli's March 16, 2022 email to the Department, which he was not sent. Def. Ex. D (ECF 174-9) at 359:5-16, 360:2-13. The email does not refer to allegations against Plaintiff; it states that if the investigator "may come across a situation which may lead to a Title IX complaint," the "Title IX Coordinator should be contacted and a separate process be invoked." Def. Ex. EE (ECF 174-59) at 3. Plaintiff testified that gender "had not even occurred to me" when he responded to the Letter of Concern. Def. Ex. D (ECF 174-6) at 150:9-19.

44.1. The bulk of Plaintiff's interview focused on Plaintiff's impression of Dean Tomaselli. Roughly 45 minutes of the interview consisted of Mr. Prusan asking Plaintiff questions about the allegations against him while the remaining three and a half hours was dedicated to "why he had the impression – Dean Tomaselli was against me." *See* Def. Ex. D at 281:16-282:11.

**Defendants' Response**: Undisputed that Plaintiff so estimated in his testimony. The same testimony confirms that he was questioned about the specific allegations against him, Def. Ex. D (ECF 174-8) at 281:23-282:7; Defs.' 56.1 ¶ 44 (undisputed), and Mr. Prusan testified that "[a]ny allegation that was mentioned in the report, he was definitely asked about," and that he tried to "give him every opportunity to … retort to the allegations," Def. Ex. V (ECF 174-49) at 58:8-12. Otherwise immaterial.

## VII. Plaintiff's Separate Title IX Proceedings

63.1. Ms. Ramirez learned of the first set of allegations in or around late April of 2022. In speaking with the potential complainant, Ms. Ramirez made it a point to ask if she knew any other individuals who would come forward with misconduct or harassment allegations against Plaintiff, and one person was identified. Neither of the potential complainants wanted to pursue an investigation and so, in July of 2022 (four months later), Ms. Ramirez took it upon herself to initiate two Title IX investigations against Plaintiff as the stand-in complainant. *See* Def. Ex. L at 137:14-140:9, 141:21-142:15.

**Defendants' Response**: Disputed as characterized, and immaterial; the Title IX investigations are not at issue on this motion. *See* ECF 79 at 29-35; ECF 88 at 2-6. The cited testimony does not say that Ms. Ramirez "took it upon herself"; she testified that she filed the complaints "because it was our obligation to do, to have an investigation," and that the first complainant contacted her in late April or early May 2022, about ten weeks before the complaints were filed. Def. Ex. L (ECF 174-22) at 138:12-16, 140:7-9. The complaints "surfaced and were referred to [Ms. Ramirez] during the investigation process," Def. Ex. NN (ECF 174-68) at 2, and Einstein's Title IX policies expressly authorize the Title IX Coordinator to initiate a complaint, Def. Ex. XX (ECF 174-79) at 12, 16; Def. Ex. YY (ECF 174-80) at 16, 21.

65.1. Ms. Ramirez learned of the first set of allegations in or around late April of 2022. In speaking with the potential complainant, Ms. Ramirez made it a point to ask if she knew any other individuals who would come forward with misconduct or harassment allegations against Plaintiff, and one person was identified. Neither of the potential complainants wanted to pursue an investigation and so, in July of 2022 (four months

later), Ms. Ramirez took it upon herself to initiate two Title IX investigations against Plaintiff as the stand-in complainant. *See* Def. Ex. L at 137:14-140:9, 141:21-142:15

**<u>Defendants' Response</u>**: *See* Defendants' response to ¶ 63.1, which is incorporated here.

## <u>PLAINTIFF' STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO FED. R. CIV. P 56.1</u>

### A. Plaintiff's Relationship and History of Disagreements with Dean Tomaselli.

79. In or around 2018, Gordon Tomaselli ("Dean Tomaselli") was appointed Dean of Einstein. *See* Ex. Def. D at 54:25-55:12.

**<u>Defendants' Response</u>**: Undisputed.

80. Plaintiff served on the search committee who selected Dean Tomaselli's for hire; Dean Tomaselli was Plaintiff's top choice to fill the role. *See* Def. Ex. D at 55:13-56:7.

**<u>Defendants' Response</u>**: Undisputed.

81. Plaintiff maintained a professional relationship with Dean Tomaselli; however, early into Dean Tomaselli's tenure as dean, disagreements arose regarding Dean Tomaselli's performance and support for the College and Department. *See* Def. Ex. D at 56:11-68:12.

**<u>Defendants' Response</u>**: Undisputed that Plaintiff so testified; otherwise immaterial.

82. Plaintiff's disagreements with Dean Tomaselli concerned, among other things, the dean's lack of responsiveness to emails, reneging on offer letters to staff and new hires, failure to address budget concerns for the College and department, and failure to support the animal facility vital to the department's research efforts. *Id*.

**<u>Defendants' Response</u>**: Undisputed that Plaintiff so testified; otherwise immaterial.

83. As a result of Dean Tomaselli's poor performance, Plaintiff tendered his resignation as Chair in 2021 which he later withdrew after being persuaded to remain as Chair by Dr. Ozuah. *See* Def. Ex. D at 68:13-69:8.

**Defendants' Response**: Undisputed that Plaintiff tendered his resignation as Chair in 2021 and later withdrew it. Def. Ex. D (ECF 174-4) at 68:13-69:8. Otherwise disputed, and immaterial. That the resignation resulted from Dean Tomaselli's "poor performance" is Plaintiff's opinion, and the cited testimony does not say that Dr. Ozuah "persuaded" Plaintiff to remain as Chair—only that Dr. Ozuah "called me." *Id.* at 69:5-8. Dean Tomaselli testified that he asked Plaintiff to stay on as Chair. Def. Ex. O (ECF 174-27) at 23:20-24:4.

84. Still, Dean Tomaselli described his relationship with Plaintiff as "not unlike [his] working relationship with other department chairs" and Plaintiff's complaints as "no more than other departments" and "pretty much similar to other complaints about resources [and] resources for departments." *See* Def. Ex. O at 19:18:23-21:3.

**Defendants' Response**: Undisputed.

### B. Members of the Department's Efforts to Concoct and Manipulate Reports of Misconduct Against Plaintiff as Part of the Letter of Concern and Student Surveys

85. Beginning in February of 2022, senior faculty members of the department engaged in a concerted campaign against Plaintiff. In so doing, the senior faculty sought to garner, and where necessary, fabricate salacious allegations of misconduct against Plaintiff with the intent to oust Plaintiff as Chair. *See* Ex. 11; Ex. 15; Ex. 16; Ex. 17.

**Defendants' Response**: Disputed, and immaterial. The statement cites four declarations in their entirety and identifies no paragraph of any of them, *see* Local Civ. R. 56.1(d); Fed. R. Civ. P. 56(c)(1)(A), and no declarant states that any allegation was fabricated: Dr. [redacted] reports "rumors," Pl. Ex. 11 (ECF 209-12) ¶¶ 15, 23; Dr. Hébert reports what unnamed colleagues told him, Pl. Ex. 15 (ECF 209-16) ¶¶ 7-11; Dr. Krzyspiak states that her comments were "taken out of context," Pl. Ex. 6 (ECF 209-7); Pl. Ex. 16 (ECF 209-17)

¶ 7; and Dr. [redacted] describes her "general perception," Pl. Ex. 17 (ECF 209-18) ¶ 4. Defendants object to those portions under Fed. R. Civ. P. 56(c)(2) and (c)(4). Plaintiff does not dispute that the faculty who drafted the Letter of Concern did not oppose him because of his sex. Defs.' 56.1 ¶ 66.

86. By way of example, Dr. Jordan contacted students to discuss a survey concerning the Neuroscience Department. Dr. Jordan represented that the survey revealed a distrust of Plaintiff and led students to believe that he was gathering examples to speak directly to Plaintiff about. *See* Ex. 16 at ¶ 1, 13-15.

**<u>Defendants' Response</u>**: Disputed in part, and immaterial. Dr. Krzyspiak's declaration describes her own "understanding" of Dr. Jordan's intentions and states that she told Dr. Jordan that her comments were "not secret" and that he could refer to them in speaking with Plaintiff. Pl. Ex. 16 (ECF 209-17) ¶¶ 3, 5. Her account of Dr. Jordan's contacts with other former lab members is based on her "conversations with these lab members," *id.* ¶¶ 13-15, to which Defendants object under Fed. R. Civ. P. 56(c)(2) and (c)(4).

87. In February of 2022, Dr. Jordan contacted [redacted] ("Dr. [redacted] a former graduate student of Plaintiff's laboratory. In his discussion, he described certain situations that had come to his attention, such as Plaintiff's alleged [redacted] and asked for Dr. [redacted] perspective on the scenario as a woman and former student. *See* Ex. 16 at ¶¶ 3-5.

**<u>Defendants' Response</u>**: Undisputed that Pl. Ex. 16 (ECF 209-17) ¶¶ 3-5 so states.

88. This incident, as described and known to Dr. Jordan as of February 2022, formed the basis of one of the later brought Title IX investigations against Plaintiff. *See* Def. Ex. NN.

**Defendants' Response**: Disputed as characterized. Nothing in Def. Ex. NN (ECF 174-68) refers to Dr. Jordan or to February 2022; it states that the two complaints "surfaced and were referred to [Ms. Ramirez] during the investigation process." *Id.* at 2. In any event, immaterial, because the Title IX investigations are not at issue. *See* ECF 79 at 29-35; ECF 88 at 2-6.

89. Dr. Jordan asked Dr. [redacted] to provide further examples and context of her interactions with Plaintiff to assist in his anticipated discussion with Plaintiff. *See* Ex. 16 at ¶¶ 3-5.

**Defendants' Response**: Undisputed that Pl. Ex. 16 (ECF 209-17) ¶¶ 3-5 so states.

90. Instead, Dr. Jordan used Dr. [redacted] statements and incorporated them into the NGSO Summary without her prior knowledge or consent. *See* Ex. 16 at ¶¶ 6-8. Dr. [redacted] never took the purported NGSO survey or any student survey as related to the investigation against Plaintiff. *See* Ex. 6; *See* Ex. 16 at ¶¶ 6-7.

**Defendants' Response**: Undisputed that Dr. [redacted] so declares and that she did not take the NGSO survey. Disputed that Dr. Jordan prepared or compiled the NGSO summary: the cited paragraphs do not say so, the summary was prepared and sent by the NGSO's student co-chairs, Def. Ex. J (ECF 174-18) at 2; Def. Ex. L (ECF 174-21) at 56:23-25, and Dr. [redacted] own account is that her comments "were included in the survey on my behalf," Pl. Ex. 6 (ECF 209-7). In any event, immaterial.

91. Dr. Jordan used manipulated statements from students, such as Dr. [redacted] to draft the NGSO Summary, and then used that document as a means to coerce faculty into signing the Letter of Concern. *Id.*

**Defendants' Response**: Disputed. Nothing in Pl. Ex. 16 or Pl. Ex. 6 states that Dr. Jordan drafted the NGSO summary or used it to "coerce" anyone to sign the Letter of Concern.

The Letter of Concern is dated February 24, 2022, Def. Ex. M (ECF 174-25), the same day the NGSO co-chairs first sent their survey summary to Dr. Freedman, Def. Ex. J (ECF 174-18) at 2; Defs.' 56.1 ¶¶ 14, 19 (undisputed). Immaterial.

92. Senior faculty members persistently lobbied their colleagues in the Department to sign the Letter of Concern. *See* Ex. 15 at ¶¶ 7-8; *See* Ex. 11 at ¶¶ 15-13; *See* Ex. 17 at ¶¶ 4-9.

**Defendants' Response**: Disputed. The cited paragraphs contain no first-hand account of "persistent" lobbying: Dr. [redacted] reports "rumors from trusted colleagues," Pl. Ex. 11 (ECF 209-12) ¶ 15; Dr. Hébert reports what he "came to learn" afterwards, Pl. Ex. 15 (ECF 209-16) ¶¶ 7-8; and Dr. [redacted] own account is that she was asked to sign and declined, Pl. Ex. 17 (ECF 209-18) ¶¶ 6-8. Defendants object to those portions under Fed. R. Civ. P. 56(c)(2) and (c)(4). In any event, immaterial.

93. Some of those who joined as signatories to the Letter of Concern were led to do so under false pretenses; rather than use the Letter of Concern to open a conversation with Plaintiff about the Department, the Letter of Concern was used to push the "malevolent feelings of some of the senior male faculty" against Plaintiff. *See* Ex. 15 at ¶¶ 5-8.

**Defendants' Response**: Immaterial. Undisputed that Dr. Hébert's declaration uses the quoted phrase. Pl. Ex. 15 (ECF 209-16) ¶ 7. Disputed that any signatory signed "under false pretenses," which the cited paragraphs do not state; Dr. Hébert states that he signed because Plaintiff "can at times lack tact" and in order "to discuss how he might more gently approach certain members of our departmental community." *Id.* ¶ 5.

94. As of March 2022, Dr. Jordan already predicted, and it was his intent, that Plaintiff would be removed as Chair due to his efforts to collect damning allegations against Plaintiff. *See* Ex. 16 at ¶¶ 19-22.

**Defendants' Response**: Disputed, and immaterial. Defendants object under Fed. R. Civ. P. 56(c)(2) and (c)(4): the cited paragraphs relay Dr. Jordan's out-of-court statements and Dr. [redacted] speculation as to his intent. Pl. Ex. 16 (ECF 209-17) ¶¶ 19-22. Dr. Jordan was not a decisionmaker. Defs.' 56.1 ¶¶ 32, 58 (undisputed).

95. By way of further example, Pablo Castillo ("Dr. Castillo") and a group of select senior faculty approached other faculty members, including Dr. Jelena [redacted] ("Dr. [redacted]") to pressure them to join in a letter of complaint against Plaintiff. *See* Ex. 17 at ¶¶ 6-9.

**Defendants' Response**: Undisputed that Dr. [redacted] declares that Dr. Castillo and others asked her to sign the Letter of Concern and that she declined. Pl. Ex. 17 (ECF 209-18) ¶¶ 7-8. Otherwise disputed: Dr. [redacted] has no personal knowledge of what Dr. Castillo intended or of what was said to any other faculty member; her only basis as to others is what junior faculty "reported" to her, *id.* ¶ 9, which is hearsay. Fed. R. Civ. P. 56(c)(2), (c)(4). In any event, immaterial.

96. In particular, Dr. Castillo and his "collaborators" exerted significant pressure on junior faculty to join in complaints against Plaintiff. *Id.*

**Defendants' Response**: Disputed, and immaterial. Defendants object under Fed. R. Civ. P. 56(c)(2) and (c)(4): the statement rests on what "several junior faculty reported" to Dr. [redacted]. Pl. Ex. 17 (ECF 209-18) ¶ 9.

97. Those that never witnessed any inappropriate conduct by Plaintiff, such as Dr. [redacted] refused to sign despite mounting pressure. *Id.*

**Defendants' Response**: Undisputed that Dr. [redacted] declined to sign the Letter of Concern, Pl. Ex. 17 (ECF 209-18) ¶ 8; otherwise disputed and immaterial. Dr. Hébert

signed the Letter of Concern and states that he never witnessed inappropriate conduct by Plaintiff. Pl. Ex. 15 (ECF 209-16) ¶¶ 5, 13.

98. Dr. [redacted] attests that Dr. Castillo, with the knowledge and support of Dean Tomaselli, pursued Title IX allegations and incriminating information/evidence of Plaintiff's alleged sexual misconduct from faculty and students. This information, months later, became at least the partial basis for two formal Title IX investigations against Plaintiff. *See* Ex. 17 at ¶¶ 4-10, 13-14, 23.

**Defendants' Response**: Disputed, and immaterial, because the Title IX investigations are not at issue. Defendants object under Fed. R. Civ. P. 56(c)(2) and (c)(4). The statement rests on Dr. Castillo's out-of-court statements to Dr. [redacted] and on her "perception." Pl. Ex. 17 (ECF 209-18) ¶¶ 13-14, 23. Nothing in the cited paragraphs says that Dean Tomaselli knew of or supported anything Dr. [redacted] claims Dr. Castillo did, and the same paragraphs report that Dr. Castillo acknowledged that "the Title IX allegations would be weak" and that Plaintiff "certainly is 'not a sexual predator.'" *Id.* ¶¶ 13-14. Dean Tomaselli testified that he does not recall Dr. Castillo ever reporting Title IX concerns to him, and that "we weren't informed during the investigation what the investigation was uncovering." Def. Ex. O (ECF 174-28) at 106:12-15, 107:3-6. The Title IX complaints "surfaced and were referred to [Ms. Ramirez] during the investigation process." Def. Ex. NN (ECF 174-68) at 2.

99. Dean Tomaselli was aware of Dr. Castillo and Dr. Jordan's efforts and supported them. *Id.*

**Defendants' Response**: Disputed, and immaterial; *see* Defendants' response to ¶ 98, which is incorporated here.

100. Dean Tomaselli, Dr. Jordan, and Dr. Castillo weaponized Title IX to achieve their own malicious intentions against Plaintiff. *Id.*

**Defendants' Response**: Disputed. The statement is argument, not a statement of fact; the only cited support is Dr. [redacted] "perception." Pl. Ex. 17 (ECF 209-18) ¶ 15; *see Alliance Sec. Prods., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) (Kaplan, J.).

### C. Defendants Determine without Sufficient Inquiry that the Allegations against Plaintiff do not even Potentially Implicate Title IX and Deny Plaintiff His Statutorily Protected Procedural Rights in the Chair Investigation

101. The NGSO Summary consisted, among other things, of anonymous allegations of [redacted] by Plaintiff. *See* Def. Ex. J.

**Defendants' Response**: Undisputed that Def. Ex. J (ECF 174-18) contained anonymous student comments, including comments alleging sexist comments and inappropriate comments to female students as well as racial, disability-related, and bullying conduct. *Id.* at 25.

102. Specifically, the NGSO Summary alleged the following reports from students:

a. [redacted]

b. [redacted]

c. [redacted]

d. [redacted]

e. [redacted]

f. [redacted]

g. [redacted]

h. [redacted]

i. [redacted]

j. [redacted]

k. [redacted]

*See* Def. Ex. J at 44-45.

**Defendants' Response**: Undisputed that Def. Ex. J (ECF 174-18) at 44-45 contains the quoted statements, except that quote (a) omits the words [redacted] and quote (d) omits the sentence that follows: [redacted] The document describes the comments as "accounts" of students and labels each entry "STUDENT." *Id.* at 2, 44-45.

103. The NGSO Summary also reported that, when asked "if you have witnessed or experienced [Plaintiff] act inappropriately", 53.8% of responses indicated alleged gender-based misconduct and 30.8% of responses alleged sexual misconduct. *See* Def. Ex. J at 25.

**Defendants' Response**: Disputed in part, but immaterial. Def. Ex. J (ECF 174-18) at 25 reports 13 responses out of 32 to a check-all-that-apply question: 7 (53.8%) selected "Gender-related," 1 (7.7%) selected "Sexual," and 4 (30.8%) selected "Greater than a microaggression." The 30.8% figure does not correspond to "sexual misconduct." *Id.*

104. All potentially applicable versions of Einstein's Title IX Policy, including the 2018, 2020, and 2022 policies, prohibited sexual harassment and mandated that allegations of potential Title IX-Sexual Harassment follow a strict investigative and adjudicative process. *See* Def. Ex. XX; Def. Ex. VV; Def. Ex. YY; Def. Ex. UU; Def. Ex. WW.

**Defendants' Response**: Disputed as characterized; the policies speak for themselves. Under each version, the formal investigative and adjudicative process is triggered by a "Complaint" signed by the complainant or initiated by the Title IX Coordinator, who "may" do so upon determining that the allegations are "serious enough"; other reports are "Reports." Def. Ex. XX (ECF 174-79) at 12, 20; Def. Ex. YY (ECF 174-80) at 16-17, 25. Each policy notes that anonymous reporting "may affect the College of Medicine's ability to investigate and respond effectively." Defs.' 56.1 ¶¶ 73-74 (undisputed).

105. Einstein's 2018, 2020 and 2022 versions of the Title IX Policy defined Title IX-Sexual Harassment as "any *unwelcome* or *unwanted* sexual advances, or other verbal, physical, demonstrative, or electronic conduct or communication of a sexual nature, or which is directed at an individual because of the individual's sex. *See* Def. Ex. XX at 10-11; Def. Ex. VV at 7-8; Def. Ex. YY at 7-8; Def. Ex. UU at 6; Def. Ex. WW at 18.

**Defendants' Response**: Disputed. The quoted language is the policies' general definition of "sexual harassment," quoted without the conditions that follow it. Def. Ex. UU (ECF 174-76) at 10; Def. Ex. XX (ECF 174-79) at 9; Def. Ex. WW (ECF 174-78) at 19. "Title IX Sexual Harassment" is separately and more narrowly defined in the 2020 and 2022 policies as "sexual harassment that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to Einstein's education program or activity," Def. Ex. UU at 10; Def. Ex. XX at 9; *see* Def. Ex. VV (ECF 174-77) at 10; Def. Ex. YY

(ECF 174-80) at 10 ("Title IX Violation"), and conduct that does not rise to that level "may be otherwise prohibited by Einstein's Discrimination and Harassment Policy (Non-Title IX)," Def. Ex. UU at 11; Def. Ex. XX at 11. The 2018 policy contains no definition of "Title IX Sexual Harassment." Def. Ex. WW at 19-20.

106. The 2018, 2020, and 2022 Title IX Policies all provided the following examples of potential Title IX-Sexual Harassment: "comments of an overtly sexual nature"; "remarks of a sexual nature about an individual's clothing or body"; "remarks speculating about an individual's sexual orientation, activity or previous sexual experiences"; "verbal harassment of abuse of a sexual nature"; "making offensive gender-based remarks"; "unwanted touching, hugging, or brushing against an individual's body"; "bullying, yelling, or name-calling"; and "sexually discriminatory remarks made by someone which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation…" *Id.*

**Defendants' Response**: Disputed in part; the policies speak for themselves. The quoted phrases are the policies' examples of conduct that "may constitute" sexual harassment generally, not of "Title IX Sexual Harassment." Def. Ex. UU (ECF 174-76) at 10; Def. Ex. XX (ECF 174-79) at 10; Def. Ex. WW (ECF 174-78) at 19. "[B]ullying, yelling, or name-calling" appears in the employee policies only as an example of "hostile actions taken against an individual because of that individual's sex, sexual orientation, gender identity or expression, pregnancy status," or another protected characteristic, Def. Ex. UU at 11; Def. Ex. XX at 10; Def. Ex. WW at 20, and does not appear in the student policies, Def. Ex. VV (ECF 174-77) at 9-10; Def. Ex. YY (ECF 174-80) at 9-10. The final quotation omits the rest of the sentence: "and which interfere with the recipient's job performance." Def. Ex. UU at 11.

107. The allegations raised in the NGSO Summary [redacted] under the 2018, 2020, and 2022 Title IX Policies. *Compare* Def. Ex. J at 25, 44-45 *with* Def. Ex. XX at 10-11; Def. Ex. VV at 7-8; Def. Ex. YY at 7-8; Def. Ex. UU at 6; Def. Ex. WW at 18.

**Defendants' Response**: Disputed. The statement is a legal conclusion, not a statement of fact, and rests on the definition addressed in Defendants' response to ¶ 105. Einstein's Title IX Coordinator reviewed the NGSO materials for that purpose and "did not find that there was sufficient information to get to that conclusion." Def. Ex. L (ECF 174-21) at 54:11-17; *see* Def. Ex. N (ECF 174-26).

108. Implication of a Title IX policy mandated that Einstein follow its Title IX Policy in investigating the allegations against Plaintiff. *See* Def. Ex. O at 71:21-72:4 ("Q: But if Title IX had been implicated by the survey results or letter of concern, then an investigation would have had to follow the Title IX policy, is that right? A: That is correct, and the Title IX coordinator would have been involved.").

**Defendants' Response**: Undisputed that Dean Tomaselli so testified in response to a hypothetical. Def. Ex. O (ECF 174-28) at 71:21-72:4. In the same testimony, Dean Tomaselli explained that "[t]here was no allegations of any Title IX violations until after the original investigation by T&M where several were identified," that "Einstein was not … doing a Title IX investigation at that time," and that whether Title IX was implicated "was unknown at that time." *Id.* at 71:5-11, 71:19-20. When allegations that implicated Title IX did surface, they were referred to the Title IX Coordinator and investigated under the Title IX policy. Defs.' 56.1 ¶¶ 41, 63-65 (undisputed).

109. Ms. Ramirez determined within mere days that there were no Title IX violations and "nothing that rises to the level of sexual misconduct…" in the NGSO Summary, GEC Survey, or the Letter of Concern. *See* Def. Ex. N.

**Defendants' Response**: Undisputed that Def. Ex. N (ECF 174-26), dated February 27, 2022, states what it states. *See* Defs.' 56.1 ¶ 24. Disputed that it reflects a "determination" or an assessment of the GEC Survey: in the cited exhibit, Ms. Ramirez wrote that she did "not believe" there were Title IX violations, and the same email states that the materials reflected "obvious inappropriate conduct which needs to be addressed" and that "I suspect there is more." Def. Ex. N at 2. The GEC Default Report was not sent to her until the next day. Def. Ex. I (ECF 174-17) at 2.

110. Ms. Ramirez came to this determination because the allegations (i) included some non-gender or sex-based allegations, (ii) were anonymous and would have taken more work than Ramirez was willing to do to further investigate, and (iii) consisted of secondhand accounts of alleged behavior. *See* Def. Ex. L at 81:12-83:17.

**Defendants' Response**: Disputed. The cited testimony does not state that further inquiry "would have taken more work than Ramirez was willing to do" and does not address the first reason stated. Ms. Ramirez testified that the survey was anonymous, that "much of it" was "what I would consider hearsay" because "[n]o one said I witnessed," and that anonymous complaints "are very difficult to investigate." Def. Ex. L (ECF 174-21) at 81:20-82:14. In response to being asked whether she "determined that Title IX violation was not implicated," she responded, "We needed more information," and described taking additional steps, *id.* at 93:15-96:8; *see also* Defendants' response to ¶ 112, which is incorporated here.

111. Ms. Ramirez admits that none of these are actual barriers to finding that allegations raise a potential Title IX violation. *See* Def. Ex. L at 81:12-83:17.

**Defendants' Response**: Disputed as characterized. Ms. Ramirez testified in the abstract that an anonymous complaint "can" implicate Title IX and that a witness report "could" do so. Def. Ex. L (ECF 174-21) at 82:15-83:7. As to the NGSO materials, she testified that she "did not find that there was sufficient information to get to that conclusion." *Id.* at 54:15-17.

112. When questioned as to the applicability of the Title IX Policy definition to the individual allegations in the NGSO Summary, Ms. Ramirez admitted that at least some of the allegations in the NGSO Summary "could have" implicated Title IX but she did not do any further investigation into whether Einstein should pursue an investigation pursuant to the Title IX Policy. *See* Def. Ex. L at 81:12-83:17, 91:14-94:18.

**Defendants' Response**: Disputed. The cited testimony contradicts the statement. Asked what steps she took to get more information on whether the allegations implicated Title IX, Ms. Ramirez described them: she discussed the materials with Dr. Burns on February 27, 2022, met with Plaintiff in early March 2022, and, "based on his input to the process, decided to have an investigation conducted by an external investigator." Def. Ex. L (ECF 174-21) at 93:23-94:22. The "could have" answer was followed immediately by "[w]e needed more information," *id.* at 93:19-23, which the investigation intended to gather. She also spoke with Dr. Jordan, Dr. Freedman, and Dr. Burns about how and why the survey was conducted, Def. Ex. L (ECF 174-20) at 42:22-44:2, and instructed Mr. Prusan to notify her "right away" of any Title IX issue, which he did, Def. Ex. L (ECF 174-22) at 137:10-21; *see* Defs.' 56.1 ¶¶ 41, 63-65 (undisputed).

113. Dr. Burns did not make any inquiries into whether Title IX was implicated by the NGSO Summary allegations and "took it as a matter of fact that there were [no Title IX issues." *See* Def. Ex. U at 47:17-48:25.

**<u>Defendants' Response</u>**: Undisputed that Dr. Burns so testified. Def. Ex. U (ECF 174-46) at 47:17-48:25. Dr. Burns forwarded the NGSO materials to the Title IX Coordinator "[a]s per college policy" on the day he received them, Def. Ex. K (ECF 174-19), and testified that he relied on her judgment, Def. Ex. U (ECF 174-46) at 54:5-7.

114. Dean Tomaselli understood Title IX to refer to "misbehavior as it relates to sex, sexuality, those kinds of things." *See* Def. Ex. O at 70:9-19.

**<u>Defendants' Response</u>**: Undisputed that Dean Tomaselli so testified.

115. Dean Tomaselli's position was that none of the allegations in the NGSO Summary implicated Title IX because he believed "either gender could be offended" by the alleged behavior and "both genders have orgasms". *See* Def. Ex. O at 61:9-69:2)

**<u>Defendants' Response</u>**: Undisputed that Dean Tomaselli used the quoted words. Def. Ex. O (ECF 174-28; sealed ECF 169-15) at 62:19-20, 66:5-7. Disputed as characterized. Dean Tomaselli testified that the alleged conduct was "inappropriate" to "all students, not specific genders," that the allegations "would make a student of any gender feel uncomfortable," that "all groups were actually subject to this kind of demeaning kind of behavior," that the allegations were "potential violations of Einstein's code of conduct," and that whether Title IX was implicated "was unknown at that time." *Id.* at 66:14-16, 68:7-13, 68:22-69:8, 71:19-20.

116. The Chair Investigation was not conducted pursuant to any rendition of Einstein's Title IX Policy. *See* Def. Ex. O at 70:22-71:11 ("Einstein was not investigating – was not doing a Title IX investigation at that time").

**Defendants' Response**: Undisputed.

117. Plaintiff was not provided any of the procedural safeguards mandated for respondents under the Title IX Policy. *See* Def. Ex. O at 70:22-71:11.

**Defendants' Response**: Disputed. The cited testimony does not mention any procedural safeguard, and the statement identifies no policy provision. Def. Ex. O (ECF 174-28) at 70:22-71:11. It is undisputed that Ms. Ramirez sat with Plaintiff in early March 2022 while "he reviewed the document in its entirety," Def. Ex. L (ECF 174-22) at 108:2-3; Def. Ex. T (ECF 174-45) at 3; that Dean Tomaselli's March 10, 2022 letter described the concerns, Def. Ex. X (ECF 174-52); that Plaintiff was interviewed for more than four hours with counsel present and asked about each allegation, and submitted further explanations and dozens of documents afterward; and that he received Dean Tomaselli's July 11, 2022 letter describing Dean Tomaselli's assessment of Plaintiff's performance as Chair. Defs.' 56.1 ¶¶ 26, 31, 33, 44-45, 58-59 (undisputed); Def. Ex. NN (ECF 174-68) at 5-6.

118. Despite repeated requests, Plaintiff was never provided an opportunity to review the Investigative Summary. *See* Ex. 8; Ex. 9; Ex. 10

**Defendants' Response**: Undisputed that Plaintiff was not provided with the Investigative Summary before this litigation, in which it has been produced (Def. Ex. F); immaterial.

**D. Einstein Ignores Evidence Calling into Question the Validity of the Underlying Complaints Against Plaintiff**

119. Faculty and students raised concerns regarding the validity of the underlying survey data and the manner in which Einstein was pursuing the investigation against Plaintiff. *See* Ex. 11; Ex. 15; Ex. 16; Ex. 17.

**Defendants' Response**: Disputed. Defendants object under Fed. R. Civ. P. 56(c)(2) and (c)(4). The statement cites four declarations in their entirety and identifies no paragraph of any of them. *See* Local Civ. R. 56.1(d). The declarations describe were raised to the investigator himself—Dr. [redacted] April 14, 2022 email, Pl. Ex. 6 (ECF 209-7), and Dr. [redacted] April 20, 2022 interview, Pl. Ex. 11 (ECF 209-12) ¶¶ 16-17—or came after Dean Tomaselli had reached his decision. Defs.' 56.1 ¶ 58 (undisputed), Pl. Ex. 11 ¶¶ 21-22, 24; Pl. Ex. 17 (ECF 209-18) ¶ 17. Dr. [redacted] reference to "letters … sent to the Dean's office" identifies no author, date, or content, Pl. Ex. 17 (ECF 209-18) ¶ 16, and Dr. Hébert identifies no report to anyone at Einstein, Pl. Ex. 15 (ECF 209-16). In any event, immaterial.

120. By way of example, in or around March of 2022, Dr. [redacted] learned that statements she had made in confidence to Dr. Jordan were included, without her consent, in the NGSO Summary. *See* Ex. 16 at ¶¶ 6-12.

**Defendants' Response**: Undisputed that Dr. [redacted] declares this; immaterial. Pl. Ex. 16 (ECF 209-17) ¶¶ 6-12. Defendants further object under Fed. R. Civ. P. 56(c)(2) and (c)(4).

121. On April 14, 2022, Dr. [redacted] notified Mr. Prusan and Ms. Ramirez that Dr. Jordan had manipulated statements she made to him in confidence and, without her consent, included them in the NGSO Summary in "a derogatory manner" and in such a way as to "change[]

the nature of the conversation to the extent that it comes off as a very harsh allegation, that is now part of an investigation that is damaging [Plaintiff's] career…" *See* Ex. 6.

**Defendants' Response**: Undisputed, and immaterial. Ms. Ramirez replied the same day: "Thank you for bringing this to our attention. I trust Eric will represent your wishes accurately." Def. Ex. MM (ECF 174-67).

122. Despite knowledge that Dr. [redacted] statements were improperly and without her consent, included in the NGSO Summary, they remained as part of the basis for the investigation and the claims against Plaintiff were not changed to reflect the inaccuracy of Dr. [redacted] alleged allegation. *See* Ex. 16 at ¶¶ 6-12.

**Defendants' Response**: Disputed. The cited paragraphs say nothing about the Investigative Summary or the Dean's decision; Dr. [redacted] states only that her statements were "still included among the allegations being considered" at the time of her interview, which preceded her April 14 email. Pl. Ex. 16 (ECF 209-17) ¶ 11; Pl. Ex. 6 (ECF 209-7). The Investigative Summary does not refer to the comment she describes, Def. Ex. F (ECF 169-6), Mr. Prusan told Ms. Ramirez that "there's nothing in the report that leads to her," Def. Ex. L (ECF 174-22) at 149:15-20, and he included first-hand accounts only after he "verified it first person," Def. Ex. H (ECF 174-16) at 79:16-19. In any event, immaterial.

123. Dr. [redacted] was not the only student to come forward and notify Einstein that the allegations against Plaintiff were false and had been conspired and manipulated by the senior faculty. *See* Def. Ex. D at 204:13-209:9; *See* Ex. 16 at ¶¶ 13-15.

**Defendants' Response**: Disputed. Defendants object under Fed. R. Civ. P. 56(c)(2) and (c)(4). Plaintiff's testimony is that Dr. [redacted] told him what another former student had supposedly said ("she told you this herself? A. No."), that "there are two other students,

I'm told—I don't know who their names are," and that nothing was ever put in writing to Einstein. Def. Ex. D (ECF 174-7) at 205:6-8, 206:3-5, 208:15-20. Dr. [redacted] declaration does not state that any student reported to Einstein that any allegation was false. Pl. Ex. 16 (ECF 209-17) ¶¶ 13-15. No student other than Dr. [redacted] raised any such concern with Ms. Ramirez. Def. Ex. L (ECF 174-22) at 152:20-153:9; (ECF 174-23) at 158:1-8. Immaterial.

124. Ms. Ramirez still took no steps to determine whether the remaining allegations in the NGSO Summary were similarly tainted or false. *See* Ex. 16 at ¶¶ 6-12; Def. Ex. L at 148:13-154:4.

**<u>Defendants' Response</u>**: Disputed. Dr. [redacted] call to Ms. Ramirez came in August 2022, after the investigation had concluded and after Plaintiff's removal as Chair; Ms. Ramirez then contacted Mr. Prusan, discussed the call with him, and asked him to confirm whether anyone else had made the same allegation. Def. Ex. L (ECF 174-22) at 148:17-149:7, 152:5-8, 153:19-24; (ECF 174-23) at 164:9-15. Dr. [redacted] April 14 email had gone to the investigator himself. Pl. Ex. 6 (ECF 209-7). Nothing in Pl. Ex. 16 ¶¶ 6-12 addresses what Ms. Ramirez did. Immaterial.

125. Moreover, as of March 3, 2022, Ms. Ramirez was aware that students wanted their comments removed from the NGSO Summary and advised that the comments could be removed but that the students should be assured before they asked to remove comments that the NGSO Summary would never be shown to Plaintiff. *See* Ex. 5.

**<u>Defendants' Response</u>**: Disputed. Pl. Ex. 5 (ECF 209-6) reflects a request from one student to remove one comment "because according to her, it will clearly identify her"; Ms. Ramirez responded that "[i]f you would like to remove the comment and resend the

document that is fine" and that the document "will never be given to Kamran"; and Dr. Jordan responded that he would ask the student whether she still wanted the comment removed. *Id.* The email does not reflect that any student wished to retract a comment, or any instruction that students be "assured" of anything.

126. Ms. Ramirez had already shown Plaintiff the NGSO Summary including the students' alleged comments. Def. Ex. D at 198:11-199:12; Def. Ex. L at 109:7-110:3; Def. Ex. T at 3. This meeting took at least one hour. Def. Ex. L at 109:7-110:3.

**Defendants' Response**: Undisputed.

127. By way of further example, several faculty members met with Dr. Burns and Ms. Ramirez to express concern over the targeted attack on Plaintiff and the manner in which Einstein was handling the investigation. *See* Ex. 17 at ¶¶ 16-20; *See* Ex. 11 at ¶¶ 24-26.

**Defendants' Response**: Undisputed that Dr. [redacted] and Dr. [redacted] met with Dr. Burns and Ms. Ramirez on August 17, 2022, after Plaintiff's removal as Chair, and that they "were assured that [their] concerns would be considered seriously." Pl. Ex. 11 (ECF 209-12) ¶¶ 24, 26; *see* Pl. Ex. 17 (ECF 209-18) ¶ 18 ("They seemed surprised and supportive"). Otherwise disputed as characterized—neither declaration refers to a "targeted attack"—and immaterial.

128. Ms. Ramirez took no action to investigate reports that the allegations against Plaintiff were not raised in good faith. *Id.*

**Defendants' Response**: Disputed. The cited paragraphs describe the August 17, 2022 meeting and do not address what Ms. Ramirez did; [redacted] declares that they "were assured that our concerns would be considered seriously." Pl. Ex. 11 (ECF 209-12) ¶ 26.

It is undisputed that Ms. Ramirez directed individuals who contacted her during the investigation to T&M. Defs.' 56.1 ¶ 47. Immaterial.

129. Several faculty members were interviewed as part of the investigation conducted by Mr. Prusan including, but not limited to, [redacted] *See* Ex. 11 at ¶ 16.

**<u>Defendants' Response</u>**: Undisputed.

130. Dr. Alpert met with Mr. Prusan on or about April 20, 2022. During his interview, Dr. [redacted] shared [redacted] *See* Ex. 11 at ¶ 17.

**<u>Defendants' Response</u>**: Undisputed that Dr. [redacted] declares as such, Pl. Ex. 11 (ECF 209-12) ¶ 17, and immaterial.

131. In response, Mr. [redacted] *See* Ex. 11 at ¶¶ 18-19.

**<u>Defendants' Response</u>**: Disputed. Defendants object under Fed. R. Civ. P. 56(c)(2) and (c)(4) to Dr. [redacted] account of Mr. Prusan's out-of-court statements. In any event, the cited paragraph states that, as of April 20, 2022, Mr. Prusan "had so far found" no "there there," Pl. Ex. 11 (ECF 209-12) ¶ 19 — before T&M completed its 59 interviews, including Plaintiff's May 19, 2022 interview and his subsequent written submissions, Defs.' 56.1 ¶¶ 41, 44-45 (undisputed). Mr. Prusan testified that "[a]ny allegation that was mentioned in the report, [Plaintiff] was definitely asked about," and that the motivations of those who raised the allegations influenced the investigation "[z]ero." Def. Ex. V (ECF 174-49) at 58:8-14, 59:6-11.

132. After Dean Tomaselli advised Dr. [redacted] that Plaintiff would be removed as Chair in July of 2022, Dr. Alpert protested to which Dean Tomaselli advised that the investigation resulted in "very troubling findings" and that a Title IX investigation was coming. *See* Ex. 11 at ¶¶ 21-23.

**<u>Defendants' Response</u>**: Undisputed that Dr. [redacted] so declares. Pl. Ex. 11 (ECF 209-12) ¶¶ 21-23.

133. Dr. [redacted] met with Ms. Ramriez and Dr. Burns thereafter to express his concerns regarding the handling of the investigation. Rather than substantively address, Dr. [redacted] concerns, Ms. Ramirez and Dr. Burns implored [redacted] to convince Plaintiff to resign. *See* Ex. 11 at ¶¶ 24-26.

**<u>Defendants' Response</u>**: Disputed as characterized, and immaterial. [redacted] declares that he and Dr. [redacted] "were assured that our concerns would be considered seriously," and that Dr. Burns "also suggested" that they persuade Plaintiff that resigning would be in his best interests; the declaration does not attribute any such suggestion to Ms. Ramirez or state that anyone "implored" [redacted] to do anything. Pl. Ex. 11 (ECF 209-12) ¶ 26. The meeting occurred on August 17, 2022, after Plaintiff's removal as Chair. *Id.* ¶ 24. Defendants also object under Fed. R. Civ. P. 56(c)(2) and (c)(4).

Dated: October 30, 2026

Respectfully submitted,

By: ______________________

Roberta A. Kaplan
Christopher R. Le Coney
Tasha N. Thompson
KAPLAN MARTIN LLP
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 316-9500
rkaplan@kaplanmartin.com
cleconey@kaplanmartin.com
tthompson@kaplanmartin.com

Gabrielle E. Tenzer
Anna Collins Peterson
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
gtenzer@heckerfink.com
apeterson@heckerfink.com

*Counsel for Defendants Montefiore Medicine Academic Health System, Inc., and Albert Einstein College of Medicine*